ORIGINAL

FILED

JAN 10 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JSC

1  Tri Huynh - Pro Se Plaintiff
2  4015 134ᵗʰ Ave SE
   Bellevue, WA 98006
3  Telephone: (408) 757-5516
   E-mail: trimhuynh@outlook.com
4

5  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
6

7  TRI MINH HUYNH,                          Case No: **CV22   00142**

8  Plaintiff,

                     v.                      **COMPLAINT FOR DAMAGES FOR:**
9
   Walmart, INC., a Delaware Corporation;    1.  Violations of the Racketeer Influ-
10  WAL-MART.COM USA LLC, a California            enced and Corrupt Organizations
   Limited Liability Corporation; Doug McMil-     Act (18 U.S.C. § 1962(c));
11  lon; Brett Biggs; Marc Lore; Rachel Brand,
   Gregory B. Penner; Timothy P. Flynn; S.   2.  Violations of the Racketeer Influ-
12  Robson Walton; Seth Beal; Valerie Ricetti;    enced and Corrupt Organizations
   Audrey Au Joulani; Melvenia Ha; GIBSON,        Act (18 U.S.C. § 1962(d));
13  DUNN & CRUTCHER LLP a Limited Lia-
   bility Partnership; Theodore J. Boutrous Jr.;  3.  Bivens Actions;
14  Rachel S. Brass; Eugene Scalia; Ryan Carl-
15  ton Stewart; Chris Wilson; Susanna G.     4.  Violations of 42 U.S.C. §
   Schuemann; Mark Marchione; William H.         1985(3);
16  Thompson; The deRubertis Law Firm, APC
17  is a Professional Law; David deRubertis;   5.  Violations 42 U.S.C. § 1986;
   Kari deRubertis; Epig Global, a privately
18  own Corporation; Douglas Kasales; Kathy    6.  Abuse of Process;
   von Lindern; Lighthouse Global a privately
19  own Corporation; Renee Quezada ; Orrick    7.  Invasion of Privacy;
   Herrington & Sutcliffe LLP a Limited Lia-
20  bility Partnership; Payne & Fears LLP a     8.  Fraud;
   Limited Liability Partnership; Bank of
21  America Corporation, a Delaware Corpora-   9.  Civil Conspiracy
22  tion; Robert F. Ohmes; Matthew Boyle; and
   DOES 1 through 20.
23                                             **JURY TRIAL DEMANDED**

24  Defendant(s).

25

26

27

28

BY FAX

**COMPLAINT – DEMAND FOR JURY TRIAL**

**INTRODUCTION**

"Power Tends to Corrupt and Absolute Power Corrupts Absolutely" Lord Acton.

1.     This case is about the arrogance of power, and the institutionalization of a culture of greed, dishonesty, and ethical blindness by Walmart's senior executives to defraud investors to the tune of $140 Bil then acted criminally in an attempt to cover it up.

2.     This case is not about the fact that Walmart ripped off their shareholders to the tune of $140 Billion (that is for Walmart's shareholders to take legal actions against Walmart and their executives to make their injuries whole).  Rather this case is about how the Walmart Participants formed an association in fact enterprise (The Walmart Shareholder Fraud Coverup Enterprise) with the other RICO Defendants to design and execute a wicked, insidious, and nefarious six-pronged illegal coverup scheme to achieve the RICO Enterprise's common purpose of covering up Walmart massive shareholder fraud and ensures a risk free civil and criminal liabilities future for all of the members of the Enterprise.

3.     The paragraphs below discussed in details how the RICO Defendants committed numerous predicate acts and overt acts to effectuate the criminal enterprise's common purpose and, in the process, the RICO Defendants caused injuries to Huynh's properties, personal and professional reputation which gave rise to the nine causes of actions asserted in this litigation.

4.     In this complaint, DC Dkt referred to the United States District Court, Northern District of California Docket for the case Tri Huynh Plaintiff(s) v. WAL-MART STORES, INC., et al. Case 3:18-cv-01631-VC.

5.     In this complaint, COA Dkt referred to the United States Court of Appeals for the Ninth Circuit Docket for the case TRI MINH HUYNH, Plaintiff-Appellant, v. WAL-MART STORES, INC., WAL-MART ASSOCIATES, INC., and WAL-MART.COM, INC. Case: 20-15211.

## THE PARTIES

**PLAINTIFF**

6.     Plaintiff Tri Minh Huynh is a citizen of the United States and citizen of the State of Washington. Huynh currently resides in King County - Bellevue, Washington.

**RICO DEFENDANTS**

7.     Walmart, INC., a Delaware Corporation, headquartered at 702 S.W. 8th Street, Bentonville AR; WAL-MART.COM USA LLC, a California Limited Liability Corporation, headquartered at 850 Cherry Avenue, San Bruno, CA. WAL-MART.COM USA LLC is a wholly-owned subsidiaries of Walmart, INC. (collectively, "Walmart"). Walmart is being sued for the conducts of its employees, board of directors, and agents.

8.     Defendant Doug McMillon ("McMillon") is an individual residing in Bentonville, Arkansas. McMillon is being sued in his official and individual capacity.

9.     Defendant Brett Biggs ("Biggs") is an individual residing in Bentonville, Arkansas. Biggs is being sued in his official and individual capacity.

10.    Defendant Marc Lore ("Lore") is an individual residing in New York City, New York. Lore is being sued in his official and individual capacity.

**COMPLAINT – DEMAND FOR JURY TRIAL**

11.     Defendant Rachel Brand ("Brand") is an individual residing in Bentonville, Arkansas.  Brand is being sued in her official and individual capacity

12.     Defendant Gregory B. Penner ("Penner") is an individual residing in Menlo Park, California.  Penner is being sued in official capacity.

13.     Defendant Timothy P. Flynn ("Flynn") is an individual residing in Marana, Arizona.  Flynn is being sued in his official capacity.

14.     Defendant S. Robson Walton ("Walton") is an individual residing in Bentonville, Arkansas.  Walton is being sued in his official capacity.

15.     Defendant Seth Beal ("Beal") is an individual residing in Park City, Utah. Beal is being sued in his individual capacity.

16.     Defendant Valerie Ricetti ("Ricetti") is an individual residing in San Francisco, California. Ricetti is being sued in her individual capacity.

17.      Defendant Audrey Au Joulani ("Joulani") is an individual residing in Santa Monica, California. Joulani is being sued in her individual capacity.

18.     Defendant Melvenia Ha ("Ha") is an individual residing in Daly City, California. Melvenia is being sued in her individual capacity.

19.     Defendant GIBSON, DUNN & CRUTCHER LLP is a Limited Liability Partnership located at 333 South Grand Avenue, Los Angeles, CA 90071-3197. Gibson Dunn Crutcher is being sue for the conducts of its employees and agents.

20.     Defendant Theodore J. Boutrous Jr. ("Boutrous ") is an individual licensed to

4

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   practice law in the State of California under State Bar No. 132099. Boutrous is an individual

2   residing in Los Angeles, California. Boutrous is being sued in his official and individual ca-

3   pacity.

4

5       21.     Defendant Rachel S. Brass ("Brass ") is an individual licensed to practice law

6   in the State of California under State Bar No. 219301. Brass is an individual residing in San

7   Francisco, California. Brass is being sued in her official and individual capacity.

8

9       22.     Defendant Eugene Scalia ("Scalia ") is an individual licensed to practice law in

10  the State of California under State Bar No. 151540. Scalia is an individual residing in Mc

11  Lean, Virginia.  Scalia is being sued in his official and individual capacity.

12

13      23.     Defendant Ryan Carlton Stewart ("Stewart") is an individual licensed to prac-

14  tice law in the District of Columbia. Stewart is an individual believe to be residing in the Dis-

15  trict of Columbia. Stewart is being sued in his official and individual capacity.

16

17      24.     Defendant Chris Wilson ("Wilson") is an individual licensed to practice law in

18  the District of Columbia. Wilson is an individual believed to be residing in the District of Co-

19  lumbia. Wilson is being sued in his official and individual capacity.

20

21      25.     Defendant Susanna G. Schuemann ("Schuemann ") is an individual licensed to

22  practice law in the State of California under State Bar No. 332956. Schuemann is an individ-

23  ual residing in San Francisco, California.  Schuemann is being sued in her official and indi-

24  vidual capacity.

25

26      26.     Defendant Mark Marchione ("Marchione") is an individual residing Bakers-

27  field, California. Marchione is being sued in his individual capacity.

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

27.     Defendant William H. Thompson ("Thompson") is an individual believed to be residing the District of Columbia.  Thompson is being sued in his individual capacity.

28.     Defendant The deRubertis Law Firm, APC is a Professional Law Corporation located at 4219 Coldwater Canyon Ave, Studio City, CA 91604-1934 The deRubertis Law Firm, APC.  The deRubertis Law Firm, APC. is being sued for the conducts of its employees and agents.

29.     Defendant David deRubertis ("deRubertis ") is an individual licensed to practice law in the State of California under State Bar No. 208709. deRubertis is an individual residing in Studio City, California. deRubertis is being sued in his official and individual capacity.

30.     Defendant Kari deRubertis ("Kari deRubertis ") is an individual residing in Studio City, California. Kari deRubertis being sued in her individual capacity.

31.     Defendant Epig Global is a privately own company locate at 777 3rd Ave, 12th Floor, New York, New York 10017. Epig Global is being sued for the conducts of its employees and agents.

32.     Defendant Douglas Kasales ("Kasales "). Kasales is an individual believed to be residing in Henderson, Nevada.  Kasales is being sued in his official and individual capacity.

33.     Defendant Kathy von Lindern ("Lindern "). Lindern is an individual residing in Hermosa Beach, California. Lindern is being sued in her official and individual capacity.

34.     Defendant Lighthouse Global is a privately own Corporation Head Quarter at

**COMPLAINT – DEMAND FOR JURY TRIAL**

51 University Street, Suite 400, Seattle, WA 98101. Lighthouse Global is being sued for the conducts of its employees and agents.

35.     Defendant Renee Quezada ("Quezada") is an individual residing Bakersfield, California. Quezada is being sued in her official and individual capacity.

36.     Defendant Orrick Herrington & Sutcliffe LLP is a Limited Liability Partnership located at 405 Howard Street San Francisco, CA.  Orrick Herrington & Sutcliffe LLP is being sued for the conducts of its employees and agents.

37.      Defendant Payne & Fears LLP is a Limited Liability Partnership located at 4 Park Plaza, Suite 1100 Irvine, CA 92614. Payne & Fears LLP is being sued for the conducts of its employees and agents.

38.     Bank of America Corporation, a Delaware Corporation, headquartered at 100 N. Tryon Street Charlotte, North Carolina 28255. Bank of America Corporation is being sued for the conducts of its employees and agents.

39.     Defendant Robert F. Ohmes ("Ohmes") is an individual believed to be residing in the State of New York. Ohmes is being sued in his official and individual capacity.

40.     Defendant Matthew Boyle ("Boyle") is an individual believed to be residing in the State of New York. Boyle is being sued in his individual capacity

41.     Defendants designated as DOE 1-20 is intentionally and otherwise responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged. The true names and capacities of DOES 1 through 20, inclusive, and each of them, are not now known to Plaintiff who therefore sues

7

**COMPLAINT – DEMAND FOR JURY TRIAL**

said Defendants by such fictitious names. Plaintiff will amend this Complaint in accordance with FRCP 15 and California Code of Civil Procedure Section 474 to show their true names and capacities when same have been ascertained.

### Subject Matter Jurisdiction and Venue

42.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

43.     Huynh's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Huynh's state law claims under 28 U.S.C. § 1367.

44.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District, and/or a substantial part of property that is the subject of the action is situated in the District.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Statement of Facts**

45.     Huynh raised his complaints internally to Walmart's senior executives in late 2016 and early 2017 that he believes Walmart may have violated the laws by overcharging Marketplace seller commission fees and by making misleading statements to investors and investment analysts regarding the states of Walmart's Marketplace.  Walmart immediately terminated Huynh's employment without conducting a thorough investigation into his concerns. So, after leaving Walmart, Huynh retained Sean McKessy and Rebecca Chang at Phillips & Cohen LLP in Mar 2017 to help bring his concerns directly to the SEC.  Huynh submitted a TCR complaint to the SEC Office of the Whistleblower (https://www.sec.gov/whistleblower/submit-a-tip) at the end of April 2017. During the next one and half years Huynh and his counsels submitted hundreds of pages of documents (including emails akin to smoking gun evidence that linked Walmart's senior executives to intentional fraud and misrepresentations. See COA Dkt. 5-1 at 6-13; Dkt. 5-4 at 20-37, 58-109; Dkt. 16 at 45-49 and 63-64; Dkt. 33 at 8-12. and 33) as well as original analyses that support Huynh's allegations that Walmart committed fraud against shareholders.

i.     Exhibit I: An Outside in Analysis of Walmart's Shareholder Fraud (not submitted to the SEC)

ii.    Exhibit II: June 19, 2017 SEC Submission

iii.   Exhibit III: January 18, 2018 SEC Submission

    a.  It specifically showed that to the SEC that Jet.com annual GMV run rate for FY17 was roughly $600 Mil not $1,2000 Million.

iv.    COA Dkt. 5-4 at 75-94: May 15, 2018 SEC Submission

    a.  Walmart's executives pressured the Walmart's Marketplace Catalog with Quality and/or Low value SKUs to inflate the total number of Marketplace SKU reported to investors and analysts in FY17.

    b.  McMillon overstated the total number of Marketplace SKUs on Walmart.com by

9

        4.1  Mil SKUs during the Q2 FY17 earnings calls

v.     COA Dkt. 5-4 at 85-103: September 19, 2018 SEC Submission

    a.  McMillon inflated the total number of Marketplace SKUs on Walmart.com by classifying Walmart's 1P SKUs (Walmart's own products) as Walmart's Marketplace SKUs.

46.     In Mar 2017, Huynh began searching for Plaintiff employment attorneys to represent him in his SOX claim against Walmart.  Huynh had conversations with multiple Plaintiff employment lawyers. Subsequently, Huynh received contingency retainer agreement offers from seven law firms (including the deRubertis Law Firm) who wanted to represent him in his civil lawsuit against Walmart.

47.     In late Mar 2017, Huynh had multiple phone conversations with deRubertis to discuss his case against Walmart. Subsequently, deRubertis invited Huynh to meet with deRubertis in person at his office in Studio City, CA in early April 2017. At the meeting, Huynh informed deRubertis that he has also been working with Sean McKessy at Phillips & Cohen to submit Huynh's complaint to the SEC to report Walmart's illegal conducts by the end of April 2017.  deRubertis became visibly excited about this news because deRubertis realized that he just stumbled on a goldmine based on the seriousness of Huynh's allegations and the risks that Walmart could face if the SEC and/or the DOJ successfully investigated into Walmart's illegal conducts.  Huynh estimated the bounty that the Walmart Participants were willing to offer to the other members of the Walmart Shareholder Fraud (WSF) Coverup Enterprise if they effectuated the Enterprise's illegal coverup scheme could be as high as one Billion dollars.

48.     Based on the time line below, Huynh believed that sometime between Apr 4 and Apr 13, deRubertis contacted the Rescue Squad (the Gibson Dunn's team that represented Walmart in Huynh's civil and SEC matters) and the Walmart Participants to inform them that

1   Huynh was about to submit serious allegations of shareholder fraud against Walmart to the

2   SEC.  Subsequently, starting on Apr 13, 2017, deRubertis began to ask Huynh and McKessy

3   for confidential and non-public information Huynh had submitted to the SEC. Huynh now re-

4   alized that deRubertis' behaviors was abnormally weird because a typical Plaintiff employ-

5   ment lawyer would not ask for specific communications Huynh had with SEC, especially

6

7



8   *Tri - I forget whether the SEC submission asks about any internal reports or complaints. That issue overlaps with our case. In retrospect I actually think it's better that I review the SEC filing before you file it to make sure it is consistent with the issues that overlap on your individual case. Can you check with the SEC lawyers and make sure they are OK with that realizing it's under full attorney-client privilege?*

*Hi Tri – Just wanted to let you know that Sean and I spoke.  Sean will forward me the complaint he intends to file for you today. I will review it today to make sure looks ok and then will be back in touch with you.*

David deRubertis purportedly filed a complaint with OSHA

Walmart's senior executives began Whitewashing Campaign

4/4/17    4/13/17    4/18/17   4/20/17   5/11/17    5/18/17

Met at David deRubertis' office. Huynh told him that Huynh was working with Sean McKessy from Phillips & Cohen

David deRubertis the leaders of the Rescue Squad

Hi Tri – Draft of the retainer is attached.  I'm tied up today but can chat tomorrow to review it. Let me know your availability for a call tomorrow.

20  when the allegations of wrong doings could lead the SEC to uncover one of the largest share-

21  holder fraud cases in US history.  Additionally, the information Huynh submitted to the SEC

22  had no relevance to Huynh's SOX retaliation claim.  deRubertis knew this very well because

23  in a June 2014 article published in Advocate Magazine[1] deRubertis wrote the following.

24

25

26

27

28  _____

[1] https://www.advocatemagazine.com/article/2014-june/protecting-whistleblowers-sarbanes-oxley-s-protected-activity-requirement

**COMPLAINT – DEMAND FOR JURY TRIAL**

**The basic requirements of SOX's protected activity prong**

SOX does not require that the **concerns disclosed by the whistleblower were actually illegal**. Instead, "[t]o encourage disclosure, Congress chose statutory language which ensures that 'an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation [of a SOX enumerated statute or rule] is protected.'" (Van Asdale, supra, 577 F.3d at 1001 [italics added].)

49.   On April 13, 2,017 deRubertis wanted Huynh to introduce him to Sean McKessy so he could learn about Huynh's SEC submission under the pretext that he wanted to make sure that there were no overlapped between Huynh's SEC and civil cases.

From: David deRubertis [mailto:david@derubertislaw.com]
Sent: Thursday, April 13, 2017 3:53 PM
To: Tri Huynh <triwyn@gmail.com>
Subject: Re: Thanks for the call- Next Steps

Tri - I forget whether the SEC submission asks about any internal reports or complaints.  That issue overlaps with our case. In retrospect I actually think it's better that I review the SEC filing before you file it to make sure it is consistent with the issues that overlap on your individual case.  Can you check with the SEC lawyers and make sure they are OK with that realizing it's under full attorney-client privilege? Thanks.

50.   On 4/18/17, David deRubertis had a phone conversation with Sean McKessy then unilaterally asked McKessy for a copy of Huynh's upcoming SEC submission.  After receiving the document from McKessy, deRubertis weirdly asked McKessy to hold off filing the complaint to give deRubertis a chance to review and approve it.

From:        David deRubertis <david@derubertislaw.com>
Sent:        Tuesday, April 18, 2017 2:47 PM
To:          Tri Huynh; Tameka White
Cc:          Jeff Rudman
Subject:     RE: Connecting Sean and David to Align on Tri's Cases

Importance:  High

Hi Tri — Would it be ok to let Sean know you're ok with your SEC filing not going out until tomorrow?  He was kind enough to send me the document to review.  However, I've been in an all day meeting and cannot review it in detail for another hour or so. I looked at it quickly and it is very detailed so I do need time to review it because there IS overlap between the two filings.  Would this be ok?  Thanks.

From:        Tri Huynh <triwyn@gmail.com>
Sent:        Tuesday, April 18, 2017 2:50 PM
To:          'Sean X. McKessy'; 'Rebecca Chang'; 'David deRubertis'
Cc:          triwyn@gmail.com
Subject:     Rebecca/Sean please hold off the filing until tomorrow's noon

Importance:  High

Sean/Becky,

Would it be possible to hope the filing with the SEC until tomorrow's noon time as David need some additional time to review the doc you sent him tonight.

12
**COMPLAINT – DEMAND FOR JURY TRIAL**

| | |
|---|---|
| From: | David deRubertis <david@derubertislaw.com> |
| Sent: | Tuesday, April 18, 2017 5:08 PM |
| To: | Tri Huynh; Sean X. McKessy; Rebecca Chang |
| Subject: | RE: Rebecca/Sean please hold off the filing until tomorrow's noon |

Hi All – Reviewed it and no problems as to the individual case as drafted.  Thank you again for letting me take a look at it and we'll reciprocate when we prepare Tri's DOL/OSHA filing.  As I told Tri when he mentioned your firm was onboard, he's in great hands obviously.  Reading your work product simply confirmed that.  Impressive read.
Take care,

51.     Two days later, deRubertis emailed Huynh a copy of the deRubertis Law Firm's contingency retainer agreement.  deRubertis knew that Huynh had received multiple retainer agreements from six other law firms. So, to lure Huynh into selecting him as Huynh's lawyer, deRubertis offered to pay for litigation expenses in the Huynh v. Walmart litigation, including but not limited to Huynh's travels and lodging expenses to meet with deRubertis in person, to attend court's hearings, and to attend mediation meetings etc.  Most importantly for Huynh was the fact that he didn't have to pay deRubertis a single cent if Huynh lost the case against Walmart. None of the other law firms made Huynh this sweet offer.

**THE deRUBERTIS LAW FIRM, APC**
*trial lawyers*

All necessary legal costs and/or expenses shall be advanced by The deRubertis Law Firm, APC on behalf of the client and shall only be reimbursed to The deRubertis Law Firm, APC by client in the event of a settlement or judgment in favor of the client. If the court awards any portion of

7.   WARNING RE: BANKRUPTCY FILING: The deRubertis Law Firm, APC hereby advises the client that filing bankruptcy can eliminate the right to pursue a lawsuit.  Client specifically promises and agrees that Client will not file any bankruptcy proceeding without first advising The deRubertis Law Firm, APC of Client's intent to do so and without first discussing the implications of a bankruptcy filing with David M. deRubertis.

____ Client Initials Acknowledging Warning re: Bankruptcy Filing

52.     However, Huynh recently discovered that none of the other Law Firms had inserted a weird bankruptcy clause in their retainer agreements either. deRubertis warned Huynh that he must notify deRubertis and the deRubertis Law Firm before filing for personal bankruptcy. Why did deRubertis insert this clause?  Huynh believed the RICO Defendants

13

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  had in their possession communications among themselves which would help answer this fun-

2  damental question.  Huynh believes this information is discoverable during discovery.

3

4  **Walmart's Civil and Criminal Penalties Could Be More Than $3,000,000,000**

5     53.     The first question was what is Walmart's risk exposure if the SEC and/or the

6  DOJ were able to successfully investigate and prosecute Walmart for securities fraud among

7  other illegal conducts.  The recent Non-Prosecution Agreement that the SEC and the DOJ en-

8  tered into with Wells Fargo would be instructive in answering this question. Wells Fargo paid

9  the SEC and the DOJ $3 Bil to settle Wells Fargo's inflation of the total number of accounts

10 per customer metric reported to investors and analysts.  Given the seriousness of Walmart's

11 illegal conducts and Walmart's senior executives active participation in committing share-

12 holder fraud, Huynh believes Walmart's civil and criminal penalties would be much higher

13 than that of Wells Fargo.  However, to be conservative, Huynh assumed Walmart's risk expo-

14 sure would be about the same as that of Wells Fargo.

