1  Mil and 20 Mil SKUs on Jan and Oct 2016).



160.    Later that day, Robert Ohmes also published a report on Walmart Inc. In his report, Ohmes purportedly replaced the term "Marketplace" with "Online/Walmart.com" to whitewash Doug McMillon previous misstatements regarding the total number of SKUs on Walmart's Marketplace.

**BofAML forecasts for WMT**

Ohmes replaced the term "Marketplace" with "Walmart.com"

Exhibit 1: WMT ecommerce analysis

$ millions

| | U.S. GMV % chg (E in F19+) | U.S. GMV $ Sales Estimate | % Chg | Owned U.S. E-com Sales % Chg | Owned U.S. E-com Sales Estimate | % Chg | WMT U.S. Store Sales Estimate | % Chg | Estimated 3P Sales ($MM) | % Chg | Estimated 3p Fees ($MM) | Estimated Fee (% of GMV) | Estimated # of Online 3KUs (# mn | Online Grocery Locations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-Q1 | | $2,800.0 | | | $1,490.0 | | $71,805.0 | | $1,310.0 | | $131.00 | 10.0% | 10 | |
| Jul-Q2 | | $3,100.0 | | | $1,750.0 | | $74,491.0 | | $1,350.0 | | $135.00 | 10.0% | 15 | |
| Oct-Q3 | 28.6% | $3,800.0 | | | $1,760.0 | | $72,790.0 | | $2,040.0 | | $204.00 | 10.0% | 23 | |
| Jun-Q4 | 29.7% | $6,200.0 | | | $3,000.0 | | $80,747.0 | | $3,200.0 | | $320.00 | 10.0% | 35 | |
| F2017 | 24.2% | $15,900.0 | | | $8,000.00 | | $299,833.0 | | $7,900.0 | | $790.0 | 10.0% | 35 | |
| | | | | | | | | | | | | | | |
| Apr-Q1 | 69.0% | $4,732.0 | 69.0% | 63.0% | $2,410.0 | 61.7% | $73,026.0 | 1.7% | $2,322.0 | 77.3% | $232.20 | 10.0% | 50 | 670 |
| Jul-Q2 | 67.0% | $5,177.0 | 67.0% | 60.0% | $2,780.0 | 58.9% | $75,958.0 | 2.0% | $2,397.0 | 77.6% | $239.70 | 10.0% | 67 | 900 |
| Oct-Q3 | 54.0% | $5,852.0 | 54.0% | 50.0% | $2,635.0 | 49.7% | $75,089.0 | 3.2% | $3,217.0 | 57.7% | $321.70 | 10.0% | 70 | 1000 |
| Jan-Q4 | 24.0% | $7,612.0 | 22.8% | 23.0% | $3,675.0 | 22.5% | $82,904.0 | 2.7% | $3,937.0 | 23.0% | $393.70 | 10.0% | 75 | 1100 |
| F2018 | 47.0% | $23,373.0 | 47.0% | 44.0% | $11,500.0 | 43.8% | $306,977.0 | 2.4% | $11,873.0 | 50.3% | $1,187.3 | 10.0% | 75 | 1100 |
| | | | | | | | | | | | | | | |
| Apr-Q1 | 19.0% | $5,632.0 | 19.0% | 33.0% | $3,205.3 | 33.0% | $74,542.7 | 2.1% | $2,426.7 | 4.5% | $242.67 | 10.0% | 76 | 1400 |
| Jul-Q2 | 23.2% | $6,377.0 | 23.2% | 40.0% | $3,892.0 | 40.0% | $78,923.0 | 3.9% | $2,485.0 | 3.7% | $248.50 | 10.0% | 77 | 1800 |
| Oct-Q3E | 22.2% | $7,152.0 | 22.2% | 45.5% | $3,835.0 | 45.5% | $76,998.0 | 2.5% | $3,317.0 | 3.1% | $331.70 | 10.0% | 78 | 2100 |
| Jan-Q4E | 18.4% | $9,012.0 | 18.4% | 32.7% | $4,875.0 | 32.7% | $84,387.9 | 1.8% | $4,137.0 | 5.1% | $413.70 | 10.0% | 80 | 2200 |
| F2019E | 20.5% | $28,173.0 | 20.5% | 37.5% | $15,807.3 | 37.5% | $314,851.6 | 2.8% | $12,365.7 | 4.1% | $1,236.6 | 10.0% | 80 | 2200 |
| | | | | | | | | | | | | | | |
| F2020E | 21.3% | $34,173.0 | 21.3% | 34.8% | $21,307.3 | 34.8% | $317,618.1 | 0.9% | $12,865.7 | 4.0% | $1,286.57 | 10.0% | 84 | 3100 |

Source: BofA Merrill Lynch Global Research estimates; company reports

Source: Oct 16, 2018 BOA report.

### Reverse Whitewash – Coverup the Coverup

161.   In Mid-Dec 2018, Huynh emailed Gregory B. Penner, Chairman of Walmart's Board of Directors, Mr. Timothy B. Flynn, Chairman of Walmart's Board of Audit and Rob Walton, former Chairman of Walmart's Board of Director, Doug McMillon, Brett Biggs, Marc Lore, and Rachel Brand to put them on notice that Huynh believes that Walmart's senior executives may have engaged in fraud against shareholders. Huynh also stated that he believes that Walmart's may have fabricated Beal's 11/30/16 email and Marketplace RIF list to assert Walmart's false affirmative defense.  See DC Dkt. 83.

162.   The very next day Rachel Brand, EVP of Global Governance, Chief Legal Officer and Corporate Secretary, sent a memo announcing the departure of Jay Jorgensen, EVP of Global Ethics and Compliance.  Subsequently, starting in early 2019, it is more likely than

**COMPLAINT – DEMAND FOR JURY TRIAL**

not that Walmart's Board of Directors ordered the RICO Defendants to reverse their white-washing campaign to coverup the WSF Coverup Enterprise's original whitewashing campaign.

163.    Starting in early 2019 to the present, the RICO Defendants began to reverse the definition of Walmart Marketplace back to its original meaning i.e., Walmart's Marketplace is a segment of Walmart.com.  Additionally, Walmart's senior executives once against embraced their original assertions that Marketplace is fast growing and improves the margin mix of Walmart's Ecommerce business.

164.    First, Walmart once again used the term "Marketplace" and "Third Party/3P" interchangeably (same as they did prior to May 2017). The syntax analysis chart below showed that after Dec 2018, Walmart used the term "Marketplace and the term Third-Party/3P interchangeably 78 times to describe Walmart's Marketplace business. The term "Marketplace" was used 66 times or 85% of the time and the term "Third-Party/3P" were used 12 times or 15% of the time.



165.    Second, instead of using the term "Third Party/3P" as an essential appositive to redefined Marketplace as Walmart.com, Robert Ohmes used the terms "Third Party/3P" and "Marketplace" inside a set of parentheses to once against assert the synonymous relations between Marketplace and Third Party/3P.

> "WMT currently offers ~90mn SKUs online but sees opportunity for that to grow as **Marketplace (3P sellers)** expands, with support from WMT's recent launch of WMT Fulfillment Services (providing more tools and helping to make WMT.com a more attractive platform for 3P sellers)." Bank of America/Merrill Lynch March 10, 2020 Investment Report.

> "WMT US owned ecommerce sales grew 74% in F1Q (vs. our 35% est. & on top of 37% LY) & contributed a record 390bps to the US comp, with strong results across grocery pickup & delivery, Walmart.com (gen. merchandise), & **Marketplace (3P)** …...WMT is seeing increases in new buyers & repeat rates and is looking to build a significantly larger online business in profitable categories & drive the growth of **Marketplace (3P)** as aggressively as possible." Bank of America/Merrill Lynch May 19, 2020 Investment Report.

> "WMT is now looking to drive the growth of its highly profitable **3P (Marketplace)** business as aggressively as possible with expansion of its relatively new Walmart Fulfillment Services division". Bank of America/Merrill Lynch June 10, 2020 Investment Report.

166.    Third, building upon Ohmes' reversion back to the original definition of Marketplace i.e., Walmart's Marketplace is a segment on Walmart.com, Walmart's Senior Executives also began to revert back to the original definition of Marketplace in their communications with investors and analysts.  Walmart also resumed reporting to the total number of SKUs on Walmart.com.

> "We're making progress on many fronts, but we need to do more and move far, **especially with our assortment including marketplace**. I continue to challenge the team to drive a deeper, more sustainable relationship with the customer, better execute the fundamentals, and improve the overall economics of the business." Doug McMillon: Q3 FY20 earnings call on November 14, 2019

**COMPLAINT – DEMAND FOR JURY TRIAL**

I would say that the continued investment in **marketplace as that's accelerating faster than the overall first-party business,** we continue to attract new sellers at this time. And then WFS is also very early, but we're seeing very encouraging signs of opening up the business to new sellers and we see that as a potentially nice growth area in the future. Marc Lore President & Chief Executive Officer-Walmart U.S. eCommerce, Walmart, Inc. Walmart's Annual Investment Community Meeting 18-Feb-2020

The assortment on **walmart.com has grown to about 80 million SKUs including marketplace** has remained focused on keeping the quality of items high. And as a result, the Marketplace business has grown by 2.5 times since FY 2017. However, this is an area, as Doug mentioned, where we still have a lot more work to do. Marc Lore Walmart's Annual Meeting with the Investment Community Meeting on 18-Feb-2020

**Question:** So, Doug, I think in your comments in the third quarter, you mentioned doing more with the **Marketplace or 3P business**. Can you – how is that in the fourth quarter and what are you guys seeing in 3P? Walmart's Annual Investment Community Meeting 18-Feb-2020

**Answer:** Yeah, it was good. But we don't think that we've done everything we must do and should do to support **marketplace sellers** in terms of the tools and services that we have available. I mean, we've grown a Marketplace business over the last few years to a pretty good size, and it's helped us a lot with the assortment and being top of mind for customers as they're looking for items. McMillon. Walmart's Annual Investment Community Meeting 18-Feb-2020

Walmart.com also saw a surge in demand during the quarter as customers opted for greater convenience and increased social distancing. The U.S. eCommerce business grew 74% in total. Growth in **marketplace** outpaced the overall business even as **first-party sales** were strong. Douglas McMillon President, Chief Executive Officer & Director, Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

167.     Fourth, instead of denying that Marketplace is not necessarily profitable and not a key growth driver for Walmart's Ecommerce, McMillon, Biggs, Lore, and other Walmart's executives reverted back to their original assertion that Walmart's Marketplace is highly profitable and fast growing.

"We've talked – you've heard us talk a lot over the last couple of years about the ecosystem, and we have a pretty healthy ecosystem today. We're growing things like ad revenue. **We're growing our Marketplace business,** both of which we think long-term will be a big part of our ecosystem…... Marketplace is going to be a big part of our business. I mean, if we're sitting here three years from now, I think we're going to be talking about a

105

much bigger Marketplace business than we have today" Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Raymond James Institutional Investors Conference on 04-Mar-2020

"Walmart.com also saw a surge in demand during the quarter as customers opted for greater convenience and increased social distancing. The U.S. eCommerce business grew 74% in total. **Growth in marketplace outpaced the overall business even as first-party sales were strong.**" Douglas McMillon President, Chief Executive Officer & Director, Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

"I would say that the continued **investment in marketplace as that's accelerating faster than the overall first-party business**, we continue to attract new sellers at this time. And then WFS is also very early, but we're seeing very encouraging signs of opening up the busi-ness to new sellers and we see that as a potentially nice growth area in the future." Marc Lore - Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

"Now, let's discuss the quarterly results for each operating segment. Walmart US had a strong quarter. Comp sales, excluding fuel, increased 9.3%, with eCommerce sales growth of 97%. eCommerce sales were strong throughout the quarter contributing approximately two-thirds of the segment comp growth. We saw significant increases in repeat rates and weekly active digital customers, and we continue to make progress on assortment expan-sion and seller tools with eCommerce **Marketplace sales growing triple digits.**   Gross profit rate was strong, up 42 basis points due to increased sales in higher-margin general merchandise categories and fewer markdowns. We also saw improvements in eCommerce margin rates, **reflecting continued progress on product mix and faster growth in mar-ketplace sales**. Douglas McMillon President, Chief Executive Officer & Director, Walmart, Inc. Q2 2021 Earnings Call 18-Aug-2020

"**Our Marketplace business has been strong, which is also an accretive category in relation to the rest of the business.**" John R. Furner President & Chief Executive Of-ficer-Walmart US, Walmart, Inc. Q2 2021 Earnings Call on 18-Aug-2020

"Walmart.com traffic has been robust with solid increases in repeat rates and good mo-men-tum in **marketplace sales which grew in triple-digits**. Gross profit rate was strong, up 33 basis points, due primarily to strategic sourcing initiatives and fewer markdowns. We continue to make progress on eCommerce margin rates as **we drive faster growth of marketplace sales and improve product mix**." Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Q3 2021 Earnings Call on17-Nov-2020

"Your second question was on eCommerce margin specifically, and Michael, those results are a reflection of mostly mix as we described, our home business has been solid online, our apparel has led, and then the overall winner in the **eCommerce business was our marketplace business, which led the marketplace – or led the eCommerce comps in**

**total to 79%** for the quarter." John R. Furner President & Chief Executive Officer-Walmart U.S., Walmart, Inc. Q3 2021 Earnings Call 17-Nov-2020

"We'll continue improving margin mix through an enhanced general merchandise offering, new brands **and marketplace growth with a greater push towards expanding fulfillment and other services for sellers**. We'll drive existing and new customer growth through initiatives like Walmart+. We'll grow sales and profit increasingly with growing higher margin businesses in advertising, financial services, **marketplace**, healthcare services and the like." Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Annual Meeting with the Investment Community on 18-Feb-2021

168.    Fifth, after two quarter of hiatus, Walmart's Senior Executives resumed reporting the total number of SKUs on Walmart.com.



**Rubber Meets the Road - Walmart's "Get Out of Jail Free" Card**

169.    In late June 2019, the Rescue Squad produced the "Non-Enforcement" Letter that James. E. Etri, Assistant Regional Director, Division of Enforcement sent to Walmart's Counsel, Kenneth Herzinger (the Law Firm of Orrick, Herrington & Sutcliffe. LP) on April 2, 2019.  See DC Dkt. 119-21 - Walmart's Exhibit 129.

Case 3:18-cv-01631-VC   Document 119-21   Filed 08/29/19   Page 2 of 2

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
FORT WORTH REGIONAL OFFICE
BURNETT PLAZA, SUITE 1900
801 CHERRY STREET, UNIT #18
FORT WORTH, TEXAS 76102-6882
PHONE: (817) 978-3821        FAX: (817) 978-2700

IN REPLYING
PLEASE QUOTE
FW-04193

April 2, 2019

<u>VIA UPS</u>

Walmart Inc.
c/o Kenneth Herzinger
Orrick, Herrington & Sutcliffe, LP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Re:    *In the Matter of Walmart E-commerce*; File No. FW-04193

Dear Mr. Herzinger:

We have concluded the investigation in the above-referenced matter.  Based on the information we have as of this date, we do not intend to recommend an enforcement action by the Commission against Walmart Inc. in connection with this matter.  We are providing this notice under the guidelines set out in the financial paragraph of the Securities Act Release No. 5310, which states in part that the notice "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation" (the full text of Release No. 5310 can be found at: https://www.sec.gov/divisions/enforce/wells-release.pdf).

Sincerely,

James E. Etri
Assistant Regional Director
Division of Enforcement

170.    However, to obtain this "Get Out of Jail Free" card required herculean efforts and tight coordination among the RICO Defendants.  As an example, in 2010, GDC's lawyers used the wire and mail extensively to exchange information, coordinate the development of documents and presentation materials, as well as coaching witnesses for interviews with the SEC and the DOJ to obtain non-enforcement letters from the SEC and the DOJ for Joseph Cassano, a former AIG executive.

- Over the course of nearly a year, they made **several detailed pres**entations to the government, explaining Cassano's actions and pointing out holes in the government's case. They reviewed **documents, e-mails, and spreadsheets** that, they asserted, showed that Cassano promptly and thoroughly disclosed his group's activities to management and auditors. The lawyers' **final series of presentations** in the fall of 2009 **lasted more than 40 hours, spread over five days and entailed more than 600 pages of presentations and 400 exhibits**. And they agreed to let Justice and the SEC **interview Cassano** in April 2010. "We ultimately bared our factual soul to them," says Walden.
- The strategy paid off. Justice informed Gibson Dunn in May 2010 that it was closing its investigation of Cassano, and a month later, the SEC followed, a remarkable turnaround that a former prosecutor says was in good part due to the defense lawyers' tactics. "The judgment that they made to engage with us in an honest and forthcoming way was unique and important to [their] success," says Paul Pelletier, the former deputy chief of the Justice Department criminal division's fraud section, who joined Mintz, Levin, Cohn, Ferris, Glovsky and Popeo last May.

171.    Likewise, in a recent article published by Pro Publica, Jesse Eisinger (a reporter at Pro Publica) outlined the effort it took Walmart's lawyers to persuade the DOJ not to prosecute Walmart criminally over the Opioid Matter.

https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment

Karen P. Hewitt, from Jones Day, drafted a 30-page and 23 letter then emailed them to the DOJ on Aug 10, 2018 and Sept 27, 2019 to persuade the DOJ not to prosecute Walmart.
- https://s3.documentcloud.org/documents/6818268/Letter-From-K-Hewitt-to-B-Benczkowski-Aug-10.pdf
- https://s3.documentcloud.org/documents/6818266/2019-09-27-Letter-From-K-Hewitt-to-G-Eyler-Final.pdf

**COMPLAINT – DEMAND FOR JURY TRIAL**

JONES DAY

4655 EXECUTIVE DRIVE • SUITE 1500 • SAN DIEGO, CALIFORNIA 92121-3134
TELEPHONE: +1.858.314.1200 • FACSIMILE: +1.844.345.3178

4655 EXECUTIVE DRIVE • SUITE 1500 • SAN DIEGO, CALIFORNIA 92121-3134
TELEPHONE: +1.858.314.1200 • FACSIMILE: +1.844.345.3178

DIRECT NUMBER: (858) 314-1119
MIHEMITT@JONESDAY.COM

September 27, 2019

August 10, 2018

FOIA CONFIDENTIAL TREATMENT REQUESTED BY JONES DAY

VIA ELECTRONIC MAIL

FOIA CONFIDENTIAL TREATMENT REQUESTED BY JONES DAY

VIA ELECTRONIC MAIL

Gustav W. Eyler
Director
Consumer Protection Branch
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
Gustav.W.Eyler@usdoj.gov

Hon. Brian Benczkowski
Assistant Attorney General, Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Re:   Walmart Inc.

Dear Assistant Attorney General Benczkowski:

Re:   Walmart Inc.

Dear Mr. Eyler:

172.    Even though Huynh doesn't possess direct evidence of mail and wire communications among Kenneth Herzinger from the Law Firm of Orrick, Herrington & Sutcliffe, the Rescue Squad, the Walmart Participants, and the other RICO Defendant to effectuate prong #2 of the illegal coverup scheme, Huynh strongly believes the RICO Defendants have in their possession hundreds of instances of mail and wire usages among themselves as well with the SEC and/or the DOJ. This information be discoverable during discovery.

173.    Thus, upon information and believe, RICO Defendants i.e., the Law Firm of Orrick, Herrington & Sutcliffe and Kenneth Herzinger committed much more than the two predicate acts required under 18 U.S.C. 1962(c) (e.g., mail and wire frauds and obstruction of an SEC investigation etc.) to effectuate Goal A of the WSF Coverup Enterprise's illegal coverup scheme.

110
**COMPLAINT – DEMAND FOR JURY TRIAL**

**Forum Selection for Shareholder Derivative Lawsuits**

**Walmart's Board of Directors Amended Walmart's Bylaw to Move the Forum for Shareholder Derivative Law Suits from Federal Court to the Court of Chancery of the State of Delaware**

Huynh's response to Walmart's motion to quash. DC Dkt. 83. Huynh filed his 12/13/18 letter and PPT presentation to put them on notices that Walmart's senior executives my have defrauded shareholders to the tune of $140 Bil.

Walmart Inc filed a 8K form with the SEC on Friday 7/26/19 after the Market closed to effectuate the forum changes. However, Walmart didn't issue any press release regarding this changes

|  |  |  |  |
|---|---|---|---|
| 6/24/19 | 7/7/19 | 7/23/19 | 7/26/19 |

Walmart filed motion to quash Huynh's Subpoenas of Walmart's Marketplace Sellers. DC Dkt. 80.

Walmart's Board Director voted and approved an amendment to Walmart'sby Law to move the forum for shareholder derivative lawsuit from Federal Court to Court of Chancery of the State of Delaware

174.   On June 24, 2019, the Rescue Squad filed a motion to quash Huynh's subpoenas of Walmart's Marketplace Sellers (DC Dkt. 80).  Huynh filed a response on July 7, 2019. In Huynh's response, he filed DC Dkt. 83-2 (Exhibit A) which are the letter and PowerPoint presentation that Huynh emailed to Walmart's Board of Director on Dec 13, 2018 to put them on notice that Walmart's senior executives may have defrauded shareholders to the tune of $140 Billion.  A short time later, Walmart's Board of Directors voted unanimously to approve the change Walmart's Bylaw to move the forum for derivative shareholder Lawsuit from Federal Court (Plaintiff's friendly) to Court of Chancery of the State of Delaware (Defendants' friendly). See DC Dkt. 102, 102-2 & 3; See COA Dkt. 5-4 at 110 to 123.

**Lore's $100 Million Exit Package**

175.    Walmart announced Marc Lore's departure on January 15, 2021, roughly 8 months before his employment contract was to expire.[30]   When he first joints Walmart as Walmart US Ecommerce CEO as part of the Jet.com acquisition, Walmart Inc's Board of Directors granted Lore roughly 3.6 million of Walmart's RSU to be vested over 5 years.  In general, Corporations used RSU as a tool to retain their senior executives i.e., if an executives leave before their employment contract expired, they would lose their unvested shares.

176.    In Lore's case, he left Walmart about 8 months before his contract expired. Lore had roughly seven hundred eleven thousand shares of unvested RSU.  However, it was unusual for Walmart' Board of Directors to allow Lore to keep these RSU shares.  In short, Walmart's Board of Directors approved Lore's $100 Mil exit package.

| | # of Shares Granted | Grant Date |
|---|---|---|
| | 3,554,093 | 9/19/2016 |
| Vesting Date | Percent | # of Share Vested |
| 9/19/2017 | 10% | 355,409 |
| 9/19/2018 | 15% | 533,114 |
| 9/19/2019 | 20% | 712,240 |
| 9/19/2020 | 25% | 887,102 |
| 10/19/2020 | 2.5% | 88,852 |
| 11/19/2020 | 2.5% | 88,852 |
| 12/19/2020 | 2.5% | 88,852 |
| 1/19/2021 | 2.5% | 88,852 |
| 2/19/2021 | 2.5% | 88,852 |
| 3/19/2021 | 2.5% | 88,852 |
| 4/19/2021 | 2.5% | 88,852 |
| 5/19/2021 | 2.5% | 88,852 |
| 6/19/2021 | 2.5% | 88,852 |
| 7/19/2021 | 2.5% | 88,852 |
| 8/19/2021 | 2.5% | 88,852 |
| 9/19/2021 | 2.5% | 88,852 |
| Total | 100.0% | 3,554,093 |
| # of shares allowed to keep after exit | | 710,819 |
| Stock Price on June 9, 2021 | $ | 139.61 |
| Estimated $ Value of shares kept | $ | 99,237,385 |

[30] https://fortune.com/2021/01/15/marc-lore-leaving-walmart-ecommerce/

177.    Although, Huynh currently doesn't have direct evidence to prove that Greg Penner, Timothy Flynn, and S. Rob Walton participated in the management of the WSF Enterprise's illegal coverup scheme.  Huynh's believes this information is in the RICO Defendants' possession and is discoverable during discover.

