1   **A One Paragraph Ruling After 18 Months of Trials and Tribulations**

2       340.    Huynh filed his Notice of Amended of Appeal with the United States

3   Court of Appeals for the Ninth Circuit in Mid Feb 2020 to appeal District Judge Vince

4

5   Chhabria's entry of final judgment in Walmart's favor.

6       Case 3:18-cv-01631-VC   Document 183   Filed 02/18/20   Page 1 of 2        Case 3:18-cv-01631-VC   Document 183   Filed 02/18/20   Page 2 of 2

7

8   Tri Minh Huynh                              NOTICE IS HEREBY GIVEN that Tri Minh Huynh, Plaintiff acting Pro Se, ("Huynh"),
    4015 134th Ave SE
9   Bellevue, WA 98006           FILED          in the above named case, submits an amended Notice of Appeal to the United States Court of Ap-
    Telephone: (408) 757-5516
    Email: trimhuynh@outlook.com  FEB 18 2020   peals for the Ninth Circuit to appeal from the final judgment from an Order granting summary
10  Plaintiff Acting Pro Se
                                 SUSAN Y. SOONG    judgment and dismissing Huynh's case (Dockets 167 and 169), entered in this action on January
11                               CLERK, U.S. DISTRICT COURT
                                 NORTHERN DISTRICT OF CALIFORNIA  14, 2020, and an Order denying Plaintiff's Motion for Reconsideration (Dkt 182) entered in this
12
                                                                  action on February 13, 2020.
13          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
            SAN FRANCISCO DIVISION
14
                                                  DATED: February 13, 2020         By:
15  TRI MINH HUYNH,            District Case No. 3:18-cv-01631-VC                   Tri Minh Huynh
                               USCA Docket No: 20-15211                             4015 134th Ave SE
16         Plaintiff(s),                                                            Bellevue, WA 98006
                                                                                   Telephone: (408) 757-5516
17      vs.                                                                         Email: trimhuynh@outlook.com
    WAL-MART STORES, INC., a Delaware   PLAINTIFF'S FIRST AMENDED                   Plaintiff Acting Pro Se
18  Corporation; WAL-MART ASSOCIATES,   NOTICE OF APPEAL TO THE
    INC., a Delaware Corporation; WAL-  UNITED STATES COURT OF AP-
    MART.COM, INC., a Delaware Corpora- PEALS FOR THE NINTH CIRCUIT
19  tion; and DOES 1 through 50, inclusive.
                                                                    I had to file my amended notice of appeal by
20  TRI MINH HUYNH,            Case No. 18-cv-01631-VC              mail because the district court revoked my e-
           Plaintiff,                                              filing due because my pro se status after he
21       v.                    ORDER DENYING MOTION                denied my motion for reconsideration. Recently,
                               RECONSIDERATION                     I noticed Pro Se Plaintiff no longer need
22  WAL-MART ASSOCIATES, INC., et al.,   Re: Dkt. No. 175          permission from a judge to e-file their case.
           Defendants.
23
    On January 28, the Court issued an order denying reconsideration of the summary     TO: Clerk's Office
24  judgment ruling. Now Huynh has filed another motion for reconsideration. That motion too is       United States District Court
    denied. In connection with his latest motion, Huynh filed on the public docket documents that     450 Golden GATE Ave, 16th FL.
25  should have been filed under seal. Accordingly, Huynh's e-filing privileges are hereby revoked.    San Francisco, CA 94102
    The Court will not consider any further filings by Huynh in this case.
26      IT IS SO ORDERED.
27  Dated: February 13, 2020
                               VINCE CHHABRIA
28                             United States District Judge

201
**COMPLAINT – DEMAND FOR JURY TRIAL**

1    341.   However, after 18 months of filing hundreds of pages of briefings, a merit

2  panel[60] comprised of Senior Circuit Judge N.R. SMITH, Senior Circuit Judge SILVER-

3
4  MAN, and Senior Circuit Judge FERNANDEZ issued a one paragraph memorandum af-

5  firming the district court orders (DC Dkt. 167, 169, and 182) and denied Huynh amended

6  notice of appeal.

7                Case: 20-15211, 05/11/2021, ID: 12108677, DktEntry: 39-1, Page 1 of 2

8                     Appeal from the United States District Court
                        for the Northern District of California
9                       Vince Chhabria, District Judge, Presiding

10                            Submitted May 7, 2021**

11  Before:   FERNANDEZ, SILVERMAN, and N.R. SMITH, Circuit Judges.

                 Case: 20-15211, 05/11/2021, ID: 12108677, DktEntry: 39-1, Page 2 of 2
12
          The district court properly granted summary judgment in favor of Wal-Mart
13  on Huynh's claims of retaliation under the Sarbanes-Oxley Act, retaliation under

14  the California Whistleblower Protection Act, and wrongful termination under
     California law.   Wal-Mart amply met its burden of producing evidence that there
15  was a legitimate, nonretaliatory reason for Huynh's termination, or that it would

16  have taken the same adverse action in the absence of any protected activity.   See
     id. at 996; Loggins v. Kaiser Permanente Int'l, 151 Cal. App. 4th 1102, 1109
17  (2007).   Further, Huynh made no showing of pretext.   See Tides v. The Boeing

18  Co., 644 F.3d 809, 816-17 (9th Cir. 2011).

19  _____
[60] Are all cases randomly assigned? Nearly all cases are randomly assigned. However, a case
20  heard by the Court on a prior appeal may be set before the same panel upon a later appeal, and
    capital cases will be set before the same panel upon a later appeal. Ninth Cir. R. 22-2(c). SE-
21  LECTION OF PANELS The Clerk sets the time and place of the calendars. The Clerk uses a
    matrix composed of all active judges and those senior judges who have indicated their availa-
22  bility. The aim is to enable each active judge to sit with every other active and senior judge
    approximately the same number of times and to assign active judges an equal number of times
23  to each of the locations at which the Court holds hearings. **At present, all panels are com-
    posed of no fewer than two members of the Court, at least one of whom is an active
24  judge.** Every year, each active judge, except the Chief Judge, is expected to sit on 32 days of
    oral argument calendars; one oral screening panel; one motions panel; and one Certificate of
25  Appealability panel. Senior judges are given a choice as to how many cases they want to hear.
    *Source: The appellate Lawyer Representatives' Guide To Practice in the United States Court of Ap-
26  peals for the Ninth Circuit. Nov 2019 ed.*

27

28
                     **COMPLAINT – DEMAND FOR JURY TRIAL**

**The Merit Panel Erred in Applying the McDonnel Douglass Framework to Assess and Deny Huynh's SOX Claim.**

342.    In Mid-August, 2009, Circuit Judge, BYBEE, of the United States Court of Appeals for the Ninth Circuit wrote in Van Asdale v. Intern. Game Techn 577 F.3d 989 (9th Cir. 2009): "This case presents our first opportunity to examine <u>the substantive requirements necessary to establish a claim under the whistleblower-protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A</u>".

"Section 1514A(b)(2) further specifies that § 1514A claims are governed by the procedures applicable to whistle-blower claims brought under 49 U.S.C. § 42121(b). Section 42121(b)(2)(B), in turn, sets forth a burden-shifting procedure[61] by which a plaintiff is first required to make out a prima facie case of retaliatory discrimination; if the plaintiff meets this burden, the employer assumes the burden of **demonstrating by clear and convincing evidence** that it would have taken the same adverse employment action in the absence of the plaintiffs protected activity."

343.    Therefore, the Ninth Circuit established in late 2009 that the proper legal framework to evaluate a SOX claim within its jurisdiction is the framework used by other federal-whistleblower statutes brought under 49 U.S.C. § 42121(b). Section 42121(b)(2)(B).

344.    In a recent Ninth Circuit Court of Appeals' ruling in Lawson v. PPG (Case No.19-55802), the merit panel in that case (comprised of Senior Circuit Judge N.R.

---

[61] Burden-Shifting Analysis: Because we conclude that the Van Asdales have made out a prima facie showing of retaliatory termination in violation of § 1514A, IGT cannot obtain summary judgment unless it shows by clear and convincing evidence that it would have terminated the Van Asdales even absent any protected activity. 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121(b)(2)(B). On appeal, IGT does not argue that it can satisfy this requirement. We thus hold that the district court erred in granting IGT summary judgment on the Van Asdales' Sarbanes-Oxley claim.

**COMPLAINT – DEMAND FOR JURY TRIAL**

SMITH[62], Senior Circuit Judge Kermit V. Lipez, and Circuit Judge Rawlinson), discussed three material differences between the legal framework used to evaluate claims under various Federal Whistleblower Statutes (including SOX) and the McDonnel Douglas' framework often used to evaluate employment discrimination and retaliation under title VII claims and California FEHA claims.  The panel then went on to propose to the California Supreme Court to adopt the burden-of-persuasion-shifting evidentiary standard (used in other Federal Whistle-blower statutes) as the unified legal framework to evaluate California Labor Code 1102.5 to ensure that it aligns with Labor Code 1102.6.

345.    First, under McDonnell Douglas, the burden of persuasion never truly shifts from the plaintiff. See Burdine, 450 U.S. at 253 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). The defendant's only burden (at step two of the analysis) is that of production; it must **merely "produce evidence** that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." However, under the SOX framework, **the burden of persuasion shifts from the plaintiff to the defendant** (at step 2 of the analysis) "to demonstrate by **clear and convincing evidence** that the alleged action **would have**[63] occurred for legitimate, independent reasons even if the employee had not engaged in protected activities. The plaintiff's **only burden** (at step two of the analysis) **is that of production**; it must merely "produce evidence that the defendants failed to prove by clear and convincing standard (i.e., producing just enough evidence to pull down the probability that the Defendant's factual assertions were true slightly below 70%.

---

[62] Senior Circuit Judge N.R. SMITH sat on both the Lawson case and Huynh's case.
[63] The "Would Have" standard is a higher burden of proof than the "Could Have" Standard used in most employment discrimination and retaliation claims.  See Huynh's Reply Brief for details – COA Dkt. 33 at 15-16.

**COMPLAINT – DEMAND FOR JURY TRIAL**

346.    A second difference between the two standards is under SOX the Defendants must to prove "clear and convincing evidence"[64] **is much heavier than the burden of production required under McDonnell Douglas**. The clear and convincing evidence standard "requires 'an abiding conviction that the truth of the factual contentions' at issue is 'highly probable.'" Mondaca-Vega v. Lynch, 808 F.3d 413, 422 (9th Cir. 2015) (en banc) (alteration adopted) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)). This is a far cry from the **burden of production required by McDonnell Douglas**, where the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257.

347.    Finally, and aside from the plain differences between these frameworks, subjecting defendants in cases involving SOX retaliation claims to the lower McDonnell Douglas standard **does some damage to workers' rights**. As we have observed in another context, "standards of proof serve a symbolic function." Mondaca-Vega, 808 F.3d at 422. Thus, subjecting a SOX retaliation claim Defendant to McDonnell Douglas's lesser evidentiary standard would subvert congress's intent in drafting the SOX statute. See Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 157–58 (3d Cir. 2013) (contrasting the two standards and finding that the clear and convincing evidence standard "is much more protective of plaintiff–employees than the McDonnell Douglas framework").

348.    In summary, the Ninth Circuit's Merit Panel in TRI MINH HUYNH, Plaintiff-Appellant, v. WAL-MART ASSOCIATES, INC. (Case: No. 20-15211) erred when it applied the McDonnel Douglas framework to assess Huynh's SOX claim against Walmart for two reasons.

---

[64] In Speegle v. Stone & Webster Construction, Inc. (ARB CASE NO. 13-074) the ARB also stated "In addition to the high burden of proof, the express language of the statute requires that the "clear and convincing" evidence prove what the employer **"would have done" not simply what it "could have done"**. COA Dkt. 33 at 17 (Huynh's opening brief filed with the Ninth Circuit Court of Appeals on Oct 8, 2020.

205

349.    First, Ninth Circuit's precedent set in late 2009 clearly established that the proper legal framework to evaluate a SOX claim is the burden-of-persuasion-shifting evidentiary standard not the burden of persuasion standard (McDonnel Douglass).

350.    Second, since Senior Circuit Judge N.R. SMITH sat on both WALLEN LAWSON, Plaintiff-Appellant, v. PPG ARCHITECTURAL FINISHES, INC., Defendant-Appellee (No. 19-55802) and TRI MINH HUYNH, Plaintiff-Appellant, v. WAL-MART ASSOCIATES, INC. (Case: No. 20-15211), Senior Circuit Judge N.R. Smith knew or should have known that McDonnel Douglas is not the proper legal framework to evaluate Huynh's SOX claim because in Lawson, Sr. Circuit Judge SMITH even proposed that the California Supreme Court adopt the burden-of-persuasion-shifting evidentiary standard (Employee's friendly) as the proper framework to evaluate California Labor Code 1102.5 claim.

### The RICO Defendants' Factual and Legal Misrepresentations

351.    Huynh wrote in his reply brief "In summary, Huynh was disappointed at Walmart and their legal counsels for making misleading statements of facts and of laws to suppress the very Motto of our judiciary "Equal Justice Under Law", inscribed on the facade of the Supreme Court Building." COA Dkt. 33 at 4.  In the reply brief, Huynh provided specific analyses and supporting evidence which proved that the RICO Defendants made misleading statements of facts and of laws in their answering brief to corruptly influence the merit panel to deny Huynh's appeal.

352.    For example, despite the fact that District Judge Vince Chhabria granted Huynh's request to drop all five of deRubertis' frivolous and nefarious ADHD FEHA

**COMPLAINT – DEMAND FOR JURY TRIAL**

claims in early July 2019 (DC Dkt. 84), the Rescued Squad still cited FEHA discrimina-

tion and retaliation case laws in their answering brief to obstruct the undue administration

of justice. To coverup the misrepresentations of the laws, the Rescue Squad purportedly

asserted in that the McDonnel Douglas framework is more employee's friendly than the

SOX legal framework.

"Some courts have suggested that "the [plaintiff's] SOX burden may be more difficult to meet" than that of the McDonnell Douglas test. Day v. Staples, Inc., 555 F.3d 42, 53 n.6 (1st Cir. 2009). Nevertheless, because of the substantial overlap and because both standards are implicated here, Walmart cites cases from under both the SOX framework and the McDonnell Douglas framework." COA Dkt. 23 at 34.

- First of all, the Rescue Squad knew or should have known that it was misleading to assert that the McDonnel Douglas framework was more Plaintiff's friendly that the SOX framework.

  353.    Additionally, the GDC Squad also misleadingly cited employment retalia-

tion and discrimination case laws and SOX case laws but taking them out of context to

support Walmart's answering brief.

### Misstating the Laws and the Facts[65]

"[D]ifferent justifications for an adverse employment action will not defeat summary judgment if those reasons are 'not incompatible.'" Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1077 (9th Cir. 2003). Only where an employer "offer[s] two distinct and arguably inconsistent reasons for an employee's discharge" will a court probe further. Ritter v. Hughes Aircraft Co., 58 F.3d 454, 459 (9th Cir. 1995). COA Dkt. 23 at 42.

### A SOX's Complainant's Motive Is Irrelevant[66]

### Cited Employment Discrimination and Retaliation Cases

Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (plaintiff must have

---

[65] A SOX Plaintiff doesn't have to prove pretext.

[66] The GDC Squad and Walmart misrepresented the laws to support bad motive defense i.e., Huynh was a fake whistleblower because he blew the whistle for personal gain. However as discussed above a Whistleblower's motive is irrelevant in assessing his reasonable belief in blowing the whistle.

207

**COMPLAINT -- DEMAND FOR JURY TRIAL**

acted under a "good faith, reasonable belief that a violation existed"). COA Dkt. 23

**Cited SOX Case Laws but Misrepresenting their Context (See COA Dkt. 33 at 8-14)**

Beacom v. Oracle Am., Inc., No. 13-CV-985, 2015 WL 2339558, at *2, *5 (D. Minn. Mar. 11, 2015). Nor is there protected activity when an employee's course of conduct makes clear that the employee made a strategic decision to engage in whistleblowing only after realizing her job was in danger.

Kantin v. Metro. Life Ins. Co., 696 F. App'x 527, 528 (2d Cir. 2017) (affirming summary judgment where "[t]he commission payment and pricing irregularities to which [the plaintiff] advert[ed] simply do not sound in fraud and are wholly unrelated to any of the provisions enumerated in § 1514A")

Ewald v. Royal Norwegian Embassy, 2 F. Supp. 3d 1101, 1123 (D. Minn. 2014) (under Minnesota law, no protected activity where the report was "a vehicle, identified after the fact, to support a belated whistle-blowing claim" (quotation marks omitted)); Wolcott v. Champion Int'l Corp., 691 F. Supp. 1052, 1059 (W.D. Mich. 1987) ("The [Michigan] Whistleblower Act was not intended to serve as a tool for extortion.").

354.     In summary, Huynh believes the merit panel relied on the RICO Defendants' factual and legal misrepresentations and District Judge Vince Chhabria suppression of material fact in his ruling in Walmart's favor (DC Dkt. 167 and 168) to deny Huynh's appeal against Walmart for the following reasons.

355.     First, the panel took Walmart's factual assertions as the truth while excluding the material facts Huynh cited which were filed with the court below when the merit panel wrote "Wal-Mart amply met its burden of producing evidence that there was a legitimate, nonretaliatory reason for Huynh's termination, **or** that it would have taken the same adverse action in the absence of any protected activity.

- should the merit panel use the word "**and**" instead of "**or**" because the panel denied both Huynh's SOX claim and California Labor Code 1102.5 claim?

356.     Second, the merit panel cited FEHA case law even though Huynh already dropped all of the FEHA ADHD claims in the court below. DC Dkt. 84.  Although, the panel cited a SOX case but it was used in the wrong context.  Lastly, the panel didn't not

208

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   cite any California Labor 1102.5 case law to dismiss Huynh's 1102.5 claim.

2
3   Wal-Mart amply met its burden of producing evidence that there was a legitimate,
    nonretaliatory reason for Huynh's termination, **or** that it would have taken the same
4   adverse action in the absence of any protected activity. See id. at 996; Loggins v. Kai-
    ser Permanente Int'l, 151 Cal. App. 4th 1102, 1109.
5
6   • Loggins v. Kaiser Permanente Int'l is a retaliatory employment termination case
      concerning violations of California Government Code section 12940, subdivision
7     (h). It had no relevance to Huynh's Appeal as all the five shotgun pleaded ADHD
      FEHA claims were dismissed by the court below.
8
9   • Even though, Senior Circuit Judge, N. Randy Smith, cited Huynh v. Wal-Mart
      Assocs., Inc., No. 18-cv-01631-VC, 2020 WL 218522, at *1 (N.D. Cal. Jan, 14,
10    2020) in WALLEN LAWSON v. PPG ARCHITECTURAL FINISHES, INC
      (Case No. 19-55802) at 16, the panel didn't any California Labor Code 1102.5
11    and 1102.6 case laws related to Huynh's CWB claim.[67]
12
13  Further, Huynh made **no showing of pretext**. See Tides v. The Boeing Co., 644 F.3d
    809, 816-17 (9th Cir. 2011). Although, Tides v. The Boeing Co was a SOX case it
14  was inapposite at two levels.

15  • First, this case addressed the issue of whether disclosure made to the media[68] is
      protected under SOX. It had nothing to do with the "Pretext".
16
17    o This was the very same case that the RICO Defendants would have cited if
        Huynh had answered Lahlein's leading questions to get District Judge Vince
18      Chhabria to throw Huynh out of court.

19  ───────────────────
    [67] PPG argues that Lawson's "reliance on section 1102.6 is overstated," because this new
20  standard only applies to "mixed-motive" claims. Cf. Huynh v. Wal-Mart Assocs., Inc., No.
    18-cv-01631-VC, 2020 WL 218522, at *1 (N.D. Cal. Jan. 14, 2020) (unpublished) (citing Ju-
21  dicial Council Of California Civil Jury Instruction 4604 in support of the assertion that section
    1102.6 is to be applied "only in 'mixed-motive' cases"); Zelaya v. RMI Int'l, Inc., No.
22  B251191, 2016 WL 1169405, at *12 (Cal. Ct. App. March 24, 2016) (unpublished) (indicat-
    ing that the section 1102.6 standard only applies if there is a "mixed motive" instruction).
23  However, the plain language of the provision imposes no such limitation. Nor does the stat-
    ute's context indicate such a limitation. Rather, section 1102.6 would appear to apply to any
24  and every whistleblower claim brought under section 1102.5.
    [68] SILVERMAN, Circuit Judge: wrote his ruling in Mid-May 2011. "We hold today that by
25  its express terms, the whistleblower provision of the Sarbanes-Oxley Act, 18 U.S.C. §
    1514A(a)(1), protects employees of publicly-traded companies who disclose certain types of
26  information only to the three categories of recipients *811 specifically enumerated in the Act
27  — federal regulatory and law enforcement agencies, Congress, and employee supervisors.
    Leaks to the media are not protected
28
    209

- Second, as discussed above under SOX, the burden of persuasion shifted to Walmart to prove by clear and convincing evidence that it would have terminated Huynh's employment even in the absence of Huynh's protected conducts. Therefore, Huynh didn't have to prove pretext.[69] See COA Dkt. 33 at X.

### Prong # 4: Catch and Kill

357.    The RICO Defendants made sure that after they got the get out of jail free card from the SEC and the get out of civil penalty free card from District Judge Vince Chhabria all of the documents that Huynh retained after leaving Walmart would be caught and killed. This eviscerated any future civil and/or criminal liabilities for the RICO Defendants. To achieve this, the RICO Defendants planned and executed prong #5 ("Catch and Kill") of the illegal coverup scheme as early as Nov 16, 2017.

358.    In Mid-Nov 2017, deRubertis told Huynh that OSHA gave Huynh the right to sue Walmart in Federal Court. deRubertis then paid for Huynh's flight and lodging expenses to meet deRubertis in his office under the pretext that he needed Huynh to give him the case facts so he could draft and file Huynh's complaint in Federal Court by Mid-Dec 2017.

359.    During the meeting, in addition to making Huynh signed a blank non-HIPPA compliance medical record authorization form and provided evidence that McMillon made misleading statements to shareholders about the total # of Marketplace SKUs (Beal's Oct 2, 2016 email), deRubertis also asked Huynh to make a copy of his 100+ Gigabit personal laptop hard drive on the spot as Huynh about to leave to catch his flight back to Seattle. Thus, Huynh was only able to copy about a quarter of the hard drive. deRubertis told Huynh to copy the hard drive and FedEx it to him the very next day.

---

[69] Additionally, unlike McDonnell Douglas, the plaintiff has no burden to show pretext under section 1102.6; once he has made his initial showing, the burden of persuasion stays with the defendant. Id See LAWSON v. PPG ARCHITECTURAL FINISHES, INC (Case No. 19-55802) at 16. https://cdn.ca9.uscourts.gov/datastore/opinions/2020/12/07/19-55802.pdf

**COMPLAINT – DEMAND FOR JURY TRIAL**

**One USB Stick was copied at D deRubertis Office on 11/16 and One was FedEx to him on 11/17**

| From: | triwyn@gmail.com |
| Sent: | Friday, November 17, 2017 1:26 PM |
| To: | 'Sari Weiser'; 'David deRubertis' |
| Subject: | just mailed out the memory stick |
| Attachments: | Fed Ex receipt.pdf |

Sari/David,

I just dropped off the memory stick at Fed Ex. See attached receipt.

June 29, 2018

*VIA PERSONAL DELIVERY (DDS)*
Epiq
ATTN: Forensics Lab
350 South Figueroa St, Suite 750
Los Angeles, CA 90071

    Re:   *Tri Huyhn v. Wal-Mart, Inc., et al.*

Dear Kathy:

Enclosed are two thumb drives regarding the above referenced matter.



| DATE | DESCRIPTION | AMOUNT | CHECK # |
|---|---|---|---|
| 07/31/18 | Epiq eDiscovery Solutions Inv. 1087509 | $ 24,228.51 | 7000 |
| 09/08/18 | Epiq eDiscovery Solutions Inv. 90262145 | $ 2,466.85 | 708.3 |
| 10/08/18 | Epiq eDiscovery Solutions Inv. 90271326 (SEPT 2018 HOURS) | $ 8,112.41 | 7147 |
| 10/31/18 | Epiq eDiscovery Solutions (DATA HOSTING CHARGES FOR OCT & USER FEES ) | $ 2,259.15 | NA |
| 11/31/18 | Epiq eDiscovery Solutions (DATA HOSTING CHARGES FOR NOV & USER FEES ) | $ 2,259.15 | NA |
| 11/31/18 | Epiq eDiscovery Solutions Total Billing from July to November 2018 | $ 39,326.07 | NA |

360.    After deRubertis filed Huynh's lawsuit on Mar 15, 2018, deRubertis left

Huynh in the dark without keeping Huynh up to date on the case developments for months on

end. See DC Dkt. 142-20 and 21. Most of the time when Huynh emailed deRubertis for a sta-

tus update he either not responding, responded with lies and evasiveness, or he asked his wife,

Kari deRubertis, to respond on his behalf.

**From:** trivyn@gmail.com
**Sent:** Tuesday, May 15, 2018 10:49 AM
**To:** 'David deRubertis'
**Cc:** 'Kari deRubertis'; 'Tri Huynh'
**Subject:** Help: Stressed Out

**Importance:** High

Hi David,

It has been 2 months since we filed the complaint.

After my name appeared almost everywhere on the Internet, I have been stressed out and unable to sleep well every night (tossing and turning thinking about the future).

It would be great if you and I can have a quick sync up call later this week for me to get the latest info on the case.

