Tri Huynh - Pro Se Plaintiff
4015 134th Ave SE
Bellevue, WA 98006
Telephone: (408) 757-5516
E-mail: trimhuynh@outlook.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TRI MINH HUYNH,<br><br>Plaintiff,<br><br>v.<br><br>Walmart INC., a Delaware Corporation; WAL-MART.COM USA LLC, a California Limited Liability Corporation; Doug McMillon; Brett Biggs; Marc Lore; GIBSON, DUNN & CRUTCHER LLP a Limited Liability Partnership; Theodore J. Boutrous Jr.; Rachel S. Brass; Eugene Scalia; Mark Marchione; The deRubertis Law Firm, APC is a Professional Law; David deRubertis; Kari deRubertis; Epiq eDiscovery Solutions, Inc.; Douglas Kasales; Kathy von Lindern; Lighthouse Document Technologies, Inc.; Renee Quezada ; Orrick Herrington & Sutcliffe LLP a Limited Liability Partnership; Payne & Fears LLP a Limited Liability Partnership; BOFA SECURITIES, INC., a Delaware Corporation; Robert F. Ohmes; Matthew Boyle.<br><br><br>Defendant(s). | **Case No: 3:22-cv-00142-JSC**<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES FOR:**<br><br>1.  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c));<br><br>2.  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d));<br><br>3.  Bivens Actions;<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**INTRODUCTION**

"Power Tends to Corrupt and Absolute Power Corrupts Absolutely" Lord Acton.

1.      This case is about the arrogance of power, and the institutionalization of a culture of greed, dishonesty, and ethical blindness by Walmart's senior executives to defraud investors to the tune of $140 Bil then acted criminally in an attempt to cover it up.

2.      This case is not about the fact that Walmart ripped off their shareholders to the tune of $140 Billion (that is for Walmart's shareholders to take legal actions against Walmart and their executives to make their injuries whole).  Rather this case is about how the Walmart Participants formed an association in fact enterprise (The Walmart Shareholder Fraud Coverup Enterprise) with the other RICO Defendants to design and execute a wicked, insidious, and nefarious six-pronged illegal coverup scheme to achieve the RICO Enterprise's common purpose of covering up Walmart massive shareholder fraud and ensures a risk free civil and criminal liabilities future for all of the members of the Enterprise.

3.      The paragraphs below discussed in details how the RICO Defendants committed numerous predicate acts and overt acts to effectuate the criminal enterprise's common purpose and, in the process, the RICO Defendants caused injuries to Huynh's properties, personal and professional reputation which gave rise to the nine causes of actions asserted in this litigation.

4.      In this complaint, DC Dkt referred to the United States District Court, Northern District of California Docket for the case Tri Huynh Plaintiff(s) v. WAL-MART STORES, INC., et al. Case 3:18-cv-01631-VC.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

5.      In this complaint, COA Dkt referred to the United States Court of Appeals for the Ninth Circuit Docket for the case TRI MINH HUYNH, Plaintiff-Appellant, v. WAL-MART STORES, INC., WAL-MART ASSOCIATES, INC., and WAL-MART.COM, INC. Case: 20-15211.

## THE PARTIES

**PLAINTIFF**

6.      Plaintiff Tri Minh Huynh is a citizen of the United States and citizen of the State of Washington. Huynh currently resides in King County - Bellevue, Washington.

**RICO DEFENDANTS**

7.      Walmart INC., a Delaware Corporation, headquartered at 702 S.W. 8th Street, Bentonville AR; WAL-MART.COM USA LLC, a California Limited Liability Corporation, headquartered at 850 Cherry Avenue, San Bruno, CA. WAL-MART.COM USA LLC is a wholly-owned subsidiaries of Walmart, INC. (collectively, "Walmart"). Walmart is being sued for the conducts of its employees, board of directors, and agents.

8.      Defendant Doug McMillon ("McMillon") is an individual residing in Benton-ville, Arkansas.  McMillon is being sued in his official and individual capacity.

9.      Defendant Brett Biggs ("Biggs") is an individual residing in Bentonville, Ar-kansas.  Biggs is being sued in his official and individual capacity.

10.      Defendant Marc Lore ("Lore") is an individual residing in New York City, New York.  Lore is being sued in his official and individual capacity.

.
3
**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

11.     Defendant GIBSON, DUNN & CRUTCHER LLP is a Limited Liability Partnership located at 333 South Grand Avenue, Los Angeles, CA 90071-3197. Gibson Dunn Crutcher is being sue for the conducts of its employees and agents.

12.     Defendant Theodore J. Boutrous Jr. ("Boutrous ") is an individual licensed to practice law in the State of California under State Bar No. 132099. Boutrous is an individual residing in Los Angeles, California. Boutrous is being sued in his official and individual capacity.

13.     Defendant Rachel S. Brass ("Brass ") is an individual licensed to practice law in the State of California under State Bar No. 219301. Brass is an individual residing in San Francisco, California. Brass is being sued in her official and individual capacity.

14.     Defendant Eugene Scalia ("Scalia ") is an individual licensed to practice law in the State of California under State Bar No. 151540. Scalia is an individual residing in Mc Lean, Virginia.  Scalia is being sued in his official and individual capacity.

15.     Defendant Mark Marchione ("Marchione") is an individual residing Bakersfield, California. Marchione is being sued in his individual capacity.

16.     Defendant The deRubertis Law Firm, APC is a Professional Law Corporation located at 4219 Coldwater Canyon Ave, Studio City, CA 91604-1934 The deRubertis Law Firm, APC.  The deRubertis Law Firm, APC. is being sued for the conducts of its employees and agents.

17.     Defendant David deRubertis ("deRubertis ") is an individual licensed to practice law in the State of California under State Bar No. 208709. deRubertis is being sued in his
.

4

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

official and individual capacity.

18.     Defendant Kari deRubertis ("Kari deRubertis ") is an individual residing in Studio City, California. Kari deRubertis being sued in her individual capacity.

19.     Defendant EPIQ EDISCOVERY SOLUTIONS, INC., a DELAWARE Corporation, locate at 777 3rd Ave, 12th Floor, New York, New York 10017, is being sued for the conducts of its employees and agents.

20.     Defendant Douglas Kasales ("Kasales "). Kasales is an individual believed to be residing in Henderson, Nevada.  Kasales is being sued in his official and individual capacity.

21.     Defendant Kathy von Lindern ("Lindern "). Lindern is an individual residing in Hermosa Beach, California. Lindern is being sued in her official and individual capacity.

22.     Defendant LIGHTHOUSE DOCUMENT TECHNOLOGIES, INC., a WASHINGTONH State Corporation, head Quarter at 51 University Street, Suite 400, Seattle, WA 98101, is being sued for the conducts of its employees and agents.

23.     Defendant Renee Quezada ("Quezada") is an individual residing Bakersfield, California. Quezada is being sued in her official and individual capacity.

24.     Defendant Orrick Herrington & Sutcliffe LLP is a Limited Liability Partnership located at 405 Howard Street San Francisco, CA.  Orrick Herrington & Sutcliffe LLP is being sued for the conducts of its employees and agents.

25.     Defendant Payne & Fears LLP is a Limited Liability Partnership located at 4 Park Plaza, Suite 1100 Irvine, CA 92614. Payne & Fears LLP is being sued for the conducts

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1   of its employees and agents.

2

3       26.     BOFA SECURITIES, INC., a Delaware Corporation, located at 1 BRYANT

4   PARK, NEW YORK, NY, 10036, is being sued for the conducts of its employees and agents.

5

6       27.     Defendant Robert F. Ohmes ("Ohmes") is an individual believed to be residing

7   in the State of New York. Ohmes is being sued in his official and individual capacity.

8

9       28.     Defendant Matthew Boyle ("Boyle") is an individual believed to be residing in

10  the State of New York. Boyle is being sued in his individual capacity

11                      **Subject Matter Jurisdiction and Venue**

12

13      29.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 be-

14  cause this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because

15  this action alleges violations of the Racketeer Influenced Corrupt Organizations Act

16  ("RICO"), 18 U.S.C. § 1962.

17

18      30.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial

19  number of the events giving rise to this action occurred in this District, and/or a substantial

20  part of property that is the subject of the action is situated in the District.

21

22

23

24

25

26

27

28      .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

**Statement of Facts**

3

**Walmart's $140 Billion Shareholder Fraud Scheme**

4

5

31.    Long before the rise of Jeff Bezos and the Amazon machine, Walmart was

6

struggling to grow its new store sales and same store sales starting in the early 2000's and

7

continued to the early part of 2010's.  The slower sales growth was due to geographic con-

8

straints, cannibalizations, and high-income customer constraint and other competitive factors

9

i.e., from Dollar Stores and pure play online retailers like Amazon.com.  See Exhibit 1 at page

10

21-22.

11

12

32.    Walmart's senior executives attempted to fix these problems by broadening its

13

general merchandise offerings, specifically in the Apparel and Home Categories, to get the

14

Walmart's selective customers who shopped most of their grocery and consumer products

15

from Walmart but spent very little on Walmart's General Merchandise products.  These cus-

16

tomers, instead shopped for General Merchandise products from other retailers like Best Buy

17

and increasing from pure online players like Amazon.com.  However, despite Walmart's ef-

18

forts to get the selective customers to cross the grocery and consumable aisles to the general

19

merchandise aisles to shop Walmart's apparel and home products, Walmart had little success.

20

21

33.    As a result of Walmart's inability to accelerate growth and broaden its general

22

and merchandise product appeals with the mid and high-income customer segments, investors

23

pushed down Walmart's PE Ratio from a height of roughly 40 in the late 1990's to about 16

24

(a 20+ turns drop). See Exhibit 1 at page 12, 19, and 34.

25

26

34.    To make matter worse for Walmart, Jeff Bezos and the Amazon machine came

27

out of nowhere and dominated the online General Merchandise categories as more and more

28

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

and more of customers' purchasing dollars for General Merchandise products shifted from physical retails to online retail. See Exhibit 1 at page 22. Analysts and investors were worried that many of the pureplay physical retailers may not be able to survive the Amazon's retail apocalypse (i.e., these retailers were put in the non-survival bucket. For example, Circuit City and Border Book Stores went out of business).

35.    In an effort to grow its online business, Walmart made significant investments (burning a lot of money) between 2012 and 2016. During this period, Walmart's Global Ecommerce Sales grew from about $6 Billion to $13.7 Billon. However, despite these significant losses, Walmart's Global Ecommerce growth rate dropped from 27% in Q1 FY15 to about 10% in Q3 FY16. Investors reacted negatively and sent Walmart's stock price downward by 10% on Oct 14, 2015 due to Walmart's slower reported Ecommerce Quarterly Sales Growth. Investors put Walmart in the "non-survival" retailer bucket.

36.    To purportedly shifted investors' and analysts' perception of Walmart from a "non-survival" retailer bucket to a company that would be an alternative to Amazon, McMillon and team communicated to investors and analysts Walmart's new Ecommerce basket strategies. In this new strategy, Walmart will not only grow its Ecommerce Sales but do so with an eye toward future profitability by getting customers to buy high margin "General Merchandise" products on Walmart.com from the Marketplace and 1P General Merchandise assortment, something that Walmart failed to do in the physical world.

37.    To execute this strategy, Walmart laid out a two prong approaches. First, Walmart would offer online grocery and consumable products at very competitive prices versus other competitors (either at a loss or low margin to Walmart. See Exhibit 1 at page 29 and 31) to lure customers to place their orders for grocery and consumable products on Walmart's

8

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

grocery apps (not integrated with Walmart.com) then come to Walmart stores' parking lot to pick up their orders. Second, Walmart leveraged these customers traffics to drive these customers to Walmart.com where they would by high margin General Merchandise Products from Walmart's Marketplace Sellers' and Walmart's own 1P products. See Exhibit 1 at 30. Therefore, Walmart purportedly communicated to investors that Walmart will not only accelerate its Ecommerce sales but will also improve its profitability.

38.     To purportedly prove to investors and analysts, its Ecommerce Basket Strategy worked, Walmart's executives purportedly showed Walmart's Ecommerce explosive sales growth during FY18 from an average Quarterly Ecommerce Sales growth rate of roughly 16% to an average growth rate of 58% (See Exhibit 1 at 34). However, Huynh recently discovered that Walmart reported inflated Ecommerce sales growth in FY18 by artificially inflation of Jet.com's Ecommerce Sales for FY17 and FY18).

39.     Walmart executives also made misleading statements about the total number of SKUs on Walmart's Marketplace (See Exhibit 1 at 48) to investors and analysts in FY17, knowing that investors relied on this material metric to assess Walmart's future eCommerce profitability outlook and value Walmart's stock price.  Walmart's executives then purportedly correlated the accelerated Marketplace SKU growth to faster Walmart's Marketplace Sales growth. See Exhibit 1 at 43. Walmart then assert that Walmart's Marketplace is highly profitable. See Exhibit 1 at page 44.  However, it is important to note that Walmart's Marketplace sales was quite small in FY 17 roughly 100 Mil (($1 Bil GMV * 10% commission fee).  Even by FY2020, Walmart's Marketplace sales was only about 250 Mil (FY20 = 2.5*1 Bil*10% = roughly 250 Mil).  These misleading statements were made to investors and analysts during

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart's Quarterly Earnings Calls and Walmart's Annual Meeting with the investment community during FY17. Investors and analysts relied and cited on this material assortment metric as one of the key reasons to expand Walmart's PE multiples and Market Cap as they believed Walmart's Ecommerce will improve over time.  See Exhibit 1 at page 45 to 47. Exhibit 2 at 17.

40.     Based on the purportedly explosive Ecommerce quarterly sales growth and purportedly growth in the high margin Walmart's Marketplace business, investors no longer categorized Walmart in the "Non-Survival Retailer" bucket. See Exhibit 1 at page 35 and 41. As a result, Walmart Market Cap increase by roughly $140 Billion during this misleading period. See Exhibit 1 at page 35 and 47.

**Huynh Submitted Hundreds of Pages of High-Quality Original Analyses and Documentary Evidence to the SEC to Prove That Walmart Violated Rule 10b-5**

41.     Between Mid-2017 to late Sept 2018, Huynh submitted hundreds of pages of original analyses and documentary evidence to prove to the SEC that Walmart's senior executives knowingly made misleading statements of material facts regarding the total number of SKUs on Walmart Marketplace at Walmart's Q2 FY17 earning calls and Walmart's Annual Meeting with the investment community on Oct 2016, knowing that investors and analysts relied on this critical metric to value Walmart Market Cap and Stock Price. The total number of SKUs on Walmart's Marketplace is a material metric because investors and analysts relied on this metric to assess Walmart's Ecommerce profit outlooks to value Walmart's stock. See Exhibit 7 at 6; Exhibit 3 at page 7-8; Exhibit 4; Exhibit 5 at page 4.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1
2
3

**Inflated Total Number of SKUs on Walmart's Marketplace**

| Time | Walmart's Reported Inflated Total # of SKUs on Its Marketplace | Walmart's Senior Executives Knew the Falsity of These Reported Numbers |
|---|---|---|
| Jan 2016 (Beginning of FY17) | McMillion reported to investors that Walmart Marketplace had 8 Mil SKUs when in fact it only had 6.2 Mil SKUs (1.8 Mil SKUs inflation). See Exhibit 7 at page 6-7 and 9. Exhibit 8 at 4-5. See Exhibit 10 – Walmart's FY17 10K showed that Walmart.com had 8 Mil SKUs not Marketplace. | Seth Beal emailed McMillon and informed him that Walmart Marketplace had 6.2 Mil SKUs. Exhibit 7 at 8. |
| Aug 2016 (Q2 FY17) | McMillion reported to investors that Walmart's Marketplace had 15 Mil SKUs when in fact it only had 10.9 Mil SKUs (4.1 Mil SKUs inflation). See Exhibit 8 at 5-6 and 23-24. | Beal emailed to McMillion that Walmart Marketplace had 10.9 Mil SKUs not 15 Mil on July 30, 2016 (end of Q2 FY17). See Exhibit 8 at 22. |
| Oct 2016 | McMillon reported to investors that Walmart's Marketplace had 20 Mil SKUs when in fact it only had 16.5 Mil SKUs (3.5 Mil inflation). See Exhibit 8 at 5-6, 25-26, and 31 | Beal emailed McMillion on Oct 2, 2016 that Walmart Marketplace had 16.5 Mil SKUs not 20 Mil SKUs.  See Exhibit 8 at 26-27. |

18
19
20
21

42.     There are three critical questions that Huynh needed to answer.  First, could the SEC use the evidence that Huynh provided to them to prove in Federal Court that Walmart is civilly liable for violating Rule 10b-5 as a matter of law?

22
23

**The Evidence Huynh Submitted to the SEC Proved With Ease That Walmart Is Civilly Liable for Violation of section 10(b) and Rule 10b-5**

24
25
26
27
28

43.     To obtain judgement against Walmart for violation of section 10(b) and Rule 10b-5, the SEC must prove by preponderance of evidence that Walmart has made misleading statements of material fact or omission of material fact, made with scienter." Ponce v. SEC, 345 F.3d 722, 729 (9th Cir. 2003) (quoting SEC v. Fehn, 97 F.3d 1276, 1289 (9th Cir. 1996))

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

(internal quotation marks omitted); see also SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir. 1993) (discussing the elements the SEC must prove to establish a misrepresentation violating Rule 10b-5), and they were made in connection with the purchase or sale of a security. See McGann v. Ernst *29 & Young, 102 F.3d 390, 393 (9th Cir. 1996) (quoting Wessel v. Buhler, 237 F.2d 279, 282 (9th Cir. 1971)).

**No 1: A material misrepresentation or omission**

44.     **Misleading:** "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008).

45.     **Materiality:** In Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988), the Supreme Court adopted the standard for materiality developed in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), (whether a reasonable shareholder would "consider it important" or whether the fact would have "assumed actual significance") as the standard for actions under 15 U.S.C. § 78j(b).   **Ninth Circuit:** Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994) (applying test of whether omission or misrepresentation would have misled reasonable investor about nature of his or her investment); McGonigle v. Combs, 968 F.2d 810, 817 (9th Cir. 1992) (applying test of whether there was substantial likelihood that, under all the circumstances, omitted fact would have assumed actual significance in deliberations of reasonable shareholder)

**No 2: Scienter**

46.     Scienter may be established, therefore, by showing that the defendants knew

.

12

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements. See Ponce, 345 F.3d at 72930 (scienter is established where defendants make "statements that they know, or are reckless in not knowing, are false"); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002) (scienter is established where "the defendant made false or misleading statements either intentionally or with deliberate recklessness"), abrogation on other grounds recognized by South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008); United States v. Farris, 614 F.2d 634, 638 (9th Cir. 1979) ("[T]he reckless disregard for truth or falsity is sufficient to sustain a finding of securities fraud.").

**No 3: In connection with the purchase or sale of a security**

47.      " A statement is made "in connection with" purchase or sale of securities if it was made "in a manner reasonably calculated to influence the investing public." McGann v. Ernst *29 & Young, 102 F.3d 390, 393 (9th Cir. 1996) (quoting Wessel v. Buhler, 237 F.2d 279, 282 (9th Cir. 1971)). Therefore, Walmart make misleading statements of material facts during its Quarterly Earnings Call, Meeting with Analysts, and Annual Meetings etc. satisfied this requirement.

**SEC's Burden of Production Against Walmart in a Rule 10b-5 Action**

48.      **Production Burden.** A party has the production burden when, if he allows the evidence to stay as it is, the factual issue will be concluded against him by the judge (regardless of the jurors) as a "matter of law." This is all that "production burden" means. Whether a burden of production has been satisfied is only for the judge to decide. Satisfaction of a party's production burden merely and solely means the judge will not direct a verdict or make .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

an equivalent peremptory legal ruling that would foreclose jury consideration of that party's

case or issue (i.e., the evidence is enough to get a reasonable trier of facts to rule for the party

that bear the burden production. This usually means that the evidence produced is substantial

i.e., more than mere scintilla of evidence but less than preponderance of evidence). In other

words, a determination that the burden of production of evidence has been carried means the

party's case (or the particular issue on which the burden has been satisfied) will survive

enough to be able to "get to the jury" for resolution, rather than being thrown out beforehand

by the judge.

49.     It is obvious that as to most issues, the plaintiff in a civil case bears the produc-

tion burden initially, in that if no evidence on the issue is adduced, they will suffer a peremp-

tory ruling. The adduction of sufficient evidence by plaintiff to get to the jury (i.e., a reasona-

ble trier of fact could rule for the plaintiff of the factual issue) does not shift the production

burden to the defendant. Only when plaintiff's **evidence is so overwhelming that it permits**

**no reasonable contrary conclusion** (thus subjecting defendant to the specter of a peremptory

ruling if the evidence remains in that state) **do we say the production burden has shifted to**

**defendant.**

**The SEC Would Be Able to Prove With Ease That as a Matter of Law, Walmart
Is Liable for Violating Rule 10b-5**

50.     The Burden of Production Adduced by the SEC (Using Huynh's Evidence) Is

So Overwhelming That a Federal Court Will Render Judgement Against Walmart as Matter of

Law for Violation of section 10(b) and Rule 10b-5.

**Element No 1:** Misleading Statements of Material Facts

51.     The evidence discussed in paragraph 47, proved with ease that Walmart and

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart's Senior Executives made misleading statements of material facts to investors regarding the total number of SKUs on Walmart Marketplace and this metric is material to Walmart's investors.

**Element No 2:  Scienter**

52.     The evidence discussed in paragraph 45 above, the third column of the table, proved beyond reasonable doubt that Doug McMillion and Walmart knew the falsity of the reported Marketplace assortment metric he reported to investors in Jan 2016, Aug 2016, and Oct 2016. However, Mr. McMillon intentionally made these misleading statements to deceive investors and analysts to drive up Walmart's Market Cap by $140 Bil

**Element No 3: In connection with the purchase or sale of a security**

53.     Walmart and Doug McMillion made misleading statements to investors and analysts during Walmart's Quarterly earnings call and Walmart's annual meeting with the investment community. Therefore, it proved beyond reasonable doubt that these statements were made in connection with the purchase or sales of Walmart's stock.

54.     In short, giving the strength of the evidence produced by the SEC to support their rule 10b-5 claim against Walmart, the burden of production shifted to Walmart to prove the non-existence of the three legal elements above.  However, since the evidence proved beyond reasonable that Walmart was liable for violating Rule 10b-5, Walmart had no evidence to rebut the SEC's production.

**The SEC Should Have Levied a $500,000,000 Civil Penalty Against Walmart Inc.**

55.     Second, given that Walmart is liable for violating section 10(b) and Rule 10b-

.

15

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

5, how much money should the SEC levied against Walmart? A recent SEC enforcement action against Wells Fargo in February 21, 2020 is instructive to answer this question. See Exhibit 10 and Exhibit 11 for details. Wells Fargo was fined $500,000,000 for making misleading statements of material facts to investors regarding the cross-sell metrics in Wells Fargo Community Bank business segment. Below are extracts from the SEC's ORDER INSTITUTING CEASE-ANDDESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASEAND-DESIST ORDER dated February 21, 2020:

56.    "These proceedings arise out of a fraud committed by Wells Fargo from 2012 through 2016, when the Company misled investors regarding the success of the core business strategy of the Community Bank operating segment, its largest business unit. Wells Fargo publicly stated on numerous occasions that its sales strategy was "needs-based." In other words, Wells Fargo claimed that its strategy was to sell customers the accounts that they needed. Well Fargo published a Community Bank "cross-sell metric" in its Annual Reports, and quarterly and annual filings with the Commission that purported to be the ratio of the number of accounts and products per retail bank household. During investor presentations and analyst conferences, Wells Fargo characterized its cross-selling strategy to investors as a key component of its financial success and routinely discussed its efforts to achieve cross-sell growth. Wells Fargo referred to the Community Bank's cross-sell metric as proof of its success at executing on this core business strategy."

57.    Accordingly, it is hereby ORDERED that: A Pursuant to Section 21C of the Exchange Act, Respondent Wells Fargo shall cease and desist from committing or causing any violations and any future violations of Section 10(b) of the Exchange Act and Rule 10b-5 .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

thereunder. B. Respondent shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of **$500,000,000.00 (Five Hundred Million Dollars)** to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

### Under Section 15 U.S.C. §78u-6(b)(1) of the Dodd-Frank Act, Huynh Was Entitled to $150 Million in Award from the SEC

58.     The third question was if it were not for the fraudulent coverup scheme and the predicate acts perpetrated by the RICO Defendants to fraudulent obtain a non-enforcement letter from the SEC, how much reward Huynh would have received from the SEC. Section 15 U.S.C. §78u-6(b)(1) of the Dodd-Frank Act states: In any covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to subsection (c), shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action, in an aggregate amount equal to— (A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and (B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions.

59.     Given the in-depth original analyses and documentary evidence Huynh provided to the SEC to prove that Walmart violated Rule 10b-5 by beyond reasonable, Huynh believes he should receive get the top range of the reward scale i.e., 30%. 30% of the $500 Million civil penalty the SEC levied upon Walmart would equal to $150 Million. In short, but for the predicate acts perpetrated by the RICO Defendants Huynh would have been awarded $150 .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Mil in reward money from the SEC.  Thus, the RICO Defendants robbed Huynh of his property worth about $150 Million.

**How Did the Walmart's Shareholder Fraud Cover Up Enterprise Got the SEC to Issue Walmart a "Non-Enforcement" Letter?**

60.     Given that Walmart could not attack legal element number 2 and 3 discussed above, Walmart created a two-prong fraudulent scheme to attack element number 1, i.e., Walmart manufactured evidence and lies to purportedly prove that Walmart and Dough McMillon didn't make misleading statements when Mr. McMillion fraudulently counted Walmart's 1P SKUs as Marketplace SKUs to report inflated Marketplace SKUs in FY17.



.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

**Prong #1: Whitewashed Evidence of Marketplace SKUs Inflation**

3      61.      In late Mar 2017, Huynh began discussions with multiple law firms in order to

4   select one of them to represent him in his civil lawsuit against Walmart for retaliatory termi-

5   nation in violation of SOX.  One of these law firm Huynh spoke to was the deRubertis Law

6   Firm, APC. In late March 2017, Huynh presented to David deRubertis legal analyses that sup-

7   port his SOX claim against Walmart.  Subsequently, deRubertis invited Huynh to meet with

8
   him in person at his office in Studio City, CA in early April 2017.
9

10      62.      At the meeting, Huynh informed deRubertis that he has also been working with

11   Sean McKessy at Phillips & Cohen to submit Huynh's complaint to the SEC to report

12   Walmart's illegal conducts by the end of April 2017.  deRubertis became visibly excited

13   about this news because Huynh believes deRubertis realized that he just stumbled on a

14   goldmine based on the seriousness of Huynh's allegations and the risks that Walmart could

15   face if the SEC and/or the DOJ successfully investigated into Walmart's illegal conducts.

16   Huynh estimated the bounty that the Walmart Participants were willing to offer to the other

17   members of the Walmart Shareholder Fraud (WSF) Coverup Enterprise if they effectuated the

18
   Enterprise's illegal coverup scheme could be as high as one Billion dollars.
19

20

21      63.      Based on the time line below, Huynh believes that sometime between Apr 4

22   and Apr 13, deRubertis contacted Walmart and the Rescue Squad (the Gibson Dunn's team

23   that represented Walmart in the Huynh's civil and SEC matters. See the discussions regarding

24   Walmart's trusted advisors) to inform the Walmart Participants that Huynh was about to sub-

25   mit serious allegations of shareholder fraud against Walmart to the SEC.  Subsequently, start-

26   ing on Apr 13, 2017, deRubertis began to ask Huynh and McKessy for confidential and non-

27   public information Huynh had submitted to the SEC. See Exhibit 13.

28

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**



**From:** David deRubertis [mailto:david@derubertislaw.com]
**Sent:** Thursday, April 13, 2017 3:53 PM
**To:** Tri Huynh <triwyn@gmail.com>
**Subject:** Re: Thanks for the call- Next Steps

Tri - I forget whether the SEC submission asks about any internal reports or complaints.   That issue overlaps with our case. In retrospect I actually think it's better that I review the SEC filing before you file it to make sure it is consistent with the issues that overlap on your individual case.   Can you check with the SEC lawyers and make sure they are OK with that realizing it's under full attorney-client privilege? Thanks.

     64.    Huynh now realized that deRubertis' behaviors were abnormally weird be-

cause a typical Plaintiff employment lawyer would have not asked for specific communica-

tions Huynh had with SEC, especially when the allegations of wrong doings could lead the

SEC to uncover one of the largest shareholder fraud cases in US history.  Additionally, the in-

formation Huynh submitted to the SEC had no relevance to Huynh's SOX retaliation claim.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

deRubertis knew this very well because in a June 2014 article published in Advocate Maga-

zine[1] deRubertis wrote the following.

**The basic requirements of SOX's protected activity prong**

SOX does not require that the **concerns disclosed by the whistleblower were actually illegal**. Instead, "[t]o encourage disclosure, Congress chose statutory language which en-sures that 'an employee's reasonable but mistaken belief that an employer engaged in con-duct that constitutes a violation [of a SOX enumerated statute or rule] is protected.'" (Van Asdale, supra, 577 F.3d at 1001 [italics added].)

65.     On April 13, 2,017 deRubertis wanted Huynh to introduce him to Sean

McKessy so he could learn about Huynh's SEC submission under the pretext that he wanted

to make sure that there were no overlapped between Huynh's SEC and civil cases.  On

4/18/17, David deRubertis had a phone conversation with Sean McKessy then unilaterally

asked McKessy for a copy of Huynh's upcoming SEC submission.  See Exhibit 13. After re-

ceiving the document from McKessy, deRubertis weirdly asked McKessy to hold off filing

the complaint to give deRubertis a chance to review and approve it. See Exhibit 14. Huynh

believes deRubertis shared the 4/18/2017 SEC submission with the Walmart and Gibson

Dunn participate before purportedly gave the okay for Sean McKessy to submit the filing.

| | |
|---|---|
| **From:** | David deRubertis <david@derubertislaw.com> |
| **Sent:** | Tuesday, April 18, 2017 5:08 PM |
| **To:** | Tri Huynh; Sean X. McKessy; Rebecca Chang |
| **Subject:** | RE: Rebecca/Sean please hold off the filing until tomorrow's noon |

Hi All – Reviewed it and no problems as to the individual case as drafted.  Thank you again for letting me take a look at it and we'll reciprocate when we prepare Tri's DOL/OSHA filing.  As I told Tri when he mentioned your firm was onboard, he's in great hands obviously.  Reading your work product simply confirmed that.  Impressive read.
Take care,

---

[1] https://www.advocatemagazine.com/article/2014-june/protecting-whistleblowers-sarbanes-oxley-s-protected-activity-requirement

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

66.     Two days later, deRubertis emailed Huynh a copy of the deRubertis Law Firm's contingency retainer agreement.  deRubertis knew that Huynh had received multiple retainer agreements from six other law firms. So, to lure Huynh into selecting him as Huynh's lawyer, deRubertis offered to pay for litigation expenses in the Huynh v. Walmart litigation, including but not limited to Huynh's travels and lodging expenses to meet with deRubertis in person, to attend court's hearings, and to attend mediation meetings etc.  See Exhibit 15. Most importantly for Huynh was the fact that he didn't have to pay deRubertis a single cent if Huynh lost the case against Walmart. None of the other law firms made Huynh this sweet of-fer. See Exhibit Y. However, Huynh recently discovered that none of the other Law Firms had inserted a weird bankruptcy clause in their retainer agreements either. deRubertis warned Huynh that he must notify deRubertis and the deRubertis Law Firm before filing for personal bankruptcy.

## THE deRUBERTIS LAW FIRM, APC
### trial lawyers

7.

All necessary legal costs and/or expenses shall be advanced by The deRubertis Law Firm, APC on behalf of the client and shall only be reimbursed to The deRubertis Law Firm, APC by client in the event of a settlement or judgment in favor of the client.  If the court awards any portion of

**WARNING RE: BANKRUPTCY FILING:** The deRubertis Law Firm, APC hereby advises the client that filing bankruptcy can eliminate the right to pursue a lawsuit.  Client specifically promises and agrees that Client will not file any bankruptcy proceeding without first advising The deRubertis Law Firm, APC of Client's intent to do so and without first discussing the implications of a bankruptcy filing with David M. deRubertis.

____ Client Initials Acknowledging Warning re: Bankruptcy Filing

67.     In early May, deRubertis pay for all of Huynh's travel and lodging expenses to come and meet him at his office in California under the pretext of preparing for the OSHA SOX filing. See Exhibit 16 for travel and hotel booking. However, when Huynh arrived at his office deRubertis asked Huynh to provide him with documentary evidence related to Huynh's SEC submission such as seller commission categorization engine and seller contract agree-ment etc. See Exhibit 17.   deRubertis also asked Huynh to share with him any and all com-

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

munications Huynh has with the SEC going forward.  For example, Huynh shared with deRubertis Exhibit 18 which described Jet.com GMV run rate while Exhibit 19 described the materiality of Walmart's misconducts.

### Walmart's Civil and Criminal Penalties Could Be More Than $3,000,000,000

68.    The first question was what is Walmart's risk exposure if the SEC and/or the DOJ were able to successfully investigate and prosecute Walmart for securities fraud among other illegal conducts.  The recent Non-Prosecution Agreement that the SEC and the DOJ entered into with Wells Fargo would be instructive in answering this question. Wells Fargo paid the SEC and the DOJ $3 Bil to settle Wells Fargo's inflation of the total number of accounts per customer metric reported to investors and analysts.  Given the seriousness of Walmart's illegal conducts and Walmart's senior executives active participation in committing shareholder fraud, Huynh believes Walmart's civil and criminal penalties would be much higher than that of Wells Fargo.  However, to be conservative, Huynh assumed Walmart's risk exposure would be about the same as that of Wells Fargo.

69.    However, in additional to the civil and criminal penalties that the SEC and/or the DOJ may impose upon Walmart, Walmart may lose approximately up to $54 Billion in SNAP sales and Walmart's Market Cap could depreciate by $20 Bil or more when the truth about Walmart's misconducts became known to the public.

| Risk Categories | Liability |
|---|---|
| Criminal and Civil penalties imposed by the SEC/DOJ. | $ 3 Billions[2] |

---

[2]  https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices

https://www.justice.gov/usao-cdca/press-release/file/1251336/download

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| Loss in sales due to exclusion from the SNAP program. | $ 54 Billions[3] |
| Walmart's stock price deflation when the truth came out. | $ 20 Billions[4] |
| **Estimated Liabilities** | **$ 77 Billions** |

**A Whopping One Billion-Dollar Bounty**

70.     Another important question is what is the bounty that the Walmart Participants were willing to pay the members of the WSF Coverup Enterprise if they were able to fulfill the Enterprise's common objective.  It is well accepted that money, especially a lot of money, is a powerful motivator to get people to do things that they normally would not do.  To answer this question, Huynh turned to an economic model proposed by Professor STRATOS PAHIS

## THE YALE LAW JOURNAL

STRATOS PAHIS

### Corruption in Our Courts: What It Looks Like and Where It Is Hidden

- We bet the principal contract c

> "If experience demands a presumption that a judge will seize every opportunity presented to him in the course of his official conduct to line his pockets, no canon of ethics or statute regarding disqualification can save our judicial system."
>
> — Justice William Rehnquist[1]

[3] ht[...] 1485546521.  It stated: "Discussions stalled over several issues beyond the size of potential penalties Wal-Mart would have to pay. The people familiar with the probe said one major sticking point has been Wal-Mart's eligibility to continue accepting food stamps in its 5,300 Wal-Mart and Sam's Club stores in the U.S. after a settlement is reached.  A company that pleads guilty to a federal crime can lose its right to win government contracts—a penalty that could block Wal-Mart from the **$71 billion food-stamp program**, which gives low-income Americans a monthly stipend to purchase food."

- Since Walmart had 26% the US Grocery Market, Walmart may lose up to $18 Billion in annual sales. Assuming a 3-year suspension, Walmart may lose up to $ 54 Bil in total sales.

[4]  Walmart's Marketplace Capitalization at the end of 5/28/2021 was $400 Billion.  Assuming a 5% deflation in Walmart's stock price when the truth came out, Walmart may lose up to $20 billion in market capitalization.

24

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

in his article published in the Yale Law Journal. https://www.yalelawjour-nal.org/pdf/795_t7d36jwp.pdfK.

### Understanding Defendants' and Litigants' Demand for Corruption

A litigant or defendant (party) will make the bribe if the expected gains of the corrupt decision are greater than the sum of the costs of the bribe and the expected costs of getting caught. The expected gains (**Y**) from a corrupt decision can be understood as a function of four factors.  The first and most obvious factor that a party will take into account is the stakes of the case (**S**). The greater the value of a favorable decision, the more a party should be willing to pay for it. Assuming that the party had an initial probability of winning the case (**p**), the value that the bribe will purchase will be the added probability of winning the case. In other words, it will be the stakes (**S**) multiplied by the difference between the original odds of winning (**p**) and the odds of winning after paying the bribe, which is assumed to be 1, or certain victory, for the sake of simplicity. So far, the benefit of paying a bribe is equal to (**S**)(**1-p**).