15

16

17    54.     However, in additional to the civil and criminal penalties that the SEC and/or

18 the DOJ may impose upon Walmart, Walmart may lose approximately up to $54 Billion in

19 SNAP sales and Walmart's Market Cap could depreciate by $20 Bil or more when the truth

20 about Walmart's misconducts became known to the public.

21

| Risk Categories | Liability |
|---|---|
| Criminal and Civil penalties imposed by the SEC/DOJ. | $ 3 Billions[2] |

[2] https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices
https://www.justice.gov/usao-cdca/press-release/file/1251336/download
Wells Fargo inflated the cross-sell metric (the average number of banking accounts opened per customers) reported to investors between 2002 to 2016 by pressuring their employees to

14

**COMPLAINT – DEMAND FOR JURY TRIAL**

| | |
|---|---|
| Loss in sales due to exclusion from the SNAP program. | $ 54 Billions[3] |
| Walmart's stock price deflation when the truth came out. | $ 20 Billions[4] |
| **Estimated Liabilities** | **$ 77 Billions** |

### A Whopping One Billion-Dollar Bounty

55.     Another important question is what is the bounty that the Walmart Participants

were willing to pay the members of the WSF Coverup Enterprise if they were able to fulfill

the Enterprise's common objective.  It is well accepted that money, especially a lot of money,

is a powerful motivator to get people to do things that they normally would not do.

56.     To answer this question, Huynh turned to an economic model proposed by

---

open fake customer accounts.  On February 20, 2020, Wells Fargo entered into a NPA with
the SEC and DOJ to resolve cross-sell metric matter for $3 Billion.

- Walmart's criminal conducts were more serious than that of Wells Fargo because there are
emails akin to smoking gun evidence that linked Walmart's senior executives to inten-
tional misrepresentation and fraud.

[3] https://www.wsj.com/articles/obstacles-remain-in-talks-to-settlewal-mart-bribery-probe-
1485546521.  It stated: "Discussions stalled over several issues beyond the size of potential
penalties Wal-Mart would have to pay. The people familiar with the probe said one major
sticking point has been Wal-Mart's eligibility to continue accepting food stamps in its 5,300
Wal-Mart and Sam's Club stores in the U.S. after a settlement is reached.  A company that
pleads guilty to a federal crime can lose its right to win government contracts—a penalty that
could block Wal-Mart from the **$71 billion food-stamp program**, which gives low-income
Americans a monthly stipend to purchase food."

- Since Walmart had 26% the US Grocery Market, Walmart may lose up to $18 Billion in
annual sales. Assuming a 3-year suspension, Walmart may lose up to $ 54 Bil in total
sales.

[4]  Walmart's Marketplace Capitalization at the end of 5/28/2021 was $400 Billion.  Assuming
a 5% deflation in Walmart's stock price when the truth came out, Walmart may lose up to $20
billion in market capitalization.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  Professor STRATOS PAHIS in his article published in the Yale Law Journal.

2  https://www.yalelawjournal.org/pdf/795_t7d36jwp.pdfK.

3

## THE YALE LAW JOURNAL

STRATOS PAHIS

## Corruption in Our Courts: What It Looks Like and Where It Is Hidden

*"If experience demands a presumption that a judge will seize every opportunity presented to him in the course of his official conduct to line his pockets, no canon of ethics or statute regarding disqualification can save our judicial system."*

— Justice William Rehnquist[1]

### Understanding Defendants' and Litigants' Demand for Corruption

A litigant or defendant (party) will make the bribe if the expected gains of the corrupt decision are greater than the sum of the costs of the bribe and the expected costs of getting caught. The expected gains **(Y)** from a corrupt decision can be understood as a function of four factors. The first and most obvious factor that a party will take into account is the stakes of the case **(S)**. The greater the value of a favorable decision, the more a party should be willing to pay for it. Assuming that the party had an initial probability of winning the case **(p)**, the value that the bribe will purchase will be the added probability of winning the case. In other words, it will be the stakes **(S)** multiplied by the difference between the original odds of winning **(p)** and the odds of winning after paying the bribe, which is assumed to be 1, or certain victory, for the sake of simplicity. So far, the benefit of paying a bribe is equal to **(S)(1-p)**.

We must now take into account the probability that the briber may not be able to keep the spoils of his corrupt decision. This may be the result of two events. First, the corrupt decision may be reversed on appeal. The value of a corrupt decision will depend upon how large this rate of reversal **(RR)** is—a probability between 0 and 1. The closer the rate of reversal is to 1, the smaller the value of the decision. We show this by multiplying our benefit equation by **(1-RR)**. Second, assuming that a party will not be able to keep the

16

spoils of a corrupt decision if the bribe is discovered, the expected gains of the decision is multiplied by the probability that the corruption will go undiscovered. We can represent this by multiplying the equation by **(1-r)**, where **r** equals the probability of being caught. The first half of our benefit equation is as follows:

$$Y = S(1-p)(1-RR)(1-r)$$

**The estimated values of the variables contextualized to Walmart were as followed:**

- (S) = $3000 Mil – See above
- (p) = 50%
- (RR) = 10%
- (r) = 5%
- Y = S(1-p)*(1-RR)*(1-r) = $3,000 Mil*(50%)*(90%)*(95%) = **$1,282 Mil.**

57.    In short, the expected gain for the WSF Coverup Enterprise if the RICO Defendants could pull off the fraudulent coverup scheme would be about $ 1.3 Bil. Therefore, the Walmart Participants could set a Bounty as high as $1 Bil to reward the RICO Defendants if they could achieve the Enterprise's the common purpose. Now, one could see why deRubertis became visibly excited when Huynh told him that Huynh and McKessy planned to file the complaint with the SEC in late April 2017.

**Theodore Boutros – Walmart's Trusted Advisor and Fixer.**

58.    Gibson Dunn has now grown its top line for 25 straight years, while boosting profitability for 24 years in a row.  Gibson Dun grew their revenue by 7.6 % to $2.16 Bil in



Gibson Dunn's Financial Performance

17
**COMPLAINT – DEMAND FOR JURY TRIAL**

2020 and their average profit per equity by 10% to **$4.125 Mil**.  As a result, GDC paid their partners handsomely.

59.     The Walmart Participants trusted and respected Theodore Boutros because Boutros rescued Walmart from legal trouble water many times over, including the famous Wal-Mart Stores, Inc. v. Dukes.[5] Thomas Mars, Wal-Mart EVP and former general counsel once remarked "I call them lifeboat lawyers, because our careers depend on them,".  "I talk to Ted Boutros more than I talk to any outside lawyer in the world, and there's not even a close second," says Tom Mars, Wal-Mart's top in-house counsel. "We have access to all the best lawyers in the world.... Yet somebody has to be the best of the best, and that's the way I would describe Ted."

> "We are the firm that **clients in distress** have turned to when they are facing **their worst problems**, or when they have in fact faced defeat," "And we have been the problem solvers, the game changers." says litigation department cochair Randy Mastro

### Maestros of the "Get Out of Jail Free" Cards from the SEC and DOJ[6]

60.     It persuaded the U.S. Department of Justice and the Securities and Exchange Commission to drop investigations of Joseph Cassano, a former American International Group, Inc. executive widely demonized as one of the creators of the financial crisis. Over the course of nearly a year, they made **several detailed presentations** to the government, explaining Cassano's actions and pointing out holes in the government's case. They reviewed documents, e-mails, and spreadsheets that, they asserted, showed that Cassano promptly and thoroughly disclosed his group's activities to management and auditors. The lawyers' final series of presentations in the fall of 2009 lasted more than 40 hours, spread over five days **and entailed more than 600 pages of presentations and 400 exhibits.** And they agreed to let Justice and the SEC interview Cassano in April 2010. "We ultimately bared our factual soul

---

[5] https://en.wikipedia.org/wiki/Wal-Mart_Stores,_Inc._v._Dukes
   https://www.oyez.org/cases/2010/10-277

[6] The American Lawyer January 2012. Special Issue – Litigation Department of the Year.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   to them," says Walden.

2       61.    The strategy paid off. Justice informed Gibson Dunn in May 2010 that it was

3   **closing its investigation of Cassano, and a month later, the SEC followed,** a remarkable

4   turnround that a former prosecutor says was in good part due to the defense lawyers' tactics.

5   "The judgment that they made to engage with us in an honest and forthcoming way was

6   unique and important to [their] success," says Paul Pelletier, the former deputy chief of the

7   Justice Department criminal division's fraud section, who joined Mintz, Levin, Cohn, Ferris,

8   Glovsky and Popeo last May.

### Maestros of the Media

9       62.    The firm also took Wal-Mart's case to the press. "Wal-Mart was being

10  portrayed as an outlier, and somehow evil, and that was the theme when we got in-

11  volved," remembers Boutrous. "We tried to take a different approach on the legal issues

12  but also explain the situation more thoroughly to the public." That willingness to work

13  beyond the courts is vital to the firm's ability to manage client crises, says Mastro.

14  "Google any of us," he says. "We come up talking to the press a lot, because our clients

    want us to."

15      63.    In short, Theodore Boutros and Gibson Dunn Crutcher were the best fix-

16  ers that the Walmart Participants would call upon when they face an existential threat

17  such as the one Huynh brought to the SEC's attention.

18

### The GDC's Fixers Worked as a Cohesive and Tightly Integrated Unit

19      64.    In a recent court filing in the case Herring Networks, Inc v. Rachel Maddow

20  (Case No: 3:19-cv-01713-BAS-AHG), Gibson Dunn described in details a typical GDC team

21  structure and how they worked together on a day-to-day basis as a cohesive unit to deliver

22  their client's objectives[7], and most surprising client pay GDC top dollars for their services.

23  For example, it shown that Boutros involved in every aspect of client engagement.  He met

24

25

26

27  ────────────────

28  [7] See Dkt. 35-2 at 8-24: https://storage.courtlistener.com/re-
       cap/gov.uscourts.casd.645957/gov.uscourts.casd.645957.35.2.pdf

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   with clients, directed the team's activities, and personally reviewed and approved major mo-

2   tions and court filings

3       65.    GDC brings World class capabilities across the firm to each engagement, lev-

4   erages powerful connections[8], and do whatever it takes to win at all cost. This was the reason

5   why Gibson Dunn Crutcher is the "Ferrari" of the legal service industry.

6

| Timekeeper | Standard 2020 Rate/Hour | |
|---|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,525 | High price mercenaries with a win at all cost attitude. An entry level associate at a typical Walmart Store makes $11/hour. Thus, this associate needs to work roughly 3.5 weeks to earn what Boutrous earns in an hour. |
| Scott A. Edelman (Partner) | $1,395 | |
| Nathaniel L. Bach (Senior Associate) | $960 | |
| Marissa B. Moshell (Mid-Level Associate) | $740 | |
| Lolita C. Gadberry (Paralegal) | $480 | |
| Duke K. Amponsah (Paralegal) | $480 | |

| Timekeeper | Hours Worked | |
|---|---|---|
| Theodore J. Boutrous, Jr. (Partner) | 55.8 | Every members of the rescue squad actively involved in the planning and execution of the rescue mission. Therefore, each member is equally liable for breaking the laws while serving their masters. |
| Scott A. Edelman (Partner) | 17.5 | |
| Nathaniel L. Bach (Senior Associate) | 135.1 | |
| Marissa B. Moshell (Mid-Level Associate) | 113.7 | |
| Daniel M. Rubin (Mid-Level Associate) | 16.6 | |
| Lolita C. Gadberry (Paralegal) | 14.7 | |
| Duke Amponsah (Paralegal) | 1.4 | |
| Erin E. Kurinsky (Researcher) | .6 | |
| Carla H. Jones (Researcher) | .1 | |
| TOTAL | 355.5 | |

    66.    Although, Huynh didn't interact with Boutros and Scalia on a daily basis, they

were actively involved in the case behind the scene for two reasons.  First, because the GDC's

operating model required them to do so, and second, Brass told Huynh in late 2019 that Scalia

was actively involved in the Huynh's litigation.[9]  Therefore, each and every member of the

---

[8] See https://en.wikipedia.org/wiki/Gibson_Dunn.

[9] Rachel Brass wrote "Secretary Eugene Scalia, formerly counsel for Defendants, withdrew from this case on August 27, 2019, Dkt. 112, and therefore is no longer available to partici-pate in any trial of Plaintiff's claims. Before his nomination to the Cabinet, Mr. Scalia was ac-tively involved in the litigation of this case and could have tried the case in the event Ms.

**COMPLAINT – DEMAND FOR JURY TRIAL**

Rescue Squad was responsible for their own predicate acts and those of the of the other member of the Rescue Squad.

67.     On the other hand, according to Brass, each and every critical action must be reviewed and approved by the Walmart Participants.  This implied that the Walmart Participants were responsible for their own predicate acts as well as the predicate acts, they caused the other RICO Defendants to commit in furtherance of the Enterprise's common objective.

**The Walmart Shareholder Fraud (WSF) Coverup Enterprise and Its Common Purpose**

68.     The Walmart Shareholder Fraud Coverup Enterprise (WSF Coverup Enterprise) was formed for the common purpose of covering up (not to committing shareholder



Brass became unavailable."

**COMPLAINT – DEMAND FOR JURY TRIAL**

fraud) Walmart's $140 Billion fraud against shareholders and pulverizing any traces of

Walmart's criminal conducts. To achieve this common purpose, the RICO Defendants and

their Co-conspirators needed to achieve three main goals (A, B, and C) using a six-pronged

scheme. These goals are symbiotic and synergistic to each other, working together in harmony

to accomplish the Enterprise's common purpose.

69.     Goal A was to obtain "Get Out of Jail Free" Card(s) for Walmart's illegal con-

ducts i.e., obtained notification letters of non-enforcement actions from the SEC and/or the

DOJ.  To achieve goal A, the RICO Defendants submitted factual and legal misrepresenta-

tions to the SEC and/or DOJ, Federal Courts, Walmart's shareholders, investment analysts,

the media, politicians, and the American public to purportedly assert the WSF Coverup Enter-

prise's Truth on the Market Defense (i.e., there was zero loss causation after Huynh's disclo-

sures became public). The Truth on the Market 2 X 2 matrices above showed that in Apr 2017

when Huynh submitted his TCR complaint to the SEC, Walmart occupied the upper right-

hand quadrant of the risk Matrices. In this quadrant, Walmart's culpability was high and

Huynh's credibility was high. This position put Walmart and their executives at great peril for

both civil and criminal penalties.

70.     Walmart's culpability was high because at that time Walmart's $140 Billion

Shareholder Fraud Enterprise (independent from the WSF Coverup Enterprise) was right in

the middle of perpetrating the $140 Billion shareholder fraud scheme. See the email and Pow-

erPoint presentation that Huynh sent to Greg Penner, Chairman of Walmart's Board of Direc-

tor, Rob Walton, former chairman and current member of Walmart's Board of director, and

Timothy F. Flynn Chair of Walmart's Audit Committee to put them on notices that Walmart's

senior executives may have committed fraud against shareholder to the tune of $140 Bil and

**COMPLAINT – DEMAND FOR JURY TRIAL**

1     attempted to obstruct and/or influence the OSHA investigation. DC Dkt. 83.

2

3         71.     There was plenty of evidence of Walmart's illegal conducts that went beyond

4     the evidence that Huynh discovered and submitted to the SEC between 2017 and 2018.  For

5     example, Huynh only recently discovered that Walmart's senior executives artificially inflated

6     Walmart's Ecommerce FY18 Quarterly Sales growth then reported this material metric to in-

7     vestors and analysts in order to mislead investors and analysts into believing that Walmart

8     would be a viable and credible alternative to Amazon. Walmart's senior executives artificially

9     inflated Walmart's Ecommerce Quarterly Sales growth during FY18 into two ways: One) by

10    inflating Jet.com's FY17 and FY18 Gross Merchandise Value (GMV) and Two) By improp-

11    erly accounted all of Jet.com's Marketplace GMV for FY17 and FY18 as Jet.com's sales in-

12    stead of only recognizing the commission fee that Jet.com collected from its Marketplace

13    sellers as required by GAAP.  The artificially inflated quarterly Ecommerce sales growth met-

14    ric misled Walmart's shareholders and analysts regarding Walmart's Ecommerce outlooks.

15    As a result of the rosy outlooks, investors pushed up Walmart's Market Cap by $140 Bil.

16    However, when Walmart's senior executives announced during Walmart's Q4 FY18 earnings

17    call on February 18, 2018 that Walmart's Q4 FY18 Ecommerce sales growth collapsed from

18    an average of 58% for the first three quarters of FY18 to 23% (a 35% dropped), Walmart

19    stock price dropped by 10%  on the same day then continued to drop from a high of $109 set

20    in 1/30/18 to a low of $82 on 5/29/18 before rebounding, wiping out approximately $82 Bil

21    from Walmart's Market Cap.

22

23        72.     On the other hand, Huynh's credibility was high because Huynh produced doc-

24    umentary evidence and analyses to the SEC which showed that Walmart's senior executives

25

26

27    artificially inflated the total number of SKUs on Walmart Marketplace then correlated this

28

23

**COMPLAINT – DEMAND FOR JURY TRIAL**

material metric to Walmart's Ecommerce GMV growth and profitability. This was done to

purportedly show that Doug McMillon's New Basket Driven Ecommerce strategy worked.

McMillon articulated to Walmart's shareholder that Walmart will not only grow its Ecom-

merce sales in two ways. First, Walmart will grow its online grocery/consumable (low mar-

gin business) by allowing customers to order store's grocery/consumable products online then

picked their order in Walmart's parking lots to drive customer traffic. Second, Walmart will

monetize this traffic by directing these customers to Walmart.com to buy general merchandise

products on Walmart.com (offered by Walmart's 1P and Walmart's Marketplace seller offer-

ings). Since Walmart didn't break out their online general merchandise business and grocery

and consumable business, investors and analysts relied heavily on the growth of the total

number of Marketplace SKUs on Walmart.com as a proxy to infer Walmart's online general

merchandise business sales.

73.     Additionally, after Huynh raised his complaint to Marc Lore, Walmart's US

Ecommerce President and CEO, and other Walmart's Ecommerce executives, Walmart imme-

diately terminated Huynh's employment without conducting any investigations in order to

sweep their fraudulent conducts under the rugs.

74.     In short, to achieve Goal A, the RICO Defendants must move Walmart's risk

position from the upper-right-hand quadrant to the lower left-hand quadrant of the 2 X 2 Truth

on the Market matrices. To do this, the RICO Defendants engaged in evidence whitewashing,

fabrication, destruction, and mutilation as well as submitting false declarations then submit-

ted factual misrepresentations regarding Walmart's illegal conducts to the SEC and/or the

DOJ, Federal Courts, Walmart's shareholders, investment analysts, the media, politicians,

other US government and State agencies, and the American public to purportedly show zero

loss causation to Walmart's stock when Huynh's disclosures became known to the public.

75.     Goal B was to obtain a "Civil Penalty Free" Card from the United States District Court, Northern District of California.  It is important to point out that Goal B was synergistic and symbiotic with Goal A in two ways.  First, Goal B allowed the RICO Defendants to misrepresent the facts and the laws then communicated them to the SEC and/or the DOJ, Walmart's shareholders, investment analysts, the media, and the American public to portray Huynh as too "mentally ill" and too "slimy" to be a credible whistleblower.  This allowed the RICO Defendants to move Huynh's credibility as a whistleblower from high to low in the 2X2 Truth on the Market Defense Matrices.  Second, the RICO Defendants not only wanted to get Huynh's lawsuit dismissed but dismissed in such a clear, convincing, and powerful fashion to reinforce the "Get Out Jail Free" card to purportedly prove that Walmart didn't defraud their shareholders.

76.     In late April 2017 when Huynh retained deRubertis to represent him in the Walmart's lawsuit, Huynh's SOX claim against Walmart occupied the upper right-hand quadrant of the RICO Defendants' "Nuts & Sluts" Defense Matrices. Huynh's case against Walmart was open and shut because of the overwhelming documentary evidence and case analyses that Huynh provided to deRubertis which proved that Huynh made a prima facie case showing for his SOX claim while Walmart failed to prove by clear and convincing evidence that they would have terminated Huynh's employment in absent of Huynh's protected activity.  Therefore, in order to move the position of Huynh's lawsuit from an "Open and Shut" position in the upper-right hand quadrant to a "Nuts & Sluts" position in the lower left-hand quadrant of the "Nuts and Sluts" Defense Matrices, the RICO Defendants engaged in ev-

idence fabrication, destruction, mutilation, concealment, and suppression as well as submit-

ting false declarations. Walmart then submitted factual and legal misrepresentations to the

United States District Court, Northern District of California through various e-filings to the

court's docket then improperly influenced District Judge Vince Chhabria and Magistrate

Judge Sallie Kim to rule in Walmart's favor throughout the Huynh's litigation.

77. Goal C was to secure a risk-free civil and criminal liabilities future for all of

the members of the RICO Defendants. To achieve this goal, the RICO Defendants executed a

three-pronged scheme (prong #4 to #6): Prong #4's objective was to engage in the conceal-

ment of the RICO Defendants' illegal conducts. Prong #5's objective was to engage in the

Catch and Kill of any evidence that may come back and haunt the RICO Defendants in the fu-

ture. The RICO Defendants achieved prong #5 in three ways: 1) the RICO Defendants took

back all of the documents that Huynh retained from Walmart to support his SEC submissions,

2) the RICO Defendants forced Huynh to sign a highly restrictive asset return agreement, and

3) the RICO Defendants concealed all of the evidence that Walmart and Huynh used during

the course of the litigation as well as during summary judgement from the public and

Walmart's investors by either designating them as "Confidential" and/or filed them under seal

even though they were not**.** The RICO Defendants corruptly influenced District Judge Vince

Chhabria to allow Walmart to file both the documents used by Huynh and by Walmart during

summary judgement under seal even though these documents failed to meet the District

Court's high sealing standards. Prong #6's objective was to kill and silence Huynh once and

for all so Huynh could never pose any risks to the RICO Defendants in the future.   To effec-

tuate this scheme, the RICO Defendants executed a massive "Nuts & Sluts" campaign against

Huynh to assassinate Huynh's characters and reputations, including concocting a 133-page

smear dossier to falsely portray Huynh as mental ill, falsely charge Huynh with dishonesty

26

and sexual harassment.  In short by achieving Goal A, B, and C, the RICO Defendants would achieve the WSF Coverup Enterprise's illegal common purpose.