178.    However, upon information and belief, the circumstantial evidence discussed above demonstrated it is more likely than not that three Walmart Board of Directors named above knew about the conducts of the other RICO Defendants and they either participated and/or failed to take corrective actions to stop the illegal conducts of the WSF Coverup Enterprise which caused injuries to Huynh properties.

**Truth Is the Cornerstone of Our Adversary System of Civil Litigation.**

"The purpose of a lawsuit is to arrive at the truth of the controversy, in order that justice may be done.[31] It is one of the "decencies of civilization that no one would dispute."[32]

179.    The American Judiciary employed the adversary system to resolve litigation disputes in Federal Courts.  This system is based on the pragmatic assumption that **the truth of the controversy** between the parties to a lawsuit stands a reasonably fairer chance of coming out when each side fights as hard as it can to see to it that all the evidence most **favorable to it and every rule of law** supporting its theory of the case are before the court.  The system relies on the "unshakable foundation **that truth is the object** of the system's process which is designed for the purpose of **dispensing justice.**"[33] However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions — all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where **honesty is preeminent**. Therefore, our justice system crumbles should those (judicial officers e.g., lawyers and judges), in whose hands are entrusted its preservation and sanctity, betray its fundamental values and principles.   There are two guardrails that were designed and implemented to protect the sanctity of our judicial process and equal justice under the law.  The first guardrail is the

---

[31] Edward F. Barrett, The Adversary System and the Ethics of Advocacy, 37 NOTRE DAME L. REV. 479, 479+ (1962) (quoting DWIGHT G. MCCARTY, PSYCHOLOGY & THE LAW 223 (1960)).

[32] Barrett, supra note 1, at 479 (quoting Mich. Trust Co. v. Ferry, 228 U.S. 346, 353 (1913)).

[33] U.S. v. Shaffer Equip. Co., 11 F.3d 450, 457 (4th Cir. 1993).

114

**COMPLAINT – DEMAND FOR JURY TRIAL**

rules of conduct for lawyers, and the second guardrail is the Federal Rules of Civil Proce-

dures.

### The California Rules of Professional Conducts and State Bar of California Acts Serve as Guardrails to Protect the Sanctity of Our Adversary System of Justice.

180.    The California's Rules of Professional Code of Conducts and State Bar Acts of

California are guardrails which protect the integrity and sanctity of the adversary system of

justice for civil litigation and adjudication from unscrupulous lawyers who acted nefariously

to corrupt the "truth finding" process in a lawsuit to secure a favorable outcome for their cli-

ents and themselves.

**Cal. Rule of Professional Conduct 3.4 Fairness to Opposing Party and Counsel**:

A lawyer shall not: (a) unlawfully obstruct another party's access to evidence, includ-
ing a witness, or unlawfully alter, destroy or conceal a document or other material hav-
ing potential evidentiary value. A lawyer shall not counsel or assist another person to
do any such act; (b) suppress any evidence that the lawyer or the lawyer's client has a
legal obligation to reveal or to produce; (c) falsify evidence, counsel or assist a witness
**to testify falsely**, or offer an inducement to a witness that is prohibited by law.

- Paragraph (a) applies to evidentiary material generally, including computerized in-
  formation. It is a criminal offense to destroy material for purpose of impairing its
  availability in a pend-ing proceeding or one whose commencement can be foreseen.
  (See, e.g., Pen. Code, § 135; 18 U.S.C. §§ 1501-1520.) Falsifying evidence is also
  generally a criminal offense. (See, e.g., Pen. Code, § 132; 18 U.S.C. § 1519.) Ap-
  plicable law may permit a lawyer to take temporary possession of physical evidence
  of client crimes for the purpose of conducting a limited ex-amination that will not
  alter or destroy material characteristics of the evidence. Applicable law may require
  a lawyer to turn evidence over to the police or other prosecuting authorities, de-
  pending on the circumstances. (See People v. Lee (1970) 3 Cal.App.3d 514, 526
  [83 Cal.Rptr. 715]; People v. Meredith (1981) 29 Cal.3d 682 [175 Cal.Rptr. 612].)

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Cal. Rule of Professional Conduct 4.1. Truthfulness in Statements to Others**

In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.

- A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms the truth of a statement of another person* that the lawyer knows* is false. However, in drafting an agreement or other document on be-half of a client, a lawyer does not necessarily affirm or vouch for the truthfulness of representations made by the client in the agreement or document. A nondisclosure can be the equivalent of a false statement of material fact or law under paragraph (a) where a lawyer makes a partially true but misleading material statement or material omission. In addition to this rule, lawyers remain bound by Business and Professions Code section 6106 and rule 8.4

- Under rule 1.2.1, a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows* is criminal or fraudulent. * See rule 1.4(a)(4) regarding a lawyer's obligation to consult with the client about limitations on the lawyer's conduct. In some circum-stances, a lawyer can avoid assisting a client's crime or fraud* by withdrawing from the representation in compliance with rule 1.16.

**Rule 8.4 Misconduct It is professional misconduct for a lawyer to**:

a) violate these rules or the State Bar Act, knowingly* assist, solicit, or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation[34]; (d) engage in conduct that is prejudicial to the administration of justice; (e) state or imply an ability to influence improperly a government agency or official, or to achieve results by means that violate these rules, the State Bar Act, or other law; or (f) knowingly* assist, solicit, or induce a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law. For purposes of this rule, "judge" and "judicial officer" have the same meaning as in rule 3.5(c).

---

[34] A lawyer may be disciplined under Business and Professions Code section 6106 for acts involving moral turpitude, dishonesty, or corruption, whether intentional, reckless, or grossly negligent.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Cal. Bus. & Prof. Code § 6068(d)**

Prohibits a lawyer from misleading a judge or any judicial officer by making a false statement of fact or law. "California law imposes a duty of candor on all attorneys." Applied Materials, Inc. v. Multimetrixs, LLC, 2008 WL 2892453, at *10 (N.D. Cal. Jul. 22, 2008). "Counsel should not forget that they are officers of the court, and while it is their duty to protect and defend the interests of their clients, the obligation is equally imperative to aid the court in avoiding error and in determining the cause in accordance with justice and the established rules of practice." Datig v. Dove Books, Inc., 73 Cal.App.4th 964, 980 (Ct. App. 1999); see also Morrow v. Superior Court, 30 Cal.App.4th 1252, 126162 (Ct. App. 1994) (stating that the purpose of § 6068 and similar statues is **to preserve the sanctity of the justice system**).

**Rule 3.3 Candor Toward the Tribunal\***

(a) A lawyer shall not: (1) knowingly* make a false statement of fact or law to a tribunal* or fail to correct a false statement of material fact or law previously made to the tribunal* by the lawyer; (2) fail to disclose to the tribunal* legal authority in the controlling jurisdiction known* to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel, or knowingly* misquote to a tribunal* the language of a book, statute, decision or other authority; or (3) offer evidence that the lawyer knows* to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence, and the lawyer comes to know* of its falsity, the lawyer shall take reasonable* remedial measures, including, if necessary, disclosure to the tribunal, * unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e) and rule 1.6. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes* is false. (b) A lawyer who represents a client in a proceeding before a tribunal* and who knows* that a person* intends to engage, is engaging or has engaged in criminal or fraudulent* conduct related to the proceeding shall take reasonable* remedial measures to the extent permitted by Business and Professions Code section 6068, subdivision (e) and rule 1.6. (c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding. (d) In an ex parte proceeding where notice to the opposing party in the proceeding is not required or given and the opposing party is not present, a lawyer shall inform the tribunal* of all material facts known* to the lawyer that will enable the tribunal* to make an informed decision, whether or not the facts are averse to the position of the client.

**Rule 1.6 Confidential Information of a Client (a):**

A lawyer shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) unless the client gives informed consent, * or the disclosure is permitted by paragraph (b) of this rule.

- [2] Paragraph (a) relates to a lawyer's obligations under Business and Professions Code sec-tion 6068, subdivision (e)(1), which provides it is a duty of a lawyer: "To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." A lawyer's duty to preserve the confidentiality of client information involves public policies of paramount importance. (In Re Jordan (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371].) Preserving the confidentiality of client information contributes to the trust that is the hallmark of the lawyer-client relationship. The client is thereby encouraged to seek legal as-sistance and to communicate fully and frankly with the lawyer even as to embarrassing or detrimental subjects. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without ex-ception, clients come to lawyers in order to determine their rights and what is, in the com-plex of laws and regulations, deemed to be legal and correct. Based upon experience, law-yers know* that almost all clients follow the advice given, and the law is upheld. Paragraph (a) thus recognizes a fundamental principle in the lawyer-client relationship, that, in the ab-sence of the client's informed consent, * a lawyer must not reveal information protected by Business and Professions Code section 6068, subdivision (e)(1). (See, e.g., Commercial Standard Title Co. v. Superior Court (1979) 92 Cal.App.3d 934, 945 [155 Cal.Rptr.393].)

### We Are Going to "Nuts & Sluts" You with Impunity

181.    In early November 2017, Huynh told deRubertis that his SOX retaliation case against Walmart was open and shut based on the documentary evidences and legal analyses Huynh provided to deRubertis.  These documents and legal analyses proved with little doubt that Walmart was liable for Huynh's termination in violation of SOX and Wrongful termination in violation of public policy.  deRubertis leaked this information to the other RICO Defendants then acted in concert with them to engage in evidence fabrication, destruction, mutilation, concealment, and committed perjury to prevent Huynh from defending his SOX claim against Walmart's chronologically impossible Defense.

118
**COMPLAINT – DEMAND FOR JURY TRIAL**

182. The chart below showed Huynh engaged in three waves of protected activities prior to his termination. The first wave occurred on Oct 4, 2016, the second wave occurred on Dec 1, 2016 (Seth Beal threatened to put Huynh's on a PIP) and the third wave occurred on Dec 20, 2016 and Jan 4, 2017. After each wave of protected activity Seth Beal and Walmart immediately retaliated against Huynh. Walmart eventually terminated Huynh's employment under the cloak of a RIF 14 days before the actual RIF. Walmart's purported reasons for Huynh's termination were due to role elimination was bogus because evidence in the record showed that Huynh's Business Development team was moved under Michael Trembley a few hours after Beal terminated Huynh's employment on Jan 10, 2017.

**Huynh's SOX Against Walmart Was Open and Shut Based on Documentary Evidence**



| Events | TUE 10/4 | FRI 10/14 | TUE 10/18 | THU 11/17 | WED 11/30 | THU 12/1 | TUE 12/20 | WED 1/4/17 | TUE 1/10/17 | TUE 1/24/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Huynh raised the excessive commission fee issues to Beal | 1 Protected Activity | | | | | | | | | |
| Beal ordered a CYA investigation into the commission fee issues. | | 2 | | | | | | | | |
| Beal retaliated by ordering HR to investigate against Huynh | | | 3 Retaliation | | | | | | | |
| Beal issued Huynh a vague bogus written warning letter. | | | | 4 Retaliation | | | | | | |
| Beal threatened to put Huynh on a PIP | | | | | | 5 | | | | |
| Huynh emailed his complaint to Jay Jorgensen and Ethics | | | | | | | 6 Protected Activity | | | |
| Huynh emailed his complaint to Marc Lore and Michael Bender. | | | | | | | | 7 Protected Activity | | |
| Beal fired Huynh 14 days before the actual RIF | | | | | | | | | 8 Retaliation | |
| Walmart's Jan 24, 2017 RIF | | | | | | | | | | 9 14 Days |

**Shotgun Pleaded Five ADHD FEHA Claims – Abuse of Process**

183.    However, two weeks later during Huynh's in person meeting in deRubertis' office, deRubertis demanded that Huynh allowed him to place Huynh's ADHD infliction at the center of Huynh's lawsuit against Walmart in addition to Huynh's SOX claim. Huynh told deRubertis that he disagreed with deRubertis' proposal for three main reasons.  First, Huynh believes his SOX whistleblower retaliation case against Walmart was open and shut. Second, there is a strong social/public stigma associated with people who suffered from mental disorders like ADHD which would impact Huynh's personal reputation and future employment prospects. Third, there was no financial upside to add this extraneous claim.  deRubertis became visibly angry and hostile toward Huynh.  deRubertis chastised Huynh by saying "Why would a whistleblower care about his reputation anyway?". Legal strategies are mine not yours. Your job is to collect the case facts and gave them to me".  deRubertis later repeatedly told Huynh this misleading assertion[35] that as a client Huynh didn't have a saying in the case's legal strategies. By late December 2017, deRubertis kept delaying filing Huynh's complaint Federal Court.  Huynh mistakenly believed that the reason deRubertis repeatedly delay-

---

[35] David deRubertis' statement contradicted with California Rules of Profession Conduct 1.2 regarding Scope of Representation and Allocation of Authority: a) Subject to rule 1.2.1, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by rule 1.4, shall reasonably* consult with the client as to the means by which they are to be pursued. Comment: Allocation of Authority between Client and Lawyer: [1] Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. (See, e.g., Cal. Const., art. I, § 16; Pen. Code, § 1018.) A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself. (Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396, 404 [212 Cal.Rptr. 151, 156].).

**COMPLAINT – DEMAND FOR JURY TRIAL**

ing filing the complaint was because Huynh didn't agree to let him put Huynh's ADHD condition at the center of his lawsuit. Thus, Huynh ultimately gave into deRubertis' demand.

184.    deRubertis purportedly asked Huynh in early January 2018 to file an ADHD disability discrimination complaint against Walmart with DFEH directly (instead filing it himself) then sought the right to sue letter on that very same day under the pretext that deRubertis was busy and needed this done so deRubertis could file the complaint against Walmart the next day.  However, deRubertis' true motive for asking Huynh to file the FEHA complaint was to use it as proof that Huynh was the one who pushed deRubertis to assert the five ADHD FEHA claims in the 3/15/18 complaint not deRubertis himself.

185.    On Mar 15, 2018, David deRubertis intentionally shotgun pleaded[36] five FEHA ADHD disability claims against Walmart in the Complaints (DC Dkt. 1 and 8) in additional to Huynh's whistleblower retaliation claims.  At the time, Huynh didn't make much of deRubertis' abnormal behaviors. However, Huynh now realized that the RICO Defendants intentionally shotgun pleaded these FEHA claims for two ulterior motives which had nothing to do with Huynh's SOX whistleblower retaliation claim except to execute the RICO Enterprise's "Nuts & Sluts" Offense against Huynh to diminish Huynh's credibility in the eyes of the SEC, the media, Walmart's investors, politicians, and the American public to effectuate RICO Enterprise's coverup scheme.

---

[36] The key characteristic of a shotgun pleading is that it "fail[s] to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests," which renders them disfavored and usually subject to dismissal. Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 (11th Cir. 2015). A complaint is a shotgun pleading where it has at least one of the following characteristics: (1) it "contain[s] multiple counts where each count adopts the allegations of all preceding counts," (2) it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," (3) it "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions[] or which of the defendants the claim is brought *24 against." See id. at 1321-23.

**COMPLAINT – DEMAND FOR JURY TRIAL**

186.     First, the five frivolous ADHD FEHA claims allowed the RICO Defendants to put Huynh's mental health and motives for engaging in protected conducts (only truth for Employment discrimination and retaliation case not SOX case) at the center of the lawsuit so the RICO Defendants could aggressively go after Huynh's psychiatrist records, medical records, personnel files from Huynh's employers dating back to 1987.

187.     Second, by asserting the FEHA Retaliation and Discrimination claims, the RICO Defendants could impose the McDonnel Douglas framework upon Huynh SOX complaint.  This later served as a platform for District Judge Vince Chhabria and the United States Court of Appeals for the Ninth Circuit's merit panels to improperly apply the McDonnel Douglas framework to purportedly dismiss Huynh's SOX's claim against Walmart. The McDonnel Douglas framework heavily favored the RICO Defendants versus Huynh in three main areas:

A.     The RICO Defendants argued that Huynh was a fake whistleblower (i.e., Huynh didn't engage in protected activity) because he only blew the whistle for personal gain to save his job.

B.     The RICO Defendants purportedly claimed that Huynh failed to prove causation for his SOX claim by imposing a higher standard of proof on Huynh.  The RICO Defendants imposed the substantial motivating factor which has a threshold requirement versus the contributing factor under SOX which had no such requirement. District Judge Chhabria later used the substantial motivating factor to purportedly prove that Huynh's failed to prove causation for his SOX claim. See DC Dkt 167 at 2-3[37].

C.     The RICO Defendants didn't have to meet the burden of persuasion to prove by

---

[37] Huynh is thus left relying entirely on the fact that the adverse action occurred a short period of time (here, a few months) after the purported protected activity, which courts often find sufficient to raise the inference, for purposes of a prima facie case, that there was a causal connection between the two. Van Asdale, 577 F.3d at 1003; Morgan v. Regents of University of California, 88 Cal. App. 4th 52, 69 (2000). But in this case, as discussed below, **the reasons for Walmart's inclusion of him in the layoffs are so strong that the short time period is arguably not enough to get Huynh past this initial hurdle**.

**COMPLAINT – DEMAND FOR JURY TRIAL**

clear and convincing evidence that Walmart "would have" terminated Huynh's employment in the absent of his protected activity. Instead, the RICO Defendants just merely needs to meet the burden of production to overcome Huynh's evidence of pretext.

188.    Even though Huynh currently doesn't possess direct evidence i.e., the who, what, when, and how the RICO Defendants communicated among themselves using their common wire and mail communication infrastructure to prove Huynh's assertions above. Huynh strongly believes this information is in the RICO Defendants' possession and is discoverable during the discovery phase of this lawsuit. The RICO Defendants (especially, the Rescue Squad) would most likely argue that this information is not discoverable due various purported claims of privileges. However, this argument is unpersuasive because the Gibson Dunn Lawyers made the opposite arguments in Chevron Corporation v. Donziger (1:11-cv-00691) under the crime-fraud exception case laws. See the excerpts below.

https://storage.courtlistener.com/recap/gov.uscourts.nysd.374606.356.1.pdf at 186-187.

"Numerous courts have also found that the crime-fraud exception to the attorney client privilege applied and thus did not shield the RICO Defendants' and their co-conspirators' pervasive fraud from discovery. The District Court for the Southern District of California, for example, reasoned that there "is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."[38] That court subsequently found that the crime-fraud exception applied to discovery of co-conspirator William Powers, finding that he was "deeply involved [in the fraud] in that his work product was apparently adopted whole cloth by the allegedly neutral expert Cabrera."[39] Similarly, the District Court of New Mexico noted that "exchanges" among the RICO Defendants "trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of

---

[38] 2 Exhibit 327 (2010.09.10 Order denying Respondent E-Tech's appeal, In re Application of Chevron, No. 10-CV-1146 (IEG) (S.D. Cal.)) at 9.
[39] Exhibit AW (2011.02.11 Order Re: Discovery Relating To Emails and Metadata, In re Application of Chevron Corp., 3:10-cv-01146-IEG-WMC (S.D. Cal.)) at 3-4.

**COMPLAINT – DEMAND FOR JURY TRIAL**

fraudulent reports," and "the fabrication of evidence."[40] And the Southern District of New York noted that "there is more than a little evidence" that the activities of the RICO Defendants "come within the crime-fraud exception."[41] https://storage.courtlistener.com/recap/gov.uscourts.nysd.374606.1728.0.pdf at 10-12.

**The Crime Fraud Exception Vitiates any Available Work Product Protection**

Further, Mr. Moncayo—along with his employer, Selva Viva, and the Assembly—is an active participant in the ongoing scheme to extort billions of dollars from Chevron. Any claim of protection over his documents is vitiated by the crime fraud exception. See *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 452-53 (S.D.N.Y. 2011).

This Court has already found "there is more than a little evidence that Donziger's activities . . . come within the crime-fraud exception to both the privilege and to work product protection." *In re Chevron Corp.*, 749 F. Supp. 2d 141, 167 (S.D.N.Y. Nov. 10, 2010), aff'd 409 Fed. Appx. 393 (2d Cir. 2010); see also Dkt. 571 at 4–5 ("Certainly the probable cause prong has been satisfied with respect to some subjects of inquiry." (citations omitted)); Dkt. 905 (making various crime-fraud findings in the context of the Patton Boggs subpoena). The materials that Chevron seeks from Mr. Moncayo would likely be relevant to and in furtherance of several of the crime-fraud categories at issue and would provide further evidence of the misconduct being carried out by Defendants and their co-conspirators, including Mr. Moncayo's employer Selva Viva and the Assembly.

To the extent ERI is seeking to shield the communications between former ERI attorney Marissa Vahlsing and Mr. Moncayo, his own testimony reveals probable cause to find that these communications were in furtherance of a fraud or crime. According to Mr. Moncayo, Fajardo and "[t]he lawyer Marissa from the team [in the U.S.]" called him to assist in drafting his witness statement and asked him to get in touch with Ms. Calva, another witness for Defendants, so that he may coordinate with her and share a copy of his witness statement. Tr. at 2099:19-2101:7. Mr. Moncayo did as he was asked and went to speak with Ms. Calva at her father's office. This not only violates this Court's sequestration order (Tr. at 43:21-44:14), it may amount to obstruction of justice and witness tampering. The coordination was presumably necessary to ensure consistency in Mr. Moncayo's and Ms. Calva's stories regarding whether Judge Zambrano actually authored the judgment—a key issue in this case. Tr. at 2099:11-13-2101:7. Mr.

---

[40] Exhibit 328 (2010.09.13 Memorandum Opinion and Order rejecting claims of attorney client privilege and ordering production of documents, In re Chevron Corp., Nos. 1:10-mc00021-22 (LFG) (D.N.M.)) at 11

[41] In re Application of Chevron Corp., No. 10 MC 00002 (LAK), 2010 WL 4910248, at *21 (S.D.N.Y. Nov. 10, 2010).

**COMPLAINT – DEMAND FOR JURY TRIAL**

Moncayo's testimony on this score was not credible, and the procuring of such testimony by prompting or facilitating coordination with other witnesses constitutes probable cause for witness tampering and/or obstruction. Whether Ms. Vahlsing knowingly took any affirmative steps to further the crime or fraud is not dispositive, as it appears her assistance was sought to facilitate or conceal it. See United States v. Kerik, 531 F. Supp.2d 610, 617 (S.D.N.Y. 2008) (finding that statements would be "admissible under the crime-fraud exception, even where . . . the attorney was not a knowing participant in the crime or fraud in question").

189. However, even without direct evidence there are at least five pieces of circumstantial evidence that proved that it was more likely than not that the RICO Defendants acted in concert to shotgun plead the five nefarious and frivolous ADHD FEHA claims.

190. First, it made no sense whatsoever for deRubertis to have shotgun pleaded these frivolous FEHA claims when there was overwhelming documentary evidence and legal analyses that Huynh provided to him which proved with little doubt that Huynh's SOX whistleblower retaliation case against Walmart was open and shut.