---

**From:** Tri Huynh <trimhuynh@outlook.com>
**Sent:** Tuesday, June 26, 2018 11:36 AM
**To:** David deRubertis; Garen@deRubertisLaw.com
**Cc:** Kari deRubertis; trimhuynh@outlook.com
**Subject:** First Cut/Preliminary List for RIF Further Analysis
**Attachments:** Selection for RIF First Pass is Not Clear and Convincing Evidence.pdf; 10312061519 Henrik V ITT Valve Engineering Judge Memo to Summary Judgement.pdf

**Importance:** High

Hi David,

Hope all is well. Please review my analysis below and let me know if you have any questions.

Please do a quick reply and let me know that you have received this email so that I know that you got my analysis and questions for my case below.

Let us talk via phone to discuss the case status after your CMC meeting with the Judge next Tuesday, July 3.

---

**From:** Kari deRubertis <kari@deRubertislaw.com>
**Sent:** Tuesday, May 15, 2018 11:00 AM
**To:** trivyn@gmail.com; David deRubertis
**Cc:** Tri Huynh; kari@deRubertislaw.com
**Subject:** Huynh RE: Help: Stressed Out

Hi Tri,

I'm so sorry to hear you're not feeling well. I get it. The process in Federal Court usually starts off pretty slow. And your case was transferred to a different judge recently so that pushed things out a little more as well. The good news is David really likes our new Judge!

Currently, we are in the process of setting an Initial Case Mgt hearing which will happen sometime next month I believe. I can't guarantee a call with David this week BUT I promise to have him reach out to you as soon as he can.

---

**From:** Tri Huynh <trimhuynh@outlook.com>
**Sent:** Thursday, July 12, 2018 4:19 PM
**To:** Kari deRubertis; David deRubertis
**Cc:** Tri Huynh
**Subject:** Our Interaction protocol

Hi David/Kari,

Thanks for the reply.

I removed Garen from the email thread so we can have an honest conversation.

Please don't take what I said below in the wrong way as I believe we have been working well together.

You and I know that this is a high value case so let find ways to work together that make both of us happy.

I have not been through a complete cycle of a civil legal proceeding so I have three questions below:

1. What is the protocol for attorney and client interaction? I.e. the frequency for periodic check in on a case (monthly? Or other?) so the attorney can keep the client on up to date the case
   o My honest feeling at this point is that I felt like I am not being treated as an equal partner (I am unable to get a 10 minutes touch base call after two months)
2. What are the key decisions during the proceeding in which I need to be involved?
3. What data which you get from the Walmart that I can have access to?

361.     In Mid-May 2018, Huynh and McKessy submitted new original analyses backed up by supporting documentary evidence to the SEC to prove that Walmart's executives pressured their employees to stuff Walmart Marketplace with low quality and/or value products to inflate the total number of SKUs on Walmart's Marketplace even though these SKUs generate very low sale volume.  Additionally, Huynh discovered that the total number of Marketplace SKUs Walmart's senior executives reported to shareholders during Walmart's

212

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Q2 FY17 earning calls were 4.1 Mil SKUs higher than the internally reported number (Beal's

2   7/30/16 email to McMillon).  Subsequently, the SEC opened a formal investigative file named

3   "Walmart Ecommerce FW-04193".

4   

**SEC investigation rattled the RICO Defendants – They want to get the Hard Fast...**

362.    Then in early July 2018, the SEC asked Huynh to provide them names of additional witness they could interviewed as a part of the Walmart's investigation.  A short time later, the RICO Defendants asked a Walmart's employee to message Huynh via LinkedIn to trap Huynh into saying that deRubertis went to the press before filing Huynh's complaint to get Huynh's case throw out of Court and forced Huynh to return the documents he retained from Walmart.  Additionally, Marc Lore (a Billionaire and high-powered executive) viewed

213
**COMPLAINT – DEMAND FOR JURY TRIAL**

1    Huynh's profile on LinkedIn for no apparent reasons.  This proved that the RICO Defendants

2    were rattled and worried by the SEC investigation. See COA Dkt. 5-4 at 65-74.

3           363.    Shortly after the above events, David and Kari deRubertis sprung into action to

4    prepare the "Catch" part of prong #5 by asking Huynh to produce any and all documents (in-

5    cluded those that Sean McKessy provided to the SEC) which proved that Walmart committed

6    fraud against shareholders under the pretext that if Huynh didn't produce such documents.

7    David and Kari deRubertis paid Epiq $40,000 to process Huynh's hard drive and these docu-

8    ments in order to turn them over to Walmart as part of the GO 71 initial disclosures.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

364.    Additionally, the RICO Defendants worried that Huynh may have excluded material evidence from the USB drive that Huynh FedEx to the deRubertis Law Firm in Mid-Nov 2017, so they forced Huynh to reproduce any evidence that could implicate Walmart for shareholder directly from Huynh's laptop in native format.

Sent from my iPhone

On Jul 25, 2018, at 4:50 PM, Tri Huynh <trimhuynh@outlook.com> wrote:

Kari/David,

I have spent 7 hours straight hours and I cannot even half way through to find the files for the Master PDF (1774 pages) that I downloaded yesterday.

I wish you have asked me to do this 2 or 3 weeks ago. I am going to try my best and let you know tomorrow how I am doing.

From: David deRubertis <david@derubertislaw.com>
Sent: Wednesday, July 25, 2018 4:56 PM
To: Tri Huynh <trimhuynh@outlook.com>
Cc: Kari deRubertis <kari@derubertislaw.com>, Garen Nadv <garen@derubertislaw.com>
Subject: Re: Huynh to-do list

Sorry Tri and you are correct. This is my fault. I didn't realize the process of this ESI vendor we are using. Won't happen again and totally my fault.

**Epiq Global already process Huynh's original personal Laptop Hard Drive which duplicated all Walmart's files**

From:
Sent:           Wednesday, July 25, 2018 6:03 PM
To:             David deRubertis, Tri Huynh
Cc:             Garen Nadr
Subject:        RE: Huynh to-do list

**Both David and Kari deRubertis lied and said that this is there learning experience**

I apologize you Mr. - this is a learning process for you as well and it won't happen again!

From:
Sent:           Friday, July 27, 2018 4:57 PM
To:             David deRubertis
Cc:             Kari deRubertis, Garen Nadr
Subject:        Christmas in July

David,

The last three days had been exhausting but it was definitely worth it.

I have prepared a Christmas present for you in July ☺. I just FedEx the 2nd flash drive and it will get there by Monday morning.

On the outlook file named email prep, look under the folder Material Misstatement and sub folders SKU inflation and Catalog Stuffing.

1. 10 Million items stuffing order by Mr. Breene
2. The CEO was on the July 30th email and the CEO & CFO plus all the big dogs from ecommerce were on the August 16th email
3. Shakir emailed Seth Beal and Seth Beal's direct report regarding the Q2 Conference call on 8/18/16 which highlighted the 15 Million items Marketplace Assortment and the contribution to faster GMV growth. I'll believe this was the reason why I both Michael Tremblay and Shakir were all shook up and so zealike they had seen a ghost when I read the BD MBR presentation on 12/15/2016 with the picture of Dough and the 15 Million SKUs highlighted in Red)
4. There was a Material Mismatch between 2 and 3 above and stuffing of low value/low quality items into the catalog from #1 above

I originally thought about not using the information 1 to 4 above for our civil case as it might conflict with the work that Sean and Rebecca did.

From: Tri Huynh <trimhuynh@outlook.com>
Sent: Monday, July 30, 2018 11:15 AM
To: David deRubertis <david@derubertislaw.com>, Kari deRubertis <kari@derubertislaw.com>
Cc: Garen Nadr <garen@derubertislaw.com>, Tri Huynh <trimhuynh@outlook.com>
Subject: Urgent Please Read and Reply RE: Christmas in July
Importance: High

David/Kari,

I thought about this over the weekend. I believe Walmart had been reaching out to me through HR and some Walmart sellers to find out if I talked to the SEC (see attached PDF).

I do not want them to know this so please do not share Shakir's email dated 8/18/2016 with them. You can share with them Seth's July 30 the email and Steve Breene's 8/26/16 email.

Please reply to me so I know you get this message. It is very important.

From:              David deRubertis <david@derubertislaw.com>
Sent:              Monday, July 30, 2018 11:18 AM
To:                Tri Huynh, Kari deRubertis
Cc:                Garen Nadr
Subject:           RE: Urgent Please Read and Reply RE: Christmas in July

**David deRubertis' MO – When he didn't want to leave paper trail he will call or want to talk in person**

Calling you now.

From:              Tri Huynh
Sent:              Thursday, September 6, 2018 7:58 PM
To:                David M. deRubertis
Cc:                'Kari deRubertis', Garen Nadr, 'Tri Huynh'
Subject:           Connecting the dots - Rotten to the Core
Attachments:       event-transcript 23rd annual meeting Oct 6 2016.pdf; Fwd: MP update

**David deRubertis wanted Huynh to produce everything as part of GO 71 initial disclosure (including Document Submitted to the SEC**

Hi David,

You made a good suggestion yesterday that I should upload Walmart's public disclosures for the last few years that we want to use as evidences to litigate this case. So Walmart couldn't connect the dots with the internal data we will submit to them, I had uploaded both Walmart's public disclosures and all the investment analyst reports to the secure server based on Kari's instruction.

See the analysis and supporting evidences below:

• On the October 2nd, 2016 Marketplace Progress Update email, Seth Beal told Dough McMillon, Marc Lore and other senior leaders that Walmart Marketplace had 16.5 Million SKUs and the total assortment is 19.7 Million including 1P (Walmart own products).
   ◦ Marketplace had 16.5 Million SKUs and 1P had 3.2 Million SKUs (19.7 Million SKUs – 16.5 Million SKUs)
• Four days later, Dough McMillon misled investment analysts at Walmart's 23rd annual meeting with the investment community on 10/6/16 that Walmart Marketplace had 20 Million SKUs. Walmart inflated the total number of Marketplace SKUs by 3.5 Millions
   ◦ Walmart came to this inflated Marketplace assortment number by falsely classified the 3.2 Million 1P SKUs as Marketplace SKUs which totalled to to 19.7 Million SKUs then rounded up the number to 20 Million SKUs
• There were two pieces of direct evidences that supported the above conclusion
   1. The internal email that Seth Beal sent on Oct 2, 2016 (see the attached email from Seth Beal)
   2. The transcript of Walmart's 23rd Annual Meeting with the Investment Community on Oct 6, 2016 (see the bottom of page 3 of the attached transcript)

215
**COMPLAINT – DEMAND FOR JURY TRIAL**

365.    On July 30, 2018, Huynh told deRubertis he was concerned about producing documents that Huynh submitted to the SEC in Mid-May 2018 which proved that McMillon had made misleading statements to shareholders during Walmart's Q2 FY17 earnings call as well as during Walmart's 23rd Annual Meeting with the investment community.  deRubertis ordered Huynh to produce this evidence to Walmart per GO 71 and told Huynh he was re-quired to do so by laws.

366.    In early Sept 2018, David deRubertis drafted a very restrictive asset return agreement before the GO 71 production to effectuate the "KILL" part of prong #5. See DC Dkt. 95-3.  As discussed above, deRubertis planned and executed the "CATCH" part of the scheme by forcing Huynh to provide a copy of his drive to deRubertis in Nov 2017.  Then starting in early July, 2018, deRubertis spent $40,000 to process Huynh's entire hard drive (DC Dkt. 142-8 and 142-9) as well as any other native files that Huynh gathered in July 2018 and provided to Epiq directly from Huynh's laptop.  deRubertis planned to return all of this document by end of Sept 2018.

367.    To execute the **"KILL"** part of prong #5, deRubertis drafted a very restrictive asset return agreement (See DC Dkt. 142-16) which forced Huynh to classify all material evi-dence that Huynh already produced to deRubertis and the SEC as well as any other documents Huynh kept from Walmart as "Confidential" under the term of the protective order (DC Dkt. 38).  Huynh objected to the David deRubertis' proposal via emailed.

368.    Instead of responding to Huynh's email David deRubertis wanted to discuss in the next day during Huynh in person meeting with him. As previous discussed deRubertis' mode operandi have aways been that when deRubertis didn't want to leave any paper trails that could implicate him for obstruction of justice, he either call or talk in person.  The fol-lowed day David deRubertis screamed at Huynh for objecting to the proposed agreement and

**COMPLAINT – DEMAND FOR JURY TRIAL**

told Huynh that legal strategy was his not Huynh's.  deRubertis also threatened to drop Huynh

as a client if Huynh continued to oppose deRubertis' proposal.



369.    As previous discussed, deRubertis' MO when it came to leaking Huynh's SEC

submissions to the Rescue Squad and the Walmart Participants has always been to purport-

edly asked Sean McKessy leading questions unrelated to Huynh's civil case to get McKessy

to provide the answer that deRubertis wanted so the RICO Defendants could use it later on to

assert the "I am incompetent" not a "crook" defense.  So, in Mid-September, deRubertis pur-

portedly asked Sean McKessy to review and give feedback on deRubertis' restrictive asset re-

turn agreement.  In his draft letter to the Rescue Squad, deRubertis also hinted that Huynh has

217

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  been communicating with the SEC.  This time around McKessy saw right through deRubertis'

2  bad intent and chastised him for even inserting such languages in the letter in the first place.

3

4  From: David deRubertis <david@derubertislaw.com>
   Sent: Tuesday, September 11, 2018 11:01 AM

5  To: Sean X. McKessy <smckessy@phillipsandcohen.com>; Tri Huynh

6  <trimhuynh@outlook.com>; Rebecca Chang <rchang@phillipsandcohen.com>

7  Cc: Kari deRubertis <kari@derubertislaw.com>
   Subject: Huynh: INPUT NEEDED re: Walmart demand for return of company materials

8  Importance: High

9  Hi Tri, Sean & Rebecca – As I've been discussing with Tri, in our

10 individual SOX retaliation case, Walmart is trying to demand that Tri

11 return company materials he retained post-termination.  We've gone

12 back and forth a bit, and the meet and confer is now getting more

13 substantive to the point of either reaching an agreement or probably a

14 motion will be filed.  I wanted to get your input/approval of sending a

15 letter along the following lines to Walmart's counsel.  I am not

16 married to approaching it in the way I'm suggesting below, but

17 believe this approach would be best for Tri in our SOX

18 case.  However, I wanted to see how you feel about it and whether

19 you have concerns in terms of the SEC proceeding – first, as to the

20 proposal of potentially returning some stuff and, second, the way I

21 phrase the issues below in terms of whether or not Tri has made

22 disclosures.  I'm trying to avoid directly answering the question, b[..]

23 also believe based on the last week or so *Ehart* decision ultimately

24 we'll be required to answer this in our SOX case (please let me know

25 if you disagree).  Obviously, want to work through this in a way that

26 works at both ends.  Can you give this a read over?  A lot of it is law

27 you I'm sure know about, but the proposal I make I've highlighted in

28 red font below as well as the areas where I discuss Tri and the

   SEC.  Anyway, appreciate your thoughts.  I'll be out of commission

---

From: Sean X. McKessy <smckessy@phillipsandcohen.com>
Sent: Tuesday, September 11, 2018 5:17 PM
To: Tri Huynh <trimhuynh@outlook.com>
Cc: David deRubertis <david@derubertislaw.com>; Rebecca Chang <rchang@phillipsandcohen.com>; Kari deRubertis <kari@derubertislaw.com>
Subject: Re: Huynh: INPUT NEEDED re: Walmart demand for return of company materials

Hi David –    **David deRubertis wanted to legitimately leak to Walmart that Huynh talked to the SEC so Walmart could subpoena Huynh for the information.**

I am OK w general approach but SEC WB is not a qui tam. So I wouldn't refer to it as such. I'd keep the argument simple – Tri retained those documents to protect his own rights against retaliation as well as potentially pretext shareholders via a WB submission to appropriate regulators. The law recognizes his right to do that and attempts to prevent him from doing so are void as against public policy.

I would not even reference the idea that he may or may not have submitted to SEC – just focus on facts that he is entitled to retain documents to protect himself and shareholders.

On Sep 12, 2018, at 3:38 PM, David deRubertis <david@derubertislaw.com> wrote:

Hi Sean – Thanks again.  One other question: I realize that the SEC tip process was done anonymously, etc., but are you aware of any authority that permits Tri in his civil SOX case to refuse to disclose that he tipped to the SEC if asked directly?  I imagine that if we cannot get an agreement in place relating to the retained materials, we will have to represent to the Court to whom Tri has disclosed any of the purportedly confidential info in the retained documents/items.  I also suspect of course that the defense attorneys will question Tri about this in depo.  I'm aware of the *Erhart v. BofIHolding, Inc.* decisions which seemed to say that there is no basis for the tipster to protect the fact that he/she made the tip.  Are you aware of contrary authority or any basis for Tri to refuse to disclose this in the civil case?  Thanks!

From: Sean X. McKessy <smckessy@phillipsandcohen.com>
Sent: Wednesday, September 12, 2018 1:16 PM
To: David deRubertis <david@derubertislaw.com>
Cc: Tri Huynh <trimhuynh@outlook.com>; Rebecca Chang <rchang@phillipsandcohen.com>
Subject: Re: Huynh: INPUT NEEDED re: Walmart demand for return of company materials

That sounds right I'm not aware of contrary law or guidance.

218

**COMPLAINT – DEMAND FOR JURY TRIAL**

370.     Starting in mid Oct 2018, Huynh could no longer tolerate deRubertis' abuses, intimidations, threats, and unilateral decision making. So, Huynh fired the deRubertis Law Firm.  Even though deRubertis already paid Epiq Global $40,000 to process Huynh's personal laptop hard drive and planned to hand all of the documents back to the Rescue Squad and the Walmart Participants on a silver platter as part of GO 71, the scheme failed apart when Huynh fired deRubertis as his attorney. As a latch ditch effort to save their plan, the RICO Defend-ants concocted and executed the old "Damsel in Distress" scheme.  This scheme consisted of two components.

371.     First, the Rescue Squad attacked Huynh's constitution right to privacy by sub-poenaing Huynh's psychiatrist records and personnel files from all of Huynh's previous em-ployers dating back to 1996.  This was done to intimidate and drive fear into Huynh's heart (i.e., the leakage of Huynh's mental health condition as well as his personnel files to the pub-lic would ruin Huynh's personal, profession reputations and social standing) to extort Huynh to give up his personal laptop hard drive to Walmart (not through Epiq but through another ESI provider) and agree to Walmart's restrictive asset return agreement.

372.     Second, deRubertis would be the hero that would swoop in and save Huynh from the Evil Rescue Squad. So deRubertis wrote the following email.

From: David deRubertis <david@derubertislaw.com>
Sent: Thursday, October 18, 2018 1:48 PM
To: Tri Huynh <trimhuynh@outlook.com>
Cc: Kari deRubertis <kari@derubertislaw.com>; Maria Olmos <maria@derubertislaw.com>; Garen Nadir <garen@derubertislaw.com>
Subject: Huynh: status of things
Importance: High

Hi Tri – Here is the email stating current status of things and outstanding pressing items.  Please review it and let's figure out when we can talk.  The most immediate thing is needing your approval or input of the two meet and confer letters regarding the subpoenas.  The next most immediate thing is the proposal on standstill that they have made, which relates to the company assets issue.

First, Walmart has now served subpoenas on the following:

1. Array Networks: production date of November 8th
2. Amazon: production date of November 15th
3. Mu Sigma: production date of November 8th
4. Dr. Bolte: production date of November 1st
5. Motif, Inc.: production date of November 8th
6. Infosys: production date of November 9th
7. Booz Allen Hamilton: production date of November 8th

Please let us know if you'd like us to send you copies of the subpoenas.  They basically are asking for everything under the sun from the prior employers and all ADD/ADHD treatment records from Dr. Bolte.  The description of what they are seeking is embedded in the draft meet and confer letters below.

**deRubertis Will Save Huynh from the Big Bad Wolfe**…

A precondition of filing a motion to quash or limit the subpoenas, we must meet and confer with Walmart's attorneys. My typical practice is that I like to meet and confer after I have been able to review the documents to determine what is the best approach to meeting and conferring. **This is why I was trying to get your Amazon records. Anyway, realizing that will not occur, we have nonetheless drafted meet and confer letters on these points**.

Here is the proposed meet and confer letters – basically, **one for the prior employment records and another for the medical records**. It is important that we send these out immediately. Can you please either approve me doing so or let me know what you would like changed if there are changes? It is important that we get this to Walmart's lawyers because, if they don't agree to the standstill, we need to file the motions to quash before the first production dates (technically, this is a joint letter to our Judge rather than a motion at first). Anyway, here are the proposed draft letters. Please let me know as soon as possible if they are approved to send as is versus changes.

**Letter re: prior employment records**

Dear Ms. Brass:

Here, Defendants' subpoenas must be quashed because they require disclosure of materials – an employee's personnel records – that are protected by plaintiff's privacy rights pursuant to the California and United States Constitutions and there is no basis factually here for overcoming the privacy objection. See Britt v. Superior Court, 20 Cal.3d 844, 855-56 (1978); Griswold v. Connecticut, 381 U.S. 479, 484 (1965); Tylo v. Superior Court (1997) 55 Cal. App. 4th 1379; San Diego Trolley, Inc., v. Superior Court, 87 Cal. App.4th 1083, 1097 (2001) (" It is clear . . . personnel records and employment history are within the scope of the protection provided by the state and federal Constitutions"); Bickley v. Schneider Nat. Inc., Case No. 08−5806-JSW (JL), 2011 WL 1344195, at *2-3 (N.D. Cal. April 8, 2011) (collecting cases, and recognizing an employee's right to privacy in personnel records and employment information in quashing defendant's subpoenas of

220

**COMPLAINT – DEMAND FOR JURY TRIAL**

plaintiffs' employment records from former employers); Buchanan v. Homeservices Lending, LLC, No. 11-cv-0922 L (MDD), 2011 WL 6778472, at *2 (S.D. Cal. Dec. 22, 2011) (quashing defendants' subpoena to plaintiff's current employer seeking employment records of plaintiff and finding that "the ultimate issue in this case is the work actually performed for Defendants by Plaintiff").

**Letter re: med recs**

Dear Ms. Brass:

Mr. Huynh maintains a privacy interest, as well as a privilege, relating to his therapy and/or medical records. In Jaffee v. Redmond, 518 U.S. 1, 15 (1996), the Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." The privilege protects communications with licensed psychiatrists, psychologists, and social workers. Id. It also protects against compelled disclosure of notes made during the course of treatment. Id. at 18. "[R]ooted in the imperative need for confidence and trust" between the patient and the psychotherapist, the privilege is designed to avoid deterring people from seeking treatment for fear that they will suffer a disadvantage in later litigation. Id. at 11

The psychotherapist-patient and physician/patient privileges are not subject to a balancing test whereby a court may weigh the interests of justice. In re Sealed Case (Medical Records) 381 F.3d 1205, 1214 (D.C. Cir. 2004). Despite this strict protection afforded by the privilege, the psychotherapist-patient privilege and the physician/patient privilege may be waived. The Ninth Circuit has recognized that "when a plaintiff puts his emotional condition at issue during a trial, he waives privilege protecting his psychological records." Lahrichi v. Lumera Corp., 433 Fed. Appx. 519, 521 (9th Cir. 2011) (citing Maynard v. City of San Jose, 37 F.3d 1396, 1402 (9th Cir. 1994). Although it is clear a plaintiff may waive the privilege, the Ninth Circuit has provided little guidance on what constitutes placing one's emotional condition at issue. District courts have adopted different approaches to determine whether the patient has waived the privilege in the course of asserting certain claims or damages. Carrig v. Kellogg USA Inc., 2013 WL 392715, at *2 (W.D. Wash. Jan. 30, 2013) (collecting cases and describing alternative approaches); see also, Fitzgerald v. Cassil, 216 F.R.D. 632, 635 (N.D. Cal. 2003) (collecting cases) (no waiver of privacy when plaintiff did not allege "cause of action for intentional or negligent infliction of emotional distress" or "specific psychiatric injury or disorder or unusually severe emotional distress extraordinary in light of the allegations"); Doe v. City of Chula Vista, 196 F.R.D. 562, 564 (S.D. Cal.1999) (attorney waived psychotherapist patient privilege by bringing emotional damages claim).

**…However, Huynh Had to Give Something in Return**

**Fourth, we still need to resolve the return of company assets issue:**
Walmart has proposed instead the following:

All of the materials Mr. Huynh has retained from his Walmart laptop will be treated as confidential under the terms of the Protective Order that the Court entered on September 14, 2018.

221
**COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

3
The parties will jointly retain a third-party vendor **specializing in forensic analysis to make a forensic image of the portable hard drive(s)** onto which Mr. Huynh copied the contents of his Walmart laptop. The parties agree to evenly split the costs of performing this examination, which will be completed no later than Friday, October 5, 2018.[70]

4
The forensic services firm will provide a copy of the forensic image to Walmart.

5
Mr. Huynh will return to Walmart by no later than October 31, 2018, any materials that the parties agree are not relevant to his claims.

6

7

8
To the extent that the materials Mr. Huynh copied from his Walmart computer include materials to which Mr. Huynh did not have legitimate access during his employment and/or contain sensitive Walmart information that is not relevant to Mr. Huynh's claims in this litigation, Walmart reserves all rights with respect to such information.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
373.    Huynh had a phone conversation with deRubertis a few days later regarding deRubertis "Status of Things" email.  Huynh said no to the Rescue Squad proposal and told deRubertis to get lost because deRubertis' email didn't pass the smell test.  As discussed above, deRubertis attacked Huynh's ruthlessly and ferociously for not signing the release form to allow the deRubertis Law Firm to obtain Huynh's Amazon personnel file (See DC Dkt. 158-9) and deRubertis had been going after Huynh's psychiatrist and medical records as early as Nov 2017.  So, it was illogical for deRubertis to grow a conscience and offered to save Huynh from the Evil Rescue Squad.  deRubertis emailed also served as proof that RICO Defendants intentionally shotgun pleaded the five nefarious ADHD FEHA Claims to effectu-ate prong #2, #3, and #6 of the illegal coverup scheme because deRubertis himself admitted in his status of things email that it was wrong for the Rescue Squad to come after Huynh's psy-chiatrist records and personnel files.  Additionally, the email also proved that the RICO De-fendants planned and executed their "Catch and Kill" as early as Nov 2017.