We must now take into account the probability that the briber may not be able to keep the spoils of his corrupt decision. This may be the result of two events. First, the corrupt decision may be reversed on appeal. The value of a corrupt decision will depend upon how large this rate of reversal (**RR**) is—a probability between 0 and 1. The closer the rate of reversal is to 1, the smaller the value of the decision. We show this by multiplying our benefit equation by (**1-RR**). Second, assuming that a party will not be able to keep the spoils of a corrupt decision if the bribe is discovered, the expected gains of the decision is multiplied by the probability that the corruption will go undiscovered. We can represent this by multiplying the equation by (**1-r**), where **r** equals the probability of being caught. The first half of our benefit equation is as follows:

$$Y = S(1-p)(1-RR)(1-r)$$

**The estimated values of the variables contextualized to Walmart were as followed:**

- (S) = $3000 Mil – See above
- (p) = 50%
- (RR) = 10%

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

- (r) = 5%
- Y = S(1-p)*(1-RR)*(1-r) = $3,000 Mil*(50%)*(90%)*(95% ) = **$1,282 Mil.**

71.     In short, the expected gain for the WSF Coverup Enterprise if the RICO De-
fendants could pull off the fraudulent coverup scheme would be about $ 1.3 Bil. Therefore,
the Walmart Participants could set a Bounty as high as $1 Bil to reward the RICO Defendants
if they could achieve the Enterprise's the common purpose. Now, one could see why deRu-
bertis became visibly excited when Huynh told him that Huynh and McKessy planned to file
the complaint with the SEC in late April 2017.

**Theodore Boutros and Gibson Dunn Is Walmart's Trusted Advisor and Fixer
with Good Reasons.  Gibson Dunn Is the Ferrari of the Legal Service Industry**

72.     Gibson Dunn has now grown its top line for 25 straight years, while boosting
profitability for 24 years in a row.  Gibson Dun grew their revenue by 7.6 % to $2.16 Bil in



Gibson Dunn's Financial Performance

2020 and their average profit per equity by 10% to **$4.125 Mil**.  As a result, GDC paid their
partners handsomely.

73.     The Walmart Participants trusted and respected Theodore Boutros because
Boutros rescued Walmart from legal trouble water many times over, including the famous

.

26

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Wal-Mart Stores, Inc. v. Dukes.[5] Thomas Mars, Wal-Mart EVP and former general counsel once remarked "I call them lifeboat lawyers, because our careers depend on them,".  "I talk to Ted Boutros more than I talk to any outside lawyer in the world, and there's not even a close second," says Tom Mars, Wal-Mart's top in-house counsel. "We have access to all the best lawyers in the world.... Yet somebody has to be the best of the best, and that's the way I would describe Ted." Gibson Dunn brings World Class Capabilities into a client engagement.

> "We are the firm that **clients in distress** have turned to when they are facing **their worst problems**, or when they have in fact faced defeat," "And we have been the problem solvers, the game changers." says litigation department cochair Randy Mastro

### Maestros of the "Get Out of Jail Free" Cards from the SEC and DOJ[6]

74.    It persuaded the U.S. Department of Justice and the Securities and Exchange Commission to drop investigations of Joseph Cassano, a former American International Group, Inc. executive widely demonized as one of the creators of the financial crisis. Over the course of nearly a year, they made **several detailed presentations** to the government, explaining Cassano's actions and pointing out holes in the government's case. They reviewed documents, e-mails, and spreadsheets that, they asserted, showed that Cassano promptly and thoroughly disclosed his group's activities to management and auditors. The lawyers' final series of presentations in the fall of 2009 lasted more than 40 hours, spread over five days **and entailed more than 600 pages of presentations and 400 exhibits.** And they agreed to let Justice and the SEC interview Cassano in April 2010. "We ultimately bared our factual soul to them," says Walden.

75.    The strategy paid off. Justice informed Gibson Dunn in May 2010 that it was **closing its investigation of Cassano, and a month later, the SEC followed,** a remarkable turnround that a former prosecutor says was in good part due to the defense lawyers' tactics. "The judgment that they made to engage with us in an honest and forthcoming way was

---

[5] https://en.wikipedia.org/wiki/Wal-Mart_Stores,_Inc._v._Dukes
https://www.oyez.org/cases/2010/10-277

[6] The American Lawyer January 2012. Special Issue – Litigation Department of the Year.
.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

unique and important to [their] success," says Paul Pelletier, the former deputy chief of the Justice Department criminal division's fraud section, who joined Mintz, Levin, Cohn, Ferris, Glovsky and Popeo last May.

### Maestros of the Media

76.     The firm also took Wal-Mart's case to the press. "Wal-Mart was being portrayed as an outlier, and somehow evil, and that was the theme when we got in-volved," remembers Boutrous. "We tried to take a different approach on the legal issues but also explain the situation more thoroughly to the public." That willingness to work beyond the courts is vital to the firm's ability to manage client crises, says Mastro. "Google any of us," he says. "We come up talking to the press a lot, because our clients want us to."

77.     In short, Theodore Boutros and Gibson Dunn Crutcher were the best fix-ers that the Walmart Participants would call upon when they face an existential threat such as the one Huynh brought to the SEC's attention.

### The GDC's Fixers Worked as a Cohesive and Tightly Integrated Unit Among Themselves as Well as with Their Clients

78.     In a recent court filing in the case Herring Networks, Inc v. Rachel Maddow (Case No: 3:19-cv-01713-BAS-AHG), Gibson Dunn described in details a typical GDC team structure and how they worked together on a day-to-day basis as a cohesive unit to deliver their client's objectives[7], and most surprising client pay GDC top dollars for their services. For example, it shown that Boutros involved in every aspect of client engagement.  He met with clients, directed the team's activities, and personally reviewed and approved major mo-tions and court filings.

79.     As discussed above, GDC brings World Class Capabilities across the firm to

---

[7] See Dkt. 35-2 at 8-24: https://storage.courtlistener.com/re-cap/gov.uscourts.casd.645957/gov.uscourts.casd.645957.35.2.pdf

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

each client engagement, leverages powerful connections[8], and do whatever it takes to win at all costs. This was the reason why Gibson Dunn Crutcher is the "Ferrari" of the legal service industry.

| Timekeeper | Standard 2020 Rate/Hour | |
|---|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,525 | High price mercenaries with a win at all cost attitude. An entry level associate at a typical Walmart Store makes $11/hour. Thus, this associate needs to work roughly 3.5 weeks to earn what Boutrous earns in an hour. |
| Scott A. Edelman (Partner) | $1,395 | |
| Nathaniel L. Bach (Senior Associate) | $960 | |
| Marissa B. Moshell (Mid-Level Associate) | $740 | |
| Lolita C. Gadberry (Paralegal) | $480 | |
| Duke K. Amponsah (Paralegal) | $480 | |

| Timekeeper | Hours Worked | |
|---|---|---|
| Theodore J. Boutrous, Jr. (Partner) | 55.8 | Every members of the rescue squad actively involved in the planning and execution of the rescue mission. Therefore, each member is equally liable for breaking the laws while serving their masters. |
| Scott A. Edelman (Partner) | 17.5 | |
| Nathaniel L. Bach (Senior Associate) | 135.1 | |
| Marissa B. Moshell (Mid-Level Associate) | 113.7 | |
| Daniel M. Rubin (Mid-Level Associate) | 16.6 | |
| Lolita C. Gadberry (Paralegal) | 14.7 | |
| Duke Amponsah (Paralegal) | 1.4 | |
| Erin E. Kurinsky (Researcher) | .6 | |
| Carla H. Jones (Researcher) | .1 | |
| TOTAL | 355.5 | |

80.     Although, Huynh didn't interact with Boutros and Scalia on a daily basis, they were actively involved in the case behind the scene for two reasons.  First, because the GDC's operating model required them to do so, and second, Brass told Huynh in late 2019 that Eugene Scalia was actively involved in the Huynh's litigation.[9]  See Exhibit X. Therefore, Scalia, Boutrous, and Brass were the leaders in Huynh's Civil and SEC cases against

---

[8] See https://en.wikipedia.org/wiki/Gibson_Dunn.

[9] Rachel Brass wrote "Secretary Eugene Scalia, formerly counsel for Defendants, withdrew from this case on August 27, 2019, and therefore is no longer available to participate in any trial of Plaintiff's claims. Before his nomination to the Cabinet, Mr. Scalia was actively involved in the litigation of this case and could have tried the case in the event Ms. Brass became unavailable."

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart. They worked with the Walmart Participants to  set strategies then directed the junior members of the Gibson Dunn team (Stewart, Schuemann, Wilson, and others) as well as other RICO Defendants to perpetrate numerous predicate acts in furtherance of the Walmart Share-holder Fraud Cover Up Enterprise's common purpose.

81.     On the other hand, according to Brass, each and every critical action must be reviewed and approved by the Walmart Participants.  This implied that the Walmart Partici-pants were responsible for their own predicate acts as well as the predicate acts, they caused the other RICO Defendants to commit in furtherance of the Enterprise's common objective.

**David deRubertis Secretly Collected the Information Huynh Submitted to the SEC Then Leaked It to the Walmart and Gibson Dunn Participants.**

82.     David deRubertis leveraged his relationship as Huynh's legal counsel between late April 2017 to late 2018 to spy on Huynh and gathered confidential and non-public infor-mation that Huynh submitted to the SEC regarding Walmart's misconducts. He then leaked



this information to the other RICO Defendants. The RICO Defendants leveraged this infor-mation to plan and execute a whitewashing campaign to make the misleading statements made

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

by McMillon regarding the total number of SKUs on Walmart's Marketplace in FY17 no

longer misleading (allowing Walmart to defeat Legal Element #1 discussed in paragraph 47).

**The RICO Defendants Whitewashed Evidence of Inflated Marketplace SKUs**

**Walmart's Marketplace Was Defined as A Segment of Walmart.com Prior to May 2017.**

83.     Prior to May 2017 (before David deRubertis leaked the SEC confidential infor-

mation to the Walmart and Gibson Dunn participants), Walmart's insiders, investment ana-

lysts, investors, and industry publications defined Walmart's Marketplace as a section on

Walmart.com where third party/3P aka Marketplace sellers listed their products for sales on

Walmart.com.  The total number of SKUs offered to customers on Walmart.com equals to the

total number of SKUs (products) offered by Walmart's 1P plus the total number of Market-

place SKUs offered by Marketplace sellers. For example, Walmart clearly stated in their

FY16 and FY17 10K filings with the SEC that Walmart's Marketplace is a section of

Walmart.com.

"Digital. Walmart U.S. provides its customers access to a broad assortment of merchandise,
including products not found in our physical stores, and services online through our e-com-
merce websites and mobile commerce applications. Walmart.com experiences on average 85
million unique visits a month and offers access to approximately 8 million SKUs. In addition,
our e-commerce website includes Marketplace, a feature of the website that permits third par-
ties to sell merchandise on walmart.com." Walmart's FY16 for the fiscal year ended January
31, 2016.

"Digital. Walmart U.S. provides its customers access to a broad assortment of merchandise,
including products not found in our physical stores, and services online through our e-com-
merce websites, including walmart.com, jet.com, hayneedle.com and shoebuy.com, as well as
mobile commerce applications. Walmart.com experiences on average 92 million unique visi-
tors a month and offers access to over 38 million SKUs, including those carried on Market-
place, a feature of the website that permits third parties to sell merchandise on walmart.com"
Walmart's FY1Y for the fiscal year ended January 31, 2017.

**Seth Beal's Definition of Walmart Marketplace Prior to May 2017**

https://www.digitalcommerce360.com/2016/04/14/walmartcom-invites-more-mer-
chants-sell-its-marketplace/

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Wal-Mart, No. 4 in the newly released Internet Retailer 2016 Top 500 Guide, <u>began in 2009 to allow other retailers to sell their products alongside the retail chain's inventory on Walmart.com.</u> Wal-Mart has developed its **online marketplace slowly, starting with six merchants**—eBags Inc. (No. 167), Wayfair LLC (No. 24), Tool King LLC, Plumstruck (No. 91, part of Hayneedle Inc.), ShoeBuy Inc. (No. 101) and ProTeam (No. 38, part of Fanatics Inc.)—and, starting in 2014, began expanding its roster that now lists approximately 300 retailers, according to investment firm Robert W. Baird & Co. After a long trial period that allowed Wal-Mart to develop technology to support more sellers and more SKUs online, Wal-Mart is ready to expand its marketplace**, Seth Beal, Wal-Mart's senior vice president of global marketplace**, said at the conference. "We started with a few sellers because we wanted to do it right," he said. "Customers were telling us they wanted more products online, and now we're ready to partner with many more sellers."

**Products from retailers** are displayed alongside Wal-Mart's own inventory and **are called out as Walmart Marketplace** items, with the seller's name displayed on the items. Retailers on Wal-Mart's marketplace can be featured in Walmart.com promotions, such as Value of the Day deals. "Customers are already shopping on Wal-Mart, and they're looking for great products with great prices," Beal said. "Our partnership **with marketplace retailers allows us to provide our customers with more brands and products on Walmart.com**."

https://www.sdcexec.com/sourcing-procurement/news/12249812/commercehub-commercehub-expands-partnership-with-walmart-adds-integration-with-walmart-marketplace

"Launched in 2009, **Wal-Mart Marketplace expanded Walmart.com's product assortment for customers alongside Wal-Mart's existing first-party merchandise**. More than 80 million unique visitors shop Walmart.com every month looking for products across popular categories like apparel, electronics and home. Customers trust Wal-Mart to provide a broad assortment of products and **investing in our marketplace helped us grow our assortment to 11 million items in just a few years[10]**," said **Seth Beal**, senior vice president of global marketplace at Wal-Mart. "By expanding our relationship with CommerceHub, we'll be able to leverage its network of retailers and brands to offer customers more of what they're looking for at Walmart.com."

84.     There are two key takeaways from Seth Beal's article below.  First, the

---

[10] This 11 million Walmart Marketplace SKUs quoted in this article jived with the 10.9 million Marketplace SKUs Beal reported to McMillon in his July 30, 2016 email. Ninth Circuit Case: 20-15211 Dkt. 5-4 at 95.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

term "Marketplace" is synonymous with the term "third-party" and these terms were used

interchangeably.  Second, Marketplace sellers are synonymous with third-party sellers.

Third, the total number of items/SKUs listed for Sales on Walmart.com equals to the total

number of Marketplace/3P SKUs and Walmart's 1P SKUs (Walmart's own inventories).

https://corporate.walmart.com/newsroom/business/20161026/expanding-your-market-place-of-products-on-walmart-com

≡ Walmart ✲

# Expanding Your Marketplace of Products on Walmart.com

By Seth Beal  |  October 26, 2016

When you visit Walmart.com, my team and I work hard to make sure you can find what you need, every single day. One way we do that is through our **Marketplace sellers**. That's what's happening behind the scenes when you visit Walmart.com. When you search for an item, not only do you see options from **Walmart.com's own inventory** – your search likely brings up choices from **third-party sellers**, too. These are **third-party sellers** that we've chosen to work with because they of-fer a great selection of products at a great price. Marketplace makes it easier for customers to find a wider range of the items we sell in stores, plus some other brands you might not find at a store, like Toms and Vans shoes.

Since this time last year, we've grown the number of **Marketplace sellers** by more than 30 times. This has helped us triple **our assortment on Walmart.com** since last year, with more than **20 million items**[11] today, and growing. One of our highest pri-orities in developing the Marketplace is ensuring the quality of our overall customer experience. We reach out to customers to learn about their experiences, and we're

---

[11] The **20 million SKUs on Walmart.com** jived with the number of SKUs that Beal reported to Doug McMillon and Marc Lore on Oct 2, 2016. Ninth Circuit Case: 20-15211 Dkt. 5-4 at 99-100.

- In his email, Beal wrote "Quick update on Marketplace progress: **16.5 million unique SKUs** (up from 6.2 million at the beginning of the year) – on the site, there are currently **19.7 million unique SKUs including 1P**".  The "on the site" referred to Walmart.com/online.  Thus, Walmart.com had roughly 20 million SKU in Oct 2016.
- However, only four days later McMillon reported to investors during Walmart's 23rd An-nual Meeting that Walmart Marketplace had 20 million SKUs (See Ninth Circuit Case: 20-15211 Dkt. 5-4 at 5-4 at 103) by counting 1P SKUs as Marketplace.

33

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

proactive about checking data to see where we can help **Marketplace sellers** improve their performance to go above and beyond. We'll continue to focus on our **Marketplace sellers** as they help us help you find exactly what you need. This is

**BARCLAYS**

TOP PICK   Wal-Mart Stores                                      Equity Research
                                                  Consumer | U.S. Food & Staples Retailing
Positioning for Tectonic Shift in Retail                        31 October 2016

just one-way Walmart.com is working to make your online shopping experience better across the board.

Barclay's Analysts: Karen Short, Sean Kras, and Matthew McClintock, CPA, CFA

**Walmart Marketplace** refers to the wide and growing selection of **third-party merchandise** available on Walmart.com. **Walmart Marketplace** was first launched in 2009 and the number of SKUs has greatly increased. In fact, the company was adding over 1 million SKUs per month earlier in 2016 – we don't know if it is still increasing this quickly – and the **site now has 20 million SKUs online** vs. 150,000 at a typical supercenter.  Seth Beal, SVP of Global Marketplace at Walmart e-commerce has said that there are still areas where more product depth is needed, including electronics, electronics accessories, apparel, home, health, and beauty. As such, we expect the number of products offered online will continue to increase. Meanwhile, the *growth of Marketplace* has led to **internal merchants** having to "raise their game" since they are also competing with **Marketplace merchants**.

**Walmart's Marketplace Purported Definition After May 2017.**

"There's an old saying: "When I see a bird that walks like a duck and swims like a duck and quacks like a duck, **I call that bird a duck**." Gary Gensler, Chairman of the Securities and Exchange Commission—May 20, 2021.

"I understand that after filing this litigation Mr. Huynh has claimed that Doug McMillon presented inaccurate SKU count information to investors during the October 2016 investor community meeting based on Mr. McMillon's use of the term "Marketplace".  **The Walmart Marketplace is comprised of every seller that sell on Walmart.com, which includes Walmart and many other third-party sellers**."[12] Seth Beal's declaration on 8/26/19 in support of Walmart's motion for summary judgment.  DC Dkt. 171-1 at 99.

85.     Shortly after deRubertis secretly obtained and leaked Huynh's 4/19/17 SEC

---

[12] Seth Beal's declaration contradicted with how he defined the term "Marketplace" prior to May 2017.

34

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

submission, the Rescue Squad, Walmart's senior executives and the other RICO Defendants and their Co-conspirators developed and executed a four-step scheme to whitewash evidence of Walmart's illegal conducts.

86.     First, Walmart stopped reporting the total number of Walmart Marketplace SKUs on Walmart.com starting on Walmart's Q1 FY18 earnings call (May 2017). For example, during Walmart's Q4 FY17 earnings call on Feb 2017, McMillon disclosed "From a **marketplace perspective**, we now have over **35 million SKUs** – more than quadrupling the



number available at the beginning of the year.".  However, on the Walmart's Q1 FY18 earnings call on 5/18/17, McMillon shifted his disclosure from the total number of Marketplace SKUs to the total number of SKUs Walmart.com.  He disclosed "Walmart.com now has **50 million first- and third-party** items to choose from compared to 10 million at this time last year (Q1 FY17)—so our assortment continues to ramp".

87.     Immediately after the earnings conference call, Robert Ohmes (a RICO Defendant) – a reputable BOA/ Merrill Lynch's Analyst, published an investment report on

35

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart. In the report Ohmes wrote "Continued **marketplace expansion** (now **50mn online SKUs** vs**. 35mn** in F4Q and 10mn last year". See Exhibit 25. Ohmes used the term "Marketplace" and "Walmart.com/Online" interchangeably in his report to classify the 50mn SKUs as Marketplace even though McMillon clearly disclosed to investors that Walmart.com had 50mn SKUs. Ohmes then broadcasted this misleading information to investors and other analysts in attempt to prime the pump via the internets and the wire to publish his report and potentially emailed it to fund managers etc.  (i.e., Ohmes planned the seed in investors' mind that Walmart's Marketplace is synonymous with Walmart.com) for Walmart's executives to go on roadshows to whitewashing evidence of Walmart's misleading statements regarding the total number of SKUs on Walmart's Marketplace in FY17. Even though Huynh didn't currently possess evidence of emails and phone calls between Ohmes and the other RICO Defendants to coordinate the content of Ohmes' report and when to publish the reports (given the close temporal proximity between Walmart's Q2 FY17 earnings call and Ohmes' published report), Huynh believes this information is in the RICO Defendants possession and could be obtained during discovery.

88.     Second, after Ohmes primed the pump, Walmart's Senior Executives went on multiple analyst conferences and Walmart's own events to begin whitewashing the misleading statements McMillon made to investors and analysts in FY17 concerning the total number of Marketplace SKUs on Walmart.com.

**Walmart's Annual Q&A Session with analysts on June 2, 2017**

Doug and Brett, you both mentioned Q1 was good. We'd agree, it was quite good. And it **was an anomaly for a retailer to see such explosive growth on e-com**, and yet the margin was relatively intact. We haven't seen it across most of the retail space. It looked like it was an omnichannel type of quarter, and I'm curious if there was something that was done, whether it was on the expense side or on the gross margin

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

side, where you've either figured out some formula to enable the e-com growth to grow at a rapid pace without harming margin. **Simeon Gutman, Morgan Stanley**.

"It's really price, it's assortment and it's service. The customer is not that different in that way. Now experience in services being redefined in a big way, and our assort-ment had gone, given the **marketplace expansion**[13] from about 10 million a year ago **to now north of 50 million**. So, you've -- we've made great progress on assortment, managing price pretty well, working hard on experience" **C. Douglas McMillon - Wal-Mart Stores, Inc. - CEO, President & Director.**

**Deutsche Bank Walmart's Investment Conference on June 13, 2017**

"Absolutely, and we drill down into the comp performance in the first quarter, e-com-merce, walmart.com, aided the comp by 80 basis points, which was surprising to The Street, and really hands off to the team on that type of performance. Walk us through how you've built the infrastructure to generate that level of performance. And also does your success on your e-commerce platform, does it alter the thought process around store count and how you utilize the stores? And maybe you can just discuss also how we should be thinking about the longer-term profit algorithm, given the suc-cess you're having in e-commerce." **Paul Elliott Trussell Deutsche Bank AG, Re-search Division.**

The systems work that we did allow us to dramatically increase **the marketplace** on our site. So back about a year ago, we had around **10 million items online**, now we have over **50 million items online.** Now 50 million, still not as much as some of our competitors would have. The difference between 10 million and 50 million is a big difference. Brett M. Biggs Chief Financial Officer and Executive Vice President.

　　89.　　The RICO Defendants also directed their Co-Conspirators to disseminate

Walmart's misrepresentations concerning the new definition of Walmart's Marketplace.

| Walmart's Disclosures during Walmart Quarterly Earning Calls | Walmart Using Reporters to Disclosures to the Walmart's Investor and the Public. |
| --- | --- |
| "**Walmart.com now has 50 million** first and third party items to choose from compared to 10 million at this time last year—so our assortment continues to ramp." McMillon – Q1 FY18 earnings call on 5/18/17. | "Wal-Mart Vice-President of Partner Services Michael Trembley said Wal-Mart's move is focused on meeting customer demand for different types of products and increasing online assortment. Wal-Mart's **marketplace inventory** has quintupled this year to **50 million items."** Nandita Bose, a Reuters Reporter, on |

---

[13] McMillon used term "**marketplace expansion**" in Ohmes' 5/18/17 report to substitute for the "Walmart.com" McMillon used during the Q1 FY18 earning calls..

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | 7/27/17.[14] |
|---|---|
| "In e-commerce, customers are responding favorably to our expanded assortment, which surpassed **67 million SKUs on Walmart.com**." McMillon Q2 FY18 on 8/17/17. | "Wal-Mart has already increased the number of products offered on **Marketplace to 67 million items**, supplemented by items from third-party sellers like Toms and Vans shoes." Francine McKenna, a Marketwatch.com reporter, on 9/13/17.[15] |

90.     Matthew Boyle (another RICO Defendants), a Bloomberg News reporter, published an article on June 16, 2017 (Exhibit 27) to purportedly report to the public, Walmart's investors, investment analysts, the SEC and the media regarding Walmart's SKUs metric for Aug and Nov 2016 and Feb 2017 as Walmart.com's SKUs even though Walmart previously reported these SKUs as Marketplace's SKUs to investor during FY17.[16] The 15 Mil, 23 Mil,



---

[14] https://www.reuters.com/article/us-walmart-vendors-exclusive/exclusive-not-made-in-america-wal-mart-looks-overseas-for-online-vendors-idUSKBN1AC1VJ

[15] https://www.marketwatch.com/story/wal-mart-accounting-for-e-commerce-overseas-asset-sales-draws-sec-scrutiny-2017-09-12

[16] https://www.bloomberg.com/news/articles/2017-06-16/wal-mart-offers-a-refuge-for-sellers-tired-of-amazon

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

and 35 Mil SKUs figures were disclosed by McMillon during FY17 to investors as Market-place's SKUs not Walmart.com.  Therefore, this evidence proved that it was more probable than not that the Walmart Defendants (directly and/or through another party e.g., a PR agency- In Exh 96, David deRubertis admitted that a PR agency was working with the Bloomberg Folks (e.g., Matthew Boyle) in preparing to generate publicity when Huynh's law-suit is filed in the Huynh v. Walmart Stores et. al. Case 3:18-cv-01631-VC with the US Dis-trict Court, Northern California.) provided this misleading information to Boyle so he could publish it in his article.

91.    If Boyle was actually doing a real reporting job and he published the total number of SKUs on Marketplace (a material metrics for Walmart's investors and analysts) on Walmart.com for Aug 2016, Nov 2016, and Feb 2017 then Boyle should have read Walmart's Quarterly Earnings Call Transcripts.  Because these transcripts clearly stated the total number of SKUs on Walmart Marketplace for Aug and Nov 2016 and Feb 2017 were 15 Mil, 23 Mil, and 35 Mil respectively.  Mr. Boyle to help you do your job Huynh referred you to Exhibit 97 which contained the transcripts for these quarterly earnings conference calls..  In short, Boyle didn't exercise his first amendment right to report an issue of great importance by reporting a material metric to the public.  Instead, He published these misleading metrics in furtherance the objective of the Walmart Shareholder Fraud Coverup Enterprise to mislead the public, Walmart's investors, the Media and most importantly he misled the SEC to obstruct a poten-tial SEC investigation.  The Walmart participants and their lawyers (Gibson Dunn and Orrick) used your published information to bring assurance to the SEC that Walmart didn't mislead the investors regarding the total number of Marketplace SKUs on Walmart.com.  Therefore, Mr. Boyle caused and/or helped others to obstruct an SEC investigation.

92.    Third, Walmart Participants stopped using the term "Marketplace" and the

39

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7
8
9
10



Syntax Analysis for the Terms "Marketplace" and "Third-Party"

11  term "Third-Party(3P)" interchangeably in their public disclosures to investors to discuss the

12  Walmart's Marketplace business. They did this to sever the synonymous relationship between

13  these two terms in order to solidify their purported definition of Marketplace as Walmart.com

14  with Walmart's investors, analysts, the SEC and/or the DOJ, and the media.

15

16          93.     Huynh performed the syntax analysis to create the chart below by examining

17  disclosures made by Walmart during various Walmart's Quarterly earning calls, investment

18  analyst conferences, and Walmart's Annual Meetings between 2016 and 2018.   Between Feb

19  2016 to April 2017, Walmart used the terms "Marketplace" and "Third-Party/3P" inter-

20  changeably 33 times to discuss the Walmart's Marketplace (3P) business. The term "Market-

21  place" was used 66% of the time (25 times) while the terms "Third-Party/Third Party/3P"

22  were used 34% of the time (13 times).  However, starting in May 2017, Walmart stopped us-

23  ing the term "Marketplace" and "Third-Party/3P" interchangeably to describe the Walmart's

24  Marketplace business.  Between May 2017 the end of 2018, Walmart used the term "Market-

25  place" 0% of the time (0 time).  Instead, term "Third-Party/Third Party/3P" was used 100% of

26  the time (28 times).

27

28  .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**The RICO Defendants Attempted to Whitewashed Walmart's Catalog Stuffing
Scheme to Inflate the Total Number of Walmart Marketplace SKUs.**

94.     In late Sept 2017, Huynh emailed deRubertis to inform him that McKessy and

Huynh will be meeting with the SEC enforcement attorneys on Oct 5, 2017 in San Francisco

to discuss Huynh's SEC submissions. Instead of replying to Huynh's original email with the



Subject: "Call to sync up tomorrow, Friday", deRubertis opened a new email thread with a

Subject that simply read **"Huynh:"** to reply to Huynh's original email to make sure that there

was no direct evidence which proved that David deRubertis had knowledge of Huynh's meet-

ing with the SEC. See Exhibit 29.


95.     A short time after Huynh informed deRubertis about his meeting with the SEC,

Doug McMillon attempted to whitewash the misleading statements he made to investors on

Oct 6, 2016 that Walmart Marketplace had 8 Mil SKUs and 20 Mil SKUs in Jan and Oct 2016

respectively by substituting the term "Marketplace" with the term "Walmart.com" in his Oct

2017 presentation to investors and analysts that Walmart.com had 8 Mil SKUs and 20 Mil

.

41

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

SKUs on Jan 2016 and Oct 2016. See Exhibit 30.[17]

96.     On that same day, Robert Ohmes published an investment report[18] on Walmart Inc. where he replaced the term "Marketplace" with "Online (Walmart.com)" to purportedly communicate to investors and other analysts that the SKU metric disclosed by McMillon in FY1Y were actually Walmart.com's SKUs.  See Exhibit 31. On the same report, Ohmes also provided highly inflated Jet.com FY17 and FY18 Sales forecast to lend credibility to Walmart' inflated Quarterly Ecommerce Sales Growth in FY18. Like Mr. Boyle, if Mr.



[17] It is important to know Mr. McMillon and Walmart broadcast his presentation using the wire/internet infrastructure.
[18] It is important to note that Mr. Ohmes used the Internet as a mean of transmission of these reports. As a client of Bank of America, Huynh and Millions of other investors have access to these reports and could download them from Bank of America's servers.  Additionally, it was foreseeable that others would email these reports to others. Thus, Mr. Ohmes committed Wire Fraud in furtherance of the Enterprise's common purpose.

42

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Ohmes was actually doing his job as an investment analyst to serve the public interest, then he would also should read Exhibit 97.  Additionally, in this report, Ohmes also provided a grossly inflated estimate of the Jet.com Sales for  FY17, FY18, and FY19 to coverup the fact that Walmart's senior executives artificially inflated the Jet.com's sales figure to inflate Walmart's Quarterly Ecommerce Sales growth for Q1, Q2, and Q3 FY 18.

97.     As showed on Exhibit 40, a JP Morgan analyst stated that Walmart disclosed to investors that that Jet.com's GMV run rate toward the end of 2016 was $1.2 Bil (This was already double that of the internal Jet.com GMV data.  See Exhibit 6 at 3 which showed that Jet.com GMV run rate at the end of 2016 was about $600 Mil).  Additionally, this analyst clearly stated that Jet.com GMV doesn't translate to sales.[19]  In short, Mr. Ohmes not only used the inflated GMV forecast provided by Walmart but he also counted Jet.com Market-place Sellers GMV as Jet.com Sales to inflate Jet.com's Sales even further.

98.     One critical question is "was it coincidental that McMillon didn't attempt to replace the term "Marketplace" with Walmart.com to report that Walmart.com had 15 Mil SKU in his Oct 17, 2017 PPT presentation to investors.  The answer was simply because there were two components of fraud that went into the reported 15 Mil SKUs figure. The first com-ponent was Walmart's improper counting of Walmart's 1P SKUs as Marketplace's SKUs while the second component of fraud was the counting of the total number Marketplace SKUs that were added during the first two weeks of Q3 FY17 as Q2 FY17's Marketplace SKUs. This latter component of fraud could not simply be whitewashed away by merely playing around with the definition of Walmart's "Marketplace" because it involved the timing of the

---

[19] Note this assumes all of Jet's sales are 1P (as comps include 1P and the commissions on 3P sales). Thus, the actual impact is likely smaller related to the portion of sales that are 3P.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Marketplace SKUs recognition.  Thus, if McMillon was to communicate to investors and ana-

lysts that Walmart.com had 15 Mil SKUs, then when the true about Walmart's misconducts

came out Walmart may be liable for future shareholder fraud lawsuits. This was the reason

why the Walmart Participants relied on the other RICO Defendants such a deRubertis, Ohmes

(see above), Boyle at Bloomberg News and other reporters to do the dirty whitewashing activ-

ities on the Walmart Participants' behalf.[20]

99.    In early July 2018, Huynh notified deRubertis that the SEC opened an official

investigation into Walmart's fraudulent conducts.  See Exhibit 32 which showed that the SEC

opened an investigative file on Walmart around Mid-May 2018 and officially investigated

Walmart around late July 2018. Shortly after the SEC started their investigation into Huynh's

complaint against Walmart, Walmart's executives stop disclosed Walmart's SKU metric all

together.

100.    Additionally, David and Kari deRubertis at the direction of the Gibson Dunn's

leaders (e.g., Brass, Boutrous, and Scalia) conspired with Kasales and Von Lindern to leak

Huynh's psychiatrist records when they secretly produced them to Walmart without the confi-

dentiality designations in late Sept 2018. Huynh believes these documents were later used by

Orrick and Gibson Dunn to respond to the SEC investigation to convince the SEC that Huynh

was not a credible whistleblower.

---

[20] Therefore, Ohmes, Boyles, and deRubertis used the wire infrastructure to disseminate mis-
leading statements regarding the total number of SKUs on Walmart Market to make McMil-
lon statements no longer misleading. Therefore, by extension the Gibson Dunn's leaders
(Boutrous, Scalia, and Brass) directed these RICO Defendants to whitewash evidence of
Walmart's misconducts.



101.    Additionally, in Oct 2018 (shortly after the SEC started their investigations into the Walmart's Ecommerce Matter: Case File No. - Walmart E-commerce FW-04193) Doug McMillon once again attempted to whitewash previous misleading Marketplace SKU assortment metrics he reported to investors in FY17 by replacing the term "Marketplace" with "Walmart.com" in his PPT presentation during Walmart's 2018 Annual Meeting with the Investment Communities. In his presentation, McMillon disclosed to investors that Walmart.com had 8 Mil SKUs and 20 Mil SKUs in in Jan and Oct 2016 respectively.  However, two years earlier McMillion reported to investors that Marketplace had 8 Mil and 20 Mil SKUs on Jan and Oct 2016 during Walmart's 2016 Annual Meeting with the investment communities.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**



102.    Shortly after, Robert Ohmes also published a report on Walmart Inc. See Exhibit 33.  In his report, Ohmes purportedly replaced the term "Marketplace" with "Online/Walmart.com" to whitewash Doug McMillon previous misstatements regarding the total number of SKUs on Walmart's Marketplace. Even though Huynh didn't have direct evidence which proved that Ohmes acted in concert with the other RICO Defendants to plan

.

46

what to put in his investment reports and when to publish the report to help whitewash

Walmart's misleading statements.  Huynh believes this documentary evidence is in Ohmes

and other RICO Defendants' (e.g., Walmart and their executives) possession and could be ob-

tained during discovery.

## BofAML forecasts for WMT

**Exhibit 1: WMT ecommerce analysis**
$ millions

Ohmes replaced the term "Marketplace" with "Walmart.com"

| | U.S. GMV % chg (E in F19+) | U.S. GMV $ Sales Estimate | % Cng | Owned U.S. E-com Sales % Cng | Owned U.S. E-com Sales Estimate | % Cng | WMT U.S. Store Sales Estimate | % Cng | Estimated 3P Sales ($MM) | % Cng | Estimated 3p Fees ($MM) | Estimated Fee (% of GMV) | Estimated of Online SKUs (# mn) | Online Grocery Locations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-Q1 | | $2,800.0 | | | $1,490.0 | | $71,805.0 | | $1,310.0 | | $131.00 | 10.0% | 10 | |
| Jul-Q2 | | $3,100.0 | | | $1,750.0 | | $74,491.0 | | $1,350.0 | | $135.00 | 10.0% | 15 | |
| Oct-Q3 | 28.6% | $3,800.0 | | | $1,760.0 | | $72,790.0 | | $2,040.0 | | $204.00 | 10.0% | 23 | |
| Jan-Q4 | 29.7% | $6,200.0 | | | $3,000.0 | | $80,747.0 | | $3,200.0 | | $320.00 | 10.0% | 35 | |
| F2017 | 24.2% | $15,900.0 | | | $8,000.0 | | $299,833.0 | | $7,900.0 | | $790.0 | 10.0% | 35 | |
| Apr-Q1 | 69.0% | $4,732.0 | 69.0% | 63.0% | $2,410.0 | 61.7% | $73,026.0 | 1.7% | $2,322.0 | 77.3% | $232.20 | 10.0% | 50 | 670 |
| Jul-Q2 | 67.0% | $5,177.0 | 67.0% | 60.0% | $2,780.0 | 58.9% | $75,958.0 | 2.0% | $2,397.0 | 77.6% | $239.70 | 10.0% | 67 | 900 |
| Oct-Q3 | 54.0% | $5,852.0 | 54.0% | 50.0% | $2,635.0 | 49.7% | $75,089.0 | 3.2% | $3,217.0 | 57.7% | $321.70 | 10.0% | 70 | 1000 |
| Jan-Q4 | 24.0% | $7,612.0 | 22.8% | 23.0% | $3,675.0 | 22.5% | $82,904.0 | 2.7% | $3,937.0 | 23.0% | $393.70 | 10.0% | 75 | 1100 |
| F2018 | 47.0% | $23,373.0 | 47.0% | 44.0% | $11,500.0 | 43.8% | $306,977.0 | 2.4% | $11,873.0 | 50.3% | $1,187.3 | 10.0% | 75 | 1100 |
| Apr-Q1 | 19.0% | $5,632.0 | 19.0% | 33.0% | $3,205.3 | 33.0% | $74,542.7 | 2.1% | $2,426.7 | 4.5% | $242.67 | 10.0% | 76 | 1400 |
| Jul-Q2 | 23.2% | $6,377.0 | 23.2% | 40.0% | $3,892.0 | 40.0% | $78,923.0 | 3.9% | $2,485.0 | 3.7% | $248.50 | 10.0% | 77 | 1800 |
| Oct-Q3E | 22.2% | $7,152.0 | 22.2% | 45.5% | $3,835.0 | 45.5% | $76,998.0 | 2.5% | $3,317.0 | 3.1% | $331.70 | 10.0% | 78 | 2100 |
| Jan-Q4E | 18.4% | $9,012.0 | 18.4% | 32.7% | $4,875.0 | 32.7% | $84,387.9 | 1.8% | $4,137.0 | 5.1% | $413.70 | 10.0% | 80 | 2200 |
| F2019E | 20.5% | $28,173.0 | 20.5% | 37.5% | $15,807.3 | 37.5% | $314,851.6 | 2.6% | $12,365.7 | 4.1% | $1,236.6 | 10.0% | 80 | 2200 |
| F2020E | 21.3% | $34,173.0 | 21.3% | 34.8% | $21,307.3 | 34.8% | $317,618.1 | 0.9% | $12,865.7 | 4.0% | $1,286.57 | 10.0% | 84 | 3100 |

Source: BofA Merrill Lynch Global Research estimates, company reports

*Source: Oct 16, 2018 BOA report.*

103.    However, given the short temporal proximity (less than a day) between

McMillon's attempts to whitewash evidence of Walmart's previous inflated Marketplace

SKU metrics and the publication of Ohmes' investment report, a reasonable trier of facts

could infer that it is more probable than not that the RICO Defendants acted in concert to exe-

cute this coverup scheme. Huynh also believes as Walmart's trusted advisors the Gibson

Dunn participants may have facilitated the publication of Mr. Ohmes'reports. Therefore, one

could also infer that in order to execute this whitewashing scheme, Ohmes and the other

RICO Defendants must had leveraged the instrument of interstate commerce i.e., emails, In-

ternet and cell phone etc. to plan and execute the dissemination of mislead information to

47

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart's investors, analysts, the Media, the SEC and other government agencies. the invest-

ing public and the SEC.