> **The RICO Defendants Developed and Executed a Six-Pronged Illegal Coverup Scheme to Effectuate the WSF Coverup Enterprise's Common Purpose.**

78.    To achieve Goal A, B, and C, the RICO Defendants developed and executed a six-pronged illegal coverup scheme (see the chart above). Prong #1 is the foundation of the illegal coverup scheme which fueled the execution of other five prongs.  For example, to effectuate prong #2, the RICO Defendants lured and deceived Huynh into retaining deRubertis to represent Huynh in his lawsuit against Walmart.  deRubertis exploited his relationship with Huynh to deceive Sean McKessy, Huynh's SEC Whistleblower lawyer at Phillips & Cohen, to provide to him with a copy of Huynh's 4/19/17 SEC submission under the pretext that deRubertis needed to ensure that there was no overlapped between Huynh's SEC submission and Huynh's civil complaint even though one had nothing to do with the other. deRubertis leaked this confidential and non-public information to the Gibson Dunn Participants (referred throughout this complaint as the Rescue Squad) and the Walmart Participants sometime between late Apr and early May of 2017.  The RICO Defendants leveraged this information to engage in a whitewashing campaign to make the misleading statements Walmart made to investors in FY17 no longer misleading.  See DC Dkt. 158-8

79.    Similarly, to execute prong #3 of the coverup scheme, deRubertis secretly gathered the documentary evidence and the legal analyses that Huynh had provided to deRubertis regarding Huynh's SOX claim. Instead of using this information to prosecute Walmart on Huynh's behalf, deRubertis leaked this information to his Co-RICO Defendants which triggered the RICO Defendants to engage in evidence fabrication, destruction, mutilation, and

concealment as wells as submitting false declarations in support of Walmart's motion for summary judgement to obstruct the undue administration of justice.  For example, the RICO Defendants fabricated Beal's 11/30/16 email and Marketplace RIF, destroyed evidence of Huynh's meeting with Beal on Oct 4 and Oct 18, 2016, mutilated Huynh's email and calendar entries in order to file factual and legal misrepresentations with OSHA, the United States District Court, Northern District of California and the United States Court of Appeals for the Ninth Circuit.

80.     Prong #2 and prong #3 of the Enterprise's coverup scheme once successfully executed will enable the RICO Defendants to achieve Goal A and Goal B.  Prong #2 is the RICO Defendants' whitewashing campaign.  The purpose of Prong #2 is to reduce Walmart's culpability from high to low in the 2x2 Truth on the Market Matrices based on the leaked information from deRubertis the RICO Defendants engaged in a whitewashing campaign in an attempt to make the misleading statements Walmart made to its shareholders in FY17 no longer misleading. For example, the RICO Defendants attempted to redefine Walmart's Marketplace as Walmart.com when it was not to make the statements made by McMillon to investors and analysts about the total number of Marketplace SKUs on Walmart.com no longer misleading.  Additionally, Huynh also recently discovered that David deRubertis intentionally delayed filing Huynh's complaint in Federal Court from Mid-Dec 2017 to Mid-Mar 2018 to give the RICO Defendants the time and run way they needed to plan and conceal the misleading statements Walmart made to investors in FY18 regarding Walmart's quarterly Ecommerce sales growth.  On the other hand, prong #3, moved Huynh's credibility as a whistleblower from high to low.  In short by achieve Goal A and B, the RICO Defendants fraudulently move their risk profile/position on the 2 X 2 "Truth on the Market" Defense Matrices from the upper right-hand quadrant to the lower left quadrant.

28

81.     Prong #3 consisted of #3A and #3B.  Prong #3A's objective was to move Huynh's factual position from strong to weak. The RICO Defendants achieved this by engaging in evidence suppression, destruction, mutilation, and concealment as well as submitting false declarations.  Prong #3B's objective was to move the RICO Defendants' factual positions from weak to strong. To effectuate prong #3B, the RICO Defendants directed David deRubertis to shotgun plead five frivolous ADHD FEHA claims in Huynh's 3/15/18 complaint against Walmart.  This put Huynh's ADHD condition and Huynh's motives for engaging in protecting conducts (only applicable to employment discrimination and retaliation case not in SOX case) at the center at his lawsuit.  This allowed the RICO Defendants to invade Huynh's right to privacy under both the US and California Constitutions in order to illegally obtain Huynh's psychiatrist records and personnel files then manipulated the facts and the laws to purportedly portray that Huynh was too mentally ill and too slimy to be a credible whistleblower to purportedly prove that Huynh didn't engage in protected activities and Walmart didn't commit securities fraud.

82.     Additionally, the RICO Defendants engaged in evidence suppression, fabrication, concealment, and submitting false declarations.  In short, by successfully executing Prong #3A and #3B, the RICO Defendants moved Huynh's competitive position in his SOX claim against Walmart from the "Open & Shut" position to the "Nuts & Sluts" position. The RICO Defendants used this new position to corruptly influence District Judge Vince Chabbria not only dismissed Huynh's complaint but did so in such a clear, convincing, and powerful fashion to reinforce the SEC's Get Out of Jail Free Card so the RICO Defendants could once and for all purportedly convince the SEC and/or the DOJ, Walmart's shareholders, investment analysts, the media, politician. Other US and States Governmental Agencies, and the American public that Walmart did not commit fraud against shareholders.

29

**COMPLAINT – DEMAND FOR JURY TRIAL**

83.     Goal C's objective was to ensure a civil and criminal liabilities risk-free future for all of the RICO Defendants.  To achieve Goal C, the RICO Defendants must successfully execute prong #4, #5, and #6. Prong #4 is the Catch and Kill scheme where the RICO Defendants deceived and threatened Huynh to turn over his personal laptop hard drive which included the documents Huynh retained from Walmart after his termination to support his SEC complain. Some of these documents akin to smoking evidence that could implicate Walmart and Walmart's senior executive for committing fraud against shareholders.  Additionally, the RICO Defendants corruptly influenced Magistrate Judge Sallie Kim and District Judge Vince Chhabria to allow Walmart to keep the "Confidentiality" designation and filed these documents under seal to make sure that these documents could not be used by investors, US and/or State governmental agencies to prosecute the RICO Defendants civilly and criminally in the future.

84.     Prong #5 is the RICO Defendants' coverup the coverup scheme.  This scheme's objective is to ensure that the predicate acts perpetrated by the RICO Defendants in furtherance of the WSF Coverup Enterprise's illegal coverup scheme didn't come back later and implicate the RICO Defendants civilly and/or criminally.  For example, deRubertis used the purported PAGA claim to coverup the facts that he illegally leaked Huynh 4/19/17 SEC submission to the Rescue Squad and the Walmart Participants.  This predicate act violated the criminal statute 18 U.S.C. § 1512(c)(2) related to obstruction of an official proceeding. It could put deRubertis in jail for a long time if the SEC discovered his obstructive conducts.

85.     Lastly, prong #6 is the kill the whistleblower scheme whereby the RICO Defendants manipulated and disseminated factual misrepresentations to falsely charged Huynh's with moral turpitudes i.e., sexual harassment and dishonesty and portrayed Huynh as mentally

ill in order to destroy Huynh's creditability as a witness so Huynh could never testify against

the RICO Defendants at any future lawsuits and/or US Government Agencies investigations.

86.    In summary, in order to achieve the WSF Coverup Enterprise's common pur-

pose (i.e., to cover up Walmart's $140 Bil shareholder fraud and to ensure a risk-free future

for all the RICO Defendants), the RICO Defendants must accomplish Goal A by successfully

executed prong #2 and #3, Goal B by successfully executed Prong #3A and #3B, and lastly

Goal C by successfully executed prong #4 to #6.

## The Whitewashing Campaign

### Walmart's Marketplace Definition Prior to May 2017.

87.    Prior to May 2017, Walmart's insiders, investment analysts, investors, and in-

dustry publications defined Walmart's Marketplace as a section on Walmart.com where third

party/3P aka Marketplace sellers listed their products for sales on Walmart.com.  The total

number of SKUs offered to customers on Walmart.com equals to the total number of SKUs

(products) offered by Walmart's 1P plus the total number of Marketplace SKUs offered by

Marketplace sellers.

### Seth Beal's Definition of Walmart Marketplace

https://www.digitalcommerce360.com/2016/04/14/walmartcom-invites-more-mer-
chants-sell-its-marketplace/

Wal-Mart, No. 4 in the newly released Internet Retailer 2016 Top 500 Guide, began
in 2009 to allow other retailers to sell their products alongside the retail chain's in-
ventory on Walmart.com. Wal-Mart has developed its **online marketplace slowly,
starting with six merchants**—eBags Inc. (No. 167), Wayfair LLC (No. 24), Tool
King LLC, Plumstruck (No. 91, part of Hayneedle Inc.), ShoeBuy Inc. (No. 101)
and ProTeam (No. 38, part of Fanatics Inc.)—and, starting in 2014, began expand-
ing its roster that now lists approximately 300 retailers, according to investment
firm Robert W. Baird & Co. **After a long trial period that allowed Wal-Mart to**

**COMPLAINT – DEMAND FOR JURY TRIAL**

**develop technology to support more sellers and more SKUs online, Wal-Mart is ready to expand its marketplace**, Seth Beal, Wal-Mart's senior vice president of global marketplace, said at the conference. "We started with a few sellers because we wanted to do it right," he said. "Customers were telling us they wanted more products online, and now we're ready to partner with many more sellers."

**Products from retailers** are displayed alongside Wal-Mart's own inventory and **are called out as Walmart Marketplace** items, with the seller's name displayed on the items. Retailers on Wal-Mart's marketplace can be featured in Walmart.com promotions, such as Value of the Day deals. "Customers are already shopping on Wal-Mart, and they're looking for great products with great prices," Beal said. "Our partnership **with marketplace retailers allows us to provide our customers with more brands and products on Walmart.com**."

https://www.sdcexec.com/sourcing-procurement/news/12249812/commercehub-commercehub-expands-partnership-with-walmart-adds-integration-with-walmart-marketplace

"Launched in 2009, **Wal-Mart Marketplace expanded Walmart.com's product assortment for customers alongside Wal-Mart's existing first-party merchandise**. More than 80 million unique visitors shop Walmart.com every month looking for products across popular categories like apparel, electronics and home. Customers trust Wal-Mart to provide a broad assortment of products and **investing in our marketplace helped us grow our assortment to 11 million items in just a few years[10]**," said **Seth Beal**, senior vice president of global marketplace at Wal-Mart. "By expanding our relationship with CommerceHub, we'll be able to leverage its network of retailers and brands to offer customers more of what they're looking for at Walmart.com."

88.     There are two key takeaways from Seth Beal's article below.  First, the term "Marketplace" is synonymous with the term "third-party" and these terms were used interchangeably.  Second, Marketplace sellers are synonymous with third-party sellers.  Third, the total number of items/SKUs listed for Sales on Walmart.com equals to the total

---

[10] This 11 million Walmart Marketplace SKUs quoted in this article jived with the 10.9 million Marketplace SKUs Beal reported to McMillon in his July 30, 2016 email. COA Dkt. 5-4 at 95.

**COMPLAINT – DEMAND FOR JURY TRIAL**

number of Marketplace/3P SKUs and Walmart's 1P SKUs (Walmart's own inventories).

https://corporate.walmart.com/newsroom/business/20161026/expanding-your-market-place-of-products-on-walmart-com

When you visit Walmart.com, my team and I work hard to make sure you can find

☰ Walmart ⁄⁄⁄

# Expanding Your Marketplace of Products on Walmart.com

By Seth Beal   |   October 26, 2016

what you need, every single day. One way we do that is through our **Marketplace sellers**. That's what's happening behind the scenes when you visit Walmart.com. When you search for an item, not only do you see options from **Walmart.com's own inventory** – your search likely brings up choices from **third-party sellers**, too. These are **third-party sellers** that we've chosen to work with because they offer a great selection of products at a great price. Marketplace makes it easier for customers to find a wider range of the items we sell in stores, plus some other brands you might not find at a store, like Toms and Vans shoes.

Since this time last year, we've grown the number of **Marketplace sellers** by more than 30 times. This has helped us triple **our assortment on Walmart.com** since last year, with more than **20 million items**[11] today, and growing. One of our highest priorities in developing the Marketplace is ensuring the quality of our overall customer experience. We reach out to customers to learn about their experiences, and we're proactive about checking data to see where we can help **Marketplace sellers** improve their performance to go above and beyond. We'll continue to focus on our **Marketplace sellers** as they help us help you find exactly what you need. This is

---

[11] The **20 million SKUs on Walmart.com** jived with the number of SKUs that Beal reported to Doug McMillon and Marc Lore on Oct 2, 2016. COA Dkt. 5-4 at 99-100.
- In his email, Beal wrote "Quick update on Marketplace progress: **16.5 million unique SKUs** (up from 6.2 million at the beginning of the year) – on the site, there are currently **19.7 million unique SKUs including 1P**". The "on the site" referred to Walmart.com/online.  Thus, Walmart.com had roughly 20 million SKU in Oct 2016.
- However, only four days later McMillon reported to investors during Walmart's 23rd Annual Meeting that Walmart Marketplace had 20 million SKUs (See COA Dkt. 5 at 5-4 at 103) by counting 1P SKUs as Marketplace.

33

**COMPLAINT – DEMAND FOR JURY TRIAL**

just one-way Walmart.com is working to make your online shopping experience better across the board.

**BARCLAYS**

**TOP PICK** Wal-Mart Stores

Positioning for Tectonic Shift in Retail

Equity Research
Consumer | U.S. Food & Staples Retailing
31 October 2016

Barclay's Analysts: Karen Short, Sean Kras, and Matthew McClintock, CPA, CFA

**Walmart Marketplace** refers to the wide and growing selection of **third-party merchandise** available on Walmart.com. **Walmart Marketplace** was first launched in 2009 and the number of SKUs has greatly increased. In fact, the company was adding over 1 million SKUs per month earlier in 2016 – we don't know if it is still increasing this quickly – and the **site now has 20 million SKUs online** vs. 150,000 at a typical supercenter.  Seth Beal, SVP of Global Marketplace at Walmart e-commerce has said that there are still areas where more product depth is needed, including electronics, electronics accessories, apparel, home, health, and beauty. As such, we expect the number of products offered online will continue to increase. Meanwhile, the *growth of Marketplace* has led to **internal merchants** having to "raise their game" since they are also competing with **Marketplace merchants**.

**Walmart's Marketplace Purported Definition After May 2017.**

"There's an old saying: "When I see a bird that walks like a duck and swims like a duck and quacks like a duck, **I call that bird a duck**." Gary Gensler, Chairman of the Securities and Exchange Commission—May 20, 2021.

"I understand that after filing this litigation Mr. Huynh has claimed that Doug McMillon presented inaccurate SKU count information to investors during the October 2016 investor community meeting based on Mr. McMillon's use of the term "Marketplace".  **The Walmart Marketplace is comprised of every seller that sell on Walmart.com, which includes Walmart and many other third-party sellers.**"[12] Seth Beal's declaration on 8/26/19 in support of Walmart's motion for summary judgment.  DC Dkt. 171-1 at 99.

89.     Shortly after deRubertis secretly obtained and leaked Huynh's 4/19/17 SEC submission, the Rescue Squad, Walmart's senior executives and the other RICO Defendants

---

[12] Seth Beal's declaration contradicted with how he defined the term "Marketplace" prior to May 2017.

34

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   and their Co-conspirators developed and executed a four-step scheme to whitewash evidence

2   of Walmart's illegal conducts.



**Assortment Metric Reported to Investors**

90.     First, Walmart stopped reporting the total number of Walmart Marketplace

SKUs on Walmart.com starting on Walmart's Q1 FY18 earnings call (May 2017). For exam-

ple, during Walmart's Q4 FY17 earnings call on Feb 2017, McMillon disclosed "From a

**marketplace perspective**, we now have over **35 million SKUs** – more than quadrupling the

number available at the beginning of the year.".  However, on the Walmart's Q1 FY18 earn-

ings call on 5/18/17, McMillon shifted his disclosure from the total number of Marketplace

SKUs to the total number of SKUs Walmart.com.  He disclosed "Walmart.com now has **50**

**million first- and third-party** items to choose from compared to 10 million at this time last

year (Q1 FY17)—so our assortment continues to ramp".  Immediately after the earnings con-

ference call, Robert Ohmes (a RICO Defendant) – a reputable BOA/ Merrill Lynch's Analyst,

published an investment report on Walmart. In the report Ohmes wrote "Continued **market-**

**place expansion** (now **50mn online SKUs** vs. **35mn** in F4Q and 10mn last year". Ohmes

used the term "Marketplace" and "Walmart.com/Online" interchangeably to classify the 50mn

SKUs as Marketplace then broadcasted this misleading information to investors and other an-

alysts in attempt to prime the pump via the internets and emails (i.e., planned the seed in in-

vestors' mind that Walmart's Marketplace is synonymous with Walmart.com) for Walmart's

executives to go on roadshows to whitewashing evidence of Walmart's illegal conducts.

91.      Second, after Ohmes primed the pump, Walmart's Senior Executives went on

multiple analyst conferences and Walmart's own events to begin whitewashing the misleading

statements McMillon made to investors and analysts in FY17 concerning the total number of

Marketplace SKUs on Walmart.com.

### Walmart's Annual Q&A Session with analysts on June 2, 2017

Doug and Brett, you both mentioned Q1 was good. We'd agree, it was quite good.
And it **was an anomaly for a retailer to see such explosive growth on e-com**, and
yet the margin was relatively intact. We haven't seen it across most of the retail space.
It looked like it was an omnichannel type of quarter, and I'm curious if there was
something that was done, whether it was on the expense side or on the gross margin
side, where you've either figured out some formula to enable the e-com growth to
grow at a rapid pace without harming margin. Simeon Gutman, Morgan Stanley.

"It's really price, it's assortment and it's service. The customer is not that different in
that way. Now experience in services being redefined in a big way, and our assort-
ment had gone, given the **marketplace expansion**[13] from about 10 million a year ago
**to now north of 50 million**. So, you've -- we've made great progress on assortment,
managing price pretty well, working hard on experience" C. Douglas McMillon -
Wal-Mart Stores, Inc. - CEO, President & Director.

### Deutsche Bank Walmart's Investment Conference on June 13, 2017

"Absolutely, and we drill down into the comp performance in the first quarter, e-com-
merce, walmart.com, aided the comp by 80 basis points, which was surprising to The

---

[13] McMillon used term "**marketplace expansion**" in Ohmes' 5/18/17 report to substitute for
the "Walmart.com" McMillon used during the Q1 FY18 earning calls. See paragraph 96
above.

**COMPLAINT – DEMAND FOR JURY TRIAL**

Street, and really hands off to the team on that type of performance. Walk us through how you've built the infrastructure to generate that level of performance. And also does your success on your e-commerce platform, does it alter the thought process around store count and how you utilize the stores? And maybe you can just discuss also how we should be thinking about the longer-term profit algorithm, given the success you're having in e-commerce." Paul Elliott Trussell Deutsche Bank AG, Research Division.

The systems work that we did allow us to dramatically increase **the marketplace** on our site. So back about a year ago, we had around 10 million items online, now we have over **50 million items online.** Now 50 million, still not as much as some of our competitors would have. The difference between 10 million and 50 million is a big difference. Brett M. Biggs Chief Financial Officer and Executive Vice President.

92.    The RICO Defendants also directed their Co-Conspirators to disseminate Walmart's misrepresentations concerning the new definition of Walmart's Marketplace.

| Walmart's Disclosures during Walmart Quarterly Earning Calls | Walmart Using Reporters to Disclosures to the Walmart's Investor and the Public. |
|---|---|
| **"Walmart.com now has 50 million** first and third party items to choose from compared to 10 million at this time last year—so our assortment continues to ramp." McMillon – Q1 FY18 earnings call on 5/18/17. | "Wal-Mart Vice-President of Partner Services Michael Trembley said Wal-Mart's move is focused on meeting customer demand for different types of products and increasing online assortment. Wal-Mart's **marketplace inventory** has quintupled this year to **50 million items."** Nandita Bose, a Reuters Reporter, on 7/27/17.[14] |
| "In e-commerce, customers are responding favorably to our expanded assortment, which surpassed **67 million SKUs on Walmart.com.**" McMillon Q2 FY18 on 8/17/17. | "Wal-Mart has already increased the number of products offered on **Marketplace to 67 million items,** supplemented by items from third-party sellers like Toms and Vans shoes." Francine McKenna, a Marketwatch.com reporter, on 9/13/17.[15] |

---

[14] https://www.reuters.com/article/us-walmart-vendors-exclusive/exclusive-not-made-in-america-wal-mart-looks-overseas-for-online-vendors-idUSKBN1AC1VJ
[15] https://www.marketwatch.com/story/wal-mart-accounting-for-e-commerce-overseas-asset-sales-draws-sec-scrutiny-2017-09-12

93.     Matthew Boyle (another RICO Defendants), a Bloomberg News reporter, published an article on June 16, 2017 to purportedly report to the public, Walmart's investors, investment analysts, the SEC and the media regarding Walmart's SKUs metric for Aug and Nov 2016 and Feb 2017 as Walmart.com's SKUs even though Walmart previously reported these SKUs as Marketplace's SKUs to investor during FY17.[16]



94.     Third, Walmart stopped using the term "Marketplace" and the term "Third-Party(3P)" interchangeably in their public disclosures to discuss the Walmart's Marketplace business in order to sever the synonymous relationship between these two terms. This allowed the RICO Defendants to solidify their purported definition of Marketplace as Walmart.com with Walmart's investors, analysts, the SEC and/or the DOJ, the media, and the American

---

[16] https://www.bloomberg.com/news/articles/2017-06-16/wal-mart-offers-a-refuge-for-sellers-tired-of-amazon

COMPLAINT – DEMAND FOR JURY TRIAL

public.  The syntax analysis chart below examined disclosures made by Walmart during various Walmart's Quarterly earning calls, investment analyst conferences, and Walmart's Annual Meetings between 2016 and 2018.   Between Feb 2016 to April 2017, Walmart used the terms "Marketplace" and "Third-Party/3P" interchangeably 33 times to discuss the Walmart's Marketplace (3P) business. The term "Marketplace" was used 66% of the time (25 times) while the terms "Third-Party/Third Party/3P" were used 34% of the time (13 times).  However, starting in May 2017, Walmart stopped using the term "Marketplace" and "Third-Party/3P" interchangeably to describe the Walmart's Marketplace business.  Between May 2017 the end of 2018, Walmart used the term "Marketplace" 0% of the time (0 time).  Instead, term "Third-Party/Third Party/3P" was used 100% of the time (28 times).



The RICO Defendants Attempted to Whitewashed Walmart's Catalog Stuffing Scheme to Inflate the Total Number of Walmart Marketplace SKUs.