191. Second, it was hard to image that if another Plaintiff's lawyer had shotgun pleaded five frivolous FEHA claims against Walmart in a different lawsuit that the Rescue Squad would just stand idly by and did not file a motion to dismiss these claims for failure to state a claim. The only logical explanation for the Rescue Squad's inactions was because they were in cahoots with deRubertis to shotgun plead these claims in the first place.

192. Third, it made no sense whatsoever for David deRubertis, as Huynh's lawyer, to ask Huynh to file a FEHA discrimination complaint against Walmart when it was deRubertis' job to do so not Huynh's (especially, when David deRubertis repeatedly told Huynh that legal strategies are his not Huynh's). The only logical explanation for deRubertis' atypical behavior was because he wanted to make it appeared as if it was Huynh the one who wanted to assert these claims not the deRubertis Law Firm in the first instance in order to coverup the fact that deRubertis colluded with the other RICO Defendants to pull off this wicked scheme.

125

**COMPLAINT – DEMAND FOR JURY TRIAL**

193.   Fourth, to purportedly show that deRubertis exhausted DFEH's administrative remedies before taking Huynh's ADHD FEHA claims to Federal Court, deRubertis and the Rescue Squad fabricated evidence to purportedly show that both deRubertis and FEHA served Walmart Huynh's right to sue letter at the same time and on the same date i.e., on Mar 9, 2018.

194.   Fifth, the analysis below showed that the RICO Defendants pulled out all stops (included illegal means) to go after Huynh's psychiatrist and medical records, and personnel files.  There were three main examples of fraudulent means that RICO Defendants undertook to obtain Huynh's records: First, deRubertis falsified Huynh's signature to obtain Huynh's psychiatrist, medical, and employment records without Huynh's knowledge or consent. Second, the Rescue Squad concocted paper/email trails to purportedly cover up the fact that Walmart never subpoenaed Amazon for Huynh's personnel files. Third, the Rescue Squad and the Walmart Participants improperly stole Huynh's 2013 email to Jeff Bezos.

195.   Claim # 4 and #5 in Huynh's complaint put Huynh's ADHD infliction and mental health at the center of his lawsuit which enabled the RICO Defendants to legitimately obtain Huynh's psychiatrist and medical records then misrepresented them to falsely portray Huynh's as mentally ill, unhinged, and prone to violence to destroy Huynh's credibility as a whistleblower in order to effectuate prong #2 and #3 of the RICO Enterprise's illegal cover-up scheme.  But for the RICO Defendants' shotgun pleaded actions, the Rescue Squad would not have been allowed to subpoena Huynh's medical and psychiatrist records as a matter of law due to Huynh's rights to Constitutional Privacy afforded by both the US Constitution and

California Constitution because under Huynh's SOX claim Huynh only asserted a garden-variety emotional distress claim [42] so the Rescue Squad and the Walmart Participants were not allow to obtain Huynh's psychiatrist records and medical records. Exploiting deRubertis' nefarious and frivolous FEHA claim #4 and #5, Brass, Steward, and Wilson repeatedly made misleading statement of the law to ruthless and viciously go after Huynh's psychiatrist records, including the deposition of Huynh's wife and the attempt to depose Huynh's juvenile son under the pretext that they needed them to assess Huynh's level of emotional distress.

196.    Below are the excerpts from Rachel Brass' January 21, 2019 letter where she forced/caused Huynh to release his psychiatrist records to the RICO Defendants.

---

[42] In Earhart v. Bofl Holding, Inc. (15cv2287-BAS (NLS) (S.D. Cal. Sep. 4, 2018), a SOX retaliation case, the Hon. Nita L. Stormes United States Magistrate Judge denied BOFI's request for Earhart's Medical Record. Judge Stormes wrote "In light of the allegations in his complaint, the Court finds that Erhart has not waived the medical privilege protecting his medical records under California state law. The remaining claims in Erhart's complaint only involves "garden-variety" emotional distress claims. Such claims are not sufficient to waive the privilege. Compare EEOC v. Peters' Bakery, 301 F.R.D. 482, 487 (N.D. Cal. 2014) (despite finding medical records relevant, holding that the "right to privacy in medical records found in the federal and California constitutions was not waived by assertion of a garden variety claim for emotional distress").

In E.E.O.C. v. Serramonte 237 F.R.D. 220 (N.D. Cal. 2006), Chief United States Magistrate Judge, LARSON, wrote "Second, Ms. Wei has not waived her right of privacy by asserting more than a garden-variety claim of emotional distress. Turner v. Imperial Stores, 161 F.R.D. 89, 97 (S.D.Cal.1995). Defendants attempt to distinguish the case at bar from Turner, in which the court held that a plaintiff had not waived privilege and did not have to submit to a Rule 35 medical examination, because they are not asking Wei to submit to a medical examination but are attempting to obtain access to her medical records. This Court finds that if anything, **delving into a plaintiff's medical or psychiatric records is even more invasive than conducting a medical or psycho-logical examination**, and that the standard for waiver should be at least as rigorous as that in Turner. See Fitzgerald v. Cassil, 216 F.R.D. 632, 636-638 (N.D.Cal.2003), citing Fritsch v. City of Chula Vista, at 187 F.R.D. 614, 632 (S.D.Cal.1999). In Fritsch, the defendant, as in this case, **sought medical records unlimited as to time: (" from her first visit to your offices to the present")** Id. at 616. Even though the plaintiff in that case claimed " severe" emotional distress, the magistrate judge found that this alone did not justify disclosure of any medical records. " [T]he plaintiff has not brought a claim for either intentional or negligent infliction of emotional distress; **she does not allege that she suffered a psychiatric injury or disorder as a result of the defendants' conduct**;

127

**COMPLAINT – DEMAND FOR JURY TRIAL**

- Ali v. eBay, Inc., 2018 WL 3368389, at *2 (N.D. Cal. July 10, 2018) (requiring release of medical records in a disability discrimination and retaliation lawsuit because "a person waives their right to privacy by bringing claims concerning physical or mental health injuries")

- Bregman v. District of Columbia, 182 F.R.D. 352, 360 (D.D.C. Oct. 23, 1998) (granting motion to compel plaintiff to provide names of medical providers who treated plaintiff for conditions relevant to plaintiff's claim)

- Walmart is "entitled to discover what other causes exist for Plaintiff's emotional distress, regardless of whether any such other causes occurred before the events at issue in the lawsuit or afterwards." Enwere v. Terman Assocs., 2008 WL 5146617, at *4 (N.D. Cal. Dec. 4, 2008) (emphasis added).

197.    Below are the excerpts from Brass's February 8, 2019, letter to Huynh to force/cause Huynh to release his medical records to Walmart. (all these letter was forwarded to Huynh either by Stewart or Wilson at Brass' instruction).

**"By placing your health and medical history directly at issue**, you made the requested information relevant to your claim and Walmart's defense. Your entire medical history is relevant—among other reasons—to show whether symptoms and other manifestations were caused by Plaintiff's medical condition(s), whether Plaintiff suffered the alleged "emotional distress," and, if so, what caused such emotional distress."

- Doe v. City of Chula Vista, 196 F.R.D. 562, 568-69 (S.D. Cal. 1999) (holding that a plaintiff who sought damages for severe emotional distress in a case alleging disability discrimination could not fairly prevent discovery into evidence relating to causation)

- Bangoura v. Andre-Boudin Bakeries, Inc., 2012 WL 5349569 at *3 (N.D. Cal. Oct. 29, 2012) (finding that in a case seeking monetary compensation for emotional distress, defendant is "entitled to discovery that will shed light on the nature of Plaintiff's alleged emotional distress and on the sources that proximately gave rise to it.").

### Signatures Falsification and Identity Theft

198.    A month before Huynh even agreed to let deRubertis put Huynh's ADHD condition at the center of his lawsuit against Walmart, Kari and David deRubertis acted in concert with the other RICO Defendants to falsify Huynh's signature and stole Huynh's identity to illegally obtain Huynh's psychiatrist records and medical records to effectuate prong #2 and #3

128

of the illegal coverup scheme.  These RICO Defendants used and/or caused other use a hundred instances of US mails and the wire transmission facilities e.g., the Internet and cell phone to illegally obtain Huynh's psychiatrist and medical records.  For example, David and Kari deRubertis caused other to ask Huynh to sign a blank and concocted HIPAA Medical Record Authorization Release Form in Mid-Nov.  This blank form didn't comply with HIPPA because it didn't list the name of the health care service providers, what types of medical records were requested, and the time period for the record requests.  In short, the RICO Defendants leveraged this blank form to fill in the names of whatever health care providers they desired and all types of medical and/or psychiatrist records they desired unbounded by time to illegally obtain Huynh's medical and psychiatrist records.

199.    David and Kari deRubertis sent and/or caused other to be sent the signed concocted blank medical record release authorization forms along with a generic cover letter to Huynh's psychiatrist, Dr. Bolte, on three occasions (January, June, and September of 2018) to illegally obtain Huynh's office visits with Dr. Bolte for the period of 2012 to Sept 2018 without Huynh's authorization and knowledge. Subsequently, David and Kari deRubertis with the help of Doug Kasales, Epiq Global's Sr. Project Manager, produced Huynh's psychiatrist records under the table without the "Confidentiality" designation so the other RICO Defendants could effectuate prong #2, #3, and #6 of the WSF Coverup Enterprise's illegal coverup scheme.

200.    It is also important to note that while deRubertis' purported reason for delaying filing Huynh's civil complaint from Dec 2017 to Mar 2018 was due to deRubertis' busy schedule.  deRubertis' statement was misleading because it contradicted with the reason he stated in the letters and emails that David and Kari deRubertis sent to Huynh's psychiatrist to

rush her to produce Huynh's psychiatrist records under the pretext that these records were needed to meet urgent court's filing deadlines.

**"Please note that this is a RUSH REQUEST as we have a court deadline fast approaching.** Please feel free to provide records to me by fax at (818) 761-2323 or to my email at iessica@derubertislaw.com. Alternatively, please feel free to mail the records to our office at 4219 Coldwater Canyon Avenue, Studio City, California 91604."

201.    Kari and David deRubertis caused others to ask Huynh to sign the Swedish Medical's release form but left the signed date blank. Because Huynh forgot to leave the signed date blank, David and Kari deRubertis order their assistance to remove the date from the signed form. This allowed the deRubertis Law Firm to fill in the signed date any time after Huynh signed the form to obtain all of Huynh's medical records from Swedish Medical without Huynh's authorization and knowledge.  On at least two occasions David and Kari deRubertis caused other to send the Jan and June 2018 record request letters to Swedish Medical to illegally obtain Huynh's medical records.  The deRubertis Law Firm also falsified Huynh's signature on the California Employment Development Department (EDD) record release forms to obtain Huynh's medical records and personnel files on Jan 2018 and July 2018.

202.    Additionally, after David and Kari deRubertis used US mails and wire transmission facilities on many separate instances to illegally obtained Huynh's medical and psychiatrist records, Kari and David deRubertis acted in concert with Kasales and lindern to produce Huynh's psychiatrist records under the table to the Rescue Squad in late Sept 2018.  The Rescue Squad later used these records to prong #2 and #3 of the illegal coverup scheme.

**Obtained Huynh's Psychiatrist and Personnel Records Through Intimidations and Threats**

203.    Building upon the David deRubertis' FEHA claims Boutros, Scalia, Brass,

130
**COMPLAINT – DEMAND FOR JURY TRIAL**

Stewart, Wilson, and Schuemann acted in concert to use and/or caused other to use the US mail and wire transmission facilities to go after Huynh's psychiatrist and personnel records at warp speed and wicked intensity to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

204.    On Nov 29, 2018, the Rescue Squad served Walmart's First Set of Interrogatory (specifically ROG #6 and #7) to Huynh via email to pressure Huynh to provide answers regarding Huynh's ADHD diagnoses and treatments dated back to 1996 to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

205.    On Nov 29, 2018, the Rescue Squad served Walmart's first set of Request for Document Production (specifically RFDP # 22 to 29) to Huynh via email to pressure Huynh produced all documents related to the diagnosis and treatment of Huynh's ADHD conditions unbounded by time to effectuate prong #2, #3, and #6 of the RICO Enterprise's coverup scheme.

206.    On December 6, 2018, Rescue Squad emailed and UPS a subpoena to Huynh's psychiatrist, Dr. Bolte and demanded that she removed redactions from all the medical records to Walmart to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

207.    On December 21, 2018, the Rescue Squad caused Dr. Bolte to produce Huynh's psychiatrist records/visit notes to effectuate prong #2, #3, and #6 of the illegal coverup scheme.  See Exhibit X.

208.    On January 21, 2018, the Rescue Squad emailed Huynh a letter dated Jan 21, 2019 to pressure Huynh to produce a comprehensive list of documents and answers to interrogatories concerning Huynh's ADHD diagnosis, and treatments (e.g., list of medical and psychiatrist providers, list of diagnosis and medication, mental health records etc.) unbounded by time for no legitimate and/or rational basis related to Walmart's defense against Huynh's SOX

131

**COMPLAINT – DEMAND FOR JURY TRIAL**

whistleblower retaliation claim except to effectuate prong #2, #3, and #6 of the illegal cov-

erup scheme.  See Exhibit X.

209.    On January 28, 2019, the Rescue Squad emailed Huynh a letter dated Jan 28,

2019 and threatened Huynh that if he failed to produce his psychiatrist records the Rescue

Squad would get Magistrate Judge Sallie Kim to intervene to force Huynh to do so in order to

effectuate prong #2, #3, and #6 of the illegal coverup scheme.

210.    On February 4, 2019, the Rescue Squad E-filed a request for a telephone con-

ference call with Magistrate Judge Sallie Kim to get her to order Huynh to produce Huynh

psychiatrist records. to effectuate prong #2, #3, and #6 of the RICO Enterprise's coverup

scheme.

211.    On February 9, 2019, the Rescue Squad emailed Huynh a letter dated Feb 8,

2019 to pressure Huynh to produce a comprehensive list of documents and provided answers

to interrogatories concerning Huynh's ADHD condition and treatment e.g., list of medical and

psychiatrist providers, list of diagnosis and medication, mental health records etc. dating back

to 2006 to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

212.    On February 10, 2019, the Rescue Squad caused Huynh to email them a list of

all of Huynh's medical and mental health providers dated back to 2006 as well as all emails

and text messages Huynh exchanged with Huynh's psychiatrist, Dr. Bolte to effectuate prong

#2, #3, and #6 of the illegal coverup scheme.  See Exhibit X.

213.    On February 10, 2019, Rescue Squad caused Huynh to email them all the

email communication Huynh had with the El Camino Medical Group and Swedish Medical

Group to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

214.    On February 13, 2019, the Rescue Squad subpoenaed Dr. Frank Annis, Huyn-

**COMPLAINT – DEMAND FOR JURY TRIAL**

h's psychiatrist via US mails and fax, for all the records and meeting notes regarding the diagnoses and treatments of Huynh's ADHD conditions to effectuate prong #2, #3, and #6 illegal coverup scheme.

215.    On February 13, 2019, the Rescue Squad subpoenaed Dr. Vu Oanh, Huynh's psychiatrist, via US Mail for all records and meeting notes regarding the diagnoses and treatments of Huynh's ADHD conditions to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

216.    On February 13, 2019, Rescue Squad subpoenaed Dr. Thi Nguyen, Huynh's primary care physician at the Swedish Medical Group via US mail and fax to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

217.    On February 13, 2019, the Rescue Squad subpoenaed Monthy Owen, Huynh's psychotherapist via US mail and fax, for all records and meeting notes related to the treatment of Huynh's ADHD to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

218.    On February 13, 2019, the Rescue Squad subpoenaed Associated Behavioral Health Care via US Mail, for all records and meeting notes related to the treatment of Huynh's ADHD conditions to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

219.    On February 19, 2019, the Rescue Squad caused Dr. Annis, Huynh's psychiatrist, to fax all documents concerning detailed diagnoses and medication treatments (Dr. Annis also produced previous records from Dr. Sheri Spirt, Huynh's psychiatrist in NYC, who first diagnosed Huynh with ADHD in 1999) to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

220.    On February 25, 2019, the Rescue Squad emailed and demanded that Huynh signed a medical record's release form which would authorize Walmart to obtain Huynh's medical and psychiatrist/psychotherapist records from any health care providers they desire to

133

**COMPLAINT – DEMAND FOR JURY TRIAL**

effectuate prong #2, #3, and #6 of the illegal coverup scheme.

221.    On February 26, 2019, the Rescue Squad caused Huynh to produce all of his medical records from the Swedish Medical group via email to them to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

222.    On Mar 4, 2019, the Rescue Squad caused Huynh to email them a signed medical record release/authorization form which allowed the RICO Defendants to obtain Huynh's psychiatrist and medical records from any of Huynh's health care providers to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

223.    On April 1, 2019, Rescue Squad threatened Huynh via email that if he didn't remove redactions from Dr. Bolte's visits/therapist notes (specifically the note that related to Huynh's 2013 email to Jeff Bezos surrounding Huynh's termination) they would get Magistrate Judge Kim to force Huynh to produce the records in order to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

224.    On April 1, 2019, the Rescue Squad caused Huynh to produce unredacted version of Dr. Bolte office visits records from Mar to Oct 2018 via email to effectuate prong #2, #3, and #6 the illegal coverup scheme.

225.    On April 1, 2019, the Rescue Squad caused Huynh to produce additional unredacted version of Dr. Bolte office visits records, specifically those records that related to Huynh's juvenile son's diagnosis and treatment to effectuate prong #2, #3, and #6 the illegal coverup scheme.

226.    On April 4, 2019, the Rescue Squad served Huynh their half of the discovery brief letter via email to threaten Huynh with Court's intervention to force Huynh to remove additional redactions from Dr. Bolte's records (specifically those that related to Huynh's 2013 email to Jeff Bezos) for no legitimate and/or rational basis in relation to Walmart's defense

1    against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal

2    coverup scheme

3         227.    On April 10, 2019, the Rescue Squad caused Huynh to produce additional un-

4    redacted version of Dr. Bolte office visits records (specifically, the Nov 2013 therapist note

5    where Huynh confided to Dr. Bolte about his 2013 email to Jeff Bezos[43] to the Rescue Squad

6    via email for no legitimate and/or rational basis in relation to Walmart's defense against

7    Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup

8    scheme.

9

10        228.    On April 21, 2019, Rescue Squad demanded via email that Huynh removed re-

11   dactions from Dr. Bolte's record from Dr. Bolte's Mar and Oct 2018 which included infor-

12   mation about Huynh's juvenile son medical condition for no legitimate and/or rational basis in

13   relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate

14   prong #2, #3, and #6 of the illegal coverup scheme.

15

16        229.    On April 21, 2019, the Rescue Squad caused Huynh to produce un-redacted

17   versions of Dr. Bolte's records via email for Huynh's Mar and Oct 2018 office visits for no

18   legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX whis-

19   tleblower retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup

20   scheme.

21

22        230.    On August 8, 2019, the Rescue Squad caused Huynh to produce up to date rec-

23   ords of his recent office sessions with Dr. Bolte for no legitimate and/or rational to effectuate

24

25

26   _____

27   [43] See paragraph X for discussions on how David deRubertis mine Huynh's personal laptop
     hard drive for Huynh's email to Jeff Bezos and Amazon personnel file then leaked them to the
     RICO Defendants.  Also see paragraph Y discussions on how the GDC Squad stole a copy of

28   Huynh's 2013 email to Jeff Bezos without Huynh's consent)

135

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   prong #2, #3, and #6 of the illegal coverup scheme.

2

3       231.    The RICO Defendants leverage deRubertis FEHA discrimination and retalia-

4   tions claims to use and/or cause other to use US Mail and/or the wire's transmission network

5   in many instances to subpoena any and all of Huynh's previous personnel files from his for-

6   mer employers dated back to 1996 under the pretext that Huynh had a pattern of making false

7   allegations against employers for personal gain to destroy Huynh's credibility as a whistle-

8   blower in order to effectuate prong #2 and #3 of the coverup scheme.  If it was not for deRu-

9   bertis shotgun pleaded these frivolous FEHA would not be able obtain Huynh's personnel

10  files as a matter of laws because under SOX and California Labor Code 1102.5 a whistle-

11

12  blower's motive is irrelevant in assessing whether he engaged in protected conducts.

13

14   •   SOX: in a March 2019 ARB opinion in Hernandez v. Metro-North Commuter Rail-
         road Co., Inc., ARB No. 17-016, ALJ No. 2016-FRS-23, the ARB noted that "a
15       complainant's motive in making a protected complaint is irrelevant," citing Guay v.
         Burford's Tree Surgeons, Inc., ARB No. 2006-0131, ALJ No. 2005- STA00045, slip
16       op. at 7 (ARB Jun. 30, 2008) (("However, 'where the complainant has a reasonable
17       belief that the respondent is violating the law, other motives he may have for engag-
         ing in protected activity are irrelevant.'") (quoting Diaz-Robainas v. Florida Light &
18       Power Co., 1992-ERA-00010 (Sec'y Jan. 19, I996)))".

19   •   California Labor Code §1102.5: See Mize-Kurzman, supra, 202 Cal.App.4th at p.
20       852, original italics. "[I]t is not the motive of the asserted whistleblower, but the na-
         ture of the communication that determines whether it is covered.". See Judicial
21       Council of California Civil Jury Instructions (May 2020) at page 1306 (CACI No.
22       4603).

23

24      232.    Boutros, Scalia, Brass, and Steward used the nefarious FEHA claims to e-file

25  DC Dkt. 69 in late May 2018 to misrepresented the laws related to Huynh's SOX claim to im-

26  properly influence Magistrate Judge Sallie Kim to force Huynh to produce his Amazon's per-

27  sonnel files (specifically the 2013 email to Jeff Bezos among other files) to Walmart for no

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

legally valid reasons except to help effectuate prong #2, #3, and #6 illegal cover-up scheme. The Rescue Squad made the following misleading statements about the laws in their court's filing to improperly influence Magistrate Judge Sallie Kim to order Huynh to turn over his Amazon's personnel files.

"First, documents related to Plaintiff's prior employment—including allegations of wrongdoing made against his prior employers—are probative of the veracity of the merits of Plaintiff's claims here." DC Dkt. 69 at 3. (Both of these cases had nothing to do with Huynh's SOX Whistleblower retaliation claim against Walmart).[44]

I.   In Frazier v. Bed, Bath & Beyond, Inc., which concerned requests for prior employment records nearly identical to those at issue here, the Court found such documents relevant under Federal Rule of Evidence 404(b) and 406 and ordered production. Dkt. 10, 2011 WL 5854601, at *2 (N.D. Cal. Nov. 21, 2011). That is because such documents bore directly on whether the plaintiff had a history of alleging mistreatment by his employers and the credibility of claims against his current employer. Id. at *1.

II.  Similarly, in Dornell v. City of San Mateo, the Court held that personnel records from a plaintiff's prior employers were relevant to claims of employment discrimination and adverse treatment by a current employer; specifically, the records were probative of whether the plaintiff had a pattern of complaining about discrimination. Dkt. 30, 2013 WL 5443036, at *5 (N.D. Cal. Sept. 30, 2013).