24

25

26

27

28
---
[70] Why this when deRubertis already spent $40,000 to have Epiq process 110 Gigabit of data from Huynh's hard drive?  The answer was to coverup the fact that the RICO Defendants were acting in concert to effectuate their "Catch & Kill" Scheme.

222

**COMPLAINT – DEMAND FOR JURY TRIAL**

374.   As a matter of fact, The RICO Defendants created a paper trail in the public court docket to effectuate their "Catch & Kill" scheme by purportedly asked Judge Chhabria during the case management conference to issue a ruling that forced Huynh to turn over the content of his personal laptop.  This provided deRubertis with the coverage he need to legitimately turn over Huynh's hard drive to Walmart on a silver platter.

| Date Filed | # | Docket Text |
|---|---|---|
| 07/03/2018 | 34 | Minute Entry for proceedings held before Judge Vince Chhabria: Initial Case Management Conference held on 7/3/2018. Plaintiff is ordered to respond in writing to defendants by 7/5/2018 regarding their written request sent to plaintiff for return of property 4 weeks ago. Last day to amend pleadings due by 1/18/2019. Close of Fact Discovery due by 2/28/2019. Last day to hear Motion Hearing set for 4/25/2019 10:00 AM in San Francisco, Courtroom 04, 17th Floor before Judge Vince Chhabria. Final Pretrial Conference set for 10/28/2019 01:30 PM in San Francisco, Courtroom 04, 17th Floor. Jury Trial set for 11/12/2019 08:30 AM in San Francisco, Courtroom 04, 17th Floor before Judge Vince Chhabria. Total Time in Court: 7 minutes. Hearing not reported or recorded. Plaintiff Attorney: David deRubertis. Defendant Attorney: Rachel Brass. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Date Filed: 7/3/2018) (Entered: 07/03/2018) |

### Prong #5: Coverup the Coverup Scheme

### Coverup the Obstruction of the OSHA Investigation

375.   David deRubertis and the other RICO Defendants never intended to go through the OSHA Whistleblower complaint process because they wanted to take Huynh's case to Federal Court in order to execute their "Nuts & Sluts" and Truth on the Market Offenses. However, the RICO Defendants pretended to have filed the complaint and the amended complaint with OSHA in May and July 2017 for three purposes:  First, to purportedly show that deRubertis exhausted OSHA's administrative remedies requirements before taking Huynh's case to Federal Court to cover up their obstruction of the OSHA proceeding.  Second, the RICO Defendants exploited these filing to legitimately handed over Huynh's SEC submissions to the Walmart Participants.  Third, to create paper trails to protect the RICO Defendants from future criminal prosecution for obstructing an SEC investigation.  **See X.**

**COMPLAINT – DEMAND FOR JURY TRIAL**

376.   Although Huynh currently doesn't possess direct evidence to prove that the RICO Defendants obstructed the OSHA proceeding in order to effectuate prong # 2 (i.e., to obstruct and influence the outcome of an SEC investigation), Huynh believes this information is in the RICO Defendants' possession and is discoverable during discovery.

377.   However, even in the absence of this evidence, Huynh proved that the RICO Defendants conspired to obstruct the OSHA proceeding based on the following circumstantial evidence.

378.   First, deRubertis repeatedly refused to provide Huynh a copy of the OSHA complainant notification letter despite Huynh's multiple requests.  This proved that deRubertis never filed Huynh's complaints with OSHA because if he had OSHA would have sent him the complainant notification letter because it was required by law for OSHA to do so.

379.   Second, deRubertis purportedly claimed that he filed a 125-amended complaint with OSHA even though there was no such pleading requirement by OSHA. deRubertis' real motive for pretending to file the amended complaint was to use it as a justification to lift the content in Huynh's 4/19/17 SEC submission verbatim and inserted them into the bogus 125-page amended complaint to launder the information to legitimately share it with the Rescue Squad and the Walmart Participants. The RICO Defendants later legitimately used this information to submit factual misrepresentations to the SEC to neutralize Huynh's allegations against Walmart in order to obstruct and influence the outcome of the SEC investigation.

380.   Third, deRubertis pretended to file the fake complaint and amended complaint on 5/11 and 7/10/17 in order to create paper trails which enabled the RICO Defendants to assert their chronologically impossible defense to coverup the facts that the they conspire to obstructed the SEC investigation process as early as the beginning of May 2017. To effectuate their scheme, deRubertis purportedly asked McKessy to review the OSHA complaint on

224

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  5/11/17 because he wanted McKessy to serve as an alibi to the fact that prior to Walmart's Q1

2  FY18 earnings call on 5/18/17 the Walmart Participants only knew about Huynh's allegations

3  of Walmart's misconducts at a superficial level based on deRubertis' 5/11/17 OSHA com-

4  plaint.  Then even though, Walmart's senior executives knew about the specificity of Huynh's

5  allegation from deRubertis' fake 125 pages amended complaint after 7/10/17 it didn't matter

6  because by then the RICO Defendants had already executed their Whitewashing Campaign.

7  Thus, it would be chronologically impossible for the US government to prove that the RICO

8  Defendants obstructed the SEC investigation/proceeding.

9

10



11

12

13

14

15

16

17

18

19

20

21  381.    Fourth, on Aug 29, 2019, the Rescue Squad filed the fake OSHA's dismissal

22  letter from Mark Marchione to purportedly show that deRubertis exhausted administrative

23  remedies before taking Huynh's case to Federal Court.  See DC Dkt. 119-20. Huynh recently

24  came to the conclusion that the RICO Defendants manufacture this letter to cover up their ob-

25  struction of the OSHA investigation process. This letter was bogus because its contents were

26  inconsistent with SOX's statutory language and also inconsistent when compared with the

27

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

1  dismissal letter from the Jackie Hosang Lawson's case (Case 1:04-cv-11651-MLV).

2

Case 3:18-cv-01631-VC   Document 119-20   Filed 08/29/19   Page 2 of 2     Case 1:04-cv-11651-MLW   Document 148-3   Filed 05/13/2008   Page 35 of 38

3

**U.S. Department of Labor** — Occupational Safety and Health Administration, Ronald V. Dellums Federal Building, 1301 Clay Street, Suite 1050N, Oakland, CA 94612

**U.S. Department of Labor** — Occupational Safety and Health Administration, J.F.K. Federal Building, Room 340, Boston, MA 02203, Telephone (617) 565-9860, Fax (617) 565-9827

Reply to the Attention of: /OSHA/ROS/CPTS

March 16, 2018

In Huynh
c/o David M. deRubertis, Shareho
The deRubertis Law Firm, APC
4219 Coldwater Canyon Avenue
Studio City, California 91604

Re:   Wal-Mart Stores, Inc /Huynh/9-3290-17-361

Dear Mr. Huynh:

On May 17, 2017, you (Complainant) filed a complaint with the Occupational Safety and Health Administration (OSHA) under Sarbanes-Oxley Act (SOX), 18 U.S.C.A. §1514A. Over 60 days have passed since you filed your complaint with OSHA. Under the Act, if the Secretary has not issued a final decision with 60 days of the filing of the complaint and there is no showing that such a delay is due to bad faith of the complainant, the complainant may bring a *de novo* action in federal District Court.

You provided this office with a copy of your federal court complaint on March 15, 2018. As a result of your electing to proceed with your case in federal court, rather than before the Secretary of Labor, this office by dismissing your complaint.

If at any time you have questions or require any information regarding employee or employer rights and responsibilities under SOX or any other whistleblower statute administered by OSHA, please contact this office.

Sincerely,

*Mark Marchione*

MARK MARCHIONE
Regional Supervisory Investigator
Whistleblower Protection Program

cc:   Wal-Mart Stores, Inc.
U.S. Securities and Exchange Commission, Chief of the Office of Market Intelligence
U.S. Department of Justice, Civil Frauds Division
U.S. Department of Labor, Occupational Safety and Health Administration,
Directorate of Whistleblower Protection Programs

January 28, 2008

Indira Talwani
Segal Roitman, LLP
111 Devonshire Street
Fifth Floor
Boston, MA 02109

RE: Fidelity Investments; Claire Cadogan; Betsy Connolly; Harris Komishane; Dick Lyons; Jean Raymond; Tim Rooney / Lawson / Case Nos. 1-0120-07-005; 1-0120-07-008; 1-0120-07-012; 1-0120-08-001

Dear Ms. Talwani:

On December 20, 2006, April 24, 2007, September 17, 2007 and November 9, 2007, respectively, you filed the above referenced complaints under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A (SOX), on behalf of your client Jackie Hosang Lawson. Over 180 days have passed since you filed your original complaint and second complaint. Under the Act, if the Secretary has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of the complainant, the complainant may bring a *de novo* action in Federal District Court.

You have notified this Office by letter dated January 3, 2008, that you intend to file case numbers 1-0120-07-005 and 1-0120-07-008 in Federal Court. In accordance with our usual practice, we have consolidated the four complaints, as the three later complaints reasonably relate back to the original. As a result, the case number for the original complaint – 1-0120-07-005 – has been retained and amended by the three additional complaints. Because you have elected to proceed with your case in Federal Court, rather than before the Secretary of Labor, the complaint, as amended, is hereby closed.

If at any time you have questions or require further information regarding employee or employer rights and responsibilities under the SOX or any other whistleblower statute administered by OSHA, please contact this office.

Sincerely,

*Martha B. Kent*

Martha B. Kent
Regional Administrator

cc:
Eugene Scalia, Esq., Attorney for Respondent (Certified Mail)
Chief Administrative Law Judge, USDOC
Deputy Director, Division of Enforcement, Securities Exchange Commission
Associate Solicitor, Fair Labor Standards, USDOL

Annotation boxes:
Several irregularities
- 60 days is the wrong kick out period for a SOX because it is 180 days.
- DOJ Civil Fraud Division, there is no such requirement.
- OSHA didn't send the dismissal letter to Eugene Scalia and the letter should address deRubertis not Huynh.

Should be addressed to deRubertis not Huynh

Huynh's complaint was filed on 5/11/17 not 5/17

No such requirement

- In the Lawson's case the dismissal letter came from a "Regional Administrator" Not a "Regional Supervisory Investigator".
- Marchione listed the kick out period for SOX as **60 days** instead of **180 days**.
- Huynh's complaint was filed on 5/11/17 not on 5/17/17. **Why?**
- Marchione cc: the U.S. Department of Justice, Civil Fraud Division when there was no such requirement.
- The letter address "Dear Mr. Huynh" when it should have been addressed to

226

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    Huynh's Lawyer David deRubertis.

2    ●    Marchione didn't cc Eugene Scalia, Boutros, and Brass in the letter.

3

 **PAYNE & FEARS**

4 Park Plaza, Suite 1100
Irvine, CA 92614
T 949. 851.1100
F 949. 851.1212

4

Daniel F. Fears
(949) 797-1227
dff@paynefears.com

5

6    August 31, 2017



7

8    _**VIA EMAIL**_

7012 0470 0002 3021 0421

9    Mark Marchione
Regional Supervisory Investigator
Marchione.Mark@dol.gov

10

11    Re:    _Tri Huynh v. Wal-Mart Stores, Inc., Case No. 9-3290-17-361_

12    Dear Mr. Marchione:

13    Please accept this letter as the position statement of Wal-Mart Stores, Inc. ("Walmart" or "the Company") in response to the above-referenced charge ("the Charge") filed by former Walmart employee Tri Huynh ("Huynh" or "the Claimant"). This information is being submitted to the Occupational Safety and Health Administration ("OSHA") with the understanding that it will be kept confidential to the maximum extent provided by the law.[1]

14

15    Very truly yours,

16

Daniel F. Fears
PAYNE & FEARS LLP

17

> Both Daniel F. Fears and Terri M. Shaw from the Law Firm of Payne & Fears worked in concerted to manufacture Beal's 11/30/16 and the 11/30/16 Marketplace RIF list and submitted factual misrepresentation to OSHA.

18    Enclosures
cc:    Tri Huynh c/o David deRubertis (_via certified mail_)
4219 Coldwater Canyon Ave.
Studio City, CA 91604

19

20

| End Bates Number | Date Range | Document Types | Author(s) | Recipient/Distribution | Privilege(s) |
|---|---|---|---|---|---|
| | | | Attorney Work Product and Attorney Client Communications Related Specifically to the _Huynh v. Walmart_ litigation and/or the related OSHA complaint | | |
| WM_PRIV00000003 | 08/17/2017 | Company Documents | Andrew K. Haefele (Outside Counsel) | Andrew K. Haefele (Outside Counsel) | Attorney-Client Communication |
| WM_PRIV00000005 | to | Draft Legal Documents | legalholds@walmartlegal.com | Becky Schmitt (Former Senior Vice President, | Attorney Work Product |
| WM_PRIV00000007 | 04/18/2018 | Emails | | Human Resources) | |
| WM_PRIV00000377 | | Spreadsheets | Mary Carter Martin (Associate General Counsel) | Crystal Crenshaw (Paralegal, Walmart Legal) | Defendants affirm that these |
| WM_PRIV00000015 | | | Melinda Greene (Director, Human Resources, | Giuletta Prezzavilli (Former Senior Director, | communications have been maintained |
| WM_PRIV00000142 | | | Walmart Global eCommerce) | Human Resources) | on a confidential basis and affirm that no |
| WM_PRIV00000245 | | | Ping Hao (Associate Director, Marketplace, | Kevin Rasmussen (Former General Manager | unauthorized persons have received |
| WM_PRIV00000284 | | | Walmart Global eCommerce) | of Home Improvement, Walmart.com & | them |
| WM_PRIV00000314 | | | Seth Beal (Former Senior Vice President, Global | Jet.com, Walmart eCommerce) | |
| WM_PRIV00000468 | | | Marketplace and Digital Store Operations, | | |
| WM_PRIV00000251 | | | Walmart Global eCommerce) | Mary Carter Martin (Associate General Counsel) | |
| WM_PRIV00000284 | | | Terri M. Shaw (Payne & Fears) | Melinda Greene (Director, Human Resources, | |
| WM_PRIV00000224 | | | | Walmart Global eCommerce) | |
| WM_PRIV00000221 | | | Valerie Ricetti (Director, Human Resources | Ping Hao (Associate Director, Marketplace, | |
| WM_PRIV00000276 | | | Business Partner, Walmart Global eCommerce) | Walmart Global eCommerce) | |
| WM_PRIV00000209 | | | | Seth Beal (Former Senior Vice President, Global | |
| WM_PRIV00000213 | | | | Marketplace and Digital Store Operations, | |
| WM_PRIV00000286 | | | | Walmart eCommerce) | |
| WM_PRIV00000291 | | | | | |
| WM_PRIV00000292 | | | | Valerie Ricetti (Director, Human Resources | |
| WM_PRIV00000267 | | | | Business Partner, Walmart GlobaleCommerce) | |

21
22
23
24
25
26
27
28

227

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Payne & Fears LLP (Daniel F. Fears and Terri M. Shaw) Participated in the Conduct of the WSF Coverup Enterprise.**

382.    The Rescue Squad hired the Law Firm of Payne & Fears on the behalf of the Walmart Participants to represent Walmart to interact with deRubertis and Mark Marchione regarding Huynh's OSHA complaints. As discussed throughout this complaint, the RICO Defendants engaged in fabrication of Beal's 11/30/16 email and 11/30/16 Marketplace RIF then submitted the fake documents to OSHA. They also conspired with Mark Marchione to obstruct OSHA from investigating Huynh's complaints. The chart above proved that Terri M. Shaw and Daniel F. Fears engaged in extensive communications with Seth Beal, Valerie Ricetti, and other Walmart's employees via mail and the wire to manufacture evidence (Beal's 11/30 email and RIF list) and submit false information to OSHA.

383.    Furthermore, Huynh believes the Law Firm of Payne & has in its possession extensive communication (probably hundreds of instances of mail and wire usages) among the RICO Defendants to effectuate prong #2 and #3 of the WSF Coverup Enterprise's illegal coverup scheme.  Thus, Huynh believe this information will be discoverable during discovery which proved that the Law Firm of Payne & Fears LLP committed much more than two predicate acts in furtherance of the illegal coverup scheme.

384.    Fifth, Since David deRubertis refused to provide Huynh with a copy of OSHA notification letter, the RICO Defendants manufactured the OSHA complainant notification letter after the fact to purportedly show that OSHA did in fact send a notification letter to deRubertis on Aug 7, 2017[71] to coverup the fact that the RICO Defendants conspired with

---

[71] David deRubertis didn't provide this letter to Huynh in Aug 2017.  Huynh only came to now of this after David deRubertis produce it to Walmart during the GO 71 document exchange.

228

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    Mark Marchione to obstruct OSHA from investigating Huynh's OSHA complaint.  Below are

2    discrepancies between Marchione's fake notification letter and the notification template letter

3    provided to OSHA investigators to communicate with complainants.

4



5    U.S. Department of Labor   Occupational Safety and Health Administration
     San Francisco Federal Building
     90 - 7° Street, Suite 18100
6    San Francisco, CA  94103

*Complaint Notification Letter*

Letter template provided in the OSHA's Investigation Manual

Certified Mail #[1234 5678 9012 3456 7890]

7    Re: Wal-Mart Stores, Inc. /Huynh /9-3290-17-361

[date]

8    Dear Mr. Huynh      From deRubertis client return files

Mr. U. R. Complainant

9    This letter acknowledges receipt of your whistleblower complaint filed under the Sarbanes-

Street Address

City, State ZIP

10   Oxley Act (SOX), 18 U.S.C.A. §1514A, which you filed on May 17, 2017 against Wal-Mart

Re: ABC Company

11   Stores (Respondent).

Why???

> There are two major discrepancies. First, the template letter included the name and contact information of the assigned investigator while deRubertis' letter didn't. Second, although deRubertis filed the complaint on 5/11/17 the deRubertis' letter indicated that the filed date was 6 days later.

12   Once an investigator is assigned to your complaint, you will be provided their contact

This letter acknowledges receipt of your complaint of retaliation under the whistleblower provisions of [name of statute], [citation] which you filed on [date]. Please save any evidence bearing on your complaint, such as notes, minutes, letters, or check stubs, etc.,

13   information. Until the assigned investigator contacts you, please save any evidence regarding

your complaint, such as notes, minutes, letters, or check stubs, etc.  It may be helpful for you to

and have them ready when the investigator named below meets with you. It will be

14   write down an account of what happened and to prepare a list of the names, addresses, and

helpful for you to write down a brief factual account of what happened and to prepare a

telephone numbers of the witnesses together with a summary of what each witness should know.

list of the names, addresses, and telephone numbers of the potential witnesses, together with a brief summary of what each witness should know. The investigator will be

15   Sincerely,      Missing Investigator Name
                       and Contact Info

contacting you in the near future.

16   [signature]

Sincerely,

Investigator:

17   Jonelle Dann
     Regional Investigator

Name

U.S. Department of Labor - OSHA

18

Street Address

City, State ZIP

19   For MARK MARCHIONE:
     Regional Supervisory Investigator

20   Wal-Mart Stores, Inc./Huynh/9-3290-17-361      Page 1 of 7

Name

Supervisor

Telephone: (123) 456-7890

21   Enclosures:  (1)Designation of Representative   Didn't enclosed the
                   (2)Copy of Complaint              7/10/17 125-amended

Fax: (123) 456-7890

22                 (3)ADR Fact Sheet & ADR Form

Enclosure:   Designation of Representative

E-mail: last.first@dol.gov

23

24    • As per statutory requirement Marchione should have sent the complainant notifica-

25       tion letter by end of May 2017 at the very latest to deRubertis.  However, Marchione

26       didn't send the letter until Aug 2017. It's worth to mention that Huynh didn't have

27       access to this letter until after he fired deRubertis and forced him to return Huynh's

         client files.

28

229

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    • Marchione didn't assign an investigator to the case even though deRubertis purport-
2       edly filed that the complaint with OSHA on May 11, 2017.

3    • Marchione stated that Huynh's complaint was filed on 5/17/17 but deRubertis
        claimed that his firm faxed, emailed, and UPS the complaint to OSHA on 5/11/17.
4       **Why the 6 days discrepancies?**

5    • Marchione didn't attached the purported 125-page amended OSHA complaint David
        deRubertis claimed he filed with OSHA on July 10, 2017.
6

7       385.    Sixth, although David deRubertis claimed he had filed Huynh's OSHA com-

8    plaint on May 11, 2017 but Marchione and the Rescue Squad purportedly claimed that

9    Huynh's complaint was filed May 17, 2017. **What was May 17, 2017' significance?**

10



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

230
**COMPLAINT – DEMAND FOR JURY TRIAL**

386.     Huynh put deRubertis on notice in late Sept 2017 that the SEC began to scruti-
nize Walmart on how they accounted for Walmart Marketplace sales, customer returns, and
inventory mark down due to the allegations in Huynh's 4/19/17 SEC submission. Huynh
shared with deRubertis Thompson's 5/22/17 letter to Biggs. To coverup the fact that the
RICO Defendants conspired with Thompson as well as engaging in the Whitewashing Cam-
paign, the RICO Defendants attempted to reset the boundary condition of their previous
"Chronologically Impossible" 1.0 Defense by getting Marchione to fabricate the 8/7/17 notifi-
cation letter where he listed the filed date for Huynh's complaint as 5/17/17 instead of the ac-
tual filed date of 5/11/17.

## FY2018 Q1 Earnings Release

Thu, May 18, 2017 | 6:00 AM US/Central

The quarterly earnings press release and pre-recorded phone call will be available at
approximately 6:00 a.m. CT on the date of release. The transcript of the call will be available
simultaneously with the pre-recorded call.

**To access the quarterly earnings call:**
In the United States and Canada, dial **877-523-5612; access code: 9256278 (W-A-L-M-A-R-T)**,
followed by the pound (#) sign. All other callers dial **1-201-689-8483, access code: 9256278 (W-
A-L-M-A-R-T)**, followed by the pound (#) sign.

387.     The RICO Defendants purportedly listed 5/17/17 as the filed date for Huynh's
complaint instead of 5/11/17 in order to reset the initial boundary condition (since Huynh
knew that Walmart's senior executives conspired with Thompson to whitewash evidence of
Walmart's illegal conducts). By changing the complaint filed date from 5/11/17 to 5/17/17,
the RICO Defendants would argue that even if someone at OSHA got a hand on Huynh's
complaint and leaked the information to Walmart it didn't really matter because by then
Walmart's senior executives had already pre-record Walmart's Q1 FY18 earnings call where

231

**COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart shifted its reported SKU metric from Marketplace to Walmart.com  Additionally, the RICO Defendants chose Aug 7, 2017 as the purported date to send out the complainant notification letter to purported proved that by then Thompson's communications with Biggs regarding Walmart's Ecommerce accounting treatment had already been completed



**Chronologically Impossible Defense 2.0**

OSHA sent out complainant letter to SEC on 8/7/17 and Walmart received it on 8/9/17.

deRubertis Filed OSHA Complaint on May 11 | Walmart's Q1 FY18 earning call | Walmart's Annual Meeting | Baird's Analyst Conference | Deutsch Bank's Analyst Conference

May 11 | May 18 | June 2 | June 7 | June 13

Thompson's Inquiry Letter | Walmart's replied letter to the SEC | SEC's letter to Walmart | Walmart's replied letter to the SEC

May 22 | June 19 | June 28 | July 25 | Aug 7

OSHA didn't receive the complaint until 5/17/17.

So what if we knew

### Coverup at DFHE

388.    Fourth, to purportedly show that deRubertis exhausted DFEH's administrative remedies requirements before shotgun pleaded the five ADHD FEHA claims in Federal Court, the RICO Defendants fabricated the proof of service from DFHE and the deRubertis Law Firm to purportedly show that deRubertis and DFEH served Walmart Huynh's right to sue letter on Mar 9, 2018.  Upon further inspections of these documents, Huynh concluded that they were manufactured for the following reasons.

389.    First, it was hard to imagine that both the deRubertis Law Firm and DFEH

served Huynh's right to sue letter to Walmart at the exact same time and date i.e., on **March 9, 2018 at 12:05 PM.** The probability that this would happen in real life is like wining the "Powerball" lottery. Second, Huynh's right to sue letter clearly stated in bolded words "**Pursuant to Government Code Section 12962, DFEH will not serve these documents on your employer**". Thus, it made no sense why would DFEH spend the time and resources to serve Huynh's right to sue letter to Walmart? Third, the purported right to sue letter that DFEH serve to Walmart had Huynh's actual signature on it even though the original right to sue letter that Huynh received from DFEH didn't have Huynh's signature. However, deRubertis was the only who had Huynh's right to sue letter that has Huynh's signature because right after Huynh received the right to sue letter from DFEH, deRubertis asked Huynh to physically sign the letter then emailed it to him. Thus, the only way that the Rescue Squad had the right to sue letter with Huynh's signature on it was deRubertis intentionally gave it to them. This further proved that deRubertis colluded with the Rescue Squad and the Walmart Participants to shotgun plead five nefarious ADHD FEHA claim to effectuate prong #2, #3, and #6 of the WSF Coverup Enterprise' illegal cover up scheme. Fourth, in Huynh's right to sue letter (under the notice to the respondent section), DFEH clearly stated that "No response to DFEH is requested or require". However, in the purported DFEH's proof of service letter it showed that DFEH requested Walmart to respond to Huynh's right to sue letter within 30 days. "Appearance or Answer Due: **within 30 days of receipt**[72]. This further proved that the DFEH proof of service letters were manufactured to cover up the facts that the RICO Defendants conspired to

---

[72] This purported statement also contradicted with what is stated in the right to sue section of the DFEH website at https://www.dfeh.ca.gov/obtainrighttosue/ which stated "You may file your own lawsuit for employment discrimination in court rather than using the DFEH investigation process. This is advisable only if you have an attorney. **Also note that if you receive a right-to-sue notice, your complaint will not be investigated by DFEH** even if you later decide not to file a lawsuit.