### Other Whitewashing Activities

**The RICO Defendants Attempted to Whitewashed Walmart's Catalog Stuffing Scheme to Inflate the Total Number of Walmart Marketplace SKUs.**

104.    In Huynh's submission to the SEC, Huynh alleged that in additional to im-

properly counted Walmart's 1P SKUs as Marketplace, Walmart also stuff Walmart's Market-

place with low value and/or quality products to inflate the total number of Marketplace SKUs

even though they knew that these SKUs generated little GMV.  See Exhibit A and Y.  To

whitewash Huynh's allegations, Walmart's executives spoke at various venues in an at-tempt

to show to investors and analysts that Walmart focused on the quality not the quantity of Mar-

ketplace SKUs i.e., Walmart didn't stuff their catalog with low quality products to inflate the

total number of Marketplace SKUs reported to investors.

| Set Up Questions | Walmart's Response |
|---|---|
| Marc, and maybe Doug, chime in on this, but I was hoping you could talk more about the marketplace, the 3P business. You've gotten to 50 million items really fast; does it level off from here? Or can that keep going? Robert Frederick Ohmes—June 2, 2017. | Sure. With respect to the marketplace, we've seen nice growth over the last year, and I think we'll continue to see growth on marketplace. But we're very focused on making sure we have **the right SKUs**, the right products. That's the habit, one of our bellwethers. And so, **it's not for us, just quantity, it's really the quality of the products.** Marc E. Lore – June 2, 2017. |
| You touched on this a little bit ear-lier, but I want to expand on the -- your assortment philosophy. I mean, I think you guys are worth 50 million plus, at least as of the end of the first quarter. You were less than, I think, 10 million even 2 years ago. So, a big growth there. | There's a finite number of SKUs. So, I'm less con-cerned about getting to parity on long-tail assortment. **It's more about getting the brands that really mat-ter**. So, it's really getting the right products as opposed to quality over quantity. Marc E. Lore – June 7, 2017. |

48

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| Peter Sloan Benedict, Baird & Co Analyst - June 7, 2017 | |
|---|---|
| Marc Lore's remarks regarding attracting premium sellers and brands to Walmart.com in Oct 2017 to address the catalog stuffing issues. | "With respect to the long tail, it's really about marketplace. And over the last year, we've grown SKUs from about 50 million to now over 60 million products. One of the things we're going to be really focused on over this next year is to elevate the Walmart.com brands so we can attract **more premium sellers to the site, more premium brands**" Marc Lore, 24th Annual Meeting with the Investment Community on 10/12/17 |
| I want to ask a follow-up about assortment. You mentioned 75 million SKUs today. You guys ramped really quickly to that 75 million SKU mark. I'd be curious to hear a little bit about your expectations around the velocity of the continued ramp. And any particular categories that represent meaningful opportunities? Benjamin Shelton Bienvenu, Stephens Inc.'s Analyst, June 1, 2018. | While we're focused on increasing the breadth of the assortment, I think **our primary focus right now is really on quality of the assortment.** With respect to the 3P side, we've been also -- **at the same time, we're adding new merchants, we've also been culling merchants back that haven't been delivering an exceptional experience**. And so, we're really focused on making sure that **each SKU that we sell and each merchant we bring onboard can deliver a great experience.** Doug McMillon – June 1, 2018. |
| McMillon's remarks regarding attracting premium brands during the Q2 FY19 earning. | "We've added 1,100 new brands to Walmart.com year-to-date, including Zwilling J. A. Henckels cutlery and cookware, Therm-a-Rest outdoor products, O'Neill surf and water apparel, Shimano cycling products and the brands available on the dedicated Lord & Taylor shop, like Steve Madden footwear. This is a key area of focus for the team because we know that customers value an expanded assortment of these popular brands." McMillon, on the Q2FY19 earn call. |
| Marc Lore stated that Walmart was neither intentional nor reckless when it stuffed the Walmart.com | Moving over to the long tail, let's just start with marketplace. Marketplace, we were adding SKUs really fast if you remember, it just got to like 70 million |

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | |
|---|---|
| catalog with low quality and/or value from non-reputable sellers to inflate the total number Market-place SKUs to investors during FY17. during Walmart's. | SKUs last year. We're adding so fast that we hadn't re-ally kept a very high bar in terms of the quality of the SKUs and quality of merchants on the site.   So last year we took a breather.  We added more than 20 mil-lion SKUs to marketplace, but at the same time we took down about an equal amount. So, the overall quantity didn't change but the quality did.  The quality is much better. And you can see that the Net Promoter Score went up almost 20 points as a result. October 16, 2018 |

**The Walmart Participants Downplayed Walmart's Marketplace Profitability and GMV Growth**

105.    Walmart's executives walked back on their original assertions that Walmart's

Marketplace/3P is a highly profitable and there was a direct correlation between the total

number of Marketplace SKUs and Walmart's Ecommerce GMV growth.

| Analysts' Questions | Walmart's Backpedal Responses |
|---|---|
| So, a couple of questions. Second question is on 1P. **Is that ever prof-itable?** We're not sure it's even prof-itable for Amazon right now. So, I'm just wondering if you guys envision that, delivered to the home, 1P busi-ness being profitable. Scott Andrew Mushkin - Wolfe Research, LLC – MD—June 2, 2017. | "Well, with respect to **1P, 3P profitability, it's not really about whether it's first party or third party, it's really more the product category.** There's still a human and merchandising aspect of this first party and I personally believe the margins are going to be rewarded, because the way the world works, hard work and differentiation is rewarded with margins. So over time, first party, **I think, will be more prof-itable than third party**[21]. McMillon – June 2, 2017. |

---

[21] McMillon contradicted the statement made by Brett Biggs on 10/6/16: "We'll open fewer stores overall, particularly in the U.S. and we believe over time this will improve our returns on capital. Not surprisingly, we'll also focus on accelerating e-commerce growth. Now this

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| Peter Sloan Benedict, Baird & Co Analyst, Walmart Conference on June 7, 2017 As it relates to what [indiscernible] on Amazon's [indiscernible] large portion of their volumes [indiscernible] | Yes. So, I don't want to think about **3P and 1P necessarily in terms of profitability.** I think you want to carry a wide or the widest possible assortment of products. It doesn't make economic sense to carry a lot of those SKUs first party because you don't have the volume. There's obsolescence issues. There's holding costs and things. Lore – June 7, 2017. Lore also contracted Bigg's 10/6/16 statement. See footnote #2 below. |
| --- | --- |

**The RICO Defendants Conspired with William H. Thompson to Downplay the Materiality of Huynh's Allegations That Walmart Inflated Its Ecommerce Sales and Operating Profit**

106.     RICO Defendant William H. Thompson, SEC's Accounting Branch Office of Consumer Products, purportedly sent a letter to Brett Biggs on May 22, 2017, asking Biggs questions related to the allegations in Huynh's 4/19/17 SEC complaint.  In the letter Thompson asked Biggs to explain how Walmart recognized revenue for its Marketplace business, how Walmart processed customer returns for its Ecommerce business, and how Walmart handled inventory marked down for Walmart's 1P Ecommerce Business.  These questions touched on the very same allegations Huynh made to the SEC.

107.     This letter was pretextual because there were no visible triggers that could have caused Thompson to send the May 22 letter.  First, Huynh just submitted his TCR to the SEC so there were no indications that the SEC had opened an MOI into Huynh's TCR.  Second, Walmart didn't file any reports with the SEC e.g., 8K, 10Q, and 10K etc. that discussed any of the issues raised in Huynh's SEC submission which could have triggered Thompson to

---

includes **Marketplace, which can benefit the profitability mix of the e-commerce business**.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

send the May 22 letter.  As an example, the table below showed that Walmart didn't report

any changes in the way they marked down stores' inventory and most importantly Walmart

never discussed about how they accounted for Marketplace seller sales or how they marked

down Walmart's 1P inventories.

| FY15 Form 10K | FY16 Form 10K | FY17 Form 10K |
|---|---|---|
| The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. | The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. | The retail method of accounting results in inventory being valued at the lower of cost or market since permanent markdowns are immediately recorded as a reduction of the retail value of inventory. |
| The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. | The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. | The retail method of accounting requires management to make certain judgments and estimates that may significantly impact the ending inventory valuation at cost, as well as the amount of gross profit recognized. |
| Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. | Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. | Judgments made include recording markdowns used to sell inventory and shrinkage. When management determines the ability to sell inventory has diminished, markdowns for clearance activity and the related cost impact are recorded. |

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | | |
|---|---|---|
| Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. | Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. | Factors considered in the determination of markdowns include current and anticipated demand, customer preferences and age of merchandise, as well as seasonal and fashion trends. Changes in weather and customer preferences could cause material changes in the amount and timing of markdowns from year to year. |

108.    In short, the real purpose behind Thompson's letter was to give Walmart a platform to answer Thompson's questions concerning Walmart's Marketplace and 1P business (estimated to be roughly $8 Bil in FY17 based on Walmart's SEC filings) in the context of Walmart physical stores (a $500 Bil business) to mask the materiality of Huynh's allegations that Walmart inflated its Ecommerce GMV and Op Profit.

| Thompson's May 22nd 2017 letter | Walmart's June 16, 2017 response letter. |
|---|---|
| Further, please include quantitative disclosure of your sensitivity to change based on other outcomes that are reasonably likely to occur and that would have a material effect on the company. | We did not make quantitative disclosure of the sensitivity to change within our Summary of Critical Accounting Estimates disclosure related to inventory because it was not material. |
| For example, **with regard to inventories,** please indicate whether your estimated inventory losses have been accurate or have required adjustment; and, indicate the impact on net income if there was a 1% change in the amount of markdowns. | For example, a change of 1 % in permanent markdowns during the year ended January 31, 2017, would have impacted net income approximately $70 million. |

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | |
|---|---|
| Please tell us **how you earn and account for revenues from third party sales as** well as your consideration of disclosing your accounting policy for this revenue stream and income statement classification.<br><br>In your response please also address whether or not third-party sellers maintain ownership of their inventory and what services, if any, **you provide in fulfilling third-party sales and returns**. | Operating our walmart.com Marketplace enables us to provide our customers a broad assortment of merchandise that would likely not otherwise be available to them in our stores or on our own websites.  While the services we provide to third party sellers include the marketplace on which they sell and the collection of payments on their behalf, the third parties generally are the primary obligor, maintain ownership of their inventory, have latitude in establishing prices and are responsible for both product fulfillment and returns. As a result, we are the agent and the third party is the principal in these transactions. |
| **Please disclose your sales return policy and address how you make estimates of the amounts of future returns**.<br><br>In addition, please provide a roll forward of the activity in your sales return allowance here or in Schedule II, or provide to us your materiality assessment indicating why such disclosure is not necessary. | "The Company recognizes sales revenue, net of sales taxes and estimated sales returns. For the year ended January 31, 2017, and consistent with previous years, our sales return reserve was less than $250 million, which we do not believe is material to the Consolidated Financial Statements |

109.    Additionally, the RICO Defendants (The Gibson Dunn Participants working in concert with one or more  PR agency to facilitate the disseminations of these misleading publication via the Internet) than corruptly influenced Francine McKenna, a Marketwatch.com reporter, to publish an article on 9/13/17 titled "Wal-Mart accounting for e-commerce, overseas asset sales draw SEC scrutiny"[22] to amplify and broadcast Walmart's purported responses to Thompson's letter to marginalize Huynh's allegations with Walmart's investors,

---

[22] https://www.marketwatch.com/story/wal-mart-accounting-for-e-commerce-overseas-asset-

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1   analysts, the SEC and/or the DOJ.

2

3   As these referral fees have been less than 0.5% of net sales for each of the fiscal years ended January 31, 2017, 2016 and 2015, we concluded **they are not material** and therefore have not disclosed our related accounting policy," Biggs told the SEC in the letter.

4

5

6   The SEC also asked in June about a non-GAAP metric called "**eCommerce Gross Merchandise Value" or GMV** in its press release. Wal-Mart told the SEC in July it defines GMV as "the total US dollar volume of merchandise sold or services rendered for all transactions, including marketplace transactions, that are generally initiated through our eCommerce platforms or include our owned inventory sold on other third-party platforms. **It also incorporates discounts, estimates for returns, shipping fees and referral fees**."

7

8

9

10

11   E-commerce sales at Wal-Mart U.S., where the company is competing directly with Amazon, grew 60% in the most recent quarter. **Wal-Mart has already increased the number of products offered on Marketplace to 67 million items**, supplemented by items from third-party sellers like Toms and Vans shoes.

12

13

### Reverse Whitewash – Coverup the Coverup

14

15   110.    In Mid-Dec 2018, Huynh emailed Gregory B. Penner, Chairman of Walmart's

16   Board of Directors, Mr. Timothy B. Flynn, Chairman of Walmart's Board of Audit and Rob

17   Walton, former Chairman of Walmart's Board of Director, Doug McMillon, Brett Biggs,

18

19   Marc Lore, and Rachel Brand to put them on notice that Huynh believes that Walmart's sen-

20   ior executives may have engaged in fraud against shareholders. Huynh also stated that he be-

21   lieves that Walmart's may have fabricated Beal's 11/30/16 email and Marketplace RIF list to

22   assert Walmart's false affirmative defense.  See Case 3:18-cv-01631-VC - DC Dkt. 83.

23

24   111.    The very next day Rachel Brand, EVP of Global Governance, Chief Legal Of-

25   ficer and Corporate Secretary, sent a memo announcing the departure of Jay Jorgensen, EVP

26

27

28   [sales-draws-sec-scrutiny-2017-09-12](sales-draws-sec-scrutiny-2017-09-12)

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

of Global Ethics and Compliance.  Subsequently, starting in early 2019, the circumstantial evidence discussed below lead Huynh to conclude that it is more likely than not that Walmart's Board of Directors ordered the Walmart Defendants to reverse their whitewashing campaign to coverup the WSF Coverup Enterprise's original cover up scheme.  Even though, Huynh didn't currently possess evidence of email and communications between Walmart's Board of Directors and the other RICO Defendants Huynh believes this information is with the Defendants and could be discovered during discovery.



112.    Starting in early 2019 to the present (see chart above), the RICO Defendants began to reverse the definition of Walmart Marketplace back to its original meaning i.e., Walmart's Market-place is a segment of Walmart.com.  Additionally, Walmart's senior executives once against embraced their original assertions that Marketplace is fast growing and improves the margin mix of Walmart's Ecommerce business. First, Walmart once again used the term "Marketplace" and "Third Party/3P" interchangeably (same as they did prior to May

.

2017). The syntax analysis chart below showed that after Dec 2018, Walmart used the term "Marketplace and the term Third-Party/3P interchangeably 78 times to describe Walmart's Marketplace business. The term "Marketplace" was used 66 times or 85% of the time and the term "Third-Party/3P" were used 12 times or 15% of the time.

113.    Second, instead of using the term "Third Party/3P" as an essential appositive to redefined Marketplace as Walmart.com, Robert Ohmes used the terms "Third Party/3P" and "Marketplace" inside a set of parentheses to once against assert the synonymous relations between Marketplace and Third Party/3P.

"WMT currently offers ~90mn SKUs online but sees opportunity for that to grow as **Marketplace (3P sellers)** expands, with support from WMT's recent launch of WMT Fulfillment Services (providing more tools and helping to make WMT.com a more attractive platform for 3P sellers)." Bank of America/Merrill Lynch March 10, 2020 Investment Report. See Exhibit 35.

"WMT US owned ecommerce sales grew 74% in F1Q (vs. our 35% est. & on top of 37% LY) & contributed a record 390bps to the US comp, with strong results across grocery pickup & delivery, Walmart.com (gen. merchandise), & **Marketplace (3P)** …...WMT is seeing increases in new buyers & repeat rates and is looking to build a significantly larger online business in profitable categories & drive the growth of **Marketplace (3P)** as aggressively as possible." Bank of America/Merrill Lynch May 19, 2020 Investment Report. See Exhibit 36.

"WMT is now looking to drive the growth of its highly profitable **3P (Marketplace)** business as aggressively as possible with expansion of its relatively new Walmart Fulfillment Services division". Bank of America/Merrill Lynch June 10, 2020 Investment Report.

114.    Third, building upon Ohmes' reversion back to the original definition of Marketplace i.e., Walmart's Marketplace is a segment on Walmart.com, Walmart's Senior Executives also began to revert back to the original definition of Marketplace in their communications with investors and analysts.  Walmart also resumed reporting to the total number of SKUs on Walmart.com.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

"We're making progress on many fronts, but we need to do more and move far, **especially with our assortment including marketplace**. I continue to challenge the team to drive a deeper, more sustainable relationship with the customer, better execute the fundamentals, and improve the overall economics of the business." Doug McMillon: Q3 FY20 earnings call on November 14, 2019

I would say that the continued investment in **marketplace as that's accelerating faster than the overall first-party business,** we continue to attract new sellers at this time. And then WFS is also very early, but we're seeing very encouraging signs of opening up the business to new sellers and we see that as a potentially nice growth area in the future. Marc Lore President & Chief Executive Officer-Walmart U.S. eCommerce, Walmart, Inc. Walmart's Annual Investment Community Meeting 18-Feb-2020

The assortment on **walmart.com has grown to about 80 million SKUs including marketplace** has remained focused on keeping the quality of items high. And as a result, the Marketplace business has grown by 2.5 times since FY 2017. However, this is an area, as Doug mentioned, where we still have a lot more work to do. Marc Lore Walmart's Annual Meeting with the Investment Community Meeting on 18-Feb-2020

**Question:** So, Doug, I think in your comments in the third quarter, you mentioned doing more with the **Marketplace or 3P business**. Can you – how is that in the fourth quarter and what are you guys seeing in 3P? Walmart's Annual Investment Community Meeting 18-Feb-2020

**Answer:** Yeah, it was good. But we don't think that we've done everything we must do and should do to support **marketplace sellers** in terms of the tools and services that we have available. I mean, we've grown a Marketplace business over the last few years to a pretty good size, and it's helped us a lot with the assortment and being top of mind for customers as they're looking for items. McMillon. Walmart's Annual Investment Community Meeting 18-Feb-2020

Walmart.com also saw a surge in demand during the quarter as customers opted for greater convenience and increased social distancing. The U.S. eCommerce business grew 74% in total. Growth in **marketplace** outpaced the overall business even as **first-party sales** were strong.  Douglas McMillon President, Chief Executive Officer & Director, Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

115.     Fourth, instead of denying that Marketplace is not necessarily profitable and not a key growth driver for Walmart's Ecommerce, McMillon, Biggs, Lore, and other Walmart's executives reverted back to their original assertion that Walmart's Marketplace is
.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

highly profitable and fast growing.

"We've talked – you've heard us talk a lot over the last couple of years about the ecosystem, and we have a pretty healthy ecosystem today. We're growing things like ad revenue. **We're growing our Marketplace business,** both of which we think long-term will be a big part of our ecosystem…... Marketplace is going to be a big part of our business. I mean, if we're sitting here three years from now, I think we're going to be talking about a much bigger Marketplace business than we have today" Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Raymond James Institutional Investors Conference on 04-Mar-2020

"Walmart.com also saw a surge in demand during the quarter as customers opted for greater convenience and increased social distancing. The U.S. eCommerce business grew 74% in total. **Growth in marketplace outpaced the overall business even as first-party sales were strong."** Douglas McMillon President, Chief Executive Officer & Director, Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

"I would say that the continued **investment in marketplace as that's accelerating faster than the overall first-party business**, we continue to attract new sellers at this time. And then WFS is also very early, but we're seeing very encouraging signs of opening up the busi-ness to new sellers and we see that as a potentially nice growth area in the future." Marc Lore - Walmart, Inc. Q1 2021 Earnings Call 19-May-2020

"Now, let's discuss the quarterly results for each operating segment. Walmart US had a strong quarter. Comp sales, excluding fuel, increased 9.3%, with eCommerce sales growth of 97%. eCommerce sales were strong throughout the quarter contributing approximately two-thirds of the segment comp growth. We saw significant increases in repeat rates and weekly active digital customers, and we continue to make progress on assortment expansion and seller tools with eCommerce **Marketplace sales growing triple digits**.   Gross profit rate was strong, up 42 basis points due to increased sales in higher-margin general merchandise categories and fewer markdowns. We also saw improvements in eCommerce margin rates, **reflecting continued progress on product mix and faster growth in marketplace sales**. Douglas McMillon, Chief Executive Officer & Director, Walmart, Inc. Q2 2021 Earnings Call 18-Aug-2020

"**Our Marketplace business has been strong, which is also an accretive category in relation to the rest of the business.**" John R. Furner President & Chief Executive Officer-Walmart US, Walmart, Inc. Q2 2021 Earnings Call on 18-Aug-2020

"Walmart.com traffic has been robust with solid increases in repeat rates and good momentum in **marketplace sales which grew in triple-digits**. Gross profit rate was strong, up 33 basis points, due primarily to strategic sourcing initiatives and fewer markdowns. We continue to make progress on eCommerce margin rates as **we drive faster growth of**

**marketplace sales and improve product mix**.” Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Q3 2021 Earnings Call on17-Nov-2020

“Your second question was on eCommerce margin specifically, and Michael, those results are a reflection of mostly mix as we described, our home business has been solid online, our apparel has led, and then the overall winner in the **eCommerce business was our marketplace business, which led the marketplace – or led the eCommerce comps in total to 79%** for the quarter.” John R. Furner President & Chief Executive Officer-Walmart U.S., Walmart, Inc. Q3 2021 Earnings Call 17-Nov-2020

“We'll continue improving margin mix through an enhanced general merchandise offering, new brands **and marketplace growth with a greater push towards expanding fulfillment and other services for sellers**. We'll drive existing and new customer growth through initiatives like Walmart+. We'll grow sales and profit increasingly with growing higher margin businesses in advertising, financial services, **marketplace**, healthcare services and the like.” Brett M. Biggs Chief Financial Officer & Executive Vice President, Walmart, Inc. Annual Meeting with the Investment Community on 18-Feb-2021

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

116.    Fifth, after two quarter of hiatus, Walmart's Senior Executives resumed reporting the total number of SKUs on Walmart.com.



**The RICO Defendants Conspired to Conceal Evidence That Proved Walmart Reported Artificially Inflated Ecommerce Q1 FY18, Q2 FY18, and Q3 FY18 Ecommerce Quarterly Sales Growth to Investor and Analyst**

**David deRubertis Asked Huynh to Share Confidential Information Submitted to the SEC which Proved Walmart Reported Inflated Quarterly Ecommerce Sales Growth for FY18.**

117.    Between April 2017 and end of 2018, David deRubertis caused Huynh and

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Phillips & Cohen to share with him confidential and non-public information that Huynh submitted to the SEC via emails that crossed interstate boundary[23] . See Exhibit 2 to 8 for the SEC submissions Huynh shared with deRubertis who in turned shared this with Gibson Dunn's leaders who in turn shared them to the Walmart Defendants.

118.    For example, in early June 2017, Huynh forwarded a memo that Sean McKessy later submitted to the SEC. See.  In the memo, Huynh alleged that the majority of the 69% Ecommerce Sale growth for Q1 FY18 that Walmart reported to investors was driven by the Jet.com acquisition.  Then in early Jan 2018, Huynh shared with deRubertis an SEC submission which included an excel spreadsheet that proved that Jet.com monthly GMV run rate at the end of 2017 was around $53 Mil.  This translated to an annual run rate of roughly $600 Mil.  See Exhibit 6 at 3.  However, Walmart disclosed to analysts that the annual run rate for Jet.com was $1.2 Bil.  As the analysis below showed, Walmart improperly inflated Jet.com sales for FY17 and FY18 to jack up Walmart's Ecommerce Quarterly Sales growth for FY18 to investors.  These misleading growth metrics led investors into believing that Walmart will be an alternative to Amazon.com.  So, investors and analyst pushed up Walmart's Market Cap by about $140 Bil.

**David deRubertis Delayed the Filing of Huynh's SOX Complaint in Federal Court to Give Walmart's Executives the Runway to Conceal the Quarterly Ecommerce Sales Growth.**

119.    Shortly after Huynh shared with David deRubertis the Jet.com GMV inflation evidence, David deRubertis intentionally delayed the filing of Huynh's SOX claim in Federal Court until Mid-March 2018. When Huynh asked deRubertis to speed up the filing of the

---

[23] Since Huynh lived in Seattle, WA and McKessy and Chang worked out of Washington DC any emails that David deRubertis cause us to send to him crossed states boundary. Therefore, David deRubertis committed wire frauds.  This evidence also proved that the Walmart Shareholder Fraud Coverup Enterprise had a nexus with Interstate Commerce.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

complaint, he lied, made excuses and intimidated Huynh in order to silence Huynh.

120.   The text messages and email evidence (below), showed that between Jan and Mar 2018, David deRubertis intentionally delayed filing Huynh's SOX complaint to allow the other RICO Defendants to mislead investors, analysts, the SEC and/or other Governmental agencies, to cover up the Ecommerce Sales inflation.



**David deRubertis' Jan 30, 2018 Email. (See Exhibit 38.)**

Hi Tri – I've tried to be diplomatic about this but it's **not getting through to you**.  I feel like I need to be less diplomatic and more direct.  I hope you'll understand and this won't hit you the wrong way.  I need you to step back and try better to understand my perspective.  I feel like we talk, you reassure me you want the best product possible and you aren't in a crazed rush to get something in your hands, but you just need clear communication on timing.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

I'm doing my best to meet your desires, but **I'm also doing my best to put together the best work product**. And, a fundamental point in this I probably should have made more clear to you (even though I have said this **repeatedly**): I don't make my schedule; often, my schedule is made for me by emergencies created by cases, courts or clients that I have to prioritize over non-actual deadlines.  Once your case is filed, you will get my priority over clients whose cases are not yet filed.  So, while I do my best to predict things, it's never near science and it's not uncommon for predictions to prove wrong.  Nonetheless, I did tell you I would communicate timeline and delays to you.  I think I have been doing that, but from my perspective, on this issue, you are not doing what I'm asking in return.  Let me explain why I say that.

Yesterday, I wrote this: "Will touch base in morning if it's not emailed to you tonight.  Hang tight…. Approaching the finish line… 😊" So yesterday I told you I would reach out to you in the morning.  But, true to form, at 8:47 a.m. **this morning you're already emailing me**.  As if that wasn't enough, then at 9:25 a.m. you're texting me.  Yet again, you don't even give me the chance to do what I say before you're bombarding me with what I perceive as "where is it" communications.

My question to you: Is this really necessary?  You really couldn't sit tight and wait to hear from me without before even 9:00 a.m. reaching out?  I sure did plan to reach out this morning but, frankly, was so annoyed that you're already at it that I didn't.

### David deRubertis' Feb 12, 2018 Email.

Hi Tri – Just saw your text from yesterday.  Please stop.  You are beating me down to the point of discouraging me from doing my best work.  **I cannot tell you this again.  You will respect it, or we don't work together**.  I told you before: NO, I'm not just sending you the work in progress until I feel it is ready to turn over to you.  I told you that last time around.  To now ask for me to do that again, **is to return to the process of not listening.  You are being your own worst enemy by continuing this pattern.**  I'm trying to do this the way that works for me because that is what produces the best result for my clients.  I've been 100% transparent about my process to you.  I've told you I don't just placate clients to make them happy.  I focus on doing the work on the case the way that will produce the best result, even when it annoys clients.  I've told you this directly **over and over, including in our initial meetings.  Nonetheless, I keep feeling pressure to placate you and make you happy**.  If you want me to be that lawyer, sorry, I won't.  I'm not going to keep feeling the pressure to account to you on meeting fictional deadlines.  I told you this weekend about the real reality of deadlines.  And I've been putting as many hours as I can into finalizing your complaint, re-reviewing ALL of the documents to make sure I'm not overlooking anything in terms of the theory we are pitching in it, etc. [24]  I want to do this

---

[24] As discussed above, my case is a SOX retaliatory termination case not a class action share-

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

the right way, and I need to stop being asked to predict when it is in your hands because the end result is that process just leads to more frustration.  Don't you see that if you keep breathing down my neck, it just incentivizes me to hurry up and finish rather than take the time to do the best result???

But, I've also concluded it makes no sense to tell you when I expect to turn it over because then I keep feeling a pressure to rush to meet a false deadline rather than working the way ALL MY OTHER CLIENTS ALLOW ME TO WORK.  Yes, I'm writing that in caps for a reason.  YOU ARE THE ONLY CLIENT WHO MAKES ME FEEL LIKE I HAVE TO FOCUS ON PLACATING YOU RATHER THAN DOING THE BEST WORK.

121.    deRubertis' purported justifications for the delaying filing the SOX complaint were because he was busy with other cases, and he needed more time to draft a comprehensive and high-quality complaint i.e., a 70-page complaint were bogus and pretextual.  First, deRubertis knew that he didn't have to plead with specificity in a SOX employment retaliation case nor was he required to prove that Walmart committed fraud against shareholders.

**The Reasons Jessica Bunkofske Gave to Huynh's Medical Providers to Expedite Record Production Contradicted with deRubertis' Stated Reasons to Delay Filing Huynh's Civil.**



holder fraud case so deRubertis didn't have plead with specificity and prove that Walmart actually committed illegal conducts.  So deRubertis didn't need four months to draft a complaint.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Second, deRubertis contradicted himself when said he said he needed more time to file the complaint was a lied because while he was delaying filing the complaint Kari deRubertis caused the deRubertis Law Firm's employees to use interstate email and fax to rush Huynh's doctors to produce Huynh's medical records under the pretext that the deRubertis Law Firm had to meet Court's deadline.  David and Kari deRubertis used interstate money transfer to procure the medical records from Swedish Medical in Seattle, WA[25].

### Back to the Future - February 18, 2018

122.    Huynh struggled for the several months in 2020 trying to answer a fundamental question: "Why did deRubertis repeatedly delay filing Huynh's complaint? What were deRubertis' true motives?  In early Sept 2020, Huynh stumbled on a recent ruling that discussed the loss causation requirement of a securities fraud class action lawsuit brought under § 10(b)(5).  This case gave Huynh the inspiration to investigate and answer the questions above.  The first case was PAUL HAYDEN, et al., Plaintiffs, v. PORTOLA PHAR-MACEU-TICALS, INC., et al., (Case 3:20-cv-00367-VC[26]) out of the United States District Court, Northern District of California.

---

[25] This evidence proved that the Walmart's shareholder fraud coverup enterprise procured good and service across states boundary. Therefore, as a matter of laws the enterprise affected interstate commerce.

[26] https://www.govinfo.gov/content/pkg/USCOURTS-cand-3_20-cv-00367/pdf/USCOURTS-cand-3_20-cv-00367-1.pdf. In his ruling, District Judge Vince Chhabria wrote: "To satisfy this element, the plaintiffs must allege that the revelation of the identified omission was a substantial factor in cause the company's stock price to decline, thereby causing an economic loss for its investors. Nuveen Municipal High Income Opportunity Fund v. City of Alameda, California, 730 F.3d 1111, 119 (9th Cir. 2013). This is frequently achieved by identifying the date that "the truth is revealed" through some public announcement and then describing how much the stock dropped thereafter, often bolstered by statements from analysts citing the revelation as the cause for investor concern. In re Daou Systems, 411 F.3d 1006, 1026 (9th Cir. 2005).

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**The Walmart Participants Engaged in a Fraudulent Scheme to Rip Off Shareholders to the Tune of $140 Billion**

123.    Huynh read numerous Walmart's 10Ks, 10Qs, and 8Ks filings, Walmart's earning calls and other events' transcript as well as numerous analysts' reports on Walmart Inc then modeled Walmart's Quarterly Ecommerce growth with and without the Jet.com FY17 and FY18 sales contribution.  Based on his analysis, Huynh discovered that Walmart's senior executives (Marc Lore, Dough McMillon, Brett Biggs, and others) artificially inflated Walmart's Ecommerce quarterly sales growth to purportedly show explosive quarterly growth rates of 63%, 60%, and 50% for Q1, Q2, and Q3 FY18 respectively then using the Internet as a medium to disseminate these fraudulent results.  As a result of these misleading results, Walmart's Market Capitalization increased by roughly $140 Bil during FY18.  However, after, Walmart announced on Feb 18, 2018 that Walmart's Q4 FY18 Ecommerce Sales growth collapsed to 23% from 50% in the previous Quarter, Walmart's stock price dropped by 10% on the same day then continued to drop from a height of $109 in late Jan 2018 to $82 on May 29, 2018 (a $27 drop), wiping out roughly $80 Bil in Walmart's Market Cap.

124.    Some investors may have been harm by these fraudulent conducts.  For example, the chart below showed that during the period where Walmart's senior executives artificially inflated Walmart's Quarterly Ecommerce Sales Growth (discussed above) which drove Walmart's Market Cap up by $140 Bil then subsequent collapse, CalPERS disposed roughly 735,000 share of Walmart stocks.  If CalPERS[27] had bought Walmart's stock at a higher price, then later sold it a lower price, then two million hard working Californians may have

---

[27]. https://www.calpers.ca.gov/

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

been harmed by Walmart's fraudulent conducts.

| CalPERS 2016-2017 Annual Investment Report | | | |
|---|---|---|---|
| Security Name | Shares | Book Value | Market Value |
| WAL MART STORES INC | 4,576,246 | 205,025,882 | 346,330,327 |

| CalPERS 2017-2018 Annual Investment Report | | | |
|---|---|---|---|
| Security Name | Shares | Book Value | Market Value |
| WALMART INC | 3,841,468 | 202,423,533 | 329,021,734 |



CalPERS Investment in Walmart's Stock

4,576,246 (2017)

Disposed 734,778 of Walmart Share Declined.

3,841,468 (2018)

125.    Walmart's senior executives artificially inflated Walmart's Quarterly Ecommerce Sales Growth in FY18 in two significant ways. First, Walmart misleadingly disclosed to investors in Oct 2016 that Jet.com's annual GMV run rate was $1.2 Bil when in actuality it was closer to $.6 Bil. See Exhibit 6- SEC Jan 2018 Submission at page 2. As a result of the inflated GMV run rate for Jet.com FY17 and FY18 GMV which led analysts materially inflated their forecast of Jet.com GMV for FY17 and FY18.  (See Exhibit 40) Second, based on the inflated Jet.com FY 17 and FY18 Jet.com GMV, Walmart recognized all of Jet.com FY17 and FY18 GMV as Jet.com sales.  However, this was not GAAP compliance because Walmart should have only recognized the seller commission fee (about 15% of GMV) generated from Jet.com Marketplace's GMV as Jet.com sales not the entire Marketplace GMV .

68

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

amount.  Walmart knew this fact very well because this was the precise answer that Mr. Biggs gave to Mr. Thompson in Mid-2017.

| SEC May 2017 Letter to Walmart. | Walmart's Reply Letter in June 2017 |
|---|---|
| **Revenue Recognition.** <br><br> Please tell us how you earn and account for revenues from third party sales as well as your consideration of disclosing your accounting policy for this revenue stream and income statement classification. | **Walmart's Methodology.** <br><br> We are the agent and the third party is the principal in these transactions. **We earn and account for referral fees from these transactions on a net commission basis, which we present in net sales** in the Company's Consolidated Statements of Income. |

**The Walmart Participants and the Other RICO Defendants Acted in Concert to Mislead Investors, Analysts, and the SEC to Coverup Walmart's Inflation of Its Quarterly Ecommerce Sales Growth During FY18**

126.    Based on the information David deRubertis leaked to his Co-RICO Defendants, Walmart's senior executives and other RICO Defendants began a cover up campaign starting on the Q4 FY18 quarterly earnings calls to conceal the facts that Walmart's senior executives had artificially inflated Walmart's Quarterly Ecommerce Sales growth in FY18 to mislead investors and analysts.  During the quarterly earnings call, Walmart's senior executives provided two purported justifications for the Ecommerce sales short fall in Q4 FY18.