95.     Walmart's executives spoke at various venues in an attempt to whitewash the fact that Walmart's executives ordered their technical team to stuff Walmart Marketplace with low value and/or low-quality SKUs in FY17, knowing that most of these SKUs generated

39

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   very little sales, to inflate the total number of Marketplace SKUs reported to investors. Basi-

2   cally, Walmart's senior executivety purportedly told investors and analysts that Walmart

3   didn't focus on increasing the total number of SKUs on Walmart's Marketplace but focused

4   on adding high quality SKUs to Walmart.com

| Set Up Questions | Walmart's Response |
|---|---|
| Marc, and maybe Doug, chime in on this, but I was hoping you could talk more about the marketplace, the 3P business. You've gotten to 50 million items really fast; does it level off from here? Or can that keep going? Robert Frederick Ohmes—June 2, 2017. | Sure. With respect to the marketplace, we've seen nice growth over the last year, and I think we'll continue to see growth on marketplace. But we're very focused on making sure we have **the right SKUs**, the right products. That's the habit, one of our bellwethers. And so, **it's not for us, just quantity, it's really the quality of the products.** Marc E. Lore – June 2, 2017. |
| You touched on this a little bit earlier, but I want to expand on the -- your assortment philosophy. I mean, I think you guys are worth 50 million plus, at least as of the end of the first quarter. You were less than, I think, 10 million even 2 years ago. So, a big growth there. Peter Sloan Benedict, Baird & Co Analyst - June 7, 2017 | There's a finite number of SKUs. So, I'm less concerned about getting to parity on long-tail assortment. **It's more about getting the brands that really matter**. So, it's really getting the right products as opposed to quality over quantity. Marc E. Lore – June 7, 2017. |
| Marc Lore's remarks regarding attracting premium sellers and brands to Walmart.com in Oct 2017 to address the catalog stuffing issues. | "With respect to the long tail, it's really about marketplace. And over the last year, we've grown SKUs from about 50 million to now over 60 million products. One of the things we're going to be really focused on over this next year is to elevate the Walmart.com brands so we can attract **more premium sellers to the site, more premium brands**" Marc Lore, 24th Annual Meeting with the Investment Community on 10/12/17 |

| | |
|---|---|
| I want to ask a follow-up about assortment. You mentioned 75 million SKUs today. You guys ramped really quickly to that 75 million SKU mark. I'd be curious to hear a little bit about your expectations around the velocity of the continued ramp. And any particular categories that represent meaningful opportunities? Benjamin Shelton Bienvenu, Stephens Inc.'s Analyst, June 1, 2018. | While we're focused on increasing the breadth of the assortment, I think **our primary focus right now is really on quality of the assortment.** With respect to the 3P side, we've been also -- **at the same time, we're adding new merchants, we've also been culling merchants back that haven't been delivering an exceptional experience**. And so, we're really focused on making sure that **each SKU that we sell and each merchant we bring onboard can deliver a great experience.** Doug McMillon – June 1, 2018. |
| McMillon's remarks regarding attracting premium brands during the Q2 FY19 earning. | "We've added 1,100 new brands to Walmart.com year-to-date, including Zwilling J. A. Henckels cutlery and cookware, Therm-a-Rest outdoor products, O'Neill surf and water apparel, Shimano cycling products and the brands available on the dedicated Lord & Taylor shop, like Steve Madden footwear. This is a key area of focus for the team because we know that customers value an expanded assortment of these popular brands." McMillon, on the Q2FY19 earn call. |
| Marc Lore stated that Walmart was neither intentional nor reckless when it stuffed the Walmart.com catalog with low quality and/or value from non-reputable sellers to inflate the total number Marketplace SKUs to investors during FY17. during Walmart's. | Moving over to the long tail, let's just start with marketplace. Marketplace, we were adding SKUs really fast if you remember, it just got to like 70 million SKUs last year. We're adding so fast that we hadn't really kept a very high bar in terms of the quality of the SKUs and quality of merchants on the site.   So last year we took a breather.  We added more than 20 million SKUs to marketplace, but at the same time we took down about an equal amount. So, the overall quantity didn't change but the quality did.  The quality is much better. And you can see that the Net Promoter Score went up almost 20 points as a result. October 16, 2018 |

**Downplayed Walmart's Marketplace Profitability and GMV Growth**

96.     Walmart's executives walked back on their original assertions that Walmart's Marketplace/3P is a highly profitable and there was a direct correlation between the total number of Marketplace SKUs and Walmart's Ecommerce GMV growth.

| Analysts' Questions | Walmart's Backpedal Responses |
|---|---|
| So, a couple of questions. Second question is on 1P. **Is that ever profitable?** We're not sure it's even profitable for Amazon right now. So, I'm just wondering if you guys envision that, delivered to the home, 1P business being profitable. Scott Andrew Mushkin - Wolfe Research, LLC – MD—June 2, 2017. | "Well, with respect to **1P, 3P profitability, it's not really about whether it's first party or third party, it's really more the product category.** There's still a human and merchandising aspect of this first party and I personally believe the margins are going to be rewarded, because the way the world works, hard work and differentiation is rewarded with margins. So over time, first party, **I think, will be more profitable than third party**[17]. McMillon – June 2, 2017. |
| Peter Sloan Benedict, Baird & Co Analyst, Walmart Conference on June 7, 2017 As it relates to what [indiscernible] on Amazon's [indiscernible] large portion of their volumes [indiscernible] | Yes. So, I don't want to think about **3P and 1P necessarily in terms of profitability.** I think you want to carry a wide or the widest possible assortment of products. It doesn't make economic sense to carry a lot of those SKUs first party because you don't have the volume. There's obsolescence issues. There's holding costs and things. Lore – June 7, 2017. Lore also contracted Bigg's 10/6/16 statement. See footnote #2 below. |

---

[17] McMillon contradicted the statement made by Brett Biggs on 10/6/16: "We'll open fewer stores overall, particularly in the U.S. and we believe over time this will improve our returns on capital. Not surprisingly, we'll also focus on accelerating e-commerce growth. Now this includes **Marketplace, which can benefit the profitability mix of the e-commerce business**.

42

**COMPLAINT – DEMAND FOR JURY TRIAL**

**The RICO Defendants Conspired with William H. Thompson to Downplay the Materiality of Huynh's Allegations That Walmart Inflated Its Ecommerce Sales and Operating Profit**

97.     RICO Defendant William H. Thompson, SEC's Accounting Branch Chief Office of Consumer Products, purportedly sent a letter to Brett Biggs on May 22, 2017, asking Biggs questions related to the allegations in Huynh's 4/19/17 SEC complaint.  In the letter Thompson asked Biggs to explain how Walmart recognized revenue for its Marketplace business, how Walmart processed customer returns for its Ecommerce business, and how Walmart handled inventory marked down for Walmart's 1P Ecommerce Business.  These questions touched on the very same allegations Huynh made to the SEC.

98.     This letter was pretextual because there were no visible triggers that could have caused Thompson to send the May 22 letter.  First, Huynh just submitted his TCR to the SEC so there were no indications that the SEC had opened an MOI into Huynh's TCR.  Second, Walmart didn't file any reports with the SEC e.g., 8K, 10Q, and 10K etc. that discussed any of the issues raised in Huynh's SEC submission which could have triggered Thompson to send the May 22 letter.  As an example, the table below showed that Walmart didn't report any changes in the way they marked down stores' inventory and most importantly Walmart never discussed about how they accounted for Marketplace seller sales or how they marked down Walmart's 1P inventories.

| FY15 Form 10K | FY16 Form 10K | FY17 Form 10K |
|---|---|---|
| The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. | The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. | The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. |
| The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. | The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. | The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. |
| Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. | Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. | Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. |
| Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. | Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. | Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. |

**COMPLAINT – DEMAND FOR JURY TRIAL**

99. In short, the real purpose behind Thompson's letter was to give Walmart a platform to answer Thompson's questions concerning Walmart's Marketplace and 1P business (estimated to be roughly $8 Bil in FY17 based on Walmart's SEC filings) in the context of Walmart physical stores (a $500 Bil business) to mask the materiality of Huynh's allegations that Walmart inflated its Ecommerce GMV and Op Profit.

| Thompson's May 22nd 2017 letter | Walmart's June 16, 2017 response letter. |
|---|---|
| Further, please include quantitative disclosure of your sensitivity to change based on other outcomes that are reasonably likely to occur and that would have a material effect on the company.<br><br>For example, **with regard to inventories,** please indicate whether your estimated inventory losses have been accurate or have required adjustment; and, indicate the impact on net income if there was a 1% change in the amount of markdowns. | We did not make quantitative disclosure of the sensitivity to change within our Summary of Critical Accounting Estimates disclosure related to inventory because it was not material.<br><br>For example, a change of 1 % in permanent markdowns during the year ended January 31, 2017, would have impacted net income approximately $70 million. |
| Please tell us **how you earn and account for revenues from third party sales as** well as your consideration of disclosing your accounting policy for this revenue stream and income statement classification.<br><br>In your response please also address whether or not third-party sellers maintain ownership of their inventory and what services, if any, **you provide in fulfilling third-party sales and returns**. | Operating our walmart.com Marketplace enables us to provide our customers a broad assortment of merchandise that would likely not otherwise be available to them in our stores or on our own websites.  While the services we provide to third party sellers include the marketplace on which they sell and the collection of payments on their behalf, the third parties generally are the primary obligor, maintain ownership of their inventory, have latitude in establishing prices and are responsible for both product fulfillment and returns. As a result, we are the agent and the third party is the principal in these transactions. |

**COMPLAINT – DEMAND FOR JURY TRIAL**

| **Please disclose your sales return policy and address how you make estimates of the amounts of future returns.** In addition, please provide a rollforward of the activity in your sales return allowance here or in Schedule II, or provide to us your materiality assessment indicating why such disclosure is not necessary. | "The Company recognizes sales revenue, net of sales taxes and estimated sales returns. For the year ended January 31, 2017, and consistent with previous years, our sales return reserve was less than $250 million, which we do not believe is material to the Consolidated Financial Statements |

100.     Additionally, the RICO Defendants corruptly influenced Francine McKenna, a Marketwatch.com reporter, to publish an article on 9/13/17 titled "Wal-Mart accounting for e-commerce, overseas asset sales draw SEC scrutiny"[18] to amplify and broadcast Walmart's purported responses to Thompson's letter to marginalize Huynh's allegations with Walmart's investors, analysts, the SEC and/or the DOJ.

As these referral fees have been less than 0.5% of net sales for each of the fiscal years ended January 31, 2017, 2016 and 2015, we concluded **they are not material** and therefore have not disclosed our related accounting policy," Biggs told the SEC in the letter.

The SEC also asked in June about a non-GAAP metric called "**eCommerce Gross Merchandise Value" or GMV** in its press release. Wal-Mart told the SEC in July it defines GMV as "the total US dollar volume of merchandise sold or services rendered for all transactions, including marketplace transactions, that are generally initiated through our eCommerce platforms or include our owned inventory sold on other third-party platforms. **It also incorporates discounts, estimates for returns, shipping fees and referral fees.**"

E-commerce sales at Wal-Mart U.S., where the company is competing directly with Amazon, grew 60% in the most recent quarter. **Wal-Mart has already increased the number of products offered on Marketplace to 67 million items**, supplemented by items from third-party sellers like Toms and Vans shoes.

---

[18] https://www.marketwatch.com/story/wal-mart-accounting-for-e-commerce-overseas-asset-sales-draws-sec-scrutiny-2017-09-12

**COMPLAINT – DEMAND FOR JURY TRIAL**

1     101.    In late Sept 2017, Huynh emailed deRubertis to inform him that McKessy and

2  Huynh will be meeting with the SEC enforcement attorneys on Oct 5, 2017 in San Francisco

3  to discuss Huynh's SEC submissions. Instead of replying to Huynh's original email with the

4  Subject: "Call to sync up tomorrow, Friday", deRubertis opened a new email thread with a

5  Subject that simply read **"Huynh:"** to reply to Huynh's original email to make sure that there

6  was no direct evidence which proved that David deRubertis had knowledge of Huynh's meet-

7
8  ing with the SEC.

9
10
11  
12
13
14
15
16
17

18     102.    A short time later, Doug McMillon attempted to whitewash the misleading

19  statements he made to investors on Oct 6, 2016 that Walmart Marketplace had 8 Mil SKUs

20  and 20 Mil SKUs in Jan and Oct 2016 respectively by substituting the term "Marketplace"

21  with the term "Walmart.com" in his Oct 2017 presentation to investors and analysts that

22
23  Walmart.com had 8 Mil SKUs and 20 Mil SKUs on Jan 2016 and Oct 2016.

24
25
26
27
28

OCTOBER 06, 2016 / 01:00PM GMT, WMT - Wal Mart Stores Inc 23rd Annual Meeting for the Investment Community

**Doug McMillon** - *Wal-Mart Stores, Inc.* - *President and CEO, Wal-Mart Stores, Inc.*

And then in e-commerce, you saw the second quarter performance was better than the first quarter performance. That's largely driven to what's happening with the Marketplace in the U.S. And when we started the year in January, we had 8 million items on our Marketplace. Here in October, we have 20 million items on the Marketplace. So the trajectory of growth related to U.S. e-commerce in the Marketplace is strong, and we need it to be.

> On Oct 6, 2016 McMillon disclosed Marketplace had 8 million SKUs on January 2016 but on Oct 10, 2017, he changed it to Walmart.com had 8 million SKUs on Jan 2016.

Walmart

2017 Investment Community Meeting

Moving With Speed

| | JAN 2016 | MAY 2016 | JUN 2016 |
| --- | --- | --- | --- |
| | 269 stores closed globally | 250th Online Grocery location in U.S. | Uber same day delivery launched |

| JUN 2015 | JAN 2016 | FEB 2016 | MAY 2016 | JUN |
| --- | --- | --- | --- | --- |
| Added 8,000 Department Managers | 8M items on walmart.com | Moved current associate wages to $10/hour | 10M items on walmart.com | Sold Yiha invested |

> On Oct 6, 2016 McMillon disclosed Marketplace had 20 million SKUs on Oct 2016 but on Oct 10, 2017, he changed to Walmart.com had 20 million SKUs on Oct 2016.

| | | FEB 2017 | FEB 2017 |
| --- | --- | --- | --- |
| | | Moosejaw acquired | Mobile Express Pharmacy launched |

| OCT 2016 | JAN 2017 | FEB 2017 | FEB 2017 | MA |
| --- | --- | --- | --- | --- |
| 20M items on walmart.com | 2-Day Free Shipping on walmart.com orders of $35 or more | Walmex launches Club Pickup in all Sam's Clubs | Mobile Express Money Services launched | ModClo |

103.    On that same day, Robert Ohmes published an investment report on Walmart

Inc. where he replaced the term "Marketplace" with "Online (Walmart.com)" to purportedly

communicate to investors and other analysts that the SKU metric disclosed by McMillon in

FY1Y were actually Walmart.com's SKUs.  On the same report, Ohmes also provided highly

inflated Jet.com FY17 and FY18 Sales forecast to lend credibility to Walmart' inflated Quarterly Ecommerce Sales Growth in FY18.

## Wal*Mart Stores
## Analyst Day: Top pick WMT leading the "Discount Store Decade"

**Bank of America Merrill Lynch**

Reiterate Rating: BUY | PO: 100.00 USD | Price: 84.75 USD     Equity | 10 October 2017

### WMT omni-channel analysis

Replaced Marketplace with Online/Walmart.com

Exhibit 1: WMT e-Commerce quarterly analysis

| | U.S. GMV % Chg | U.S. GMV $ Sales Estimate | Owned E-com Sales % Chg | Owned U.S. E-com Sales Estimate | % Chg | Estimated 3P Sales ($MM) | % Chg | Estimated 3p Fees ($MM) | Estimated Fee % of GMV | (Millions) of Online SKUs | % Chg | Online Grocery Locations | Estimated E-com comp $s | % Chg | Implied acquired E-com $ | Estimated Jet.com Sales $s | % C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-Q1 | | $2,900.0 | | $1,738.1 | | $1,161.9 | | $116.19 | 10.0% | 10 | | | $139.1 | 3.5% | | $150.0 | |
| Jul-Q2 | | $3,200.0 | | $1,815.7 | | $1,384.3 | | $138.43 | 10.0% | 15 | | | $292.9 | 109.5% | | $250.0 | |
| Oct-Q3 | 28.6% | $3,900.0 | | $1,775.7 | | $2,124.3 | | $212.43 | 10.0% | | | | $359.9 | 246.1% | | $300.0 | |
| Jan-Q4 | 29.7% | $5,500.0 | | $1,974.5 | | $3,525.5 | | $352.55 | 10.0% | 35 | 337.5% | | $322.6 | 36.5% | | $400.0 | |
| F2017 | | $15,500.0 | | $7,303.96 | | $8,196.0 | | $819.6 | 10.0% | 35 | 337.5% | | $1,114.5 | 81.4% | | $1,100.0 | |
| Apr-Q1 | 69.0% | $4,901.0 | 63.0% | $2,833.0 | 63.0% | $2,068.0 | 78.0% | $206.80 | 10.0% | 50 | 400.0% | 670 | $580.5 | 317.4% | $514.49 | $500.0 | 233.3 |
| Jul-Q2 | 67.0% | $5,344.0 | 60.0% | $2,905.1 | 60.0% | $2,438.9 | 76.2% | $243.89 | 10.0% | 67 | 346.7% | 900 | $528.4 | 80.4% | $561.66 | $600.0 | 40. |
| Oct-Q3E | 51.3% | $5,900.0 | 55.2% | $2,755.1 | 55.2% | $3,144.9 | 48.0% | $314.49 | 10.0% | 77 | #DIV/0! | 1000 | $590.4 | 64.0% | $388.93 | $700.0 | 33. |
| Jan-Q4E | 45.5% | $8,000.0 | 52.2% | $3,005.1 | 52.2% | $4,994.9 | 41.7% | $499.49 | 10.0% | 87 | 148.6% | 1100 | $994.9 | 208.4% | $35.67 | $1,000.0 | 50. |
| F2018E | 55.8% | $24,145.0 | 57.4% | $11,498.3 | 57.4% | $12,646.7 | 54.3% | $1,264.7 | 10.0% | 87 | 148.6% | 1100 | $2,694.2 | 141.7% | $1,500.1 | $2,800.0 | 54.5% |
| F2019E | 33.1% | $32,145.0 | 43.5% | $16,498.3 | 43.5% | $15,646.7 | 2.0% | $1,564.67 | 10.0% | 135 | 55.2% | 1600 | $3,768.6 | 39.8% | $1,231.4 | $4,800.0 | 71.4% |

Source: BofA Merrill Lynch Global Research estimates, company reports

*Provided inflated forecast for Jet.com FY17 and FY18 Sales to lend credibility to Walmart's inflated Quarterly Ecommerce Sales growth*

104.    One critical question is "was it coincidental that McMillon didn't attempt to replace the term "Marketplace" with Walmart.com to report that Walmart.com had 15 Mil SKU in his Oct 17, 2017 PPT presentation to investors.  The answer was simply because there were two components of fraud that went into the reported 15 Mil SKUs figure. The first component was Walmart's improper counting of Walmart's 1P SKUs as Marketplace's SKUs while the second component of fraud was the counting of the total number Marketplace SKUs

49

**COMPLAINT – DEMAND FOR JURY TRIAL**

that were added during the first two weeks of Q3 FY17 as Q2 FY17's Marketplace SKUs. This latter component of fraud could not simply be whitewashed away by merely playing around with the definition of Walmart's "Marketplace" because it involved the timing of the Marketplace SKUs recognition.  Thus, if McMillon was to communicate to investors and analysts that Walmart.com had 15 Mil SKUs, then when the true about Walmart's misconducts came out Walmart may be liable for future shareholder fraud lawsuits. This was the reason why the Walmart Participants relied on the other RICO Defendants such a deRubertis, Ohmes (see above), Boyle at Bloomberg News and other reporters to do the dirty whitewashing activities on the Walmart Participants' behalf.

**Obstruction of the DOL/OSHA Investigation Process**

105.    On May 11, 2017 (See DC Dkt. 158-7), deRubertis asked McKessy via email to confirm whether the way deRubertis drafted Huynh's OSHA SOX whistleblower complaint against Walmart may interfere with any future SEC proceeding.  McKessy confirmed that it would not due to the general nature of the allegations. deRubertis filed the complaint with OSHA that same day.

### deRubertis Wanted to Ensure the OSHA Complaint Won't Interfere with SEC Case

| | |
|---|---|
| From: | David deRubertis <david@derubertislaw.com> |
| Sent: | Thursday, May 11, 2017 10:44 AM |
| To: | Sean X. McKessy; rchang@phillipsandcohen.com |
| Cc: | Tri Huynh; Tameka White; Jeff Neiderman |
| Subject: | RE: Connecting Sean and David to Align on Tri's Cases |
| Attachments: | OSHA DOL Complaint.pdf |

Hi Sean & Rebecca – Hope you have been well.  Attached is the DOL/OSHA charge we'd like to file for Tri tomorrow.  Would you mind just giving this a very quick read to make sure us filing this doesn't present any issue with the SEC process?  We have kept the allegations as generic as possible.

U.S. Department of Labor                                    OMB # 1218-0236
Occupational Safety and Health Administration
Notice of Whistleblower Complaint

25.  Why do you believe the employer took these actions against you? *You may check one or more of the boxes below, and/or describe the reason in the space provided.*

☐ Called/Filed with OSHA                        ☐ Called/Filed with Another Agency
☒ Complained to Management                 ☒ Reported an Accident or Injury
☐ Participated in Safety and Health Activities
☒ Refused to Perform Task (please specify reason for refusal)
☐ Testified or provided statement in investigation or other proceedings (please specify)
☒ Other (please describe)    Engaged in Sarbanes-Oxley protected activity by reporting and/or
opposing/refusing to perform what reasonably believed were acts of:
shareholder fraud; mail &/or wire fraud; violation of and/or attempted violation
of internal controls; securities fraud; fraud on shareholders; violation of laws
and rules or regulations of SEC; etc.  Made internal complaints to
management and human resources and made formal ethics complaints to
ethics hotline and CEO

| | |
|---|---|
| From: | Sean X. McKessy <smckessy@phillipsandcohen.com> |
| Sent: | Thursday, May 11, 2017 11:28 AM |
| To: | David deRubertis; Rebecca Chang |
| Cc: | Tri Huynh; Tameka White; Jeff Neiderman |
| Subject: | RE: Connecting Sean and David to Align on Tri's Cases |

Thanks for chance to review David. I don't see this as having any impact on our SEC submission.

51
**COMPLAINT – DEMAND FOR JURY TRIAL**

106.    On 7/10/17, David deRubertis purportedly asked Huynh via email to do a quick review of an amended complaint he planned to file with OSHA later that afternoon. Huynh reviewed and gave David deRubertis his feedback.  However, unliked in early May 2017, deRubertis didn't ask McKessy for feedback this time. Later that day, deRubertis purportedly filed a 125-page amended complaint (See DC Dkt. 158-7) with OSHA via fax, email, and overnight delivery to Ms. Jonelle Dunn, an OSHA investigator.

**THE deRUBERTIS LAW FIRM, APC**
trial lawyers

LAW OFFICE & MAILING ADDRESS
4219 COLDWATER CANYON AVENUE
STUDIO CITY, CALIFORNIA 91604
TEL:(818)761-2322 • FAX:(818)761-2323

July 10, 2017

Via Email and Overnight Delivery

Jonelle Dunn (Dunn.Jonelle@dol.gov)
U.S. Department of Labor
Occupational Safety & Health Administration
90 7th Street, #18-100
San Francisco, CA 94103

Re:   Tri Huynh v. Wal-Mart Stores, Inc.; Walmart.com; Walmart eCommerce; Wal-Mart Associates, Inc.
Supplemental material regarding May 11, 2017 Sarbanes-Oxley Whistleblower Retaliation Charge

**THE deRUBERTIS LAW FIRM, APC**
trial lawyers

MAIN OFFICE & MAILING ADDRESS
4219 COLDWATER CANYON AVENUE
STUDIO CITY, CALIFORNIA 91604
TEL:(818)761-2322 • FAX:(818)761-2323

**FACSIMILE TRANSMITTAL SHEET**

| To: | Jonelle Dunn | From: | Taneka R. White, Legal Assistant on |
| | U.S. Department of Labor - OSHA | | behalf of David M. deRubertis, Esq. |

| Fax Number: | (415)625-2534 | Fax Number: | (818)761-2323 |

| Date: | July 10, 2017 | Pages (Including Transmittal Page): | 12 |

Re:   Tri Huynh

Attached please find our correspondence concerning the above matter.
I attempted to email this document along with a link to our exhibits, but my email was rejected.  A copy of the rejection is also attached.