233.   As a result of the RICO Defendants' misrepresentations, Magistrate Judge Sallie Kim ruled in Walmart's favor in late May 2019 (DC Dkt. 72) by ordering Huynh to release his Amazon's personnel files to Walmart.  However, the troublesome part was not that Magistrate Judge Sallie Kim ruled in Walmart's favor but rather Judge Kim took it a step further to

---

[44] Frazier v. Bed, Bath & Beyond, Inc was a retaliation and discrimination case asserted under Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination ("NJLAD") See: https://storage.courtlistener.com/recap/gov.uscourts.njd.247975/gov.uscourts.njd.247975.54.0.pdf at 4 while Dornell v. City of San Mateo was a discrimination and retaliation in violation of Title VII, 42 U.S.C.§ 2000 et seq. ("Title VII"), and California Fair Employment and Housing Act, Cal. Gov't Code § 12940 et seq. ("FEHA") case.  See https://storage.courtlistener.com/recap/gov.uscourts.cand.261155/gov.uscourts.cand.261155.59.0.pdf

lend credibility to Walmart's false assertion that Huynh was a fake whistleblower by indi-

rectly to misleading classify Frazier v. Bed, Bath & Beyond, Inc. as a discrimination and re-

taliation whistleblower case when in fact it was not[45]. As previously discussed under SOX a

whistleblower motive for blowing the whistle was irrelevant. See COA Dkt. 33 at X.

### Give Us the Jeff Bezos Email or Else!

234.    In Mid-March 2019, Huynh discovered for the first time that the RICO De-

fendants (deRubertis and Kasales engaged in data mining of Huynh's personal laptop hard

drive (see paragraph X) to extract privilege attorney-client communications between Huynh

and Sean McKessy and Rebecca Chang as well as the Scott Blankenship Law Firm PLLC[46]

(who provided legal advises to Huynh in 2013 relating his Amazon employment matters).

Second, the Rescue Squad stole Huynh's 2013 email to Jeff Bezos then file the letter as

Walmart's Exhibit 117 to support Walmart's Motion for Summary Judgement and to misrep-

resent these facts and the laws to the SEC and/or the DOJ that Huynh had a pattern of blowing

the whistle for personal gain. Third, Huynh's entire iPhone backup text file which included

private communications between Huynh and his confidants regarding his ADHD conditions

which had nothing to do with Walmart's defense against Huynh's SOX claim. The Rescue

Squad stole this record which they subsequently filed under Exhibit 124 in support of

Walmart's Motion for Summary Judgement in order to effectuate prong #2, #3, and #6 of the

illegal coverup scheme.

---

[45] Judge Kim wrote in her order: "First, the documents potentially show **Plaintiff's pattern and practice of alleging that he was the victim of discrimination and retaliation as a whistleblower**. Frazier v. Bed, Bath & Beyond, Inc., 2011 WL 5854601, at *2 (N. D. Cal. Nov. 21, 2011) (finding discoverable personnel records as evidence of a pattern and practice of alleging discrimination)."

[46] https://www.blankenshiplawfirm.com/

**COMPLAINT – DEMAND FOR JURY TRIAL**

235.    Even though, Huynh doesn't have direct evidence to prove the assertions above, there are circumstantial evidence which proved that deRubertis provided the information he stole from Huynh's personal laptop to the Rescue Squad and the Walmart Participant based on the types of interrogatories and request for document productions the Rescue Squad impounded upon Huynh during discovery.  These RFDPs and Interrogatories were derived from the information David deRubertis stole from Huynh's personal laptop hard drive. See the table below.

| Data Mining | Walmart's RFDPs and ROGs |
|---|---|
| • Huynh's email to Jeff Bezos in 2013. (See Ex. X)<br>• Huynh's communications with the Blankenship Law Firm seeking advices regarding the Amazon's Employment matters. (Ex. Y) | • RFDP # 43: All documents relating to any other legal action Plaintiff has commenced, or threatened to commence, against any employer.<br>• RFDP #44: All documents concerning any other allegation of discrimination Plaintiff has made against any person, including but not limited to other employers.<br>• RFDP # 43: All documents relating to any other legal action Plaintiff has commenced, or threatened to commence, against any employer.<br>• RFDP #50:  All documents concerning any allegation of employment-related retaliation Plaintiff has made against any person, including, but not limited to other employers.<br>• RFPD #51: All documents concerning any alleged violations by any previous employer of Plaintiff of the Sarbanes-Oxley Act, the federal securities laws, federal antitrust laws (See Email to Jeff Bezos), or any other law, regulation, or rule.<br>• RFDP #52: All documents concerning any allegations of employment-related ethical violations that Plaintiff has made against any person, including but not limited to other employers. |
| • Huynh's communication with Sean McKessy<br>• Huynh's iPhone Backup file.<br>• Huynh's | • ROG #1: Identify all persons, including, but not limited to, present or former employees or representatives of Walmart, with whom You or anyone on Your behalf has spoken or communicated about Your Complaint, the allegations in the Complaint, or this lawsuit and describe any such discussions or communications.<br>• ROG #2: Identify all email addresses that You have maintained or used from January 1, 2014, to the present.<br>• RFDP #4: All documents concerning or relating to any communications Plaintiff has had with Walmart (including, as defined above, Walmart's |

| | |
|---|---|
| personal emails which Huynh sent from his Gmail and Yahoo accounts | employees and agents) since the date of the termination of Plaintiff's employment with Walmart<br>• RFDP #47: All documents relating to statements obtained by Plaintiff or anyone acting on Plaintiff's behalf from any witnesses and/or from any person with knowledge of relevant facts regarding allegations of the Complaint.<br>• RFDP # 12: All documents concerning any communication between Plaintiff and/or his attorneys and the Securities and Exchange Commission ("SEC"). |
| • Huynh's iPhone Backup file. | • RFDP #54: All documents constituting text message communications between Plaintiff and any current or former Walmart employee from January 1, 2016 to the present.<br>• All documents constituting text message communications between Plaintiff and any other person from January 10, 2017 to the present relating to Plaintiff's work at Walmart, Plaintiff's termination from Walmart, and/or Plaintiff's administrative charges and lawsuits against Walmart. |

236.    Even though, Huynh currently doesn't possess direct evidence (i.e., the what, who, when, and how the RICO Defendants communicated among themselves using their common wire and mail communication infrastructure to prove that the RICO Defendants acted in concert to steal Huynh's information to effectuate prong #2, #3, #6 of the illegal cover-up scheme.  However, Huynh strongly believes that this information is in the RICO Defendants' possession and is discoverable during the discovery.

**The RICO Enforcer and Leg Breaker**

237.    On Sept 25, 2019, David deRubertis caused both Anthony Nichols and Garen Nadir to call Huynh to purportedly ask Huynh to sign an authorization form to allow the deRubertis Law Firm to obtain all of Huynh's Amazon personnel file for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

**COMPLAINT – DEMAND FOR JURY TRIAL**

238.    On Sept 25, 2019 @10:27 AM, deRubertis chastised and pressured Huynh via email to force Huynh to signed the Amazon's personnel files release form to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

239.    On Sept 25, 2019 @ 5:37 PM, deRubertis threatened and pressured Huynh via email to force Huynh to signed the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

240.    On Sept 27, 2019 @ 5:27 PM, David deRubertis once again harassed and pressured Huynh via email to force Huynh to sign the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

241.    On Sept 28, 2019 @ 9:04 AM, David deRubertis again harassed and pressured Huynh via email to force Huynh to signed the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

242.    On Sept 28, 2019 @ 2:23 PM, David deRubertis again harassed and pressured Huynh via email to force Huynh to signed the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

243.    On Oct 8, 2019 @ 2:18 PM, David deRubertis again harassed and threatened that if Huynh will not sign the record release form deRubertis would drop Huynh as client to extort Huynh to sign the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to

effectuate prong #2, #3, and #6 of the illegal coverup scheme.

244.    On Oct 10, 2019 @ 7:59 PM, David deRubertis again harassed and threatened to withdraw as Huynh's counsel to extort Huynh to sign the Amazon's personnel files release form for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX retaliation claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

245.    Huynh could no longer take the abuse and pain that deRubertis repeatedly inflicted upon him up, Huynh wrote deRubertis a 10-page response email on Oct 10, 2018 at 9:35 PM. In the email, Huynh provided a summary of all the California Rules of Professional Conducts and State Bar Acts of California that deRubertis had broken during Huynh's representation. On October 16, 2018, Huynh emailed David deRubertis a signed letter asking deRubertis to withdraw himself as Huynh's lawyer because Huynh could no longer trusted deRubertis to act in Huynh's best interest.

**Damsel In Distress Strategy**

246.    The RICO Defendants knew that after Huynh terminated his relationship with deRubertis, they would not be able to get Huynh to hand over evidence in his possession that would implicate Walmart's and their executives civilly and criminally.  To deceive Huynh to hand over Huynh's personal lap top hard drive to the Rescue Squad the RICO Defendants engaged in the "Damsel in Destress" Strategy in two ways.

247.    First, the Rescue Squad subpoenaed six of Huynh's previous employers to obtain Huynh's personnel records dating back to 1996 as well as Dr. Bolte, Huynh's psychiatrist, for all of Huynh's psychiatrist records.  The RICO Defendants attempted to gather the most intimate information about Huynh's life in order to cause embarrassment and shame to force Huynh to turn over Huynh's hard drive to effectuate prong #5 of the coverup scheme.

142

**COMPLAINT – DEMAND FOR JURY TRIAL**

248.    Second, David deRubertis attempted to play the hero to save Huynh from the evil "Rescue Squad" by offering to file a motion to quash the Rescue Squad's intrusion into Huynh's constitutional right to privacy if Huynh agreed to let Walmart imaged Huynh personal laptop hard drive and entered into a highly restrictive non-disclosure agreement to effectuate prong #5 of the illegal coverup scheme.  Ultimately, Huynh told deRubertis to get loss because Huynh saw right through the RICO Defendants' Damsel in Distress strategy because it made no sense to Huynh that deRubertis went through a 180-degree reversal i.e., a short time before, David deRubertis attacked Huynh viciously and ferociously in an attempt to get Huynh's Amazon personnel files and now he tried to rescue Huynh from the evil "Rescue Squad".

### Playing Ping Pong with Jeff Bezos's Money

249.    In early April 2019, Huynh emailed Rachel Brass, Chris Wilson, and Susanna Schuemann to request that Walmart provided him with his Amazon's personnel records which Walmart subpoenaed Amazon in Mid-November 2018.  Rachel Brass responded that Amazon has no responsive records in an attempt to deceive Huynh and coverup the RICO Defendants' "Damsel in Distress" scheme.   Two weeks later, Huynh emailed Rachel Brass again and asked her to provide Huynh with all the communications that Walmart had with Amazon concerning Huynh's personnel files.  Rachel Brass responded that since Huynh didn't issue a RFDP Walmart would not honor Huynh's request.  A month later, Huynh served Walmart's his third Request for Document Production.[47]  In Mid-June 2019, the Rescue Squad purport-

---

[47] RFDP #23: All documents concerning the Defendants' communication with Amazon Inc. regarding the Defendants' Subpoena of Amazon Inc. (See appendix A for the Defendants'

143

**COMPLAINT – DEMAND FOR JURY TRIAL**

edly produced two set of documents related to Huynh's RFDP #23.  The first set of documents were related to the purported email exchanges between Rachel Brass and Melissa Lamfalusi, Amazon's internal counsel, on Oct 12, 2018 where Brass asked Lamfalusi to help draft a narrowly scope subpoena that would be acceptable to Amazon.  Based on Lamfalusi's feedback (i.e., a narrow scope subpoena), the Rescue Squad served Amazon the Subpoena on October 15, 2018.  The second set of documents were emails and documents exchange between Ryan Stewart and Hannah Ard, Amazon's purported outside counsel between Oct 24, 2018[48] and Dec 6, 2016.  First, all the individual emails and documents were amalgamated into one big PDF file with no accompanying system metadata to conceal the facts that the communications between Stewart and Ard were fabricated.  Even though, Huynh didn't have the system metadata to prove that the communication between Brass and Amazon's inside counsel and Stewart and Amazon's outside counsel were fabricated.  However, from a logical standpoint, there were at least two things that didn't pass the smell test concerning the purported communications among Rachel Brass, Ryan Stewart, Amazon's inside counsel, and inside counsel.

250.    First, after numerous email exchanges between Rachel Brass and Amazon's purported inside counsel, Brass and Amazon's inside counsel agreed on a reduce scope subpoena that would be acceptable to Amazon.  However, the subpoena that Walmart purportedly

---

Subpoena to Amazon on 10/15/2018) for Plaintiff's employment records including, but not limited to correspondences from Amazon to Defendants which Amazon sated that they had no responsive records related to Plaintiff's employment due to their records retention policies.

1.  [48] Hannah Ark, Amazon's purported outside legal counsel, emailed Ryan Stewart Amazon's purported objection to Walmart's 10/15/18 Subpoena on Oct 24, 2018.

2.  On 11/6/18, Ryan Stewart responded to Hannah Ark's opposition. Stewart and Ark's met and conferred a week later on the matter. For the next month or so they were radio silence.

3.  On 12/6/2018, Hannah Ark wrote to Ryan Stewart: "Amazon has informed me that there are no personnel records available for Tri Huynh because his Amazon employment is too old - from 7/18/2011 to 1/22/2014.

144

**COMPLAINT – DEMAND FOR JURY TRIAL**

served on Amazon on Oct 15, 2018 was exactly the same as those that were served on Huynh's other former employers i.e., the scope of the Amazon's subpoena was exactly not narrower. Additionally, why would Amazon's inside counsel spend the time and resource to help Brass draft a subpoena that would later be served on Amazon to invade the privacy and potentially disclose Amazon's confidential information?

251.    Second, it made no sense whatsoever for Amazon to pay Hannah Ark, Amazon's purport outside counsel, top dollars to play ping pong with Ryan Stewart for over a month to purportedly fight off Walmart's subpoena only to come back a month later and told Ryan Stewart that Amazon had no responsive documents to produce because Amazon purged Huynh's personnel files (Amazon's policy was to purge personnel file that was older than four years). If that was the case, then Why Hannah Ark didn't communicate this to Ryan Stewart on day one and saved Jeff Bezos a lot money.

252.    In short, as discussed thorough this complaint, the RICO Defendants' mode operandi when interacted with Huynh were: Kept Huynh in the dark (DC Dkt. 142-20 and 142-21), being evasive in their responses, used intimidations and threats, and when all else failed fabricate, lie, and obstruction of justice.

**Invasion of Privacy at Warp Speed**

253.    On October 11, 2018, the Rescue Squad subpoenaed Mu Sigma for all of Huynh's personnel records via mail to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

254.    On October 11, 2018, the Rescue Squad subpoenaed Array Networks for all of Huynh's personnel records via mail to effectuate prong #2, #3, and #6 the illegal coverup

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    scheme.

2

3         255.    On October 8, 2018, the Rescue Squad subpoenaed Booz Allen and Hamilton

4    for all of Huynh's personnel records via US mail to effectuate prong #2, #3, and #6 of the ille-

5    gal coverup scheme.

6

7         256.    On October 9, 2018, the Rescue Squad subpoenaed Infosys for all of Huynh's

8    personnel records via mail to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

9

10        257.    On October 11, 2018 Rescue Squad Subpoenaed Motif Inc. for all of Huynh's

11   personnel records via mail to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

12

13        258.    On October 15, 2018, the Rescue Squad purportedly subpoenaed Amazon.com

14   for all of Huynh's personnel records via mail to effectuate prong #2, #3, and #6 of the illegal

15   coverup scheme.

16

17        259.    On November 14, 2018, the Rescue Squad caused Infosys to produce all of

18   Huynh's personnel files via email and fax to effectuate prong #2, #3, and #6 of the illegal cov-

19   erup scheme.

20

21        260.    On November 18, 2018, the Rescue Squad caused Array Networks to produce

22   all of Huynh's personnel files via mail (included personal credit report) to effectuate prong

23   #2, #3, and #6 the illegal coverup scheme.

24

25        261.    On April 11, 2019, the Rescue Squad emailed Huynh and demanded that

26   Huynh produced the 2013 Jeff Bezos letter as well as all of Huynh's Amazon personnel to ef-

27   fectuate prong #2, #3, and #6 the illegal coverup scheme.

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

262.     As discussed throughout this complaint, the RICO Defendants illegally ob-

tained Huynh's private and confidential SEC submissions, Huynh's personnel files, Huynh's

medical records and psychiatrist records in order to effectuate the WSF Coverup Enterprise'

illegal coverup scheme.  However, this information could not be used until they were laun-

dered to cover up the fact that they were improperly obtained/stolen and/or they were classi-

fied as confidential under the term of protective order.

263.     For examples, David deRubertis attempted to use the 125-page OSHA

amended complaint and the PAGA claim to legitimately leak Huynh's SEC submissions to

the Rescue Squad.  Additionally, Kari deRubertis exploited the  GO 71 document production

to produce Huynh's psychiatrist record without the confidentiality designation and the names

of over 30 potential witnesses that may have information regarding Walmart's illegal con-

ducts that Huynh submitted to the SEC to legitimately produce the illegal obtained records to

the Rescue Squad so they could manipulate and misrepresent the facts in their communica-

tions with the SEC and/or DOJ to misled the SEC into issuing Walmart a  "Get Out of Jail "

Card in early Apr 2019.

**The Origin of the 333-Page "Nuts & Sluts" Dossier**

264.     Similarly, the RICO Defendants obtained a massive amount of Huynh's consti-

tutionally protected information e.g., Huynh's psychiatrist records that dated back to 1999 as

well as Huynh's personnel files that dated back to 1996.  However, to use these documents to

damage Huynh's credibility, personal and professional reputation, and Huynh's livelihood to

effectuate prong #2, #3, and #6 of the illegal coverup scheme, the RICO Defendants must first

launder them before they could disseminate to the SEC and/or DOJ, the Media, the Courts,

politicians and the American public.  Thus, to launder these documents, the RICO Defendants

147

**COMPLAINT – DEMAND FOR JURY TRIAL**

developed manipulated and leading questions which the Rescue Squad were asked Huynh's

psychiatrist, Huynh's wife, and Huynh during deposition.   The RICO Defendants used the

330-page deposition transcript of Huynh's deposition to create a the "Nuts & Sluts" dossier

on Huynh which were later filed in the public docket to support Walmart's motion for sum-

mary judgement.

265.    To illegally forced Huynh, his wife, and his psychiatrist to take depositions, the

RICO Defendants used and/or caused other to use the mail and wire's transmission facilities

on at on numerous instances to intimate, threat, and used the court to force Huynh, his wife,

and his psychiatrist to the deposition table to effectuate prong #2, #3, and #6 of the illegal

coverup scheme.

266.    On May 15, 2019, the Rescue Squad served Dr. Bolte, Huynh's psychiatrist,

via email a deposition notices to force her to take a 6 hours deposition under the pretext of de-

termining Huynh's level of emotional to effectuate prong #2, #3, and #6 of the illegal coverup

scheme.

267.    On May 15, 2019, the Rescue Squad served Huynh's wife and juvenile son

deposition notices to compel them to take depositions regarding mental health under the pre-

text of assessing Huynh's emotional distress claim to effectuate prong #2, #3, and #6 of the

illegal coverup scheme.

268.    On July 15, 2019, the Rescue Squad served Huynh with a second deposition

notice via email under the pretext of assessing Huynh's motive as a whistleblower based on

information the RICO Defendants stole from Huynh's hard drive to effectuate prong #2, #3,

and #6 of the illegal coverup scheme even though District Judge Chhabria granted Huynh's

request to drop all of David deRubertis wicked FEHA ADHD claims with prejudice on July 8, 2019 (DC Dkt. 84).  Thus, as a matter of law, there was no basis for Walmart to continue to force Huynh to take a second deposition because under SOX a Whistleblower motive for blowing whistle was irrelevant.

269.    On August 12, 2019, Huynh filed a motion to quash Walmart's subpoena to take a deposition of Huynh's wife, especially after Huynh had already dropped all of David deRubertis' nefarious FEHA ADHD claims.  Thus, as a matter of law, Walmart could not assert that they needed to depose Huynh's wife in order to assess Huynh's emotional distress claim because Huynh already removed his ADHD condition from the lawsuit.  Additionally, Huynh didn't list his wife as a witness who may have knowledge about Huynh's level of emotion distress as part the rule 26 discovery disclosure.  Despite these facts, Boutros, Brass, and Stewart e-filed an opposition brief (DC Dkt. 109) on Aug 16, 2019.  The Rescue Squad made misleading statements of facts and of laws to force Huynh's wife to take a deposition for no legitimate and/or rational basis in relation to Walmart's defense against Huynh's SOX claim except to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

270.    The Rescue Squad improperly cited the case laws below to force Huynh's wife to a deposition in order to effectuate prong #2, #3, and #6 of the illegal coverup scheme.

McCoy v. LTD Driving School, Inc., 2017 WL 3610552, at *6 (D. N.M. Feb. 21, 2017) (finding it "reasonably necessary" for Defendants to depose Plaintiff's husband regarding Plaintiff's emotional distress claim). This is unsurprising because a spouse is well-situated to offer testimony on the sources and severity of a party's emotional distress. DC Dkt. 109 at 4

- First, this case was about a "Pregnancy Discrimination" not a Whistleblower retaliation case.  The Plaintiff in this case put her physical health at the center

of the lawsuit.[49]

• Second, the ruling cited here was for "Attorney Liability for Costs and Fees under 28 U.S.C. § 1927" and not related to a motion to quash a spouse deposition. Regardless, Chief United States District Judge, M. CHRISTINA ARMIJO, wrote clearly in her order "the deposition of Plaintiff's husband was *15 reasonably necessary at the time it was taken because Plaintiff listed her husband (then fiancé), repeatedly, as a person "likely to have discoverable information related to Plaintiff's emotional distress damages,"

> David deRubertis never listed Huynh's wife as someone who has knowledge about his level of emotional distress as part of the GO 71 disclosure.

> Huynh also listed his wife as someone who has knowledge about his level of emotional distress as part of Rule 26 disclosure.

Lamothe v. Bal Harbour 101 Condo. Ass'n Inc., 2007 WL 781909, at *2 (S.D. Fla. Mar. 13, 2007) ("It is [] customary in employment practice to depose close family members of a plaintiff with regard to an alleged emotional distress claim."

271.    First, this case was not a SOX whistleblower retaliation case so it was inapposite to Huynh's case. Second, United States Magistrate Judge's, Edwin G. Torres, wrote "This matter is before the Court on Defendant's Motion to Strike Witnesses [D.E. 63] that is based upon Plaintiff's failure to disclose two witnesses in Rule 26 pretrial disclosures prior to the close of discovery. Defendant's pending Motion seeks to strike two witnesses, Angie Lamothe Plaintiff's wife, and Jeffrey Irvin – Plaintiff's nephew, from the trial witness list

---

[49] See https://storage.courtlistener.com/recap/gov.uscourts.nmd.323715/gov.uscourts.nmd.323715.106.0.pdf.
This case was not a SOX whistleblower retaliation case.  Instead, the Plaintiff brought the following claims: Count I: Violation of the New Mexico Minimum Wage Act; Count II: prima facie tort (based on the termination of Plaintiff's employment); Count III: Violation of the New Mexico Human Rights Act; Count IV: Violation of the **Pregnancy Discrimination Act**. [Doc. 1-1, pp. 9-13] Only Plaintiff's fourth claim, for violation of the Pregnancy Discrimination Act, presents a question of federal law. Defendants removed this case on the basis of Count IV pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441. [Doc. 1, ¶ 3]it was a pregnancy discrimination case where the Plaintiff placed her medical condition at the center of the lawsuit. The Plaintiff put her health at the center of the lawsuit.  While Huynh didn't, especially after Huynh dropped all of deRubertis nefarious and frivolous FEHA Claims.