**COMPLAINT – DEMAND FOR JURY TRIAL**

shotgun pleaded the five ADHD FEHA claims in Huynh's 3/15/18 complaint.

## Walmart and the GDC Squad Fabricated the Process Service Confirmation and Attached It to DFEH Right to Sue Form with Huynh's Signature Which David deRubertis Gave to Them.



How was it possible that FEHA and David deRubertis served Walmart at the exact time

Contradicted with the official FEHA's Notice to Complainant which stated "DFEH will not serve these documents on your employer" and Notice to respondents which stated "No response to DFEH is requested or required?"

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Cover Up at LWDA**

390.    Since David deRubertis never filed the 125-page amended complaint with OSHA (deRubertis couldn't claim that he produced the content of Huynh's 4/19/17 SEC submission to Walmart through a legitimate legal process), deRubertis and the Rescue Squad acted in concert to file a PAGA claim with LWDA in early Jan 2018 then added the PAGA claim to Huynh's amended complaint (see DC Dkt. 8 at 68) to use the PAGA claim as another excuse to leak Huynh's 4/19/17 SEC submission to the RICO Defendants.

David deRubertis filed a PAGA Claim in order to Leak Huynh's SEC Submission to Walmart



235
**COMPLAINT – DEMAND FOR JURY TRIAL**

391.    On Jan 9, 2018, deRubertis mailed the PAGA notification letter to Walmart via US Postal Mail.  As showed below the OSHA amended complaint and the PAGA notification letter were exactly the same.

**THE deRUBERTIS LAW FIRM, APC**
trial lawyers

MAIN OFFICE & MAILING ADDRESS
4219 COLDWATER CANYON AVENUE
STUDIO CITY, CALIFORNIA 91604
TEL: (818) 783-2222 · FAX: (818) 783-2878

January 9, 2018

VIA CERTIFIED MAIL, RETURN-RECEIPT REQUESTED

Wal-Mart Stores, Inc.
Wal-Mart Associates, Inc.
Wal-Mart.com, Inc.
850 Cherry Avenue
San Bruno, California 94066
To Whom It May Concern:

This office represents
Code section 1102.5.  Under the Private Attorneys General Act of 2004 (PAGA), the purpose of this letter is to satisfy the requirements of Labor Code section 2699.3 and all other applicable notice requirements.

I.    BRIEF SUMMARY OF VIOLATIONS.

    A.    Walmart's eCommerce business, Mr. Huynh's hiring into it, and his consistent positive work performance while working for it.

● As early as December 2014, Mr. Huynh reported concerns about the design of Walmart's Global Marketplace Platform's categorization engine, and its ability to categorize sellers' products into the correct product contract categories.  When a customer purchases a third-party seller's item on Walmart's online platform, Walmart charges a commission on the purchase to the third-party seller.  The applicable commission percentage for the transaction is spelled-out in the contract between Walmart and the third-party seller.  When a transaction occurs, Walmart's online platform categorizes the product sold into the applicable product category on a product-by-product basis.  Walmart's online platform does this through a machine learning program which tries to identify the proper category for the item upon each transaction being made.  But Walmart's online platform's categorization process does not work as well as it should.  Often, the computer program fails to find the correct category for the item in which case it categories the item as "unrecognized."  This incorrect "unrecognized" category designation improperly increases the commission percentage that Walmart charges the third-party seller for the item's purchase because "unrecognized" products are automatically assigned the highest commission percentage of fifteen percent (15%).  Mr. Huynh identified systemic problems with categorization formulas from the onset, and he reported his concerns that the design flaws would lead to significant and excessive designation of products as "unrecognized" products to his management team.  Mr. Huynh had a reasonable belief that the reported concerns, *inter alia*, would lead to systemic overcharging of commissions; would consequently overstate Walmart's operating income from its eCommerce business; constituted an internal control violation; were a sign of insufficient controls; cause reputational harm to Walmart's eCommerce business; etc. Nonetheless, Walmart implemented this systemically flawed program and ignored Mr. Huynh's concerns about it.

> *The content of the OSHA amended complaint and PAGA letter sent to Walmart is the same. It was extracted verbatim from Huynh's SEC submission that provided the specificity of Huynh's allegations against Walmart's illegal conducts.*

**THE deRUBERTIS LAW FIRM, APC**
trial lawyers

MAIN OFFICE & MAILING ADDRESS
4219 COLDWATER CANYON AVENUE
STUDIO CITY, CALIFORNIA 91604
TEL: (818) 783-2222 · FAX: (818) 783-2878

July 10, 2017

Via Email and Overnight Delivery

Ms. Dunn (Dunn.Janelle@dol.gov)
Department of Labor
Occupational Safety & Health Administration
Street #18-100
Francisco, CA 94103
Ms. Dunn:

Pursuant to our previous discussions, please allow the following to serve as supplemental materials regarding the SOX retaliation charge filed by Mr. Huynh on May 11, 2017.

I.    BRIEF SUMMARY OF ADDITIONAL FACTUAL ALLEGATIONS AND EVIDENCE.

    A.    Walmart's eCommerce business, Mr. Huynh's hiring into it, and his consistent positive work performance while working for it.

● As early as December 2014, Mr. Huynh reported concerns about the design of Walmart's Global Marketplace Platform's categorization engine, and its ability to categorize sellers' products into the correct product contract categories.  When a customer purchases a third-party seller's item on Walmart's online platform, Walmart charges a commission on the purchase to the third-party seller.  The applicable commission percentage for the transaction is spelled-out in the contract between Walmart and the third-party seller.  When a transaction occurs, Walmart's online platform categorizes the product sold into the applicable product category on a product-by-product basis.  Walmart's online platform does this through a machine learning program which tries to identify the proper category for the item upon each transaction being made.  But Walmart's online platform's categorization process does not work as well as it should.  Often, the computer program fails to find the correct category for the item in which case it categories the item as "unrecognized."  This incorrect "unrecognized" category designation improperly increases the commission percentage that Walmart charges the third-party seller for the item's purchase because "unrecognized" products are automatically assigned the highest commission percentage of fifteen percent (15%).  Mr. Huynh identified systemic problems with categorization formulas from the onset, and he reported his concerns that the design flaws would lead to significant and excessive designation of products as "unrecognized" products to his management team.  Mr. Huynh had a reasonable belief that the reported concerns, *inter alia*, would lead to systemic overcharging of commissions; would consequently overstate Walmart's operating income from its eCommerce business; constituted an internal control violation; were a sign of insufficient controls; cause reputational harm to Walmart's eCommerce business; etc. Nonetheless, Walmart implemented this systemically flawed program and ignored Mr. Huynh's concerns about it.

**COMPLAINT – DEMAND FOR JURY TRIAL**

392.    Additionally, in order to coverup the fact that the RICO Defendants asserted the ridiculous and frivolous PAGA claim in Huynh's amended complaint to secretly leak Huynh's SEC submission to the Walmart Participants, the Rescue Squad asked Huynh to e-file a joint stipulation to ask District Vince Chhabria to dismiss the PAGA claim with prejudice. Judge Chhabria dismissed the claim with prejudice in early April 2019. DC Dkt. 67.

**The RICO Defendants Used GO 71 to Leak Names of Potential SEC Witnesses**

393.    On Sept 7, 2018, Huynh provided deRubertis a list of witnesses relevant to Huynh's SOX Retaliation employment case.  However, on Sept 18, 2018, deRubertis emailed Huynh that he had added more witnesses to the list because in Huynh's situation the more witnesses we produced to Walmart the better.

| | |
|---|---|
| **From:** Tri Huynh <trimhuynh@outlook.com> | **From:** David deRubertis <david@derubertislaw.com> |
| **Sent:** Friday, September 7, 2018 11:19 AM | **Sent:** Tuesday, September 18, 2018 9:19 AM |
| **To:** Tri Huynh; David deRubertis; Kari deRubertis | **To:** Tri Huynh |
| **Cc:** Garen Nadir; Anthony Nichols | **Subject:** Huynh witnesses |
| **Subject:** List of people to interview and Meeting confirmation for next week | |
| **Attachments:** List of people with case knowledge 09.06.18.docx | |
| **Importance:** High | |
| | Hi Tri – I'd like to make sure we identify more witnesses than just the ones you've identified. This is a situation where the more the better. I'm adding a lot myself, but want to make sure you have identified all of your team members who may know about your management of the team.  Are there other team members you did not list?  If so, please send me their names/info. |
| Hi David, | |
| Attached is the list of people you can talk to regarding my case. | |
| Let me know if you have further questions. | |
| Also are we meeting next week at your office to go over the documents in preparation for General Order 71 data exchange with Walmart? | |

394.    On Sept 19, 2018, Kari deRubertis served the GO 71 Plaintiff's disclosure memo to Eugene Scalia, Theodore Boutros, Rachel Brass, and Ryan Stewart. In the memo, deRubertis leaked the names of all the potential witness that Huynh had provided to the SEC that may have information regarding Walmart's illegal conducts. Even though, Huynh doesn't

currently possess direct evidence to prove that the RICO Defendants used the name of the witnesses to obstruct the SEC investigation. Huynh believes this information is in the RICO Defendants' possession and could be obtained during discovery.

395.    Additionally, as discussed throughout this complaint the RICO Defendants engaged in a systematic pattern of evidence whitewashing, fabrication, destruction, mutilation, concealment, and suppression as well as corruptly influencing witnesses to file false declarations to obstruct justice to effectuate Goal A and B of the illegal coverup scheme. Thus, it would not be a surprise to Huynh if the RICO Defendants used the names of the witnesses that David and Kari deRubertis leaked to the other Co-RICO Defendants to coach and corruptly influence these witnesses to present false testimonies and/or half-truth answers to the SEC to obstruct the SEC investigation in order to obtain the 4/2/19 "Get Out of Jail Free" Card from the SEC. See Defs Ex. 129 – DC Dkt. 119-21.

# The Origin of the "Nuts & Sluts" Strategy

## The "Nuts & Sluts" Strategy Is Commonly Used by the Defendants I Sexual Harassment and Gender Discrimination Claims.

365.    "Nuts and Sluts" refers to the defense tactic of portraying women who bring harassment and employment discrimination claims as "too unstable to be believed or too promiscuous to be harassed".  These tactics were later adapted by corrupted Corporations to go after Whistleblowers to portray them as too "Nutty" and too "Slimy" to be Whistleblower.

**https://www.merriam-webster.com/dictionary/nutjob**

Informal: a mentally unbalanced person: a crazy person

Weird, erratic, and alcoholic, [he] was the kind of nutjob it was easy, if not irresistible, to demonize. — Jennifer Reese

**https://www.dictionary.com/e/slang/slut-shaming/**

Slut-shaming is the practice of disparaging women, and occasionally men, for acting in a manner that violates "norms" regarding sexually appropriate behavior. These denigrations, which are often double standards, range from criticizing women for wearing sexy clothing or having multiple sexual partners to blaming sexual assault and rape survivors for their attacks.

**https://definitions.uslegal.com/v/victim-blaming/**

Victim blaming is a devaluing act where the victim of a crime, an accident, or any type of abusive maltreatment is held as wholly or partially responsible for the wrongful conduct committed against them. Victim blaming can appear in the form of negative social reactions from legal, medical, and mental health professionals, as well as from the media and immediate family members and other acquaintances. Traditionally, victim-blaming has emerged in racist and sexist forms. The reason for victim blaming can be attributed to THE misconceptions about victims, perpetrators, and the nature of violent acts.

366.    Below are excerpts from the Harvard Journal of Law & Gender [Vol. 33] Excerpts from the Article "Lily Bart to the Boom-Boom Room (page 227-232)" which discussed the Defendants' "Nut and Slut" defense.

"In employment discrimination litigation, "nuts and sluts" refers to the defense tactic of <u>portraying women who bring harassment and employment discrimination claims as too</u>

**COMPLAINT – DEMAND FOR JURY TRIAL**

un-stable to be believed or too promiscuous to be harassed. See generally SUSAN ES-
TRICH, SEX AND POWER 179, 185 (2000) (referencing the "nuts and sluts defense");
Hillary Jo Baker, No Good Deed Goes Unpunished: Protecting Gender Discrimination
Named Plaintiffs from Employer Attacks, 20 HASTINGS WOMEN'S L.J. 83, 95-100
(2009) (describing the "nuts and sluts" litigation strategy); Kent D. Streseman, Head-
shrinkers, Manmunchers, Moneygrubbers, Nuts & Sluts: Reexamining Compelled Men-
tal Examination in Sexual Harassment Actions Under the Civil Rights Act of 1991, 80
CORNELL L. REv. 1268 (1994-1995) (describing compelled mental examinations of
women labeled "nuts and sluts").

Antilla reports that when two female employees of a major Wall Street brokerage firm
complained that a male coworker had tried to force himself on them physically, the em-
ployees had to wait three years for a hearing. "A week before the hearing, the firm...
forced the two women to undergo examinations by a psychiatrist of the brokerage firm's
choosing." ANTILLA, supra note 309, at 150-51. One of the women was subjected to an
interrogation that included "questions about her sex life, the opening of her gynecologi-
cal records, and queries about her menstrual periods, her marital counseling, and her di-
vorce. The psychiatrist even had copies of her therapy records." Id. at 151.

The other employee also reported that she was grilled with questions relating to her sex-
ual experiences and **her childhood**. Id. According to Antilla, this woman finally broke
down when the psychiatrist asked her to recite in reverse order the names of the U.S.
Presidents. Id. For a discussion of the psychology behind "nuts or sluts" tactics, see for
example, Lynn Hecht Schafran, Sexual Harassment Cases in the Courts, or Therapy
Goes to War: Supporting a Sexual Harassment Victim During Litigation, in SEXUAL
HARASSMENT IN THE WORKPLACE AND ACADEMIA: PSYCHIATRIC ISSUES
133, 139 (Clinical Practice Series No. 38, Diane K. Shrier ed., 1996).

**The Cautionary Tale of Jenson v. Eveleth Taconite**

367.    Jenson v. Eveleth Taconite Co. was the first sexual harassment class action to

be certified.[73] This extraordinary and heartbreaking case inspired a nonfiction book and

served as the inspiration for North Country, an Academy Award nominated film. The eleven-

---

[73] 139 F.R.D. 657, 667 (D. Minn. 1991), rev'd, 130 F.3d 1287 (8th CiT. 1998) (remanding for
de novo trial on damages based on error of Special Master McNulty). See also CLARA
BINGHAM & LAURA LEEDY GANSLER, CLASS ACTION: THE STORY OF LOIS
JENSON AND THE LANDMARK CASE THAT CHANGED SEXUAL HARASSMENT
LAW 243 (2002).

**COMPLAINT – DEMAND FOR JURY TRIAL**

year long litigation provides a cautionary tale about abusive discovery and unchecked judicial

discretion. Though hostile work environment cases are rare,[74] they provide vivid examples of

the abuses that may arise in a gender discrimination class action. These cases also illustrate

the challenges of pleading emotional distress damages, thus "opening the door" to intrusive

questioning about mental state and past trauma.

368.    Lois Jenson initiated a hostile work environment case by filing a complaint

with the Minnesota Department of Human Rights after suffering extreme sexual harassment

that included stalking, slurs, vulgar graffiti directed towards her, and sexual attacks. Other

named plaintiffs in that case endured similar abuse. For example, on multiple occasions, Judy

Jarvela opened her locker to find semen on her clothing. Shirley Burton suffered such extreme

harassment that she carried a can of mace, a pocketknife, and a length of rope to tie the door

to her work area shut. Kathy O'Brien carried a sharpened screwdriver in her boot after a

coworker harassed and physically assaulted her during her first month of work.[75] Even when

---

[74] See Melissa Hart, Book Review, Litigation Narratives: Why Jenson v. Eveleth Didn't Change Sexual Harassment Law, But Still Has a Story Worth Telling, 18 BERKELEY WOMEN'S L.J. 282, 288 (2003) (finding that between 1995 and 2002 there were only ten reported sexual harassment class actions that were certified and ten with certification denied).
[75] BINGHAM & GANSLER, supra note 97, at 54-55. In the lunchroom, a coworker named Frank Lipka yelled out in front of many others, "Hey Kathy, do you fuck on the job?" Id. Subsequently, Lipka tormented O'Brien by trapping a bat in the phone call box and then announcing over the PA system that O'Brien had a phone call. Id. O'Brien was afraid of bats and very startled by the incident. Id. She was sitting at a bench to calm down when Lipka came up and said, "I'll show you what will really scare you." Id. Then he twisted O'Brien's nose between the knuckles of his middle and index fingers until her nose bled. Id. He then grabbed her feet and flipped her backwards off the table, causing her to knock her head against the wall. Id. Lipka was never formally disciplined but was moved to a different crew. Id. O'Brien started carrying a sharpened screwdriver in her boot and continued to do so for the next nine years. Id.

241
**COMPLAINT – DEMAND FOR JURY TRIAL**

the women complained to management or to the union, little, if anything, was done to remedy the situation. Instead, they faced retaliation for making complaints.

369.     In litigation as a proposed class, counsel for the mines engaged in a "nuts and sluts" strategy, attempting to paint the plaintiffs as unstable and sexually promiscuous. After the court certified the class and found the employers liable, it appointed Patrick McNulty as Special Master to manage discovery on damages. Despite the plaintiffs' objections, the scope of discovery against the **named plaintiffs was virtually limitless**. III McNulty allowed a total of 7,469 pages of testimony during a seven-week trial and issued a 416-page Report and Recommendation.[76] Defendants explored Jenson's past extensively and intrusively in discovery, including scrutinizing an incident in her past when she was raped, which resulted in her pregnancy with her first child. Though Jenson's attorneys objected to the scope of discovery, their objections were overruled. The only concession plaintiffs received from McNulty was that this information was at least to remain under seal. Jenson was deeply afraid that her son would learn the painful story of his conception. But Jenson was betrayed in a strikingly unprofessional and unethical move by the judge, who revealed as part of his voluminous opinion that "[i]n 1967, <u>Jenson became pregnant by reason of what she now characterizes as rape. . . . [This] characterization of the event is not particularly important, in and of itself, ... [but] has importance as a reflection on credibility.</u> Another plaintiff, Jan Friend, dropped out of the case because she found it too painful to answer prying questions about her family, especially questions about her son, who had been convicted of murder. McNulty awarded staggeringly low damages, a total of $182,500 for the entire class. The plaintiffs appealed McNulty's findings, and the Eighth Circuit reversed and remanded for a new trial. The federal district court judge

---

[76] Id. at 1290. See Jenson v. Eveleth Taconite Co. (Jenson I), No. 5-88-163, 1996 U.S. Dist. LEXIS 17978 (D. Minn. Mar. 28, 1996).

**COMPLAINT – DEMAND FOR JURY TRIAL**

to whom the case was assigned on remand was much more responsive to the plaintiffs' requests - one of his first preliminary rulings was that anything that had happened in the women's lives more than one year prior to the class period was not relevant, not discoverable, and not admissible.

### Old Wine in New Bottle - The "Nuts & Sluts" Defense Used by Corrupt Corporations to Shoot the Whistleblowers.[77]

"The Truth Will Set You Free." John 8:32

370.    Nothing is more powerful than the truth. But few paths are more treacherous than the one that challenges an abuse of power. Time and time again, GAP has seen whistleblowers pay an enormous professional and personal price for their actions.  One person against a corporation is not a fair fight. In terms of raw power, the corporation holds all the cards. It enjoys a presumption of legitimacy and legal authority vis-à-vis its employees. It boasts **extraordinary resources and connections with politicians, the media, industry, and the larger community**. It defines the workplace and its rules and regulations within the law. It bears primary responsibility for holding itself accountable.  When company employees go public with tales of malfeasance, the focus often turns quickly to whether there was a reprisal or justified corporate response. You will surely suffer some level of harassment or retribution for blowing the whistle because bureaucracies instinctively tend to eliminate anything perceived as a threat. You may not believe that your employer is your adversary, but the record shows that employers often do not want to be told what is wrong with their operations.

---

[77] Extracted from "The Corporate Whistleblower's Survival Guide – A Handbook for Committing the Truth" by Tom Devine and Tarek F. Massarani.

"Whistleblowers - Broken Lives and Organization Power" – By C. Fred Alford.

"Mental Health as a Weapon: Whistleblower Retaliation and Normative Violence" – Kate Kenny, Marianna Fotaki, and Stacey Scriver.

**COMPLAINT – DEMAND FOR JURY TRIAL**

Frequently, the antidote to **bad news is secrecy enforced by repression to cover up miscon-duct**, avoid costly delays and litigation, and protect the short-term bottom line.

371.   What would a civics lesson from Michel Foucault look like? The power that disciplines the whistleblower, he might say, has less to do with the organization's ability to fire the whistleblower than one might suppose. That is merely power's most obvious expression, its last and most visible eruption. Power works in more intimate and subtle ways in the modern world, **isolating the insubordinate one from his or her fellows by diagnosing him or her as abnormal or disturbed.** Foucault calls this disciplinary power, which casts the gaze of the entire organization on the whistleblower almost **as though the organization were a physician**, treating the whistleblower not as someone who has challenged the power of the organization but **as one who is sick, ill, morally suspect, criminal, or disturbed[78], and so must be isolated from those who are normal.** Disciplinary power makes of the **whistle-blower a patient**, though we have to understand that term in its broadest sense: one whose flawed perceptions of reality are the result of a **moral or emotional illness** and who must be reformed by power, lest his symptoms prove catching. Under discipline there can be no political or ethical discourse. Any talking that takes place with the patient is strictly instrumental,

---

[78] The most powerful weapon in a corporation's arsenal is the exploitation of a whistleblowers' **mental illness/psychological disorders to delegitimize their complaints**. This is an effective strategy because it draws on the **social stigma associated** with people who suffered from mental illness. Even the smallest hint of mental health issues (Corrigan and Watson 2002) would destroy the whistleblowers' reputation, credibility, and livelihood. It is damaging at many levels because it can lead to a self-reinforcing cycle; those who experience retaliation can frequently suffer from a range of health issues, including mental health ones, and often seek counseling at some point in the process. Thus, reactions to whistleblowing by and within organizations, including retaliation, can produce negative mental health effects, which are then used by the organization to discredit the whistle-blower. **It is akin to double jeopardy.**

244

**COMPLAINT – DEMAND FOR JURY TRIAL**

**aimed at controlling the patient through categorization and labeling. Ideally the patient accepts the label**. "The psychiatrist they sent me to said I was suffering from a **histrionic personality disorder**, " said one whistleblower. "I think that meant I needed to show off. No one else but a show-off would have gone to talk with that environmental group about what we were doing. Well, you know what. I believed them. I really did. For years I believed them . . . sometimes I still do. A little bit, sometimes, when I'm feeling bad."

372.    "Nuts and sluts" is what many whistleblowers call this familiar strategy, by **which their claims are ignored by finding them to be emotionally disturbed or morally suspect.**[79]. Anita Hill is the most famous nut and slut in recent years. David Brock (1993) called her that in The Real Anita Hill: The Untold Story, a hatchet job that he has since recanted, at least in part.  Daniel Ellsberg might have been neutralized in this way had Nixon's plumbers not bungled their burglary of Ellsberg's psychiatrist's office.

373.    The suffering the whistleblower experiences has the quality of what Michel Foucault (1979) calls discipline.[80]  No matter how irrelevant, this often focuses attention on

---

[79] In high-stakes court cases it is common for the organization's lawyers to hire private detectives to research every aspect of a whistleblower's life. Today few records are unavailable. Until a few years ago, the easiest way to get rid of a federal employee was to send him or her to a government psychologist who would find him or her psychologically unfit for duty. The whistleblower psychologist who lives down the street from me had this as his assignment until he blew the whistle on the practice and lost his job. Some whistleblowers report that Employee Assistance Programs, which provide a therapist paid for by the organization, have taken over this disciplinary function.

[80] An accountant for a large corporation, he'd gone to his boss about his suspicion that they were overcharging the government on a contract they were working on first thing, they sent me to the doctor, then they put me on medical leave, and when I tried to go back to work they told me I was too sick. Before I knew it they gave me early retirement, made me take it. Don't get me wrong, I got great benefits, better than if I'd kept my mouth shut, but it's not what I wanted. I wanted to do the right thing, save the government some money. Now I'm the one with the money and no job

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   the whistleblower's personality and work record instead of the issues that prompted the whis-

2   tleblowing. Rather than face the problems brought to light, managers often blame the **"dis-**

3   **gruntled employee,"** who is portrayed as **vengeful, imbalanced, or self-serving**.

4

5                    **Strategies and Tactics to Shoot the Messenger.**

6          374.    Corporate hierarchies employ intimidation and fear to convince their workers

7   that the power of the organization is stronger than the power of the individual—even individ-

8   uals who have truth on their side. Often, making an example out of one troublemaker is suffi-

9   cient to keep the majority silent. The following section illustrates tactics your employer may

10  use to "shoot the messenger" of bad news. None of these techniques of retaliation is unique or

11  new. Keep in mind that the following list is not exhaustive; the forms of harassment are lim-

12

13  ---

    ### Richard Parks and Wrongdoing at Three Mile Island

14  When Three Mile Island engineer Richard Parks challenged sloppy cleanup
    practices that could have triggered a nuclear meltdown, his employer's first

15  reaction was to brush aside the safety issues and place Parks under inves-
    tigation for an alleged financial conflict of interest. The company's search

16  for incriminating evidence took on some extreme measures. Parks returned
    home one day to find that his house had been broken into and ransacked.