127.    First, Walmart intentionally stopped unprofitable sales of items that apparently juiced prior year holiday online result (Walmart found items being sold by resellers) i.e., Walmart didn't want to lose more money during the Q4 FY18 holiday shopping season.  This purported explanation was not was not credible for two reasons. First, when Huynh asked McMillon during a town hall meeting with Walmart.com's employees in late 2016 "How

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

would Walmart closed the Ecommerce sales gap with Amazon?".  McMillon's answer was

simply **investment matter!** We have to put more fuel on the fire not less.  So, losing money

could not be the real reason for missing an important metric analysts used to value Walmart's

stock.  Especially, when Walmart's senior executives knew that investors were willing to

overlook operating margin short fall in the short to medium term as long as Walmart delivered

high Ecommerce Sales growth.  See Exhibit 41.



Source: Cowen and Company, Company Reports, Thomson One; note: P/E FY2

128.    Second, Walmart was spending money like a drunken sailor to buy both US

same stores sales and US Ecommerce sales.  The chart below is scatter plot between

Walmart's US operating margin and same store sales growth.  Since taking over as Walmart

Inc.'s CEO, McMillon bought US same-store sales growth at the expense of operating mar-

gin. (i.e., he was willing to lose or make less money).  Although, Walmart's US same-store-

sales increased to around 3%, Walmart's US operating margin eroded significantly from the

.

70

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

7% to 8% range under McMillon's predecessors to around 5% under McMillon's leadership.



129.    Additionally, Walmart lost Billions of Dollars on its Ecommerce business since FY12 in order to buy growth.  Thus, it was difficult to believe that someone that spent



.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

money like a drunken sailor suddenly woke up one day and decided to be frugal.

130.    Second, Walmart's purported explanation that the FC operational problems during the FY18 holidays season was a minor contributing factor to Walmart's slower Ecommerce sales growth was at the very best half-truth.  Huynh believes that while it was true that Walmart encountered operational issues when they tried to swap out the bulky and heavy grocery and consumable items with holidays merchandises.  Huynh does not believe that the impact of this problem was a minor factor in Walmart's slower Ecommerce sales growth. The chart below showed that Walmart.com's Ecommerce sales growth (without Jet.com contribution) was averaging about 36% between Q1 and Q3 of FY18 but suddenly dropped by 20% to 16% during Q4 FY18.  What this showed was that Walmart overstuffed their FCs with gro-

**Online Grocery and the Jet.com Acquisition Are the Key Drivers That Helped Walmart Cross the Chasm to Purportedly High Ecommerce Growth in FY18**



Source: Estimated Walmart US Ecommerce sales growth based on Walmart's SEC filings and analyst reports

cery and consumable items during off peak season in FY18 to maximize Ecommerce sales.

72

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

3          131.    However, Huynh believes Walmart failed to foresee the huge operational chal-

4    lenges of swapping out bulky and heavy grocery and consumable items with general merchan-

5    dise/holiday items.  Therefore, Huynh believes Walmart's challenges in bringing holiday as-

6    sortments to their FCS materially impacted Walmart's Ecommerce sales growth during Q4 of

7    FY18 for two reasons.  First, customers did not simply buy more grocery and consumable

8    items during the holidays. On the other hand, customers spent significantly more money on

9

10   general merchandise products during the holiday shopping season.  For example, a typical

11   online retailer's sales in Q4 usually double that of a normal/off peak quarter.  Second, grocery

12   and consumable products are bulkier and take up more space than general merchandise prod-

13   ucts. Imagine how many general merchandise items a 12 rolls of paper tower would displace.

14   So, for every consumable item that Walmart was unable to swap out of their FCs Walmart lost

15   sales on multiple General Merchandise items. Additionally, General Merchandise items often

16
     have higher average selling prices than consumable items.  Loss of general merchandise item
17
     sales resulted in further sales declined for Walmart.
18

19          132.    Several days after McMillon announced that Walmart Q4 FY18 Ecommerce

20   sales growth collapsed to 23% from 50%, Matthew Boyle published an article on Feb 23,

21
     2018 to misrepresent the reasons behind Walmart's slower Ecommerce sales growth to con-
22
23   ceal the fact that Walmart was driving its Ecommerce sales growth in FY18 by selling more

24

25

26

27

28   .

                                                   73
**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1   low margin grocery and consumable products instead of selling the high margin general mer-

2   chandise products as purportedly implied by Walmart. [28]   In hist article, Matthew Boyle pur-

3   portedly attributed the reason for Walmart's slower Ecommerce sales growth was due to

4   Walmart's inability to fulfill the flood of customer holiday gifts orders (indirectly implied that

5   customers loved Walmart's general merchandise products very much but Walmart was not



6   able to fulfill their orders).  See Exhibit 42.

https://www.bloomberg.com/news/articles/2018-02-23/walmart-s-amazon-killer-goes-from-superstar-to-man-on-hot-seat

| Boyle's statements | Walmart's disclosures on Feb 18 | Remarks |
|---|---|---|
|  |  |  |

---

[28] If investors and analysts knew that the majority of the Ecommerce sales growth was com-ing from grocery and consumable then it would shatter Walmart's purported Ecommerce bas-ket growth strategy because the cornerstone of this strategy was to earn low margin (maybe even lose money) with click & collect grocery and consumable offering then earned high mar-gin by getting customers to buy general merchandise e.g., Apparel and Home products.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | | |
|---|---|---|
| But the first crack came over the holidays. **An influx of gift orders overwhelmed Walmart's supply chain, leaving no room for everyday items**. Sales rose 23 percent, a slower pace than both Amazon and Target over the same period. Feb 23, 2018. | "Yes. So, the operational challenges that I mentioned were more around fulfillment. And so, as you start -- you always have this challenge. As you start **pulling more seasonal inventory into a fulfillment center, where you have everyday goods, you can have some challenges with that**." Brett Biggs – Mar 2018. | Walmart stated the lack of holiday (general merchandise) offerings was the main contributing factor to the slower Ecommerce sales growth not Walmart's inability to fulling the tsunami of incoming customer orders. |

133.    However, this completely contradicted with what Walmart's senior executives were telling investors and analysts i.e., Walmart's slower Ecommerce sales growth was intentionally because Walmart didn't want to be too promotional not during the holidays not Walmart's inability to fulfill the tsunami of customer gift orders during the holidays.   A business reporter with years of reporting experience would not make the mistake above.  Therefore, it is more likely than not that the Walmart Participants, Gibson Dunn Participants and other unknow co-conspirators provided Boyle with the misleading statements above.  Boyle then used the Internet to disseminate misleading information to investors and analysts to cover-up the facts that Walmart didn't gain traction in their online General Merchandise business in any meaningful way.

134.    Furthermore, to help Walmart downplayed the importance of Jet.com in Walmart's Ecommerce Quarterly Sales growth, Huynh believes Boyle published an online article on 4/13/18[29] to purportedly accentuate the spectacular collapse of Jet.com website traffic

---

[29] https://www.bloomberg.com/news/articles/2018-04-13/walmart-s-jet-traffic-declines-as-hipsters-prove-costly-to-reach

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

to divert investors' and analysts' scrutiny away the fact that Walmart had improperly inflated Jet.com FY17 and FY18 sales.

**Jet.com is losing altitude.**

Walmart Inc., Jet's owner, has increased marketing of its primary website while scaling back promotion for Jet. While the shift may help maintain the retailer's declining profit margins, the impact has been felt on Jet's website, **where traffic declined about 60 percent in March compared with a year earlier.** according to data tracker SimilarWeb.

"So long as Walmart's numbers are strong it doesn't matter what happens to Jet," said Sucharita Kodali (as a reminder this purported expert/analyst was also in Boyle's Mar 16, 2018 article to downplay the materiality of Huynh's allegations) , an analyst at Forrester Research. "This makes it easy to sunset Jet and focus on Walmart. **I'm not sure, honestly, why Jet is even still around."**

135.    In short, the Walmart participants and the other RICO Defendants plant and execute a controlled the deflation of the Jet.com's misleading sales accounting for FY17 then made-up bogus reasons to shift investors and the SEC away from scrutinizing the Jet.com sales inflation.  For example, during the Q4 FY18 earnings call, Walmart announced that they would not invest marketing dollars in Jet.com going forward (downplaying the success of Jet.com).   admitting the Jet.com failure to stop

**The RICO Defendants Campaign of Lies to Destroy Huynh's Credibility with Walmart's Investors, Analysts and the SEC.**

**David deRubertis Lure Huynh Across State Line to Gather Confidential Information to Conspire with the Gibson Dunn and Walmart Participants and Other RICO Defendants to Discredit Huynh's Allegations.**

136.    About a month after Huynh informed deRubertis of his meeting with the SEC in San Francisco in early Oct 2017, deRubertis informed Huynh that OSHA had not finished and allowed Huynh to take his SOX case to Federal Court OSHA. In Mid-Nov 2017, deRubertis asked Huynh to come to meet him in person at his office in Studio City, California under the pretext of getting to file a lawsuit against Walmart in Dec 2017.  The deRubertis Law .

76

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Firm, APC fully funded Huynh's trip (the deRubertis booked Hotels and reimburse for air fare and Uber fair). See Exhibit 43.

137.    During the meeting, deRubertis took the binder that Huynh and Sean McKessy, Phillips & Cohen, produced to the SEC in Oct 2017 then asked his assistance to make a copy of the binder.  deRubertis also asked Huynh for the Oct 2, 2016 email that Seth Beal sent to Dough McMillon to update him that Marketplace had 10.9 Mil SKUs and 19.7 Mil SKUs on Walmart.com. See Exhibit 45. Huynh didn't realize that this email was a smoking gun that proved scienter (Legal element #2 of an SEC 10-b 5 enforcement action) i.e., McMillon intentionally misled investors. Huynh only came to learn the importance of this Oct 2 email a year later.[30].

138.    Second, deRubertis asked Huynh to share with him an email that contained an internal presentation that discussed one instances of how Walmart's Ecommerce failed to process customer returns which impacted profit by $7 Mil (Not sales). See Exhibit 44.  deRubertis, the Gibson Dunn and Walmart participants attempted to fixate on the $7 Mil figure to downplay Huynh's allegation that Walmart's Ecommerce inflated its GMV to the tune of $386 Mil.

139.     deRubertis also asked Huynh for two additional things. First, Kari deRubertis asked Huynh to sign a non-HIPPA compliance medical records release form without the name

---

[30] This evidence proved that the Walmart participants (knowing that McMillon lied to investors during the Oct 6, 2016 meeting the investment community) and GDC participants instructed David deRubertis to obtain this information to manipulate it to make McMillon statements not misleading. Otherwise how could a mere Plaintiff employment knew about the importance this Marketplace assortment metric and most importantly how did he know that Huynh had the Oct 2, 2016 email in his possession.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

of a health provider and the types of medical records sought on.  David and Kari deRubertis used this obtained Huynh's psychiatrist records then produced this secretly to the Gibson Dunn participants on September 18, 2018.  This is around the time that the SEC opened an investigation into Walmart's illegal conducts.  The Gibson Dunn, Orrick, and Walmart participants most likely used this information during their interaction with the SEC enforcement attorneys to prove that Huynh was mentally ill and should not be trust.

140.     Second, David deRubertis asked Huynh to give him a copy of Huynh's personal computer hard drive which exceeded 100 plus Gigabyte of information. See Exhibit 99. Huynh's hard drive contained both information that Huynh retained from Walmart as well as his personal/private information and attorney-client privilege communication. See the discussions below for how deRubertis, the Gibson Dunn and Walmart Participants and the Orrick participants used this information (i.e., the Jeff Bezos' email) to discredit Huynh with the SEC by purportedly asserted that Huynh's allegations of shareholder fraud against Walmart is not credible because he had made similar complaint at Amazon. As a reminder, deRubertis intimidate and harassed Huynh to force Huynh to allow him to get Huynh's Amazon personnel records at around the same time that the SEC started to investigated into the Walmart matter. So, the Gibson Dunn and Orrick participant could present them to the SEC.

### deRubertis and His Co-RICO Defendants Leveraged Huynh's 3/15/18 SOX Complaint to Discredit Huynh's Allegation of Walmart's Marketplace SKU Inflation.

141.     On Nov 16, 2017, David deRubertis came out of nowhere and asked Huynh for the Oct 2, 2017 email that Seth Beal sent to McMillon and Lore to inform them that Walmart's Marketplace had 16.5 Mil SKUs. See Exhibit 45.  At the time of deRubertis' request, Huynh didn't even know the importance of this email.  It took Huynh another 10 months to finally figure out the important of this email when Huynh compared the 16.5 Mil

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

SKUs and the 20 Mil SKUs that McMillon disclosed to investors during Walmart's Annual Meeting with the investment community.  Huynh reported this discrepancy with the SEC in his Sept 2018 submission.  See Exhibit 8.  Huynh now realized the reason deRubertis asked for this very specific email so the Walmart and Gibson Dunn participants could create a mis-leading narrative to be insert into Huynh's  3/15/18 Complaint to discredit Huynh's allega-tions and to whitewash evidence of Walmart's misleading statements regarding the total num-ber of SKUs on Walmart's Marketplace. It is important to note that since David deRubertis was acting as Huynh's lawyer anything he put in the Civil complaint would be viewed as coming straight out of Huynh's mail.  Thus, by making the misleading statements below the RICO Defendants could prove to the SEC that Huynh also agreed with the new fraudulent definition of Marketplace.

**The RICO Defendants Used the March 15, 2018 SOX Complaint to Fraudulently Made McMillon Misleading Statement No Longer Misleading (Attempted to De-feat Legal Element 1 Discussed Above).**

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

142.   In the 3/15/2018 SOX Complaint, deRubertis and the other RICO Defendants acted in concert to purportedly redefine "Marketplace" as Walmart.com by using the term "1P" and "third party/3P" as an **"essential appositive"** in front of the term "Marketplace". See the Chart above.  deRubertis used the term **"third-party/3P" as an essential appositive** in an attempt to redefine Walmart Marketplace as Walmart.com.  See the chart above.

143.   Under this novel approached, David deRubertis defined Walmart Marketplace as having both the First-Party/1P Marketplace and the Third-Party(3P) Marketplace even though there is only one Marketplace on Walmart.com.  This new definition of Marketplace

**An appositive further explains, identifies, or renames a noun or pronoun in a sentence. There are two types of appositive**

### Essential Appositives

- When the information an appositive gives about a noun is ESSENTIAL, we DON'T use commas. (Some people call this *restrictive*)
- This year, actor **Freddy Redmayne** won the Oscar for Best Actor for his portrayal of Stephen Hawking in *The Theory of Everything*.

Without his name, we don't know which actor we're talking about because "actor" is a very broad, undefined noun.

### Nonessential – Use Commas

- Larry, **my roommate obsessed with *Where's Waldo* books,** embarrasses me when we go out in public.

The appositive phrase provides extra information. We could move it around or take it out.



*Ask:* Does the information **define the subject** or simply provide **extra info** about the subject?



The MVP soccer player of the final game, **Zach Still**, celebrated his victory by going to Disneyland.

*We can assume there was only one MVP soccer player for a particular game, so the subject is already very specific and defined. The name is extra information.*

The soccer star **Zach Still** celebrated his victory by going to Disneyland.

*There could be many soccer stars, so we must know the name to fully define the subject of the sentence.*

**Definition Prior to May 2017**

- There is only one Marketplace on Walmart.com where third-party (marketplace) sellers list their product for sales.
- Marketplace **is synonymous** with Third-Party/3P.
- Marketplace is a segment of Walmart.com.

**Definition Between May 2017 And Dec 13, 2018**

- There are two Marketplaces on Walmart.com:  a third-party/3P marketplace and a first party/1P Marketplace.
- Marketplace **is not synonymous** with Third-Party.
- Marketplace **is synonymous** with Walmart.com.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

made McMillon's statements to investors in FY17 no longer misleading because it was perfectly okay to include 1P SKUs in the total number of Marketplace SKUs reported to investors. deRubertis used the paragraphs below in the 3/15/18 Complaint in an attempt to prove that Huynh actually used this definition for Walmart's Marketplace which contradicted the allegations in Huynh's SEC submissions. See Exhibit 98 for the first amended complaint.

"In this "third-party" or "3P" model, Wal-Mart provides "third-party" sellers the ability to offer their products for purchase on Wal-Mart's "**third-party**" **marketplace** at Walmart.com, and Wal-Mart then charges a commission to the "third-party" seller for each completed sales transaction." deRubertis – FAC DC Dkt. 8 at ¶ 39.

"However, traditionally, **"third-party" marketplaces** tend to be far more profitable than a **"**first-party" online business." deRubertis – FAC DC Dkt. 8 at ¶ 59.

"By boosting-up these indirect measures, Wal-Mart paints a picture of E-commerce growth and success (including specifically in the typically more profitable **"third party" Marketplace**) that, in fact, misleads the investing public." deRubertis – FAC DC Dkt. 8 at ¶ 60.

"Among other things, and merely by way of example and not by way of limitation, Wal-Mart's online **"third-party" Marketplace** had items listed such as: "Tranny Granny" Costume: An offensive, inappropriate Halloween costume mocking transgender people:" — deRubertis – FAC DC Dkt. 8 at ¶ 67.

"The Fiscal Year 2018 Plan set operational targets of ending Fiscal Year 2018 (i.e., February 2018) with twenty thousand (20,000) **Marketplace "third-party"** sellers." — deRubertis – FAC DC Dkt. 8 at ¶ 86.

"Mr. Huynh also explained that Wal-Mart had allowed its Marketplace catalogue to be stuffed "with many published SKUs that are not buyable by customers (non-buyable published SKUs are useless for customers)," and noted the extreme disconnect between this metric on Wal-Mart's own "first-party" system versus its **"third-party**" **Marketplace."** — deRubertis – FAC DC Dkt. 8 at ¶ 101.

144.     After misleadingly altered the original meaning of Walmart's Marketplace, deRubertis replaced the Marketplace's original definition with his new definition of Marketplace to whitewash McMillon's misleading statements i.e., made McMillon's statements no longer misleading. This allowed Walmart to defeat legal element # of the SEC 10b-5 claim.

81

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| Walmart's usage of the original Marketplace term. | deRubertis' Usage of the New Marketplace term. | Remarks |
|---|---|---|
| Quick update on **Marketplace** progress: **16.5 million unique SKUs** (up from 6.2 million at the beginning of the year) – **on the site**, there are currently **19.7 million** unique SKUs including 1P. Beal's Oct 2nd 2016 Email. See Exhibit 45. | "For example, the same senior leader who boasted in early-October 2016 that the **"third-party"** Marketplace now had two thousand and seventy-four (2,074) and **sixteen million five hundred thousand (16,500,000) unique SKUs"**— deRubertis – FAC DC Dkt. 8 at ¶ 66. | deRubertis whitewashed the term "Marketplace" in Beal's email by replacing it with the term **"third-party"** Marketplace to purportedly assert that Marketplace had approximately **20 Mil SKUs** while "third-party" Marketplace had **16.5 Mil SKUs**. This made McMillon's statement no longer misleading.  As discussed above in paragraph X, the reason McMillon didn't attempt to whitewash the 15 Mil SKUs number was because it contained two components of fraud.  That |
| "Next, we are growing our **marketplace offering** at a strong pace. Since the beginning of the year, **we've added about 7 million new items to the assortment** and today offer approximately **15 million SKUs**". McMillon Q2 FY 17 earnings call. | In its August 18, 2016 second quarter FY17 earnings call, Wal-Mart's Chief Executive Officer Doug McMillon reported that Wal-Mart had added **seven million** (7,000,000) **SKUs to its Marketplace offerings** since the beginning of the year and now reached fifteen million **(15,000,000) SKUs on its Marketplace**. DC Dkt. 8 at paragraph 61. | Under deRubertis' new definition of Marketplace, McMillon's statement on the Q2 FY17 earning call was no longer misleading because Marketplace now included both 1P Marketplace SKUs and 3P Marketplace SKUs. |

| | | |
|---|---|---|
| **From a marketplace perspective**, we're scaling fast – **adding 8 million SKUs** over the past 3 months alone. McMillon - Q3 FY 17 earnings call on Nov 17, 2016. 15 million SKUs (Q2 FY17) + 8 million SKUs = 23 million SKUs. | In its November 18, 2016 third quarter FY17 earnings call, McMillon began his portion of the earnings report highlighting "some recent developments in e-commerce" including that Wal-Mart was "scaling fast – **adding 8 million SKUs** over the past 3 months alone" **within its Marketplace.** DC Dkt. 8 at ¶ 87. | Under deRubertis' new definition of Marketplace, the statement McMillon made on Walmart's Q2 FY17 earnings call was no longer misleading. |

**deRubertis and His Co-RICO Defendants Conspired to Selectively Used the $7 Mil Figure to Downplay the Materiality of Huynh's Allegations that Walmart Inflated the Its Ecommerce GMV and Op Profit by $384 Mil and $126 Mi.**

145.    As a reminder, David deRubertis obtained the Apr 2017 SEC submission and reviewed it before giving his SEC lawyer at Phillips & Cohen, Sean McKessy, the okay to file it with the SEC.  Therefore, deRubertis knew that Huynh alleged to the SEC that Walmart inflated their Ecommerce GMV and Operating Profit to the tune of **$384 Mil and $126 Mil** respectively.  See Exhibit 2 at page 11.  However, between Mid-Nov 2017 to Mid-March 2018, deRubertis attempted to ask leading questions to deceive Huynh to answer questions that would purportedly prove that Huynh confirm the GMV impact related to unprocessed customer return was a mere $7 Mil amount not the $384 Mil amount alleged in Huynh's SEC submission.  See Exhibit X.  Below are several examples of deRubertis' leading questions.

146.    First, deRubertis emailed Huynh on 2/12/18 to put words in Huynh's mouth that the unprocessed customer returns worth about $7 Mil (deRubertis took this isolated figure from the email he asked Huynh to forwarded to him in 11/16/2017. See Exhibit 45 at 6-8). Huynh told deRubertis told him that his statement was incorrect.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

On Feb 12, 2018 deRubertis wrote in his email to Huynh: "Got it. So, Pangaea is not a third-party seller. It is a platform that Wal-Mart uses, correct? This makes more sense now because Wal-Mart's powerpoint says the $7 million was across 150 sellers. Thx." See Exhibit 45 at 8.

147.    Second, having failed to trap Huynh to said that the total customer return was $7 Mil, deRubertis again texted Huynh on 2/13/2018 to about the $7 Mil figure. Exhibit 45 at 7. Huynh spoke to deRubertis immediately via phone and told him that his statement was incorrect and he should not cite this number out of context.

"Got it. So dec 2014 when u raised concerns about the universal specs was that at The Pangea level of the process? In other words, were both the commission inaccuracies and the failure to process the 7m in returns Pangea problems?"

148.    Third, David deRubertis tried to trap Huynh to acknowledge the purported $7 Mil customer returns figure in a very nefarious way by emailing Huynh his half-finish complaint (38 pages) and purportedly ask Huynh to fill in the blank for him.  All of the fill in the blank requests were frivolous and unimportant.  However, in paragraph 51, in addition to asking Huynh to answer a generic question, deRubertis sleazily sneaked in the $7 Mil figure again.  but didn't ask Huynh to validate it.  Therefore, if Huynh didn't point out that the $7 Mil figure was incorrect, then by default the Gibson Dunn, Walmart, and Orrick participants could provide his information to the SEC to discredit Huynh's $384 Mil figure.

149.    The following day, in addition to filling in the frivolous blanks, Huynh also told deRubertis to remove the $7 Mil figure from paragraph 51. However, David deRubertis shamelessly refused to remove the $7 Mil figure from paragraph 51 as per Huynh's request when he filed the SOX Complaint on 3/15/2018.. The reason he did this was to enable the Gibson Dunn Maestro of the Media and their hired gun PR firm(s) (see deRubertis discussing about working with a PR agency and Bloomberg. See Exhibit 46).  On March 15, 2018, the RICO Defendants blasted the $7 Mil figures across the Internet and business cable news.

84

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**The Gibson Dunn's Maestros of the Media and the Other RICO Defendants and Their Co-Conspirators Launched Their "Truth on the Market" Defense on Mar 15, 2018 to Destroy Huynh's Credibility with the SEC.**

150.    On March 15, 2018, Matthew Boyle published an article on Bloomberg News with guidance from the other RICO Defendants and a PR agency to purportedly release a control disclosure of Huynh's 3/15/18 complaint to belittle Huynh's credibility with the SEC, investors, analysts, the media, and the American public.  Exhibit 47. The fact that deRubertis refused to correct the $7 Mil figure is proof that Boyle, an unknown PR firm, Gibson Dunn, and Walmart planned to use this petty number to downplay Huynh's allegations.

151.    Also please noted that Boyle didn't do his job as a reporter because he only reported Huynh's allegations against Walmart for committed shareholder fraud and inflating their Ecommerce GMV and profit (which were stated in the 3/15/18 complaint) at a vague and generic level, except the $7 Mil figure.  This proved that Boyle didn't research and write the content of his report.  Rather, Huynh believes it was probably ghost written by someone else then gave to Boyle to publish.  Mr. Boyle there is no first amendment protection for committing fraud here.

**Matthew Boyle, a Bloomberg News reporter.  Mar 15 and 16, 2018 articles Provide Vague Reference to the Allege Misconducts in Huynh's SOX Complaint.** (Huynh's remarks are Italicized inside the parentheses which proved the vagueness of Boyle's reporting regarding the allegations in Huynh 3/15/18 SOX complaint.

"The whistle-blower lawsuit, filed in federal court in San Francisco, claims Walmart issued **misleading results** (*what kind of misleading results?*). Tri Huynh, a former director of business development, claims he was terminated "under false pretenses" after raising concerns (*what kind of concerns?*) about an "overly aggressive push **to show meteoric growth** (*what did Walmart push?*) in its e-commerce business by any means possible -- even, illegitimate ones."

"Walmart's systems sometimes failed to label marketplace items in the right product category, resulting in some vendors **paying higher commissions** than they should have (*How big was the total amount of commission fees overbilling?*".

.

85

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

"The company also failed to process customer returns on items totaling more than **$7 million** (*The RICO Defendants and Boyle used the $7 Mil figure that deRubertis refused to remove to downplay the material of Huynh's allegations. See above*), which resulted in reporting inflated sales the customer return, Huynh said."

152.    In addition to Boyle's article, the RICO Defendants also broadcasted deRubertis' low-ball $7 Mil figure using the other news outlets to marginalize the materiality of Huynh's allegations against Walmart for Ecommerce GMV and Operating Profit inflation.

**Excerpts from Other Reporters' 3/15/18 Articles Regarding the $7 Mil Figures**.

"Huynh also said Walmart failed to process more than **$7 million** of customer returns, inflating the total value of merchandise sold from September 2015 to March 2016." Jonathan Stempel and Nandita Bose, Reuters' Reporters – Mar 15, 2018/

"It refused to accept legitimate returns on over **$7 million** worth of products. He also claims that Walmart overstated its revenue to "paint an overly-optimistic picture of its current and short-term progress in the catching-up in the e-commerce space." Leticia Miranda, Buzzfeed news' reporter – Mar 15, 2018.

"Huynh claims that a coding error in Walmart's Pangea system failed to process some return and refund orders between September 2015 and at the earliest March 2016 worth about **$7 million**, creating an "inflation" in sales for the period." Kali Hay, WWD.com's reporter.

"The suit, filed this week in Northern California federal court by Tri Huynh, alleges that Walmart has been lowering its standards to boost the size of its online catalogue; mis-categorizing some items listed for sale, which can result in overcharging some merchants who sell through Walmart.com; and failing to process **$7 million in returned items**." Jason Del Rey, Recode's reporter, Mar 15, 2018.

"Among other things, the lawsuit alleges, Walmart placed some marketplace items in the wrong product categories, causing some vendors to pay higher commissions. It also alleges the company's failure to process customer returns worth **$7 million** led to inflated ecommerce sales." Mike O'Brien, Multichannel Merchant's reporter. Mar 15, 2018.

https://www.cnbc.com/video/2018/03/15/walmart-drops-on-whistleblower-lawsuit.html
https://www.cnbc.com/video/2018/03/15/walmart-responds-to-whistleblower-lawsuit.html

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**Walmart's Spoke Person Falsely Claimed That Walmart Investigated Huynh's Allegations and Found Nothing Improper to Discredit Huynh's Allegations.**

153.    The RICO Defendants also attacked Huynh's credibility with the SEC and the public by falsely stated that Walmart investigated into Huynh's complaint but find no wrong doing.  In actuality, this was a lie because Walmart shut downed the investigation into Huynh's allegations of Walmart's fraudulent conduct after it was opened for only three days.

> Walmart spokesman Randy Hargrove said the litigation is based on allegations by a disgruntled former employee, who was let go when the business was restructured. "We take allegations like this seriously and looked into them when they were brought to our attention," he said. "**The investigation found nothing to suggest that the company acted improperly**. Reuters' Reporters: Jonathan Stempel and Nandita Bose - Mar 15, 2018.

Walmart told BuzzFeed News that "this litigation is based on allegations by a disgruntled former associate, who was let go as part of an overall restructuring." "We take allegations like this seriously and looked into them when they were brought to our attention," said the company. "**The investigation found nothing to suggest that the company acted improperly**. We intend to vigorously defend the company against these claims. Leticia Miranda Mar 15, 2018.

"The claims come from "a **disgruntled** former associate," who was let go as part of a broader workforce restructuring, said Greg Hitt, a Walmart spokesman. "We take allegations like this seriously and looked into them when they were brought to our attention," Hitt said. "The investigation found nothing to suggest that the company acted improperly." The Seattle Time on 3/15/18.

"This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," said a Walmart spokesperson in a statement emailed to Investor's Business Daily. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Elaine Low – **Investor's Business Daily** 3/15/18.

"Walmart in a statement to CNBC said that it intends to "vigorously defend" itself against these claims. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," Walmart said. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**." **Lauren Thomas, CNBC**, on 3/15/18.

"Walmart denied Huynh's claims in an email to Courthouse News on Thursday after-noon. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," the company said. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Court House News** --MAT-THEW RENDA, A.E. YOUNG / March 15, 2018

Walmart said Huynh's allegations lack merit. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," spokesman Greg Hitt said in a corporate statement. "We take allegations like this seri-ously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Kevin McCoy - **USA TODAY** 3/15/18.

In a statement to Retail Dive, Walmart said it **followed up with claims** made by Tri Huynh, a former director of business development, and that he was laid off along with many others. "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," according to Walmart's statement. "We take allegations like this **seriously and looked into** them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Daphne Howland – **Retail Dive** 3/16/18.

Randy Hargrove, a spokesperson for Walmart, told Dailymail.com that the allegations come from a **'disgruntled former employee'** who was let go due to the restructuring of the company.  He said an investigation looked into the allegations made by Huynh and found nothing to suggest the company acted **improperly**. By DANIELLE ZOELL-NER FOR **DAILYMAIL.COM** 3/18/18.

Walmart told Talk Business & Politics that Huynh is a disgruntled former employee and the allegations are untrue. The company provided the following statement: "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring. We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to sug-gest that the company acted **improperly**. We intend to vigorously defend the company against these claims." Kim Souza -**Talk Business & Politics** – 3/15/18.

 "This litigation is based on allegations by a **disgruntled** former associate, who was let go as part of an overall restructuring," a Walmart rep tells Recode. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

to vigorously defend the company against these claims." By Jason Del Rey- **Recode/VOX** on 3/15/18.

Walmart spokesman Randy Hargrove said the complaint is "based on allegations by a **disgruntled** former associate" who was let go as part of the company's overall restructuring in early 2017. "We take allegations like this seriously and looked into them when they were brought to our attention," Hargrove said in a statement. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Northwest Arkansas Democrat Gazette** 3/16/18.

 But Walmart is calling foul. A company spokesman said Huynh's allegations are those of "a **disgruntled** former associate, who was let go as part of an overall restructuring." "We take allegations like this seriously and looked into them when they were brought to our attention," the spokesman added. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **WWD.com** Kali Hay on March 15, 2018

Walmart has denied the allegations and said they were made by a "**disgruntled** former associate, who was let go as part of an overall restructuring," according to company spokesperson Randy Hargrove. "We take allegations like this seriously and looked into them when they were brought to our attention," he said in a statement to TheStreet. "The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Thestreet.com** – Cathleen Chen – 3/15/18.

"This litigation is based on allegations by a **disgruntled** former associate who was let go as part of an overall restructuring," said Walmart spokesman Randy Hargrove. "We take allegations like this seriously and looked into them when they were brought to our attention. The investigation found nothing to suggest that the company acted **improperly**. We intend to vigorously defend the company against these claims." **Multichannel Merchant** - Mike O'Brien- 3/15/18.

   **The RICO Defendants Purportedly Asserted Walmart's Zero Loss Causation by Carefully Controlling the Disclosures of Information Stated in Huynh's Complaint to Downplay the Materiality of Huynh's Allegations and Credibility. See Exhibit 48.**

   154.   The RICO Defendants also used Boyle's March 16, 2018[31] articles to support

---

[31] It would be impossible for Boyle to bring together all of these experts (professors, investors, and industry experts) to provide comments on Huynh's complaint only one day after it

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

their purported "Zero Loss" Causation Defense to cover up the fact that the corrective disclo-

sures on Feb 18, 2018 (Walmart announced the collapse of their Q4 FY18 Ecommerce Sales

growth) caused an approximate $80 Bil in Market Cap vaporization. One day after deRubertis

filed Huynh's complaint, the RICO Defendants pulled together a beautiful informercial which

Matthew Boyle published on 3/16/18 to execute Walmart's "Truth on the Market" Offense.

155.    On the one hand, the informercial included testimonies from "industry ex-

perts", "professors", and "hedge fund managers" to downplay the materiality of Huynh's alle-

gations.  While on the other hand, Boyle disseminated the RICO Defendants' portrayal of

Huynh as a disgruntle and dishonest former employee in order to destroy Huynh's credibility

to assert Walmart's "Truth on the Market Defense".

https://www.bloomberg.com/news/articles/2018-03-16/walmart-whistle-blower-suit-re-
news-jitters-about-amazon-battle

https://www.bloomberg.com/news/videos/2018-03-16/walmart-whistle-blower-claims-
retailer-cheated-to-catch-amazon-video (also see Matthew Boyle's 5 minutes interview on
Bloomberg Network).

Business
# Walmart Whistle-Blower Suit Renews Fears About Amazon Battle

By Matthew Boyle  + Follow
March 16, 2018, 2:00 AM PDT  *Updated on March 16, 2018, 7:48 AM PDT*

► Investor reaction to cheating claims was brief though sharp    *No Loss Causation*
► Worries over the retailer's push to boost online business

The **reaction** to a whistle-blower's allegations of improprieties at Walmart Inc.'s online
business **was sharp**. The stock suffered its worst intraday decline in two weeks, showing
just how deep the worries are over the company's growth engine.

The **shares bounced back before the market closed on Thursday and rose on Friday**.

---

was filed with the US District Court of Northern District of California. This circumstantial ev-
idence proved that Boyle coordinated his activities with the other RICO Defendants (Maestro
of the Media, PR agency, and Walmart) to create and disseminate this false informercial to
purportedly assert Walmart's Zero Loss Causation Defense.  However, Huynh believes Boyle
and the other RICO Defendants have in their positions many emails and other form of com-
munication to carry this media plan.  This information will be discoverable during discovery.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

But the abrupt, initial dip was enough to signal once again that, when it comes to the bid to catch up with Amazon.com Inc. in e-commerce, the world's largest retailer has little margin for error.

The claims of cheating leveled Thursday by a former executive "could be an alarm -- **but minor,**" said Sucharita Kodali, an analyst at Forrester Research Inc. "If it turns out that Walmart completely fabricated online numbers and they are way smaller than reported, that would be a problem. **There's no indication of that yet**."

The whistle-blower lawsuit, filed in federal court in San Francisco, claims Walmart issued misleading results. Tri Huynh, a former director of business development, claims he was terminated "under false pretenses" after raising concerns about an "overly aggressive push to show meteoric growth in its e-commerce business by any means possible -- even, ille-gitimate ones." Huynh claims the company failed to process customer returns, mislabeled some products and, basically, painted a rosier picture of its online growth than what was really the case.

### 'Disgruntled Former Associate'

Walmart said it investigated the allegations and found they had no merit. Greg Hitt, a company spokesman, called Huynh "a **disgruntled** former associate."

Over the past three years, Walmart has spent billions to revitalize its once-moribund web unit, expanding delivery options, hiring fresh talent and making acquisitions. While sales soared last year, the spending has taken a toll on profitability. When the company reported slowing online growth and disappointing margins during the critical holiday quarter, in-vestors pummeled the stock. And the business could bleed even more red ink this year, Chief Executive Officer Doug McMillon said last month.

"The marketplace is very receptive to any story that's negative about anyone going up against Amazon," Scott Galloway, a marketing professor at NYU, said on Bloomberg TV.

However, they play out, the allegations are an additional headache for Marc Lore, the head of Walmart's U.S. e-commerce business, who's trying to take the website upscale with new apparel, home decor items and a partnership with the **Lord & Taylor depart-ment store**. Walmart has said it will focus more of its **marketing spending on Walmart.com and less on Jet.com** (to conceal the facts that Walmart artificially inflated its Quarterly Ecommerce Sales growth in FY18 to inflate Walmart's Market Cap by roughly $140 Bil), the urban-focused startup that Lore co-founded in 2014 and sold to Walmart in 2016. That will hamper growth at Jet, which focuses on younger, more afflu-ent customers.

Still, Walmart has maintained its growth forecast for the online unit. One bright spot has been the online grocery business. Walmart's existing fresh-food supply chain gives it an advantage over Amazon, which, despite its acquisition of Whole Foods Market Inc., is still better at selling batteries than bananas.

91

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart said this week that it will expand home delivery of groceries to 100 metro areas this year. It has 1,200 stores where customers can pull up and have their orders brought to their cars.

"Online grocery pickup is going very well for them," said Laura Kennedy, an analyst at Kantar Retail LLC.

The lawsuit, along with slowing growth, could prompt increased scrutiny of all aspects of Walmart's online business. It shows that even a retailing behemoth can experience growing pains.