A hard copy of the attached with exhibits will follow by overnight delivery.

Thank you for your attention to this matter.

107.    Having the benefit of hindsight, Huynh now realized that it made no sense whatsoever for David deRubertis to file a 125-page amended complaint because OSHA had no such requirement (not even in Federal Court).

In Erhart v. BOFI Holding, Inc, District Judge Cynthia Bashant wrote "The Court initially notes that the DOL's regulations for retaliation complaints under § 1514A provide that "[n]o particular form of complaint is required." 29 C.F.R. § 1980.103(b). Indeed, a complaint may even be made orally, in which case the complaint "will be reduced to writing by OSHA." Id. This "absence of formal pleading requirements" means "complaints in

52
**COMPLAINT – DEMAND FOR JURY TRIAL**

OSHA administrative proceedings are not expected to meet the standards of pleading that apply to claims filed in federal court under Rule 12(b)(6)." Wadler v. Bio-Rad Labs., Inc., 141 F. Supp. 3d 1005, 1020 (N.D. Cal. 2015); accord Sharkey v. J.P. Morgan Chase & Co., 805 F. Supp. 2d 45, 53 (S.D.N.Y. 2011). See Case 3:15-cv-02287-BAS-NLS Document 192 at 13.

Jason Zuckerman, a leading whistleblower lawyer, also established that Rule 9(b) Does Not apply to Sarbanes-Oxley Retaliation Whistleblower Claims and that SOX Whistleblowers Need Not Prove an Actual Violation of an Enumerated Fraud Provision in Section 806. [19] Even David deRubertis himself admitted that a SOX Plaintiff doesn't have to plead with specificity even in Federal Court let alone with OSHA. [20]

| | |
|---|---|
| From: | Tri Huynh <triwyn@gmail.com> |
| Sent: | Wednesday, August 16, 2017 2:45 PM |
| To: | 'David deRubertis' |
| Cc: | 'Tameka White'; 'Jeff Neiderman'; 'Tri Huynh' |
| Subject: | Any reply from Walmart? |
| Importance: | High |

Hi David,

I was reading: PART 1980—PROCEDURES FOR THE HANDLING OF RETALIATION COMPLAINTS UNDER SECTION 806 OF THE SARBANES-OXLEY ACT OF 2002. Below are the keys take away:

- The DOL have already forwarded everything Walmart
- The DOL seems to forward all the material to the SEC.
   ○ I have sent the supplemental filing + exhibits to Rebecca and Sean so they are in the loop.
- Walmart have 20 days to reply to the DOL about our retaliation allegation.

Have you heard anything back from DOL regarding Walmart's response to our filings.

Thanks.

Tri

§1980.104 Investigation. (a) Upon receipt of a complaint in the investigating office, OSHA will notify the respondent of the filing of the complaint, of the allegations contained in the complaint, and of the substance of the evidence supporting the complaint. Such materials will be redacted, if necessary, in accordance with the Privacy Act of 1974, 5 U.S.C. 552a, et seq., and other applicable confidentiality laws. OSHA will also notify the respondent of its rights under paragraphs (b) and (f) of this section and §1980.110(e). OSHA will provide an unredacted copy of these same materials to the complainant (or complainant's legal counsel, if complainant is represented by counsel) and to the Securities and Exchange Commission. (b) Within 20 days of receipt of the notice of the filing of the complaint provided under paragraph (a) of this section, the respondent may submit to OSHA a written statement and any affidavits or documents substantiating its position. Within the same 20 days, the respondent may request a meeting with OSHA to present its position.

| | |
|---|---|
| From: | Tri Huynh <triwyn@gmail.com> |
| Sent: | Wednesday, September 13, 2017 10:08 AM |
| To: | David deRubertis; tameka@derubertislaw.com |
| Cc: | Jeff Neiderman; Tri Huynh |
| Subject: | DOL Docketing and Notification Letter |

Hi David/Tameka,

Has the DOL sent a letter to the deRubertis Law Firm notifying that the complaint filed by Tri Huynh has been reviewed, given an official designation (i.e., case name and number)?

If yes, it would be great if you can forward me a copy of the letter from OSHA/DOL.

Best Regards,

Tri Huynh

---

[19] https://www.zuckermanlaw.com/sox-whistleblower-decision-adopts-favorable-pleading-standard-for-whistleblowers/

[20] https://www.advocatemagazine.com/article/2014-june/protecting-whistleblowers-sarbanes-oxley-s-protected-activity-requirement.

**COMPLAINT – DEMAND FOR JURY TRIAL**

108.   For the next several months, Huynh repeatedly asked deRubertis for status update on his OSHA complaints.  Specifically, Huynh asked deRubertis to forward him the complainant notification letter that OSHA sent to the deRubertis Law Firm.  Neither deRubertis nor his office replied to Huynh's request.

109.   It was unusual for deRubertis to repeatedly avoiding Huynh's numerous requests because by law OSHA was required to send the complainant notification letter to a complainant shortly after receiving his/her complaint.  In the letter, OSHA would provide the complainant with the case name, assigned case number, the name of the assigned investigator and his/her contact information. 29 CFR §1980.104 (a)[21], and the OSHA's Investigation Manual[22] outlined the steps that OSHA typically took to investigate a SOX complaint.

---

[21] (a) Upon receipt of a complaint in the investigating office, OSHA will notify the respondent of the filing of the complaint, of the allegations contained in the complaint, and of the substance of the evidence supporting the complaint. OSHA will provide an unredacted copy of these same materials to the complainant (or complainant's legal counsel, if complainant is represented by counsel) and to the Securities and Exchange Commission. (b) Within 20 days of receipt of the notice of the filing of the complaint provided under paragraph (a) of this section, the respondent may submit to OSHA a written statement and any affidavits or documents substantiating its position. Within the same 20 days, the respondent may request a meeting with OSHA to present its position

[22] Chapter 2-5 stated "As part of the docketing procedures, **when a case is opened for investigation, the supervisor must send a letter notifying the complainant that the complaint has been reviewed, given an official designation (i.e., case name and number), and assigned to an investigator. The name, address, and telephone number of the investigator will be included in the docketing letter**. A Designation of Representative Form (see sample at the end of this Chapter) will be attached to this letter to allow the complainant the option of designating an attorney or other official representative.

Also, at the time of docketing, or as soon as appropriate, the Supervisor must prepare a letter notifying the respondent that a complaint alleging retaliation has been filed by the complainant and requesting that the respondent submit a written position statement. Failure to promptly forward the respondent letter could adversely impact the respondent's due process rights and the timely completion of the investigation.

54

**COMPLAINT – DEMAND FOR JURY TRIAL**

110.    After receiving a SOX Whistleblower complaint from a complainant, a Regional OSHA Investigator Supervisor should open and docket a case in IMS, **assign an investigator to investigate the case, and send notification letters to both the respondent and complainant**.

OSHA's investigation manual chapter 5-10 – VII described how an OSHA investigator should determine the proper complaint filed date before entering it into IMIS. A correct filed date for the complaint was critically importantly because it would be used to determine the timeliness of the complaint.

Documenting Key Dates in IMIS: The timely and accurate entry of information in IMIS, as detailed in OSHA Directive IRT 01-00-016, is critically important. A. "Date Complaint Filed: the date a complaint is filed is the date of the post-mark, **facsimile transmittal, e-mail communication**, telephone call, hand-delivery, delivery to a third-party commercial carrier, or in-person filing at an OSHA office."



**OSHA Investigation Process As Required 29 CFR §1980.104 and 105**

111.    The respondent notification letter should also inform the respondent that they may submit a position statement to OSHA within 20 days. Additionally, under 29 CFR § 1980.105(a) [23], OSHA must issue a preliminary reasonable cause finding and preliminary order for the case within 60 days after receiving the complaint.  The chart above outlined the

---

[23] **Issuance of findings and preliminary orders**: (a) After considering all the relevant information collected during the investigation, the Assistant Secretary shall issue, within 60 days

timeline that OSHA would have investigated Huynh's 5/11/17 complaint against Walmart if deRubertis did in fact filed the complaint on 5/11/17.

Note: The average time it took OSHA to process the complaint and send out the notification letters is about 14 days based on the two SOX case below.

- https://storage.courtlistener.com/recap/gov.uscourts.paed.534987.1.0.pdf
- https://storage.courtlistener.com/re-cap/gov.uscourts.flsd.535106/gov.uscourts.flsd.535106.1.0_1.pdf

112.    After a long period of silence regarding Huynh's OSHA complaints, deRubertis contacted Huynh in early Nov 2017 and purportedly informed Huynh that OSHA informed deRubertis that Huynh could take his case against Walmart to Federal Court because OSHA couldn't complete the investigation within the 180 days kick out period.  deRubertis flew



From deRubertis' client return file that deRubertis didn't previous share with me.

From: Eldridge, Megan - OSHA [mailto:Eldridge.Megan@dol.gov]
Sent: Wednesday, November 8, 2017 2:37 PM
To: david@derubertislaw.com
Subject: Wal-Mart Stores, Inc /Huynh/9-3290-17-361

Mr. Derubertis,

Be advised I have been reassigned to complete this investigation. Please confirm if you have received the August 31, 2017 Position Statement from Wal-Mart Stores, Inc. It may be some time before I am able to investigate this complaint due to our backlog of cases. Therefore, I want to let you know that there are a few options available to move the case forward more quickly:

- If OSHA has failed to issue Secretary Findings, and the delay was not due to bad faith on your part, you may have the option of withdrawing your matter from OSHA's jurisdiction and filing directly in federal district court.  Please keep in mind that according to Jones v. Southpeak Interactive Corp. of Delaware, et al., (4th Cir. 2015), you may be prevented from exercising this withdrawal if four years have passed since the accrual of the claim pursuant to 28 U.S.C. §1658(a).

of filing of the complaint, written findings as to whether or not there is reasonable cause to believe that the respondent has retaliated against the complainant in violation of the Act.

56

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Huynh to Studio City, CA the following week under the pretext of discussing the facts of the

2   case so deRubertis could file Huynh's complaint against Walmart with the United States Dis-

3   trict Court, Northern District of California by Mid-Dec 2017.

### Rocky Roads to the US District Court of Northern CA's Doorsteps

deRubertis intentionally delayed filing the civil complaint by over three months

| | Meeting with deRubertis in Studio City, CA | Target date to file complaint | Revised target date to file complaint | Bully, Threats and intimidations #1 | Bully, Threats and intimidations #2 | deRubertis filed complaint |
|---|---|---|---|---|---|---|
| **5/11   7/10** | **Mid Nov** | **Mid Dec** | **1/10/18** | **1/31/18** | **2/12/18** | **3/15/18** |

OSHA complaint filed    OSHA amended complaint filed    OSHA Kick Out Provision.

DOL/OSHA didn't investigate the complaints after 180 days

deRubertis' and PR Agency Executed Media Campaign

OSHA issued right to sue letter

### Delayed and Coverup a $140 Bil Shareholder Fraud Scheme

113.   The chart above showed that David deRubertis intentionally delayed filing Huynh's complaint in Federal Court from Mid-Dec 2017 to Mid-Mar 2018.  Whenever Huynh asked David deRubertis for the case filing status deRubertis either evaded or lied about the delay e.g., due to health issues and family emergency etc.

114.   David deRubertis also attempted to deceive Sean McKessy and Rebecca Chang about his purported plan to file Huynh's complaint in Federal Court on Jan 9, 2018.

| | |
|---|---|
| From: David deRubertis <david@2rubertislaw.com> | From: Rebecca Chang [mailto:rchang@phillipsandcohen.com] |
| Sent: Tuesday, January 9, 2018 12:57 PM | Sent: Thursday, January 11, 2018 12:05 PM |
| To: Sean X. McKessy; Rebecca Chang | To: trivyn@gmail.com |
| Cc: Tri Huynh; Diana Pinkey an; Jeff Niederman; Kari deRubertis | Cc: Sean X. McKessy <smckessy@phillipsandcohen.com>; 'Tri Huynh' <trinhhuynh@outlook.com> |
| Subject: Huynh; filing retaliation SOX case in fed court | Subject: Re: Re-analyzing SKU Misstatement |
| | |
| Importance: High | Tri thanks, think we have a new hearing need from you will update shortly - was your civil case filed yesterday (I don't think we saw a Complaint but did see letter from David) |

Hi Sean & Rebecca – Hope you've been doing well and are having a good new year so far. As Tri has advised, we are filing his complaint in federal court tomorrow. I will send you the draft of it to take a look at before we file. However, I wanted to make sure my understanding is correct that we don't need to file it under seal because he has already disclosed to SEC. Just wanted to make sure I'm not incorrect about that, as I don't have nearly the SEC whistleblower experience that you all have and I obviously don't want to impact your case with Tri in any negative way. Can you confirm we are ok to publicly file?  Thanks,

-David

| | |
|---|---|
| From: trivyn@gmail.com |
| Sent: Thursday, January 11, 2018 12:08 PM |
| To: 'Rebecca Chang' |
| Cc: 'Sean X. McKessy'; 'Tri Huynh' |
| Subject: RE: Re-analyzing SKU Misstatement |

Hi Becky,

Thanks for the reply.

David has pushed the filing to next Tuesday or Wednesday to finish the complaint.

I will make sure David will send you and Sean a copy of the complaint for your review.

115.     When deRubertis could not keep Huynh away from asking deRubertis to do his job and file Huynh's complaint timely with excuses and lies, deRubertis resorted to nastiness, threats, and intimidations to stop Huynh from pushing deRubertis to file the complaint.



Hi Tri - sorry lost a couple days this week unexpectedly. Back on your complaint now. Proba-
bly send you a draft over the weekend but I will keep in touch. Thanks. I was in court today
against Walmart again for a case likely getting tried in February. Walmart was not happy
again today. My gloves are off for these fuckers. – David deRubertis Dec 21, 2017

**David deRubertis' Jan 30, 2018 Email.**

Hi Tri – I've tried to be diplomatic about this but it's **not getting through to you**.  I feel
like I need to be less diplomatic and more direct.  I hope you'll understand and this won't
hit you the wrong way.  I need you to step back and try better to understand my perspec-
tive.  I feel like we talk, you reassure me you want the best product possible and you
aren't in a crazed rush to get something in your hands, but you just need clear communica-
tion on timing.

I'm doing my best to meet your desires, but **I'm also doing my best to put together the
best work product**. And, a fundamental point in this I probably should have made more
clear to you (even though I have said this **repeatedly**): I don't make my schedule; often,
my schedule is made for me by emergencies created by cases, courts or clients that I have
to prioritize over non-actual deadlines.  Once your case is filed, you will get my priority
over clients whose cases are not yet filed.  So, while I do my best to predict things, it's
never near science and it's not uncommon for predictions to prove wrong.  Nonetheless, I
did tell you I would communicate timeline and delays to you.  I think I have been doing
that, but from my perspective, on this issue, you are not doing what I'm asking in return.
Let me explain why I say that.

Yesterday, I wrote this: "Will touch base in morning if it's not emailed to you tonight.
Hang tight…. Approaching the finish line…  😊" So yesterday I told you I would reach
out to you in the morning.  But, true to form, at 8:47 a.m. **this morning you're already
emailing me**.  As if that wasn't enough, then at 9:25 a.m. you're texting me.  Yet again,
you don't even give me the chance to do what I say before you're bombarding me with
what I perceive as "where is it" communications.

My question to you: Is this really necessary?  You really couldn't sit tight and wait to hear
from me without before even 9:00 a.m. reaching out?  I sure did plan to reach out this
morning but, frankly, was so annoyed that you're already at it that I didn't.

**David deRubertis' Feb 12, 2018 Email.**

Hi Tri – Just saw your text from yesterday.  Please stop.  You are beating me down to the
point of discouraging me from doing my best work.  **I cannot tell you this again.  You
will respect it, or we don't work together**.  I told you before: NO, I'm not just sending
you the work in progress until I feel it is ready to turn over to you.  I told you that last time
around.  To now ask for me to do that again, **is to return to the process of not listening**.
**You are being your own worst enemy by continuing this pattern.**  I'm trying to do this

59

**COMPLAINT – DEMAND FOR JURY TRIAL**

the way that works for me because that is what produces the best result for my clients. I've been 100% transparent about my process to you.  I've told you I don't just placate clients to make them happy.  I focus on doing the work on the case the way that will produce the best result, even when it annoys clients.  I've told you this directly **over and over, including in our initial meetings.  Nonetheless, I keep feeling pressure to placate you and make you happy.**  If you want me to be that lawyer, sorry, I won't.  I'm not going to keep feeling the pressure to account to you on meeting fictional deadlines.  I told you this weekend about the real reality of deadlines.  And I've been putting as many hours as I can into finalizing your complaint, re-reviewing ALL of the documents to make sure I'm not overlooking anything in terms of the theory we are pitching in it, etc. [24]  I want to do this the right way, and I need to stop being asked to predict when it is in your hands because the end result is that process just leads to more frustration.  Don't you see that if you keep breathing down my neck, it just incentivizes me to hurry up and finish rather than take the time to do the best result???

But, I've also concluded it makes no sense to tell you when I expect to turn it over because then I keep feeling a pressure to rush to meet a false deadline rather than working the way ALL MY OTHER CLIENTS ALLOW ME TO WORK.  Yes, I'm writing that in caps for a reason.  YOU ARE THE ONLY CLIENT WHO MAKES ME FEEL LIKE I HAVE TO FOCUS ON PLACATING YOU RATHER THAN DOING THE BEST WORK.

116.    In short, deRubertis' purported justifications for the delaying filing the complaint was 1) deRubertis was busy with other cases, and 2) deRubertis needed more time to draft a comprehensive and high-quality complaint i.e., a 70-page complaint.  deRubertis' justifications for the delay were bogus for two reasons.  First, deRubertis knew that he didn't have to plead with specificity in a SOX employment retaliation case nor was he required to prove that Walmart committed fraud against shareholders. Second, deRubertis contradicted himself when said he said he was busy and needed more time because at the same time that deRubertis delayed filing Huynh's complaint David and Kari deRubertis ordered their associ-

---

[24] As discussed in paragraph X above, my case is a SOX retaliatory termination case not a class action shareholder fraud case so deRubertis didn't have plead with specificity and prove that Walmart actually committed illegal conducts.  So deRubertis didn't need four months to draft a complaint.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  ates to contact and rush Huynh's primary care physician and psychiatrist to expedite the pro-

2  duction of Huynh's medical and psychiatrist records stating due to court filing deadlines.

**The Reasons Jessica Bunkofske Gave to Huynh's Medical Providers to Expedite Record Production Contradicted with deRubertis' Stated Reasons to Delay Filing Huynh's Civil.**



**Back to the Future - February 18, 2018**

117.    Huynh struggled for the last several months trying to answer a fundamental

question "Why did deRubertis repeatedly delay filing Huynh's complaint? What were deRu-

bertis' true motives?  In early Sept 2020, Huynh stumbled on two recent rulings regarding the

loss causation requirement of a securities fraud class action lawsuit brought under § 10(b)(5).

These cases gave Huynh the inspiration to investigate and answer the questions above.  The

first case was PAUL HAYDEN, et al., Plaintiffs, v. PORTOLA PHAR-MACEUTICALS,

61

**COMPLAINT – DEMAND FOR JURY TRIAL**

INC., et al., (Case 3:20-cv-00367-VC) out of the United States District Court, Northern District of California.

https://www.govinfo.gov/content/pkg/USCOURTS-cand-3_20-cv-00367/pdf/USCOURTS-cand-3_20-cv-00367-1.pdf

In his ruling, District Judge Vince Chhabria wrote: "To satisfy this element, the plaintiffs must allege that the revelation of the identified omission was a **substantial factor in cause the company's stock price to decline, thereby causing an economic loss for its investors**. Nuveen Municipal High Income Opportunity Fund v. City of Alameda, California, 730 F.3d 1111, 119 (9ᵗʰ Cir. 2013). This is frequently achieved by identifying the date that "the truth is revealed" through some public announcement and then describing how much the stock dropped thereafter, often bolstered by statements from analysts citing the revelation as the cause for investor concern. See, e.g., In re Daou Systems, 411 F.3d 1006, 1026 (9ᵗʰ Cir. 2005).

118.    The second case was out of the United States Court of Appeals for the Ninth Circuit.  IN RE BOFI HOLDING, INC. SECURITIES LITIGATION (Case No. 18-55415). Circuit Judge Kenneth LEE wrote the following in his dissenting opinion (the bullet points were Huynh's remarks)

https://cdn.ca9.uscourts.gov/datastore/opinions/2020/10/08/18-55415.pdf

"Philosophers have long debated the question, "If a tree falls in the forest but no one is around to hear it, does it make a sound?" This case perhaps presents the converse of that conundrum: If there is no fraud, can a securities fraud lawsuit still proceed?"

- Walmart not only made sure that no one was around to hear the truth about their $140 Bil fraudulent scheme against Walmart's investors but they also used their wealth, power, connections in high places, high-price lawyers, and PR agencies to banish Huynh from society, friends, colleagues, and even family members to destroy Huynh's life and leave him for dead. Huynh currently was forced to wander in the wilderness and some barren wastelands for speaking up and telling the truth about Walmart's illegal conducts to protect Walmart's shareholders and the American public from harms.

Below are the excerpts from the book "Whistle-blowers Broken Lives and Organization Power" by C. Fred Alford. This book described the extend corrupted Corporations went through to shot the messenger in order to cover up their crimes.

**COMPLAINT – DEMAND FOR JURY TRIAL**

"I think the whistleblower has as much to teach us about **politics as about suffering. Or rather, it is the suffering of the whistleblower that connects these two terms**. The story of the first scapegoat will tell us why. Part of the ancient ritual among the Hebrews for the Day of Atonement, the instructions for **the sacrifice of the scapegoat** are found in Leviticus 16:21-22: "The priest shall lay both his hands on [the scape-goat] and confess over it all the iniquities of the Israelites and all their acts of rebel-lion, that is, all their sins; he shall lay them on the head of the she goat and **send it away into the wilderness** in charge of a man who is waiting ready. The goat shall carry all their iniquities upon itself into some **barren waste** and the man shall let it go, there in the wilderness.""