**COMPLAINT – DEMAND FOR JURY TRIAL**

based upon the fact neither of these individuals were identified as potential witnesses in Plain-tiff's Rule 26 disclosures, related to in the case". Thus, it had nothing to do with a motion to quash a spouse from being depose. As matter of fact this case should further support Huynh's position that because Huynh never listed his wife as someone who had knowledge about his level of emotional distress: Walmart should have never been allowed to force Huynh's wife to take the deposition.

272.    The RICO Defendants cherry picked 133 pages out of the 330-page transcript that contains the most damaging information to falsely portray Huynh as mentally ill, prone to violence, morally corrupted (e.g., the RICO Defendants falsely accused Huynh of sexual har-assment, dishonesty, and slimy person who blew the whistle for personal gain). For example, to support of Walmart's Motion for Summary Judgement, the Rescue Squad filed Huynh's medical records without the confidentiality designation to effectuate prong #2, #3, and #6 of the illegal coverup scheme (DC Dkt. 119-8 Defs' Ex. 8). See DC Dkt. 156 to 160. Addition-ally, the Rescue Squad filed the 133-page negative dossier as DC Dkt. 119-19 (Defs' Ex. 127). Ex. 127 was filed as one of 24 Walmart's Exhibits under DC Dkt. 119. However, in order to make the 133-page negative dossier more visible and easier to discover by the public and the media, the Rescue Squad purportedly refiled Ex. 127 separately under DC Dkt 123-1 under the pretext of updating DC Dkt. 119-19.

**Fabrication, Destruction, Mutilation, and Concealment of Evidence**

273.    Starting in Mid-2017, Huynh provided deRubertis with overwhelming evidence and analysis which proved that Huynh made prima facie case showing for this SOX retaliation claim against Walmart.  Below is a summary of the analysis.

## The RICO Defendants' Three-Pronged Strategy to Crush Huynh's SOX Case

| Events | TUE 10/4 | FRI 10/14 | TUE 10/18 | THU 11/17 | WED 11/30 | THU 12/1 | TUE 12/20 | WED 1/4/17 | TUE 1/10/17 | TUE 1/24/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Huynh raised the excessive commission fee issues to Beal | ① Protected Activity | | | | | | | | | |
| Beal ordered a CYA investigation into the commission fee issues. | ② | | | | | | | | | |
| Beal retaliated by ordering HR to investigate against Huynh | ③ Retaliation | | | | | | | | | |
| Beal issued Huynh a vague bogus written warning letter. | ④ Retaliation | | | | | | | | | |
| Beal "purportedly selected Huynh for the preliminary RIF | | | | | | | | | | |
| Beal threatened to put Huynh on a PIP | | | | | ⑤ Protected Activity | | | | | |
| Huynh emailed his complaint to Jay Jorgensen and Ethics | | | | | ⑥ Protected Activity | | | | | |
| Huynh emailed his complaint to Marc Lore and Michael Bender. | | | | | ⑦ Protected Activity | | | | | |
| Beal fired Huynh 14 days before the actual RIF | | | | | | | | | ⑧ Retaliation | |
| Walmart's Jan 24, 2017 RIF | | | | | | | | | 14 Days | ⑨ |

**Strategy # 1:** Destroyed outlook appointments of Huynh's meetings with Beal on Oct 4 and 8. Melvenia Ha fabricated the Oct 17 interview note.

**Strategy # 2:** Shotgun pleaded five ADHD-DFEH claims to execute the "Nut & Slut" defense to prove that Huynh didn't engaged in protected activities because he blew the whistle for personal gain

**Strategy # 3:** Fabricated Beal's 11/30/16 email and RIF list to purportedly claim that Beal selected Huynh for the RIF weeks before his complaints. Concealed evidence that prove Huynh's role was not eliminated.

*Wave I*

*Wave II*

152
**COMPLAINT – DEMAND FOR JURY TRIAL**

274.     Furthermore, Huynh proved to David deRubertis that Huynh's role was not eliminated because his Business Development team was moved under Michael Trembley, one of Huynh's peers, several hours after Seth Beal terminated Huynh's employment on Jan 10, 2017.



On January 10, All of Tri's Direct Report Were Moved Under Michael Trembley Organization (Increasing His Span of Control from 1 to 12 to 1 to 50)

On January 10, 2017 Seth Beal Announced That the BD Team Was Absorbed into the Strategy and Program Team to Create a Unified Team to Drive Aggressive Growth

**Memorandum**                                        **Walmart** Marketplace

To:      Global Marketplace

From:    Seth Beal, Senior Vice President

Date:    January 10, 2017

RE:      **Business Development team update**

I wanted to let everyone know that Tri Hyunh, Director Marketplace Business Development, is no longer with the company.

As one of the early members of the Marketplace team, Tri was instrumental in creating, evolving and growing the Business Development function and team and driving new seller acquisition growth. We are grateful to Tri for his many contributions over the past two years and wish him the best in his future endeavors.

As we look to the future and aligning the organization for our aggressive growth plans, the Business Development team will report to Michael Trembley to create a unified Program, Strategy & Business Development team.

* * *

All information contained within this communication is Confidential. It's intended for the sole use of the individual(s) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, duplication or distribution of this information by someone other than the intended addressee or its designated agent is strictly prohibited.

275.    David deRubertis leaked Huynh's confidential information to the other RICO Defendants.  This triggered the Rescue Squad, David deRubertis, Payne & Fears, Seth Beal, Valerie Ricetti Melvenia Ha, Audrey Au, Doug Kasales, Kathy Vonlindern, Renee Quezada, and others to engage in a systematic patterns of evidence fabrication, destruction, mutilation, and concealment as well as filing false declarations to assert Walmart's misleading affirmative defense in four ways.

276.    First, Seth Beal acted in concert with Rescue Squad to fabricate Beal's 11/30/16 and the purported Marketplace RIF list then submitted them to OSHA in Sept 2017 in support of Walmart's OSHA position statement. deRubertis emailed Huynh Walmart's OSHA position statement in late Sept 2017.  In the email, deRubertis purportedly told Huynh that Huynh had no case against Walmart[50] for two reasons. First, Seth Beal had already selected Huynh for the RIF on 11/30/16 which were weeks before Huynh raised his complaints to Walmart's senior executives. Second, Huynh didn't engage in protected activity in early Oct 2016 because he raised his complaint orally instead of email.  To enable deRubertis to effectively response to Walmart's AOSH position statement, Huynh immediately emailed deRubertis his analysis and supporting evidence which proved that Walmart fabricated Beal's 11/30/16 email and the Marketplace 11/30/16 RIF for two main reasons.  First, Beal's 11/30/16 email referred to the DSO

---

[50] BTW, you'll notice they did exactly what I told you they would do in our first meetings.  I knew the "we laid him off right after learning of the formal ethics complaint" theory of your case was too good to be true.  **They say and show a late-November 2016 email from Beal listing you on the RIF list at this time**.  Shows why my initial point to you was right on -- the protected activity needs to focus on what happened in October more so than December.  Anyway, let us know if Monday works and if so when.

**COMPLAINT – DEMAND FOR JURY TRIAL**

Group (Digital Store Operations) not the Marketplace Group but Beal purportedly attached to the Marketplace RIF list to his email in an attempt to put a date stamp of 11/30/16 on the Marketplace RIF. Second, for Beal to have created the RFI list for the Marketplace group Beal must at least have the pre-calibration ratings inputs for all of the Marketplace employees from their managers.  However, the pre-calibration list for the Marketplace Group was not completed until late after 12/13/16.

277.   Despite overwhelming evidence of document fabrication, deRubertis was not interested in talking to Huynh regarding his analyses. Subsequently, Huynh asked deRubertis how would he prove the authenticity of Beal's document. deRubertis' answer was he will made Walmart produce metadata during discovery.

278.   Fast forward a year later, both parties completed their document productions as dictated by GO 71 in late Sept 2018.  Huynh immediately emailed deRubertis to ask him to confirm the authenticity of Beal's documents.  deRubertis repeatedly avoid answering Huynh's question regarding the authenticity of Beal's documents.

**No System Metadata for You**

279.   Despite being put on notice that Walmart engaged in document and evidence fabrication, deRubertis conspired with the Rescue Squad (Boutros, Scalia, Brass, and Stewart) to exclude system metadata fields from the Joint Stipulation ESI Order (DC Dkt. 36) in order to obstruct Huynh from authenticating Beal's documents as well as any other documents that Walmart subsequently produced to Huynh.

280.   Between June and July 2018, Garen Nadir communicated with the Rescue via email at least six instances (See DC Dkt. 161-2) to purportedly negotiated the ESI

Joint Stipulation Protocol to coverup the facts that the RICO intentionally excluded system metadata fields to obstruct Huynh from proving the authenticity of Walmart's document to defend himself against Walmart's motion for summary judgement.  See DC Dkt. 95-3 for purported discussions about ESI Protocol, Protective Order, and GO 71 to create paper tails to coverup the fact that the RICO Defendants acted in concerts to effective the WSF Enterprise's illegal coverup scheme).

281.    The Chart below showed that system metadata fields were required in most Joint Stipulation ESI protocol orders. However, the RICO Defendants acted in concert to intentionally exclude them from the ESI Joint Stipulation Protocol order in Huynh's case.

282.    The links below pointed to ESI Joint Stipulation Protocol Orders issued by United States District Judges and Magistrate Judges at the United States District Court in California.  All of these ESI Joint Stipulation Protocol Orders listed system metadata fields as required metadata fields. Therefore, it made no sense whatsoever for deRubertis to intentionally leave out the system metadata fields in Joint Stipulation ESI Protocol.

- https://storage.courtlistener.com/recap/gov.uscourts.ksd.108490/gov.uscourts.ksd.108490.40.0.pdf
- https://storage.courtlistener.com/recap/gov.uscourts.cacd.753745/gov.uscourts.cacd.753745.62.0.pdf
- https://storage.courtlistener.com/recap/gov.uscourts.caed.274559/gov.uscourts.caed.274559.128.0.pdf
- https://storage.courtlistener.com/recap/gov.uscourts.cand.321505/gov.uscourts.cand.321505.60.0.pdf
- https://storage.courtlistener.com/recap/gov.uscourts.cand.375004/gov.uscourts.cand.375004.79.0.pdf

156
**COMPLAINT – DEMAND FOR JURY TRIAL**

Huynh v. Walmart  (3:18-cv-01631-VC)
Dkt. 36 at 8-9 – Required Meta Data

a.  Beginning Document Bates Number

b.  Ending Document Bates Number

c.  Beginning Family Bates Number (begins with 1st page of parent)

d.  Ending Family Bates Number

e.  Custodian or Source

f.  Duplicate Custodians

g.  Confidentiality Designation

h.  Page Count

i.  Redaction (Y/N)

j.  Document Date (if available)

k.  File Name (including extension)

l.  File Extension

m.  Document Type

n.  From

o.  To

p.  CC

q.  BCC

r.  Subject

s.  Email Date Received (Local Time Zone)

t.  Email Time Received (Local Time Zone)

u.  Email Date Sent (Local Time Zone)

v.  Email Time Sent (Local Time Zone)

w.  Text File Name with extension

x.  Text File Path, including filename and extension

y.  MD5 Hash Values (or alternatively agreed upon Hash Standard)

The RICO Defendants intentionally left out the most common asked metadata fields during discovery to authenticate produced documents. The "Document Date" was not even a valid metadata field.

| | Field | Definition | Doc Type |
|---|---|---|---|
| 39 | DATECRTD (mm/dd/yyyy) | Creation Date | Edocs |
| 40 | TIMCRTD | Creation Time | Edocs |
| 41 | LASTAUTHOR | Last Saved field contained in the metadata of the native file | Edocs |
| 42 | LASTMODD (mm/dd/yyyy) | Last Modified Date | Edocs |
| 43 | LASTMODT | Last Modified Time | Edocs |

Source: Case 3:07-cv-05944-JST Document 828 Filed 12/16/10 Page 17 of 25

| Field | Value | Definition |
|---|---|---|
| LINK | D:\001\EDC\000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | MSG | The content type of an Email or native file document as identified extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty) Native: Time the document was created **This date must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty) Native: Time the document was last modified **This date must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty) Native: Time the document was last accessed **This date must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |

Source: U.S. Securities and Exchange Commission Data Delivery Standards Rev 02/2018

**Who, What, and When?**

283.    System Metadata reflects information created by the user or by the organization's information management system." Sedona Principles 2d Cmt. 12a. This data may not be embedded within the file it describes, but can usually be easily retrieved from whatever operating system is in use. See id. Examples of system metadata include data concerning " the author, date and time of creation, and the date a document was modified." Md. Protocol

157

**COMPLAINT – DEMAND FOR JURY TRIAL**

26. Courts have commented that most system (and substantive) metadata lacks evidentiary value because it is not relevant. See Mich. First Credit Union v. Cumis Ins. Soc'y, Inc., No. Civ. 0574423, 2007 WL 4098213, at *2 (E.D.Mich. Nov.16, 2007); Ky. Speedway, LLC v. Nat'l Assoc. of Stock Car Auto Racing, No. Civ. 05-138, 2006 WL 5097354, at *8 (E.D.Ky. Dec.18, 2006); Wyeth v. Impax Labs., Inc., 248 F.R.D. 169, 170 (D.Del.2006). System metadata is relevant, however, **if the authenticity of a document is questioned or if establishing " who received what information and when" is important to the claims or defenses of a party.** See Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L., No. 04 Civ. 3109, 2006 WL 665005, at *3 (N.D.Ill. Mar.8, 2006).

### Timing of Knowledge

284.     System metadata is often used to Discover "who knew what when" through creation dates, author, dates modified, etc. Example: Chevron Corp. v. Stratus Consulting, Inc., No. 10-CV-00047MSK-MEH, 2010 WL 3489922, at *4 (D. Colo. 2010) (employment lawsuit in which the timing documents were authored "was a critical issue").

### If at First You Don't Succeed Try Again!

285.     Based on the face of documents produced by Walmart in late Sept 2018 alone, Huynh concluded beyond reasonable doubt that Beal's 11/30/16 Email and the Marketplace 11/30/16 RIF lists that Walmart submitted to OSHA in Sept 2017 were fabricated.  The chart below showed that in Sept 2017, Walmart used Seth Beal's 11/30/16 email and the purported Marketplace 11/30/16 RIF list as Exhibit C to support Walmart's OSHA position statement (on the left side of the chart below).  Upon close inspection Huynh noticed that Beal's email didn't have an excel file attachment (i.e., the Marketplace 11/30/16 RIF list).  A year later in late Sept 2018, Walmart produced a revised version of Beal's 11/30/16 email. However, this time Walmart attached two excels files (the

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    Marketplace and DSO RIF Lists) to Beal's 11/30/16. The Rescue Squad with the assis-

2    tance Renee Quezada, project manager at Lighthouse Global, fabricated a new version of

3    Beal's documents in an attempt to cover up the fact that Walmart submitted fabricated

4    documents to OSHA in Sept 2017.

5

6    The RICO Defendants Attached both the Marketplace and DSO 11/30/16 RIF Lists to Purportedly
     Coverup the SNAFU They Made Their Original Fabrication in Sept 2017.

7

8    

25       286.    Additionally, at the direction and instruction of the Rescue Squad and the

26   Walmart's participants Seth Beal and Valerie Ricetti submitted false declarations to

27   sworn that Beal's 11/30/16 and the Marketplace RIF were authentic when they were not.

28

                                        159
                      **COMPLAINT – DEMAND FOR JURY TRIAL**

See Seth Beal's Declaration (DC Dkt. 171-1 at 13 ¶ 63) and Valerie Ricetti Declaration (DC Dkt. 117-2 at 9 ¶ 47).  Even though Rachel Brass and Ryan Stewart knew that these documents and declarations were false, they filed them anyway with the United States District Court, Northern District of California to obstruct justice.

287.    Additionally, the Rescue Squad, Seth Beal, Valerie Ricetti, and Renee Quezada manufactured the following documents and files false declarations to purportedly sworn the authenticity of these documents to support Walmart's motion for summary judgement.

i.     Email dated 9/29/16 from one of Huynh's peers which purportedly triggered Melvenia Ha to investigate Huynh for the bogus sexual harassment charge – Walmart's Exhibit 45 DC Dkt. 115-11

ii.    Beal's 11/30/16 Emails and the attached DSO and Marketplace RIF – Walmart's Exhibit 15 -- DC Dkt. 114-15.

iii.   Ricetti's purported 12/14/16 email and the attached Marketplace 12/14/16 RIF list – Walmart's Exhibit 60 DC Dkt. 115-26

**Supersize PDF Is the All You Can Eat Buffet for Fabricators and Cheaters**

288.    The article cited below (https://www.bernsteinshur.com/what/publications/the-e-discovery-field-guide-8/) discussed ESI production deficiencies in the context of Supersize PDF files produced during discovery in violations of F.R.C.P Rule 34 i.e., a party is required to produce documents (1) "as they are kept in the usual course of business.

**Background**

In a relatively straightforward business dispute, a central issue in the case was whether the plaintiff had effectively terminated a certain agreement with the defendant. In response to the plaintiff's discovery requests, the defendant produced over **1,000 pages of documents**, including various contracts, invoices, letters, and e-mails. The documents **were produced in a single PDF** with no bookmarks or

**COMPLAINT – DEMAND FOR JURY TRIAL**

other differentiation for where one document ended and the next began. **No metadata was produced**.

**Problem #1: Production Formats and Federal Rule of Civil Procedure 34**

Metadata is data about data. For example, in a Word document, the metadata will provide information about the author or creator, creation date, and file name. In an e-mail, the metadata will provide the parties to/from/cc'd on the e-mail, the e-mail subject, and the sent date. All of this metadata may be relevant to the legal issues in a case, and the metadata also serves an additional function: it allows for efficient and organized review of a large document production in a database. However, a PDF production—**especially a production where every document is combined into a single PDF—excludes critical (meta)data about the documents** and makes searching and sorting electronically impossible. This directly leads to more time, more expense, and a less efficient E-discovery practice. **For these reasons, a PDF production without metadata is rarely sufficient—and the receiving party should almost certainly not accept it without a fight.**

In addition, **a PDF production of electronically stored information (ESI) without metadata also fails to comply with the Federal Rules**. Under Federal Rule of Civil Procedure 34, a party is required to produce documents (1) **"as they are kept in the usual course of business** or must label them to correspond to the categories in the requests," Fed. R. Civ. P. 34(b)(2)(E)(i), and (2) if a request does not specify a form of producing ESI, "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms," Fed. R. Civ. P. 34(b)(2)(E)(ii). Of course, an opposing party may request a production in PDF format, viewing it as its preferred "reasonably usable form." See Fed. R. Civ. P. 26(f)(3)(c) & 34(b)(2)(E). If so, the producing party may oblige but, absent such agreement, the format likely is not adequate.

- A party who opts to produce documents as maintained in the usual course of business must actually produce the documents that way. **A production of e-mails in PDF format violates this obligation because a PDF is not how an e-mail is used or kept in the ordinary course —but rather involves converting the e-mail into a non-ordinary course format**. See Johnson v. Italian Shoemakers, Inc., 2018 WL 5266853, at *2 (W.D.N.C. Oct. 23, 2018) (awarding sanctions where party continued to produce e-mails as PDFs, "which is not how emails are maintained in the regular course of business"). **Further, a single PDF combining multiple separate documents also violates this obligation because such documents were not maintained or compiled that way in the ordinary course of business.** Indep. Mktg. Grp., Inc. v. Keen, 2012 WL 207032, at *2 (M.D. Fla. Jan. 24, 2012) (**producing party failed to produce documents as ordinarily kept where it printed documents and scanned them, rendering PDF files only**). Again, a PDF production fails this obligation by limiting—if not completely eliminating—the ability to search and sort documents, as a proper production format would allow.

**Problem #2: Document Manipulation**

289.     Another problem with attempting to manually convert a set of native documents into PDFs is the **risk of manipulating the metadata—and the actual contents of the documents**. Each time a document is opened, the metadata for that document is changed. For example, when an e-mail is forwarded by a party to its attorney and then printed, the metadata of that e-mail is first altered (e.g., adding a new recipient to the e-mail) and then completely lost by **the PDF'ing process**. The receiving party is entitled to rely on accurate, complete metadata for its review and prosecution of the case, and **changes to the metadata create a misleading story of what actually happened**. Perhaps even more concerning, the actual substance of documents or **e-mails themselves may be changed along the way.** For instance, the attorney or paralegal who opens an e-mail may accidently delete part of the e-mail, fail to save an attachment, **or add new text to the e-mail**. And, as happened in the situation at hand, opening a Word document can change the contents of the document, such as when an automatic date field is updated, **changing the critical purported sent date in the header of a letter to a later date reflecting when the letter was accessed in discovery. When that document is later produced as a PDF, the falsely updated date remains, an entirely new document is created, and the original document lost.**

290.     The RICO Defendants used the "Supersize" PDF strategy highlighted above to manufacture Walmart's purported Global and Ethics Investigations Reports. R#1: Walmart's purported investigation into the false sexual harassment charges against Huynh. #2: Walmart's purported investigation into Huynh's complaint that Beal mistreated him because of his ADHD. #3: Walmart's purported investigation report into Huynh's complaint that Walmart committed fraud against shareholders.  These reports were manufactured after the facts to provide a post hoc justification for why Walmart shut down the investigation into Huynh's shareholder fraud complaint after it was opened for only three days.

291.     Report #1 was manufactured to falsely accuse Huynh of sexual harassment in order to portray Huynh as "Slutty" while investigation report #2 was manufacture to

162

**COMPLAINT – DEMAND FOR JURY TRIAL**

portray Huynh as mentally ill and dishonest because his complaints against Seth Beal for ADHD discrimination was not substantiated.  Lastly, investigation reported #3 was man-ufactured to purportedly prove that Walmart didn't conduct a detail investigation into Huynh's shareholder fraud complaint because based on report #1 and report #2 Huynh was not a credible whistleblower. See COA Dkt. 16 (Huynh's opening brief) page 28-39 for detail discussion.

292.    After Huynh fired deRubertis, Huynh requested him to return all of Huynh's client files, specifically Huynh asked deRubertis to return the documents that Walmart produced to the deRubertis Law Firm in late Sept 2018.  After Huynh's repeated attempts, David deRubertis eventually FedEx him a monster size PDF file that contained roughly 3,700 pages of documents without any accompany metadata. To make matter worse, David and Kari deRubertis intentionally made the PDF file non searchable to ob-struct Huynh from using them against Walmart.

293.    Between Feb and Mar 2019, deRubertis and Lindern used email to repeat-edly attempt to transfer the Epiq's account ownership from deRubertis to Huynh's name to obstruct Huynh from having access to documents and metadata to effectuate prong #3 of the illegal coverup scheme.  Huynh was able to get the Epiq Global Account for the Huynh's litigation transferred under Huynh's name in late Mar 2019. Subsequently, Huynh was able to obtain the metadata for the 3700 pages of the monster size PDF file that deRubertis produced.  However, the metadata led Huynh to discover that David and Kari deRubertis, Kasales, and Lindern conspired to suppress about 400 pages of docu-ments that Walmart had produced in late Sept 2018.