17  Parks was not vindicated until he went public and sought help from the
    Department of Labor (DOL), Congress, and the Nuclear Regulatory Commis-

18  sion (NRC). All three acknowledged the substance of his claims, and after a
    six-month investigation the NRC ordered his employer to redo the entire

19  cleanup with revised procedures and to conduct extensive safety tests.[3]

20  ---

    ited only by the imagination and, as in Orwell's 1984, likely will be customized to strike at a

21  whistleblower's unique vulnerabilities. Further, they vary in intensity. There **is a direct rela-**

22  **tionship between the significance of a whistleblower's threat and the severity of the re-**

23

24  **taliation**.

25

26              **Spotlight the Whistleblower, Not the Wrongdoing**

27          375.    This is also known as the smokescreen tactic, and it operates almost like a

28  knee-jerk instinct. The first imperative of retaliation is to make the whistleblower the issue:

                    **COMPLAINT – DEMAND FOR JURY TRIAL**

obfuscate the dissent by attacking the source's **motives, credibility, professional competence, or virtually anything else that will work to cloud the issue**. The point is to direct the spotlight at the whistleblower instead of the alleged misconduct. A typical initial management response to a whistleblower's disclosures is to launch an **internal investigation and retaliate against the employee on trumped-up charges**. Retaliatory travel, reimbursement, and time audits are so common they could be classified as bureaucratic knee-jerk reactions against whistleblowers. Allegations of everything from **sexual harassment to stealing paper clips are possible**—even charges that have already been investigated and discredited. Moreover, smears of alleged misconduct similar to what the whistleblower is exposing are not unusual.

376.    Chutzpah in selecting the smear charges is a common tactic to demonstrate the organization's invincibility. Soft-spoken, humble individuals have been **branded loudmouth egomaniacs**. There is no limit to the petty and outrageous depths to which an unscrupulous employer may be willing to sink. An example is charging an employee with gambling at work for buying a charitable raffle ticket from a colleague. Often a private security firm will be hired to do the dirty work of investigating a whistleblower. Sometimes investigations and surveillance are conducted by "babysitters," spies assigned by management to "assist" the whistleblower. Increasingly, employers also seek criminal prosecution for theft or misappropriation of company property—materials that are frequently the very evidence of illegality being used by the whistleblower.

377.    Spotlighting whistleblowers, as opposed to their claims, **often involves public humiliation—Psychiatric fitness-for-duty exams** are one of the ugliest forms of retaliation and have long been used as a way to spotlight the whistleblower. At the same time, companies

1   can hide behind privacy laws to hint that there is a problem with the employee that the corpo-

2   ration is not at liberty to disclose.

---

### "Crazy Like a Fox"

When Dr. James Murtagh, a physician at Atlanta's Grady Hospital, blew the whistle on fraud involving the hospital's federal medical care grants, an <u>alert was issued that he was armed and dangerous. He was alleged to be mentally unstable and ordered to keep off the hospital grounds, with instructions to security that he could be dangerous.</u> Eventually, Dr. Murtagh successfully settled a Federal False Claims Act lawsuit against the hospital for $1.6 million and organized other Grady whistleblowers into a relentless coalition that led to widespread white-collar prosecutions, <u>including the felony conviction of a notorious Georgia state senator for his involvement in an extensive corruption scandal.</u> Dr. Murtagh resumed his career and has become a leader in the whistleblower community, organizing two national conferences.

---

12   • The RICO Defendants used the same tactics by taking Huynh's psychiatrist records
13       out of context to portray Huynh as mentally unstable and prone to violence to sup-
14       port their affirmative defense that they fired Huynh 14 days before the RIF due to
         fear of physical violence.

### Build a Damaging Record against the Whistleblower

378.    This tactic goes hand in glove with spotlighting the whistleblower. Not infre-

quently, companies spend years manufacturing an official personnel record to brand a whistle-

blower as a chronic "problem employee" who has refused to improve. The idea is to convey

that the employee does nothing right. In truth, many whistleblowers have a history of sterling

performance evaluations—until this tactic is used against them. An employer may begin by

compiling memoranda about any incident, real or contrived, that projects inadequate or prob-

lematic performance on the job. This is often followed by a series of confrontational "counsel-

ing" sessions, in which the employee is baited to lash back. Reprimands and comparatively

mild disciplinary actions are taken first, in part because the employee has few (if any) due

process rights in defense and in part because company policy may require progressive disci-

pline. By the time something more serious such as termination is proposed, the employer is

248

**COMPLAINT – DEMAND FOR JURY TRIAL**

armed with a long and contrived history of "unsatisfactory performance."

Several years ago, an individual herein pseudonymously referred to as John Doe began working at a major US pharmaceuticals production facility. This facility was charged with manufacturing a new infant vaccine for meningitis and pneumonia. Doe's role was to ensure that the facility's employees were sufficiently trained to the level required by Food and Drug Administration (FDA) standards. He soon became aware of gaps and shortcuts that were being taken both with the employees' training and with the manufacturing process itself. These shortcuts in the training program were particularly alarming because producing biological vaccines required more-complex processes than regular pharmaceutical production.

Doe's concerns led him to send a written memorandum to his supervisor, explaining that the facility was not satisfying FDA regulations and the company's own code of conduct and that he would not be complicit in misrepresenting that fact. Doe filed complaints with both the company's Office of Compliance and its Office of Ethics and revealed the depth and the breadth of manufacturing, quality assurance, and product release problems to one of the company's attorneys. He was told that the resulting investigation found no problems with the facility, though internal memoranda unearthed later in discovery revealed a much different picture.

Two months later Doe was placed on a personal improvement plan (PIP) for 90 days. The PIP stated that he had to stop making comments to anyone regarding the company's noncompliance with training requirements. Doe was promptly suspended and fired two months later, after he had a hostile encounter with the human resources director at a holiday party. It later surfaced that this manager was brought in to "deal with" Doe after his predecessor was terminated for refusing to fire Doe and that the manager himself was later dismissed for cause, including harassment, expense report "discrepancies," and unauthorized disclosure of proprietary information to a competitor. The Wayward Whistleblower

**Paralyze Their Careers**

379.    An effective retaliation technique—and one that also sends a signal to other would-be dissenters—is to deep-freeze the careers of whistleblowers who manage to thwart termination and hold on to their jobs. These employees become living legends of retaliation when employers deny all requests for promotion or transfer. A related tactic is to deny whistleblowers the training needed for professional development. The message is clear: "She is

going nowhere." Bad references for future employment openings are common, and any whis-
tleblower settling a legal case should be careful to take this into account. Sometimes this tac-
tic can be subtle, using buzzwords to signal that a former employee should not be hired. Com-
mon examples are statements that an employee "is not always a team player" or "needs to
work on maintaining cooperative relationships."

**Blacklist Them**

380.    Sometimes it is not enough merely to fire or make whistleblowers rot in their
jobs: the goal is **to make sure they "will never work again" in their chosen field or indus-
try**. After several oil-industry whistleblowers exposed illegal pipeline practices, for example,
the company placed them on a list of workers "not to touch" in future hiring. It does not mat-
ter whether you are completely vindicated. As Professor Alford summarized the experience of
a Medicare fraud whistleblower, "Her boss went to jail, but she couldn't get a job in the state
where she worked. 'They were all afraid I might commit the truth.'"

381.    Employers in scientific professions have exercised some of the ugliest forms of
blacklisting. Dr. James Murtagh has endured a steady pattern of receiving new jobs in sup-
portive environments just to get terminated without explanation within weeks. **He subse-
quently found that his former employer had posted the equivalent of a smear dossier
about him on its website**.

- The RICO Defendants exploited deRubertis five frivolous ADHD FEHA
  claims to obtain Huynh's psychiatrist and personnel records dating back to
  1987 then use them to ask leading questions to capture the answers in a 333
  page deposition transcript.  The RICO Defendants than extracted 130 pages
  from the transcript out of context to create the "Smear" Dossier on Huynh and
  filed it in the public docket. DC Dkt. 123.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Life Is Not a Fairly Tale and Most Whistleblowers Do Not Live Happily Ever After.[81]**

382.    The Movie Insider (starring Al Pacino and Russell Crowe), depicts a cigarette company executive who became a whistleblower. "The little man who stood up against the big corporation and won" is a type of folk hero. But that is just the problem. He is a type of folk hero, that is, a stereotype. Everyone wants to hear about the stereotype, but no one wants to know how vulnerable we are to power and how much it can take from us, including the meaning of our lives.  Unfortunately, this has not been the experience of most whistleblowers. Most are in **some way broken, unable to assimilate the experience**, unable, that is, to come to terms with what they have learned about the world. Almost all say they wouldn't do it again - if they had a choice, that is. John Brown put it this way:

> If I had to do it over again, I wouldn't blow the whistle for a million dollars. It ruined my life. My neighbor kept talking about all these stories he'd read about "the little man who stood up against the big corporation and won." Well, I stood up against the big corporation and I lost. I didn't just lose my job. I lost my house, and then I lost my family. I don't even see my kids anymore. My ex-father-in-law said if I'd been a real whistle-blower, I'd have been on 60 Minutes.

> I spent $50,000 to have my day in court, only it was more like my minute in court. After five years of waiting to get to court, the judge said I didn't have standing to sue. I was out on the street an hour after I walked in the door. I still owe my lawyer.

> My boss, the one who told me to lie to the FBI. He got a promotion. You know what I do now? I deliver pizza. Me, a licensed professional engineer. The Engineers Association, they just wished me luck, said they admired someone who stood up for his beliefs. Take that to the bank. They wouldn't even help me find a new job. Nobody understands. Lots of people say they admire my spunk, but nobody has any idea of the consequences. No one wants to know.

> So, I think I was crazy to blow the whistle. Only I don't think I ever had a choice. It was speak up or stroke out So all I can real say is that I wouldn't do it again if I didn't have to. But maybe I'd have to. I don't know.

---

[81] Excerpts from the book "Whistleblowers - Broken Lives and Organization Power" – By C. Fred Alford. "Mental Health as a Weapon: Whistleblower Retaliation and Normative Violence" – Kate Kenny, Marianna Fotaki, and Stacey Scriver.

**COMPLAINT – DEMAND FOR JURY TRIAL**

**ATHERTON AND THE NRC**

Peter James Atherton is his name, one of the few actual names of whistleblowers used in this book. I use it because he asked me to and because his case is well known. His is not a typical story, but it illustrates much that is. A nuclear engineer and inspector for the Nuclear Regulatory Commission, Atherton became convinced that the electrical cables that would be needed to shut down the Maine Yankee nuclear plant in an emergency were not properly separated. If one failed because of fire, all would fail because they were routed through the same cable tray, as it is called. The plant should be shut down until this and other deficiencies were corrected.

Atherton's concerns were not based on fantasy. Just three years earlier, in 1975, some workers used a candle flame to check for air leaks in the containment building that housed the reactor at the Brown's Ferry nuclear plant. The flame touched some insulation, igniting a fire that burned more than two thousand cables and disabled electrical controls at the plant. It took more than three days to shut down the plant's two operating reactors, one of which came close to boiling off its cooling water. Had that happened, a meltdown would have occurred.

In the keep 'em glowing climate of the 1970s, plants were rarely shut down for repairs. Atherton's supervisors were aware of his conclusions, **and while he was preparing his report, they began preparing a response. Their position was that Atherton was emotionally ill, his report an exaggeration.** The NRC would not type up his report, and Atherton began showing a handwritten copy to his colleagues. They refused to read it, and so did his supervisors, or so they said.

On the day the NRC met with Maine Yankee officials, Atherton got in his car, drove to downtown Washington, D.C., and carried his report straight to NRC commissioner Victor Gilinsky. When Gilinsky would not shut down Maine Yankee immediately, Atherton went to the top nuclear engineer in the country, President Jimmy Carter. After showing his NRC credentials to the Secret Service agent at the gate, he was admitted to the White House grounds, handcuffed, and sent to St. Elizabeth's Hospital for three days of involuntary psychiatric confinement. He was released and fired.

**Molly Higgins may help explain this.**

A self-described military wife, Molly is married to Tom, a pilot who lost his career for protesting the failure of the military to live up to the law regarding the education of disabled children of military personnel. After Tom wrote to his congressman about his son's poor education, the air force sent him for psychiatric observation. This is standard procedure, the quickest, easiest way to separate someone from the military (until just recently it was the quickest and easiest way to separate any federal worker). In short order, Tom was decertified from flying and transferred to a remote base where he was given a desk job

252

**COMPLAINT – DEMAND FOR JURY TRIAL**

keeping track of spare parts. A series of bad efficiency reports followed. After being sent for yet another psychiatric examination, Tom was confined for several days in a military hospital. He was separated from the military when he was less than a year from retirement. The whole process took about three years from the day Tom wrote his congressman.

One might argue that Tom Higgins was unstable, and certainly somewhere along the way he may have become so. But no one found him unstable until he wrote his congressman, after trying for several years to get his child placed in special education. (His letter is temperate.) It was then that Tom entered the machine whose product is the elimination of the whistleblower in ways entirely compatible with the law.

Molly Higgins watched all this, and in some ways she understands what has happened to her husband better than he does. She has become her broken husband's less broken voice. Tom is still somewhere in the machine. Molly says:

- We were a good military family. We thought it was a misunderstanding. When I was a girl, I grew up near an Air Force base, and I loved to see the big birds come in. When I met my husband and he told me he owned one, it was love at first sight. I was the most patriotic girl who ever was, born in a small town, white. I didn't know what happens to you if you end up on the other side.

- They kill you; they isolate you in the desert. We weren't traitors. We were trying to get the best education for our kid. I lost it there for a while. I lost something to be proud of. I lost faith in God. We were too far North. [Her husband's last posting had been to a base near the arctic circle.] You know, we wanted it exposed, what the military was doing to the children. But we were the ones who were exposed, and now it will never be the same. Now I don't believe in anything.

**Pain and Suffering of the Whistleblowers.**

383.    The process of **character assassination resembles an annihilation of a human life**, as the damage sustained can last a lifetime. Many lost their families. It doesn't happen all at once, but whistleblowers' cases drag on for years, putting a tremendous strain on families.

Most whistleblowers will suffer from depression and alcoholism (Clark 1997, 1065; Miethe 1999, 77-78). Miethe (1999, 78) found that half went bankrupt. Most whistleblowers will be unable to retire. A typical fate is for a nuclear engineer to end up selling computers at Radio Shack.

Somewhere between half and two-thirds of the whistleblowers lose their jobs, according to several studies (Miethe 1999, 77-78; Rothschild and Miethe 1996, 15-16; Glazer and

253

**COMPLAINT – DEMAND FOR JURY TRIAL**

Glazer 1989, 206-7). At least one study, however, has found significantly less retaliation (Miceli and Near 1992, 226-27). As might be expected, most of the difference depends on whom and how one counts (Miethe 1999, 73-78).

Not only do most whistleblowers get fired, but they rarely get their jobs back. Most never work in the field again. In some tight-knit fields there is an informal blacklist. One whistleblower was fired from her new job in the pharmaceutical industry when she sued a previous employer for wrongful discharge. "[My new boss] said it was unconscionable that anyone working for Personal Products would sue a sister company." (Glazer and Glazer 1989, 95) When all organizations are sisters, the whistleblower has nowhere else to go. That, presumably, is the point.

- Of the several dozen whistleblowers I have talked with, most lost their houses. Many lost their families. It doesn't happen all at once, but whistleblowers' cases drag on for years, putting a tremendous strain on families. Most whistleblowers will suffer from depression and alcoholism (Clark 1997, 1065; Miethe 1999, 77-78). Miethe (1999, 78) found that half went bankrupt. Most whistleblowers will be unable to retire. A typical fate is for a nuclear engineer to end up selling computers at Radio Shack.

- One whistleblower put it this way: "I decided I needed to go back to work. I interviewed with the state of Texas, the city of Austin, and many industries…...But nobody wants to hire former whistleblowers. They are all afraid of what we would do if we were asked to tell the truth about some problem" (Glazer and Glazer 1989, 228).

384.    In perhaps the most comprehensive survey of whistleblowers in the academic literature, authors Joyce Rothschild and Terance D. Miethe wrote as a consequence of their whistleblowing experience, the majority of the whistle-blowers in our sample suffered intensely. The most common fallout from their whistleblowing involved:

- severe depression or anxiety (84 percent)
- feelings of isolation or powerlessness (84 percent)
- distrust of others (78 percent)
- declining physical health (69 percent)
- severe financial decline (66 percent)
- problems with family relations (53 percent).

385.    A massive study by Dr. David Welch, a pioneer SOX whistleblower whose seven-year ordeal illustrated the unreliability of those rights, summarizes what you can expect

254

**COMPLAINT – DEMAND FOR JURY TRIAL**

based on 27,000 whistleblowers' fates from 1994 to 2008 who filed retaliation complaints with the Occupational Safety and Health Administration (OSHA):

- 78 percent struggled financially for the first five years after blowing the whistle;
- 83 percent found it "extremely difficult to impossible" to find a new job in their field
- 66 percent found it "extremely difficult to impossible" to find a new job after changing professions

### Justice for Whom?

386.    The intent of the Whistleblower Legislations such as STAA, ERA, CAA, CERCLA, FWPCA, SDWA, SWDA, TSCA, AIR21, **SOX**, PSIA, FRSA, NTSSA, CPSIA, ACA, CFPA, SPA, and FSMA is often benign but the way in which the law serves those with the time and money to use it is the point.  However, the critique of liberal jurisprudence provides another perspective. It is the purpose of the **law to enshrine existing power differences in society**. It is not accidental but essential to the law that **its procedures are on the side of the organization**. That it takes **five to ten years** and a hundred thousand dollars to get one's day in federal court is riot a neutral fact applicable to both parties. Like the law that forbids princes and paupers alike to sleep out under the bridge at night, legislation to protect whistleblowers must end up serving the organization against the unemployed and **bankrupt middle-aged whistleblower, who worries if he will ever have enough money to retire**. Time is on the side of the organization.  Five years is not a long time for an organization to be involved in the courts; ten years is not unusual. But it is a long time for a whistleblower to be without a job.  It is worth reflecting, however, on what the law looks like from the wrong end of the telescope, from the perspective of the whistleblower. From this perspective, the law is entirely capricious, government the province of men, not laws. "**The law is a crap game, and the odds are against you. It all depends on who hears your case, and what he had for break-**

**fast**." In part, the whistleblower is referring to the fact that cases are rarely clear-cut. Witnesses lie, and most judges hate to get involved in what they regard as personnel matters, an inclination that almost always favors the organization. The result is that who the judge or hearing examiner is makes all the difference in the world, a government of men not laws.

> **District Judge Chhabria Exploited the Prestige and Power of His Office as a Megaphone to Disseminate Walmart's Factual Misrepresentations to Lend Credibility the RICO Defendants' Purported "Get Out of Jail Free" Card.**

387.    On May 20, 2019, the RICO Defendants deposed Huynh for over seven hours with manipulated and/or asked leading questions to obtain the desired responses and when they didn't like the answers, they removed it all together from the deposition transcript in the Defs' Exhibit 127 (DC Dkt. 123) to take Huynh's answer out of context.

388.    Below are the manipulated conversations presented by the RICO Defendants regarding the SEC investigations into Walmart's misconducts to support Walmart's motion for summary judgement.  It worth pointing out that the RICO Defendants got a "Get Out of Jail Free" Card from the SEC on April 2, 2019 – DC Dkt. 119-21. However, they never produced this letter to Huynh's until end of June 2019.  In short, based on the discussion below the RICO Defendants purportedly claimed that the SEC's investigative team (comprising with securities fraud specialists and other qualified team members) investigated Walmart and clear Walmart of any wrong doing.

Case 3:18-cv-01631-VC Document 123-1 Filed 08/29/19 Page 97 of 117 (page 250 of 323-page deposition transcript)

Q. Did you meet in person with the SEC?

A. Yes.

Q. For how long?

A. To the best of my recollection, probably couple hours, three hours.

1   Q. Did they ask you questions like this?

2   A. They asked me questions in here, yes.

3   Q. They gave you an opportunity to present your concerns about the issues you'd raised in your complaint?

4   A. They read the complaint and they have specific question about a complaint.

5   Q. Did they ask for other information outside of that meeting as well?

6

7   Case 3:18-cv-01631-VC Document 123-1 Filed 08/29/19 Page 97 of 117 (page 252 of 323-page deposition transcript)

8   (Edited out conversations before "filled" because it was disadvantage to Walmart i.e., page 251)

9   **Filled** with specialists who investigate claims about things like securities fraud and so forth at the federal government, right?

10

11  A. I don't know how they structure it. If that's what you say and do. More experience and that appear to be so.

12  Q. You made very similar complaints about misconduct by Walmart in your SEC complaint as you make in this lawsuit, correct?

13  A. There are some overlap between the two, yes.

14  Q. You suggested that Doug McMillon and others did not thoroughly investigate your complaints because of a self-interested cover-up, correct?

15

16  A. Correct.

17  Q. That's the kind of allegation you would expect the Securities and Exchange Commission to take very seriously, correct?

18  A. I think so. Yes.

19  Q. **And if they did an investigation and decided to close it without punishing Walmart in any way, might that suggest to you that your complaints lack merit?**

20  A. **Depend on what time frame are you talking**

21  (The RICO Defendants **left out the specificity regarding the misleading statements McMillon made to investors regarding the total number of Marketplace SKUs** i.e., cut out page 253-256 of the deposition transcript as they did not want the public to known).

22

23

24

25      389.    It was important to note that Huynh's SEC TCR process and Huynh's Federal

26  Court's complaint against Walmart had a symbiotic and synergistic relationship with each

27  other.  Walmart exploited the judicial process to file factual misrepresentations in the 3/15/18

28  complaint to whitewash McMillon's misleading statements, portrayed Huynh as mentally

257

**COMPLAINT – DEMAND FOR JURY TRIAL**

etc., to shotgun plead five frivolous FEHA ADHD claims to improperly obtain Huynh's medical and psychiatrist records and personnel records from Huynh's previous employers to "Nuts & Sluts" Huynh.  The Rescue Squad and the Walmart Participants directed and caused David deRubertis and others to use the discovery process to leak the confidential and non-public information in Huynh's SEC submissions (included name of confidential witnesses) to the RICO Defendants so they could coach these witnesses to submit factual misrepresentations (like they coached some of RICO Defendants to submit false declarations and committed perjury in the official federal judicial proceeding) and lied to the SEC to obstruct justice and obtain their "Get Out of Jail Free" Card.

390.    In short, imagine what would have happened if instead of granting Walmart summary judgement on Jan 14, 2020 (DC Dkt. 167 and 168), District Judge Vince Chhabria ruled in Huynh's favor; It would shock Walmart's investors, analysts, the SEC, the media and politicians that Walmart got away scotch free for defrauding shareholders to the tune of $140 Bil.  Thus, the RICO Defendants would never let this happened because if it had the Walmart's Shareholder Fraud Coverup Enterprise's Scheme would collapse in a spectacular fashion and put Walmart, their executives, and board of directors in both in civil and criminal jeopardies.

391.    To ensure that District Judge Vince Chhabria's  ruling synergized with the SEC April 2, 2019 Non-Enforcement Letter, the RICO Defendants corruptly influenced District Judge Vince Chhabria so he not only granted Walmart summary judgment but do so in a one siding way to assassinate Huynh's character, social and professional reputations, and moral characters to kill and leave Huynh for dead (i.e., destroyed Huynh's credibility and good name, foreclosed any future employment prospects, and financially bankrupted Huynh

258
**COMPLAINT – DEMAND FOR JURY TRIAL**

1   and his family).  District Judge Vince Chhabria's ruling was the final nail in the coffin that

2   buried Huynh's life six feet under so Huynh could no longer posed any threats to the RICO

3   Defendants in the future.

4

5       392.    Furthermore, the RICO Defendants amplified and disseminated the factual and

6   legal misrepresentations in District Judge Chhabria's dismissal ruling (DC Dkt. 167) to the

7   world using their Maestros of the Media and their expansive PR/Media networks.  For exam-

8   ple, on Jan 14, 2020 a reporter from Court House News, MATTHEW RENDA, published an

9   article title "Judge Tosses Whistleblower Suit by Ex-Walmart Exec" which contains factual

10  misrepresentations and lies against Huynh.[82]

11

12

13      SAN FRANCISCO (CN), January 14, 2021 – A federal judge tossed a case involv-
    ing **a disgruntled Walmart employee** who claimed he was fired for revealing a massive

14  fraud by the retail company's e-commerce division. MATTHEW RENDA.

15      U.S. District Court Judge Vince Chhabria handed down summary judgment in favor
    of Walmart, saying Tri Huynh, a former e-commerce executive for the retail giant, **failed to**

16  **prove he was fired because he was a whistleblower**.

17      **"There is little evidence in the record that Huynh raised concerns to Beal about**
    **Walmart's allegedly unlawful activities**," Chhabria wrote in the 6-page order. Beal is the

18  surname of Huynh's supervisor. Chhabria said the record establishing such a meeting took
    place was rather thin "There is also no actual evidence that this meeting, assuming it took

19  place, played any causal role in Beal's decision to terminate Huynh's employment," Chha-
    bria wrote.

20
    - As discussed above, David and Kari deRubertis, Garen Nadir, Doug Kasales,
21        Kathy Von lindern and other Doe(s) destroyed and mutilated Huynh's outlook cal-
          endar meetings with Beal on Oct 4 and Oct 18 at the direction of the GDC Squad
22        and sanctioned by Walmart's insiders

23  - The Rescue Squad and the Walmart Participants directed and ordered Melvenia Ha
          to fabricated the Oct 17, 2016 interview notes, the Oct 5 and Oct 18 HR investiga-
24        tion reports to purportedly prove that Huynh didn't engage in protected activities.