"They are going **at 100 miles an hour** here," said Mark Stoeckle, CEO of Adams Funds, which has **$2.4 billion** under management and holds Walmart shares. "Was it intentionally deceptive? Or is it that the proper controls were not in place? From our perspective, this could be something. But based on what we know currently, it isn't something right now."

**Boyle's Beautiful but Bogus Zero Loss Causation Chart.[32]**



---

[32] This Chart is "Bogus" because the GDC and Walmart Participants influenced Boyle to disclose the allegations in Huynh's 3/15/18 complaint only generic information regarding Marketplace SKU and financial metrics inflation. Investors would not react to negative disclosures when the information disseminated was lukewarm and frivolous i.e., the deRubertis' **Bogus $7 Mil Figure and generic reference to vague metrics**.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

**Links to other news' outlets publications**

2
https://www.cnbc.com/video/2018/03/15/walmart-drops-on-whistleblower-lawsuit.html

3
https://www.cnbc.com/video/2018/03/15/walmart-responds-to-whistleblower-lawsuit.html

4
https://www.investors.com/news/former-walmart-exec-sues-alleging-illegitimate-e-commerce-efforts/

5

6
https://www.cnbc.com/2018/03/15/walmart-sued-by-former-executive-alleging-unlaw-ful-conduct-in-e-commerce-business.html

7
https://www.ft.com/content/3bf2df42-2893-11e8-b27e-cc62a39d57a0

8
https://www.businessinsider.in/Walmart-dives-after-lawsuit-alleges-company-issued-misleading-e-commerce-results/articleshow/63323305.cms

9

10
https://www.businessinsider.com.au/walmart-stock-price-dives-after-whistleblower-says-company-issued-misleading-e-comerce-results-2018-3

11
https://www.thestreet.com/investing/stocks/walmart-fudged-e-commerce-sales-law-suit-alleges-14525430

12

13
https://www.vox.com/2018/3/15/17126498/walmart-whistleblower-lawsuit-tri-huynh-ecommerce

14
https://www.seattletimes.com/business/retail/whistle-blower-claims-walmart-cheated-in-race-with-amazon/

15

16
https://www.usatoday.com/story/money/2018/03/15/whistleblower-charges-walmart-misled-e-commerce-data-catch-up-race-amazon/429922002/

17
https://nypost.com/2018/03/15/walmart-retaliated-against-whistleblower-suit/

18
https://www.dailymail.co.uk/news/article-5515221/Walmart-whistleblower-sues-com-pany-fired.html

19
https://multichannelmerchant.com/ecommerce/walmart-whistleblower-claims-ecom-merce-results-overstated/

20

21
https://www.courthousenews.com/walmart-faces-whistleblower-suit-over-its-e-com-merce-business/

22
https://vinnews.com/2018/03/15/san-francisco-whistleblower-says-walmart-eyeing-amazon-cheated-on-e-commerce/

23

24
https://www.mhlnews.com/technology-automation/article/22054902/walmart-whistle-blower-claims-cheating-in-race-with-amazon

25
https://www.retaildive.com/news/whistleblower-alleges-walmart-inflated-digital-sales/519302/

26

27
https://talkbusiness.net/2018/03/whistleblower-claims-walmart-inflated-e-commerce-reporting/

28

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

https://www.nwaonline.com/news/2018/mar/16/fired-for-noting-net-sales-fibs-walmart/

https://wwd.com/business-news/legal/fired-walmart-exec-alleges-online-fraud-stemming-from-amazon-rivalry-1202629981/

156.    A month later, Boyle also published an article about slower Walmart's Marketplace seller growth on April 10. See Exhibit 49. Huynh believes the GDC and Walmart participants improperly fed Boyle the misleading statement to get Boyle to use his platform as a business reporter to disseminate false information for two purposes.

157.    First, the article purportedly showed that Walmart focused on seller quality independent of Huynh's allegations (linking back to Boyle's Mar 15 and 16, 2018 articles). See the above for discussions on how the Walmart participants attempted to whitewash Huynh's catalog stuffing allegation.   Second, most importantly, the article purportedly implied a correlation between slower Q4 FY17 Ecommerce sales growth and the pace of Marketplace's seller additions to coverup the fact that Walmart's senior executives artificially inflated Walmart's Ecommerce sales growth in FY18 by improperly accounting for Jet.com FY17 and FY18 sales.  Walmart's Lawyers argued in their motion to dismiss that Boyle was simply expressing his first amendment right in his reporting about an important public issue.  Well, Boyle had the right to exercise his first amendment right as a reporter, however, he had no right to publish misleading information as part of a RICO Enterprise to mislead Walmart's investors, analysts, and the SEC in attempt to whitewash evidence of Walmart's misconducts.  As a matter of fact, this seemed to violate the predicate act related to obstruction of an official proceeding e.g., an SEC Investigation.

Technology
# Walmart Is Getting Picky About Online Marketplace Sellers

By Matthew Boyle + Follow
April 10, 2018, 3:00 AM PDT

https://www.bloomberg.com/news/articles/2018-04-10/walmart-gets-more-selective-with-

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

web-sellers-after-growth-spurt (See Exhibit 49)

The retailer's website --where third-party vendors sell their own wares -- is adding far fewer sellers a month compared with a year ago, according to data tracker Marketplace Pulse. The site, which Walmart created in 2009 to compete with a similar offering from Amazon.com Inc., now includes about 18,000 sellers.

**Seller Shortfall**

The growth of vendors selling on Walmart's marketplace site has slowed in recent months. **The slowdown mirrors a deceleration in growth at Walmart's e-commerce business last quarter, which spooked shareholders** and renewed concerns about the investments Walmart is making to catch up with Amazon, such as its recent expansion of grocery home delivery to 100 markets. It also comes amid a whistle-blower lawsuit from a former marketplace executive. He claims he **was fired after raising** concerns about the company's "overly aggressive push to show meteoric growth in its e-commerce business by any means possible -- even, illegitimate ones."

"Since November they appear to **have reduced the number of sellers** they approve," said Juozas Kaziukenas, founder of Marketplace Pulse. "Most U.S. marketplaces are adding thousands of sellers a day, so Walmart is doing the opposite by trying to manage it."

Walmart's U.S. e-commerce business generated $11.5 billion in revenue last year, and should do about $16 billion this year, but the company doesn't disclose how much of that business comes from the third-party site. It has doubled the number of products available online over the past year to almost 75 million.

"We're focused on **adding the best items our customers** want from the best sellers," said Ravi Jariwala, a spokesman for Walmart. "In any given month, the number of new Marketplace sellers added to our platform may fluctuate as we continuously add new items and offer customers an expanding range of choices."

**David and Kari deRubertis Along with the Other RICO Defendants Exploited the Judicial and OSHA Proceeding to Tarnish Huynh's Credibility**

**The RICO Defendants Acted in Concert to Steal Huynh's 2013 Email to Jeff Bezos to Discredit Huynh's against Walmart**

158.    David and Kari deRubertis improperly obtained Huynh's medical records then secretly produced them to the GDC and Walmart participants under the table at around the same time that the SEC opened an official investigation into the Walmart's matter to tarnish Huynh's reputation by portraying Huynh as mentally ill and had patterns of blowing the whistle.  Of importance, is the Nov 6, 2013 office visit note from Dr.

95
**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Bolte, which stated that Huynh emailed Jeff Bezos regarding potential violation of the law.[33] Interestingly, the WSJ published an article regarding the same topic regarding Amazon's using their seller data to develop competing products. Exhibit 105- Jeff Bezos Letter and the WSJ article.[34]

159.    In Mid-June 2018, Kari deRubertis entered into a service agreement with Epiq eDiscovery solutions Inc. to purportedly process Huynh's personal laptop hard drive to further the Walmart Shareholder Fraud Coverup Enterprise's common purpose. Officially, the deRubertis Law Firm, APC paid Epiq Discovery Solutions, Inc. at least $40,000 for their services to improperly process Huynh's hard drive[35]. See Exhibit 101. However, it is not unreasonable to infer that the Walmart and GDC participants may have paid Dough Kasales and Kathy Von Lindern money on the side to get them to perform improper acts (i.e., mining Huynh's laptop for confidential and privilege information as well as engaging in evidence destruction and concealment etc.).

160.    In early March 2019, Huynh uncovered evidence that led him to conclude that Dough Kasales helped David deRubertis mined Huynh's hard drive to improper obtain privilege attorney-client communications.  Exhibit 102 showed that Kasales search

---

[33] "Tri continues to deal with the situation at work, After I saw him, he contacted an attorney, who helped him draft a letter to Jeff Bezos regarding the treatment he had received at Amazon. In addition, he pointed out several things that violated antitrust laws that he witnessed his coworkers doing. He thinks this is the reason he was "fired" because he said something about this and believes they were retaliating by firing him." David and Kari deRubertis used this information to mine and obtain the Jeff Bezos Letter.

[34] Is it possible that some large competitor collected this information then leaked it to the press to screw Mr. Bezos?

[35] Procurement of services from vendors across interstate line (from Epiq which based out of New York City) satisfied the nexus to interstate commerce required under RICO.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

for terms that related to various attorneys that Huynh communicated with.

161.    For example, on Mar 6, 2019, Huynh emailed Dough Kasales and asked him whether the file name and file path for Huynh's emails with Phillips & Cohen were correct.  Even though, Huynh knew the answered to this question, Huynh wanted to an-swered it on the record.  As predicted, Kasales lied to Huynh that the file names and file paths for the emails were correct for two reasons.  First, an outlook email file name must include the extension .msg.[36]  Therefore, the file path should also include the .msg at the end also. Second, a file path for a child email is not the concatenation of the parent sub-ject line and the child email subject line.  On Mar 12, 2019, Kasales lied to Huynh again when he stated that Epiq eDiscovery Solutions, Inc followed industry e-discovery stand-ard when it extracts metadata from native files.  He specifically states that any number of email file types can be generated when the native files are extract from the .PST file.  This was misleading because for outlook items like emails, an appointments, contacts, and tasks etc. that are stored within the container file .PST etc., their file type is .MSG.  In short, Kasales lied to coverup the facts that he and deRubertis mined Huynh's personal laptop hard drive to extract client-attorney-privilege communications and other private matter.

162.    Recently Huynh also discovered that by using the bogus concatenation strategy above, deRubertis and Kasales exposed Huynh's email communication with his legal counsel at the Blankenship Law Firm (https://www.blankenshiplawfirm.com/) which advise Huynh's regarding his termination from Amazon.  As showed in Exhibit

---

[36] Early on March 1, 2019, Kasales also lied to Huynh that an outlook email had no file exten-sion.  See Exhibit 104.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

106, Kasales concocted file paths that expose the subject line of email communication

with had with his attorney in 2013 which include the file names for Huynh's 2013 email

to Jeff Bezos, CEO of Amazon.com. The evidence below proved that deRubertis shared

the information he mined from Huynh's personal laptop hard drive to the Walmart and

Gibson Dunn Participants because of the Request for Document production and Interrog-

atories they impounded upon Huynh during discovery were based on this information.

See Exhibit 107.

| Data Mining | Walmart's RFDPs and ROGs |
|---|---|
| • Huynh's email to Jeff Bezos in 2013. <br> • Huynh's communications with the Blankenship Law Firm seeking advices regarding the Amazon's Employment matters. | • RFDP # 43: All documents relating to any other legal action Plaintiff has commenced, or threatened to commence, against any employer. <br> • RFDP #44: All documents concerning any other allegation of discrimination Plaintiff has made against any person, including but not limited to other employers. <br> • RFDP # 43: All documents relating to any other legal action Plaintiff has commenced, or threatened to commence, against any employer. <br> • RFDP #50: All documents concerning any allegation of employment-related retaliation Plaintiff has made against any person, including, but not limited to other employers. <br> • RFPD #51: All documents concerning any alleged violations by any previous employer of Plaintiff of the Sarbanes-Oxley Act, the federal securities laws, federal antitrust laws (See Email to Jeff Bezos), or any other law, regulation, or rule. <br> • RFDP #52: All documents concerning any allegations of employment-related ethical violations that Plaintiff has made against any person, including but not limited to other employers. |
| • Huynh's communication with Sean McKessy | • ROG #1: Identify all persons, including, but not limited to, present or former employees or representatives of Walmart, with whom You or anyone on Your behalf has spoken or communicated about Your Complaint, the allegations in the Complaint, or this lawsuit and describe any such discussions or communications. <br> • RFDP #4: All documents concerning or relating to any communications Plaintiff has had with Walmart (including, as defined above, Walmart's employees and agents) since the date of the termination of Plaintiff's employment with Walmart |

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | • RFDP #47: All documents relating to statements obtained by Plaintiff or anyone acting on Plaintiff's behalf from any witnesses and/or from any person with knowledge of relevant facts regarding allegations of the Complaint. |
|---|---|

163.    Even though David deRubertis had already shared the 2013 Jeff Bezos email and Huynh's research note regarding potential antitrust violation to the Gibson Dunn and Walmart participants sometime around August 2018 time frame (The SEC began to investigate into the Walmart's Ecommerce Matter around this time frame) , The Gibson Dunn, Walmart, and Orrick participants couldn't use these documents with the SEC to discredit Huynh's allegations because these documents were not obtained through legal mean..  Thus, deRubertis became desperate to obtain these documents so they could be used in response to the SEC investigation.  Starting in late September 2018 deRubertis began a campaign of fear and intimidation to force Huynh to allow him to obtain Huynh's personnel files from Amazon. Firm to obtain Huynh's personnel files from Amazon.  During late September 2018, David deRubertis used interstate emails on at least 7 different occasions: Sept 25, 2018 @10:27 AM and @ 5:37 PM, Sept 27, 2018 @ 5:27 PM, Sept 28, 2018 @ 9:04 AM, on Sept 28, 2018 @ 2:23 PM, on Oct 8, 2018 @ 2:18 PM, and on Oct 10, 2018 @ 7:59 PM to threaten and intimidate Huynh into given access to Huynh's Amazon personnel file. See Exhibit 18.  Huynh refused to give into deRubertis intimidations and Huynh eventually fire David deRubertis as his lawyer in Nov 2018.

164.    Since deRubertis couldn't legally obtain the Jeff Bezos email and other related Amazon personnel file, the Walmart and Gibson Dunn participants eventually stole this information from Huynh when Huynh returned the Walmart's information to

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart per the Asset Return Agreement and Addendum.  Exhibit 109 at 4-5, specifically stated that any documents that Huynh inadvertently returned to Walmart that are not Walmart's documents they must not be viewed them and must promptly returned them to Huynh.  However, during Huynh's deposition, Ms. Brass produced the Jeff Bezos email and other Amazon's related documents that she stole from Huynh's personal laptop.  When Huynh asked Ms. Brass why did she stole Huynh's personal property? Her answer was simply sued me. See Exhibit 110.  Brass used this stolen information to ask Huynh leading questions to capture Huynh's answers out of context marginalize Huynh's credibility with the SEC.  She used this information to marginalize Huynh's credibility regarding Huynh's allegations that Walmart engaged in shareholder fraud conducts.

**Payne & Fears, deRubertis, the Gibson Dunn and Walmart Participants Discredited Huynh's Allegations of Walmart's Illegal Conducts with the SEC by Submitted Fabricated Evidence to OSHA**

165.    David deRubertis forwarded Huynh Walmart's OSHA position statement on Sept 22, 2017. See Exhibit 111. In his email, deRubertis told Huynh that he had no case against Walmart because Walmart selected Huynh for termination weeks before his Dec 20, 2016 complaint to Walmart's Global Ethics.  deRubertis based his statement on the purported Nov 30, 2016 preliminary RIF which purportedly proved that Huynh was selected for termination due to his poor performance and Walmart's RIF.  This implied that Huynh was not a genuine whistleblower (not credible) because Huynh blew the whistle to protect his job.  The analysis below that the Walmart fabricated the Nov 30, 2016 email and RIF excel list based on the evidence Huynh provided to deRubertis to support Huynh's SOX case against Walmart.

166.    Column 3 of the excel spreadsheet in Exhibit 112, showed that Terri M.

.
**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Shaw (a lawyer with Payne & Fears – See Exhibit 113) led the creation of emails and excel spreadsheets along with Seth Beal and other Walmart's employees as well as legal documents.  One of these emails and spreadsheet were the Fabricated Nov 30 and Marketplace RIF List. Ms. Shaw (based out of California – See Exhibit 113) transmitted these documents via emails to Mary Carter Martin (Walmart's legal counsel based out of Bentonville, Arkansas – See Exhibit 113) and other Walmart's employees.  via emails.  This proved Ms. Terri M. Shaw (by Default Payne & Fears LLP) committed wire fraud because she sent emails across state lines in furtherance of the Walmart's Shareholder Coverup Enterprise.  Mr. Fears wrote and submitted the fabricated documents to OSHA in early Sept 2017 to obstruct OSHA from its investigation into Huynh's SOX complaint.  See Exhibit 114. Additionally, Mr. Fears, the Gibson Dunn and the Walmart Participants knew or should have known that Huynh would eventually share Walmart's OSHA position statement to his Sean McKessy at Phillips & Cohen (Exhibit 115 showed that Huynh indeed emailed the document to McKessy on Nov 9, 2017) and Sean McKessy would eventually email the document to the SEC.  Indeed, McKessy did share the document to the SEC on Sept 19, 2018 (Christopher Reynold, Scott Mascianica, and Jane Norberg).  See Exhibit 115. Thus, David deRubertis and Daniel Fears committed wire fraud in furtherance of the Enterprise's common objective i.e., they tried to tarnish Huynh's credibility with the SEC by purportedly claim that Huynh's termination was not a contributing factor to his protected conducts.

167.    Based on the evidence in Huynh's possession[37], Huynh showed that Payne

---

[37] Additionally, Huynh believes there may be hundreds of emails in these RICO Defendants' possession which would be discoverable during discovery. This evidence would further prove that Payne & Fears committed much more than the two predicate acts required under RICO.

101

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

and Fears, the Walmart and Gibson Dunn participants acted in concert to submit fabricate

documents knowing that these documents would eventually land in the SEC's desks to

discredit Huynh's allegations that Walmart made misleading statements of material facts

to Walmart's shareholders regarding the total number of SKUs on Walmart Marketplace.

Therefore, Payne & Fears committed much more than the two predicate acts as well as

attempted to obstruct an SEC investigation which is a predicate act under 18 U.S.C. §

1512(c)(2).

### David and Kari deRubertis, Kasales, and the Gibson Dunn Participants Illegal Obtained Huynh's Psychiatrist Records to Produce to the SEC to Portray Huynh as Mentally to Discredit His Allegations

168.    As early as Nov 2017, David and Kari deRubertis began a fraudulent

campaign to obtain Huynh's medical and psychiatrist records. See the discussion below.

They faked Huynh's signatures and used a generic non-HIPPA compliance to obtain

these records without Huynh's knowledge.  Huynh only came to know of the existence of

these records only after Huynh fired the deRubertis Law Firm.

169.    Most shockingly for Huynh was the fact that David and Kari deRubertis

with the help of Kasales secretly produce Huynh's psychiatrist record under the table to

the Gibson Dunn and Walmart Participants.  Even though, the deRubertis Law Firm paid

at least $40,000 to Epig eDiscovery Solutions, Inc. to process Huynh's data for produc-

tion to Walmart in compliance to the Court's protective order i.e., the production docu-

ments from ESI files must be produce in TIFF format with extracted text and stipulated

metadata fields. See Exhibit 116.  However, on Sept 18, 2018 at 8:22 AM, Kari deRuber-

tis asked Kasales to provide her with the last bate number from documents Kasales pre-

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

pared for production to Walmart so she could manually stamp other documents to pro-

duce separately to Walmart.   Several hours later, Kasales[38] emailed Kari deRubertis the

last bate number (HUYNH0014158).  Kari deRubertis used this number and manual bate

stamps 264 pages of documents (HUYNH0014159- HUYNH0014422) without the "Con-

fidentiality" Designation.  On that same day, Kari deRubertis produced these documents

(under the table) the Rachel Brass via an unsecure link. These documents didn't have the

confidentiality designation and all the requirements stated in the ESI protocol order.  See

Exhibit X.  45 out of the 264 pages were Huynh's psychiatrist medical records.  David

and Kari deRubertis leaked these records to Walmart without the confidentiality designa-

tion in the middle of an SEC investigation to Gibson Dunn, Walmart, and Orrick partici-

pants.  Huynh believes the Orrick participants worked tightly with Walmart and GDC

transmitted these documents to the SEC (across interstate line, California to Dallas,

Texas, and potentially Washington D.C. a violation of wire fraud) to diminish Huynh's

credibility as a whistleblower.  These co-conspirators used this information to purport-

edly portray Huynh as mentally ill and unstable to be a credible whistleblower.

170.     In short, David and Kari deRubertis, Kasales (Epiq eDiscovery Solutions,

Inc.), the Gibson Dunn participants, and Orrick committed wire fraud and obstruction of

an SEC (violation of 18 U.S.C. § 1512(c)(2)) proceeding in furtherance of the Walmart

Shareholder Fraud Coverup Enterprise's Fraudulent Coverup Scheme by using the illegal

obtained documents.

---

[38] It's worth to mention that Kasales was based out of Seattle during this time so email ex-
changes between Kasales and Kari deRubertis cross state line in furtherance of the RICO En-
terprise's fraudulent coverup scheme resulted in violation of the wire fraud statute.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**The SEC Opened an Investigative File into the Walmart's Ecommerce Matter In Mid-2018 and Start to Investigate Walmart in Early July**

171.    After Huynh submitted his supplemental submission to the SEC in Mid-May 2018 (Exhibit 7), the SEC officially opened an official investigative file into Walmart's misconducts.  Subsequently, the SEC began their investigation in Mid-July 2018.  By September of 2018, the Gibson Dunn Participants (most likely Boutros and other Senior Partners from GDC Securities Litigation[39] and SEC Enforcement Group[40]) and Walmart's Senior Leaders started to prepare and respond to the investigation. Additionally, looking back it made sense because in Mid-September, although Huynh only supplied deRubertis with the names of 11 witnesses that may have information regarding Huynh's SOX complaint against Walmart, deRubertis emailed Huynh in Sept 18, 2018 and told Huynh he would add more witness to the list because the more names the better. See Exhibit 117 at 4. On Sept 19, 2018, David deRubertis[41] caused Kari deRubertis to email Brass, Boutros, Stewart (Washington DC base) and Scalia (Washington DC based) the GO 71 initial discovery disclosure.  This included a list of 60 witnesses (most of whom David deRubertis extracted from Huynh's SEC submissions). The witnesses had nothing to do with Huynh's SOX claims against Walmart.  Huynh strongly believe that the only reason David and Kari deRubertis leaked this confidential information to

_____

[39] https://www.gibsondunn.com/practice/securities-litigation/
[40] https://www.gibsondunn.com/practice/securities-enforcement/
[41] David and Kari deRubertis violated wire fraud because they used interstate email (California to Washington DC. Additionally, deRubertis knew that this information will also be emailed to Bentonville, AR by Boutros to Walmart) to further the RICO Enterprise's common goal. Additionally, by leaking the list of witness to the other RICO Defendants, deRubertis knew they will used this information to obstruct the investigation. This is a violation of XXXX.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart, Gibson Dunn and Orrick, Herrington & Sutcliffe LLP were to allow these co-conspirators to use them to prepare witnesses for the SEC investigation.  See Exhibit 117.

172.    Furthermore, as discussed in paragraph 156, in Sept 2018, David deRubertis emailed Huynh across interstate line between Washington and California at least seven time in an attempt to deceive and intimidate Huynh to sign the personnel record release form so he could obtain the Jeff Bezos letter so he could email these documents to the other RICO Defendants to diminish Huynh's credibility in order to defeat Element #1 of an 10b-5 SEC action against Walmart. See paragraph the discussion above.  Therefore, deRubertis committed at least seven instances of wire fraud in furtherance of the RICO Enterprise's common purpose.

173.    One of the key questions is why did Walmart and Boutros decide to hire Orrick, Herrington & Sutcliffe LLP Lawyers to interact with the SEC attorney during the investigation into the Walmart matter when Gibson Dunn has powerful Securities Litigation and SEC Enforcement Teams?[42]

174.    Huynh believes Walmart and Boutros (Walmart's most trusted advisor) brought in Orrick (Mr. Kenneth Herzinger who was named in the SEC April 2019 non-enforcement letter and other Orrick's lawyers) to drive the front-end interactions with the SEC Enforcement Attorneys to purportedly show the appearance of a Chinese Wall between Huynh's SEC case and Huynh's SOX claim against Walmart. This was deployed

---

[42] This didn't make business sense because why would GDC give their lunch to Orrick.  It's like Geico Insurance who sold both Auto and Home Insurance decided to refer their customers to buy home insurance from progressive insurance.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

to cover up the facts that David deRubertis was stealing confidential/non-public information that Huynh submitted to the SEC to help the Walmart Shareholder Fraud Coverup Enterprise planned and executed a fraudulent and nefarious scheme to get the non-enforcement letter from the SEC.

175.    Based on the discussion above, Huynh believes Walmart hired Orrick, Herrington & Sutcliffe LLP sometime in August 2018 (after the SEC officially an investigation into the Walmart's Ecommerce matter) and retained them up until the SEC issued the non-enforcement letter to Walmart in early April 2019.  As discussed in paragraph 80 above, Gibson Dunn expended a lot of effort and resources to coordinate and plan the activities of teams that scattered across the US to interact with the SEC enforcement attorneys during an SEC investigation.  Since Mr. Kenneth Herzinger stationed out of the Bay Area California, he had to leverage the instruments of interstate commerce such as Wire, Internet, Mail, and Phone etc. to communicate and coordinate the activities among may participants that scattered across the U.S. i.e., Bentonville, Dallas, Texas where James Etri, Scott Mascianica, and Christopher Reynolds were stationed, as well as Washington D.C. where the SEC leadership team located.

176.    In short, to execute the Walmart Shareholder Fraud Coverup Scheme (to defeat Element #1 of the SEC Section 10b-5 prosecution plan), Huynh strongly believes Orrick, Herrington & Sutcliffe LLP must have in their passion hundreds if not thousands of email communication to coordinate the activities of the other RICO Defendants and their Co-conspirators.  Therefore, Huynh estimated Orrick, Herrington & Sutcliffe LLP perpetrated at least hundreds of instances wire fraud to improperly influenced the SEC to issue the non-enforcement letter the SEC to Walmart in April 2019.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

177.    Huynh planned to submit a Request for Production to the Defendants (Orrick, Walmart, and GDC Defendants) shortly after the Case Management Conference call to request for all communications and documents that these Defendants shared with the SEC as well as received from the SEC for the time period where the SEC started to interact with these Defendants.

**Huynh's SOX Case Against Walmart Was Open and Shut Based on the Evidence Huynh Provide to David deRubertis in 2017 Along**

178.    To prevail in a SOX retaliation claim, a Plaintiff must prove his prima facie case by preponderance of evidence.

> To make prima facie showing, the plaintiff must show that (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer knew, actually or constructively, of the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the unfavorable action. Id. at 814 (citing Van Asdale v. Int'l Game Tech., 577 F.3d 989, 996 (9th Cir. 2009)); see also 29 C.F.R. § 1980.104(e)(2)(i)–(iv). If the plaintiff makes this showing, the burden shifts to the employer to demonstrate "by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." Van Asdale, 577 F.3d at 996 (emphasis added).

179.    Between March and Nov 2017, Huynh provided David deRubertis with overwhelming evidence and legal analyses to prove that Walmart was liable for terminating Huynh's employment in violation of SOX. See Exhibit 50, 51, 52, and 53. The table below proved that Huynh overwhelmingly met his burden of production to prove his prima facie case by preponderance of evidence and rebuff Walmart's burden of production to prove their affirmative defense by clear and convincing evidence.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**Huynh's SOX Prima Facie Case Showing**

| Legal Element | Huynh's Burden of Production by Preponderance of Evidence | Walmart's Burden of Production to Rebut |
|---|---|---|
| Protected Activities | Huynh complained about seller commission overbilling in early Oct 2016. Walmart investigate Huynh's complaint on Oct 14. Exhibit 50 at 3 and 5. Exhibit 52; | Walmart had no evidence to rebut the fact that Huynh engaged in protected activity I early Oct 2016. |
| | Huynh complained about seller commission overcharging and shareholder fraud in Dec 2016 and Jan 2017. See Exhibit 50 at 3,5, 6-7, Exhibit 52. and 5. | Walmart had no evidence to rebut the presume fact Huynh engaged in protected conduct in Dec 2016 and Jan 2017. |
| Employer's Knew of protected activities | Beal knew about Huynh's early Oct 2016 complaint. Exhibit 50 at 3 and 5. Exhibit 52. Walmart's executives knew about Huynh's complaint in Dec 2016 and Jan 2017. Exhibit 50. | Walmart had no evidence to rebut the presume fact that Walmart's executives knew about Huynh's protected conduct. |
| Unfavorable Personnel Action | Seth Beal ordered HR to investigate the purported sexual harassment allegations against Huynh on Oct 18, 2016, roughly two weeks after Huynh's Oct protected activities See Exhibit 52.<br><br>Beal issued Huynh written warning base on HR purported investigation in Mid-Nov 2016 then on 12/1/16. Exhibit 52.<br><br>Beal threatened to put Huynh on a PIP for objecting to the written warning. See Exhibit 52. | Walmart had no evidence to rebut the presume fact that Walmart's executives took unfavorable personnel action against Huynh on: Oct 18, 2016 (order the investigation). Mid-Nov 2016 (issued a bogus written warning). Dec 1, 2016 (threatened to put Huynh on a Performance Improvement Plan. |
| | A few days after Huynh raised his complaint to Marc Lore, Walmart terminated Huynh's employment, 14 days before everyone. Exhibit 50 at 3 and 5. | Walmart had no evidence to rebut the presume fact that Walmart terminated Huynh's employment in early Jan 2107. |
| Contributing Factor to Between protected activity and retaliation | Beal ordered HR to investigate Huynh on Oct 18, issued a written warning in Mid-Nov, and threatened to put Huynh on a PIP on Dec 1. See Exhibit 52.<br><br>Walmart terminated Huynh in early January shortly after he raised his complaint to Marc Lore. Exhibit 50 at 3 and | Walmart had no evidence to rebut the presume fact that Huynh's protected activities were a contributing factor to the unfavorable personnel action due to short temporal proximity. |

108

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

| | | |
|---|---|---|
| | 5. Walmart's shifting explanation for Huynh's termination.<br><br>Terminated Huynh 14 days before the RIF.<br><br>Note the above evidence is not exhaustive but rather illustrative purpose to give the context of why the RICO Defendants engaged in evidence destruction, fabrication, and suppression etc. during the course of the Huynh v. Walmart Stores between 2018 and 2020. | |

**Walmart's Burden of Production by Clear and Convincing Evidence**

| Legal Element | Walmart's Burden of Production | Huynh's Burden of Production to Rebut |
|---|---|---|
| Walmart's Affirmative Defense | Walmart terminated Huynh's Employment because of role elimination and his poor performance. | Huynh's role was not eliminated. It was given to Huynh's peer. See Exhibit 51 at 8.<br><br>Huynh was terminated 14 days before everyone. Exhibit 50 at 3 and5.<br><br>Huynh's peer who had a few or no direct report were retained after the RIF versus Huynh who managed a team of 40 people i.e., Walmart treated Huynh's differently than non-whistleblowers. Exhibit. Exhibit 51 at 5 to 7.<br><br>Walmart provided shifting explanation for Huynh's termination. |

180.    The evidence discussed above proved that Huynh came forward with overwhelming evidence to support his SOX prima facie case showing while Walmart produced little evidence to rebut Huynh's evidence which shifted the burden of production to Walmart to prove their affirmative defense.  However, Huynh also produced overwhelming rebuttal evidence that proved Walmart failed to meet its evidence of production by clear and convincing evidence to support its affirmative defense.  Therefore, as a matter .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

of law Walmart is liable for retaliatory termination against Huynh in violation of SOX.

Additionally, since Huynh's California wrongful termination in violation of public claim

is a derivative of Huynh's SOX claim, Walmart is also liable for this claim as a matter of

law. It is important to mention that the evidence above is what Huynh gave David deRu-

bertis in 2017.  Later on Huynh was also able to obtain additional material facts to sup-

port his prima facie case showing as well as defeating Walmart's affirmative defense.

**Huynh's Lawsuit Against Walmart Is a Constitutional Protected Activities and Estimated to Worth at Least $10 Million Dollars.**

181.    Huynh's lawsuit against Walmart Inc. in the case Huynh v. Wal-Mart

Stores, Inc. et al. Case 3:18-cv-01631-VC is a clearly established constitutional property

right.

"A plaintiff has a private property right in his claim of action-i.e., in the right to sue-and in his lawsuit once filed. Indeed, the U.S. Supreme Court has "squarely" held that even an unadjudicated cause of action is constitutional property (Thomas Mer-rill, The Landscape of Constitutional Property, 86 VA. L. REV. 885, 913 (2000)).  In Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982), the Su-preme Court considered it "settled" that a cause of action is a species of property"), basing its assertion on Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950). Logan further noted that a "tort or discrimination action" is "a property in-terest".

182.    Based on comparable case analysis Huynh estimate his lawsuit to be be-

tween $6 Mil to $16 Mil.  See Exhibit 54 for comparable case analyses.   Additionally, by

getting Huynh's civil case threw out of Court the Walmart Shareholder Coverup Enter-

prise also strengthened their assertions that the SEC investigated and properly issued

Walmart a get out of jail free card (i.e., a non-enforcement letter).  The critical question

Huynh needed to answer was how did the RICO Defendants and their Co-conspirators

moved Huynh's case from a "Open & Shut" to a "Kick Out of Court" position?

.

110

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

183.   Given the fact that Huynh produced undisputed evidence that exceeded his burden of production to prove by preponderance of evidence the first three prongs of his SOX prima facie case, the Gibson Dunn and the Walmart participants developed a fraudulent and nefarious two-step scheme and recruited other RICO Defendants to commit predicate acts to get Huynh's case kicked out of Court.



184.   First, they planned to attack prong #4 of Huynh's prima facie case i.e., they purportedly showed that Huynh failed to meet his burden of production to prove that his protected activity was a contributing factor to the unfavorable personnel actions Walmart took against him (because Walmart selected Huynh for termination before the Dec 2016 complaint and Huynh didn't engage in protected activity in early October 2016)

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

185.    Second, RICO Defendants purportedly proved that even if Huynh was able to prove his prima facie case, Walmart was not liable for Huynh's termination in violation of SOX claim because Walmart meet its burden of production to prove by clear and convincing evidence that they would have terminate Huynh's employment in the absence of his protected activity and Walmart purportedly claimed that Huynh failed to meet his burden of product to rebut the presumed fact that Walmart had legitimate business reasons to terminate Huynh's employment i.e., due to the Jan 2017 RIF.

186.    The discussions below showed how the Walmart and Gibson Dunn defendants, Seth Beal, Valerie Ricetti, Melvenia Ha, David and Kari deRubertis, Douglas Kasales, Kathy Von Lindern, Renee Quezada, Magistrate Judge Sallie Kim, and District Judge Vince Chhabria acted in concert to execute the two-step strategy discussed above.

**Step #1: The RICO Defendants and Their Co-Conspirators Engaged in Evidence Destruction, Fabrication, Concealment, Suppression, and Submitted False Declarations to Purportedly Prove That Huynh Didn't Engaged in Protected Activity on Oct 4, 2016.**

187.    To execute Step #1 of their fraudulent scheme the RICO Defendants executed a two-pronged approach to purportedly proved that Huynh didn't engage in protected activity in early Oct 2016.  First, at the direction of the Walmart and Gibson Dunn participants, David and Kari deRubertis employed Epiq eDiscovery Solutions Inc. (through the actions of their employees Kathy Von Linder and Douglas Kasales) to destroy documentary evidence of Huynh's meeting with Beal of Oct 4, Oct 18, and Dec 1, 2018.  To prove that Epiq eDiscovery Solutions, Inc and Lighthouse Document Technologies, Inc. destroy and fabricate document evidence, Huynh answered two key questions: #1) Did Epiq eDiscovery Solutions, Inc and Lighthouse Document Technologies, Inc. processed the outlook email and calendar items in the Huynh v. Walmart Stores Inc. et.

112

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

al. Litigation using industry-standard ESI processing as purportedly claimed by Douglas

Kasales and Renee Quezada (Case 3:18-cv-01631-VC Dkt. 120) and #2) What kind of

evidence Huynh have to prove that these two ESI vendors engaged in evidence destruc-

tion and fabrication by bypassing industry ESI processing standard instructed by ESI

technology platform like Relativity and Nuix.

**Epiq eDiscovery Solutions, Inc. and Lighthouse Document Technologies Inc. Didn't Follow Industry Standard Process to Process Evidence in the Huynh v. Walmart Stores, Inc Litigation.**

**Description of the Standard ESI Extraction Process Implemented by Technologies Platform Such as Relativity and Nuix.**

188.     Below is a summary of a process a typical ESI service provider process

and extract meta data from ESI evidence using leading technology platforms such as Rel-

ativity and Nuix.

189.     Outlook is one of the most popular desktop email clients in the Market. It

is being used by small and large companies, government agencies as well as individual

consumers. Microsoft created a .PST (Personal Storage Table) file type (i.e., a container

file type) to store hundreds and thousands of Outlook items for a typical user such as Out-

look emails, appointments, contacts, and tasks etc. Each of these outlook items is stored

in a .MSG file format with the file extension .msg.  See Exhibit 118 for the file types that

have the .msg extension.  For example, when you drag-and-drop an email from Outlook

to a folder on your computer, the email message is converted into an MSG file. This file

stores the email text, but it also stores the email metadata – things like who sent the

email, who received it and when, etc. And it also stores links and attachments from the

email.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

190.    PSTs is a great way to organize, store, and share batches of email and calendar entries to provide to your ESI service providers for processing an production. For example, you can put all your emails from last year into a PST file, and 'archive' that PST. And you can have multiple PSTs (e.g., one for each year of the last decade) open at the same time, as well as your main, active PST. For eDiscovery, you can even load emails from different custodians into a single PST file. And you can store these PSTs on local hard drives, a USB drive, or in the Cloud.