Think about how much the scapegoat must know. For many whistleblowers this knowledge is like a **mortal illness**. They live with it, and it with them, every day and night of their lives. They do not just know the sins of the tribe. They are afflicted with them. My plan has been to follow the scapegoat **into the desert of his exile and there to study his affliction** so that I might learn the sins of the tribe. You might reply that not only is this way of putting it melodramatic, but how much I can learn depends on how articulate and thoughtful the whistleblower is. About the first objection you will have to decide for yourself. About the second, there are ways of listening that do not depend on the articulateness of the whistleblower. Not everyone is creative, but every-one has a creative unconscious. Not every whistleblower is articulate, but there is **elo-quence even in silence** and cliche if we are prepared to feel its sources. To put the same point another way, I learned most from those whistleblowers who seemed to feel their experiences most deeply, whether or not they were able to articulate them. When I listen to whistleblowers, I feel awe at one who has **stepped outside the skin of the world and lived to tell about it**. The whistleblower has become sacred, a term whose original meaning was both blessed and cursed. Daniel Ellsberg, the whistleblower who leaked the Pentagon Papers, said that his former friends and colleagues regarded him with neither admiration nor censure but with wonder, as though **he were a space-walking astronaut who had cut his lifeline to the mother ship**. What was this mother ship? Was it the academic military-industrial complex, the system, the organi-zation? Call it what you will, it is not so much a precise concept as an overwhelming feeling. Every chapter aims to explain this feeling. Every chapter is written from the perspective of this feeling. This is not because the feeling is so important in itself but because of what it tells us about the forces that hold society together and their conse-quences: the willingness of most people to do anything not to be sent space-walking.

Judge Lee continues:

"The majority believes that Erhart's allegations in his separate whistleblower lawsuit against BofI are plausible enough to constitute a "corrective disclosure" under Rule 10b-

**COMPLAINT – DEMAND FOR JURY TRIAL**

5's loss causation requirement. But what if it turns out that Erhart's allegations in his lawsuit are bunk? What if he is mistaken? Perhaps he misconstrued certain information because, **as a fairly junior level employee**, he did not understand or have access to all the facts. Or what if (as BofI suggests) **he is a loose cannon who has a messianic zeal for seeing wrongdoing where none exists**? At this point, we simply do not know, especially with no other evidence or disclosure to corroborate Erhart's claims in his lawsuit But we do know that <u>BofI has not issued any financial disclosures that would confirm Erhart's allegations that he first aired in 2015. BofI has not done so, even though the U.S. Department of Justice, the Securities and Exchange Commission, and the Treasury Department have reportedly investigated BofI. And apparently at least one SEC investigation that began in 2015 has already closed with no action.</u>

Put another way, five years have passed since Erhart first disclosed allegations of misconduct at BofI, and multiple government agencies commenced investigations into BofI. Yet so far, we have not seen any external evidence corroborating Erhart's allegations. So, it may turn out that there may be smoke but no fire.

But based solely on a **midlevel employee's self-interested allegations** in a separate lawsuit, we are allowing a securities fraud lawsuit to move forward. It is premature to do so. Erhart may ultimately be vindicated, and perhaps the government investigations will eventually expose fraud, but we should not let a securities fraud lawsuit proceed when, at this point, there may no there there.

We may end up with a scenario in which **Erhart loses his whistleblower trial, and the government agencies end their investigations without any action** — and yet BofI may end up settling a securities fraud case for millions of dollars to avoid litigation c

In short, if a securities fraud lawsuit turns on insider allegations of wrongdoing in a whistleblower lawsuit, I would prefer a bright-line rule that requires an external disclosure or evidence that confirms those allegations. It need not be a mea culpa from the company, but perhaps a surprise restatement of earnings, an unexplained announcement about an increase in reserves, or some other information that confirms those allegations and thus acts as a corrective disclosure.

1   Page 35 Footnote #1: "Some may argue that such a requirement may create perverse incen-

2   tives for a company not to make a corrective disclosure. Perhaps it might in the short run,

3   but a wrongdoer can balance **its house of cards for only so long until it ultimately col-**

4   **lapses**. Insider allegations of wrongdoing almost always lead to governmental investiga-

5   tions, and the truth ultimately comes out under scrutiny."

6   - It took a decade for Bernie Madoff's house of cards to fall. However, by then he had
      ripped off Billions of dollars from hard working American families and destroyed
7   their hopes, dreams, and livelihoods.

8   - The same thing also happened with Enron, WorldCom, Tyco, HealthSouth, Freddie
      Mac, AIG, Lehman Brother, MCI, Lucent Technologies, and Chart Communication.
9
   - How long should we as a society allow for the fraudulent Corporations' house of cards
10    to fall before, they permanently injure the American public?

11

12   https://www.icpas.org/information/copy-desk/insight/article/summer-2013/the-21st-cen-
     turys-top-10-frauds
13   https://list25.com/25-biggest-corporate-scandals-ever/
14   https://en.wikipedia.org/wiki/List_of_corporate_collapses_and_scandals

15
16       119.    The rulings above were like the DeLorean in the Movie Back to the Future be-

17   cause they took Huynh back in time to Feb 18, 2018 when Walmart's stock crashed by 10%

18   after Walmart announced that they missed analysts' expectation regarding Walmart's Q4

19   FY18 Ecommerce sales growth.  For the last several months, Huynh read numerous

20   Walmart's 10Ks, 10Qs, and 8Ks filings, Walmart's earning calls and other events' transcript

21   as well as numerous analysts' reports on Walmart Inc then Huynh modeled Walmart's Quar-

22   terly Ecommerce growth with and without the Jet.com FY17 and FY18 sales contribution.
23

24

25

26

27

28
**COMPLAINT – DEMAND FOR JURY TRIAL**

**Lied Big or Go Home!**

120.    Based on his analysis, Huynh discovered that Walmart's senior executives (Marc Lore, Dough McMillon, Brett Biggs, and others) artificially inflated Walmart's Ecommerce quarterly sales growth to purportedly show explosive quarterly growth rates of 63%, 60%, and 50% for Q1, Q2, and Q3 FY18 respectively.  As a result of these misleading results, Walmart's Market Capitalization increased by roughly $140 Bil during FY18.  However, after, Walmart announced on Feb 18, 2018 that Walmart's Q4 FY18 Ecommerce Sales growth collapsed to 23% from 50% in the previous Quarter, Walmart's stock price dropped by 10% on the same day then continued to drop from a height of $109 in late Jan 2018 to $82 on May 29, 2018 (a $27 drop), wiping out roughly $80 Bil in Walmart's Market Capitalization valuation.  This definitely satisfied the causation prong of a 10(b)(5) class action lawsuit and obvious made the RICO Defendants' "Truth on the Market" Defense asserted in Mid-March 2018 a laughing stock. Investors who bought and sold stock during the misleading period may have already been harmed by Walmart's fraudulent acts.

121.    The Chart below showed that during period where Walmart's senior executives artificially inflated Walmart's Quarterly Ecommerce Sales Growth (discussed above) which drove Walmart's Market Cap to increase by $140 Bil then subsequent collapse, CalPERS disposed roughly 735,000 share of Walmart stocks.  If CalPERS[25] had bought Walmart's stock at a higher price, then later sold it a lower price, then two million hard working Californians may have been harmed by Walmart's fraudulent conducts.

---

[25] https://www.calpers.ca.gov/



122.    Walmart's senior executives artificially inflated Walmart's Quarterly Ecom-

merce Sales Growth in FY18 in two significant ways. First, Walmart misleadingly disclosed

to investors in Oct 2016 that Jet.com's annual GMV run rate was **$1.2 Bil** when in actuality it

was closer to **$.6 Bil**. See Exhibit III- SEC Jan 2018 Submission at page 2. As a result of the

inflated GMV run rate for Jet.com FY17 and FY18 GMV which led analysts materially in-

flated their forecast of Jet.com GMV for FY17 and FY18. Second, based on the inflated

Jet.com FY 17 and FY18 Jet.com GMV, Walmart recognized all of Jet.com FY17 and FY18

GMV as Jet.com sales.  However, this was not GAAP compliance because Walmart should

have only recognized the seller commission fee (about 15% of GMV) generated from Jet.com

Marketplace's GMV as Jet.com sales not the entire Marketplace GMV amount.  Walmart

knew this fact very well because this was the precise answer that Mr. Biggs gave to Mr.

Thompson in Mid-2017.

| SEC May 2017 Letter to Walmart. | Walmart's Reply Letter in June 2017 |
|---|---|
| **Revenue Recognition.** | **Walmart's Methodology.** |
| Please tell us how you earn and account for revenues from third party sales as well as your consideration of disclosing your accounting policy for this revenue stream and income statement classification. | We are the agent and the third party is the principal in these transactions. **We earn and account for referral fees from these transactions on a net commission basis, which we present in net sales** in the Company's Consolidated Statements of Income. |

123.    In short, deRubertis' reasons for delaying filing Huynh's complaint were not Because deRubertis was too busy nor because he wanted to draft a beautiful and high quality complaint (on the contrary deRubertis shotgun pleaded five wicked ADHD FEHA claims in Huynh's complaint) but because he had ulterior motives i.e., deRubertis delayed the filing to give the Walmart Participants the run way they needed to execute a plan to conceal the fact that they ripped off Walmart's shareholders to the tune of $140 Bil.

124.    Walmart's senior executives knew by late Nov and Early Dec 2017 during the shopping holiday season that Walmart will miss analysts' expectations regarding Walmart's Q4 FY18 Ecommerce sales growth.  Thus, the RICO Defendants planned and executed a campaign of factual misrepresentations and/or half-truth justifications to mislead Walmart's investors, analysts, the media, and the SEC etc. in order to cover up the facts that Walmart had artificially inflated Walmart's Quarterly Ecommerce Sales growth in FY18 to jack up its Market Cap by $140 Billion. Walmart's senior executive provided two purported justifications for the Ecommerce sales short fall.

125.    First, Walmart intentionally stopped unprofitable sales of items that apparently

**COMPLAINT – DEMAND FOR JURY TRIAL**

juiced prior year holiday online result (Walmart found items being sold by resellers) i.e., Walmart didn't want to lose more money during the Q4 FY18 holiday shopping season. Second, Walmart encountered operational problems at their FCs when they tried to swap out every day items (grocery and consumable) with holiday merchandises during Q4 FY18. Although, Walmart claimed this had a minor impact on slower Ecommerce sales growth Huynh believe it was not the case. The key question here is whether the two purported explanations that Walmart's senior executives gave to investors and analysts were truthful?  Base on the analyses below Huynh came to believe that these justifications were not truthful or at the very best they were half-true for two reasons.

126.     First, Walmart's senior executives claimed that Walmart didn't want to be too promotional during the FY18 holiday seasons because Walmart didn't want to lose more money was not credible in two ways. First, when Huynh asked McMillon during a town hall meeting with Walmart.com's employees in late 2016 "How would Walmart closed the Ecommerce sales gap with Amazon?".  McMillon's answer was simply **Investment matter! We have to put more fuel on the fire not less**.  So, losing money could not be the real reason for missing an important metric analysts used to value Walmart's stock.

127.     Especially, when Walmart's senior executives knew that investors were willing to overlook operating margin short fall in the short to medium term as long as Walmart delivered high Ecommerce Sales growth.  Second, Walmart was spending money like a drunken sailor to buy both US same stores sales and US Ecommerce sales growth at the expense of US operating margin.

1
2
3
4
5
6
7
8
9
10



**Figure 4: Digital Growth Driving Multiples**

Source: Cowen and Company, Company Reports, Thomson One; note: P/E FY2

11

12    128.    The chart below is scatter plot between Walmart's US operating margin and

13   same store sales growth.  Since taking over as Walmart Inc.'s CEO, McMillon bought US

14   same-store sales growth at the expense of operating margin. (i.e., he was willing to lose or

15   make less money).  Although, Walmart's US SSS increased to around 3%, Walmart's US op-

16   erating margin eroded significantly from the 7% to 8% range under McMillon's predecessors

17   to around 5% under McMillon's leadership.

18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT – DEMAND FOR JURY TRIAL**





129.     Additionally, Walmart lost Billions of Dollars on its Ecommerce business since FY12 in order to buy growth.  Thus, it was difficult to believe that someone that spent money like a drunken sailor suddenly woke up one day and decided to be frugal.



71

**COMPLAINT – DEMAND FOR JURY TRIAL**

130.    Second, Walmart's purported explanation that the FC operational problems during the FY18 holidays season was a minor contributing factor to Walmart's slower Ecommerce sales growth was at the very best half-truth.  Huynh believes that while it was true that Walmart encountered operational issues when they tried to swap out the bulky and heavy grocery and consumable items with holidays merchandises.  Huynh does not believe that the impact of this problem was a minor factor in Walmart's slower Ecommerce sales growth.

131.    The chart below showed that Walmart.com's Ecommerce sales growth (without Jet.com contribution) was averaging about 36% between Q1 and Q3 of FY18 but suddenly dropped by 20% to 16% during Q4 FY18.  What this showed was that Walmart overstuffed their FCs with grocery and consumable items during off peak season in FY18 to maximize Ecommerce sales.

**Online Grocery and the Jet.com Acquisition Are the Key Drivers That Helped Walmart Cross the Chasm to Purportedly High Ecommerce Growth in FY18**



Source: Estimated Walmart US Ecommerce sales growth based on Walmart's SEC filings and analyst reports

72

**COMPLAINT – DEMAND FOR JURY TRIAL**

132.    However, it was more likely than not that Walmart failed to foresee the huge operational challenges of swapping out bulky and heavy grocery and consumable items with general merchandise/holiday items.  Huynh believes Walmart's challenges in bringing holiday assortments to their FCS materially impacted Walmart's Ecommerce sales growth during Q4 of FY18 for two reasons.

133.    First, customers did not simply buy more grocery and consumable items during the holidays. On the other hand, customers spent significantly more money on general merchandise products during the holiday shopping season.  For example, a typical online retailer's sales in Q4 usually double that of a normal/off peak quarter.

134.    Second, grocery and consumable products are bulkier and take up more space than general merchandise products. Imagine how many general merchandise items a 12 rolls of paper tower would displace.  So, for every consumable item that Walmart was unable to swap out of their FCs Walmart lost sales on multiple General Merchandise items. Additionally, General Merchandise items often have higher average selling prices than consumable items. Loss of general merchandise item sales resulted in further sales declined for Walmart.

135.    Several days after McMillon announced that Walmart Q4 FY18 Ecommerce sales growth collapsed to 23% from 50% in the previous quarter (a 30% drop), Matthew Boyle published an article on Feb 23, 2018 to misrepresent the reasons behind Walmart's slower Ecommerce sales growth to conceal the fact that Walmart was driving its Ecommerce sales growth in FY18 by selling more low margin grocery and consumable products instead of selling the high margin general merchandise products[26] as purportedly implied by Walmart.

---

[26] If investors and analysts knew that the majority of the Ecommerce sales growth was coming from grocery and consumable then it would shatter Walmart's purported Ecommerce basket growth strategy because the cornerstone of this strategy was to earn low margin (maybe

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    136.    In hist article, Matthew Boyle purportedly attributed the reason for Walmart's

2    slower Ecommerce sales growth was due to Walmart's inability to fulfill the flood of cus-

3    tomer holiday gifts orders (indirectly implied that customers loved Walmart's general mer-

4    chandise products very much but Walmart was not able to fulfill their orders).  However, this

5    completely contradicted with what Walmart's senior executives were telling investors and an-

6    alysts i.e., Walmart's slower Ecommerce sales growth was intentionally because Walmart

7    didn't want to be too promotional and to some small extend, Walmart had difficulties in

8    swapping out grocery and consumable products with general merchandising products.  In

9    short, it was the lack of product offerings drove slower Ecommerce sales not Walmart's ina-

10   bility to fulfill the tsunami of customer gift orders during the holidays.



**Digital Downshift**
Walmart's online expansion decelerated in its latest quarter
■ U.S. e-commerce sales growth

Source: Walmart
Note: Fiscal year ends Jan. 31

https://www.bloomberg.com/news/articles/2018-02-23/walmart-s-amazon-killer-goes-from-superstar-to-man-on-hot-seat

---

even lose money) with click & collect grocery and consumable offering then earned high mar-
gin by getting customers to buy general merchandise e.g., Apparel and Home products.

| Boyle's statements | Walmart's disclosures on Feb 18 | Remarks |
|---|---|---|
| But the first crack came over the holidays. **An influx of gift orders overwhelmed Walmart's supply chain, leaving no room for everyday items**. Sales rose 23 percent, a slower pace than both Amazon and Target over the same period. Feb 23, 2018. | "Yes. So, the operational challenges that I mentioned were more around fulfillment. And so, as you start -- you always have this challenge. As you start **pulling more seasonal inventory into a fulfillment center, where you have everyday goods, you can have some challenges with that.**" Brett Biggs – Mar 2018. | Walmart stated the lack of holiday (general merchandise) offerings was the main contributing factor to the slower Ecommerce sales growth not Walmart's inability to fulling the tsunami of incoming customer orders. |

137.   Furthermore, Boyle published an online article on 4/13/18[27] to purportedly emphasize and accentuate the spectacular collapse of Jet.com website traffic to down-play the success of Jet.com in order to direct investors' and analysts' scrutiny away the fact that Walmart had improperly inflated Jet.com FY17 and FY18 sales to inflate Walmart's Quarterly Ecommerce sales growth in FY18.

### Jet.com is losing altitude.

Walmart Inc., Jet's owner, has increased marketing of its primary website while scaling back promotion for Jet. While the shift may help maintain the retailer's declining profit margins, the impact has been felt on Jet's website, **where traffic declined about 60 percent in March compared with a year earlier.** according to data tracker SimilarWeb.

"So long as Walmart's numbers are strong it doesn't matter what happens to Jet," said Sucharita Kodali, an analyst at Forrester Research. "This makes it easy to sunset Jet and focus on Walmart. **I'm not sure, honestly, why Jet is even still around."**

---

[27] https://www.bloomberg.com/news/articles/2018-04-13/walmart-s-jet-traffic-declines-as-hipsters-prove-costly-to-reach

**COMPLAINT – DEMAND FOR JURY TRIAL**

## Jet Crash

Traffic to Jet.com site has fallen as Walmart has reduced the site's marketing efforts

■ Jet.com monthly site visits



Source: SimilarWeb

### The RICO Defendants' D-Day: Truth on the Market" Offense

138.    Shortly after Walmart's Q4 FY18 earnings call, deRubertis repeatedly contacted Huynh to specifically ask for evidence that would prove Walmart engaged in illegal conducts by making misleading statements to investors about the total number Marketplace SKUs on Walmart.com and by inflating its Ecommerce GMV and Op Income due to Walmart intentionally not processing process customer returns and failure to mark down obsolete inventory. deRubertis gathered this information then worked with the other RICO Defendants to concoct a strategy to use the Mar 15, 2018 complaint as a platform to whitewash evidence of Walmart's conducts and to disseminate factual misrepresentations across the Internet and major business news cable networks for two purposes: 1) To destroy Huynh's credibility with the SEC i.e., by making the statements in the Mar 15, 2018 complaint contradicted with the allegations in Huynh's SEC submissions and 2) to falsely assert Walmart's "Truth on the Market"

76

**COMPLAINT – DEMAND FOR JURY TRIAL**

Defense.[28] to mislead the SEC, Walmart's investors, investment analysts, the media and other governmental agencies that there was zero loss causation to Walmart's stock when Huynh's disclosures became public.



Do you know where we can easily find these #s for Walmart:

88.  Likewise, Mr. Huynh observed similar misrepresentations regarding total seller numbers.  For example, by way of illustration and not by way of limitation, Wal-Mart was reporting the total number of sellers who had been onboarded with Wal-Mart, regardless of whether the seller was actually live and ready and able to sell on Walmart.com.  This misrepresentation of seller numbers was occurring on both Walmart.com and Jet.com.  For example, at one point Mr. Huynh observed that Jet.com was reporting over thirteen thousand (13,000) sellers when, in fact, just over three thousand five hundred (3,500) were actually live on the site – over six thousand (6,000) were deemed "inactive" and another over three thousand two hundred (3,200) were not yet live. As to Walmart.com, _____

---

[28] Since David deRubertis was Huynh's lawyer at the time, anything he put in the complaint about Walmart's misconducts (and Huynh ADHD conditions) would be construed as coming directly from Huynh's mouth.

77

**COMPLAINT – DEMAND FOR JURY TRIAL**

139.     For example, Huynh alleged in his 4/19/17 SEC submission that Walmart intentionally failed to process its Ecommerce customer product returns for months at a time to overstate its GMV by approximately **$384M USD**, and inflated its operating income by approximately $126M USD. Despite, having this knowledge, deRubertis cherry picked the **$7 Mil** customer returns amount out of thin air then intentionally inserted it in paragraph 51 of Huynh's 3/15/18 complaint even though Huynh repeatedly told deRubertis not to do so. The **$7 Mil figure** was later broadcast Globally across the Internet, CNBC, and Bloomberg News.

| deRubertis 3.8.18 Draft Paragraph 51 | Feedback Provided to deRubertis on 3.9.18 |
| --- | --- |
| Mr. Huynh also learned of other system problems within Wal-Mart's online Marketplace platform, including a major flaw or error within Wal-Mart's Pangaea system, which _____. Also, in or about March 2016, Wal-Mart received a complaint from a large third-party seller that Wal-Mart had failed to process three thousand (3,000) refund orders. Wal-Mart looked into the complaint and concluded that there was a coding and system error within the Pangaea system that caused Wal-Mart to serially and systematically fail to process certain returns or refund orders from certain third-party sellers since September 8, 2015. In short, Wal-Mart had improperly retained over **seven million dollars ($7,000,000)** that should have been refunded to third-party sellers from September 2015 through the discovery of the issue in March 2016. | We should remove the first paragraph on Pangea system as most of the issues I identified are related to GMP.  The only issue on Pangea that I know of was the incorrect processing of customer returns. <br><br> The last paragraph was not correct. In this case, Walmart had already refunded the money to customers but failed to collect the money back from sellers so they had to claw back the money from sellers by giving them incentive to reimburse Walmart the money. <br><br> Here is a **proposed revision** to the last paragraph. <br><br> In short from September 2015 through the discovery of the issue in March 2016, Wal-Mart had failed to process customer returns **worth Millions of dollars which resulted in an overstatement of gross merchandise value/sales.** Additionally, Wal-Mart needed to collect the customer refunds from sellers as it has already refunded the money to customers |

140.   Next, deRubertis and the other RICO Defendants acted in concert to purport-

edly redefine "Marketplace" as Walmart.com by using the term "1P" and "third party/3P" as

an **"essential appositive"** in front of the term "Marketplace".

**An appositive further explains, identifies, or renames a noun or pronoun in a sentence. There are two types of appositive**

## Essential Appositives

- When the information an appositive gives about a noun is ESSENTIAL, we DON'T use commas. (Some people call this *restrictive*)
- This year, actor Freddy Redmayne won the Oscar for Best Actor for his portrayal of Stephen Hawking in *The Theory of Everything.*



Without his name, we don't know which actor we're talking about because "actor" is a very broad, undefined noun.

## Nonessential – Use Commas

- Larry, my roommate obsessed with *Where's Waldo books*, embarrasses me when we go out in public.



The appositive phrase provides extra information. We could move it around or take it out.

*Ask:* Does the information define the subject or simply provide extra info about the subject?



The MVP soccer player of the final game, Zach Still, celebrated his victory by going to Disneyland.