**COMPLAINT – DEMAND FOR JURY TRIAL**

294.    The chart below showed that on 9/19/2018, Walmart produced four Super-size PDF files (Item # 1, #2, #5, and #6) to David deRubertis. Huynh defined a Supersize PDF file as a file that contains multiple native files inside of it but provides no metadata for these native files.

| Supersize PDF Files - Walmart's Purported Global Ethic and Compliance Investigation Reports | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Item # | ProdBeg | ProdEnd | ProdBeg Attach | ProdEnd Attach | Document Type | File Name | File Extension | Page Count | Document Date | Production Date | Walmart's Exh |
| 1 | WM000 03447 | WM000 03620 | WM0000 3447 | WM0000 3620 | | | | 174 | | 9/19/2018 | 99. DC Dkt. 121-109 |
| 2 | WM000 03447 | WM000 03620 | WM0000 3447 | WM0000 3620 | Document | (4) (WMT 16-12-1017) (Disability Complaints).pdf | pdf | 174 | 8/15/2017 | 2/14/2019 | 99. DC Dkt. 121-109 |
| 3 | WM000 03755 | WM000 03933 | WM0000 3755 | WM0000 3933 | | | | 179 | | 9/19/2018 | 99. DC Dkt. 121-109 |
| 4 | WM000 03755 | WM000 03933 | WM0000 3755 | WM0000 3933 | Document | WMT-16-12-1017 (Disability).pdf | pdf | 179 | 4/27/2018 | 2/14/2019 | 99. DC Dkt. 121-109 |
| 5 | WM000 03437 | WM000 03446 | WM0000 3437 | WM0000 3446 | Document | (3) (WMT 16-12-0994 Post-Conference).pdf | pdf | 10 | 8/15/2017 | 9/19/2018 | 94. DC Dkt. 118-2 |
| 6 | WM000 03741 | WM000 03754 | WM0000 3741 | WM0000 3754 | Document | WMT-16-12-0994 (Post-Conference).pdf | pdf | 14 | 3/27/2018 | 9/19/2018 | 94. DC Dkt. 118-2 |
| 7 | WM000 04048 | WM000 04107 | WM0000 4048 | WM0000 4107 | Document | WMT-16-12-5109 (Marketplace via Jorgensen).pdf | pdf | 60 | 3/27/2018 | 2/12/2019 | 106. DC Dkt. 121-116 |
| 8 | WM000 03676 | WM000 03729 | WM0000 3676 | WM0000 3729 | Document | (6) (WMT-16-12-5109 (Marketplace via Jorgensen)).pdf | pdf | 54 | 8/15/2017 | 2/12/2019 | 106. DC Dkt. 121-116 |
| 9 | WM000 03934 | WM000 04047 | WM0000 3934 | WM0000 4047 | Document | WMT-16-12-5058 (Marketplace via Webportal).pdf | pdf | 114 | 3/27/2018 | 2/12/2019 | 105. DC Dkt. 121-113 |
| 10 | WM000 03621 | WM000 03675 | WM0000 3621 | WM0000 3675 | Document | (5) (WMT 16-12-5058 (Marketplace via Web Portal).pdf | pdf | 55 | 8/15/2017 | 2/12/2019 | 105. DC Dkt. 121-113 |

**COMPLAINT – DEMAND FOR JURY TRIAL**

295.    Item #1 and #3 is Walmart's Global Ethic purported ADHD investigation report had no file name, file extension, document type and document date metadata fields.  In essence Walmart produced this 174-page ADHD investigation report in a Supersize document by treating it a document from hard copy source as defined in the Joint Stipulation ESI Protocol (DC Dkt. 36).

Case 3:18-cv-01631-VC   Document 36   Filed 09/11/18   Page 7 of 15

**Documents from hard copy sources**

The parties will produce documents originating from hard copy sources ("Hard Copy Documents") and attachments in Group IV single-page TIFF format (black and white, 300 dpi)[1] with corresponding searchable OCR text, along with the below-listed metadata fields when available. The parties will provide a standardized load file compatible with Concordance and with a Bates number field included in the load file to match text and metadata with TIFF images. With respect to Hard Copy Documents, data on the load file will include:

a.    Beginning Document Bates Number
b.    Ending Document Bates Number
c.    Beginning Family Bates Number (begins with 1st page of parent)
d.    Ending Family Bates Number
e.    Custodian or Source
f.    Confidentiality Designation
g.    Page Count
h.    Redaction (Y/N)
i.    Text File Name with extension
j.    Text File Path, including filename and extension (must be a separate field from item i)

296.    Although item #1 and #3 are supposed to be the same report one had 179 pages while the other had 174 pages. This investigation report was later filed as Walmart's Exhibit 99 to support Walmart's motion for summary judgement.  Likewise, item #5 and #6 are supposed to be the same investigation report but one had 14 pages while the other had 10 pages.

297.   In early Feb 2019, Huynh emailed the Rescue Squad to put them on notices that Walmart didn't produce the metadata fields for the four documents above. Shortly after Huynh's email, the Rescue Squad acted in concert with Renee Quezada to produce revised versions of item #2 and #4 to purportedly address the missing metadata fields in order to conceal the facts that Walmart original produced these monster sized reports as paper format reports (i.e., Walmart scanned the individual fabricated document from paper source then merged them together into a Supersize PDF file to remove system metadata for the individual documents conceal the fact that Walmart fabricated their Ethics investigation reports).   It's also worth mentioning that although #2 and #4 supposed to be the same ADHD investigation report they had different name, different document dates.   In summary, the analyses above proved that the RICO Defendants manufactured Walmart's purported Global Ethics investigation reports by fabricate individual documents then amalgamated these documents into a Supersize PDF file to support the RICO Defendants' false narratives that Walmart shutdown the investigation into Huynh's shareholder fraud complaint after three days because Huynh was too "Nutty" and "Slutty" to be a credible whistleblower.

From:         Henry, Lois - OSHA <Henry.Lois@dol.gov>
Sent:         Wednesday, July 24, 2019 8:05 AM
To:           tinhhuynh@outlook.com
Subject:      FOIA Request - SMS 879443
Attachments:  Walmart _Position Statement_Redacted_Applied.pdf, Response letter - SMS 879443.pdf

Good morning Mr. Huynh:

Please see the attached documents regar

Thank you

Lois Henry
OSHA Region IX FOIA Coordinator
415-625-2561

> The investigation into Huynh's shareholder fraud complaint was closed after only three days. Additionally, despite the seriousness of Huynh's allegations it was classified as "Priority C".

**CASE DETAILS**
WMT-16-12-5169

CONFIDENTIAL MEMORANDUM

| | | | | |
|---|---|---|---|---|
| Report Initiated | 2016-12-20 15:24 ET | Primary Priority | C | |
| Scheduled Follow up | 2016-12-27 | Case Indicator | | |
| Source | EA/911 | Current Status | Referred | 2016-12-23 |
| Awareness Resource | Unknown | Case Opened | 2016-12-20 | |
| Language | English | Case Closed | | |
| Documented by | (b)(7)(C) | Days Open | 3 days | |
| | | Case Due Date | 2017-02-03 | |

| Allegation | Class | Priority | Primary |
|---|---|---|---|
| NE - Non Ethics | Non-Ethics | C | Yes |

166
**COMPLAINT – DEMAND FOR JURY TRIAL**

298.    In late Nov 2018, deRubertis FedEx Huynh roughly 3,700 pages of documents that he purportedly claimed that he had received from Walmart in Sept 2018. However, by early February 2019, Huynh discovered that David and Kari deRubertis, Kasales, Lindern, and the Rescued Squad acted in concert to withhold roughly 400 pages of documents from Huynh.  Below is an excerpt from the letter Huynh sent to Rachel Brass regarding the missing documents.

Tri Huynh
4015 134th Ave SE
Bellevue, WA 98006
Tel. 408.757.5516

February 11, 2019

VIA ELECTRONIC MAIL

Rachel S. Brass

Gibson, Dunn & Crutcher LLP

555 Mission Street, Suite 3000

San Francisco, CA 94105-0921

Re:    Huynh v. Wal-Mart Stores, Inc. et al., Case No. 3:18-cv-01631-VC

* At least 386 pages were missing from the documents produced by Walmart (Excluding Attorney Eyes Only).  See the table below.

**Missing Pages From Walmart Produced Documents**

| BegBates | EndBates | # of Pages | Remarks |
|---|---|---|---|
| WM0000590 | WM0000600 | 11 | Attorney Eyes Only |
| WM0000644 | WM0000647 | 4 | Attorney Eyes Only |
| WM00001530 | WM00001550 | 21 | Attorney Eyes Only |
| | Total | 36 | |
| WM0000658 | WM0000658 | 1 | Missing |
| WM0000660 | WM0000661 | 2 | Missing |
| WM0000676 | WM0000678 | 3 | Missing |
| WM0000769 | WM0000771 | 3 | Missing |
| WM00003323 | WM00003422 | 100 | Missing |
| WM00003621 | WM00003729 | 109 | Missing |
| WM00003934 | WM0000-1101 | 168 | Missing after WM00003934 |
| | Total | 386 | |
| | Total | 422 | |

299.    The missing documents were related to Walmart's purported investigations into Huynh's shareholder fraud complaint and other material facts such as email communications between Marc Lore and other Walmart's executives affirming the seriousness of Huynh's shareholder fraud allegations.  The RICO Defendants withheld these documents to effectuate prong #2 and #3 of the illegal coverup scheme.

300.    On Feb 12, 2019, the Rescue Squad acted in concert with Renee Quezada to produce the missing documents to Huynh directly to address Huynh's complaint.

1   There were four Supersize PDF files (Item 4# 7 to 10) for the same purported investiga-

2   tion report into Huynh's complaint regarding Walmart's fraud against shareholders.

3   Even though, these reports were supposed to be the same they had different names and

4   page count #.  This further proved that the RICO Defendants manufactured Walmart's

5   Global Ethics and Compliance investigation reports in order fit Walmart's false narra-

6   tives.

7

8       301.    Using the Supersize PDF file strategy above, Audrey Au manufactured a

9   fake investigation report to substantiate Seth Beal's false allegations of sexual harassment

10  against Huynh then submitted false declarations Au Decl. ¶¶ 25, 29, 30, 31, 32 to testify

11  that the report is authentic (Walmart's Exhibit 99).  See COD Dkt. 16 (Huynh's Opening

12  Brief page 28-39 for detail discussion.  Audrey Au manufactured this report by amalgam-

13  ating Melvenia Ha's fake Oct 5 HR investigation reports which were based on Melvenia



168

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Ha's fabricated Oct 4 and Oct 5 interview notes.  In order to cover up the fact that

2   Walmart's Exhibit 99 was fabricated, the Rescue Squad redacted multiple pages the re-

3   port to conceal evidence of fabrication.

4

5          302.    Furthermore, Audrey Au also amalgamated many individual documents

6   from multiple sources to manufacture the 174-pages ADHD investigation report and the

Case 3:18-cv-01631-VC   Document 76-1   Filed 06/03/19   Page 3 of 4

## Exhibit A:  Information In Scope of the Protective Order (50 Pages)

| Item # | Bates Number(s) | Page Count | Date(s) | Document Type | Author(s) | Recipient/Distribution | Subject Matter |
|---|---|---|---|---|---|---|---|
| 12 | WM000034147-WM100003453 | 7 | 12/23/2016 | Report | Walmart Inc. | Walmart Global Ethics Distribution List (200+ Recipients) | Finished investigative report regarding Plaintiff's complaint against his former manager, Seth Beal, SVP Global Marketplace, for discrimination and retaliation |
| 13 | WM000003471 | 1 | 12/23/2016 | email | Audrey Au, Senior Manger/Investigator Global Ethics, Lance Lanciault, SVP Global Ethics and Compliance | Audrey Au, Senior Manger/Investigator Global Ethics, Lance Lanciault, SVP Global Ethics and Compliance | Discussion regarding informing Marc Lore President and CEO, Walmart eCommerce U.S. on the outcome of Plaintiff's complaint against Seth Beal for discrimination and retaliation and Plaintiff's 12/20/16 email complaint to Jay Jorgenson regarding Walmart's potential violations of GAAP/SOX and Shareholder Fraud |
| 14 | WM000003414-WM000003415 | 2 | 12/21/2016 | email | Audrey Au, Senior Manger/Investigator Global Ethics, Lance Lanciault, SVP Global Ethics and Compliance, Jay Jorgenson, EVP Walmart Inc Global Ethics and Compliance, Laurie Harrison, Director Global Intake, Global Ethics & Compliance | Audrey Au, Senior Manger/Investigator Global Ethics, Lance Lanciault, SVP Global Ethics and Compliance, Jay Jorgenson, EVP Walmart Inc Global Ethics and Compliance, Laurie Harrison, Director Global Intake, Global Ethics & Compliance, Trey Marshal, Global Ethics, Melinda Green, Director Employee Relations | Discussion regarding attaching Plaintiff's complaint against his former manager, Seth Beal, SVP Global Marketplace, for retaliation and Discrimination to Plaintiff's 12/20/2016 Global Ethics Complaint. |
| 15 | WM000004106 | 1 | 12/23/2016 | email | Lance Lanciault, SVP Global Ethics and Compliance | Anne Myong, CFO Walmart Global eCommerce, Audrey Au, Senior Manager / Investigator, Global Ethics | Email communication between Lance Lanciault, SVP Global Ethics, and Anne Myong, CFO Walmart Global eCommerce, regarding the closure of the investigation into Plaintiff's 12/20/2016 Global Ethics complaint conducted by Walmart's Global Ethics (3 days after the case was opened) and transferred of the investigation to the local business in San Bruno, CA to Walmart eCommerce Finance Group |
| 16 | WM000004046-WM000004053 | 6 | 12/23/2016 | Report | Walmart Inc. | Walmart Global Ethics Distribution List (200+ Recipients) | Finished investigative report regarding Plaintiff's 12/20/2016 Global Ethics Complaint regarding potential violations of GAAP/SOX and Shareholder Fraud |
| 20 | WM000002601-WM000002603 | 3 | 1/4/2017, 1/8/2017, and 1/9/2017 | email | Michael Bender, EVP and Chief Operations Officer Walmart.com, Marc Lore President and CEO, Walmart eCommerce U.S, Becky Smith, SVP Walmart.com HR, Melinda Greene, Director HR | Michael Bender EVP and Chief Operations Officer Walmart.com, Marc Lore President and CEO, Walmart eCommerce U.S, Becky Smith, SVP Walmart.com HR, Melinda Greene, Director HR | Email communication concerning Plaintiff's 1/4/2017 email complaint to Marc Lore and Michael Bender regarding Walmart's potential violations of GAAP/SOX and Shareholder Fraud (related to Plaintiff's 12/20/2016 Global Ethics Complaint). Michael Bender, Walmart.com COO, characterized Plaintiff's complaint as pretty strong allegations and discussed with Becky Smith, SVP HR Walmart.com, regarding investigation into Plaintiff's email complaint to Marc Lore and Michael Bender on 1/4/2017. |
| 21 | WM000003679 | 1 | 1/11/2017 | Report | Audrey Au, Senior Manger/Investigator Global Ethics | Walmart Global Ethics Distribution List (200+ Recipients) | Global Ethics and Global eCommerce Finance to provide updates to Marc Lore, President and CEO, Walmart eCommerce U.S. regarding Plaintiff's Ethics Complaint (12/20/2016) and his 1/4/2017 email complaint to Marc Lore and Michael Bender regarding Walmart's potential violations of GAAP/SOX and Shareholder Frauds. HR also confirmed that the business, Seth Beal, elected to terminate Plaintiff for non-ethics reasons. |
| 22 | WM000004107 | 1 | 1/13/2017 | email | Global Ethics | Plaintiff's Walmart.com's email address (huynh@walmart.com) | Notification of Closure for Plaintiff's 12/20/2016 Global Ethics Complaint. The email was sent to Plaintiff's Walmart.com email address 3 days after Plaintiff's termination |

169

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    54 to 114 pages shareholder fraud investigation report.  It's worth to link the fabricated

2    Walmart's Global Ethics investigation reports above to the 65-page confidentiality desig-

3    nation disputes.

4

5        303.    The chart above showed that the disputed item #12 to #14 are individual

6    native files amalgamated inside of the Supersize PDF ADHD investigation reports while

7    the disputed item # 15 to #22 are individual native files amalgamated inside the share-

8    holder fraud investigation report. The Rescue Squad made two misleading arguments to

9    support their position to keep the confidentiality designation on these non-confidential

10       Case 3:18-cv-01631-VC   Document 82-1   Filed 07/02/19   Page 10 of 16

| From: | Wilson, Chris <CWilson@gibsondunn.com> |
| Sent: | Monday, April 15, 2019 2:00 PM |
| To: | Tri Huynh; Brass, Rachel S. |
| Cc: | Stewart, Ryan C.; Schuemann, Susanna G. |
| Subject: | RE: Huynh v Walmart - A meet and confer call to discuss the issue of confidentiality designation removal |
| Attachments: | Huynh ESI Protocol Order Joint Stipulation - For FIling.pdf; Ex. A - ESI Protocol Agreement.pdf |

Mr. Huynh,

As we discussed, attached please find the ESI protocol applicable to this litigation.  As we pointed out during our call on April 15, section 9 of the Protocol provides that parties can produce only a single copy of identical ESI.  We also note that sections 2 and 5 require the parties to make a confidentiality designation as it applies to an entire document, as opposed to selected pages of documents.  This prevents the Defendants from producing the same document twice with conflicting confidentiality designations or designating specific pages of otherwise confidential documents as non-confidential.

Separately, Fed. R. Civ. P. 34(b)(2)(E)(i) requires that parties "produce documents as they are kept in the usual course of business."  This prevents Walmart from breaking up a single document in its files into confidential and non-confidential portions for discovery purposes.  While Defendants' confidentiality designations may present a perceived inconvenience to you, as we noted during our call, they do not interfere with your use of documents in discovery, such as during depositions or in other settings that do not require the documents to be placed in the public record.  Should dispositive motion practice become necessary in this litigation, Defendants are willing to discuss whether individual pages of documents need to be filed under seal.  As we discussed on the call, we are happy to set a call for late June or early July to discuss such redactions, or to set a time between Defendants' filing of any motion and your deadline to reply, so that you can focus your efforts on material that is responsive to any motion actually filed.

Thanks,

Chris Wilson

27   native files.   First, they argued that event though these individual documents may not be

28   confidential as standalone documents but because they lived inside of the Supersize PDF

                                             170
                            **COMPLAINT – DEMAND FOR JURY TRIAL**

file which is classified as confidential. Therefore, these native files are protected under the "Protective Order (DC Dkt. 38). Second, they argued that Walmart could not remove the confidentiality designation of these native files because Walmart stored all of these natives file inside the Supersize PDF file investigative report as they are kept in the usual course of business. See DC Dkt. 75 for Huynh's rebuttals to the argument above.

304. Additionally, Huynh also emailed a letter to District Judge James Donato on June 24, 2019 seeking Judge Donato's help to refer the Rescue Squad to the Standing Committee on Professional Conduct to investigate and take appropriate actions against their violations of the California Rules of Professional conducts. See DC Dkt. 82.

305. With regard to the Rescue Squad's argument that the Supersize PDF investigation report was how Walmart kept their Whistleblower investigation reports as they are kept in the normal course of business was false and misleading.

306. The Walmart's Global Ethics and Compliance Investigation System is power by the sophisticate NAVEX Global Ethic and Compliance Technology Platform. As showed in the chart above, the NAVEX Compliance and Ethics Platform stores individual files generated during the course of an investigation in their native format. So, for example, Melvenia Ha's purported Oct 5, 2016 HR investigation report and Oct 4, Oct 5, and Oct 16 interview notes should have been store in its Microsoft Word native file format. In short, the true reasons behind the RICO Defendants' repeated refusals to remove the confidentiality designation for only 64 pages of non-confidential documents was because the RICO Defendants attempted to conceal the facts that the Global Ethics and Compliance investigative reports were manufactured to mislead the SEC and/or the DOJ into believing Walmart's spoke person statement which purportedly claimed that

Walmart had investigated Huynh's shareholder fraud complaint but found nothing improper.



**Destruction of Evidence: Beal's Meetings on Oct 4 and 18, 2017**

307.   The chart above to show David deRubertis, Kari deRubertis, Nadir, Kasales, and Lindern acted in concert (at the instruction and direction of the Rescue Squad) to mutilate and destroy Huynh's outlook calendar appointments that proved Huynh with met Beal on Oct 4 and Oct 18, 2016.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**The Phantom Oct 17 Interview**

308.   The evidence below proved beyond reasonable doubt that Melvenia Ha acted in concert with the Rescue Squad, Renee Quezada, and others to fabricate her Oct 17 interview note with Huynh, filed as Walmart's Exhibit 66 in support of Walmart's motion for summary judgement, to purportedly prove that Beal didn't retaliate against Huynh on Oct 18, 2016. Additionally, at the direction and instruction of the Rescue



174
**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Squad and the Walmart's Participants Melvenia Ha also submitted false declaration under

2   oath with the United States District Court of the District of Northern California to pur-

3   portedly claim that her 10/17/16 interview note was authentic.  DC Dkt 116 at 3 ¶ 10.

4

5        309.     Similarly, Melvenia Ha also manufactured the following documents and

6   submitted false declarations to purportedly sworn to their authenticity in order to support

7   Walmart's motion for summary judgement.

8

9   i.     Oct 4 interview note: Walmart's Exhibit 64 – DC Dkt. 116-1.

10  ii.    Oct 5 interview note: Walmart's Exhibit 65 – DC Dk. 116-2

11  iii.   Oct 5, 2016 purported HR investigation report to falsely accuse Huynh of sexual
           harassment -Walmart's Exhibit 94 – DC Dkt. 118-2 at 8-11.

12  iv.    Oct 18, 2016 Final HR investigation report to falsely accus Huynh of sexual
           harassment.

13

14       310.     David and Kari deRubertis, Kasales (See DC Dkt. 161-3) and Lindern

15  acted at the directions of the Rescue Squad to mutilate the time and date of the documents

16  (Emails and outlook calendars) Huynh produced to Walmart in late Sept 2018 by using

17

18  From:trivvyn@gmail.com <trivvyn@gmail.com>

19  Sent: Friday, October 18, 2019 11:02 AM

20  To: Kasales, Douglas <DKasales@epiqglobal.com>        Case 3:18-cv-01631-VC  Document 36  Filed 09/11/18  Page 9 of 15
    Cc: Vonlindern, Kathy <kathy.vonLindern@epiqglobal.com>

21  Subject: RE: Urgent Question | P-1032722 - Huynh v. Walmart-DLFO301

22  Doug,                                                   s.    Email Date Received (Local Time Zone)

23                                                          t.    Email Time Received (Local Time Zone)
    According to the ESI Protocol Order (See attached), all the parties agreed that the time was supposed to be processed in
    Local time i.e. PDT/PST.                               u.    Email Date Sent (Local Time Zone)

24                                                          v.    Email Time Sent (Local Time Zone)
    So both the Court and Walmart interpreted the time in the email produced was in PDT/PST. This is really bad news for

25  me 😊.

26

27  Did The deRubertis Law Firm told you why they asked ePiq to process the time in UTC when the ESI Protocol stated Local
    Time?