25  - The Rescue Squad and the Walmart Participants directed Audrey Au Joulani to

26
    _____

27  [82] https://www.courthousenews.com/judge-tosses-whistleblower-suit-by-ex-walmart-exec/
    https://www.courthousenews.com/wp-content/uploads/2020/01/HuynhWalmart-SJ.pdf (Judge

28  Chhabria's ruling - DC Dkt. 167

1  manufacture the sexual harassment investigation report, the ADHD investigation
2  report, and the shareholder fraud reports to justify the reasons Walmart shut down
   Huynh investigation after three days.
3

4      Huynh, who recruited businesses to Walmart's e-commerce platform, filed suit in
   March 2018 claiming Walmart committed securities fraud and various other egregious ac-
5  tions of corporate malfeasance and that he was fired when he told his supervisors. The for-
   mer executive said Walmart was willing to cut corners and engage in illegal practices in its
6  race to catch Amazon in the cutthroat industry of online retail. Walmart said Huynh was not
7  fired because he blew the whistle on its practices, but was instead included in a 200-person
   layoff at the company **after performing poorly as an employee for several months**.

8      Chhabria agreed with Walmart's recounting of the events. "Walmart has **produced a
   mountain of evidence** that Huynh was a poor-performing employee, and that its inclusion
9  of Huynh in a significant round of layoffs was unconnected to any whistleblowing," the
10 judge wrote. Huynh was credibly **accused of sexual harassment and almost fired months
   before his actual termination**, was accused of fostering a hostile work environment, made
11 unauthorized statements to the press resulting in a media ban and received several poor per-
   formance evaluations related to his work. "**Huynh presents virtually nothing to contra-
12 dict any of this evidence**," the judge wrote

13    • As discussed in Huynh's motion for reconsideration DC Dkt. 178 and multiple
         briefs filed with the United States Court of Appeals for the Ninth Circuit (COA
14       Dkt. 5, 9, 13, 15, 16, and 33). Huynh proved that District Vince Chhabria sup-
15       pressed the mountain of evidence of pretext (although Huynh didn't have to prove
         pretext under SOX).
16
17    • District Judge Vince Chhabria never ruled on Huynh's motion for leave to supple-
         ment/submit material evidence in the records.

18    • District Judge Chhabria canceled oral argument for summary judgement immedi-
         ately after being put on notice that David deRubertis and the Rescue Squad en-
19       gaged in conspiracy to obstruct justice.

20    • District Judge Vince Chhabria made misleading statement about local rule 7 re-
         garding motion for reconsideration (i.e., Huynh needed Judge Chhabria's permis-
21       sion to file a motion for reconsideration of his final entry of Judgement in
         Walmart's favor) in DC Dkt. 174 to purportedly obstruct Huynh from filing a mo-
22       tion for reconsideration of Judge Chhabria final judgement.

23    • District Judge Vince Chhabria attempted to recategorize Huynh's Jan 19, 2020 let-
24       ter in his ruling denying Huynh's motion for reconsideration to coverup the facts
         that he engaged in a conspiracy to deny Huynh's motion for consideration without
25       affording due process and equal protection under law.

26    • As discussed, COA Dkt. 33, Audrey Au Joulani, Melvenia Ha, Seth Beal, and Va-
         lerie Ricetti etc. used fabricated evidence and false declarations to falsely accuse
27       Huynh of sexual harassment (a very serious allegations in the age of the "Me Too"
         movement.
28

**COMPLAINT – DEMAND FOR JURY TRIAL**

393.    In short, the RICO Defendants corruptly influenced and/or enticed District Judge Vince Chhabria to use the power, prestige, and trust that the American public bestows on his office as a Federal Judge as a megaphone to disseminate and amplify the RICO Defendants' factual misrepresentations about Huynh's moral characters, good name and reputation, and professional competency to kill Huynh once and for all to pulverize any future threats to the Walmart's Shareholder Fraud Cover Up Enterprise as well as the Walmart's $140 Bil Shareholder Fraud Enterprise .

394.    The RICO Defendants shotgun pleaded five nefarious and frivolous ADHD FEHA claim against Walmart in the 3/15/18 complaint then use it disseminate Huynh's ADHD condition to exploit the public's stigmatization of people who suffered from mental illness to portray Huynh as mentally ill and unhinged, unable to regulate his emotion, antisocial, lack of empathy, and prone to violence.   The RICO Defendants used the derogatory languages below to spread Huynh's ADHD condition across the Internet.

- FAC Dkt. 8 paragraph 57: In late-May of 2016, after Mr. Huynh was criticized for refusing to follow the direction of "staying within the boundaries" of his job – even if that meant turning a blind-eye to concerns of unlawful conduct – Mr. Huynh shared with his direct supervisor and human resources that he suffered from a **hidden mental disability – Attention Deficit Hyperactivity Disorder (ADHD).** Mr. Huynh provided his supervisor and human resources with a detailed presentation about his ADHD, his progress in trying to treat and manage it, and **how it impacts his day-to-day behavior and functioning. Mr. Huynh directly explained that his ADHD caused challenges and limitations in emotional self-regulation**, but he also explained how he is and has been committed to improving himself in that regard.

- FAC Dkt. 8 at paragraph 79: **"Emotional intelligence" is defined as "the capacity to be aware of, control, and express one's emotions, and to handle interpersonal relationships judiciously and empathetically."** But, Mr. Huynh had

specifically shared with his direct boss and human resources **that emotional reg-ulation and impulse control were symptoms of his underlying ADHD disabil-ity** – indeed, he had even presented a Powerpoint presentation about his condition to them in an effort to educate them about his struggles with his disability. To the extent that there were **any real issues involving Mr. Huynh's emotional regula-tion or impulse control, t**hey should have been dealt with through a proper inter-active process that was appropriately tailored to his specific disability. But, in-stead, his disability's role was being ignored and he was told he must take this course that was inappropriate for him under the circumstances of his disability.

- FAC Dkt. 8 at paragraph 143: At all relevant times, **Plaintiff had one or more mental and/or physical disabilities; had a history of one or more disabilities; had a record of one or more disabilities**; and/or was perceived or regarded as having one or more disabilities that constituted protected characteristics under the FEHA including but not limited to because of either present or future disabling effects.

395.    The Rescue Squad and the Walmart Participants directed and caused David and Kari deRubertis to improperly obtain Huynh's psychiatrist records then produce them to Walmart's under the table without the "Confidentiality" designation with the help of Kasales and Lindern to bypass Epiq Global ESI processing, extraction, and production workflow.  On Aug 29, 2019 the Rescue Squad filed Huynh's psychiatrist records without sealing in the court's public docket as Defs. Exhibit 116 (DC Dkt. 119-3).  They manipulated and take Huynh's private and intimate conversations with his psychiatrist, Dr. Bolte out of context to support their purported legitimately reason for firing Huynh 14 days before the general RIF.

| David deRubertis Leaked Huynh's Confidential Information. | The GDC Squads, Walmart's Insider's, and David deRubertis' Neutralization Strategies |
|---|---|
| Huynh repeatedly informed David deRubertis between early 2017 to end of 2018 that Walmart's terminated Huynh's employment 14 days before everyone else was evidence of pretext. | David deRubertis improperly obtained Huynh's psychiatrist record by faking Huynh's signatures then produced to Walmart without the confidentiality designation. The GDC Squad and Walmart's insiders filed Huynh's psychiatrist records in public for not legal basis and without sealing then took Huynh's private conversation with his psychiatrist, Dr. Bole out of context to portray Huynh as a violence person to support their post hoc rationalization for firing Huynh 14 days before the general RIF. See analysis below. |

**Huynh's Original Authorization**

**Altered Version of Huynh's Authorization – Made the Signed Date Fillable**

Employment Development Department
P.O. Box 826880, MIC 53
Sacramento, CA 94280-0001

deRubertis corrected misspelling

Employment Development Department
P.O. Box 826880, MIC 53
Sacramento, CA 94280-0001

I, Toi Minh Huahn, authorize the

I, Tri Minh Huynh, authorize the

Type or Print Name

Typed Print Name

Employment Development Department to release a copy of my medical records pertaining to:

Employment Development Department to release a copy of my medical records pertaining to:

Unemployment Insurance Records; Disability Insurance Records

Unemployment Insurance Records; Disability Insurance Records

Specify type of Records - Example: Unemployment Insurance Records, Disability Insurance Records

Specify type of Records - Example: Unemployment Insurance Records, Disability Insurance Records

for the period of: 01/01/1997 through 02/31/2018 to the

for the period of: 01/01/1997 through 02/31/2018 to the

MM/DD/YY    MM/DD/YY

MM/DD/YY    MM/DD/YY

following individual or entity (or its representative):

following individual or entity (or its representative):

The deRubertis Law Firm, APC

The deRubertis Law Firm, APC

Name of Individual/Entity (or its Representative)

Name of Individual/Entity (or its Representative)

4219 Coldwater Canyon Avenue

4219 Coldwater Canyon Avenue

Address

Address

Studio City, CA 91604

Studio City, CA 91604

City, State, Zip Code

City, State, Zip Code

This Authorization shall remain in effect for 90 days from date of signature or as otherwise specified. A copy of this Authorization shall be as valid as the original.

This Authorization shall remain in effect for 90 days from date of signature or as otherwise specified. A copy of this Authorization shall be as valid as the original.

01/26/18

MM/DD/YY    Signature

MM/DD/YY    Signature

Social Security Number*

Social Security Number*

deRubertis erased Huynh's signed date so he didn't have to ask Huynh for authorization for future requests

**COMPLAINT – DEMAND FOR JURY TRIAL**

**Huynh's Original Authorization**

**Altered and Manipulated Form – Made he signed date fillable**



- On 1/26/18, deRubertis filled in the blanked form to request for all types of medical records from Swedish Medical unbounded by time without my knowledge. On 6/27/18, deRubertis sent another request to Swedish Medical to ask for the latest medical records not previously obtained.

deRubertis erased the actual signed date on the original form to make the signed date fillable. This allowed deRubertis to submit another record request to Swedish Medical on June 27 without asking for my authorization

**The RICO Defendants Took Dr. Bolte's Jul 19, 2017 Note Out of Context to Portray Huynh as Mentally Ill and Prone to Violence to Justify Firing Him 14 Days Before the General RIF.**

"Beal and HR shared concerns that Huynh might cause serious workplace disturbances, including verbal altercations and **potentially physical violence**, were he to remain in the office; and therefore, communicated the RIF decision to Huynh on January 10, Beal Decl. ¶ 72; Ricetti Decl. ¶ 63, Trembley Decl. ¶ 40, the first day Huynh was in the office following the Christmas and New Year holiday, Tr. 315:12-21.

The Rescue Squad manipulated of Dr. Bolte July, 19, 2017 office note and quoted it out of contest:

- The Rescue Squad's manipulation: "These concerns do not appear to have been misplaced. Huynh later told his therapist that he has violent thoughts surrounding his termination. Ex. 116 at 14401 (Huynh "has fantasies about hurting the people at Walmart **who [terminated]** him")." DC Dkt. 113 at 12.
- Dr. Bolte Actual Note for the July19, 2017 office notes: "Has fantasies about hurting the people at Wal-Mart **who did this to him** - but no intent or plan"

The Rescue Squad Lied When They Equated "**who did this**" with "**terminated**".

264
**COMPLAINT – DEMAND FOR JURY TRIAL**

**April 13, 2017 Visit Notes:**

Tri is officially unemployed. His life right now is a nightmare. Not only was he laid off, but now he has lost half of his designated bonus because **some anonymous observer has accused him of sexual harassment because he hugged a female employee, who is his friend, after a meeting in front of several other employees.** The person he hugged was not the person who reported this, nor does this person feel it was at all harassment, however she is now reluctant to stand up for him against the authorities because she fears losing her job. He feels that as a reward for keeping her mouth shut, she has been promoted. **Tri is feeling stunned. He is feeling like he was raped, then they turned around and raped him again.** He is not able to sleep more than a couple of hours. His thoughts are obsessive, **focused on the unfairness of the situation, how betrayed he has been by others and how angry he is at everyone.** He is having physical symptoms suggestive of panic attacks and becomes overwhelmed with anxiety. **He feels like he is going to explode.** His blood pressure has been high despite the guanfacine and losartan. His pulse today is in the 80's. **He says he would "never never ever do this to anyone else". He would never sexually harass anyone. Even his wife is upset about this charge.**

He has spoken to attorneys who want to take his case, but now with the sexual harassment charge thrown in it is much more complicated. He feels they did this just to prevent him from suing. He is wanting to apply for other jobs but is unable to concentrate and feels desperate about the situation. **"This is the hardest thing I have ever had to face, even being a refugee from Viet Nam this is worse." He feels exceedingly guilty about not being there for his son and for yelling at his wife this past week because he was so stressed. "It is not like me to be this way."**

**July 19, 2017 Notes:**

He is still very ruminative in his thinking about Wal-Mart, the circumstance of his termination, and the unfairness of it all. **He is furious that they would say he sexually harassed someone, and believes they only did this to prevent him from suing them. He becomes so enraged at times that he starts to shake all over. He just can't let it go. He is having a great deal of trouble focusing on anything else.**

"He denies psychosis, thoughts of self harm, has fantasies about hurting the people at **Wal-Mart who did this to him - but no intent or plan**, speech is as loud and pressured as it always is. He makes good eye contact."

396.     The contextual analysis above showed, the word "**who this did**" used by Dr. Bolte was not about being **terminated** from Walmart.  Instead, it was related to Walmart's character assassination against Huynh by falsely charged Huynh with **sexual harassment** (i.e., a serious charge of moral turpitude especially in the "Me Too" era).  This false sexual allegation charges caused Huynh and his family significant pains and suffering.

397.    It is important to note that as a human being we all have moments in our lives when someone inflicted so much pain and suffering on us that we fantasied about hurting them for inflicting such pain. However, the difference between sanity and insanity is that the sane person may have fantasies about hurting people who hurt him/her but never acted on it. We all have seen in so many movies where this type of fantasies played out in the minds of the protagonists when the antagonists inflicted mental or physical pains upon them.  In Dr. Bolte's July 19, 2017 office note she clearly stated "**has fantasies** about hurting the people at Wal-Mart who did this to him - **but no intent or plan**.

398.    A research article from Warwick Business School titled "Whistleblowers' mental health attacked by firms" describes tactics used by Corporations to silence whistleblowers. The RICO Defendants used eerily similar tactics to "Kill" the Whistleblower (Huynh) to effectuate the Walmart's $140 Bil Shareholder Fraud Coverup Enterprise.

https://www.wbs.ac.uk/news/whistleblowers-mental-health-attacked-by-firms/

**Whistleblowers' mental health attacked by firms**

10 May 2016

- Far from being protected whistleblowers are attacked by firms retaliating
- Study found some were driven to contemplating suicide
- Research finds many forced to leave jobs after revealing wrongdoing
- Bullying, harassment and isolation used against whistleblowers

Organisations demonise whistleblowers leaving some suicidal in an attempt to paint them as mentally ill and discredit their claims, according to new research.

Whistleblowers are protected by law in the UK so they shouldn't be treated unfairly or lose their job, but a study of 25 workers who revealed wrongdoing in their organisations such as banks, healthcare or procurement services, paints a different picture.

The study found whistleblowers did lose their job either by being pressured out of the organisation or being dismissed. If they did stay, they suffered retaliation through bullying, demotion, isolation, and harassment, while some were forced by their company to take

**COMPLAINT – DEMAND FOR JURY TRIAL**

mental health counselling, and one saw her husband, who worked at the same bank, sacked.

Many did crack under the pressure, underline suffering mental illness through depression, panic attacks, and anxiety or developed drinking problems.

Marianna Fotaki, Professor of Business Ethics, said: "**The stigma surrounding mental illness can be used as a weapon intended to defame and neutralise a person who discloses wrongdoing**, with the process of whistleblowing only intensifying the likelihood of experiencing such negative health effects.

"The mental health of litigants can be used by organisations in defending allegations and can result in diverting attention away from the seriousness of the disclosure and discrediting the whistleblower."

Co-investigator Kate Kenny, of Queen's University Belfast, added: "As long as we as a society play along and turn a blind eye to the whistleblower's plight, the organisations, who are in reality the true transgressors, will continue to have their way."

In their working paper **How Organizations Use Mental Health To Discipline Whistleblowers and Undermine their Message**, one whistleblower John (not his real name), is quoted saying: "They put me on psychiatric support at the Priory Clinic. So, what they do here is they pacify you as somebody with mental health issues. Therefore, there's no validity."

While Greg (not his real name) said: "You may know that you are unemployed because you did something right, that doesn't stop you feeling isolated, it doesn't stop you feeling low self-esteem, it doesn't stop you being poor, it doesn't stop your health being affected."

In the 25 interviews with whistleblowers from the UK, Europe and the US, the researchers found the initial stage of secretly obtaining information was stressful, but when they went public, battling with the organisation was when many were pushed to breaking point.

"Many find the stresses too much to cope with and they just give up," said Professor Fotaki. "They are forced to settle and not take the matter any further because the stress is overwhelming. Some even took the self-management of mental health to the extreme of not wanting it mentioned during interviews with health professionals **for fear of it damaging their reputation**.

"The loneliness and alienation that comes from being positioned outside of the social, or organisational, norm leads to self-doubt, and if prolonged can cause mental stress, illness or even attempted suicide.

"This self-management and even self-censorship only feeds into the hands of the companies.

"The more oppressive the struggle with mental health the greater the likelihood of demotivation. Thus, some whistleblowers were forced to accept the bad practice as normal to fit in with the rest of the organisation and avoid any more stress, even though they felt guilt and mental anguish about the bad practice – a paradox they found difficult to cope with."

**COMPLAINT – DEMAND FOR JURY TRIAL**

'Whistleblower retaliation' – in which the company isolates or punishes whistleblowers, whether by demoting them, worsening their working conditions or terminating employment – was part of every one of the 25 cases Professor Fotaki and Dr Kenny studied.

No organisation in the research were thankful for the whistleblower highlighting wrongdoing and sought to rectify it. Instead, the reaction was one of denial and demonising the whistleblower.

A whistleblower named Georgia revealed the bank reacted by chasing her husband, who worked at the same bank, demanding he pay his mortgage immediately.

"They wouldn't give him the finance to finish the houses…. then they sacked him, so he didn't have a source of income," she says. "And they were threatening him because obviously if you don't have any money, you can't pay the mortgage."

Georgia described the frequent bullying and harassment she experienced, noting it was a deliberate ploy to grind her down. "They wanted to see me break," she said.

While Liam (not his real name), who reported a case of corruption involving arms contracts, said: "Psychologically they almost got me. I think it had been working on me for some time."

Another whistleblower saw his company commission a report into his complaint, **but found it was mostly about him rather than the issue raised**[83], with it describing him as "emotional and not reasoned, measured or coherent", which was then leaked to the press, including the Financial Times.

He said: "It was devastating. Can you imagine being described like that...? When you set out to do your job to the best of your ability?"

Professor Fotaki, who teaches Ethical Leadership on the suite of MSc Business courses, said: "It is clear that retaliatory tactics might create vulnerability to poor mental health and the emergence of symptoms of mental illness: stress, anxiety and fear are a common occurrence.

"Furthermore, retaliation against whistleblowers can also include character assassination. Accusations of being disgruntled employees, spies or 'squealers' can often undermine whistleblowers' efforts to expose immoral or illegal acts.

"By throwing around these labels, it only compounds the stress of whistleblowing and increases the vulnerability to mental health issues. It also serves as a way to demotivate other potential whistleblowers.

"Whistleblowers' disclosures save public money and protect the public interest. A growing number of countries are implementing legislation that aims to protect whistleblowers

---

[83] See paragraph X for discussions regarding the use of monster/supersize PDFs (produced as paper documents without any system metadata fields to coverup document fabrications by making misleading statements. This was how Audrey Au Joulani and the other RICO Defendants exploited to manufacture the fake sexual harassment to falsely substantiate the sexual harassment charge against Huynh.

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   from retaliation by their employers. This study has shown this is crucial for recognising
2   the importance of candour and speaking up against wrongdoing."

3
4   **The RICO Defendants Cherry Picked Pages from Huynh's 330 Pages Deposition**
    **Transcript to Create a 133 Smear Dossier Then Filed It in the Court Public Docket**
5   **to Kill Huynh Once and for All.**

6       399.    On February 28, 2019, the Rescue Squad served Huynh with a deposition no-
7   tice via email for a deposition in May 2019.  At this deposition, Brass asked Huynh well-
8   crafted/leading questions (based on Huynh's psychiatrist records dated back to 1999) and
9   Walmart's false allegations of sexual harassment charge against Huynh to solicit the desired
10  responses.  Huynh's answers were captured in a 333-page transcript (dossier)[84]. The RICO
11
12  Defendants cherry pick 133 pages out of the 333-page deposition transcript out of context to
13  create a "Smear" Dossier against Huynh to effectuate prong #2, #3, and #6 of the WSF Cov-
14  erup Enterprise's illegal coverup scheme. The smear dossier contains most damaging infor-
15  mation which falsely portrayed Huynh as mentally ill, prong to violence, morally corrupted
16  (e.g., falsely accused of sexual harassment, dishonesty, and blowing the whistle for personnel
17  gain) and lack of emotional control etc.  For example, to support of Walmart's Motion for
18  Summary Judgement, the Rescue Squad filed Huynh's medical records without the confiden-
19
20  tiality designation in the public domain. DC Dkt. 119-8 Defs' Ex. 8. See DC Dkt. 156 to 160
21  discussed how the RICO Defendants acted in concert to leaked Huynh's psychiatrist records.
22  The RICO Defendants also filed the 133-page "Smear" Dossier as Defs' Ex. 127 under DC
23  Dkt. 119 to support Walmart's motion for summary judgment. However, since Ex. 127 origi-
24  nally filed as DC Dkt. 119 along with another 23 Exhibits it would not be visible and accessi-
25  ble to the public.   In order to make the smear dossier more visible to the public and the media
26

27  _____
    [84] Basically, by asking misleading/manipulated questions based on Huynh's psychiatrist rec-
28  ords and captured them in a 333-page transcript

269

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   (especially those that are under the RICO Defendants' payrolls), the Rescue Squad purport-

2   edly refiled Ex. 127 separately under DC Dkt 123-1 under the pretext of updating and correct-

3   ing the original Ex. 127.  Basically, the RICO Defendants took Exhibit 127 which was buried

4   deep inside DC Dkt. 119 and exposed it to the public as a standalone Exhibit.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT – DEMAND FOR JURY TRIAL**

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
(Violations of RICO, 18 U.S.C. § 1962(c))
(Against All RICO Defendants)

**Legal Elements of a 1962(c) Claim**

"To allege a RICO claim under 18 U.S.C. § 1962(c), the plaintiff must plead four elements: (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. Stanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir. 2010). It is also important to note that in RICO civil claim Huynh only needs to prove the elements above by preponderance of evidence versus the beyond reasonable doubt standards under criminal case.

RICO defines the term "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *15 18 U.S.C. § 1961(4). This broad definition includes both legitimate and illegitimate, formal and informal organizations, see United States v. Turkette, 452 U.S. 576, 587 (1981), and it is immaterial whether the defendant has a stake in the operation of the enterprise **because individuals outside the enterprise may assist the enterprise in attaining its illegal goals.** See, e.g., United States v. Mokol, 957 F.2d 1410, 1417 (7th Cir. 1992). "An enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management."[85]

- Although attorneys "do not conduct an enterprise's affairs through run-of-the mill provision of professional services," courts "will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise." Chevron Corp. v. Donziger, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) (judgment against lawyer for a RICO enterprise); G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521 (S.D.N.Y. 2002) (claims that attorneys operated a RICO enterprise); Liberty Mut. Life Ins. Co. v. Diamante, 138 F. Supp. 2d 47 (D. Mass. 2001) (claims against attorney); Lemelson v. Wang Labs., Inc., 874 F. Supp. 430 (D. Mass. 1994) (allegations of a RICO association-in-fact enterprise between defendant and his attorneys).

- There is "no question" that a corporation, its lawyers, and its experts can form "an 'associated in fact' RICO enterprise." See Living Designs, Inc. v. E.I. DuPont de

---

[85] Reves, 37 F.3d at 185 (emphasis added); see also In re Lupron Mktg. & Sales Practices. Litig., 295 F. Supp. 2d 148, 172 n.25 (D. Mass. 2003) (rejecting an interpretation of outsider liability that would "elevate the Reves' participation test to one of 'control' of the enterprise, a significantly higher standard than Reves contemplates").

Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quoting United States v. Blinder, 10 F.3d 1468, 1473 (9th Cir. 1993)), DuPont — a company that offers products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel — retained law firms for the purpose of defending DuPont in Plaintiffs' lawsuits. These law firms are required to conform to ethical rules and thus are not merely at the beck and call of their clients. As we recently observed:  Membership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, **like the court itself, an instrument or agency to advance the ends of justice**. Gadda v. Ashcroft, 377 F.3d 934, 942-43 (9th Cir. 2004) (citations and quotations omitted).

### The Statute of Limitations Element Defined:

Even though the RICO statute does not provide for a specific statute of limitations, the Supreme Court announced a uniform **four-year limitations** period for civil RICO actions. See Agency Holding Corp. v. Malley– Duff & Assocs., Inc., 483 U.S. 143, 156– 57, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Although the Supreme Court has yet to specify when the RICO period of limitations begins to run, the Second Circuit has held that it "begins to run when the plaintiff discovers or should have discovered the RICO injury." In re Merrill Lynch P'ship Litig., 154 F.3d 56, 58 (2d Cir.1998).

- Although, Huynh knew that the RICO Defendants conspired with District Judge Vince Chhabria with certainty around right after Huynh's file his motion for reconsideration on Feb 9, 2020 (DC Dkt. 176). However, Huynh only came to know about the existence of the WSF Coverup Enterprise since Mid-2021 due to the wicked, insidious and nefarious nature of the scheme.

- However, let assumed arguendo that Huynh knew about existence of the WSF Coverup Enterprise' illegal coverup scheme in early Feb 2020 it didn't matter because the four-year statute of limitation would put the deadline for Huynh to file his RICO claims against the RICO Defendants until Jan 14, 2024.

### The Walmart Shareholder Fraud Coverup Enterprise

400.   Huynh restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein. This claim is brought against the RICO Defendants for actual damages and treble damages under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, et seq.