191.    To process outlook items stored in a PST file, Relativity begins to harvest individual MSG files from the PST Container in batches and processes them. If an MSG has attachments, Relativity harvests files during discovery and places them in the queue to be discovered individually. Throughout this process, the family relationship is maintained. The following graphic depicts what happens behind the scenes when the system copies native files to the repository during processing. Specifically, this shows you how the system handles the data source and EDDS repository across all phases of processing when that data source isn't considered permanent. A file extension of .msg is assigned by



.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

the processing engine after it reads the header information from the original outlook item file.[43]  In short, if an ESI service provider processed Outlook emails and appointments used the process discussed above then the extension of these items should have "msg" extension not "Blank" and/or "eMail".  See Exhibit 119.

**Epiq eDiscovery Solutions, Inc. Bypassed Industry Accepted ESI Extraction Process Huynh's Evidence to Destroy and Mutilate Huynh's Emails and Appointments.**

192.    In his, March 1, 2019 email to Huynh, Kasales lied and told him that Outlook emails do not have a file extension.  See Exhibit 55. Kasales again lied to Huynh in his March 13, 2019 email that the file type for outlook emails is "Microsoft Outlook Notes" and they have no file extension.  Exhibit 56. In his email to Kari and David deRubertis he showed that he processed 803 emails (with the filed type "Microsoft Outlook Note" with no extension) and 2,520 Outlook Microsoft Appoint with no extension. Exhibit 57.  Even though both Kari and David caused Von Lindern and Kasales to generate these manipulated files (Epiq eDiscovery Solutions, Inc through their employees not only Kasales and Lindern but other employees that worked on this project) they eventually produced them to the Walmart and Gibson Dunn participants in late September 2018. Since for these group of people to perpetrate the evidence fabrication, destruction, mutilation and concealment etc. they must use the instrument of interstate commerce i.e., wire, phone and internet transmission etc.  it is important to point out that Lighthouse Document Technologies, Inc. is based out of Seattle, WA. Kasales also based out of WA. WA, Epiq eDiscovery is based of New York City, Kari and David deRubertis, Brass, Boutros

---

[43] Renaming a file extension has little effect on how Relativity identifies the file type. When processing a file type, Relativity looks at the actual file properties, such as digital signature, regardless of the named extension.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

and Lindern are based out California.  Stewart and Wilson are based out of Washington

D.C.  Thus, when they used emails, phone, and other mean of Internet transmission e.g.,

downloading documents that were stored in remote servers etc. in furtherance of the En-

terprise's objective they violated wire fraud.  Additionally, each instance of email usage

is considered to be a predicate act.

**Lighthouse Document Technologies, Inc. Bypassed Industry Accepted ESI Processing Standard Walmart's Outlook Emails and Calendar Entries for Production to Huynh.**

193.    Renee Quezada falsely declared in ECF-120 in Huynh v. Walmart Stores,

Inc. Case 3:18-cv-01631-VC that she and others at Lighthouse Document Technologies,

Inc process Walmart's emails and calendar items using industry ESI processing standard.

The evidence below proved that she lied because the Walmart's emails and appointments

that Lighthouse Document Technologies, Inc processed for the Huynh v. Walmart Stores

### All the Emails and Calendars Processed by Lighthouse Had Improper Extensions

| September 2018 Productions | | |
|---|---|---|
| File Type | # of Items | File Extension |
| **Calendar Entry** | **12** | **(blank)** |
| Document | 35 | docx |
| Document | 197 | pdf |
| **Email** | **443** | **eMail** |
| Image | 3 | JPG |
| Image | 2 | png |
| Presentation | 19 | pptx |
| Spreadsheet | 27 | XLSX |
| (blank) | 21 | (blank) |

| February 2019 Productions | | |
|---|---|---|
| Document Type | # of Items | File Extension |
| **Calendar Entry** | **12** | **(blank)** |
| Document | 47 | docx |
| Document | 79 | pdf |
| **Email** | **297** | **eMail** |
| Image | 7 | jpg |
| Presentation | 4 | pptx |
| Spreadsheet | 44 | xlsx |

| April 2019 Productions | | |
|---|---|---|
| Document Type | # of Items | File Extension |
| **Calendar Entry** | **11** | **(blank)** |
| Document | 17 | docx |
| Document | 36 | pdf |
| **Email** | **153** | **eMail** |
| Image | 6 | jpg |
| Image | 2 | png |
| Presentation | 19 | pptx |
| Spreadsheet | 2 | xlsb |
| Spreadsheet | 14 | XLSX |
| Spreadsheet | 6 | (blank) |
| Unrecognised | 1 | txt |

| June 2019 Productions | | |
|---|---|---|
| Document Type | # of Items | File Extension |
| **Calendar Entry** | **1** | **(blank)** |
| Document | 6 | docx |
| Document | 18 | PDF |
| Drawing | 1 | emf |
| Drawing | 1 | vsd |
| **Email** | **92** | **eMail** |
| Image | 5 | jpeg |
| Multimedia | 1 | mp4 |
| Presentation | 19 | pptx |
| Spreadsheet | 1 | xlsb |
| Spreadsheet | 18 | xlsx |

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

litigation had an "eMail" and blank extensions respectively. There is no such eMail extension out there in the real world for email files including Microsoft Outlook emails. The closest email extension to the purported "eMail" extension is the "eml" extension. See https://fileinfo.com/extension/eml. All the Walmart's Emails and Calendars Lighthouse Document Technologies, Inc. processed for Walmart between Sept 2018 to June 2019 had the improper extensions "eMail" and "Blank" respectively.  This proved these emails and calendars items didn't went through the industry standard processing methodology discussed above.  It these items had went through the proper ESI extraction process Walmart's Outlook emails and calendar items should have an "msg" extension.

### Epiq eDiscovery Solutions, Inc. Through Their Employees (Douglas Kasales and Kathy Von Lindern) Destroyed Evidence of Huynh's Oct 4, 8, and Dec 1, 2016 Meetings with Seth Beal.

194.    Huynh emailed David Dobson, Epiq eDiscovery Solutions, Inc., on Feb 13, 2020 to inform him that his employees (Kasales and Von Lindern) intentionally destroyed documentary evidence of Huynh's Oct 4, Oct 18, and Dec 1, 2016. See the summary table in Exhibit 58 at 5.  showed that Epiq eDiscovery Solutions, Inc. destroyed the Subject, Location, and the From Fields from Huynh's Oct 4, 8 and Dec 1, 2016 outlook meetings with Seth Beal.  See Exhibit 58 at page 6 to 8.

195.    Additionally, Huynh also brought up the fact that Kasales and Von Lindern used the UTC versus PST time zone when the ESI Protocol Order ECF-36 specifically dictated that the documents should be processed in the PST time zone.[44]  Huynh

---

[44] Kasales lied to Huynh when he asked Kasales why did he use the UTC versus the PST time zone to process Huynh's evidence when the ESI Protocol Order specifically stated the PST time zone. This was a bogus excuse because on Sept 18, 2018 Kari deRubertis emailed Kasales and specifically instructed him to follow the ESI Protocol not the June 2018 designed

117

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

provided specific examples on how this had prejudiced Huynh from defending himself against Walmart's motion for summary judgment. Exhibit 58 at 11 to 22.

196.    In addition to the email to Dobson above, Huynh also emailed Kasales on 9/25/2019, why the email Huynh sent to Marc Lore was so jumbled? Kasales lied by as-serting some technical jargons to cover up the facts that he colluded with Kari and David deRubertis to mutilate Huynh's emails so he couldn't use it as evidence to oppose Walmart's motion summary judgement.  Kasales also admitted that all the emails he pro-cessed may have appeared jumble up. See Exhibit 59.

### Lighthouse Document Technologies, Inc. Through Their Employees (Renee Kasales) Manufactured Evidence to Purportedly Prove That Huynh Didn't Engage In Protected Activity On Oct 4, 2016.

197.    Support Walmart's motion for summary judgement (ECF 113), Rachel Brass field exhibit 66 (in Case 3:18-cv-01631-VC- ECF 116-4; See Exhibit 61. which is Melvenia Ha's purported interview note with Huynh on Oct 17, 2016.  This note was fab-ricated by the Walmart and Gibson Dunn Defendants then corruptly influenced Renee Quezada to produce this manufactured note.  Although, Rachel Brass caused Melvenia Ha to declare under the oath that she interviewed Huynh on Oct 17, 2018 to support the manufacture evidence. See Ha's declaration (ECF 116) at paragraph 10[45].  However, the evidence in Exhibit 60 clearly showed that Ha emailed Huynh October 18, 2016 at 11:22 AM to interview Huynh for regarding a "Confidential" matter. Huynh replied to Ha and told her he could meet her between 3:00 PM to 4:00 PM.  Subsequently, Ha interviewed

---

manual.

[45] Seth Beal also submitted false declaration (Case 3:18-cv-01631-VC ECF 171-1 at para-graph 35) that Ha completed her investigation in Mid-Oct 2018. As discussed above the Oct 18 final HR investigation report was bogus.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Huynh at 3:30 PM that same day.  Additionally, Ha's purported Oct 17, 2016 interview note contradict with Exhibit 67 in Case 3:18-cv-01631-VC. (Ha's purported Oct 18, 2016 completed HR investigation report) filed by Rachel Brass in support of Walmart's motion for summary judgement.  Exhibit 61 at 2 to 6 is Ha's purported HR Oct 18, 2016 final investigation report.  In the report, Ha wrote that she interviewed Huynh on Oct 18, 2016 not Oct 17, 2016.  Therefore, not only she lied about the Oct 17 interview note but she also lied about the authenticity of the  Oct 18, 2016 HR investigation report because it was impossible for her to have completed that report when she didn't complete her interview with Huynh until 4:00 PM.  The way Corporate America works is that even if Ha did in fact completed the report late at night on Oct 18 (not true), she had to run up the chain of command for feedbacks and approval before she could issue the complete report to Seth Beal.

198.    In short, even though the documents above were manufactured by the Walmart and Gibson Dunn defendants.  However, Lighthouse Document Technologies, Inc. (Renee Quezada and other employees) knew that these documents were fake but they processed them any way by bypassing the industry standard ESI processing methodologies. Lighthouse Document Technologies, Inc communicated with Walmart and their lawyers to coordinate the production of these fake documents via email, phone, internet communication etc.  There must be hundreds if not thousands of emails that were sent and received by these collaborators.  Thus, Lighthouse Document Technologies, Inc. violated hundreds of predicate acts.  As discussed above each email sent is considered to be a unique and distinct count of wire fraud.

199.    In summary, the reason that the  Walmart and Gibson Dunn participants,

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Quezada, and Ha manufactured the Oct 17 interview note and October 18 HR investigation report were to discredit Huynh's potential declaration (which Huynh didn't know he had to file in support of his opposition to Walmart's motion for summary judgement) to neutralized the statement Huynh provided to David deRubertis in Exhibit  52 at 15  that Beal retaliated against Huynh by ordering HR to investigate into the made-up sexual harassment charge against Huynh on Oct 18, 2016.  This also proved that David and Kari deRubertis shared the confidential information in Exhibit 52 because based on this information the Walmart and Gibson Dunn participants improperly influenced Renee Quezada and other unknow employees of Lighthouse Document Technologies, Inc. to manufacture the above evidence.  Since Lighthouse Document Technologies, Inc is responsible for the actions of their employees and/or agents, they also committed hundreds counts of wire fraud.

200.    Taken together the destruction of evidence, fabrication of evidence, and false declarations discussed above allowed Walmart's to purportedly proved in their motion for summary judgement (Case 3:18-cv-01631-VC ECF-113) that Huynh didn't engage in protected activity in early October 2016.

**Step #2: The RICO Defendants and Their Co-Conspirators Manufactured Evidence and Entered False Declarations to Purportedly Prove That Beal Selected Huynh for Termination Weeks Before He Raised His Complaint with Global Ethics on Dec 20, 2016.**

201.    Based on the evidence Huynh provided to deRubertis in 2017 (see discussion above), the Walmart and Gibson Dunn participants directed Payne & Fears to work with Walmart's employees (Beal and Ricetti) and Walmart's internal counsel (  Seth Beal and Valerie Ricetti to manufacture the Nov 30, 2016 and Marketplace RIF list to purportedly prove that Huynh's protected activity in Dec 2016 was not a contributing factor to

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

his termination because 1) Huynh didn't engage in protected activity in early Oct 2016 (discussed above) and Beal had already selected Huynh for termination one day before Beal threatened to put Huynh on a PIP (see Exhibit 52 at 12-13) and several weeks before Huynh's 12/20/16 complaint to Walmart's Global Ethics.  Payne & Fears LLP submitted these misleading assertions to the DOL/OSHA in Sept 2016, knowing that Huynh and his SEC Lawyers will eventually share this information with the SEC which would dimmish Huynh's credibility as a whistleblower (i.e., Walmart purportedly claimed that they didn't terminate Huynh's employment because of his protected conducts.)

202.     In late Sept 2017, Huynh provided deRubertis with detailed analysis to prove that Beal Nov 30 email and Marketplace RIF list was bogus because it was chrono-logically impossible for Beal to come up with the RIF list and the purported Nov 30 dis-cussed Walmart's DSO not Walmart's Marketplace Group. See Exhibit 53.  Subsequently David deRubertis refused to confirm to Huynh whether the Nov 30 email and RIF list were fabricated after the GO 71 production in Sept 20108.

203.     However, Huynh recently discovered that there was an easier way to prove that these documents were fabricated by examining the Document Payne & Fears submit-ted to OSHA/DOL in Sept 2017 and the documents manufactured by the Walmart and Gibson Defendants and processed by Renee Quezada and other employees at Lighthouse. These documents were produced to David deRubertis in late Sept 2018. Exhibit 63 at 3 showed that the Nov 30 email that Payne & Fears submitted to OSHA in Sept 2017 didn't have the DSO and Marketplace RIF excel lists attached to it (even though, Mr. Fears ref-erence the Marketplace RIF list as Exhibit C in his memo to OSHA).  To coverup this

.

SNAFU, the Walmart and Gibson Dunn participants caused Renee Quezada to manufacture a new version of the Nov 30 email to show that it had both the Marketplace and DSO RIF excel lists attached to it.  See Exhibit 64 at 2.

204.    In short, the OSHA Nov 30 email had no attached excel files while the new version had the attached excel.  Additionally, because these documents were fabricated, Lighthouse Document Technologies, Inc (through Renee Quezada and other employees of Lighthouse) produced these documents with bogus email extension i.e., "eMail" and DSO and Marketplace RIF excel lists had no file name, no file extension. See Exhibit 65 for the metadata of the documents produced in late Sept 2018. Basically, Renee Quezada and others at Lighthouse didn't process these bogus documents using an industry accepted ESI a processing standard discussed above. Instead, these Lighthouse' employees just attached the new version of the fabricated Nov 30 email and attached child excel spreadsheets.

205.    Huynh raised to Ms. Brass in Feb 7 (Exhibit 66) and Feb 11(Exhibit 67) letters that Walmart didn't comply to the ESI Protocol order (Case 3:18-cv-01631-VC: ECF-36) because the metadata produced that Walmart produced on Sept 18, 2018 missed various data attribute.  On Feb 12, 2019, Walmart purportedly produced another 2,354 pages of documents that were manually processed (instead of following industry standard protocols) by Lighthouse.  Because Huynh told Ms. Brass that Walmart needed to produce the metadata for the Nov 30 email and excel RIF lists produced in Sept 2018 due to the metadata deficiencies, Ms. Brass directed Renee Quezada to manufacture metadata for attached excel spreadsheets by populating the document type, file name, file extension, and document date metadata field.  Interestingly, only a two weeks early Ms. Brass .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

vouched in her Jan 29, 2019 (Exhibit 69) letter to Huynh that metadata for the Market-

place Nov 30 RIF were accurate and this document was genuine.  Ms. Brass also caused

Valerie Ricetti to submit false verification to vouch that the Marketplace Nov 30 RIF was

not altered or falsified.[46]

206.    In summary, by executing the two-steps fraudulent scheme discussed

above, the RICO Defendants (the Walmart and Gibson Dunn participants, Kari and David

deRubertis, Kasales and Von Lindern (Epiq eDiscovery Solutions, Inc.), Renee Quezada

(Lighthouse Document Technologies, Inc.), and Payne & Fears purportedly proved that

Huynh failed to meet his burden of production for prong #4 of his SOX prima facie case.

Judge Chhabria cited bogus evidence in ruling that Huynh failed to prove that his pro-

tected activity was a contributing factor to his termination.  See Exhibit 70 at 2-3.

**Step #2: The RICO Defendants and Their Co-Conspirators Engaged Evidence Concealment, Suppression, and Committed Perjury Under Oath to Burden Prove That Huynh Failed His Burden of Production to Rebut Walmart's Affirmative Defense.**

> **The Walmart and Gibson Dunn Defendants Caused David and Kari deRubertis, Kasales and Von Lindern to Conceal and Suppressed Over 2,300 Pages of Documents to Obstruct Justice**

207.    On Nov 29, 2018, after Huynh terminated his relationship with deRuber-

tis, deRubertis returned 3,672 pages of documents that the he purportedly claimed that

Walmart had produced to him on Sept 18, 2018. See Exhibit 71.   However, he refused to

---

[46] Defendants did not alter and/or falsify any documents submitted to OSHA in connection with Case No. 9-3290-17-361, including but not limited to Exhibit B, as demonstrated by the metadata produced with that document in this litigation (see WM00000831; WM00000836). Defendant's response to Huynh Interrogatory No. 4(a). Ms. Brass not only caused Ricetti to lie under oath, she also emailed it across interstate boundary (California to Seattle) to deceive Huynh. This is a violation of Wire Fraud and Obstruction of a Judicial Proceeding.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

confirm how many pages Walmart actually produced to him in total on 9/18/2018.

208.    On Dec 17, 2018, Huynh impounded his second set of interrogatories upon Walmart and they responded to Huynh's ROG on Jan 16, 2019.  Walmart's answer to Huynh ROG No. 9 stated for the first time that they had produced more than 4,048 pages of document to deRubertis in late Sept 2018,[47] (See Exhibit 72 at 3) subtracted this number from the 36 pages Walmart designated as AEO, deRubertis still received 340 pages more than what he purported claimed Walmart produced to him which he FedEx to Huynh in late 2018.  Additionally, at David and Kari deRubertis instruction, Douglas Kasales and Von Lindern only uploaded in the Relativity Server 3,672 pages of Walmart's documents on the Epiq portal to Huynh.  When Huynh asked Kasales whether he could provide the Walmart documents to Huynh he said it cost money to extract these documents.

209.    On Feb 7, 2019, Brass set up a conference call with Huynh to harass Huynh to produce his confidential records to Walmart.  Brass previously arranged a discovery teleconference call with Magistrate Judge Kim on Feb 15, 2019 at 9:30 AM to get Judge Kim to force Huynh to produce these documents if Huynh refused to do so.  During the call Huynh told Brass that he believes his previous counsel may have acted in concert with the Walmart's lawyers to suppress evidence from Huynh.  On the same day, Huynh emailed Brass a letter listing his concerns that Walmart intentionally discoverable

---

[47] Subject to and without waiving the foregoing objections and subject to its interpretation of this Interrogatory, Defendants refer Plaintiff to documents labeled WM00003323; WM00003377; WM00003437; WM00003447; WM00003621; WM00003676; WM00003741; WM00003755; WM00003934; and WM00004048, which are non-privileged documents and communications sufficient to show the basis for the above-identified statement that Plaintiff's allegations were investigated and deemed unsubstantiated

124

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

documents that Huynh requested in his first set of RFDP and second set of ROGs.

210.    Toward the end of a nine minutes teleconference call with Judge Kim on Feb 15, Brass told Judge Kim that Huynh had a serious matter that he would like to bring to her attention and whether Huynh still want to do it.  Huynh told Judge Kim that it seemed that David deRubertis and the Walmart's lawyers may have acted improperly to prejudice Huynh in the instant litigation.  To Huynh's surprise, the next day Judge Kim posted a video's court staff file Case 3:18-cv-01631-VC: ECF-60.  Attached to the PDF file was an audio recording of the teleconference call the day before.  Looking back this was quite unusually for Judge Kim to record the teleconference call then filed it in the public docket. Huynh believe the most logical explanation was Brass may have informed Judge Kim about Huynh's complaint.  Thus, to purportedly show an appearance of im-partiality, Judge Kim record and file the audio file for public consumption.  The audio re-cording could be accessed by clicking the link:  https://youtu.be/jP03UYa8iyY. Huynh's concerned about potential David deRubertis' and Walmart's lawyers' misconduct could be heard starting at 7 minutes and 6 second for the recording.

211.    After the conference call with Judge Kim. Later that evening of Feb 11, 2019 (Exhibit 67 at 5), Huynh emailed Brass a letter stating that there were at least 386 pages of Walmart's documents missing from the Sept 2018 GO 71 productions.  In Ex-hibit 67 at 7, Huynh stated that believes this is a violation California Professional Code of Conduct Rule 3.4 Fairness to Opposing Party and Counsel and Rule 4.1 Truthfulness in Statements to Others.  The following morning at 7:45 AM Ryan Stewart produced an ad-ditional 2,354 pages documents.  This proved that David and Kari deRubertis, Kasales, and the Walmart and Gibson Dunn participants attempted to suppress evidence to prevent .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Huynh's access to the Court to prosecute his case against Walmart.  This is obstruction of the undue administration of justice in a judicial producing which is a predicate acter under the RICO statute. Some of these documents had material evidence for Huynh to exceed his burden of production to prove prong #4 of his prima facie case by preponderance of evidence and rebut Walmart's affirmative defense. The table below summarized the material facts that Huynh were able extracted from the additional 2,354 pages of documents that David and Kari deRubertis, Kasales, Lindern, Brass, Stewart and others suppressed from Huynh to prevent him from using them in his defense against Walmart.

| Item # | ProdBeg | ProdEnd | Document Type | File Name | Remarks |
|---|---|---|---|---|---|
| 1 | WM00002601 | WM00002604 | Email | RE: Ethics violation/intentional dishonesty at the executive level - Negatively impacting Walmart's reputation | Temporal Proximity: Walmart's executives made the decision to terminate Huynh's employment 8.5 hours after he raised his complaint to Marc Lore. |
| 2 | WM00004273 | WM00004273 | Email | Re: Services CBT | Walmart treated 2 non-whistleblowers more favorably by remvoing them from the RIF list |
| 3 | WM00004310 | WM00004310 | Email | Memo - Business Development team update | Showed Huynh's role was not eliminated rather it was moved under Huynh's Peer who didn't blew the whistle on Walmart. |
| 4 | WM00004656 | WM00005303 | Spreadsheet | Master Aggregated List - AI.xlsx | This Jan 13, 2017 RIF list showed Walmart Marketplace added 10 FTEs in the middle of a RIF. This proved Seth Beal's reason for RIF was misleading. The list also  stated the reason for Huynh's elimination was role elimination. |
| 5 | WM00005331 | WM00005345 | Spreadsheet | Impact List - 2017_Jan_18.xlsx | Showed that Beal removed two non-whistleblowers in item 2 shortly after Huynh's termination on Jan 10, 2017. |
| 6 | WM00005782 | WM00005797 | Spreadsheet | Workbook - Organization Realign Template v6_Marketplace.xlsx | The reason for Huynh termination was performance on 12/14/16. Proved Walmart provided shifitng explantion for Huynh's termination. |

.

126

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

**The Walmart and Gibson Dunn Defendants Corruptly Influenced Magistrate Judge Sallie Kim to Deny Huynh's Requests to Get Walmart to Remove the Confidential Designation on a Limited Number of Pages.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

212.    In late May and early June 2019, Huynh met and conferred with the Gibson Dunn participants in an attempt to get Walmart to remove the confidentiality designation for only 65 pages of documents which are not confidential so Huynh could later use them to defend himself against Walmart's motion for summary judgement (given that Huynh didn't know how to file documents under seal).  However, instead of negotiating in good faith, the Gibson Dunn participants made misleading statements about the laws to deceived Huynh from challenging Walmart's improper confidentiality designation.  Chris Wilson emailed Huynh on 4/15/19 (from Washing D.C. to Seattle) to deceive Huynh that confidentiality designation applies to an entire document, as opposed to selected pages of documents and Fed. R. Civ. P. 34(b)(2)(E)(i) requires that parties "produce documents as they are kept in the usual course of business." This prevents Walmart from breaking up a single document in its files into confidential and non-confidential portions for discovery purposes.  See Exhibit 74.  In short, Wilson lied to Huynh in an attempt to obstruct the removal of the confidentiality designation from these documents to suppress them from being used by Huynh to defend himself against Walmart's motion for summary judgement. The parties filed a joint discovery brief letter with Magistrate Judge Sallie Kim on June 3, 2019 (Case 3:18-cv-01631-VC: ECF-75 and 76). The following day, Judge Kim ordered Walmart to submit the disputed documents for in camera review. Case 3:18-cv-01631-VC: ECF-77.  Two weeks later Judge Kim issued an order given Walmart the option to pick and choose which of the 65 pages of documents Walmart wanted to remove the confidentiality designation.  Case 3:18-cv-01631-VC: ECF-78.

27

28

213.    At that time, Huynh didn't know any better so he believed Magistrate

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Judge Sallie Kim's order was proper.  However, Huynh recently discovered that after a

District Judge or a Magistrate Judge performed in-camera review for disputed documents

that Judge most of the time will issue an order giving specific instructions to the produc-

ing party what they must do with regard to the disputed documents.  Therefore, by giving

Walmart the option to decide which of the 65 pages they wanted to produce to Huynh

without the confidentiality designation was prejudicial, and improper. This is akin to let-

ting "the fox guarding the hen house".  The links below are discovery dispute orders is-

sued by Judges at the United States District Court, Northern District of California after

completing in camera reviews.

    i.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.320421/gov.uscourts.cand.320421.105.0.pdf) – Judge Kim order after in-camera review.

    ii.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.364504/gov.uscourts.cand.364504.174.0.pdf

    iii.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.325523/gov.uscourts.cand.325523.343.0.pdf

    iv.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.206484/gov.uscourts.cand.206484.31.0.pdf

    v.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.204440/gov.uscourts.cand.204440.68.0.pdf

    vi.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.202134/gov.uscourts.cand.202134.38.0.pdf

    vii.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.178002/gov.uscourts.cand.178002.154.0.pdf

    viii.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.176106/gov.uscourts.cand.176106.37.0.pdf

    ix.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.174687/gov.uscourts.cand.174687.117.0.pdf

    x.    https://storage.courtlistener.com/re-cap/gov.uscourts.cand.174323/gov.uscourts.cand.174323.38.0.pdf

    214.    Since Walmart still refused to remove the confidentiality designation for

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

any of the remain disputed pages, Huynh filed a second discovery brief letter on Aug 13,

2019 (Case 3:18-cv-01631-VC: DC Dkt. 103-104) to request Magistrate Judge Sallie

Kim to order Walmart to remove the confidentiality designation from these pages.  On

the very same day, Magistrate Judge Sallie Kim issued an order (Case 3:18-cv-01631-

VC: DC Dkt. 106) denying Huynh's requests for the second time without any rational ex-

planations.

| Item # | ProdBeg | ProdEnd | Document Type | File Name | Remarks |
|---|---|---|---|---|---|
| 18 | WM00002095 | WM00002095 | Email | a couple updates | Beal decided to terminated Huynh's employment within 8.5 hours aftet he complaint to Marc Lore |
| 20 | WM00002601 | WM00002604 | Email | RE: Ethics violation/intentional dishonesty at the executive level - Negatively impacting Walmart's reputation | Walmart's senior executives received Huynh's complaint on January 4, 2017.  The acknowledged the complaint was serious yet they allowed Beal to terminate Huynh's employement the following week. |
| 25 | WM00004656 | WM00005303 | Spreadsheet | Master Aggregated List - AI.xlsx | This Jan 13, 2017 RIF list showed Walmart Marketplace added 10 FTEs in the middle of a RIF. This proved Seth Beal's reason for RIF was misleading. The list also  stated the reason for Huynh's elimination was role elimination. |
| 23 | WM00005782 | WM00005797 | Spreadsheet | Workbook - Organization Re-align Template v6_Marketplace.xlsx | The reason for Huynh termination was performance on 12/14/16. Proved Walmart provided shifitng explantion for Huynh's termination. |

*Note items #18, #20, #23, and #25 are the very items that Judge Kim refused to order Walmart to re-move the confidentiality designation. See Exhibit 75.*

215.    The key question here is whether Judge Kim refusal to order Walmart to

remove the Confidentiality Designation for the items listed in Case 3:18-cv-01631-VC:

ECF-104-1 prejudicial to Huynh's SOX claim against Walmart.  The answer is absolutely

yes.  Huynh could not use item #18, #20, #25, and #23 to meet his burden of production

to prove prong #4 of his prima facie case and to rebut Walmart's affirmative defense dur-

ing summary judgement because Huynh didn't know how to file these items under seal.

See Exhibit 75.  In short, the Walmart and Gibson Dunn participants improperly influ-

enced Jude Kim to rule in Walmart's favor to obstruct the undue administrative of justice

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

216.    Two days after Huynh filed his opposition brief to Walmart's motion for

summary judgment, Huynh filed a motion seeking leave from District Judge Vince Chha-

bria to supplement his opposition brief (See Exhibit 76) as afforded by F.R.C.P Rule

56(e).  Shortly after, Rachel Brass filed an opposition to Huynh's motion (See Exhibit 76)

by making frivolous legal arguments and cited in misleading case laws in an attempt to

obstruct the undue administrative of justice. The case laws Brass cited below had nothing

to do with Huynh's motion for leave to supplement his opposition brief.

 Accordingly, Plaintiff's request for leave to amend his opposition brief to add new
exhibits should be denied. See Banga v. Kanios, 2016 WL 7230870, at *2, n. 3 (N.D.
Cal. Dec. 14, 2016) (denying motion to extend deadline to oppose motion to dismiss
because pro se plaintiff "d[id] not explain why he did not request an extension before
the response deadline passed, or why his neglect to do so is excusable."

Porter v. Jennings, 2013 WL 552123, at *1 (E.D. Cal. Feb. 12, 2013) (denying motion
to extend deadline to amend pleadings and conduct discovery because pro se Plaintiff
"present[ed] no documents demonstrating that good cause exists" and "present[ed] no
argument that would merit granting modification.")

217.    The Walmart and Gibson Dunn Defendants corruptly influenced District

Judge Vince Chhabria not to rule on Huynh's motion to supplement material fact into the

record for the next 122 days.  Indeed, Judge Chhabria dismissed all of Huynh's claims

against Walmart with prejudice in early Mid-January 2020 without ever ruling on

Huynh's motion.  The question again is whether Judge Chhabria prejudicial action to ob-

struct the undue administration of justice in his court's room prevented Huynh from de-

fending his case against Walmart.  The answer is unquestionable yes.  The table below

showed that by not allowing Huynh to submit the following material evidence into the

record Judge Chhabria used this lack of evidence to rule in Walmart's favor. Item #18,

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

#20, and #25 are the same items that Huynh requested Judge Kim to order Walmart to re-

move the confidentiality designation. See Exhibit 75.

| Item # | ProdBeg | ProdEnd | Document Type | File Name | Remarks |
|---|---|---|---|---|---|
| 18 | WM00002095 | WM00002095 | Email | a couple updates | Beal decided to terminated Huynh's employment within 8.5 hours aftet he complaint to Marc Lore |
| 20 | WM00002601 | WM00002604 | Email | RE: Ethics violation/intentional dishonesty at the executive level - Negatively impacting Walmart's reputation | Walmart's senior executives received Huynh's complaint on January 4, 2017. The acknowledged the complaint was serious yet they allowed Beal to terminate Huynh's employement the following week. |
| 25 | WM00004656 | WM00005303 | Spreadsheet | Master Aggregated List - AI.xlsx | This Jan 13, 2017 RIF list (WM00004656, WM00004658, WM00005046, WM00005048, WM00005056, and WM00005058) proved that Beal hired 10 FTEs in the middle of a RIF. Therefore, his purportedly 10% cost reduction was not belieable. |

218.    After Huynh learned how to file documents under seal, Huynh filed 11

Exhibit under seal in early Oct 2019 to support his motion for summary judgement. See

ECF-142, 143, 144, and 145. ECF 143-1 is a summary table of the exhibits and their de-

scription. The following Exhibits (from ECF 143-1) proved without a doubt that Huynh

overwhelmingly met his burden of production to prove that Walmart failed to prove by

clear and convincing evidence that Walmart would have terminated Huynh's employment

in the absence of Huynh's protected activity. See Exhibit 77.

- Exhibit 25 proved that Huynh's role was not eliminated, rather it was trans-
  ferred to Huynh's peer even though he had no business development experi-
  ence. This rebutted Walmart's misleading asserting that was selected for the
  RIF because his role became obsolete.

- Exhibit 21, proved that Walmart's purported RIF was bogus because instead of

131

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

saving labor cost Beal actually hired 10 new FTEs for the Marketplace Group in the middle of a RIF.

- Exhibit 22 and 28 proved that Walmart removed the names of two employees who were selected for the Jan 24, 2017 RIF several days after Huynh's termination because they didn't complaint about Walmart's shareholder fraud conducts.

219.    Despite the facts that Huynh filed the material facts above into the record, to support his opposition to Walmart's motion for summary judgement, Judge Chhabria ignored these material facts when he granted Walmart summary judgement.  However, the most chilling thing for Huynh was the fact that Judge Chhabria purportedly claimed that he reviewed these Exhibits but found them immaterial to Huynh's defenses.

"Otherwise, Huynh's opposition brief references numerous instances when he purportedly raised concerns to supervisors at Walmart prior to October 2016, using the citation "(Exhibit)," but the Court has not been able to identify any evidence supporting any of these allegations in any of Huynh's copious filings. See Exhibit 70 at page 2 (footnote).

**Acting on Behalf of the Walmart Defendants, the Gibson Dunn Defendants Corruptly Influenced District Judge Vince Chhabria to Violated Huynh's Substantive Due Process Right and Equal Protection Under the Law**

220.    A few days after Judge Chabbria dismissed all of Huynh's claims against Walmart, Huynh filed a letter in (Case 3:18-cv-01631-VC: ECF 170) on Jan 19, 2020 to inform and guide Judge Chhabria to evidence Huynh filed in the record that rebutted Walmart's affirmative defense i.e., Seth Beal hired 10 new FTEs in the Marketplace group right in the middle of the purported Marketplace RIF.  See Exhibit 78 at 12.

221.    A few days later, Huynh discovered that David and Kari deRubertis caused Kasales to destroy evidence of Huynh's meetings with Beal in early Oct 2016.  In the absence of this evidence, Huynh's could not meet his burden of production that Huynh's protected activity was a contributing factor to his termination.  Huynh immediately emailed Kasales in Jan 27, 2020 to ask him to explain why he destroyed Huynh's
.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Outlook meeting appointments with Beal.  Additionally, Huynh told Kasales he needed an answer from Kasales by Jan 30, 2020 so he could file a motion for reconsideration of Judge Chhabria's ruling granting Walmart summary judgement. At 9:41 AM on Jan 28, 2020, Kasales replied and provided a misleading and bogus answer to justify his destruction of evidence.  See Exhibit 79 at 4. An hour after Kasales email, Judge Chhabria issued an order regarding Huynh's Jan 19 letter (ECF 170). See Exhibit 79 at 8.  In his ruling Judge Chhabria wrote: "The Court construes Mr. Huynh's notice, filed at docket 170, as a request to file a motion for reconsideration. The request is denied. The Court will not consider further unsolicited filings on the docket by Mr. Huynh."  This purported ruling was not based on the law because F.R.C.P Rule 59(e) allowed Huynh to file a motion for reconsideration 28 days after entry of final judgement against him.

222.     The one-hour temporal proximity between Kasales' email to Huynh and Judge Chhabria ruling (attempted of obstruct Huynh from filing a motion for reconsideration) led Huynh to conclude that after receiving Huynh's email, Kasales contacted Rachel Brass and/or David deRubertis to inform them of Huynh's plan to file a motion for reconsideration of Judge Chhabria's ruling granting Walmart summary judgement.  Huynh believes, subsequently a reputable party within the judicial community must have contacted Judge Chhabria to improperly influence him to issue the ruling to obstruct Huynh from filing a motion for reconsideration.   On Feb 9, 2020, Huynh filed a motion for reconsideration of Judge Chhabria dismissal of all of Huynh's claims per Rule 59(e).  Ms. Schuemann immediately reached out to Huynh and alleged that Huynh violated Judge Chhabria's protective order   because he failed to redact the last of a non-party.  Huynh immediately fixed the redaction issue then filed a notice with Judge Chhabria informing him .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

that with had fixed the defect raised by Walmart's counsel. Two days later, Judge Chha-bria issued an order denying Huynh's motion for reconsideration. In his ruling, Judge Chhabria wrote:

> "On January 28, **the Court issued an order denying reconsideration of the summary judgment ruling. Now Huynh has filed another motion for reconsideration. That motion too is denied**. In connection with his latest motion, Huynh filed on the public docket documents that should have been filed under seal. Accordingly, Huynh's e-filing privileges are hereby revoked. The Court will not consider any further filings by Huynh in this case." See Exhibit 80.

223.    Judge Chhabria changed the language he used to characterize Huynh's 1/19/20 letter (DC Dkt. 170) from "a request to file a motion for reconsideration" (used in DC Dkt 174) to "a motion for reconsideration" (used in See Exhibit 80).  Judge Chhabria made this misleading statement to mislead the America public and the media into believing that since Huynh filed duplicate motions for reconsideration Judge Chhabria was justified in denying Huynh's motion without having to go through the motion practice dictated by Local Rule 7-2 and 7-3 and without given his right to procedural and substantive due process right under the Fifth Amendment of the US Constitution.