*We can assume there was only one MVP soccer player for a particular game, so the subject is already very specific and defined. The name is extra information.*

The soccer star Zach Still celebrated his victory by going to Disneyland.

*There could be many soccer stars, so we must know the name to fully define the subject of the sentence.*

**Definition Prior to May 2017**
- There is only one Marketplace on Walmart.com where third-party (marketplace) sellers list their product for sales.
- Marketplace is **synonymous** with Third-Party/3P.
- Marketplace is a segment of Walmart.com.

**Definition Between May 2017 And Dec 13, 2018**
- There are two Marketplaces on Walmart.com: a third-party/3P marketplace and a first party/1P Marketplace.
- Marketplace is **not synonymous** with Third-Party.
- Marketplace is **synonymous** with Walmart.com.

**COMPLAINT – DEMAND FOR JURY TRIAL**

141.    deRubertis used the term **"third-party/3P" as an essential appositive** in an attempt to redefine Walmart Marketplace as Walmart.com.  Under this novel approached, David deRubertis defined Walmart Marketplace as having both the First-Party/1P Marketplace and the Third-Party(3P) Marketplace even though there is only one Marketplace on Walmart.com.  This new definition of Marketplace made McMillon's statements to investors in FY17 no longer misleading because it was perfectly okay to include 1P SKUs in the total number of Marketplace SKUs reported to investors. deRubertis used the paragraphs below in the 3/15/18 Complaint in an attempt to create a new definition for Walmart's Marketplace.

"In this "third-party" or "3P" model, Wal-Mart provides "third-party" sellers the ability to offer their products for purchase on Wal-Mart's "**third-party" marketplace** at Walmart.com, and Wal-Mart then charges a commission to the "third-party" seller for each completed sales transaction." deRubertis – FAC DC Dkt. 8 at ¶ 39.

"However, traditionally, **"third-party" marketplaces** tend to be far more profitable than a "first-party" online business." deRubertis – FAC DC Dkt. 8 at ¶ 59.

"By boosting-up these indirect measures, Wal-Mart paints a picture of E-commerce growth and success (including specifically in the typically more profitable **"third party" Marketplace**) that, in fact, misleads the investing public." deRubertis – FAC DC Dkt. 8 at ¶ 60.

"Among other things, and merely by way of example and not by way of limitation, Wal-Mart's online **"third-party" Marketplace** had items listed such as: "Tranny Granny" Costume: An offensive, inappropriate Halloween costume mocking transgender people:" — deRubertis – FAC DC Dkt. 8 at ¶ 67.

"The Fiscal Year 2018 Plan set operational targets of ending Fiscal Year 2018 (i.e., February 2018) with twenty thousand (20,000) **Marketplace "third-party"** sellers." — deRubertis – FAC DC Dkt. 8 at ¶ 86.

"Mr. Huynh also explained that Wal-Mart had allowed its Marketplace catalogue to be stuffed "with many published SKUs that are not buyable by customers (non-buyable published SKUs are useless for customers)," and noted the extreme disconnect between this metric on Wal-Mart's own "first-party" system versus its **"third-party" Marketplace."** — deRubertis – FAC DC Dkt. 8 at ¶ 101.

142.   After misleadingly altered the original meaning of Walmart's Marketplace, deRubertis replaced the Marketplace's original definition with his new definition of Marketplace to whitewash McMillon's misleading statements.

| Walmart's usage of the original Marketplace term. | deRubertis' Usage of the New Marketplace term. | Remarks |
|---|---|---|
| Quick update on **Marketplace** progress: **16.5 million unique SKUs** (up from 6.2 million at the beginning of the year) – **on the site**, there are currently **19.7 million** unique SKUs including 1P. Beal's Oct 2nd 2016 Email. | "For example, the same senior leader who boasted in early-October 2016 that the **"third-party"** Marketplace now had two thousand and seventy-four (2,074) and **sixteen million five hundred thousand (16,500,000) unique SKUs"**— deRubertis – FAC DC Dkt. 8 at ¶ 66. | deRubertis whitewashed the term "Marketplace" in Beal's email by replacing it with the term **"third-party"** Marketplace to purportedly assert that Marketplace had approximately **20 Mil SKUs** while "third-party" Marketplace had **16.5 Mil SKUs**. This made McMillon's statement no longer misleading. |
| "Next, we are growing our **marketplace offering** at a strong pace. Since the beginning of the year, **we've added about 7 million new items to the assortment** and today offer approximately **15 million SKUs**". McMillon Q2 FY 17 earnings call. | In its August 18, 2016 second quarter FY17 earnings call, Wal-Mart's Chief Executive Officer Doug McMillon reported that Wal-Mart had added **seven million (7,000,000) SKUs to its Marketplace offerings** since the beginning of the year and now reached fifteen million **(15,000,000) SKUs on its Marketplace**. DC Dkt. 8 at paragraph 61. | Under deRubertis' new definition of Marketplace, McMillon's statement on the Q2 FY17 earning call was no longer misleading because Marketplace now included both 1P Marketplace SKUs and 3P Marketplace SKUs. |

**COMPLAINT – DEMAND FOR JURY TRIAL**

| | | |
|---|---|---|
| **From a marketplace perspective, we're scaling fast – adding 8 million SKUs** over the past 3 months alone. McMillon - Q3 FY 17 earnings call on Nov 17, 2016. 15 million SKUs (Q2 FY17) + 8 million SKUs = 23 million SKUs. | In its November 18, 2016 third quarter FY17 earnings call, McMillon began his portion of the earnings report highlighting "some recent developments in e-commerce" including that Wal-Mart was "scaling fast – **adding 8 million SKUs** over the past 3 months alone" **within its Marketplace. DC Dkt. 8 at ¶ 87.** | Under deRubertis' new definition of Marketplace, the statement McMillon made on Walmart's Q2 FY17 earnings call was no longer misleading. |

143.    Before filing the complaint, David deRubertis repeatedly asked Huynh to make sure that McKessy must sent an email **directly from his mail box** to deRubertis to confirm that it was okay for deRubertis not to have to file Huynh's complaint under seal. deRubertis' true motive for asking this question had nothing to do with whether it was okay to file under seal because deRubertis knew or should have known the answer.  deRubertis' true motive for asking this question was to make sure that McKessy didn't object to the fact that deRubertis' fraudulently took the information in Huynh's SEC complaint and included it to the 70-page complaint for no rational basis except to whitewash McMillon's misleading statements and to legitimately leak the information to the Rescue Squad and the Walmart Participants.

From: David deRubertis <david@derubertislaw.com>
Sent: Sunday March 11, 20:38 59:10 AM
To: trinyn@gmail.com
Subject: RE: Why Any Partner with Business?

Hi Tri - Got it. Yes, I'm revising to some degree based on this. Also, I'm working on making the internal control allegations more concrete and specific. Have you heard back from Sean/Rebecca at all? BTW, timing-wise, we are ok filing the complaint a few days later this week to accommodate their review, etc. and making sure these changes are good to go. It's important that we give the PR person a 24-hour head's up or so with a completed draft. So, I may push filing not tomorrow most likely. But, will likely be Wed/Thursday - just depends on timing of the PR Bloomberg folks.

From:     David deRubertis <david@derubertislaw.com>
Sent:     Wednesday, March 14, 2018 12:45 PM
To:       trinyn@gmail.com
Cc:       Kan deRubertis
Subject:  RE: Huynh review the Facts please

Why does it have to come directly from McKessy???

And most important please send the confirmation from them to me re: no need to file under seal. Please re' mean the emails to them. Thx.

From:        Tri Huynh <trimhuynh@outlook.com>
Sent:        Friday, March 9, 2018 9:29 AM
To:          'Sean X. McKessy', 'Rebecca Chang'
Cc:          David deRubertis'
Subject:     FW: Huynh: draft of facts
Attachments: Complaint Facts.pdf

Hi Sean/Becky,

Attached is the almost finish complaint that we will be filing for the civil case.

Please review the document and let us know 1) if you are okay with what was said in the doc and 2) that we do NOT need to file this under seal.

To: Tri Huynh <trimhuynh@outlook.com>; Rebecca Chang <rchang@phillipsandcohen.com>
Cc: David deRubertis <david@derubertislaw.com>
Subject: RE: Final Complaint: Need your feedback

I don't see any reason that you would need to from an SEC investigation/reward perspective.

From: David deRubertis <david@derubertislaw.com>
Sent: Wednesday, March 14, 2018 12:51 PM
To: Sean X. McKessy <smckessy@phillipsandcohen.com>; Tri Huynh <trimhuynh@outlook.com>; Rebecca Chang <rchang@phillipsandcohen.com>
Subject: RE: Final Complaint: Need your feedback

Thanks, Sean. Just wanted confirmation from those who really know – i.e., you guys!

144.    Additionally, by getting McKessy's confirmation, deRubertis could later assert (if being charged for obstructing the SEC investigation) the "I am incompetence" not "a crook" defense i.e., "I didn't know any better because the SEC whistleblower experts told me it was okay to do so". That was the reason why in David deRubertis March 14, 2018 email to McKessy, deRubertis wrote:  " Thanks, Sean. **Just wanted confirmation from those who really know – i.e., you guys!**

**Maestros of the Media: "Truth on the Market" Defense – Pinocchio's Style.**

145.    In his 3/11/18 email to Huynh, deRubertis wrote: "It's important that we give **the PR person a 24-hour head's up** or so with a completed draft. So, I may push filing not tomorrow most likely. But, will likely be Wed/Thursday – **just depends on timing of the PR/Bloomberg folks.**" This proved that the RICO Defendants worked with a PR agency or agencies (not yet known at this time) and Matthew Boyle to disseminate Walmart's factual misrepresentations across the Internet and business cable networks to mislead the SEC, Walmart's investors, analysts, the Media, and the American Public into believing that Walmart did nothing wrong.  On the other hand, the RICO Defendants portrayed Huynh as too "Nutty" (a mentally ill, emotionally out of control employee, and a savage "Vietnamese native" (not trust worthy)) and too slimy (dishonest, disgruntle, and engaged in sexual harassment) to be a credible Whistleblower.

146.    Most importantly the RICO Defendants wanted to prove that there was zero loss causation when Huynh's disclosure came out in public. So, immediately after deRubertis filed the complaint there was massive media coverage although the messages were carefully controlled (made the disclosures vague when it comes to Walmart's misleading statements regarding the Walmart's Marketplace SKU metric while amplified deRubertis' fraudulent $7 Mil customer return figure) to support Walmart's truth on the market defense.

**$7 Million – Materiality: Are You Kidding Me?**

**Matthew Boyle, a Bloomberg News reporter.  Mar 15 and 16, 2018 articles.** Huynh's remarks are Italicized inside the parentheses.

"The whistle-blower lawsuit, filed in federal court in San Francisco, claims Walmart issued **misleading results** (*what kind of misleading results?*). Tri Huynh, a former director of business development, claims he was terminated "under false pretenses" after raising concerns (*what kind of concerns?*) about an "overly aggressive push **to show**

84

**meteoric growth** (*what did Walmart push?*) in its e-commerce business by any means possible -- even, illegitimate ones."

"Walmart's systems sometimes failed to label marketplace items in the right product category, resulting in some vendors **paying higher commissions** than they should have (*How big was the total amount of commission fees overbilling?*)".

"The company also failed to process customer returns on items totaling more than **$7 million** (*Walmart used the $7 Mil figure that deRubertis refused to remove per my request. See above*), which resulted in reporting inflated sales the customer return, Huynh said."

**Excerpts from Other Reporters' 3/15/18 Articles Regarding the $7 Mil Figures**.

"Huynh also said Walmart failed to process more than **$7 million** of customer returns, inflating the total value of merchandise sold from September 2015 to March 2016." Jonathan Stempel and Nandita Bose, Reuters' Reporters – Mar 15, 2018/

"It refused to accept legitimate returns on over **$7 million** worth of products. He also claims that Walmart overstated its revenue to "paint an overly-optimistic picture of its current and short-term progress in the catching-up in the e-commerce space." Leticia Miranda, Buzzfeed news' reporter – Mar 15, 2018.

"Huynh claims that a coding error in Walmart's Pangea system failed to process some return and refund orders between September 2015 and at the earliest March 2016 worth about **$7 million**, creating an "inflation" in sales for the period." Kali Hay, WWD.com's reporter.

"The suit, filed this week in Northern California federal court by Tri Huynh, alleges that Walmart has been lowering its standards to boost the size of its online catalogue; mis-categorizing some items listed for sale, which can result in overcharging some merchants who sell through Walmart.com; and failing to process **$7 million in returned items**." Jason Del Rey, Recode's reporter, Mar 15, 2018.

"Among other things, the lawsuit alleges, Walmart placed some marketplace items in the wrong product categories, causing some vendors to pay higher commissions. It also alleges the company's failure to process customer returns worth **$7 million** led to inflated ecommerce sales." Mike O'Brien, Multichannel Merchant's reporter. Mar 15, 2018.

Huynh also alleged Walmart failed to process **$7 million** in customer returns – Mar 15, 2018

https://www.cnbc.com/video/2018/03/15/walmart-drops-on-whistleblower-lawsuit.html
https://www.cnbc.com/video/2018/03/15/walmart-responds-to-whistleblower-lawsuit.html

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Crazy Like a Fox - Too Nutty to Be a Whistleblower**

147.    The RICO Defendants engaged in character assassination by "Nuts & Sluts" Huynh's in in the public eyes (including attacking Huynh's national origin as a Vietnamese American, Huynh's ADHD condition, and honesty) to destroy Huynh's credibility for raising complaints in order to shift the spotlight away from Walmart's illegal conducts and shine it the spot light on Huynh instead.

148.    First, the RICO Defendants through their PR agency enticed and/or influenced Jonathan Stempel and Nandita Bose (Reuters' Reporters), and Kali Hay, Total Digital Display's reporter, to intentionally inserted Huynh's ADHD condition and inflictions in their articles without any context even though it didn't enhance the editorial value of their article except to exploit the American public's stigmatization of people with mental disorders to "Nuts" Huynh in the eyes of the public. [29]

---

[29] The most powerful weapon in a corporation's arsenal is the exploitation of a whistleblowers' **mental illness/psychological disorders to delegitimize their complaints**. This is an effective strategy because it draws on the **social stigma associated** with people who suffered from mental illness.  Even the smallest hint of mental health issues (Corrigan and Watson 2002) would destroy the whistleblowers' reputation, credibility, and livelihood. It is damaging at many levels because it can lead to a self-reinforcing cycle; those who experience retaliation can frequently suffer from a range of health issues, including mental health ones, and often seek counseling at some point in the process. Thus, reactions to whistleblowing by and within organizations, including retaliation, can produce negative mental health effects, which are then used by the organization to discredit the whistle-blower.  **It is akin to double jeopardy**.

**COMPLAINT – DEMAND FOR JURY TRIAL**

| From: | David deRubertis <david@derubertislaw.com> |
| Sent: | Sunday, March 11, 2018 8:59 AM |
| To: | triwyn@gmail.com |
| Subject: | RE: Why Jay Partner with Business? |

Hi Tri – Got it. Yes, I'm revising to some degree based on this. Also, I'm working on making the internal control allegations more concrete and specific. Have you heard back from Sean/Rebecca at all? BTW, timing-wise, we are ok filing the complaint a few days later this week to accommodate their review, etc. and making sure these changes are good to go. It's important that we give the PR person a 24-hour head's up or so with a completed draft. So, I may push filing not tomorrow most likely. But, will likely be Wed/Thursday – just depends on timing of the PR/Bloomberg folks.

MARCH 15, 2018 / 11:36 AM / UPDATED 3 YEARS AGO

Whistleblower says Walmart, eyeing Amazon, cheated on e-commerce
By Jonathan Stempel, Nandita Bose

Huynh said he was fired not long after raising concerns with U.S. e-commerce chief Marc Lore, and was dismissed under the "false pretenses" of a broader workforce reduction and alleged performance issues.

He said he had told human resources the prior May of his efforts to deal with attention deficit hyperactivity disorder.

By then, Huynh, who claims to have ADHD, says he was being retaliated against. He was called in to human resources over "manufactured or [exaggerated]" misconduct at two trade shows and was written-up and required to take a course on "emotional intelligence." Total Digital Display By Kali Hay on March 15, 2018

These reporters inserted Huynh's ADHD condition without context to stigmatize Huynh's reputation not for any editorial value.

**You Are Not One of US - Charlie Not Welcomed Here!**

149.     Second, the RICO Defendants attacked Huynh's national origin as a Vietnamese refugee. Huynh's civil complaint described a beautiful and hopeful American Dream story of a poor 12-year-old refugee boy's journey (without his parents) from Saigon to Harvard Business School. Instead of highlighting this beautiful and inspiring story, Matthew Boyle, Johnathan Stempel, and Nandita Bose, chose to insert non-essential appositives like "**Vietnamese Native**" and "Who was **born in Vietnam**" without any context in their articles. These appositives didn't enhance the editorial values of their articles nor they increased readers' appeals. The only reason these reporters inserted these appositives in their articles was to exploit the American Public's unconscious bias against Vietnamese people based on Holly-

87

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  wood's stereotypical portrayal of Vietnamese people in Vietnam War movies to vilify and de-
2  humanize Huynh and the Vietnamese people.

3  Instead of retelling a "beautiful" American success story about a Vietnamese refugee who overcame adversity to
4  graduate from Harvard Business School, these reporters intentionally maligned Huynh and his people.

**First Amended Complaint**

5  32.  Tri Huynh was born in Vietnam to parents who resided in Long Xuyen
6  South Vietnam. At twelve years-old, Tri Huynh was separated from his parents and
7  sent to a refugee camp in Thailand with his aunt and two cousins.  In 1980, Tri
8  Huynh was sponsored by his aunt's daughter who had previously immigrated to the
9  United States right after the fall of Saigon to come to America.  He thus left
10  Thailand and made his way to New York.

11  33.  Tri Huynh's family wanted him to immigrate to the United States for
12  the same reasons as so many other American immigrants.  Their country was torn
13  apart by civil unrest and America promised a brighter future. Grateful for the
14  opportunities that America promised, Tri Huynh worked hard to achieve the

15  34.  Tri Huynh spent his teenage years in a tough inner city neighborhood in
16  Queens. Struggling to master the English language, Mr. Huynh still graduated near
17  the top of his high school class.  He then went on to obtain a Bachelor's of
18  Engineering (B.E.) in Electrical Engineering, a Masters of Science (M.S.) in
19  Manufacturing Engineering from New York University - Polytechnic School of
20  Engineering and a Master of Business Administration (M.B.A.) with a focus on
21  Strategy and Finance from Harvard Business School.

MARCH 15, 2018 / 11:38 AM / UPDATED 3 YEARS AGO

**Whistleblower says Walmart, eyeing Amazon, cheated on e-commerce**

By Jonathan Stempel, Nandita Bose

The plaintiff, who was born in Vietnam and lives in Washington state, said Walmart abruptly fired him in January 2017 in retaliation for his repeated complaints about its e-commerce reporting and internal controls.

**Walmart Whistle-Blower Claims Cheating in Race With Amazon**

By Matthew Boyle

**Non-essential Appositives**

March 15, 2018, 10:52 AM PDT

Huynh, a native of Vietnam, joined Walmart in 2014 from Amazon. He claims he warned his superiors and the company's ethics department that if "Walmart did not properly address these issues, its failure to do so could have serious long-term implications for its critically important e-commerce business."

"Huynh, a native of Vietnam, joined Walmart in 2014 from Amazon. He claims he warned his superiors and the company's ethics department that if "Walmart did not properly address these issues, its failure to do so could have serious long-term implications for its critically important e-commerce business."
Material Handling & Logistic – 3/16/18

22
23  See **RACISM AT THE MOVIES: VIETNAM WAR FILMS**, 1968-2002 at
24  https://scholarworks.uvm.edu/cgi/viewcontent.cgi?article=1180&context=graddis

25  •  The stereotype of Asian women as prostitutes stems from the days of Chinese immi-
26  gration and the Page Act when women were barred out of the fear, they were all pros-
27  titutes. Vietnam War films, if they have women at all, often show them in this role.
   For example, a scene in the movie "Full Metal Jacket (1987)" portrayed Vietnamese
28  women as prostitutes and Vietnamese men as pimps. Remembered that infamous line

88

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   "Me so horny, Me love you long time." in the movie. This phrase became a pop cul-
2   ture phenomenon in America. There was rap song titled "Me So Horny" that reached
    number 1 on the U.S. Billboard Hot Rap Tracks chart. https://en.wikipe-
3   dia.org/wiki/Me_So_Horny

4   • Much has been said about the way the Vietnamese have been represented, from the
5     stereotypes of **corrupted** officials to **inept and effeminate** warriors in the South Viet-
      namese army, invisible and/or superhuman and/or **barbaric warriors** in the North Vi-
6     etnamese Army and Viet Cong, prostitutes, and simple-minded, **backwards peasants**.

7   • The corrupt official and inept/effeminate warrior are most often applied to the South
8     Vietnamese ally, as in The Green Berets (1968) and Hearts and Minds (1974). The
      various stereotypes of the enemy can be found in virtually every Vietnam War film,
9     from the **vicious** Viet Cong in The Green Berets to the wraith-like jungle fighters in
10    Platoon (1986).

11  • Acts of the enemy "proved" their **barbaric nature: they killed innocent villagers,**
      **raped children, mutilated American bodies, and shot to wound, not kill,** in films
12    like The Green Berets, Platoon and Full Metal Jacket

13

14                                **Moral Turpitudes**

15       150.    Third, the RICO Defendants attacked Huynh's moral turpitudes (dishonesty,
16  self-serving, and disgruntle) while eulogizing Walmart's as a faultless and honest.
17

18  Walmart spokesman Randy Hargrove said the litigation is based on allegations by a dis-
19  gruntled former employee, who was let go when the business was restructured. "We take
    allegations like this seriously and looked into them when they were brought to our atten-
20  tion," he said. "The investigation found nothing to suggest that the company acted im-
21  properly. Reuters' Reporters: Jonathan Stempel and Nandita Bose - Mar 15, 2018.

22  Walmart told BuzzFeed News that "this litigation is based on allegations by a disgruntled
    former associate, who was let go as part of an overall restructuring." "We take allegations
23  like this seriously and looked into them when they were brought to our attention," said the
    company. "The investigation found nothing to suggest that the company acted improperly.
24  We intend to vigorously defend the company against these claims. Leticia Miranda Mar
25  15, 2018.

26  "The claims come from "a **disgruntled** former associate," who was let go as part of a
    broader workforce restructuring, said Greg Hitt, a Walmart spokesman. "We take alle-
27  gations like this seriously and looked into them when they were brought to our atten-
28  tion," Hitt said. "The investigation found nothing to suggest that the company acted

                                      89

improperly." The Seattle Time on 3/15/18.

"This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," said a Walmart spokesperson in a statement emailed to Investor's Business Daily. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Elaine Low – **Investor's Business Daily** 3/15/18.

"Walmart in a statement to CNBC said that it intends to "vigorously defend" itself against these claims. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," Walmart said. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**." **Lauren Thomas, CNBC**, on 3/15/18.