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    the UTC time zone versus the stipulated PST time Zone. See DC Dkt. 161 to 164 for a

2    detail analysis of how these actions had prejudiced Huynh in his lawsuit against Walmart.

3

4         311.   David and Kari deRubertis, Nadir, Kasales and Lindern acted in concert to

5    mutilate the he headers of Huynh's emails produced to Walmart to obstruct Huynh from

6    using them to support his opposition brief to oppose Walmart's motion for summary

7    judgement.

8

9              Case 3:18-cv-01631-VC   Document 124-1   Filed 09/19/19   Page 2 of 3

10   | Message | |
11   | **From:** | Tri Huynh [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c146c343bc8b448fbbb54e5d19620c62-Tri Huynh -] |
12   | on behalf of | Tri Huynh [/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=c146c343bc8b448fbbb54e5d19620c62-tri huynh -] |
13   | **Sent:** | 1/4/2017 3:59:45 PM |
14   | **To:** | 'Marc Lore - Executive CEO' [marc@walmart.com]; Michael Bender EVP and Chief Operations Officer [michael.bender@walmart.com] |
15   | **Subject:** | Ethics violation/intentional dishonesty at the executive level - Negatively impacting Walmart's reputation |
     | **Attachments:** | Veritas_Tri Huynh_01042017.pdf |
16

17        312.   deRubertis leaked the confidential information Huynh shared with him in

18   2017 which proved that Huynh's role was not eliminated. This leaked information trig-

19   gered the Rescue Squad and the Walmart participants to engage in evidence concealment

20   of material facts to prevent Huynh from impeaching Walmart's false assertion that

21   Huynh's role was eliminated as part of the RIF. Additionally, to support this false asser-

22   tions, Seth Beal (DC Dkt. 171-1 at 13 ¶ 62) and Valerie Ricetti (DC Dkt. 117-2 at 8-9 ¶

23

24   44) submitted false declarations under oath to purportedly sworn that Huynh role was

25   eliminated as part of the RIF when it was not. Brass and Stewart filed these documents

26   and the declarations in late Aug 2019 to support Walmart's motion for summary judge-

27   ment even though they knew these documents were fabricated.

28
                                        176
                        **COMPLAINT – DEMAND FOR JURY TRIAL**

## RICO Defendants Concealed Evidence Which Proved Huynh's Role Was Not Eliminated

**The 400 Missing Pages of Documents**

313.    Huynh terminated his relationship with David deRubertis and the deRubertis Law Firm in Nov 2018.  After David deRubertis was no longer Huynh's lawyer, David deRubertis acted in concert with the Rescue Squad, Kasales, and Linern to withhold and  and conceal 386 pages of documents to obstruct Huynh from using them to prosecute his SOX claim against Walmart. Below is the Feb 11, 2019 letter Huynh sent to

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Rachel Brass to put her on notice about the missing documents. This was done in an at-

2   tempt to obstruct Huynh form using these documents to prosecute his SOX claim against

3   Walmart.

Tri Huynh

4015 134th Ave SE

Bellevue, WA 98006

Tel. 408.757.5516

February 11, 2019

VIA ELECTRONIC MAIL

Rachel S. Brass

Gibson, Dunn & Crutcher LLP

555 Mission Street, Suite 3000

San Francisco, CA 94105-0921

Re:   Huynh v. Wal-Mart Stores, Inc. et al., Case No. 3:18-cv-01631-VC

*   At least 386 pages were missing from the documents produced by Walmart (Excluding Attorney Eyes Only).  See the table below.

| Missing Pages From Walmart Produced Documents | | | |
|---|---|---|---|
| BegBates | EndBates | # of Pages | Remarks |
| WM0000590 | WM0000600 | 11 | Attorney Eyes Only |
| WM0000644 | WM0000647 | 4 | Attorney Eyes Only |
| WM00001530 | WM00001550 | 21 | Attorney Eyes Only |
| | Total | 36 | |
| WM0000658 | WM0000658 | 1 | Missing |
| WM0000660 | WM0000661 | 2 | Missing |
| WM0000676 | WM0000678 | 3 | Missing |
| WM0000769 | WM0000771 | 3 | Missing |
| WM00003323 | WM00003422 | 100 | Missing |
| WM00003621 | WM00003729 | 109 | Missing |
| WM00003934 | WM00004101 | 168 | Missing after WM00003934 |
| | Total | 386 | |
| | Total | 422 | |

178

**COMPLAINT – DEMAND FOR JURY TRIAL**

**The Federal Rules of Civil Procedure Is the Second Guardrails of Truth**

314.    The Federal Rules Civil Procedure (F.R.C.P) was designed and institution-alized across our Federal Courts to serve as guardrails to protect the sanctity of our judicial process and to ensure equal justice law for all.  F.R.C.P implements an adversarial system by means of rules that ensure litigants get their cases heard on the merits. The paradigmatic merits determination in suits at common law is the jury verdict, which follows a trial where the judge officiates between adversaries.  It provides the mechanism for applying substantive law to real disputes. Such a system sets guidelines as to what information the judge or jury receives, how that information is to be presented, and by what standards of proof (e.g., "beyond a reasonable doubt," "by clear and convincing evidence," "by a preponderance of the evidence") the information will be adjudged.  These rigorous procedures seek to ensure the impartiality of jurors as fact finders, as contrasted with judges, who enjoy a more robust presumption of impartiality in their traditional role as umpires on questions of law[51].

---

[51] "If experience demands a presumption that a judge will seize every opportunity presented to him in the course of his official conduct to line his pockets, no canon of ethics or statute regarding disqualification can save our judicial system." -Justice William Rehnquist

William H. Rehnquist, Sense and Nonsense About Judicial Ethics, 28 REC. ASS'N B. CITY N.Y. 694, 699-700 (1973). Our system of government is premised upon subservience to the rule of law. If a judge in the exercise of judicial power loses sight of these principles, the result is autocratic rule by lawless judicial action." Reserve Mining Co. v. Lord, 529 F.2d 181, 188 (8th Cir. 1976). "[T]he right to an impartial decision-maker is required by due process." Arnett v. Kennedy, 416 U.S. 134, 197 (1974) (White, J., concurring in part and dissenting in part). Goldberg v. Kelly, 397 U.S. 254, 271 (1970) (an impartial decision maker is essential).

Fraud on the court is "only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Courts have found fraud upon the court only where there has been the

179

315.    While the F.R.C.P afford judges opportunities to decide cases on the merits prior to trial to drive judicial economy and cost efficiencies for litigants, those opportunities are carefully circumscribed to reduce the risk of uninformed, premature judgments that could fairly be characterized as prejudice.  Thus, for example, in a defendant's motion to dismiss for failure to state a claim, the judge must accept as true all facts alleged in the complaint, and must err on the side of non-dismissal by construing the complaint liberally and "drawing all reasonable inferences in plaintiffs favor."'  And at the summary judgment stage, the judge must let the case proceed to trial unless there is "no genuine dispute as to any material fact."

316.    At an elemental level, then, the F.R.C.P and the adversarial process it regulates restrict the authority of judges to act upon their predispositions, prejudices, and personal biases by sharply limiting their opportunities to end cases before the necessary facts can be adduced and the merits explored. Professor Judith Resnik described the underlying problem as one of prejudgment: Deciding at one point in time versus another is not intrinsically faulty unless the assumption is that prejudgment is based upon incomplete or inaccurate information. Prejudgment is suspect in the context of a system that assumes an increase in information over time and designates specific points in time when the act of judging becomes legitimate. By necessary implication, prejudgment is illegitimate because judges who lack the information needed to make reasoned determinations

most egregious conduct involving a corruption of the judicial process itself. Examples are bribery of judges, employment of counsel to `influence' the court, bribery of the jury, and the involvement of an attorney (an officer of the court) in the perpetration of fraud." Id. at 631-632

**COMPLAINT – DEMAND FOR JURY TRIAL**

on the merits must ground their decisions in under-informed speculation that is preju-

diced (and hence, partial) by definition. Professor Lon Fuller credited the adversarial pro-

cess with imposing a structure that controls the judge's propensity toward premature deci-

sions grounded in personal predilections: An adversary presentation seems the only effec-

tive means for combating this natural human tendency to judge too swiftly in terms of the

familiar that which is not yet fully known. The arguments of counsel hold the case, as it

were, in suspension between two opposing interpretations of it. While the proper classifi-

cation of the case is thus kept unresolved, there is time to explore all of its peculiarities

and nuances.

**Similarly Situated Litigants Are Treated Equally Under the Law**

317.    Numerous case laws in our Judiciary ensure consistent and uniform appli-

cations of the Federal Rules of Civil Procedures and District Court's Local Rules to en-

sure that justice be served for all.

- Sutton Place Development Co. v. Abacus Mortgage Investment Co., 826 F.2d 637, 640 (7th Cir. 1987) (noting that "the federal rules [of civil procedure] are carefully crafted instruments designed to achieve, by their uniform application, fairness . . . in the conduct of federal litigation").

- Numerous doctrines of reviewability are contained in our case law and our rules of appellate procedure. Uniform application thereof ensures that similarly situated litigants are treated in a consistent and, hence, just manner. See, e.g., Silkwood v. Kerr-McGee Corp., 667 F.2d 908, 916 (10th Cir. 1981) ("the objective of *521 doing equal justice cannot be attained absent a consistent application of the rules"); Park City Hospital v. Commission on Hospitals Health Care, 14 Conn. App. 413, 423, 542 A.2d 326 (1988) (Bieluch, J., dissenting) ("due process in the administration of justice requires the uniform application of the rules of practice"), affd, 210 Conn. 697, 556 A.2d 602 (1989).

- "The Federal Rules are "as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the mandate [of a Federal Rule] than they do to disregard constitutional or statutory provisions. Bank of

Nova Scotia v. United States, 487 U.S. 250, 255 (1988) (stating that "a federal court may not invoke supervisory power to circumvent" the dictates of a Federal Rule of Criminal Procedure, id. at 254)."

**Motion for Summary Judgement[52](Trial Without Jury)- A Pro Se's Nightmare**

318.    Summary judgment is a critical event in the course of federal civil justice designed to dispose cases that lack the merits to be trialed by Jury. However, summary judgement motion poses a lot of challenges for pro se litigants. For pro se claims, the effect of summary judgment motions is dramatic. At trials, parties without lawyers can at least testify. Win or lose, they air their complaints publicly (subject to evidentiary rule hurdles) and receive a determination of their claims' merits. Not so when defendants file summary judgment motions. Then, rule technicalities befitting Kafka can exclude factual assertions and prevent even a judge, let alone a jury, from considering the merits.

319.    To address these challenges, courts across our land have been known to make accommodations for self-represented litigants during summary judgement.  One of the accommodations courts have approved for self-represented litigants to prevent "inadvertent forfeiture of important rights because of their lack of legal training."[53] "Legal

---

[52] Rule 56 (a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

[53] Traguth v. Zuck, 710 F.2d 90, 95 (2nd Circuit 1983). See also Lombardi v. Citizens National Trust & Savings Bank, 289 P.2d 823, 824 (California 2nd District Court of Appeal 1955) (judge has duty to see that a self-represented litigant's cause is not defeated by mere inadvertence or want of attention).

**COMPLAINT – DEMAND FOR JURY TRIAL**

technicalities must be tempered by justice."[54].  Some courts also used oral arguments as a tool to ask probing questions to liberally construe a pro se litigant's opposition brief against the Defendants' motion for summary judgement. See Terio v. Carlin, No. 10–CV–3201, 2010 WL 4117434, at *1 n. 1 (S.D.N.Y. Sept. 27, 2010) (considering the plaintiff's "statements at oral argument in deciphering [the] [p]laintiff's claims"), adopted by 2010 WL 4117377. See paragraph X for discussions used oral argument to draw out answers not only from Pro Se Litigants but also those who were represented by counsel. Additionally, although F.R.C.P Rule 56(e) was designed for all litigants, it specifically addressed many of the difficulties Pro Se litigants have in submitting material facts into the records in support of their opposition brief to oppose the Defendant's motion for summary judgement.

Rule 56(e) states:  FAILING TO PROPERLY SUPPORT OR ADDRESS A FACT. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

1) give an opportunity to properly support or address the fact;
2) consider the fact undisputed for purposes of the motion;
3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
4) issue any other appropriate order.

### Locked Out of Court - You Are Not Welcome Here!

320.    Walmart filed their Motion for Summary Judgement on Aug 29, 2019 (DC Dkt. 113 to 123).  Huynh filed his opposition brief on Sept 19, 2019 (DC Dkt. 124). However, Huynh was not able to file material facts along with the opposition brief because these documents still designated as confidential by Walmart (even though they

---

[54] Rappleyea v. Campbell, 884 P.2d 126, 132 (California 1994) (Arabian, concurring).

183

1   were not) and Huynh didn't know how to file these documents under seal.

2   Case 3:18-cv-01631-VC   Document 79   Filed 06/18/19   Page 1 of 2

3   4                          UNITED STATES DISTRICT COURT

4   5                         NORTHERN DISTRICT OF CALIFORNIA

5   6

6   7      TRI MINH HUYNH,                              Case No. 18-cv-01631-VC  (SK)

7   8              Plaintiff,

8   9         v.                                        ORDER REGARDING JOINT
                                                        DISCOVERY LETTER FILED ON
9   10     WAL-MART ASSOCIATES, INC., et al.,           JUNE 3, 2019

10  11             Defendants.                          Regarding Docket No. 75

11  12          Now before the Court is the joint discovery letter brief filed on June 3, 2019.  Plaintiff Tri

12  13   Minh Huynh ("Plaintiff") challenges the designation of 65 documents as "Confidential" pursuant

13  14   to the protective order in this case.  (Dkts. 38, 38-1).  Defendants provided the contested

14  15   documents to the Court for *in camera* review.  After review, the Court ORDERS Defendants to

15  16   designate *specific pages* as "Confidential."  Defendants argue that there should be one designation

16  17   for an entire document, as opposed to specific pages within a document, as "Confidential" and cite

17  18   to the ESI Protocol (Dkt. 36) as support for this proposition.  However, the ESI Protocol does not

18  19   support that position.  Defendants must designate only the pages or portions of the documents that

19  20   are confidential and provide that information to Plaintiff by July 1, 2019.  If Plaintiff further

20  21   wishes to challenge the confidentiality of those documents, Plaintiff must meet and confer with

21  22   Defendants before submitting this dispute again to the Court.

22

23          321.    Huynh foresaw filing document under seal as a major challenge to oppose

24   Walmart's motion for summary judgement several months earlier. So, Huynh filed a dis-

25   covery dispute brief with Magistrate Judge Sallie Kim in early June 2019 DC Dkt. 75 and

26   76) to request Judge Kim to order Walmart to remove the confidentiality designation for

27   only 65 pages of non-confidential documents which Huynh needed to oppose Walmart's

28   motion for summary judgement.  The next day Judge Kim ordered Walmart to submit the

     65 pages of documents for in-camera review. DC Dkt. 77. However, despite having con-

     ducted the in-camera review, Judge Kim issued an order on July 2, 2019 (DC Dkt. 79) to

                                            184

basically give Walmart a free pass to pick and choose which of the 65 disputed pages Walmart wanted to produce to Huynh without the confidentiality designation. Subsequently, Walmart only removed the confidentiality designation for one page out of the sixty-five disputed pages.

322.    At that time, Huynh didn't know any better so he believed Magistrate Judge Sallie Kim's order was proper.  However, Huynh recently discovered that after a District Judge or a Magistrate Judge performed in-camera review for disputed documents that Judge most of the time will issue an order to give specific instructions to the producing party what they must do with regard to the disputed documents.  For example, if the litigants disputed the confidentiality designation for 65 pages of documents, then after the judge completed the in-camera review, the judge would issue an order with specific instructions to the producing party as to which of the 65 pages they could retain the confidentiality designation and which they could not. Therefore, by giving Walmart the option to decide which of the 65 pages they wanted to produce to Huynh without the confidentiality designation was prejudicial, and improper. This is akin to letting "the fox guarding the hen house".  The links below are discovery dispute orders issued by Judges at the United States District Court, Northern District of California after completing in camera reviews.

i.      https://storage.courtlistener.com/re-
        cap/gov.uscourts.cand.320421/gov.uscourts.cand.320421.105.0.pdf) – Judge Kim
        order after in-camera review.
ii.     https://storage.courtlistener.com/re-
        cap/gov.uscourts.cand.364504/gov.uscourts.cand.364504.174.0.pdf
iii.    https://storage.courtlistener.com/re-
        cap/gov.uscourts.cand.325523/gov.uscourts.cand.325523.343.0.pdf
iv.     https://storage.courtlistener.com/re-
        cap/gov.uscourts.cand.206484/gov.uscourts.cand.206484.31.0.pdf

**COMPLAINT – DEMAND FOR JURY TRIAL**

v.    https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.204440/gov.uscourts.cand.204440.68.0.pdf

vi.   https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.202134/gov.uscourts.cand.202134.38.0.pdf

vii.  https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.178002/gov.uscourts.cand.178002.154.0.pdf

viii. https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.176106/gov.uscourts.cand.176106.37.0.pdf

ix.   https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.174687/gov.uscourts.cand.174687.117.0.pdf

x.    https://storage.courtlistener.com/re-
      cap/gov.uscourts.cand.174323/gov.uscourts.cand.174323.38.0.pdf

323.    In Magistrate Judge Sallie Kim order (DC Dkt. 79), Judge Kim wrote "If
Plaintiff further wishes to challenge the confidentiality of those documents, Plaintiff must
meet and confer with Defendants before submitting this dispute again to the Court." So,
after Huynh and the Rescue Squad met and conferred multiple times regarding the re-
maining 64 disputed pages and the Rescue Squad still refused to remove the confidential
designation for these pages, Huynh filed a second discovery brief letter on Aug 13, 2019
(DC Dkt. 103-104) to request Magistrate Judge Sallie Kim to order Walmart to remove
the confidentiality designation from these pages.  On the very same day, Magistrate
Judge Sallie Kim issued an order (DC Dkt. 106) denying Huynh's requests for no rational
basis.

1

2      TRI MINH HUYNH,                           Case No.  18-cv-01631-VC   (SK)

3              Plaintiff,
                                                 **ORDER REGARDING JOINT LETTER**
4          v.                                    **BRIEF ON CONFIDENTIALITY**
                                                 **DESIGNATIONS**
5      WAL-MART ASSOCIATES, INC., et al.,

6              Defendants.                       Regarding Docket No. 103

7          On August 13, 2019, the parties filed a joint letter brief to address Defendants'

8  confidentiality designations.  Plaintiff challenges the confidentiality designation by Defendants of

9  certain documents.  Plaintiff argues that he needs the contested documents to prove his case and to

10 oppose Defendants' motion for summary judgment, which Defendants have not yet filed.  Plaintiff

11 misunderstands the designation of confidentiality under the terms of the Protective Order in this

12 case.  Plaintiff can use any confidential documents to prove his case and to oppose any motion for

13 summary judgment, but he must comply with the terms of the Protective Order in doing so.

14     For that reason, Plaintiff's motion is DENIED.

> First, if a document is not confidential then Judge Kim should have ordered Walmart to remove the confidential designation independent of what Huynh's must do. Second, Huynh was acting Pro Se and he didn't know how to file document under seal.

15     **IT IS SO ORDERED.**

16 Dated: August 13, 2019

17                                               _Sallie Kim_
                                                 _____

18                                               SALLIE KIM
                                                 United States Magistrate Judge

19     324.    Two days after filing his opposition brief to Walmart's motion for sum-

20 mary judgment, Huynh filed a motion for leave to supplement his opposition brief (DC

21 Dkt. 127) as afforded by F.R.C.P Rule 56(e).  Since Huynh was worried that he may not

22 be able to supplement his opposition brief timely, he emailed Judge Chhabria's Court-

23 room Deputy, Ms. Kristen, for help[55].  Brass, immediately replied to Huynh's email.

24

25 _____

26 [55] Dear Ms. Melen,

27 I apologized for reaching out to you today to seek your help regarding the motion I filed on 9/21/2019 (Dkt. 127) for leave to file supplement to Plaintiff's opposition to Walmart's motion for summary judgment.

28 Given that I am acting Pro Se and not a professional lawyer, I am afraid that I may miss my

**COMPLAINT – DEMAND FOR JURY TRIAL**

Brass wrote "Dear Ms. Melen, We will be filing a response to Mr. Huynh's motion today, and respectfully request that the Court defer ruling until that response is on file".

325.    Although the Rescue Squad and the Walmart Participants knew with certainty that Huynh had every right to supplement his records per F.R.C.P 56(e), they e-filed their opposition to Huynh's motion (DC. Dkt. 128) a few days later. In their brief they misrepresented the laws in an attempt to obstruct Huynh from submitting additional material facts into the record defend himself against Walmart's motion for summary judgement. The case laws cited by the Rescue Squad had nothing to do with Huynh's motion for leave to supplement his opposition brief.

- Accordingly, Plaintiff's request for leave to amend his opposition brief to add new exhibits should be denied. See Banga v. Kanios, 2016 WL 7230870, at *2, n. 3 (N.D. Cal. Dec. 14, 2016) (denying motion to extend deadline to oppose motion to dismiss because pro se plaintiff "d[id] not explain why he did not request an extension before the response deadline passed, or why his neglect to do so is excusable."
- Porter v. Jennings, 2013 WL 552123, at *1 (E.D. Cal. Feb. 12, 2013) (denying motion to extend deadline to amend pleadings and conduct discovery because pro se Plaintiff "present[ed] no documents demonstrating that good cause exists" and "present[ed] no argument that would merit granting modification.")

chance to supplement my opposition to Walmart's motion for summary judgement. This is critical for me to have a fair chance to present my arguments to the Court regarding my opposition to Walmart's motion for summary judgement.
I hope you could let Judge Chhabra know my situation so he could review and render judgment on my request.

188
**COMPLAINT – DEMAND FOR JURY TRIAL**

**Local Rules on Motion Practice**

326.    According to the United States District Court, Northern District of California's Handbook for Pro Se Litigants[56] it should not have taken more than a month (especially when Huynh's motion is relatively straight forward and didn't need a court hearing) for District Judge Chhabria to rule on Huynh's motion. However, for 122 days after Walmart filed their opposition brief, Judge Chhabria never rule on Huynh's motion despite Huynh's multiple requests.  Judge Chhabria ultimately granted Walmart summary judgement without ruling on Huynh's motion. In short, District Judge Vince Chhabria locked Huynh out of Court because Huynh was powerless, not wealthy, and had no connections in high places.



DIAGRAM VIII.  STANDARD TIMELINE FOR A CIVIL MOTION

**MOTION TERMINOLOGY AND TIMELINE**

The party who files a motion is the "moving party." The other parties are "non-moving parties." A party who does not want the motion to be granted is the "opposing party."

Civil Local Rules 7-2 and 7-3 set out the minimum time periods between each filing and the hearing

1.  FILING. The moving party files a motion explaining what action he or she wants the Court to take and why. The moving party chooses as a hearing date a day when the assigned judge has a "civil law and motion calendar" scheduled; that date must be at least 35 days from the motion filing date.

2.  OPPOSITION. The opposing party files an opposition brief explaining why it believes the Court should not grant the moving party's motion. It is due no later than 14 days after the motion filing date.