401.    Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Huynh is a "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in his business or property as a result of the RICO Defendants wrongful conducts.

402.    The Walmart Shareholder Fraud Coverup Enterprise (referred herein as the WSF Coverup Enterprise) is an association-in-fact enterprise. It was formed as early as 2016 and continues to Mid 2021 for the common purpose of covering up Walmart's $140 Bil fraud against shareholders and ensuring a civil and criminal risk-free future for all of its members. The WSF Coverup Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3). The named persons below participated in the management and/or conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

Walmart Inc., including its employees, Board of Directors, and agents; and the Walmart's participants.

**The Walmart Board of Directors**

- Greg Penner, Chairman of the Walmart Inc. Board of Directors
- Robson Walton, Member of Walmart Inc. Board of Director
- Timothy Flynn, Member of Walmart Inc Board of Director and Chairman of Walmart's Audit Committee
- Doe(s)

**The Walmart Participants)**

- Doug McMillion, President and CEO, Walmart Inc.
- Brett Biggs, Executive Vice President and Chief Financial Officer, Walmart
- Marc Lore, former President and CEO, Walmart.com US.
- Rachel Brand, Executive Vice President of Global Governance, Chief Legal Officer and Corporate Secretary
- Doe(s)

**COMPLAINT – DEMAND FOR JURY TRIAL**

**The law firm of Gibson Dunn Crutcher Law Firm,** including its employees and agents; and the GDC participants (aka the Rescue Squad).

**The Rescue Squad**

- Theodore Boutros, Senior Partner
- Eugene Scalia, Senior Partner
- Rachel Brass, Senior Partner
- Chris Wilson, Sr. Associate
- Ryan Stewart, Associate
- Susanna Schuemann, Associate
- Doe(s)

**The other Law Firm participants**

- The deRubertis Law Firm, including its employees and agents; and the deRubertis participants i.e., David deRubertis, Kari deRubertis, and Garen Nadir.
- The Payne & Fears Law Firm, including its employees and agents, and the PF participants i.e., Daniel F. Fears, Terri M. Shaw, and Doe(s)
- The law firm of Orrick, Herrington & Sutcliffe, including its employees and agents and the OHS participants i.e., Kenneth Herzinger and Doe(s)

**The ESI Providers**

- Epiq Global, including its employees and agents, and the Epiq Participants i.e., Doug Kasales, Kathy Vonlindern, and Doe(s).
- Lighthouse Global, including its employees and agents, and the Lighthouse Global Participants i.e., Renee Quezada, and Doe(s).

**The PR Machine (PR agencies and Journalists)**

- The PR Agency participants (not known at this time), including its employees and agents.
- Matthew Boyle, a Bloomberg News' Reporter.
- Doe(s)

**The Investment Analysts**

- Bank of America, including its employees and agents, and Robert Ohmes, Investment Analyst at Bank of America/Merrill Lynch.
- Doe(s)

**The Federal Officials**

- Mark Marchione, OSHA's Regional Investigator
- William H. Thompson, SEC Accounting Branch Chief Office of Consumer Products
- Doe(s)

**COMPLAINT – DEMAND FOR JURY TRIAL**

1    **The Federal Judges**[86]

2    - Vince Chhabria, District Judge for the United States District Court for the Northern
3      District of California
     - Sallie Kim, Magistrate Judge for the United States District Court for the Northern Dis-
4      trict of California.

5    **The Former Walmart's Employees**

6    - Seth Beal, former SVP Walmart's Global Marketplace
     - Valerie Ricetti, former Director of Walmart US HR
7    - Audrey Au, former Sr. Manager of Walmart's US Global Ethics and Compliance
8    - Melvenia Ha, former Manager of US HR

9         403.    To achieve its common purpose, the WSF Coverup Enterprise through the

10   RICO Defendants and their Co-conspirators set out to achieve three main goals, namely, A) to

11
12   

13   **Purpose: Coverup Walmart's $140 Bil Fraud Against Shareholder**

28   ---
     [86] Not named as Defendants in this complaint due absolute immunity protection.

**COMPLAINT – DEMAND FOR JURY TRIAL**

obtain a "Get Out Jail Free" card i.e., non-enforcement action letters from the SEC and/or DOJ, B) to obtain a "Civil Penalty Free" card i.e., the dismissal of Huynh's SOX complaint to reinforce the SEC's and/or DOJ's non-enforcement action letters, and 3) to ensure a civil and criminal risk-free future for the RICO Defendants.  To achieve these goals, the WSF Coverup Enterprise through the RICO Defendants and Co-conspirators developed and executed a six-pronged fraudulent coverup scheme. See the chart above.

404.    The RICO Defendants and their Co-conspirators are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the Walmart Participants and the Rescue Squad. Specifically, each member of the WSF Coverup Enterprise shared in the bounty generated by the successful execution of the Enterprise's fraudulent coverup scheme e.g., up to a Billion-dollar bounty. Additionally, Walmart's senior executives would be able to keep their high paying compensation package and enjoy significant appreciation in the value of their Walmart's stock portfolio.

- As an example, when Walmart Inc. acquired Jet.com, Walmart Inc granted Marc Lore 3,554,093 shares of Walmart stocks in Sept 19, 2016 to be vested over five years. Walmart's stock price in Sept 2016 was about $73 (Lore's Walmart stock portfolio valued at $260 Mil) and $149 at the time of Marc Lore's departure from Walmart in Mid-Jan 2021 (Lore's Walmart's stock portfolio valued at $530 Mil). Thus, by participating the management and/or conduct of the WSF Coverup Enterprise, Marc Lore became $270 Mil richer.

- Additionally, although Marc Lore left his position as CEO of Walmart US Ecommerce eight months before his employment contract with Walmart expired, Walmart Board of Directors shockingly allowed Marc Lore to keep all of his unvested shares of Walmart's stock (approximately 710,819 shares).  At a price of $149 per share, Marc Lore exit package with Walmart valued at least $106 million.

405.    There were regular communications among the RICO Defendants to share information, strategies, and tactics to plan, coordinate, manage and operate the conducts of the

**COMPLAINT – DEMAND FOR JURY TRIAL**

enterprise in order to successfully execute the WSF Coverup Enterprise's six-pronged fraudulent coverup scheme. Typically, these communications occurred through the use of the wires and the mail.

406.     At all relevant times, the WSF Coverup Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization formed as an association in fact with its members engaged in the management and/or operations of the WSF Coverup Enterprise to effectuate its common purpose.

407.     While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements

### Conduct of the WSF Coverup Enterprise

In order to be liable under § 1962(c), a defendant must "conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Mere association with an enterprise does not violate § 1962(c). In order to "conduct or participate" in the conduct of an enterprise's affairs, a defendant must have "participated in the operation or management of the enterprise itself."

Reves v. Ernst Young, 507 U.S. 170, 179 (1993). An enterprise is "operated" not just by upper management, but also by "lower rung participants" who are under the direction of upper management. Id. at 184. "Outsiders" to the enterprise may meet this requirement if they exert control over the enterprise, but outsider defendants must have "conducted or participated in the conduct of *26 the enterprise's affairs, not just their own affairs." Id. at 184-85.

408.     The RICO Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a top-down command structure, with the Heads of the enterprise based out of Bentonville, AR, Northern and Southern CA, and Washington DC, while its members scattered across various states.  The Walmart

277

**COMPLAINT – DEMAND FOR JURY TRIAL**

Participants funded the WSF Coverup Enterprise out of Walmart Inc.'s head quarter in Bentonville, AR by funneling the money through the Gibson Dunn Crutcher Participants who in turn wired the money directly and/or through third parties to pay fund the criminal activities of the RICO Defendants in furtherance the WSF Coverup Enterprise's common purpose.

409.    Over the years they have adapted their fraudulent scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities. While the size and scope of the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to achieve their common purpose. Walmart and Walmart's participants controlled, exerted influence, and directed the affairs of the WSF Coverup Enterprise with the aid and assistant of Walmart's trusted legal advisors from Gibson Dunn Crutcher (referred to in this complaint as the Rescue Squad)

### Walmart's Shareholder Fraud Coverup Enterprise Command Structure



278

**COMPLAINT – DEMAND FOR JURY TRIAL**

to coordinate and direct the activities of the other members of the WSF Coverup Enterprise as **instrumentalities** to execute the six-pronged fraudulent coverup scheme described above.

410.    Each person in the WSF Coverup Enterprise had specific roles and responsibilities in the management and/or conduct of the Enterprise to effectuate the six-pronged fraudulent coverup scheme in order to the achieve the common purpose of coverup up Walmart's $140 Bil fraud against shareholders.

### The Walmart Participants

- Approved the strategies and tactics of the WSF Coverup Enterprise's fraudulent coverup scheme to effectuate the Enterprise's common purpose.
- Recruited and paid the Rescue Squad to 1) advised on strategies and tactics in order to develop and operationalize the WSF Coverup Enterprise' fraudulent coverup scheme.
- Transferred and funneled money through the Gibson Dunn Crutcher to fund the illegal conducts of the WSF Coverup Enterprise.
- Engaged in whitewashing activities to whitewash evidence of Walmart's criminal conducts at various investors and analysts' conferences and events and Walmart's quarterly earnings calls and annual meetings with investors to whitewashing evidence of Walmart's illegal conducts.
- Participated in the reverse whitewashing campaign at the order of Walmart's Board of Directors to coverup the original whitewashing activities after Huynh emailed Walmart's Board of Directors to put them on notices that Walmart's senior executives' may have committed fraud against Walmart's shareholders.

### The GDC Participants (The Rescue Squad)

411.    The Rescue Squad played a critical role in effectuating prong #1 to #6 of the WSF Coverup Enterprise's fraudulent coverup scheme to drive the accomplishment of the Enterprise's common purpose while shielding Walmart and the Walmart Participants from legal jeopardies for engaging in obstruction of justice e.g., obstructed the SEC and the OSHA proceeding as well the federal judicial proceeding.

**COMPLAINT – DEMAND FOR JURY TRIAL**

- Provided strategic and operational advices to Walmart's Participants to develop and execute the WSF Coverup Enterprise's coverup scheme in order to effectuate the Enterprise' common purpose.
- Provided cover and shielded the Walmart Participants by recruiting, contracting, paying (funneled Walmart's money to the other member of the Enterprise) and funneled evidence of Walmart's illegal conducts back to the Walmart Participants under the cloak of attorney-client privilege communications and attorney work product privilege.
- E-filed documents that contained misrepresentations and fabricated documents with the US District Court of the Northern District of California and the US Court of Appeals for the Ninth Circuits to effectuate prong #2, #3, and #5 of the coverup scheme.
- Corruptly influenced District Judge Vince Chhabria to obstruct Huynh from submitting material facts into the record to support the factual assertions in his opposition brief to oppose Walmart's motion for summary judgement.
- Corruptly influenced District Judge Vince Chhabria to purportedly construed Huynh's 1/19/20 letter as a request to for leave to file a motion for reconsideration then denied the request (even though District Judge Vince Chhabria knew that Local Rule 7-X is only applicable to interlocutory orders).
- Corruptly influenced District Judgement to deny Huynh's motion for reconsideration to appeal Judge Chhabria's entry of final judgement without going through Local 7-2 and 7-3 on motion practice for no rational basis.
- Corruptly influenced Magistrate Judge Sallie Kim to deny Huynh's requests to get Walmart's to remove the confidentiality designations of only 65 page of documents that were not confidential, especially after Judge Sallie Kim conducted an in-camera review of these non-confidential documents.
- Engaged in and/or cause other to engage in evidence destruction, mutilation, fabrication, and concealment as well as submitted false declaration to effectuate the RICO Defendants' common purpose.
- Improperly influenced the United States Court of Appeals for the Ninth Circuit's merit panel to deny Huynh's amended appeal against District Judge Vince Chhabria order (DC Dkt. 167 and 168) granting Walmart summary judgement and denying Huynh's motion for reconsideration (DC Dkt. 182).

**The deRubertis Law Firm and Participants**

412.   The deRubertis Law Firm and the Participants i.e., Kari and David deRubertis and Garen Nadir was instrumental in effectuating prong #1, #2, #3, #4, #5, and #6 of the WSF Coverup Enterprise's fraudulent coverup scheme. Below are the critical roles played by the deRubertis Law Firm Participants to effectuate the Enterprise's coverup scheme.

280

**COMPLAINT – DEMAND FOR JURY TRIAL**

- Secretly spied, stole, and leaked Huynh's confidential information regarding Walmart's misconducts to the other RICO Defendants in order to effectuate the WSF Coverup Scheme.
- Fraudulently redefined Walmart Marketplace as Walmart.com and downplayed the material of Huynh's allegations that Walmart inflated its Ecommerce GMV and Op Profit to effectuate prong #2 of the coverup scheme.
- Engaged in intimidations, threats, and deceptions to delay the filing of Huynh's complaint in federal court from Mid-Dec 2017 to Mid-Mar 2018 to enable Walmart's insiders to mislead Walmart's shareholders, investment analysts, the SEC and/or the DOJ, the media, politician, and the American public to cover up the facts that Walmart artificially inflated Walmart's US quarterly Ecommerce growth rate for FY18 and the category mix of Walmart's Ecommerce sales.
- Shotgun pleaded five frivolous ADHD FEHA claims against Walmart to put Huynh's ADHD conditions and motive for engaging in protected conducts at the heart of the Huynh's lawsuit against Walmart to effectuate prong #2, #3, and #6 of the coverup scheme.
- Acted in concert with the rescue squad, Epiq Global, and Lighthouse Global to destroy, mutilate, fabricate, and concealment of evidence to effectuate prong #2, #3, and #6 of the fraudulent coverup scheme.

### The PR Machine/Journalists

413.    PR agencies and journalists played a critical role to amplify and disseminate Walmart's false factual misrepresentations to the Media, Walmart's investors, analysts, the SEC and/or DOJ, politicians, and the American public to effectuate Goal A of the coverup scheme.  For example, Matthew Boyle published numerous articles to cover up Walmart's illegal conducts and "Nuts & Sluts" Huynh to purportedly support the RICO Defendants' truth on the Market Defense. Numerous reporters such as Johnathan Stempel and Nandita Bose from Reuter also published articles effectuate prong #2 and #6 of the coverup scheme.  The identifies of the PR agencies are not know at this time as is pleaded as John Doe(s).

### The Investment Analyst Participant(s)

414.    The RICO Defendants corruptly influenced and/or enticed Robert Ohmes to

publish numerous articles to whitewash evidence of Walmart's misrepresentations regarding the state of Walmart's Marketplace and the artificial inflation of Walmart's Ecommerce Quarterly sales growth to investors during FY18.

### The Pattern of Racketeering Element Defined:

To plead sufficiently a pattern of racketeering activity, the Plaintiffs must allege a pattern of "two or more predicate acts of racketeering" generally within a period of ten years. Lundy, 711 F.3d at 119 (citing 18 U.S.C. § 1961(5)); see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq., 758 F.Supp.2d 153, 167–168 (E.D.N.Y.2010). Section 1961(1) sets out an exhaustive list of predicate acts that qualify as racketeering activity for purposes of RICO. See In re U.S. Foodservice Inc. Pricing Litig., Nos. 3:07MD1894(CFD), 3:06CV1657(CFD), 3:08CV4(CFD), 3:08CV5(CFD), 2009 WL 5064468, at *16 (D.Conn. Dec. 15, 2009) ("Section 1961(1) sets out an exhaustive list of predicate acts"); see also, N.Y. Transp., Inc. v. Naples Transp., Inc., 116 F.Supp.2d 382, 387 (E.D.N.Y.2000) (same).

### The Pattern of Racketeering Predicate Acts

415.    To carry out, and attempt to carry out their coverup scheme to conceal Walmart's $140 Bil fraud against shareholders, the RICO Defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud, 18 U.S.C. § 1512(c)(2) related to obstruction official proceeding i.e., the SEC and DOL/OSHA proceedings.; 18 U.S.C. § 1512(c)(1) relating to Destroy, Alter, OR Conceal Document or Object;  18 U.S.C. § 1512(k) relating to engaging in a conspiracy to commit 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1512(c)(1); 18 U.S.C. § 1512(b)(2)(B); 18 U.S.C. § 1503 relating to Obstruction of Justice in a judicial proceeding; 18 U.S.C. § 371 relating to conspiracy to defraud the United States; U.S.C. § 201(b)(1) related to bribery of a federal official;

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   Cal. Pen. Code § 92 (California); Travel Act (18 U.S.C. § 1952 ) through Furtherance of un-

2   lawful activities under Cal. Pen. Code § 92 (California) and 18 U.S.C. § 201 (Federal).

3   Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Vi-
4   olation of 18 U.S.C. §1341 and 1343

5   The Elements of 18 U.S.C. § 1341 and 1343

6       416.    To state a claim for mail and wire fraud, a plaintiff must allege: (1) the existence

7   of a scheme to defraud[87]; and (2) the knowing use of interstate mails or transmission facilities
8
    i.e., the wires (email, internet, text, and phone calls) in furtherance of the fraud. See United
9
    States v. Gelb, 700 F.2d 875, 879 (2d Cir.), cert. denied, 464 U.S. 853, 104 S.Ct. 167, 78
10
    L.Ed.2d 152 (1983); United States v. Corey, 566 F.2d 429, 430 n. 2 (2d Cir. 1977); United
11
    States v. Paccione, 749 F. Supp. 478, 485 (S.D.N.Y. 1990).
12

13      417.    Under RICO, each separate use of the mails or wires constitutes a separate pred-
14
    icate act even if there is only one scheme to defraud. Connors v. Lexington Ins. Co., 666 F.
15
    Supp. 434, 451 n. 12 (E.D.N.Y. 1987). See Bridge, 553 U.S. at 648 ("In furtherance of this
16
    scheme, petitioners used the mail on numerous occasions to send the requisite notices to prop-
17
    erty owners. Each of these mailings was an 'act which is indictable' as mail fraud."); Spira, 876
18
    F. Supp. at 559 ("Inasmuch as each such use of the mails is separately indictable under 18
19
    U.S.C. § 1341, each constitutes an act of racketeering under RICO."); Curiale v. Capolino, 883
20
    F. Supp. 941, 948 (S.D.N.Y. 1995) (Kaplan, J.) (same); Nat'l Council of Young Isr., 963 F.
21
    Supp. at 280–81.
22
23      418.    The "gravamen" of the mail and wire fraud offense is the " scheme to defraud,"
24
    and the use of the mails in furtherance of a scheme to defraud. The mailings need not be an
25

26
    _____

27  [87] The first element of mail fraud, the existence of a scheme to defraud, requires "fraudulent
    or deceptive means, such as material misrepresentation or concealment." In re Gas Reclama-
28  tion, Inc. Secur. Litigation, 659 F. Supp. 493, 512 (S.D.N.Y. 1987).

COMPLAINT – DEMAND FOR JURY TRIAL

essential part of the fraudulent scheme as long as they are incidental to an essential part of the scheme. Schmuck v. U.S., 489 U.S. 705, 710-11, 109 S.Ct. 1443, 1444, 103 L.Ed.2d 734, reh. denied, 490 U.S. 1076, 109 S.Ct. 2091, 104 L.Ed.2d 654 (1989).

- The mailing itself doesn't need to contain false information." See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) (quoting Schmuck v. United States, 489 U.S. 705, 712, 715 (1989) (alteration in original)); United States v. Maze, 414 U.S. 395, 400 (1974) (mails need only be "for the purpose of executing" the scheme) (quoting Kann v. United States, 323 U.S. 88, 94 (1944)), nor must they contribute directly to the deception of the plaintiffs. Id. at 744, 109 S.Ct. at 1444; In re Gas, 659 F. Supp. at 513.

- Even mailings which are "innocent" or routine when viewed in isolation, may still satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme as conceived by the perpetrators at the time.[88] 51 This is because the crux of mail and wire fraud is a scheme to defraud; the mails or wires need only be used to carry out the scheme.

- Plaintiffs are not required to demonstrate that Defendants personally mailed the documents; it is enough to show that Defendants caused the mailing to occur, or that the use of the mails was foreseeable, even if not actually intended. United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989); United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986).

- The complaint needs not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used. Landy v. Mitchell Petroleum Technology Corp., 734 F. Supp. 608 (S.D.N.Y. 1990); Connors v. Lexington Ins. Co., 666 F. Supp. 434 (E.D.N.Y. 1987); Beth Israel Medical Center v. Smith, 576 F. Supp. 1061 (S.D.N.Y. 1983).

---

[88] Tabas v. Tabas, 47 F.3d 1280, 1294 n.18 (3d Cir. 1995); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,1415 (3d Cir. 1991); Smith v. Our Lady of the Lake Hosp., Inc., 960 F.2d 439, 445 (5th Cir. 1992); Dana Corp. v. Blue Cross & Blue Shield Mut. of No. Ohio, 900 F.2d 882, 886 (6th Cir. 1990); Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1330 (7th Cir. 1994); Abels v. Farmers Commodities Corp., 259 F.3d 910, 918 (8th Cir. 2001); PlaterZyberk v. Abraham, No. 97-CV-3322, 1998 WL 67545 (E.D. Pa. Feb. 17, 1998), judgment aff'd, 203 F.3d 817 (3d Cir. 1999); Spira v. Nick, 876 F. Supp. 553, 558-559 (S.D.N.Y. 1995). See also Schmuck v. United States, 489 U.S. 705 (1989) (holding "innocent" mailings sufficient for purposes of mail fraud statute).

**COMPLAINT – DEMAND FOR JURY TRIAL**

419.   As described herein, the RICO Defendants developed and executed a six-pronged fraudulent coverup scheme discussed above to achieve three key goals (once completed these goals would fulfill the RICO Defendants' common purpose.

420.   To achieve goal A i.e., to get the SEC and/or DOJ to issue non-enforcement letters to Walmart Inc, the RICO Defendants engaged in a whitewashing scheme to whitewash evidence of Walmart's illegal conducts (e.g., inflation of the total # of Marketplace on Walmart.com disclosed to investors in FY17 and the artificial inflation of Walmart's US Ecommerce quarterly sales growth to investors in FY18).  Walmart disseminated these fraudulent and factual misrepresentations via mail, email, internet, and phone to the SEC and/or DOJ, Walmart's shareholders, investment analysts, the Media, State agencies, and politician in order to assert Walmart's "Truth on the Market" Defense in order to mislead them into believing that Walmart was innocent of fraud against shareholders.

421.   To achieve Goal B i.e., to get the United States District Court of the Northern District of California to dismiss all of Huynh's claims against Walmart.  To achieve this goal, the RICO Defendants and their co-conspirators engaged in the following: 1) evidence destruction, mutilation, fabrication, concealment, and suppression as well as filing false declarations, 2) shotgun pleaded five nefarious ADHD FEHA claim to misrepresent the facts and the law, 3) corruptly influenced judicial officers of the court to suppress evidence and cited the improper legal framework with higher burden of proof for Huynh in order to grand Walmart summary judgement and to obstruct Huynh from filing his motion for reconsideration.  It was worth mentioning that it was critical important for the RICO Defendants to obtain a clear and convincing victory in Federal Court in order to strengthen the non-enforcement actions from the SEC and the DOJ.

422.     To achieve Goal C i.e., to ensure a risk-free civil and criminal liabilities in the future, the RICO Defendants made factual and legal misrepresentations in their court's e-filings and corruptly influenced Magistrate Judge Sallie Kim and District Judge Vince Chhabria to conceal evidence of Walmart's illegal conducts (e.g., Magistrate Judge Sallie Kim allowed Walmart to keep the confidentiality designation on documents that was not confidential and District Judge Vince Chhabria allowed Walmart's to file document under seals which he should not have) from the public, the media, Walmart's shareholders, investment analysts, the SEC and the DOJ, and politicians.

423.     In furtherance of their fraudulent coverup scheme, the RICO Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  The RICO Defendants likely used hundreds if not thousands of separate instances mails and the interstate wires in furtherance of the unlawful WSF Coverup Enterprise's illegal coverup scheme. Each such use of the mails and the wires is separately indictable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343 and each constitutes an act of racketeering under RICO.

424.     Although Huynh cited numerous and specific pieces of evidence throughout this complaint which proved that the RICO Defendants used the mails and the wires transmission facilities as an instrument to effectuate the RICO Defendants' fraudulent coverup scheme, Huynh believes the RICO Defendants have in their possession hundreds if not thousands of instances of mail and wire frauds (i.e., the what, who, when, and how the RICO Defendants communicated among themselves to effectuate their illegal coverup scheme. Thus, Huynh strongly believes this information will be discoverable during discovery.

**COMPLAINT – DEMAND FOR JURY TRIAL**

425.    Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the RICO Defendants exploited to defraud the US government i.e., the SEC and/or the DOJ, the DOC/OSHA, the United States District Court of the Northern District of California and the United States Court of Appeals for the Ninth Circuit, Walmart's investors, investment analysts, the media, politicians, and the American Public in order to achieve the Enterprise's common purpose. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results causing injuries to Huynh's properties. Below are examples that showed how the RICO Defendants used the US mail, and wire (internet, emails, texts, and phone calls) to effectuate the six-prongs of the WSF Coverup Enterprise's fraudulent coverup scheme.

**Prong #1: Armies of Spies (Evidence of Walmart's Misconducts.)**

426.    As discussed above, prong #1 of the fraudulent coverup scheme is a foundational prong that fueled the execution other five prongs.

A.    David deRubertis emailed Huynh on 4/25/17 an extra ordinary generous retainer agreement to lure and deceive Huynh to retain David deRubertis and the deRubertis Law Firm as Huynh's Lawyer so he could steal and leak Huynh's confidential information to the other RICO Defendants.

B.    David deRubertis Secretly stole and leaked the confidential and non-public information in Huynh's 4/19/17 SEC TCR submission to the other RICO Defendants so they could effectuate the Enterprise's unlawful coverup scheme.