224.    In short, after ruling in Walmart's favor to dismiss all of Huynh's claims (by suppressing and obstructing Huynh from filing evidence into the record), Judge Chhabria attempted to block Huynh from filing a motion for reconsideration. When Huynh finally filed his motion for reconsideration, Judge Chhabria denied Huynh's motion without notice and hearing according to this court's local rule.

225.    The Walmart and Gibson Dunn Defendants (either Mr. Scalia or Mr. Boutros due to their prestige within the legal community) corruptly influenced Judge Chhabria by offering him things of value in exchange for his dismissal of all of Huynh's

.

134

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

claims against Walmart.  As a reminder, the dismissal of Huynh's complaint against

Walmart was extremely critical because it further support the SEC's decision not to pros-

ecute Walmart for committing fraud against its shareholders

**Obstruction of the OSHA Investigation Process for Improper Purpose.**

226.    On May 11, 2017 (See DC Dkt. 158-7), deRubertis asked McKessy via

email to confirm whether the way deRubertis drafted Huynh's OSHA SOX whistle-

blower complaint against Walmart may interfere with any future SEC proceeding.

**deRubertis Wanted to Ensure the OSHA Complaint Won't Interfere with SEC Case**

| From: | David deRubertis <david@derubertislaw.com> |
|---|---|
| Sent: | Thursday, May 11, 2017 10:44 AM |
| To: | Sean X. McKessy; rchang@phillipsandcohen.com |
| Cc: | Tri Huynh; Tameka White; Jeff Neiderman |
| Subject: | RE: Connecting Sean and David to Align on Tri's Cases |
| Attachments: | OSHA DOL Complaint.pdf |

Hi Sean & Rebecca – Hope you have been well.  Attached is the DOL/OSHA charge we'd like
to file for Tri tomorrow.  Would you mind just giving this a very quick read to make sure us
filing this doesn't present any issue with the SEC process?  <u>We have kept the allegations as
generic as possible.</u>

 **U.S. Department of Labor**   OMB # 1218-0236
Occupational Safety and Health Administration
Notice of Whistleblower Complaint

**25.   Why do you believe the employer took these actions against you?** *You
may check one or more of the boxes below, and/or describe the reason in the space
provided.*

☐ Called/Filed with OSHA                        ☐ Called/Filed with Another Agency
☒ Complained to Management                ☐ Reported an Accident or Injury
☐ Participated in Safety and Health Activities
☒ Refused to Perform Task (please specify reason for refusal)
☐ Testified or provided statement in investigation or other proceedings (please specify)
☒ Other (please describe)    Engaged in Sarbanes-Oxley protected activity by reporting and/or
opposing/refusing to perform what reasonably believed were acts of:
shareholder fraud; mail &/or wire fraud; violation of and/or attempted violation
of internal controls; securities fraud; fraud on shareholders; violation of laws
and rules or regulations of SEC; etc.  Made internal complaints to
management and human resources and made formal ethics complaints to
ethics hotline and CEO

| From: | Sean X. McKessy <smckessy@phillipsandcohen.com> |
|---|---|
| Sent: | Thursday, May 11, 2017 11:28 AM |
| To: | David deRubertis; Rebecca Chang |
| Cc: | Tri Huynh; Tameka White; Jeff Neiderman |
| Subject: | RE: Connecting Sean and David to Align on Tri's Cases |

Thanks for chance to review David.  <u>I don't see this as having any impact on our SEC submission.</u>

.

135

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1    McKessy confirmed that it would not due to the general nature of the allegations. deRu-

2    bertis filed the complaint with OSHA that same day.

3

4          227.    On 7/10/17, David deRubertis purportedly asked Huynh via email to do a

5    quick review of an amended complaint he planned to file with OSHA later that afternoon.

6    Huynh reviewed and gave David deRubertis his feedback.  However, unliked in early

7    May 2017, deRubertis didn't ask McKessy for feedback this time. Later that day, deRu-

8    bertis purportedly filed a 125-page amended complaint (See DC Dkt. 158-7) with OSHA

9    via fax, email, and overnight delivery to Ms. Jonelle Dunn, an OSHA investigator.

10

11



12

13

14

15

16

17

18

19

20

21

22

23

24

25

26          228.    Having the benefit of hindsight, Huynh now realized that it made no sense

27    whatsoever for David deRubertis to file a 125-page amended complaint because OSHA

28    .

136

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1   had no such requirement (not even in Federal Court).

2

3      229.    For the next several months, Huynh repeatedly asked deRubertis for status

4   update on his OSHA complaints.  Specifically, Huynh asked deRubertis to forward him

5   the complainant notification letter that OSHA sent to the deRubertis Law Firm.  Neither

6   deRubertis nor his office replied to Huynh's request. It was unusual for deRubertis to re-

7   peatedly avoiding Huynh's numerous requests because by law OSHA was required to

8   send the complainant notification letter to a complainant shortly after receiving his/her

9   complaint.  In the letter, OSHA would provide the complainant with the case name, as-

10  signed case number, the name of the assigned investigator and his/her contact infor-

11  mation. 29 CFR §1980.104(a) [48], and the OSHA's Investigation Manual[49] outlined the

12  steps that OSHA typically took to investigate a SOX complaint.

13

14

15

_____

[48] (a) Upon receipt of a complaint in the investigating office, OSHA will notify the respond-
ent of the filing of the complaint, of the allegations contained in the complaint, and of the sub-
stance of the evidence supporting the complaint. OSHA will provide an unredacted copy of
these same materials to the complainant (or complainant's legal counsel, if complainant is rep-
resented by counsel) and to the Securities and Exchange Commission. (b) Within 20 days of
receipt of the notice of the filing of the complaint provided under paragraph (a) of this section,
the respondent may submit to OSHA a written statement and any affidavits or documents sub-
stantiating its position. Within the same 20 days, the respondent may request a meeting with
OSHA to present its position

[49] Chapter 2-5 stated "As part of the docketing procedures, **when a case is opened for inves-
tigation, the supervisor must send a letter notifying the complainant that the complaint
has been reviewed, given an official designation (i.e., case name and number), and as-
signed to an investigator. The name, address, and telephone number of the investigator
will be included in the docketing letter**. A Designation of Representative Form (see sample
at the end of this Chapter) will be attached to this letter to allow the complainant the option of
designating an attorney or other official representative.

Also, at the time of docketing, or as soon as appropriate, the Supervisor must prepare a letter
notifying the respondent that a complaint alleging retaliation has been filed by the complain-
ant and requesting that the respondent submit a written position statement. Failure to promptly
forward the respondent letter could adversely impact the respondent's due process rights and
the timely completion of the investigation.

137
**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

230.    After receiving a SOX Whistleblower complaint from a complainant, a

Regional OSHA Investigator Supervisor should open and docket a case in IMS, assign an

investigator to investigate the case, and send notification letters to both the respondent

and complainant.

> OSHA's investigation manual chapter 5-10 – VII described how an OSHA investigator should determine the proper complaint filed date before entering it into IMIS. A correct filed date for the complaint was critically importantly because it would be used to determine the timeliness of the complaint.

> Documenting Key Dates in IMIS: The timely and accurate entry of information in IMIS, as detailed in OSHA Directive IRT 01-00-016, is critically important. A. "Date Complaint Filed: the date a complaint is filed is the date of the post-mark, facsimile transmittal, e-mail communication, telephone call, hand-delivery, delivery to a third-party commercial carrier, or in-person filing at an OSHA office."



231.    The respondent notification letter should also inform the respondent that

they may submit a position statement to OSHA within 20 days. Additionally, under 29

CFR § 1980.105(a) [50], OSHA must issue a preliminary reasonable cause finding

---

[50] **Issuance of findings and preliminary orders**: (a) After considering all the relevant information collected during the investigation, the Assistant Secretary shall issue, within 60 days of filing of the complaint, written findings as to whether or not there is reasonable cause to believe that the respondent has retaliated against the complainant in violation of the Act.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

and preliminary order for the case within 60 days after receiving the complaint.  The chart above outlined the timeline that OSHA would have investigated Huynh's 5/11/17 complaint against Walmart if deRubertis did in fact filed the complaint on 5/11/17.

Note: The average time it took OSHA to process the complaint and send out the notification letters is about 14 days based on the two SOX case below.

- https://storage.courtlistener.com/recap/gov.uscourts.paed.534987.1.0.pdf

-  https://storage.courtlistener.com/recap/gov.uscourts.flsd.535106/gov.uscourts.flsd.535106.1.0_1.pdf

**Coverup the Obstruction of the OSHA Investigation Process**

232.    David deRubertis and the other RICO Defendants never intended to go through the OSHA Whistleblower complaint process because they wanted to take Huynh's case to Federal Court in order execute the two-pronged strategy discussed above. However, David deRubertis, Payne & Fear, the Walmart and Gibson Dunn participants, and Mark Marchione pretended that David deRubertis had filed the complaint and the amended complaint with OSHA in May and July 2017 for three purposes:

233.    First, to purportedly show that deRubertis exhausted OSHA's administrative remedies requirements before taking Huynh's case to Federal Court to cover up their obstruction of the OSHA proceeding.

234.    Second, David deRubertis and Payne & Fear exploited these filings to legitimately handed over Huynh's SEC submissions to the Walmart and Gibson Dunn Participants.

.

139

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

235.     Third, to create paper trails to protect the RICO Defendants from future criminal prosecution for obstructing an SEC investigation.

236.     Although Huynh currently doesn't possess direct evidence to prove that the RICO Defendants obstructed the OSHA proceeding in order to take Huynh's case to Federal Court. Huynh believes this in-formation is in the RICO Defendants' possession and is discoverable during discovery.  However, even in the absence of this evidence, Huynh proved that the RICO Defendants conspired to obstruct the OSHA proceeding based on the following circumstantial evidence.

237.     First, deRubertis repeatedly refused to provide Huynh a copy of the OSHA complain-ant notification letter despite Huynh's multiple requests.  This proved that deR-ubertis never filed Huynh's complaints with OSHA because if he had OSHA would have sent him the complainant notification letter because it was required by law for OSHA to do so.

238.     Second, deRubertis purportedly claimed that he filed a 125-amended com-plaint with OSHA even though there was no such pleading requirement by OSHA. deRu-bertis' real motive for pretending to file the amended complaint was to use it as a justifi-cation to lift the content in Huynh's 4/19/17 SEC submission verbatim and inserted them into the bogus 125-page amended complaint to launder the information to legitimately share it with the Gibson Dunn and the Walmart Participants. The RICO Defendants later used this information to submit factual misrepresentations to neutralize the evidence Huynh provided to the SEC.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

239.     Third, deRubertis pretended to file the fake complaint and amended complaint on 5/11 and 7/10/17 in order to create paper trails which enabled the RICO Defendants to assert their chronologically impossible defense to coverup the facts that the they conspire to obstruct the SEC investigation process as early as the beginning of May 2017. To effectuate their scheme, deRubertis purportedly asked McKessy to review the OSHA complaint on 5/11/17 because he wanted McKessy to serve as an alibi to the fact that prior to Walmart's Q1 FY18 earnings call on 5/18/17 the Walmart Participants only knew about Huynh's allegations of Walmart's misconducts at a superficial level based on deRubertis' 5/11/17 OSHA complaint.  Then even though, Walmart's senior executives knew about the specificity of Huynh's allegation from deRubertis' fake 125 pages amended complaint after 7/10/17 it didn't matter because by then the RICO Defendants had already executed their Whitewashing Campaign. Thus, it would be chronologically impossible for the US government that the RICO Defendants obstructed the SEC investigation/proceeding.



.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

3

4

5

6

7

8

9

10

11

      240.    Fourth, on Aug 2, 2019, the Brass, Boutros, and Stewart filed the fake OSHA's 3/16/18 dismissal letter from Mark Marchione in the Court docket to purportedly show that deRubertis exhausted administrative remedies before taking Huynh's case to Federal Court.  See Case 3:18-cv-01631-VC: DC Dkt. 119-20. Huynh recently came to the conclusion that the RICO Defendants manufacture this letter to cover up their obstruction of the OSHA investigation process. This letter was bogus because its contents were inconsistent with SOX's statutory language and also inconsistent when compared with the dismissal letter from the Jackie Hosang Lawson's case (Case 1:04-cv-11651-MLV).

12

13

14

15

16

17

- In the Lawson's case the dismissal letter came from a "Regional Administrator" Not a "Regional Supervisory Investigator".
- Marchione listed the kick out period for SOX as **60 days** instead of **180 days**.
- Huynh's complaint was filed on 5/11/17 not on 5/17/17. **Why?**
- Marchione cc: the U.S. Department of Justice, Civil Fraud Division when there was no such requirement.
- The letter address "Dear Mr. Huynh" when it should have been addressed to Huynh's Lawyer David deRubertis.

18

19

20

21

22

23

24

25

26

27

28

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Case 3:18-cv-01631-VC   Document 119-20   Filed 08/29/19   Page 2 of 2

Case 1:04-cv-11651-MLW   Document 148-3   Filed 05/13/2008   Page 35 of 38

**Left Letter:**

U.S. Department of Labor

Occupational Safety and Health Administration
Ronald Dellums Federal Building
1301 Clay Street, Suite 1080N
Oakland, CA 94612

*Several irregularities*
- **60 days** is the wrong kick out period for a SOX because it is 180 days.
- DOJ Civil Fraud Division. there is no such requirement.
- OSHA didn't send the dismissal letter to Eugene Scalia and the letter should address deRubertis not Huynh.

March 16, 2018

Tri Huynh
c/o David M. deRubertis, Shareho
The deRubertis Law Firm, APC
4219 Coldwater Canyon Avenue
Studio City, California 91604

Re:   Wal Mart Stores, Inc./Huynh 9-3290-17-361

**Should be addressed to deRubertis not Huynh**

Dear Mr. Huynh:

On May 17, 2017, you (Complainant) filed a complaint with the Occupational Safety and Health Administration ("OSHA") under Sarbanes-Oxley Act (SOX), 18 U.S.C.A. §1514A. Over 60 days have passed since you filed your complaint with OSHA. Under the Act, if the Secretary has not issued a final decision within 60 days of the filing of the complaint, and there is no showing that such a delay is due to the bad faith of the complainant, the complainant may bring a *de novo* action in Federal District Court.

You provided this office with a copy of your federal court complaint on March 15, 2018. As a result of your electing to proceed with your case in federal court, rather than before the Secretary of Labor, this office is dismissing your complaint.

If at any time you have questions or require any information regarding employee or employer rights and responsibilities under SOX or any other whistleblower statute administered by OSHA, please contact this office.

Sincerely,

**Huynh's complaint was filed on 5/11/17 not 5/17**

Mark Marchione

MARK MARCHIONE
Regional Supervisory Investigator
Whistleblower Protection Program

cc:   Wal-Mart Stores, Inc.
U.S. Securities and Exchange Commission, Chief of the Office of Market Intelligence
U.S. Department of Justice, Civil Frauds Division   **No such requirement**
U.S. Department of Labor, Occupational Safety and Health Administration,
Directorate of Whistleblower Protection Programs

**Right Letter:**

U.S. Department of Labor

Occupational Safety and Health Administration
J.F.K. Federal Building, Room E340
Boston, MA 02203
Telephone   (617) 565-9860
Fax           (617) 565-9827

Reply to the Attention of:  /OSHA/BOS/EPTS

January 28, 2008

Indira Talwani
Segal Roitman, LLP
111 Devonshire Street
Fifth Floor
Boston, MA 02109

RE: Fidelity Investments; Claire Cadogan; Betsy Connolly; Harris Komishane; Dick Lyons, Jean Raymond; Tim Rooney / Lawson / Case Nos. 1-0120-07-005; 1-0120-07-008; 1-0120-07-012; 1-0120-08-001

Dear Ms. Talwani:

On December 20, 2006, April 24, 2007, September 17, 2007 and November 9, 2007, respectively, you filed the above referenced complaints under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A (SOX), on behalf of your client Jackie Hosang Lawson. Over 180 days have passed since you filed your original complaint and second complaint. Under the Act, if the Secretary has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of the complainant, the complainant may bring a *de novo* action in Federal District Court.

You have notified this Office by letter dated January 3, 2008 that you intend to file case numbers 1-0120-07-005 and 1-0120-07-008 in Federal Court. In accordance with our usual practice, we have consolidated the four complaints, as the three later complaints reasonably relate back to the original. As a result, the case number for the original complaint – 1-0120-07-005 – has been retained and amended by the three additional allegations. Because you have elected to proceed with your case in Federal Court, rather than before the Secretary of Labor, the complaint, as amended, is hereby closed.

If at any time you have questions or require further information regarding employee or employer rights and responsibilities under the SOX or any other whistleblower statute administered by OSHA, please contact this office.

Sincerely,

Martha B. Kent
Regional Administrator

cc:
Eugene Scalia, Esq., Attorney for Respondent (Certified Mail)
Chief Administrative Law Judge, USDOL
Deputy Director, Division of Enforcement, Securities Exchange Commission
Associate Solicitor, Fair Labor Standards, USDOL

143

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

# PAYNE & FEARS

4 Park Plaza, Suite 1100
Irvine, CA 92614
T 949.851.1100
F 949.851.1212

Daniel F. Fears
(949) 797-1222
dff@paynefears.com



August 31, 2017

**VIA EMAIL**

Mark Marchione
Regional Supervisory Investigator
Marchione.Mark@dol.gov

Re:   *Tri Huynh v. Wal-Mart Stores, Inc., Case No. 9-3290-17-361*

Dear Mr. Marchione:

Please accept this letter as the position statement of Wal-Mart Stores, Inc. ("Walmart" or the "Company") in response to the above-referenced charge ("the Charge") filed by former Walmart employee Tri Huynh ("Huynh" or "the Claimant"). This information is being submitted to the Occupational Safety and Health Administration ("OSHA") with the understanding that it will be kept confidential to the maximum extent provided by the law.[1]

Very truly yours,

Daniel F. Fears
PAYNE & FEARS LLP

> Both Daniel F. Fears and Terri M. Shaw from the Law Firm of Payne & Fears worked in concerted to manufacture Beal's 11/30/16 and the 11/30/16 Marketplace RIF list and submitted factual misrepresentation to OSHA.

Enclosures
cc:    Tri Huynh c/o David deRubertis (*via certified mail*)
       4219 Coldwater Canyon Ave.
       Studio City, CA  91604

Attorney Work Product and Attorney Client Communications Related Specifically to the *Huynh v. Walmart* litigation and/or the related OSHA complaint

| End Bates Number | Date Range | Document Types | Author(s) | Recipient/Distribution | Privilege(s) |
|---|---|---|---|---|---|
| WM_PRIV00000003 WM_PRIV00000005 WM_PRIV00000007 WM_PRIV00000377 WM_PRIV00000015 WM_PRIV00000142 WM_PRIV00000245 WM_PRIV00000284 WM_PRIV00000314 WM_PRIV00000468 WM_PRIV00000251 WM_PRIV00000264 WM_PRIV00000224 WM_PRIV00000221 WM_PRIV00000276 WM_PRIV00000209 WM_PRIV00000213 WM_PRIV00000286 WM_PRIV00000291 WM_PRIV00000292 WM_PRIV00000297 | 08/17/2017 to 04/16/2018 | Company Documents Draft Legal Documents Emails Spreadsheets | Andrew K. Haeffele (Outside Counsel) legalholds@walmartlegal.com Mary Carter Martin (Associate General Counsel) Melinda Greene (Director, Human Resources, Walmart Global eCommerce) Ping Hao (Associate Director, Marketplace, Walmart Global eCommerce) Seth Beal (Former Senior Vice President, Global Marketplace and Digital Store Operations, Walmart Global eCommerce) Terri M. Shaw (Payne & Fears) Valerie Ricetti (Director, Human Resources Business Partner, Walmart Global eCommerce) | Andrew K. Haeffele (Outside Counsel) Becky Schmitt (Former Senior Vice President, Human Resources) Crystal Crenshaw (Paralegal, Walmart Legal) Giuletta Pezzanti (Former Senior Director, Human Resources) Kevin Rasmussen (Former General Manager of Home Improvement, Walmart.com & Jet.com, Walmart eCommerce) Mary Carter Martin (Associate General Counsel) Melinda Greene (Director, Human Resources, Walmart Global eCommerce) Ping Hao (Associate Director, Marketplace, Walmart Global eCommerce) Seth Beal (Former Senior Vice President, Global Marketplace and Digital Store Operations, Walmart Global eCommerce) Valerie Ricetti (Director, Human Resources Business Partner, Walmart Global eCommerce) | Attorney-client Communication Attorney Work Product Defendants affirm that these communications have been maintained on a confidential basis and affirm that no unauthorized persons have received them. |

144

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

241.     Walmart and the Gibson Dunn Participants hired the Law Firm of Payne & Fears on the behalf of the Walmart Participants to represent Walmart to interact with deRubertis and Mark Marchione regarding Huynh's OSHA complaints. Huynh believes Payne & Fears along with David deRubertis, the Gibson Dunn leaders fabricated and/or caused other to fabricate of Beal's 11/30/16 email and 11/30/16 Marketplace RIF then submitted the fake documents to OSHA. They also conspired with Mark Marchione to obstruct OSHA from investigating Huynh's complaints.

242.     The chart above proved that Terri M. Shaw and Daniel F. Fears engaged in extensive communications with Seth Beal, Valerie Ricetti, and other Walmart's employees via mail and the wire to manufacture evidence (Beal's 11/30 email and RIF list) and submit false information to OSHA.

243.     Fifth, Since David deRubertis refused to provide Huynh with a copy of OSHA notification letter, the RICO Defendants manufactured the OSHA complainant notification letter after the fact to purportedly show that OSHA did in fact send a notification letter to deRubertis on Aug 7, 2017 to coverup the fact that the RICO Defendants conspired with Mark Marchione to obstruct OSHA from investigating Huynh's OSHA complaint.  Below are discrepancies between Marchione's fake notification letter and the notification template letter provided to OSHA investigators to communicate with complainants.

- As per statutory requirement Marchione should have sent the complainant notification letter by end of May 2017 at the very latest to deRubertis.  However, Marchione didn't send the letter until Aug 2017. It's worth to mention that Huynh didn't have access to this letter until after he fired deRubertis and forced him to return Huynh's client files.

- Marchione didn't assign an investigator to the case even though deRubertis

.                                          145

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1    purportedly filed that the complaint with OSHA on May 11, 2017.

2    • Marchione stated that Huynh's complaint was filed on 5/17/17 but deRuber-

3    tis claimed that his firm faxed, emailed, and UPS the complaint to OSHA on
     5/11/17.  Why the 6 days discrepancies?

4    • Marchione didn't attached the purported 125-page amended OSHA com-

5    plaint David deRubertis claimed he filed with OSHA on July 10, 2017.

6

7

8    

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

244.     Sixth, although David deRubertis claimed that he had filed Huynh's

OSHA complaint on May 11, 2017 but the Gibson Dunn and Walmart Defendants im-

properly influenced Mark Marchione to list the complaint filed date as May 17, 2017.

**What was May 17, 2017' significance**?



245.     Huynh put deRubertis on notice in late Sept 2017 that the SEC began to

scrutinize Walmart on how they accounted for Walmart Marketplace sales, customer re-

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

turns, and inventory mark down due to the allegations in Huynh's 4/19/17 SEC submission. Huynh shared with deRubertis Thompson's 5/22/17 letter to Biggs. To coverup the fact that the RICO Defendants conspired with Thompson as well as engaging in the Whitewashing Campaign, the RICO Defendants attempted to reset the boundary condition of their previous "Chronologically Impossible" 1.0 Defense by getting Marchione to fabricate the 8/7/17 notification letter where he listed the filed date for Huynh's complaint as 5/17/17 instead of the actual filed date of 5/11/17.

## FY2018 Q1 Earnings Release

Thu, May 18, 2017 | 6:00 AM US/Central

The quarterly earnings press release and pre-recorded phone call will be available at approximately 6:00 a.m. CT on the date of release. The transcript of the call will be available simultaneously with the pre-recorded call.

**To access the quarterly earnings call:**
In the United States and Canada, dial **877-523-5612**; access code: 9256278 (W-A-L-M-A-R-T), followed by the pound (#) sign. All other callers dial **1-201-689-8483**, access code: 9256278 (W-A-L-M-A-R-T), followed by the pound (#) sign.

246.    The RICO Defendants purportedly listed 5/17/17 as the filed date for Huynh's complaint instead of 5/11/17 in order to reset the initial boundary condition (since Huynh knew that Walmart's senior executives conspired with Thompson to whitewash evidence of Walmart's illegal conducts). By changing the complaint filed date from 5/11/17 to 5/17/17, the RICO Defendants would argue that even if someone at OSHA got a hand on Huynh's complaint and leaked the information to Walmart it didn't really matter because by then Walmart's senior executives had already pre-record Walmart's Q1 FY18 earnings call where Walmart shifted its reported SKU metric from Marketplace to Walmart.com  Additionally, the RICO Defendants chose Aug 7, 2017 as the purported

148

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

2

3

4

5

6

7

8

9

10

11

12

13

14



date to send out the complaint notification letter to purported proved that by then

Thompson's communications with Biggs regarding Walmart's Ecommerce accounting

treatment had already been completed.

**Coverup at DFHE**

247.    Fourth, to purportedly show that deRubertis exhausted DFEH's adminis-

trative remedies requirements before shotgun pleaded the five ADHD FEHA claims in

Federal Court, the RICO Defendants fabricated the proof of service from DFHE and the

deRubertis Law Firm to purportedly show that deRubertis and DFEH served Walmart

Huynh's right to sue letter on Mar 9, 2018.  Upon further inspections of these documents,

Huynh concluded that they were manufactured for the following reasons.

248.    First, it was hard to imagine that both the deRubertis Law Firm and DFEH

.

149

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

served Huynh's right to sue letter to Walmart at the exact same time and date i.e., on March 9, 2018 at 12:05 PM. The probability that this would happen in real life is like wining the "Powerball" lottery.

249. Second, Huynh's right to sue letter clearly stated in bolded words "Pursuant to Government Code Section 12962, DFEH will not serve these documents on your employer". Thus, it made no sense why would DFEH spend the time and resources to serve Huynh's right to sue letter to Walmart? Third, the purported right to sue letter that DFEH serve to Walmart had Huynh's actual signature on it even though the original right to sue letter that Huynh received from DFEH didn't have Huynh's signature. However, deRubertis was the only who had Huynh's right to sue letter that has Huynh's signature because right after Huynh received the right to sue letter from DFEH, deRubertis asked Huynh to physically sign the letter then emailed it to him. Thus, the only way that the Rescue Squad had the right to sue letter with Huynh's signature on it was deRubertis intentionally gave it to them.

250. Fourth, in Huynh's right to sue letter (under the notice to the respondent section), DFEH clearly stated that "No response to DFEH is requested or require". However, in the purported DFEH's proof of service letter it showed that DFEH requested Walmart to respond to Huynh's right to sue letter within 30 days. "Appearance or Answer Due: **within 30 days of receipt[51]**. This further proved that the DFEH proof of service letters were manufactured to cover up the facts that the RICO Defendants conspired to shotgun pleaded the five ADHD FEHA claims in Huynh's 3/15/18 complaint.

---

[51] This purported statement also contradicted with what is stated in the right to sue section of the DFEH website at https://www.dfeh.ca.gov/obtainrighttosue/ which stated "You may file your own lawsuit for employment discrimination in court rather than using the DFEH investigation process. This is advisable only if you have an attorney. **Also note that if you receive a right-to-sue notice, your complaint will not be investigated by DFEH** even if you later decide not to file a lawsuit.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

## Walmart and the GDC Squad Fabricated the Process Service Confirmation and Attached It to DFEH Right to Sue Form with Huynh's Signature Which David deRubertis Gave to Them.



**CT Corporation**

**Service of Process Transmittal**
03/09/2018
CT Log Number 532936478

TO: Kim Lundy Service of Process, Legal Support Supervisor
Walmart Inc.
702 SW 8th St, #640215
Bentonville, AR 72716-6209

RE: **Process Served in California**

FOR: Wal-Mart Associates, Inc. (Domestic State: DE)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| TITLE OF ACTION: | In the Matter of the Complaint of Huynh Tri, Complainant vs. Wal-Mart Stores, Inc., et al., Respondents // To: Wal-Mart Associates, Inc. |
| DOCUMENT(S) SERVED: | Letter(s), Complaint, Verification |
| COURT/AGENCY: | Department of Fair Employment & Housing, CA Case # NONE |
| NATURE OF ACTION: | Employee Litigation - Discrimination |
| ON WHOM PROCESS WAS SERVED: | C T Corporation System, Los Angeles, CA |
| DATE AND HOUR OF SERVICE: | By Process Server on 03/09/2018 at 12:05 |
| JURISDICTION SERVED: | California |
| APPEARANCE OR ANSWER DUE: | Within 30 days of receipt |
| ATTORNEY(S) / SENDER(S): | Department of Fair Employment 2218 Kausen Drive, Suite 100 Elk Grove, CA 95758 800-884-1684 |
| REMARKS: | Please Note: Document may cont. The document(s) received have being served. |
| ACTION ITEMS: | CT has retained the current log, 03/17/2018 Image SOP Email Notification, Kim Lundy Se |
| SIGNED: | C T Corporation System |
| ADDRESS: | 818 West Seventh Street Los Angeles, CA 90017 |
| TELEPHONE: | 213-337-4615 |

THE deRUBERTIS LAW FIRM, APC        (818) 761-2322
4219 Coldwater Canyon Avenue
Studio City, California 91604
ATTORNEY FOR (Name)                        N/A

COMPLAINANT:  TRI HUYNH
RESPONDENTS:  WAL-MART STORES, INC.; et al.

PROOF OF SERVICE                HEARING DATE    TIME    DEPT/DIV.    DFEH NO: 201801-00721009

1. At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the *(specify documents)* NOTICE OF FILING OF DISCRIMINATION COMPLAINT; NOTICE OF CASE CLOSURE AND RIGHT TO SUE; COMPLAINT OF EMPLOYMENT DISCRIMINATION BEFORE THE STATE OF CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING Under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.)

2. a. Party served:        Wal-Mart.com, Inc.

   b. Person served:       C.T. Corporation System, Agent for Service of Process
                           Service was recieved by Daisy Montenegro, Intake Specialist

   c. Address:             818 West 7th Street, Suite 930
                           Los Angeles, California 90017

3. I served the party in item 2
   a.        by personally delivering the copies     (1) on *(date)*: 03/09/2018
                                                      (2) at *(time)*: 12:05 p.m.

Person serving *(name, address, and telephone No.)*:

Juan Ramirez
Ace Attorney Service, Inc.
811 Wilshire Boulevard, Suite 900
Los Angeles, California 90017
(213) 623-3979

e. Fee for service:

c. Registered California process server.
(1) Employee or independent contractor.
(2) Registration No.: 2016308048
(3) County: LOS ANGELES

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   March 9, 2018

*(signature)*

*Contradicted with the official FEHA's Notice to Complainant which stated 'DFEH will not serve these documents on your employer' and Notice to respondents which stated 'No response to DFEH is requested or required?'*

*How was it possible that FEHA and David deRubertis served Walmart at the exact time*

151

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

**Cover Up at LWDA**

2

3

251.    Since David deRubertis never filed the 125-page amended complaint with

4

OSHA (deRubertis couldn't claim that he produced the content of Huynh's 4/19/17 SEC

5

submission to Walmart through a legitimate legal process), deRubertis and the Rescue

6

Squad acted in concert to file a PAGA claim with LWDA in early Jan 2018 then added

7

the PAGA claim to Huynh's amended complaint (see Case 3:18-cv-01631-VC: Dkt. 8 at

8

68) to use the PAGA claim as another excuse to leak Huynh's 4/19/17 SEC submission to

9

the RICO Defendants.

10

11



David deRubertis filed a PAGA Claim in order to Leak Huynh's SEC Submission to Walmart

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.

152

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

252.    On Jan 9, 2018, deRubertis mailed the PAGA notification letter to Walmart via US Postal Mail.  As showed below the OSHA amended complaint and the PAGA notification letter were exactly the same



> The content of the OSHA amended complaint and PAGA letter sent to Walmart is the same. It was extracted verbatim from Huynh's SEC submission that provided the specificity of Huynh's allegations against Walmart's illegal conducts.

.

153

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

253.    Additionally, in order to coverup the fact that the David deRubertis and

Brass acted in concerted to assert the ridiculous and frivolous PAGA claim in Huynh's

amended complaint to secretly leak Huynh's SEC submission to the Walmart Partici-

pants, the Rescue Squad asked Huynh to e-file a joint stipulation to ask District Vince

Chhabria to dismiss the PAGA claim with prejudice. Judge Chhabria dismissed the claim

with prejudice in early April 2019. Case 3:18-cv-01631-VC: DC Dkt. 67..

**The Walmart Shareholder Fraud Coverup Enterprise Continues to Commit-
ted Illegal Predicate Acts in Furtherance of Their Common Purpose of Get-
ting Huynh's Lawsuit Dismissed Against All the RICO Defendants.**

254.    Huynh filed the instant law suit with the United States District Court,

Northern District of California on Jan 10, 2022 asserting RICO and RICO conspiracy

claims against the RICO Defendants.  The RICO Defendants immediately acted in con-

cert to plan and execute a coordinated fraudulent scheme to obstruct the undue admin-

istration of justice in a judicial proceeding to get Huynh's complaint dismissed by this

Court.

**The Court Would Most Likely Dismiss Huynh's Complaint If It
Lacked Jurisdiction Over the RICO Defendants.**

255.    For this Court to have jurisdiction to hear Huynh's complaint, Huynh have

to meet three legal requirements.  First, this Court must have subject matter jurisdiction to

hear Huynh's lawsuit. This would not be a problem because his causes of actions arose

under Federal Laws i.e., RICO 18 U.S.C. § 1964(c) and RICO 18 U.S.C. § 1964(d), and

Bivens Action Claim against the Defendants.

256.    Second, in order for this Court to have personal jurisdiction upon the De-

fendants Huynh must satisfied two requirements: 1) Nexus of the Defendant to the forum

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

(i.e., Huynh must satisfy the minimum contact requirement for the Defendant). This should not be a problem because Huynh's RICO claims allow for national service of process. The Defendants need on have minimum contact with the United States, and 2) Huynh must meet the "Notice" requirements i F.R.C.P. Rule 4.

257.   Third, Huynh must prove the United States District Court, Northern District, Northern District of California is the proper venue for his lawsuit. This would not be a problem because a substantial number of the events (T and O) giving rise to this action occurred in this District.

258.   Therefore, the single point of failure for Huynh in this law suit is if he failed to effectuate service of process upon any of the Corporate Defendants because the Defendant will file a 12(b)(5) motion to dismiss Huynh's complaint. Once the Court dismissed Huynh's complaint, any of the remaining Defendant could file a 12(b)(7) motion to dismiss Huynh's complaint for failure to joint an indispensable party. Once the defendant succeeds in their motion, Huynh's complaint will be dismissed as to all the Defendants with prejudice.

**Rachel Brass Attempted to Deceive Huynh Into Improperly Effectuating Service Upon the RICO Defendants By Making Misleading Statements Regarding F.R.C.P Rule 4(d).**

259.   Exhibit 81 at 3 to 8 summarized in details of how Ms. Brass attempted to obstruct Huynh from effectuating service of process upon the Walmart and Gibson Dunn Defendants. Huynh discussed below two instances where Ms. Brass (acting on behalf of the Walmart Shareholder Fraud Cover Up Enterprise) committed wire fraud to execute the RICO Defendants' fraudulent scheme to get Huynh's lawsuit dismissed.

.

260.     On Jan 25, 2022 (Exhibit 82), Ms. Brass emailed Huynh out of the blue and purportedly claimed that she represents the Walmart and Gibson Dunn Defendant. Brass asked Huynh to send her the required paper work so she could waiver service of process for all of her clients. Ms. Brass attempted to deceive Huynh into obtaining waiver of service from her by purportedly cited F.R.C.P Rule 4(d).  However, Ms. Brass state-ment was misleading for two reasons. First, Rule 4(d) specifically instructs Huynh to mail a notice of waver of service of summons directly to Defendant directly (not to the Defendant's counsel).  Second, let assumed arguendo that Rule 4(d) does allow Huynh to send the notice of waiver of service of summons to miss Brass, Huynh still failed to ef-fectuate service of process upon he purported clients because Ms. Brass produced zero evidence which proved that she is the Walmart and Gibson Dunn Defendants' counsel. Although Ms. Brass previously represented Walmart Inc. in Huynh's SOX matter in 2018, it doesn't mean by extension that she is Walmart's legal counsel.  In short, if Huynh had acted on Ms. Brass' insidious deceptions, Huynh's lawsuit against all the RICO Defendants would be dismissed by this Court.

261.     On Jan 26, 2022 (Exhibit 83) , Ms. Brass attempted to deceive Huynh a second time. She emailed and purportedly claimed that she already waived service of pro-cess for the Walmart and Gibson Dunn Defendants and she ordered Huynh to email her the appropriate paper work so she could sign and return the waiver of service.  Ms. Brass' action was appalling and shameless because nowhere in Rule 4(d) that stated that Huynh could email Ms. Brass the notice of waiver of service of summons.

262.     In short, right of the bat Ms. Brass perpetrated at least two predicate acts (wire fraud under 18 U.S.C. § 1343) by emailing Huynh twice from California to Seattle .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1   in furtherance of the RICO Enterprise's Common Purpose of getting the instant lawsuit

2   throw out of Court. Additionally, Ms. Brass also violated 18 U.S.C. § 1503 for obstruc-

3   tion of the undue administration of Justice in a Judicial Proceeding. The other RICO De-

4   fendants also committed the sane predicate acts Ms. Brass because they caused Ms. Brass

5   to email Huynh in attempt to get Huynh's lawsuit against them dismissed.