"Walmart denied Huynh's claims in an email to Courthouse News on Thursday afternoon. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," the company said. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Court House News** --MATTHEW RENDA, A.E. YOUNG / March 15, 2018

Walmart said Huynh's allegations lack merit. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," spokesman Greg Hitt said in a corporate statement. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Kevin McCoy - **USA TODAY** 3/15/18.

In a statement to Retail Dive, Walmart said it **followed up with claims** made by Tri Huynh, a former director of business development, and that he was laid off along with many others. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," according to Walmart's statement. "We take allegations like this **seriously and looked into** them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Daphne Howland – **Retail Dive** 3/16/18.

Randy Hargrove, a spokesperson for Walmart, told Dailymail.com that the allegations come from a **'disgruntled former employee'** who was let go due to the restructuring of the company.  He said an investigation looked into the allegations made by Huynh and found nothing to suggest the company acted **improperly**. By DANIELLE ZOELLNER FOR **DAILYMAIL.COM** 3/18/18.

Walmart told Talk Business & Politics that Huynh is a disgruntled former employee and the allegations are untrue. The company provided the following statement: "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring. We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Kim Souza -**Talk Business & Politics** – 3/15/18.

"This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," a Walmart rep tells Recode. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." By Jason Del Rey- **Recode/VOX** on 3/15/18.

Walmart spokesman Randy Hargrove said the complaint is "based on allegations by a **disgruntled** former associate" who was let go as part of the company's overall restructuring in early 2017. "We take allegations like this seriously and looked into them when they were brought to our attention," Hargrove said in a statement. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Northwest Arkansas Democrat Gazette** 3/16/18.

But Walmart is calling foul. A company spokesman said Huynh's allegations are those of "a **disgruntled** former associate, who was let go as part of an overall restructuring." "We take allegations like this seriously and looked into them when they were brought to our attention," the spokesman added. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **WWD.com** Kali Hay on March 15, 2018

Walmart has denied the allegations and said they were made by a "**disgruntled** former associate, who was let go as part of an overall restructuring," according to company spokesperson Randy Hargrove. "We take allegations like this seriously and looked into them when they were brought to our attention," he said in a statement to TheStreet. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Thestreet.com** – Cathleen Chen – 3/15/18.

"This litigation is based on allegations by a **disgruntled** former associate who was let go as part of an overall restructuring," said Walmart spokesman Randy Hargrove. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Multichannel Merchant** - Mike O'Brien- 3/15/18.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Zero Loss Causation Informercial and Boyle's Beautiful Chart**

151.    Fourth, one day after deRubertis filed Huynh's complaint, the RICO Defend-
ants pulled together a beautiful informercial which Matthew Boyle published on 3/16/18 to
execute Walmart's "Truth on the Market" Offense.  On the one hand, the informercial in-
cluded testimonies from "industry experts", "professors", and "hedge fund managers" to
downplay the materiality of Huynh's allegations.  While on the other hand, the Boyle dissemi-
nated the RICO Defendants' portrayal of Huynh as a disgruntle and dishonest former em-
ployee in order to destroy Huynh's credibility to assert Walmart's "Truth on the Market De-
fense".

https://www.bloomberg.com/news/articles/2018-03-16/walmart-whistle-blower-suit-re-
news-jitters-about-amazon-battle

https://www.bloomberg.com/news/videos/2018-03-16/walmart-whistle-blower-claims-
retailer-cheated-to-catch-amazon-video (also see Matthew Boyle's 5 minutes interview on
Bloomberg Network).

Business
# Walmart Whistle-Blower Suit Renews Fears About Amazon Battle

By Matthew Boyle  + Follow
March 16, 2018, 2:00 AM PDT  *Updated on March 16, 2018, 7:48 AM PDT*

► Investor reaction to cheating claims was brief though sharp.  No Loss Causation
► Worries over the retailer's push to boost online business

The **reaction** to a whistle-blower's allegations of improprieties at Walmart Inc.'s online
business **was sharp**. The stock suffered its worst intraday decline in two weeks, showing
just how deep the worries are over the company's growth engine.

The **shares bounced back before the market closed on Thursday and rose on Friday**.
But the abrupt, initial dip was enough to signal once again that, when it comes to the bid
to catch up with Amazon.com Inc. in e-commerce, the world's largest retailer has little
margin for error.

The claims of cheating leveled Thursday by a former executive "could be an alarm -- **but
minor,**" said Sucharita Kodali, an analyst at Forrester Research Inc. "If it turns out that
Walmart completely fabricated online numbers and they are way smaller than reported,
that would be a problem. **There's no indication of that yet.**"

92
**COMPLAINT – DEMAND FOR JURY TRIAL**

The whistle-blower lawsuit, filed in federal court in San Francisco, claims Walmart issued misleading results. Tri Huynh, a former director of business development, claims he was terminated "under false pretenses" after raising concerns about an "overly aggressive push to show meteoric growth in its e-commerce business by any means possible -- even, illegitimate ones." Huynh claims the company failed to process customer returns, mislabeled some products and, basically, painted a rosier picture of its online growth than what was really the case.

### 'Disgruntled Former Associate'

Walmart said it investigated the allegations and found they had no merit. Greg Hitt, a company spokesman, called Huynh "a **disgruntled** former associate."

Over the past three years, Walmart has spent billions to revitalize its once-moribund web unit, expanding delivery options, hiring fresh talent and making acquisitions. While sales soared last year, the spending has taken a toll on profitability. When the company reported slowing online growth and disappointing margins during the critical holiday quarter, investors pummeled the stock. And the business could bleed even more red ink this year, Chief Executive Officer Doug McMillon said last month.

"The marketplace is very receptive to any story that's negative about anyone going up against Amazon," Scott Galloway, a marketing professor at NYU, said on Bloomberg TV.

However, they play out, the allegations are an additional headache for Marc Lore, the head of Walmart's U.S. e-commerce business, who's trying to take the website upscale with new apparel, home decor items and a partnership with the **Lord & Taylor department store**. Walmart has said it will focus more of its **marketing spending on Walmart.com and less on Jet.com** (to conceal the facts that Walmart artificially inflated its Quarterly Ecommerce Sales growth in FY18 to inflate Walmart's Market Cap by roughly $140 Bil), the urban-focused startup that Lore co-founded in 2014 and sold to Walmart in 2016. That will hamper growth at Jet, which focuses on younger, more affluent customers.

Still, Walmart has maintained its growth forecast for the online unit. One bright spot has been the online grocery business. Walmart's existing fresh-food supply chain gives it an advantage over Amazon, which, despite its acquisition of Whole Foods Market Inc., is still better at selling batteries than bananas.

Walmart said this week that it will expand home delivery of groceries to 100 metro areas this year. It has 1,200 stores where customers can pull up and have their orders brought to their cars.

"Online grocery pickup is going very well for them," said Laura Kennedy, an analyst at Kantar Retail LLC.

The lawsuit, along with slowing growth, could prompt increased scrutiny of all aspects of

1 Walmart's online business. It shows that even a retailing behemoth can experience grow-
2 ing pains.

3 "They are going **at 100 miles an hour** here," said Mark Stoeckle, CEO of Adams Funds,
which has **$2.4 billion** under management and holds Walmart shares. "Was it intention-
4 ally deceptive? Or is it that the proper controls were not in place? From our perspective,
this could be something. But based on what we know currently, it isn't something right
5 now."

6 (**Updates with professor and investor comments beginning in eighth paragraph.**)

7 **Zero Loss Causation**



152. Lastly, the RICO Defendants through their Maestros of the media pushed their

factual misrepresentation across the globe to once and for all deceived the SEC and/or DOJ,

and Walmart's investors to conceal Walmart's $140 Bil fraud against Walmart's shareholders.

https://www.bloomberg.com/news/articles/2018-03-16/walmart-whistle-blower-suit-re-
news-jitters-about-amazon-battle

1   https://www.bloomberg.com/news/videos/2018-03-16/walmart-whistle-blower-claims-
2   retailer-cheated-to-catch-amazon-video

    https://www.cnbc.com/video/2018/03/15/walmart-drops-on-whistleblower-lawsuit.html
3
    https://www.cnbc.com/video/2018/03/15/walmart-responds-to-whistleblower-lawsuit.html
4
    https://www.investors.com/news/former-walmart-exec-sues-alleging-illegitimate-e-
5   commerce-efforts/

6   https://www.cnbc.com/2018/03/15/walmart-sued-by-former-executive-alleging-unlaw-
    ful-conduct-in-e-commerce-business.html
7
    https://www.ft.com/content/3bf2df42-2893-11e8-b27e-cc62a39d57a0
8
    https://www.businessinsider.in/Walmart-dives-after-lawsuit-alleges-company-issued-
9   misleading-e-commerce-results/articleshow/63323305.cms

10  https://www.businessinsider.com.au/walmart-stock-price-dives-after-whistleblower-
    says-company-issued-misleading-e-comerce-results-2018-3
11
    https://www.thestreet.com/investing/stocks/walmart-fudged-e-commerce-sales-law-
12  suit-alleges-14525430

13  https://www.vox.com/2018/3/15/17126498/walmart-whistleblower-lawsuit-tri-huynh-
    ecommerce
14
    https://www.seattletimes.com/business/retail/whistle-blower-claims-walmart-cheated-
15  in-race-with-amazon/

16  https://www.usatoday.com/story/money/2018/03/15/whistleblower-charges-walmart-
    misled-e-commerce-data-catch-up-race-amazon/429922002/
17
    https://nypost.com/2018/03/15/walmart-retaliated-against-whistleblower-suit/
18
    https://www.dailymail.co.uk/news/article-5515221/Walmart-whistleblower-sues-com-
19  pany-fired.html

20  https://multichannelmerchant.com/ecommerce/walmart-whistleblower-claims-ecom-
    merce-results-overstated/
21
    https://www.courthousenews.com/walmart-faces-whistleblower-suit-over-its-e-com-
22  merce-business/

23  https://vinnews.com/2018/03/15/san-francisco-whistleblower-says-walmart-eyeing-
    amazon-cheated-on-e-commerce/
24
    https://www.mhlnews.com/technology-automation/article/22054902/walmart-whistle-
25  blower-claims-cheating-in-race-with-amazon

26  https://www.retaildive.com/news/whistleblower-alleges-walmart-inflated-digital-
    sales/519302/
27
    https://talkbusiness.net/2018/03/whistleblower-claims-walmart-inflated-e-commerce-
28  reporting/

**COMPLAINT – DEMAND FOR JURY TRIAL**

https://www.nwaonline.com/news/2018/mar/16/fired-for-noting-net-sales-fibs-walmart/

https://wwd.com/business-news/legal/fired-walmart-exec-alleges-online-fraud-stemming-from-amazon-rivalry-1202629981/

153.    A month later, Matthew Boyle published an article about slower Walmart's Marketplace seller growth for two purposes.  First, the article purportedly showed that Walmart focused on seller quality independent of Huynh's allegations (linking back to Boyle's Mar 15 and 16, 2018 articles). Second, most important, purportedly implied a correlation between slower Q4 FY17 Ecommerce sales growth and the pace of Marketplace's seller addition to coverup the fact that Walmart's senior executives artificially inflated Walmart's Ecommerce sales growth in FY18 by improperly accounting for Jet.com FY17 and FY18 sales.

https://www.bloomberg.com/news/articles/2018-04-10/walmart-gets-more-selective-with-web-sellers-after-growth-spurt

Technology

## Walmart Is Getting Picky About Online Marketplace Sellers

By Matthew Boyle  + Follow
April 10, 2018. 3:00 AM PDT

The retailer's website --where third-party vendors sell their own wares -- is adding far fewer sellers a month compared with a year ago, according to data tracker Marketplace Pulse. The site, which Walmart created in 2009 to compete with a similar offering from Amazon.com Inc., now includes about 18,000 sellers.

**Seller Shortfall**

The growth of vendors selling on Walmart's marketplace site has slowed in recent months. **The slowdown mirrors a deceleration in growth at Walmart's e-commerce business last quarter, which spooked shareholders** and renewed concerns about the investments Walmart is making to catch up with Amazon, such as its recent expansion of grocery home delivery to 100 markets. It also comes amid a whistle-blower lawsuit from a former marketplace executive. He claims he **was fired after raising** concerns about the company's "overly aggressive push to show meteoric growth in its e-commerce business by any means possible -- even, illegitimate ones."

"Since November they appear to **have reduced the number of sellers** they approve," said Juozas Kaziukenas, founder of Marketplace Pulse. "Most U.S. marketplaces are adding thousands of sellers a day, so Walmart is doing the opposite by trying to manage it."

Walmart's U.S. e-commerce business generated $11.5 billion in revenue last year, and should do about $16 billion this year, but the company doesn't disclose how much of that business comes from the third-party site. It has doubled the number of products available online over the past year to almost 75 million.

"We're focused on **adding the best items our customers** want from the best sellers," said Ravi Jariwala, a spokesman for Walmart. "In any given month, the number of new Marketplace sellers added to our platform may fluctuate as we continuously add new items and offer customers an expanding range of choices."

**Gibson Dunn Attempted to Use the "Kill Step" on Huynh**

154.    In early July 2018, Huynh notified deRubertis that the SEC opened an official investigation into Walmart's fraudulent conducts. See DC Dkt. 158-12. A short time later, Huynh received a strange message on LinkedIn from an individual named Robyn Lahlein who purportedly claimed that she was fired from Walmart after raising an ethics complaint.

**Something in common**

Hi Tri - I hope this finds you well. Confidentially, I was j**ust fired from Walmart for raising ethics complaints** too and also worked in ecommerce. I know you can't talk about your case, but can I ask a few questions?

**Did going to the press help or hurt you**?

Who at Walmart legal did you go to? (I'm trying to figure that out with my atty) Anything else you think might be helpful as I navigate this, I'd be very grateful and I will keep in the utmost confidence. If you'd prefer to speak, my number is 917-XXX-XXXX.

Thank you so much and I wish you the best of luck.

155.    Lahlein's leading questions above (most like drafted by the Rescue Squad) attempted to trap Huynh to admit that deRubertis went to the press before filing the complaint in Mar 2018. Whether, Huynh answered "Yes" or "No" to the question is irrelevant because

1    it still proved that deRubertis went to the press.  If Huynh had responded to Lahlein's leading

2    questions, the RICO Defendants would have used it as an excuse to get District Judge Vince

3    Chabbria to dismiss Huynh's case against Walmart with prejudice then forced Huynh to im-

4    mediately turn over the content of his personal hard drive which contained information that

5    implicated Walmart for committing fraud against shareholders (effectuating the "Catch &

6    Kill" prong, very beneficial to Walmart during an SEC investigation). See Tides v. The Boe-

7    ing Co., 644 F.3d 809, 816-17 (9th Cir. 2011) (leaks to the media is not protected under

8    SOX).  Coincidentally, the Ninth Circuit merit panel cited the very same SOX case (although

9    it was cited in the context of proving pretext) to deny Huynh's amended appeal against

10   Walmart.

**From:** Tri Huynh <trihuynh@outlook.com>
**Sent:** Monday, July 30, 2018 11:15 AM
**To:** David deRubertis <david@derubertislaw.com>; Kari deRubertis <kari@derubertislaw.com>
**Cc:** Garen Nadir <garen@derubertislaw.com>; Tri Huynh <trihuynh@outlook.com>
**Subject:** Urgent Please Read and Reply RE: Christmas in July
**Importance:** High

David/Kari,

I thought about this over the weekend. I believe Walmart had been reaching out to me through HR and some Walmart sellers to find out if I talked to the SEC (see attached PDF).

I do not want them to know this so please do not share Stoki's email dated 8/18/2016 with them. You can share with them Seth's July 30 the email and Steve Breene's 8/26/16 email.

Please reply to me so I know you get this message. It is very important.

**From:** David deRubertis <david@derubertislaw.com>
**Sent:** Monday, July 30, 2018 11:18 AM
**To:** Tri Huynh; Kari deRubertis
**Cc:** Garen Nadir
**Subject:** RE: Urgent Please Read and Reply RE: Christmas in July

Calling you now.

156.    Huynh expressed the concerns above to deRubertis regarding Walmart's fish-

ing expedition via email.  Huynh told deRubertis that Huynh didn't want to share the newly

discovered evidence which Huynh submitted to the SEC which proved that Walmart's execu-

tive intentionally ordered Walmart's technical team to stuff Walmart's Marketplace with low

value and/or quality items from sellers in order to inflate the total number of SKUs on

Walmart's Marketplace.

**COMPLAINT – DEMAND FOR JURY TRIAL**

deRubertis Wanted to Share Everything, Especially Evidence of Walmart's Fraudulent Conducts (Including the Information Submitted to the SEC). Why? This Was SOX Retaliation Case Not Shareholder Fraud Case.

**From:** David deRubertis <david@derubertislaw.com>
**Sent:** Tuesday, July 24, 2018 12:38 PM
**To:** Tri Huynh
**Cc:** Garen Nadir; Kari deRubertis
**Subject:** Huynh: to do list

1. Any and all communications concerning the factual allegations or claims at issue. Really, this means any documents that you have (including emails) which we believe relate to the case issues. This is any issue in the case. Protected activity. Proof of their fraud, etc. Proof of their violations. Proof of your good work performance. Anything we have about why you were terminated. Literally, everything that we want to use. I know we have lots of this, but I also know you have others in your emails so it's really a matter of pulling everything out of your email folders.

**From:** Tri Huynh
**Sent:** Thursday, July 26, 2018 7:49 AM
**To:** Kari deRubertis; David deRubertis

Are we going to share a lot of this with Walmart? Or We are showing our cards to litigate our case. The reason I am asking this is because I am afraid that we are showing our cards too much if we give all of these documents to Walmart.

If the answer to the question above is no then I can search for more emails and docs that will help our case.

**From:** David deRubertis <david@derubertislaw.com>
**Sent:** Thursday, July 26, 2018 8:18 AM
**To:** Tri Huynh

Great news Tri. Short answer is yes we have to give everything we intend to use to Walmart. They are required to do the same. So we cannot hold back our cards. Doing so would mean we cannot use those cards.

**From:** David deRubertis <david@derubertislaw.com>
**Sent:** Tuesday, September 18, 2018 9:19 AM
**To:** Tri Huynh
**Subject:** Huynh: witnesses

Hi Tri – I'd like to make sure we identify more witnesses than just the ones you've identified. This is a situation where the more the better. I'm adding a lot myself, but want to make sure you have identified all of your team members who may know about your management of the team. Are there other team members you did not list? If so, please send me their names/info.

**From:** Tri Huynh
**Sent:** Friday, July 27, 2018 4:57 PM
**To:** David deRubertis
**Cc:** Kari deRubertis; Garen Nadir
**Subject:** Christmas in July

I have prepared a Christmas present for you in July ☺. I just FedEx the 2 "Flash drive and it will get there by Monday morning.

On the outlook file named email, look under the folder Material Misstatement and sub folders SKU inflation and Catalog Stuffing.

1. 10 Million items Stuffing ordered by Mr. Breene
2. The CEO was on the July 30th email and the CEO & CFO plus all the big dogs from ecommerce were on the August 16th email
3. Shakir emailed Seth Beal and Seth Beal's direct reporters regarding the Q2 Conference call on 8/18/16 which highlighted the 15 Million items Marketplace Assortment and the contribution to faster GMV growth (I believe this was the reason why I both Michael Trembley and Shakir were all shook up and scared like they had seen a ghost when I made the BOVRB presentation on 12/15/2016 with the picture of Dough and the 15 Million SKUs highlighted in Red)
4. There was a Material Mismatch between 2 and 3 above and stuffing of low value/low quality items into the catalog from #1 above

[diagram: Material Misstatement of Mark...]
  - SKU Inflation
  - Catalog Stuffing
  - Lack Internal Control
  - Seller and Scalability Issues

[Email Prep]

**From:** Tri Huynh
**Sent:** Thursday, September 8, 2017 3:51 PM
**To:** David deRubertis
**Cc:** Kari deRubertis; Garen Nadir; Tri Huynh
**Subject:** Connecting the dots – Nutmeg 8.2 the Case
**Attachments:** event transcript, 2013 Annual meeting Oct 6 2016 pdf; Fwd: MP update

Hi David,

You made a good suggestion yesterday that I should upload Walmart's public disclosures for the last few years that we want to use as evidences to litigate this case so Walmart couldn't connect the dots with the external data we will submit to them. I had uploaded both Walmart's public disclosures and all the investor mentality's reports to the sec use as ever based on Kari's instruation.

See the analysis and supporting evidences below:

- On the October 2nd, 2016 Marketplace Progress Update email, Seth Beal told Dough McMillon, Marc Lore and other senior leaders that Walmart Marketplace had 16.5 Million SKUs and the total assortment is 19.7 Million including 1P (Walmart own products).
  - Marketplace had 16.5 Million SKUs and 1P had 3.2 Million SKUs (19.7 Million SKUs = 16.5 Million SKUs)
- Found a system, Dough McMillon misled investment analysts at Walmart's 23rd annual meeting with the investment community on 10/6/16 that Walmart Marketplace had 20 Million SKUs. Walmart inflated the total number of Marketplace SKUs by 3.5 Million
  - Walmart came to this inflated Marketplace assortment number by falsely classified the 3.2 Million 1P SKUs as Marketplace SKUs which total led to 19.7 Million SKUs then rounded up the number to 20 Million SKUs
- There were two pieces of direct evidences that supported the above conclusion
  1. The internal email that Seth Beal sent on Oct 2, 2016 (see the attached email from Seth Beal)
  2. The transcript of Walmart's 23rd Annual Meeting with the Investment Community on Oct 6, 2016 (see the bottom of page 3 of the attached transcript)

157.    Typical deRubertis' Modus Operandi when he didn't want to leave any paper trails behind, he either 1) ignore Huynh's email all together or 2) call Huynh via phone instead of responding to Huynh via email. deRubertis called Huynh to purportedly address Huynh's concerns about turning over the information Huynh submitted to the SEC. During the call Huynh asked deRubertis whether it was illegal for Walmart to ask their employee to trap Huynh into saying that deRubertis went to the Media.  Instead of being angry at Walmart

99

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  for contacting his client directly, deRubertis brushed aside Huynh's concerns by providing an

2  elusively answer "It depends".  Subsequently, David deRubertis ordered Huynh to produce all

3  newly discovered evidence of Walmart's illegal conducts to Walmart.  deRubertis purportedly

4  claimed that Huynh is required to do so by laws.

5

6      158.  Shortly after the SEC started their investigation into Huynh's complaint

7  against Walmart, Walmart's executives stop disclosed Walmart's SKU metric all together.

8

9  **Walmart Stopped Reporting the SKU Metric Shortly After the SEC Started to Investigate Walmart.**



23      159.  Doug McMillon also attempted to whitewash his previous misleading state-

24  ments to investors in FY17 by replacing the term "Marketplace" with "Walmart.com" during

25  Walmart's 2018 Annual Meeting with the Investment Communities on Oct 16, 2018 by stat-

26  ing in his PPT presentation that Walmart.com had 8 Mil SKUs and 20 Mil SKUs in in Jan and

27  Oct 2016 respectively (2 years earlier McMillion reported to investors that Marketplace had 8

28

100

**COMPLAINT – DEMAND FOR JURY TRIAL**