3.  REPLY. The moving party may file, no later than 7 days after the due date for the opposition brief, a reply brief in which it responds only to the arguments made by the opposing party's opposition brief. After this is done, neither party can file any more documents about the motion without first getting permission from the Court.

4.  HEARING. After the motion and the briefs are filed, the Court can decide the motion based entirely on the arguments in the papers, or it can hold a hearing. If the Court holds a hearing, each party will be given a chance to talk to the court about the arguments in their papers. The Court then announces its decision in the courtroom or sends the parties a written decision.

*Source: United States District Court of Northern District of California's Representing Yourself in Federal Court: A Handbook for Pro Se Litigants  MARK B. BUSBY Clerk of the Court 2020 Edition*

---

[56] https://cand.uscourts.gov/wp-content/uploads/2020/02/Pro_Se_Handbook_2020ed_links_12-2021_MBB.pdf

**COMPLAINT – DEMAND FOR JURY TRIAL**

1

**No Hearing for You – You Can't Handle the Truth**

2

    327.    Between Oct and Nov of 2019, Huynh filed multiple notices to put District

3

Judge Vince Chhabria on notice that the Rescue Squad conspired with deRubertis to mu-

4

tilate evidence to prevent Huynh from using them to oppose Walmart's motion for sum-

5

mary judgement.

6

7

  i.     Walmart violated Huynh's 7th amendment right by blocking Huynh from sup-

8

        plementing his opposition brief with material facts. DC Dkt. 153 on Oct 13.

9

  ii.    David deRubertis secretly leaked Huynh's confidential psychiatrist records un-
        der the table without the confidentiality designations which the RICO Defend-
        ants used to effectuate prong #2, #3 and #6 of the Enterprise's coverup scheme.

10

        DC Dkt. 153, 155, 156,158, 159, and 160.

11

12

     a.  DC Dkt 158-4 showed that Doug Kales provided the last Bate Number[57] of
          the official Epiq production so Kari and David deRubertis could manually

13

          create a 265 Supersize PDF file without the confidentially designation to
          leak Huynh's medical records as well as the content of Huynh's 4/19/17

14

          SEC submission to the Rescue Squad.

15

 iii.    The Rescue Squad, David deRubertis, Kari deRubertis, Doug Kasales, and the
        other RICO Defendants engaged in a conspiracy to destroy and mutilate docu-

16

        ments Huynh produced to Walmart by shifting the time and date of Huynh's
        outlook emails and calendar events by +8 hours which prevented Huynh from

17

        using them to oppose Walmart's motion for summary Judgement. DC Dkt. 161,
        162, 163.

18

19

    328.    On Nov 4, 2019, Huynh filed DC Dkt. 164 to provide District Judge Vince

20

Chhabria with clear and convincing evidence which proved that the Rescue Squad and

21

deRubertis acted in concert to obstruct justice by mutilating and destroying evidence to

22

block Huynh from defending himself against Walmart's motion for summary judgement.

23

However, instead of taking corrective actions against the wrong doers to prevent injustice

24

25

26

27

28

---

[57] The last bates number used in our production is HUYNH0014158, so you should start with
HUYNH0014159. The team is almost done with their work. I will be QCing after that, fol-
lowed by the data being put up on the FTP. I'll advise once we have that done. Let me know
if you have questions. Thank you.

**COMPLAINT – DEMAND FOR JURY TRIAL**

in his court room, District Judge Vince Chhabria cancelled oral argument for summary

judgement the next day to prevent Huynh a meaningful opportunity to be heard.

> "CLERK'S NOTICE vacating the hearing scheduled for **11/7/2019** re 113 Motion for
> Summary Judgment, and 125 Motion for Sanctions. The Court will issue a written
> ruling. (This is a text−only entry generated by the court. There is no document associ-
> ated with this entry.) (knm, COURT STAFF) (Filed on **11/5/2019**) (Entered:
> 11/05/2019).

329.    This was done in joint coordination with the Rescue Squad to prevent

Huynh from telling his side of the story at oral argument. The RICO Defendants worried

that if the oral argument was not cancelled then all of their misconducts would be cap-

tured in a court transcript which would be made available to the public. Two months later

District Judge Chhabria granted Walmart summary judgement and dismissed all of

Huynh's claims.

### Compassion and Kindness for Others

330.    District Judge Vince Chhabria was compassionate and kind towards other

similarly situated litigants that appeared in his court room him except for Huynh.  Histor-

ically, in cases where District Judge Vince Chhabria tentatively planned to grant sum-

mary judgement to the Defendants, Judge Chhabria gave the Plaintiff's lawyers meaning-

ful opportunities to tell the Plaintiff's side of the story before ruling on the Defendant's

motion for summary judgement. Below are two such examples.

331.    The first case was Non v. Comcast Inc.− Case 3:14-cv-01845-VC.  District

Judge Vince Chhabria asked Non's lawyer very specific questions during oral argument

concerning similarly situated employees then offered the lawyer a chance to respond. Be-

low are excerpts from the oral argument transcript.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   THE COURT: Good morning.

2   So, Mr. Bacon, I'll start with you because my -- my tentative inclination is that the

3   summary judgment motion should be granted, and the -- the place -- the only area

4   where you could turn me -- could possibly turn me around is <u>on the issue of similarly</u>

5   <u>situated employees who received lesser discipline for similar conduct</u>. Now, I guess

6   my view about that is -- my tentative view about that is that that doesn't get you over

7   the hump of the five employees you discuss. There are two who I think could, you

8   know, sort of viewing everything in a light most favorable to the Plaintiff sort of start

9   to come close to being similarly situated, and that is the guy who went to Wendy's --

10   I'm forget-ting his name -- and Compos, who was the fifth of the employees you men-

11   tioned who said that he was -- said I think a couple of times that he was on a particu-

12   lar block when he really wasn't and later claimed that it was because he had to deal

13   with a family emergency. But, you know, those two people, at least according to the

14   records that you sub-mitted on those two people -- I'm pulling up the records now --

15   you know, they had different supervisors. The facts are somewhat different, and it

16   seems like you've pulled these employees out of a pretty large universe of employees,

17   right? I mean, they -- I al-lowed you to do discovery on this and they turned over dis-

18   ciplinary records of employees who were disciplined for committing serious viola-

19   tions, and I think they turned over a lot of records to you. I don't know exactly how

20   many employees they gave you, and maybe you could clarify that and tell me where

21   that is in the record, but -- and of all of those, you've got two that maybe come close,

22   and I just -- my -- my tentative inclination is that that's not enough. And so, I'll sort of

23   be quiet now and let you address what I've -what I've said so far.

24   332.    The second case was Gutierrez. v. Sodexo, Inc.– Case No. 13-cv-00946-

25   VC.  District Judge Vince Chhabria asked Gutierrez's lawyer very specific questions re-

26   garding material facts in the record to support Gutierrez's claims of harassment and hos-

27   tile work environment then offered the lawyer an opportunity to respond. Below are ex-

28   cerpts from the oral argument transcript. See DC Dkt. 49 at 3-6.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    THE COURT: Good afternoon.

2    It's the afternoon. So, on this case, I -- you know, I don't think there's any adverse em-

3    ployment action, and so the question is whether -- the real question is whether there's

4    enough evidence to support a claim for harassment. <u>My inclination is that there is not

5    -- and hostile work environment.</u> My inclination is that there is evidence that both the

6    supervisor and the employee were difficult people and they were at odds with one an-

7    other. And viewing the evidence in a light most favorable to Ms. Gutierrez, her super-

8    visor was an unpleasant guy and treated her very poorly, but the instances in which he

9    treated her poorly based on race or gender, even if you, like I said, view it most favor-

10   ably to Ms. Gutierrez, are very sparse. And I don't think that they add up to a hostile

11   work environment or harassment claim. So, I wanted to go through your opposition

12   brief where you purport to tick off everything. <u>And if there's something in there that

13   you want to identify that you didn't tick off, please don't hesitate to do that.</u> But if we

14   go through it, on pages four and five of your brief, the first day Kennedy barked at

15   Jessica when she offered to help. I don't need you. I'm the boss. You don't understand.

16   Okay. That's not helpful I think to Ms. Gutierrez. Kennedy tried to inquire about the

17   personal life of the employees who work under him and wanted to know more about

18   her last name and if she was married. There's nothing inherently wrong with that. So,

19   I wanted to go through your opposition brief where you purport to tick off everything.

20   And if there's something in there that you want to identify that you didn't tick off,

21   please don't hesitate to do that. But if we go through it, on pages four and five of your

22   brief, the first day Kennedy barked at Jessica when she offered to help. I don't need

23   you. I'm the boss. You don't understand. Okay. That's not helpful I think to Ms.

24   Gutierrez. Kennedy tried to inquire about the personal life of the employees who

25   work under him and wanted to know more about her last name and if she was mar-

26   ried. There's nothing inherently wrong with that. He berated Ms. Gutierrez in front of

27   her coworkers, saying, "That's not the way you do things. What do you think you are

28   doing?" That's not helpful to Ms. Gutierrez's case. Kennedy didn't stop berating and

     humiliating Gutierrez. A couple days later, he started giving her orders in an angry

     tone. She pleaded to stop. And he responded, "I run the operation. I'm the boss. Too

     bad if you don't like it." That doesn't help her claim of race and gender discrimina-

                                            193
                          **COMPLAINT – DEMAND FOR JURY TRIAL**

tion…. But in this instance, you don't have that. I mean you don't have race -- comments about race and gender pervading the mistreatment. You have a couple very scattered isolated instances, and I just don't think -- I'm not inclined to think that a reasonable jury could conclude that all of this hostile treatment to which Ms. Gutierrez claims.

**Suppression and Exclusion of Material Facts**

333.     District Judge Vince Chhabria wrote in his ruling dismissing all of Huynh's claims: "Indeed, Huynh **has produced zero evidence of pretext**" DC Dkt. 167 at 5. Even though there were plenty of material facts in the record. Given this inconsistency, Huynh was concerned that District Judge Chhabria may have overlooked the material facts in the record.  So, Huynh filed a letter (DC Dkt. 170) dated Jan 19, 2020 to help guide District Judge Vince Chhabria toward Huynh's evidence of pretext in the record in an attempt to persuade Judge Chhabria to reconsider his rulings.  In the letter,

Case 3:18-cv-01631-VC   Document 170   Filed 01/19/20   Page 2 of 20

For example, if Huynh was able to bring to the Court's attention these two material pieces of evidence (ECF 143-4 Exhibit 21 and ECF 139-2 Exhibit B), Huynh could have persuaded the Court to deny Walmart's Motion for Summary Judgement. These two pieces of evidence proved that Walmart's legitimate/non-retaliatory reason (i.e. Walmart's January 24, 2017 eCommerce RIF) for Huynh's termination was pretextual for three main reasons:

1. Walmart hired **10** new FTEs for the Marketplace Business Unit between late September and November of 2016 right smack in the middle of the RIF (ECF141 page 6 line 14 to 17 and ECF 143-4 Exhibit 21 – WM00005058).
2. Walmart concealed the fact that they hired **10** new FTEs prior to firing **4** existing FTEs for the January 24, 2017 RIF (ECF141 page 6 - line 18 to 23 and ECF 139-2 Exhibit B).
3. Walmart Marketplace missed the total labor cost reduction target of **10%** mandated by Marc Lore, Walmart.com CEO, by **22%** (ECF141 – page 6 line 23 and page 7 line 1 to 3).

Huynh point to evidence in the record which proved that Beal hired 10 new FTEs into the Marketplace group right in the middle of a RIF then let go of four existing employees that he didn't like (75% Asians and 75% over the age of 50).  Although, Beal purportedly claimed in his declarations (DC Dkt. 171-1) that Walmart.com needed to cut 10% labor cost across the board, Beal missed his cost reduction target by 22%.

334.    After filing the 1/19/20 letter to District Judge Vince Chhabria, Huynh discovered that the RICO Defendants (David and Kari deRubertis, Kasales, Lindern, and the Rescue Squad) destroyed evidence of Huynh's meeting with Seth Beal on Oct 4 and Oct 18, 2016 to obstruct Huynh from proving that he engaged in protected conduct in early Oct 2016.  Judge Chhabria cited this lack of evidence to rule that Huynh didn't engage in protected activity prior to 11/30/16. Huynh immediately confronted Kasales and Lindern about the destroyed documents and asked him to give Huynh an explanation so Huynh could file a motion for reconsideration of Huynh's case dismissal. See COA Dkt. 5-3 at 31-36. Kasales emailed and provided evasive and misleading statements in an attempt to justify his actions.  However, an hour after Kasales responded to Huynh's question, District Judge Chhabria issued an order to obstruct Huynh from filing a motion for consideration.  In his ruling (DC Dkt. 174), District Judge Vince Chhabria purportedly construed Huynh's 1/19/20 letter as a request for leave to file a motion for reconsideration then denied the request.  See COA Dkt. 5-3 at 34-38.  However, per Local Rule 9(a), a litigant only needs to obtain a Judge's permission to file a motion for reconsideration of an interlocutory order not for a final judgment.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    **From:** Tri Huynh <trimhuynh@outlook.com>
     **Sent:** Monday, January 27, 2020 9:09 PM
2    **To:** Kasales, Douglas <DKasales@epiqglobal.com>; Vonlindern, Kathy <Kathy.vonLindern@epiqglobal.com>
     **Cc:** Pierre-Blanks, Mandy <mpierre@epiqglobal.com>; Tri Huynh <trimhuynh@outlook.com>
3    **Subject:** RE: Please cancel my January 23, 2020 to close down my account RE: Closing Down My Account - RE:
     OCT Invoice: DLF0001 - Huynh v. Walmart - 90388522
4

5    Hi Doug,

6    In summary, I needed Epiq to explain to me how I could prove to Judge Chhabria that the meeting
     between Seth Beal and I took place on October 4, 2016 based on HUYNH0002782. I need this
7    information by January 30, 2020 so I could include it in my Motion for Reconsideration to appeal
     Judge Chhabria's decision disposing my case on 1/14/2020.

8    **From:** Kasales, Douglas <DKasales@epiqglobal.com>
     **Sent:** Monday, January 27, 2020 3:47 PM
9    **To:** Tri Huynh <trimhuynh@outlook.com>; Vonlindern, Kathy <Kathy.vonLindern@epiqglobal.com>
     **Cc:** Pierre-Blanks, Mandy <mpierre@epiqglobal.com>
10   **Subject:** RE: Please cancel my January 23, 2020 to close down my account RE: Closing Down My Account - RE:
     OCT Invoice: DLF0001 - Huynh v. Walmart - 90388522
11

12   The two documents in the PDF are appointments as displayed in REL and as produced. I have also created a
     search of all calendar entries between 10/1/16 and 10/31/16 that mention Seth Beal and you (there are 33
13   hits). That search is here (the two documents you sent are in the results of this search):

14   | From: | ECF-CAND@cand.uscourts.gov |
     | Sent: | Tuesday, January 28, 2020 10:49 AM |      3
15   | To: | efiling@cand.uscourts.gov |
     | Subject: | Activity in Case 3:18-cv-01631-VC Huynh v. Wal-Mart Stores, Inc. et al. Order |

16   **Docket Text:**
     **ORDER re Notice (Dkt. [170]). Signed by Judge Vince Chhabria on 1/28/2020. (vclc2S,**
17   **COURT STAFF) (Filed on 1/28/2020)**

18

19       335.    Pursuant to F.R.C.P Rule 59(e), a litigant may file a motion for considera-

20   tion of a final judgement within 28 days after the entry of that judgment. Accordingly,

21   Huynh filed a motion for reconsideration timely on Feb 9, 2020. Schuemann immediately

22   contacted Huynh to purportedly claim that Huynh had violated District Judge Vince

23   Chhabria protective order by not redacting the name of a third-party person in his motion

24   for reconsideration. Schuemann told Huynh he must address the deficiency. See COA

25   Dkt 5-3 60-67. The RICO Defendants attempted to use legal technicality to push Huynh's

26   motion for reconsideration over the 28 days deadline so District Judge Vince Chhabria

27

28

                                    196
                     **COMPLAINT – DEMAND FOR JURY TRIAL**

1   could deny Huynh's motion for reconsideration for untimeliness versus having to go

2   through Local Rule 7-1 and 7-2 on motion practice and rule on Huynh's motion on the

3   merits.  Knowing the Rescue Squad's intentions, Huynh immediately fixed the redaction

4   issue and filed a notice[58] (DC Dkt. 179) to inform Judge Chhabria that Huynh had ad-

5   dressed Walmart's objection.   Despite Huynh's notice, District Judge Vince Chhabria is-

6   sued an order two days later to deny Huynh's motion for reconsideration.

7

8       336.    District Judge Vince Chhabria attempted to conceal the fact that he con-

9   spired with the Rescue Squad to deny Huynh's motion for reconsideration without afford-

10  ing Huynh due process protection by purportedly shifting the language he used to charac-

11  terize Huynh's 1/19/20 letter (DC Dkt. 170) from "**a request to file a motion for recon-**

12  **sideration**" (used in DC Dkt 174) to "**a motion for reconsideration**" (used in DC Dkt

13  182).   This was done to mislead the public and the media into believing that since Huynh

14  filed duplicate motions for reconsideration Judge Chhabria was justified in denying

15  Huynh's motion without going through the motion practice dictated by Local Rule 7-2

16  and 7-3.

17

18

19

20

21

22

23

24

[58] Huynh wrote in his filing. "Plaintiff Tri Huynh ("Plaintiff" or "Huynh"), acting Pro Se,
submits this notice to inform the Court that he had fixed the issue in Dkt. 177 that Walmart's
legal counsel brought to his attention (Huynh Decl. in support of Dkt. 179). Plaintiff would
also be grateful if the Court or the opposing counsels would inform him of any additional is-
sues that he needed to fix in Dkt. 175, Dkt. 176, and Dkt. 178 to be in compliance because to-
day is the deadline for him to fix any additional issues so his Motion for Reconsideration
would not be invalidated."

**COMPLAINT – DEMAND FOR JURY TRIAL**





337.     The chart above compared how District Judge Vince Chhabria ruled on

Mahan's motion for reconsideration versus Huynh's. The cycle time for Judge Chhabria

to rule on Mahan's motion after it was filed was **62 days** versus only **3 days** for Huynh's

motion. The reason it only took District Judge Vince Chhabria  3 days to deny Huynh's

motion for reconsideration was not because of process efficiency. Rather it was because

1   District Judge Vince Chhabria didn't require Walmart to file an opposition brief[59] and he

2   didn't give Huynh a meaningful opportunity to respond to Walmart's opposition brief be-

3   fore denying Huynh's motion for reconsideration.

4

5   ## District Judge Chhabria Also Treated These Plaintiffs More Favorably Than Huynh for No Rational Basis

6

7   ◆ Gutierrez e. Sodexo, Inc. (3:13-cv-00946)
    District Court, N.D. California
8   Assigned To: Vince Girdhari Chhabria
    Date Filed: March 1, 2013
    Date Terminated: July 24, 2014
9   Date of Last Known Filing: Jan. 8, 2015
    Cause: 28:1332 Diversity-Employment Discrimination
    Nature of Suit: 442 Civil Rights: Jobs
    Jury Demand: Plaintiff

10

| | | |
|---|---|---|
| 53 | Aug 21, 2014 | MOTION to Alter Judgment [Notice of Motion] filed by Jessica Gutierrez. Motion Hearing set for 9/25/2014 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Hon. Vince Chhabria. Responses due by 9/4/2014. Replies due by 9/11/2014. (Shea Hagebols, Mary) (Filed on 8/21/2014) (Entered: 08/21/2014) |
| | | Main Document | Buy on PACER |
| 58 | Aug 21, 2014 | Brief re 53 MOTION to Alter Judgment [Notice of Motion] MPA In Support of Motion filed by Jessica Gutierrez. (Related document(s) 53 ) (Shea Hagebols, Mary) (Filed on 8/21/2014) (Entered: 08/21/2014) |
| | | Main Document | Buy on PACER |
| 59 | Sep 4, 2014 | RESPONSE (re 53 MOTION to Alter Judgment [Notice of Motion] ) filed by Steven Kennedy, Sodexo, Inc.. (Attachments: # 1 Declaration of C. Christine Maloney In Opposition to Motion to Alter Judgment and for Reconsideration)(Maloney, C.) (Filed on 9/4/2014) (Entered: 09/04/2014) |
| | | Main Document | Buy on PACER |
| 60 | Sep 11, 2014 | REPLY (re 53 MOTION to Alter Judgment [Notice of Motion] ) filed by Jessica Gutierrez. (Attachments: # 1 Declaration Shea Hagebols Dec )(Shea Hagebols, Mary) (Filed on 9/11/2014) (Entered: 09/11/2014) |
| | | Main Document | Buy on PACER |
| 63 | Oct 2, 2014 | ORDER by Judge Vince Chhabria denying 53 Motion to Alter Judgment (krm, COURT STAFF) (Filed on 10/2/2014) (Entered: 10/02/2014) |
| | | Main Document | Download PDF ▾ |

19  ◆ J & J Sports Productions, Inc v. Phair (3:12-cv-05781)
    District Court, N.D. California
20  Assigned To: Vince Girdhari Chhabria
    Date Filed: Nov. 9, 2012
    Date Terminated: Sept. 2, 2014
21  Date of Last Known Filing: Jan. 8, 2015
    Cause: 28:1331 Fed Question: Fed Communications Act of 1934
    Nature of Suit: 490 Cable/Satellite TV
22  Jury Demand: None
    Jurisdiction Type: Federal Question

| | | |
|---|---|---|
| 39 | Jul 25, 2014 | MOTION to Alter Judgment filed by J & J Sports Productions, Inc. Motion Hearing set for 8/28/2014 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Hon. Vince Chhabria. Responses due by 8/8/2014. Replies due by 8/15/2014. (Attachments: # 1 Proposed Order)(Riley, Thomas) (Filed on 7/25/2014) (Entered: 07/25/2014) |
| | | Main Document | Buy on PACER |
| 43 | Aug 7, 2014 | RESPONSE (re 39 MOTION to Alter Judgment ) filed by E.J. Phair Brewing Company, John Jeffrey Phair. (Wheatley, Christine) (Filed on 8/7/2014) Modified on 8/14/2014 (kk3, COURT STAFF). (Entered: 08/07/2014) |
| | | Main Document | Buy on PACER |
| 44 | Aug 15, 2014 | ORDER by Judge Vince Chhabria denying 39 Motion for Attorney Fees; denying 39 Motion to Alter Judgment (krm, COURT STAFF) (Filed on 8/15/2014) (Entered: 08/15/2014) |
| | | Main Document | Download PDF ▾ |

27

28  [59] In most cases, if the opposing party didn't file an opposition brief the moving party's mo-
    tion would be considered unopposed and the court would rule for the moving party.

199

**COMPLAINT – DEMAND FOR JURY TRIAL**

338.    Similarly, the chart above, showed that in Gutierrez v. Sodexo, Inc. and J&J Sports Productions, Inc *v*. Phair, District Judge Vince Chhabria adhered to Local Rule 7-2 and 7-3 on motion practice to let the litigants fully briefed their arguments before ruling of the motion for reconsiderations.

339.    In short, District Judge Vince Chhabria treated every other similarly situated litigants that appeared in his court room with kindness, compassion, and just. However, in Huynh's case the RICO Defendants corruptly enticed District Judge Vince Chhabria and turn him into their instrument of oppression to lock Huynh out of court.

**COMPLAINT – DEMAND FOR JURY TRIAL**