C.    The RICO Defendants caused Huynh to email David deRubertis his June 19, 2017 SEC submission.

D.    David deRubertis purportedly filed a 125-page amended complaint via email to OSHA then used it as a legitimate reason to leak the information in Huynh's SEC complaints to the other RICO Defendants.

287

**COMPLAINT – DEMAND FOR JURY TRIAL**

E.  Caused Huynh's SEC Whistleblower lawyer, Rebecca Chang, to email David deRubertis a copy of the materiality memo submitted to the SEC which discussed the inflation of the Jet.com sales by accounting Marketplace GMV as Jet.com sales.

F.  Caused Huynh to share with the RICO Defendants that Huynh had an interview with the SEC attorney in San Francisco, CA in early Oct 2017.

G.  David deRubertis purportedly file a PAGA claim with LWDA and transmitted a fee of $75 to pay for the cost of the filing on 1/8/18. The deRubertis Law Firm used USPS Mail with return receipt to mail a copy of Huynh's 4/19/17 SEC submission to the other RICO Defendants on 1/9/17.

H.  David deRubertis falsified and/or caused other to falsified Huynh's signatures to email and/or sent request letters via US mails to Huynh's primary care physician and psychiatrist at least on six different occasions to illegal obtain Huynh's medical and psychiatrist record then transmitted them via email, US mail, and/or server download. This helped effectuate prong #2 and #3 of the coverup scheme.

I.  The RICO Defendants exploited the GO 71 production process to email the list of names of witnesses that Huynh provided to the SEC for investigating into Walmart's misconducts so the RICO Defendants could coach and/or influence the witnesses to submit factual misrepresentation to the SEC and/or the DOJ.

J.  David deRubertis Caused Huynh to share his 5/15/18 SEC submission to the RICO Defendants so they could effectuate prong #2 of the coverup scheme. This submission was material because it contained smoking gun evidence which proved that Walmart's senior executives made misleading statements to investors and analysts regarding the total number of SKUs on Walmart's Marketplace.

K.  David deRubertis Illegally mined Huynh's personal laptop hard drive to obtain Huynh's 2013 email to Jeff Bezos and communications between Huynh and his SEC Lawyers then leaked to the other RICO Defendants vie wire transmission in order to effectuate prong #2 and #3 of the coverup scheme.

L.  David and Kari deRubertis secretly leaked Huynh's psychiatrist records via email and/or server download among the RICO Defendants without the confidentiality designation in order to effectuate prong #2, #3, and #6 of the coverup scheme.

M.  David deRubertis caused Huynh to share with him on 11/16/117 Beal's Oct 2, 2016 email to Doug McMillon where he updated McMillon that Walmart Marketplace had 16.5 Mil. A few days later McMillon reported to investors and analysts that Walmart Marketplace had 20 Mil SKUs.

428.   As discussed above, the objective of prong #2 of the coverup scheme was to whitewash evidence of Walmart's illegal conducts based on deRubertis' leaked information.

**COMPLAINT – DEMAND FOR JURY TRIAL**

A.  Doug McMillon switched reporting Walmart's SKUs metric to investors from that of Walmart's Marketplace to Walmart.com during the Q1 FY18 earnings calls in an attempt to refine Walmart Marketplace as Walmar.com.

B.  Robert Ohmes, BOA/Merrill Lynch's analyst, used the term "Marketplace" and Walmart.com/online interchangeably in his 5/18/17 report to prime the pump for Walmart's executives to carry out their whitewashing campaign.

C.  William H. Thompson, SEC Accounting Branch Chief Office of Consumer Products, purportedly issued a letter to Brett Biggs on 5/22/17 asking Walmart a series of questions which were almost verbatim to the allegations Huynh submitted to the SEC on 4/19/17 to allow the RICO Defendants to use it as platform to downplay the materiality of Huynh's allegations.

D.  Doug McMillon used the term Marketplace and Walmart.com interchangeably during Walmart's annual meeting with investors on June 2, 2017 to purportedly disclose that Walmart Marketplace had 50 Mil SKUs on Q1 FY18 to investors and analysts when he knew it was not true. Additionally, Doug McMillon backpedaled on Walmart's previous statements that Walmart's Marketplace was highly profitable and would improve the profitability mix of Walmart's Ecommerce business.

E.  Brett Biggs used the term Marketplace and Walmart.com interchangeably at an analyst's conference on 6/13/17 to purportedly redefine Walmart Marketplace as Walmart.com.

F.  Marc Lore purportedly disclosed to investors and analysts on 6/2/17 and 6/7/17 that Walmart focused on adding quality not quantity product assortment to Walmart Marketplace. Marc Lore also purportedly backpedaled on Walmart's previous statements that Walmart's Marketplace was highly profitable and fast growth.

G.  Brett Biggs provided half-truth and/or misleading statements or omission of material facts in his letter to the SEC on 6/16/17 to downplay the materiality of Huynh's allegations against Walmart.

H.  Matthew Boyle, Bloomberg News' Reporter, published an article online on 6/16/17 to purportedly report that Walmart.com had 15 Mil SKUs, 23 Mil SKUs for Aug and Nov 2017, and 35 Mil SKUs for Feb 2017 when they were not true

I.  William H. Thompson, SEC Accounting Branch Chief Office of Consumer Products, purportedly replied and acknowledge Walmart's response to his 5/22/17 letter to purportedly show that Walmart was in compliance with GAAP and didn't inflate its Ecommerce GMV and Operating Profit.

J.  The RICO Defendants caused Nandita Bose, Reuters' Reporter, to publish an online article on 7/27/17 where she disseminated Michael Trembley's misleading statement that Walmart Marketplace had 50 million SKUs on Q1 FY18 when it was not true.

K.  The RICO Defendants caused Francine McKenna, a Marketwatch.com's Reporter, to publish an online article on 9/13/17, where she purportedly used the term Marketplace and Walmart.com interchangeably to falsely report that Walmart Marketplace had 67 Mil SKUs on Q2 FY18 when it was not true. She also transmitted Walmart's misleading response letter to Mr. Thompson 5/22/17 letter to her readers.

289

**COMPLAINT – DEMAND FOR JURY TRIAL**

L.   Doug McMillon made misleading statements to analysts and investors on Oct 10, 2017 via the internet and internet publications that Walmart.com had 8 Mil and 20 Mil SKUs on Jan and Oct of 2016 when he knew they were not true.

M.   Robert Ohmes published an investment report of Walmart on 10/10/2017 to white-wash Walmart's misleading statements regarding the total number of SKUs on Walmart Marketplace disclosed to investors in FY17 (calendar year 2016). Addi-tionally, on the same reported Ohmes forecasted that Jet.com Sales were **$1.1 Bil and $2.8 Bil in FY17 and FY18** when he knew they were not true to coverup the facts that Walmart artificially inflated Walmart's Quarterly Ecommerce sales growth in FY18 based on importing accounting of Jet.com Sales.

N.   David deRubertis communicated multiple times to Huynh via emails between Dec 2017 and Mar 2018, to deceive Huynh into believing that the reasons that David deRubertis repeatedly delayed filling Huynh's complaint against Walmart in Federal Court were because his busy schedule and his desire to write a first rate complaint in order to give the RICO Defendants to cover up the facts that they made mislead-ing statements to investors and analysts regarding Walmart's Quarterly Ecommerce Sales growth the nature Ecommerce sales mix.

O.   During Walmart's Q4 FY18 earnings call on Feb 20, 2018, Doug McMillon made misleading statements regarding the reasons for Walmart's Ecommerce Quarterly growth rate to collapse from 50% in Q3 FY18 to 23% in Q4 FY18 as well as the Walmart's Ecommerce sales mix i.e., online general merchandise sales versus online grocery.

P.   Matthew Boyle, Bloomberg News' Reporter, published an article online on 2/23/18 to purportedly mislead Walmart's investors, analysts, the media, and the SEC about the real driver behind Walmart's Ecommerce growth.

Q.   David deRubertis made misleading and fraudulent statements in his court filing on 3/15/18 (DC Dkt. 1) to mislead the Court, SEC, the Media, Walmart's investors, and the public to whitewash Walmart's misleading statements regarding the total number of SKUs on Walmart's Marketplace on January, August, and October 2016. Addi-tionally, David deRubertis made misleading statement that the impact to Walmart's GMV growth due Walmart not processing customer returns was $7 Mil when he knew that Huynh alleged it to be in the hundreds of millions of dollars.

R.   The RICO Defendants (PR agencies and Journalists) carefully controlled and selec-tively disseminated the content of Huynh's 3/15/18 complaint across the internet to dimmish Huynh's credibility as a whistleblower and to downplay the materiality of Huynh's allegations to falsely assert the RICO Defendants purported zero loss cau-sation claim when Huynh's disclosures became public.

S.   Matthew Boyle, Bloomberg News' Reporter, published two articles online on 3/15/18 and 3/16/18 to purportedly mislead Walmart's investors, analysts, the me-dia, and the SEC and/or the DOJ into believing that there was zero loss causation when Huynh's disclosures became public.

T.   Matthew Boyle, Bloomberg News' Reporter, published an online article on 4/10/18 to help the RICO Defendants coverup the facts that Walmart improperly inflated

Jet.com FY17 and FY18 Sales to artificially inflate Walmart's Quarterly Ecommerce Sales growth in FY18.

U.   Matthew Boyle, Bloomberg News' Reporter, published an online article on 4/13/18 to purportedly downplay Jet.com growth potential to conceal the fact that Walmart improperly inflated Jet.com FY17 and FY18 sales to inflate Walmart's Ecommerce Quarterly sales growth in FY18.

V.   Doug McMillon made misleading statements to analysts and investors in early Oct 2018 that Walmart.com had 8 Mil and 20 Mil SKUs on Jan and Oct of 2016 when he knew they were not true.

W.   Robert Ohmes published an investment report in early Oct 2018 to whitewash the misleading statements Walmart made to investors and analysts Walmart regarding the total number of SKUs on Walmart Marketplace.

429.   As discussed above prong #3 of the coverup scheme is to collect information and manipulate them to purportedly assert Walmart's "Nuts & Sluts" strategy to diminish Huynh's credibility as a whistleblower in order to accomplish both Goal A and Goal B.

A.   On 3/15/18 David deRubertis e-filing Huynh's complaint with US District Court of the Northern District of California.  He shotgun pleaded five nefarious FEHA ADHD claims (Discrimination, Retaliation, and Failure to accommodate etc.) to improperly obtain evidence then manipulated them to purportedly argue that Huynh did not engage in protected activities and Walmart terminated Huynh's employment 14 days before the general RIF due to Huynh's mental illness and violence tendency.

B.   The RICO Defendants caused Doug Kasales and Kathy Vonlindern to destroy evidence of Huynh's meetings with Beal on Oct 4 and Oct 18, 2016 to obstructed Huynh from proving that he engaged in protected activity.

C.   The RICO Defendants caused Doug Kasales and Kathy Vonlindern to mutilate and alter Huynh's email and documents David deRubertis produced to the Rescue Squad so the RICO Defendants could use it to effectuate prong #2, #3, and #6 of the coverup scheme.

D.   Doug Kasales emailed Kari deRubertis emailed the last bate number on the official document productions to enable David and Kari deRubertis to produce Huynh's psychiatrist records and other SEC submission without the confidentiality designation so the RICO Defendants so they could use it to effectuate prong #2, #3,and #6 of the coverup scheme.

E.   The RICO Defendants caused Lighthouse Global and Renee to process and produce Beal's fabricated 11/30/16 email and Marketplace RIF list, Beal's fabricated

12/13/16 email and Marketplace RIF, Beal's fabricated 12/14/16 email and Market-place RIF list in Sept 19, 2108, Feb 12, 2018, and Feb 14, 2018. Additionally, Light-house Global through the act of its employees (Renee Quezada and other doe(s)) help the RICO Defendants produced fabricated documents to Huynh in Feb, Apr, and June of 2019 so they could filed this fabricated documents to support Walmart's motion for summary judgement.

F.    In late Sept 2018, David deRubertis emailed Huynh on multiple occasions to intimi-date and threaten Huynh to sign an employment release form so he could obtain Huynh's Amazon personnel files (specifically, the 2013 email to Jeff Bezos to effec-tuate prong #3 of the cover up scheme.

G.    Between Nov 2017 and Sept 2018 David deRubertis used and/or caused other to sue US mail and wire's transmissions on at least 10 instances to fraudulently obtain Huynh's medical records and psychiatrist records then secretly leaked them to the other RICO Defendants to they could effectuate prong #2, #3, and #6 of the coverup scheme.

H.    The Rescue Squad used and/or caused other to US Mails and wire transmissions on least 10 instances to illegal obtain Huynh's personnel files from Huynh's previous employers dating back to 1996 to effectuate prong # 2, #3, and #4 of the coverup scheme.

I.    Between late 2018 and late 2019, the Rescue Squad used and/or caused other to use US mail and wire transmission on at least 29 instances to improperly obtain Huynh's medical records to purportedly show that Huynh was a fake whistleblower and Huynh was mentally ill and prone to violence to support Walmart's purport legiti-mate reason for Huynh's termination.

430.    Prong #4 is the coverup the coverup prong of the coverup scheme deployed to conceal the facts that the RICO Defendants engaged in a conspiracy to accomplish their com-mon purpose.  Between 2018 and late 2019, the RICO Defendants and their conspirators used US mails and wire transmissions on multiple occasions in an attempt to coverup the WSF Coverup Enterprise's illegal coverup scheme.

431.    Prong #5 is the catch and kill scheme. Its objective is to pulverize any evidence and traces of Walmart's criminal conducts to ensure a risk-free civil and criminal liabilities future for the RICO Defendants.  The RICO Defendants used US mails and wire transmission on numerous occasions to effectuate prong #5 of the coverup scheme.

432.    To carry out, and attempt to carry out, the scheme to defraud, the RICO Defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud). 310.

433.    Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 & 1343), within the past ten years. The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other and had a common purpose of effectuate the WSF Coverup Enterprise coverup scheme. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting Huynh.

Pattern of Racketeering Activity:  Obstruction SEC and DOL/OSHA Proceedings[89]  in Violation of 18 U.S.C. § 1512(c)(2)

---

[89] **Official Proceeding Defined:**
Section 1515(a)(1) provides that, as used in section 1512 the term "official proceeding" means: (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury; (B) a proceeding before the Congress; (C) a proceeding before a Federal Government agency which is authorized by law

**COMPLAINT – DEMAND FOR JURY TRIAL**

18 U.S.C. § 1512(c)(2) provides that:

(c) Whoever corruptly —

(2) otherwise obstructs, influences, or impedes any official proceeding[90], or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

**The RICO Defendants Engaged in Predicate Acts to Obstruct the SEC Investigation**

434.    As discussed above, David deRubertis was visibly excited when Huynh informed him that Huynh was working with Sean McKessy to raise Huynh's concerns about Walmart's misconducts to the SEC because he knew he was sitting on top of a gold mine.  He could sell the confidential and non-public information in Huynh's 4/19/17 SEC submission to at his desired price because the alternative for the Walmart Participants not pay would cost them and Walmart at least $3 Billion or possible long jail time.  So, sometime between late Apr and early May 2017, David deRubertis sold Huynh's confidential information to Walmart

---

[90] **An SEC investigation is accepted as an Official Proceeding as a matter of law:**

One of the first cases to examine the meaning of "proceeding" was United States v. Batten, 226 F.Supp. 492 (D.D.C.1964). There, the defendant challenged a Section 1505 charge for obstructing a Securities and Exchange Commission ("SEC") investigation, on the basis that it "was not in reality a proceeding contemplated by" Section 1505. 226 F.Supp. at 492–93. But the district court noted that Congress "specifically empowers [SEC] investigations to be conducted and witnesses to be sworn at such investigations," making the proceeding at issue "more than a mere police investigation." Id. at 494. The court therefore found that "proceeding... should be construed broadly enough to include any investigation directed by a formal order of the [SEC], at which a designated officer takes testimony under oath." Id. The court recognized that there is a "distinction between adjudicative and investigative proceedings of the [SEC]," but reasoned that "[i]t would seem to follow that both types of proceedings are...covered by the statute involved here." Id.

The Ninth Circuit has also held that "proceeding" is broad enough to include investigative actions, but like the district court in Batten, has so held only in cases involving agencies that also had adjudicative or rulemaking authority. See, e.g. , United States v. Technic Servs. , 314 F.3d 1031, 1044 (9th Cir.2002) (holding that an Environmental Protection Agency "investigation into a possible violation of the Clean Air Act or Clean Water Act, which could lead to a civil or criminal proceeding is a kind of [Section 1505 ] proceeding") (citations omitted); United States v. Vixie , 532 F.2d 1277, 1278 (9th Cir.1976) (holding that an Internal Revenue Service "administrative investigation is a proceeding within the meaning of [Section] 1505 ").

294

**COMPLAINT – DEMAND FOR JURY TRIAL**

which set in motions the perpetration of series of criminal acts by the RICO Defendants.  Specifically, David deRubertis' leak information (Prong #1 of the coverup scheme) was the fuel and ignition source that drove the other five prongs of the WSF Coverup Enterprise's fraudulent coverup scheme.  Without such information, there would be no WSF Coverup Enterprise.  Specifically, to support prong #2 as the information allowed the RICO Defendants to whitewash evidence of Walmart's illegal conducts to obstruct the foreseeable SEC investigation into Huynh's complaints.  The RICO Defendants obstructed and/or attempted to obstruct the SEC investigation into Huynh's complaint in five ways.

435.    First, the RICO Defendants caused David deRubertis to steal and disseminate the confidential and non-public information contains in Huynh's SEC submissions between Apr 2017 and late 2018 to the other RICO Defendants. The RICO Defendants used this leaked information as a foundation to plan and commit numerous predicate acts to effectuate Goal A (Prong #2 and #3) of the coverup scheme.

436.    Second, the RICO Defendants (specifically Walmart's senior executives) went on a road show to whitewashing evidence which proved that Walmart made misleading statements to its shareholders regarding the future outlook of Walmart's Marketplace e.g., the total number of Marketplace SKUs on Walmart Marketplace.

437.    Third, the RICO Defendants delayed the filing of Huynh's civil complaint by three months in order to plan and coverup evidence that proved Walmart reported inflated Walmart's Quarterly Ecommerce Sales growth in FY18 by improperly accounting for Jet.com FY17 and FY18 sales.

438.    Fourth, the RICO Defendants exploited Huynh's 3/15/18 complaint as a platform to whitewash the misleading statements made by Walmart's senior executives to its shareholders in FY17 regarding the total number of Walmart Marketplace SKUs on

295
**COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart.com in Jan, Aug, and Oct 2016.  The RICO Defendants knew or should have known that Sean McKessy would forward this complaint to the SEC to dimmish Huynh's credibility in the eyes of the SEC because the allegations in Huynh's SEC submissions contradicted with the allegations in Huynh's complaint e.g., the definition of Walmart's Marketplace in Huynh's complaint contradicted with that in Huynh's SEC submissions.

439.   Fifth, the RICO Defendants and their co-conspirator planned and executed a perfect "Truth on the Market" defense to purportedly prove to Walmart's investors, invest-ment analysts, the SEC and/or the DOJ, the Media, politicians, and the American Public that Huynh's allegations was not credible because there was zero loss causation when Huynh's disclosures came out public.

440.   Sixth, the RICO Defendants leveraged the GO 71 initial disclosure to legiti-mately leak the names of witnesses that Huynh proposed to the SEC that may have infor-mation regarding Walmart's illegal conducts.  By having this information (and specific allega-tions in Huynh's SEC submissions) the RICO Defendants coached and/or influenced wit-nesses to made misleading and/or half-true statements to the SEC in order to influence the outcome of the SEC investigation which led to the SEC to issue a non-enforcement action let-ter to Walmart on 4/2/19.

441.   Seven, the RICO Defendants at the directions of Walmart's Board of Directors engaged in a reverse whitewashing campaign to coverup the fact between May 2017 to end of 2018, the RICO Defendants whitewashed evidence of Walmart's misrepresentations to inves-tors in FY17 regarding the outlook of Walmart's Marketplace and Walmart's Ecommerce. with the SEC investigators with the truth definition of Walmart Marketplace in Huynh's SEC submissions.

**COMPLAINT – DEMAND FOR JURY TRIAL**

442.    In closing, the confidential information in Huynh's SEC submissions that Da-vid deRubertis leaked to his Co-RICO Defendants between Mid-2017 to late 2018 was the fuel and ignition source that started a massive wild fire to burn and eviscerate evidence of Walmart's illegal conducts in order to obstruct and influence the outcome of the SEC investi-gation into Huynh's complaints against Walmart.  Ultimately, the SEC and/or the DOJ de-cided to prosecute Walmart's $140 Bil fraud against shareholders based on the RICO Defend-ants' factual misrepresentations and lies.

**The RICO Defendants Engaged in Predicate Acts to Obstruct the OSHA Investigation**

443.    As discussed above, the RICO Defendants conspired with OSHA's investiga-tors to obstruct the DOL/OSHA from performing their legally mandated duties to investigate and adjudicate Huynh's OSHA SOX whistleblower complaints against Walmart. The main reason the RICO Defendants didn't want Huynh's case to be adjudicated at the OSHA ex-haustive remedy stage because the RICO Defendants wanted to take Huynh's case to Federal Court in order to effectuate the WSF Coverup Enterprise's fraudulent coverup scheme to achieve the RICO Defendants' common purpose.  The RICO Defendants obstructed OSHA from investigating Huynh's SOX complaint in several ways.

444.    First, although David deRubertis and the deRubertis Law Firm purportedly filed Huynh's OSHA complaint and OSHA amended complaints on May 11 and July 10, 2017, OSHA never opened Huynh's case in IMIS for months after it was filed and OSHA never investigated Huynh's complaints.  This was because the RICO Defendants acted in con-cert with Mark Marchione, OSHA's Regional Supervisory Investigator, and Jonelle Dunn, OSHA's investigator, and other Doe(s) to obstruct OSHA from investigating Huynh's OSHA complaints.

**COMPLAINT – DEMAND FOR JURY TRIAL**

445.    Second, to cover up the fact that the RICO Defendants obstructed OSHA from investigating Huynh's complaint.  Davide deRubertis, Payne & Fear, and the Rescue Squad, conspired with Mark Marchione and Jonelle Dunn to purportedly issue a complainant and respondent notification letters dated Aug 8, 2017 to Walmart and the deRubertis Law Firm to purportedly show that OSHA had opened Huynh's case in IMIS.  However, upon Huynh's in-depth analysis, he concluded these letters were fabricate to coverup the RICO Defendants' obstruction of the OSHA investigation and adjudicating process.

446.    Third, to purportedly show that David deRubertis had exhausted OSHA administrative remedies before taking Huynh's case to Federal Court and to cover up the RICO Defendants' obstruction of the OSHA investigation process, the RICO Defendants fabricated the OSHA 3/16/18 dismissal letter (filed as Defendants' Exhibit 128 in DC Dkt. 119-20).  See ¶ X for fabrication analysis.

447.    In short, the RICO Defendants obstructed OSHA from investigated Huynh's 5/11/17 and 7/10/17 complaints because they wanted to take Huynh's case to Federal Court so they could effectuate the WSF Coverup Enterprise's fraudulent coverup scheme.

Pattern of Racketeering Activity:  – Destroy, Alter, OR Conceal Document or Object in Violation of 18 U.S.C. § 1512(c)(1)

The Elements of 18 U.S.C. § 1512(c)(1)

18 U.S.C. § 1512(c)(1), provides that:

(c) Whoever corruptly —

**COMPLAINT – DEMAND FOR JURY TRIAL**

1   (1) alters[91], destroys, mutilates[92], or conceals a record, document, or other object, or
2   attempts to do so, with the intent to impair the object's integrity or availability for use
3   in an official proceeding . . . shall be fined under this title or imprisoned not more than
    20 years, or both.

4   ### The SEC Investigation Process

5   448.   As previously discussed, Goal A of the WSF Coverup Enterprise was to obtain

6   a "Get Out of Jail Free" Card from the SEC and/or DOJ i.e., non-enforcement action letters

7   issued to Walmart.  To achieve this goal, the RICO Defendants must successful completed

8   prong #2 of the coverup scheme i.e., by engaging in a whitewashing campaign to alter, muti-
9   late, destroy evidence or conceals a record to coverup Walmart's $140 Bil fraud against share-
10  holders.  Within this context, the RICO Defendants in engage in at least five predicate acts to
11
12  prevent the SEC to investigate Walmart's illegal conducts.

13  449.   First, the RICO Defendants (specifically, Walmart's senior executives with as-
14  sistance of the Rescue Squad and Robert Ohmes) attempted to alter the meaning of the term
15  Walmart's Marketplace to make the misleading statements made by Doug McMillon to inves-
16  tors in FY17 no longer misleading.
17
18  450.   Second, the RICO Defendants (Specifically, David deRubertis altered the
19  meaning of Walmart's Marketplace at the direction of the Rescue Squad and sanctioned by

20

21  [91] Alter is defined as "**to cause to become different in some particular characteristic** . . .
22  without changing into something else." United States v. Kilbride, 2009 U.S. App. LEXIS
    23722 (9th Cir. Ariz. Oct. 28, 2009).
23  See MCI Telecommunications Corp. v. American Telephone & Telegraph Co. 512 U.S. 241
    (1994)- See Black's Law Dictionary 1198 (3d ed. 1933) (defining "modification" as "A
24  change; an alteration which introduces new elements into the details, or cancels some of them,
25  but leaves the general purpose and effect of the subject matter intact").
    [92] https://thelawdictionary.org/mutilation/
26  As applied to written documents, such as wills, court records, and the like, this term means
27  rendering the. document imperfect by the subtraction from it of some essential part, as, by
    cutting, tear ing, burning, or erasure, but without totally destroying it. See Woodfill v. Patton,
28  76 Ind. 583, 40 Am. Rep. 269.

299
**COMPLAINT – DEMAND FOR JURY TRIAL**