6

7               **Clawson Attempted to Deceive Huynh to Get His Case Dismissed**
               **Against All Defendants Through Fraudulent Means.**
8

9        263.   On March 9, 2022, Ms. Clawson emailed Huynh and purportedly claimed

10  that she was retained by Epiq Global Service (there's no such entity). Since Ms. Clawson

11  didn't furnish any documentary evidence to prove that she was acting as Epiq eDiscovery

12  Solutions, Inc.'s legal counsel, Huynh asked her to file a notice of appearance with this

13  Court before he could talk with her regarding the case.

14

15       264.   On March 17, 2022, Ms. Clawson filed a notice of appearance (Case 3:22-

16  cv-00142-JSC: ECF 92) where she purportedly named EPIQ GLOBAL BUSINESS

17  TRANSFORMATION SOLUTIONS, LLC as a Defendant in this case as well as

18  Kasales, and Lindern. Therefore, by default Ms. Clawson purportedly claimed that

19  Kasales and Lindern worked for EPIQ GLOBAL BUSINESS TRANSFORMATION SO-

20  LUTIONS, LLC while they participated in the conducts of the RICO Enterprise between

21  Mid-June 2018 to beginning of 2020.  Huynh proved to Ms. Clawson in his March 17,

22  2022 email that neither Lindern nor Kasales worked for EPIQ GLOBAL BUSINESS

23  TRANSFORMATION SOLUTIONS, LLC. This entity was not formed until October of

24  2019.  Furthermore, Huynh provided Ms. Clawson with the contract that Kari deRubertis

25  had signed with Epiq eDiscovery Solutions, Inc. and various wire transfers made by Kari

26

27  .

28

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

deRubertis to pay the billed invoices.  Subsequently, Ms. Clawson filed an amended no-
tice of appearance to replace the name EPIQ GLOBAL BUSINESS TRANSFOR-
MATION SOLUTIONS, LLC with Epiq eDiscovery Solutions, Inc. See Exhibit 84.

265.    In short, Ms. Clawson used the name EPIQ GLOBAL BUSINESS
TRANSFORMATION SOLUTIONS, LLC as the named Defendant in this lawsuit in or-
der to purportedly claim later that Huynh served the wrong entity i.e., Epiq eDiscovery
Solutions, Inc instead of her client. So, this Court couldn't assert personal jurisdiction
over her client.  As discussed above, Since the Court had no personal jurisdiction over
her client the Court mostly likely dismissed all of Huynh's claim against all of the other
RICO Defendants.

266.    In her notice of appearance filed on March 19, 2022, Ms. Clawson stated
that Huynh purportedly served Epiq eDiscovery Solutions, Inc on Feb 28.  Huynh wor-
ried that Ms. Clawson may improperly influenced the person who accepted service from
Victoria Huynh on Feb 28 to file a false declaration to purportedly assert that Huynh was
the one who served him not Victoria Huynh.  Out of abundance of caution Huynh asked
Victoria Huynh to serve Epiq eDiscovery Solutions, Inc. again. However, this time,
Huynh captured the service of process in video to prove to this Court Huynh properly ser-
viced Epiq eDiscovery Solutions, Inc.  See Exhibit 84.

267.    Huynh filed additional proof of service for Epiq eDiscovery Solutions,
Inc. on March 24, 2022(See Exhibit 85). In his filing, Huynh explained to the Court that
the reason that Huynh served the Defendant again because his complaint may be dis-
missed against all the RICO Defendants if he failed to comply to F.R.C.P Rule 4.  Inter-
estingly, on the following Monday, the Defendant's registered agent, Cogency Global

158

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Inc., purportedly returned the summons and complaint served upon them a few days early. The reason they provided was that they do not serve or no longer serve as agent of process for the Defendant.  However, when Victoria Huynh served Epiq eDiscovery Solutions, Inc. on Feb 28, 2022 by personally serve Cogency Global, Inc. they didn't return the summons and complaint to Huynh.  See Exhibit 86 at 4 to 8.

268.    On March 29, 2022, Huynh emailed Ms. Clawson four times to ask her to confirm whether Cogency Global Inc. is still the registered agent for Epiq eDiscovery Solutions, Inc. However, Ms. Clawson refused to confirm whether Cogence Global, Inc. is still the registered agent for her client. See Exhibit 86.

269.     In short, the circumstantial evidence discussed above led Huynh to infer that after Huynh filed his additional proof of service for her client, Ms. Clawson contacted and/or caused other to contact Cogency Global to ask them to return the summons to Huynh in other to coverup the facts that Ms. Clawson was acting in concert with the other RICO Defendants to get Huynh's lawsuit dismissed against all of the RICO Defendants.  Since Ms. Clawson not only acted in Epiq eDiscovery Solutions, Inc.'s behalf but also acted in the other RICO Defendants' behalf to dismiss Huynh's lawsuit, she also committed wire fraud several times (email transmissions from California and Washington States) in furtherance of the RICO Enterprise's objective.

**The RICO Defendants Caused ABC Legal Service to Sabotage Huynh's Attempt to Effectuate Service of Process Upon These Defendants.**

**Circumstantial Evidence Led Huynh to Conclude That David deRubertis Caused ABC Legal Service to Sabotage Huynh's Attempt to Effective Service of Process Upon Him and His Wife**

270.    Huynh hired ABC Legal Services to serve the summons and complaint

159

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

upon Kari deRubertis on Mar 3, 2022.  In his proof of service, he wrote:

> "Kari deRubertis, I delivered the documents to Kari deRubertis with identity con-
> firmed by subject stating their name. The individual accepted service with direct
> delivery. The individual appeared **to be a bald white male contact** 45-55 years of
> age and 5'6"-5'8" tall. Very rude acceptance of service"

271.    Huynh interpreted the term "bald white male" who lives in the same house
with Kari deRubertis to be David deRubertis.  David deRubertis purportedly claimed to
be Kari deRubertis to accept service of process from the process server to cause Huynh's
service of process upon Kari deRubertis to be defective.  However, it was abnormal for
the server to personally served deRubertis when he was not a woman. Subsequently,
Huynh emailed David deRubertis multiple times to ask him to confirm whether he had
received service of process for his wife, Kari deRubertis.  deRubertis refused to answer
Huynh's question. This led Huynh to conclude that David deRubertis acted in concert
with ABC Legal Service and the process server to sabotage Huynh's service of process
upon Kari deRubertis. This allowed Kari deRubertis to get Huynh's lawsuit against her
dismissed.  See Exhibit 87

272.    Huynh hired ABC Legal Service to serve David deRubertis with summons
in his official capacity at his office at 8889 W. Olympic Blvd. Second Floor, Beverly
Hills, CA 90211. The process server served a Jane Doe instead of David deRubertis in
the first instance on Feb 14, 2022.  Huynh filed the proof of service with this Court the
following day. At the time Huynh didn't realize that the manner upon which the ABC Le-
gal Service's process server served deRubertis was deficient.  After conducting legal re-
search, Huynh found that the service of process was flawed in two ways.  First, the pro-
cess server didn't attempt to personally serve David deRubertis at least 2 to 3 times be-
fore resorted to substitute service.  This violated ABC Legal Service Process and Poicies.

160

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

See Exhibit 91.

273.     Second, the process server served a Jan Doe without verifying whether she was authorized to receive service of process on David deRubertis' behalf.  Huynh communicated these findings to ABC Legal Service. Huynh also asked Vincent Lo, project manager, at ABC Legal Service during a phone call on Mar 9, 2022 why the process server didn't attempt to personally serve David deRubertis at least a few times as required by California Civil Code of Civil Procedure before resorting to substitute service.  Mr. Lo angrily told Huynh that ABC Legal Service did comply with the Court process.  Lo told Huynh that if Huynh didn't like it then he will cancel the order and refund Huynh the money.  Huynh asked Mr. Lo to send another server to serve Mr. deRubertis at his residence. Substitute service was effectuated upon deRubertis in his official capacity on Mar 15, 2022 in accordance with California Laws.  Huynh filed an amended proof of service with the Court on Mar 31 (ECF 146).  Despite knowing that ABC Legal Service properly served him the summons on Mar 15, 2020, Mr. deRubertis and his lawyer filed a frivolous motion to dismiss Rule 12(b) for improper purpose. Huynh emailed deRubertis' counsel an analysis which proved that both Mr. deRubertis and Mr. Holder acted improperly when they filed their motion to dismiss.  See Exhibit 88.

274.     In short, Mr. deRubertis committed wire fraud and/or caused others to commit wire fraud by using email and/or cell phone to communicate with ABC Legal Service (between California and Washington States) in an attempt to cause Huynh service of process upon him, his wife, and the deRubertis Law Firm to be defective.

.

**The Circumstantial Evidence Discussed Below Led Huynh to Conclude That Each of the RICO Defendants Directly Influenced And/Or Caused Other To Improperly Influence ABC Legal Service to Sabotage Huynh's Service of Process.**

275.    On March 14, 2022, Huynh emailed Vincent Lo at ABC Legal Service to put him and his employer on notice that ABC Legal Services provided Huynh with defective proof of services which could cause Huynh's lawsuit to be dismissed by this Court. The proof of services that ABC Legal Services produced for Payne & Fears LLP, Orrick Herrington & Sutcliffe LLP, Matthew Boyle, Mark Marchione, Kathy Von Lindern (personal capacity), Kari deRubertis, and Renee Quezada (personal capcity) listed the Oakland District Court as the Court that has jurisdiction on Huynh's Lawsuit instead of the San Francisco Court.  See Exhibit 89. Additionally, the proof of services produced for Payne & Fears LLP, Orrick Herrington & Sutcliffe LLP didn't provide the details of who the process server served the summons and complaint to. This was a violation of ABC Legal Service policy and procedure. See Exhibit 90.

276.    In summary, the circumstantial evidence discussed in in paragraph 218 to 236 proved that the RICO Defendants acted in a coordinate manner since the beginning of this litigation to execute a two-prong strategy to get Huynh's Lawsuit against all the RICO Defendants dismissed by 1) caused Huynh's service of process for at least one Corporate Defendant to be defective which led Huynh's complaint against this Defendant to be dismissed under Rule 12(b)(5), and 2) this enabled any one of the RICO Defendants to get Huynh's lawsuit against all the Defendants dismissed by filing a motion to dismiss for failure to join an indispensable party under Rule 12(b)(7).

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
(Violations of RICO, 18 U.S.C. § 1962(c))
(Against All RICO Defendants)

**Legal Elements of a 1962(c) Claim**

"To allege a RICO claim under 18 U.S.C. § 1962(c), the plaintiff must plead four elements: (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. Stanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir. 2010). It is also important to note that in RICO civil claim Huynh only needs to prove the elements above by preponderance of evidence versus the beyond reasonable doubt standards under criminal case.

There are five components that the Plaintiff needs to prove:

1. Existence of an enterprise.

2. That Engaged or Affect in Interstate Commerce.

3. The Defendants Participate in the Conduct or Management of the Enterprise.

4. Through a pattern of racketeering activity

5. Which Caused Injury to the Plaintiff's properties

278.    Elements #1 and #2 are proved at the Enterprise Level while Elements 3,4, and 5 are proved at the Defendants level.

279.    Huynh restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein. This claim is brought against the RICO Defendants for actual damages and treble damages under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, et seq.

**Existence of the Walmart Shareholder Fraud Coverup Association in Fact Enterprise**

**The Walmart Shareholder Fraud Coverup Enterprise Is an Association in Fact Enterprise Form as Early as Late June 2016 and Continue To Today.**

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

280.    The Walmart Shareholder Fraud Coverup Enterprise (referred herein as the WSF Coverup Enterprise) is an association-in-fact enterprise. It was formed as early as 2016 and continues to Mid 2021 for the common purpose of covering up Walmart's $140 Bil fraud against shareholders and ensuring a civil and criminal risk-free future for all of its members. The Enterprise Consists of the Following Individual.

**The Walmart Participants)**

- Walmart Inc. and Walmart.com USA LLC
- Doug McMillion, President and CEO, Walmart Inc.
- Brett Biggs, Executive Vice President and Chief Financial Officer, Walmart
- Marc Lore, former President and CEO, Walmart.com US.

**The law firm of Gibson Dunn Crutcher Law Firm,** including its employees and agents; and the GDC participants (aka the Rescue Squad).

**The Gibson Dunn Particpants**

- Theodore Boutros, Senior Partner
- Eugene Scalia, Senior Partner
- Rachel Brass, Senior Partner

**The other Law Firm participants**

- The deRubertis Law Firm, including its employees and agents; and the deRubertis participants i.e., David deRubertis and Kari deRubertis.
- The Payne & Fears Law Firm, including its employees and agents
- The law firm of Orrick, Herrington & Sutcliffe, including its employees and agents i.e., Kenneth Herzinger and others

**The ESI Providers**

- Epiq eDiscovery Solutions, Inc. including its employees and agents such as Doug Kasales, Kathy Vonlindern, and others.
- Lighthouse Document Technologies, Inc. including its employees and agents, and the e.g., Renee Quezada, and other

**The PR Machine (PR agencies and Journalists)**

- Matthew Boyle, a Bloomberg News' Reporter.

**The Investment Analysts**

164

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

- BOFA Securities, Inc. including its employees and agents, such as Robert Ohmes, Investment Analys.

**The Federal Official**

- Mark Marchione, former OSHA's Regional Investigator

**The Federal Judges[52]**

- Vince Chhabria, District Judge for the United States District Court for the Northern District of California
- Sallie Kim, Magistrate Judge for the United States District Court for the Northern District of California.

281.    As discussed in the paragraph above, the Walmart Shareholder Fraud Coverup Enterprise was formed in late 2016 and operates through Mid-2021 (after the dismissal of Huynh's 9th Circuit Court of Appeal Case).  However, as discussed above the Enterprise starts up again after Huynh filed this instant lawsuit on Jan 10, 2022 in an attempt to obstruct Huynh from prosecute the RICO Enterprise and the RICO Defendants.  The main purpose of the Enterprise was to coverup Walmart's Shareholder Fraud Conducts for making misleading statements of material facts to its investors in FY17 and FY18.

282.    The Walmart Shareholder Fraud Coverup Enterprise is an association in fact enterprise because it met three criteria.  First, it has a common purpose to coverup Walmart $140 Bil Shareholder Fraud Scheme.  Second, there are tightly integrated and coordination of activities among its members to execute the two-pronged strategies discussed in paragraph 69.  Third, it has longevity in its pursuit of its common purpose.  The Enterprise formed sometime late 2016 after Huynh raised his complaint to Walmart's executives regarding Walmart's po-

---

[52] Not named as Defendants in this complaint due absolute immunity protection.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

tential misconducts then continues to present day (attempting to obstruct Huynh from prose-

cuting the instant lawsuit as well as continues to cover up Walmart's $140 Bil shareholder

fraud scheme).

**The Walmart Shareholder Fraud Coverup Enterprise Affect Interstate Commerce**

283.    As discussed in previous paragraphs, to further its common objective the En-

terprise procured interstate services, move people/its members or others across state line, and

engaged in predicate acts that used the instrument of interstate commerce.

- David and Kari deRubertis (based in California) signed an agreement with Epig eDiscovery Solutions, Inc (Based out of New York City) in Mid-2018 to provide ESI services that engaged in evidence destruction, mutilation and suppression.
- Likewise, Walmart (Bentonville, AR) and Gibson Dunn (California) used the ser- vice of Lighthouse Document Technologies, Inc. (Based out of Seattle, WA) to fab- ricate and manufacture evidence (discussed above for example, the Nov 30 email and RIF list). They also manipulated how they process other documents by bypass- ing the industry standard ESI extraction/processing protocol.
- David and Kari deRubertis caused Huynh to travel from Seattle, WA to Southern California, in order to collect confidential and non-public information that Huynh submit to the SEC to execute the two prong-strategy discuss in paragraph 46 above.
- Additionally, the RICO Defendants used the instruments of Interstate Commerce like emails, phone, internet video streaming, and US mails to effectuate the Enter- prise Common's purpose.

284.    In short, the evidence proved the Walmart Shareholder Fraud Enterprise met

the Interstate Commerce Nexus requirement under RICO.

285.    The analysis of Element 3,4, and 5 will be conduct at an individual Defend-

ants. Please note that once Huynh proved the presume facts for the individual Defendants then

the Corporate Defendants would be liable for the actions and misconducts of their employees

and/or agent.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

**Individual Defendants Dough McMillon, Brett Biggs, and Marc Lore**

286.    As discussed above all three of these Defendants, engaged evidence white-washing activities to make the misleading statements made by Walmart regarding the total number of Marketplace SKUs to investors in FY17.  They perpetrate in numerous predicate acts (wire fraud and obstruction of an SEC proceeding etc.) to further the common purpose of the Enterprise.  Additionally, these defendants also are the leaders which set strategy and direction for the Enterprise with the help of their trusted advisor at Gibson Dunn. In short, they not only participate in the conduct of the Enterprise but also involved its management.

287.    These Defendants engaged in wire fraud as they engaged in the whitewashing evidence discussed above at numerous investors communication events such as Walmart's Quarterly Earnings Calls, Annual Meetings with Walmart's shareholders and investment analysts, they also attended various investment analyst conference to disseminate misleading statements to whitewash evidence of Walmart's misconducts.  Additionally, they also caused others to act on their behalf (e.g., David deRubertis, Ohmes, Boyles and others).

288.    The predicate acts perpetrated by these Defendants were not random because the Enterprise have a framework, discussed above, to attack legal element #1 of the SEC Burden of Productions (i.e., to prove the non-existence of misleading statements of material facts).  Lastly, the predicate acts perpetrated and/or caused other to perpetrate in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward and losing Huynh's SOX claims).

289.    Each of these three RICO Defendants hav  engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).
.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

290.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award and 2) loss of Huynh's claim to his civil lawsuit against Walmart, and 3) costs to appeal District Judge Vince Chhabria's dismissal of Huynh's complaint against Walmart with the Ninth Circuit Court of Appeal.

291.     Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

292.     Defendants' conduct was a substantial factor in causing that harm. The above-described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

293.     Pursuant to 18 U.S.C. § 1964(c), Huynh is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

294.     Additionally, Walmart Inc. and Walmart.com USA LLC is also responsible for the injuries sought by Huynh above because it is responsible for actions and misconducts of its employee and/or agent.

**Individual Defendants Boutrous, Scalia, and Brass**

295.     As discussed above, these three defendants engaged in the conducts of the Enterprise (obstruction of the judicial proceeding by engaging evidence suppression, fabrication, .

destruction, collection of confidential and non-public information from David deRubertis then and coordinate the activities among various members (including the Walmart Participants) in furtherance of the Enterprise common purpose.).  They also advised the Walmart participants on strategies and tactics to defeat Legal Element #1 of the SEC 10-b 5 claim

296.    As discussed in details above, these Defendants used and/or cause other to use the wire and/or mail infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, they engaged and/or cause other to engage in evidence destruction, fabrication, mutilation, and evidence suppression.  They also caused Judge Chabbria to block Huynh from submitting evidence into the records to defend himself against Walmart's Motion for Summary Judgment.  Additionally, by perpetrating all the described predicate acts above they also obstruct the judicial and SEC proceeding.

297.    The predicate acts perpetrated by these Defendants were not random because the Enterprise have a framework, discussed above, coordinate their activities with those order RICO Defendants to attack legal element #1 of the SEC Burden of Productions (i.e., to prove the non-existence of misleading statements of material facts) in order to obtain a non-enforcement action letter.   Lastly, the predicate acts perpetrated and/or caused other to perpetrate in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward and losing Huynh's SOX claims).

298.    Each of these three RICO Defendants have engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

299.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award and 2) loss of Huynh's claim to his civil lawsuit against

.

169

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Walmart, and 3) costs to appeal District Judge Vince Chhabria's dismissal of Huynh's complaint against Walmart with the Ninth Circuit Court of Appeal.

300. Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

301. Defendants' conduct was a substantial factor in causing that harm. The above-described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

302. Pursuant to 18 U.S.C. § 1964(c), Huynh is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

303. Additionally, Gibson Dunn & Crutcher LLP. is also responsible for the injuries sought by Huynh above because it is responsible for actions and misconducts of its employee and/or agent.

**Individual Defendants Kari and David deRubertis**

278. As discussed above, both Kari and David deRubertis engaged in the conducts of the Enterprise (obstruction of the judicial proceeding by engaging evidence suppression, fabrication, destruction, collecting a dissemination of confidential and non-public information to the other RICO Defendants to further the Enterprise objective of covering up the $140 Shareholder Fraud Scheme). Their conducts contributed to the defeat of Legal Element #1 of the SEC 10-b 5 claim

.

170

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

279.     As discussed in details above, these Defendants used and/or cause other to use the wire and/or mail infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, they engaged and/or cause other to engage in evidence destruction, fabrication, mutilation, and evidence suppression.  They disseminate information to that result in the obstruction of the administrative of justice as well as obstruction of an official proceeding (OSHA and SEC investigations).

280.     The predicate acts perpetrated by Kari and David deRubertis were not random because the Enterprise have a framework in place to coordinate their activities with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts they perpetrated eventually lead to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).  The predicate acts ultimately caused the dismissal of Huynh's civil case.

281.     Lastly, these Defendants perpetrated predicate acts perpetrated and/or caused other to perpetrate in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward and losing Huynh's SOX claims).  Each of these three RICO Defendants have engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

282.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award and 2) loss of Huynh's claim to his civil lawsuit against Walmart, and 3) costs to appeal District Judge Vince Chhabria's dismissal of Huynh's complaint against Walmart with the Ninth Circuit Court of Appeal.

.

171

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

283.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

284.    Defendants' conduct was a substantial factor in causing that harm. The above-described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

285.    Pursuant to 18 U.S.C. § 1964(c), Huynh is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

286.    Additionally, the deRubertis Law Firm, APC., is also responsible for the injuries sought by Huynh above because it is responsible for actions and misconducts of its employee and/or agent.

**Individual Defendants Kasales and Von Lindern**

287.    As discussed above, both Kasales and Von Lindern engaged in the conducts of the Enterprise (destruction, mutilation, and suppression of evidence which resulted in the obstruction of a judicial proceeding) in furtherance of the Enterprise's common purpose to defeat Legal Element of the SEC 10b-5 claim and Huynh's SOX claims). Their conducts contributed to the defeat of Legal Element #1 of the SEC 10-b 5 claim

288.    As discussed in details above, these Defendants used and/or cause other to use the wire and/or mail infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, they engaged and/or cause other to engage in evidence destruction, fabrication, .

172

mutilation, and evidence suppression.  They disseminate information to that result in the obstruction of the administrative of justice as well as obstruction of an official proceeding (SEC investigations).

289.    The predicate acts perpetrated Kasales and Von Lindern were not random because they executed them within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts they perpetrated contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart) and the dismissal of Huynh's SOX claim against Walmart.

290.    Lastly, these Defendants perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward and losing Huynh's SOX claims).  Each of these  RICO Defendants have engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

291.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award and 2) loss of Huynh's claim to his civil lawsuit against Walmart, and 3) costs to appeal District Judge Vince Chhabria's dismissal of Huynh's complaint against Walmart with the Ninth Circuit Court of Appeal.

292.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

293.    Additionally, Epiq eDiscovery Solutions Inc., is also responsible for the injuries sought above because it is responsible for actions and misconducts of its employee and/or
.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

agent.  Please note there maybe other employees within Epiq eDiscovery Solutions, Inc. who engaged in the rendering of services to the deRubertis Law Firm who action may also caused Epiq eDiscovery to be liable.

**Individual Defendant Renee Quezada**

294.    As discussed above, both Renee Quezada engaged in the conducts of the Enterprise (Fabrication of Evidence and Submitted False Evidence) in furtherance of the Enterprise's common purpose specifically to get Huynh's Civil Claim against Walmart dismissed.

295.    As discussed in details above, these Defendants used and/or cause other to use the wire and/or mail infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, they engaged and/or cause other to engage the manufacturing and production of false evidence which enable Walmart to fraudulent defeat Huynh's lawsuit against them.

296.    The predicate acts perpetrated Renee Quezada were not random because they executed them within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts they perpetrated contribute to the dismissal of Huynh's SOX claim against Walmart.

297.    Lastly, the Defendant perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's property i.e., the dismissal of Huynh Huynh's SOX claims.  Each of these RICO Defendants have engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

298.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his civil lawsuit against Walmart, and 2) costs to appeal District Judge

.

Vince Chhabria's dismissal of Huynh's complaint against Walmart with the Ninth Circuit Court of Appeal.

299.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

300.    Additionally, Lighthouse Document Technologies, Inc. is also responsible for the injuries sought above because it is responsible for actions and misconducts of its employee and/or agent (e.g., Renee Quezada.  Please note there may be other employees within Epiq eDiscovery Solutions, Inc. who engaged in the rendering of services to the deRubertis Law Firm who action may also cause Lighthouse Document Technologies to be liable.

**Individual Defendant Matthew Boyle**

301.    As discussed above, Boyle engaged in the conducts of the Enterprise (Disseminate of false and misleading information to make the misleading statements made by Walmart's executives no longer misleading to further of the Enterprise's common purpose to defeat Legal Element No. 1 of the SEC 10b-5 claim. Their conducts contributed to the defeat of Legal Element #1 of the SEC 10-b 5 claim

302.    As discussed in details above, these Defendants used and/or cause other to use the wire and/or mail infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, Boyle involved in dissemination of misleading statements regarding the Walmart Marketplace as well as other Walmart's financial metric) the dissemination of false information also result in the commission of obstruction of an official proceeding.

303.    The predicate acts perpetrated Boyle were not random because they were executed within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts they perpetrated .

175

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).

304.    Lastly, these Defendants perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward). Boyle engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

305.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award.

306.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

**Individual Robert Ohmes**

307.    As discussed above, Ohmes engaged in the conducts of the Enterprise (Disseminate of false and misleading information to make the misleading statements made by Walmart's executives no longer misleading to further of the Enterprise's common purpose to defeat Legal Element No. 1 of the SEC 10b-5 claim. These conducts contributed to the defeat of Legal Element #1 of the SEC 10-b 5 claim

308.    As discussed in details above, Ohmes used and/or cause other to use the wire and/or mail and Internet infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. For example, Ohmes involved in dissemination of misleading statements regarding the Walmart Marketplace as well as other Walmart's financial metrics) the dissemination of false information also result in the commission of obstruction of an official SEC investigation. .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

309.    The predicate acts perpetrated Ohmes were not random because they were executed within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts Ohmes perpetrated contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).

310.    Lastly, these Defendants perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward). Ohmes engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

311.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award.

312.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

313.    Additionally, BOFA Securities Inc. which will be added as party in this action and replaced Bank of America Inc. is also responsible for the injuries sought above because it is responsible for actions and misconducts of its employee and/or agent (e.g., Robert Ohmes).

**Individual Marc Marchione**

314.    As discussed above, Marchione engaged in the conducts of the Enterprise (obstruction of the OSHA investigation which allowed Walmart Inc. and the other RICO Defendants to take Huynh case to Federal Court where they leverage the relationship with Huynh to obtain Huynh from Huynh as well as disseminate false information to discredit Huynh with

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

the SEC). Marchione's action contributed to the success of the Walmart Inc. to further of the Enterprise's common purpose to defeat Legal Element No. 1 of the SEC 10b-5 claim.

315. As discussed in details above, Marchione used and/or cause other to use the wire and/or mail and Internet infrastructure to carry out the Enterprise Fraudulent Coverup Scheme more than two instances. For example, Ohmes involved coordination with David deRubertis and Payne & Fears via emails, mail and/or other mean of communications to obstruct OSHA from investigating Huynh's claim.

316. The predicate acts perpetrated Marchione were not random because they were executed within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts Marchione perpetrated contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).

317. Lastly, Marchione perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward). Marchione engaged in multiple predicate acts, as described above. The conduct of his actions constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

318. Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award.

319. Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

.

**Orrick Herrington & Sutcliffe LLP**

320.     As discussed above, Orrick's employees and/or agents engaged in the conducts of the Enterprise by collecting the misleading statements and manufacturing of evidence discussed above and worked with the Gibson Dunn and Walmart Participants to prove the non-existence of the misleading statements made by Walmart to investors to the convince the SEC that Walmart Inc. didn't make misleading statements to investor). Ultimately, Orrick's employees and/or agents working together with the other RICO Defendants resulted in the SEC issuance of the non-enforcement actions against Walmart.

321.     As discussed in details above, Orrick Herrington & Sutcliffe LLP used and/or cause other to use the wire and/or mail and Internet infrastructure to carry out the Enterprise Fraudulent Coverup Scheme. i.e., its involvement in the coordination and dissemination of misleading statements (regarding the whitewashing evidence statements made by Walmart to investors to coverup the original misleading statements) to the SEC to be deceived and issue a non-enforcement letter to Walmart.

322.     The predicate acts perpetrated by Orrick Herrington & Sutcliffe LLP's employees and/or agents were not random because they were executed within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts these individual perpetrated contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).

323.     Lastly, these Defendants perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward). Ohmes engaged in multiple predicate acts, as described above. The conduct of each of the

.

179

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

RICO Defendants constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

324.    Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award.

325.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

**Payne & Fears LLP**

326.    As discussed above, Payne & Fears' employees and/or agent engaged in the conducts of the Enterprise (obstruction of the OSHA investigation which allowed Walmart Inc. and the other RICO Defendants to take Huynh case to Federal Court where they leverage the relationship with Huynh to obtain Huynh from Huynh as well as disseminate false information to discredit Huynh with the SEC).  Payne & Fears' employees and/or agent actions contributed to the success of the Walmart Inc. to further of the Enterprise's common purpose to defeat Legal Element No. 1 of the SEC 10b-5 claim.

327.    As discussed in details above, Payne & Fears' employees and/or agents actions and/or cause other to use the wire and/or mail and Internet infrastructure to carry out the Enterprise Fraudulent Coverup Scheme much more than two instances of perpetration. For example, Payne & Fears coordinated and communicated with Walmart, David deRubertis, and Marchione via emails, mail and/or other mean of communications to obstruct OSHA from investigating Huynh's claim.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

328.     The predicate acts perpetrated Payne & Fears' employees and/or agents Marchione were not random because they were executed within the framework established by the Enterprise in coordination with the other RICO Defendants to achieve the Enterprise's common purpose. The predicate acts Payne & Fears' employees and/or agents perpetrated contribute to the dismissal of Huynh's SEC whistleblower case (attacking Legal Element #1 of the 10b-5 SEC action against Walmart).

329.     Lastly, Payne & Fears' employees and/or agents perpetrated predicate acts in furtherance of the Enterprise's common purpose caused injury to Huynh's properties (losing Huynh's SEC reward).  Payne & Fears' employees and/or agents engaged in multiple predicate acts, as described above. The conduct of his actions constitutes a pattern of racketeering activity within the meaning of U.S.C. § 1961(5).

330.     Huynh was injured in his property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c) which included but not limited to the following: 1) loss of Huynh's claim to his SEC award.

331.     Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

**CLAIMS FOR RELIEF**
**SECOND CLAIM FOR RELIEF**
(Violations of RICO, 18 U.S.C. § 1962(d))
(Against All RICO Defendants)
**Legal Elements of an 18 U.S.C. § 1962(d) Claim**

Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate subsections (a), (b), or (c) of RICO. 18 U.S.C. § 1962(d).

The essential elements of a § 1962(d) conspiracy include: (1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities. Salinas v. United States, 522 U.S. 52, 66 (1997); Rose v. Bartle, 811 F.2d 331, 366 (3d Cir. 1989). Be-

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

cause there is no requirement of some overt or specific act, the RICO conspiracy pro-vision is even more comprehensive than the general conspiracy offense. Salinas, 522 U.S. at 63. Thus, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001); see also Salinas, 522 U.S. at 64 ("If conspirators have a plan which calls for some con-spirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

332.    Huynh realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

333.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

334.    Using the framework to prove the existence of an agreement to engage in a conspiracy and the specificity of the RICO Defendants' commission of the illegal predicate acts, it was more probable than not RICO Defendant had an agreement in place to violate 18 U.S.C. § 1962(d) for several reasons. Huynh alleges in details the very same elements that each Defendants above perpetrated.  The only different here is instead of repeating the analy-sis as to each Defendants, Huynh will perform the analysis for all the Defendant then at the end Huynh will sought injuries as to each Defendants as discussed in the First Cause of Ac-tion discussed above.

335.    The predicate acts and/or overt acts committed by the RICO Defendants as de-scribe above were coordinated and interdependence of each other which resulted in the fulfill-ment of the Walmart's Shareholder Fraud Enterprise's common purpose. In short, the above factual allegations and analyses proved that it is more likely than not that the RICO Defend-ants entered in an agreement to conspire to violated 18 U.S.C. § 1962(c).

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

336. Additionally, due to the high level of coordination and interdependency of the predicate acts and over acts perpetrated by the RICO Defendants, it was more likely than not that RICO Defendants (specifically the Walmart Participants) had knowledge of the WSF Coverup Enterprise's activities.

337. In short, there was an agreement among the RICO Defendants to conspire to participate in the management and/or operation of the WSF Coverup Enterprise for the common purpose of covering up Walmart's $140 Bil fraud against shareholders and to ensure a criminal and civil risk-free future for the RICO Defendants. Therefore, the RICO conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

338. As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Huynh has been injured in his business and properties. The injuries sought as to each of the Defendants had already been discussed in the First Cause of Actions to Huynh will not repeat it here in the interest of non-redundancy.

339. Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

340. Defendants' conduct was a substantial factor in causing that harm. The above-described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional man-ner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

341.    Pursuant to 18 U.S.C. § 1964(c), Huynh is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## CLAIMS FOR RELIEF
## THIRD CLAIM FOR RELIEF
(Bivens Actions)
(For the Named RICO Defendants Except the Excluded the Defendants Below[53])

### Elements of a § 1983 Action

"Traditionally, the requirements for relief under [§] 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991). Or, more simply, courts have required plaintiffs to "plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986); see also Pistor v. Garcia, 791 F. 3d 1104, 1114 (9th Cir. 2015.

342.    As the factual allegations above showed the named Defendants entered into an agreement with Judge Chhabria and Magistrate Judge Kim to committed overact acts to injure Huynh in his property (specifically the dismissal of his SOX claims against Walmart Stores Inc.).  In the process of committed the overt act in further of the Walmart's Shareholder Fraud Coverup Enterprise's common purpose, the Defendant Violated Huynh's Right to Substantive Due Process (i.e., right to access to the Court) and Equal Protection Under Law as guaranteed by the Fifth amendment of the constitution.

343.    As discussed above, the Defendants named in this cause of actions engaged in over acts that violated Huynh's substantive right to due process i.e., the right to have access to

---

[53] This third cause of actions applied to all the Defendants except the following excluded Defendants:  Payne & Fears, Orrick, Herrington & Sutcliffe, Ohmes, Boyle, and Marchione.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

the Court by engaging evidence fabrication, destruction, and suppression which resulted in the dismissal of Huynh's SOX Complaint against Walmart.  Additionally, the named Defendants also caused District Judge Vince Chhabria and Magistrate Judge Sallie Kim to treat Huynh differently than other litigants (obstructed Huynh from entering evidence into the record (e.g., didn't rule on Huynh's motion for leave to supplement material facts so Huynh could defend himself against Walmart's motion for summary judgment, allowed Walmart to classify documents as confidential when in the fact they were not to prevent Huynh from using them to prosecute his case against Walmart) that appeared in their Court's room for no national basis (i.e., Huynh's claim of deprivation of his Equal Protection Class of One).  These Defendants were integral participants in the conspiracy with the other Defendants to commit overt acts which they knew or should have known will cause injuries to Huynh's properties.

344.    In summary, each of the RICO Defendant knowingly participated in a conspiracy with federal officials and has engaged in overt acts, as described above in furtherance of the WSF Coverup Enterprise's illegal common purpose i.e., to conceal Walmart's $140 Bil fraud against shareholders.  As a foreseeable result of these overt acts, Huynh was injured in his properties which include but are not limited to the loss of Huynh's civil lawsuit against Walmart, and the costs to appeal District Judge Vince Chhabria's dismissal of Huynh's complaint with the United States Court of Appeals for the Ninth Circuit.

345.    Furthermore, the overt acts committed by the named Defendants in furtherance of the WSF Coverup Enterprise's common purpose, caused injuries to Huynh's constitutional properties (i.e., the loss of Huynh's SOX claim against Walmart) through the violations of

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

Huynh's rights under the Fifth Amendment of the US Constitution. Namely, The RICO Defendants robbed Huynh's right to procedural and substantive due process and equal protection under law (class of one).

346.    Further, as a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled to general and special damages and all appropriate compensatory relief.

347.    Defendants' conduct was a substantial factor in causing that harm. The above-described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**

1

## VERIFICATION OF FIRST AMENDED COMPLAINT

2

3    I, Tri Minh Huynh, hereby verify, under penalty of perjury, as follows:

4    I am over the age of 18 years. I am Plaintiff acting Pro Se in the above-entitled action, I

5    have personal knowledge of the facts set forth in this Verified First Amended Complaint,

6    and if called upon to do so, I could and would competently testify thereto.

7    I verify under penalty of perjury under the laws of the United States that the foregoing is

8    true and correct to the best of my knowledge, information, and belief.

9
     Executed on this 6th day of April, 2022 in Bellevue, WA.

10

11           Dated: April 6, 2022                          Respectfully submitted,
12                                                         /s/ Tri Minh Huynh
                                                           Tri Minh Huynh
13                                                         4015 134th Ave SE
                                                           Bellevue, WA 98006
14                                                         Telephone: (408) 757-5516
                                                           Email: trimhuynh@outlook.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28
     .

**VERIFIED FIRST AMENDED COMPLAINT – DEMAND FOR JURY TRIAL**